39290

72

EX 1-2

## UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JUDGE SYLVIA JAMES, an
individual,

                Plaintiff,

v

HILLIARD HAMPTON, an individual and as
Mayor of the City of Inkster; THE CITY OF INKSTER,
a municipality of the State of Michigan; DAVID JONES,
an individual; DEBORAH GREEN, an individual;
PAMELA ANDERSON, an individual; PAUL FISCHER,
an individual and Executive Director of the Judicial Tenure
Commission; THE JUDICIAL TENURE COMMISSION OF THE
STATE OF MICHIGAN; VALDEMAR WASHINGTON, an
Individual,

                Defendants.

**Case: 2:12-cv-10273**
**Judge: Zatkoff, Lawrence P.**
**MJ: Whalen, R. Steven**
**Filed: 01-20-2012 At 03:41 PM**
**CMP: JUDGE SYLVIA JAMES V. HILLARD**
**HAMPTON, ET AL (KB)**

_____/

MAYER MORGANROTH (P17966)
JEFFREY B. MORGANROTH (P41670)
MORGANROTH & MORGANROTH, PLLC
Attorneys for Plaintiff
344 North Old Woodward Ave., Suite 200
Birmingham, Michigan 48009
(248) 864-4000

ELLIOTT S. HALL (P14546)
Attorneys for Plaintiff
400 Renaissance Center
Detroit, MI 48243
(313) 568-6516

_____/

## PLAINTIFF'S VERIFIED COMPLAINT,
## REQUEST FOR INJUNCTIVE RELIEF and JURY DEMAND

## PURSUANT TO 42 U.S.C. 1981, 1982, 1983, 1985 (3), 1988, THE UNITED STATES
## CONSTITUTION, FEDERAL AND MICHIGAN LAW

COMES NOW Plaintiff, Judge Sylvia James, bringing this Complaint seeking an order barring the use and disclosure of private information that was obtained in violation of Plaintiff's Fourth Amendment and Fourteenth Amendment right against unreasonable searches and seizures and in violation of federal and state law; and seeking an order compelling the return to the Plaintiff of such illegally obtained and disclosed communications.  Further, Plaintiff seeks a declaratory order that the use of the information in a pending state Judicial Tenure Commission proceeding, is a violation of the United States Constitution and federal law.

Plaintiff seeks declaratory and injunctive relief against the Defendant, Paul Fischer and the Judicial Tenure Commission, striking from the Complaint against her, all allegations in paragraphs 3-106 related to a Community Service Program ("CSP"),  its existence and the use of the funding, for the reason that the complainants authorized, audited and participated in the functions of the CSP and that they are estopped from using the CSP as a basis for a finding of judicial misconduct.

Plaintiff also seeks to have stricken paragraphs 107-128, 138-141 and 179-192, together with the companion paragraphs seeking findings of misconduct,  entitled "Banking Practices", "Attorneys Fees" and " Misrepresentations"  for the reasons respectively that Plaintiff's decisions relative to moving funding to an account controlled by the Court were made at the direction and/or with the approval of the Office of the State Court Administrator, Defendant Deborah Greene; that there is no statutory , court rule or  other prohibition against hiring and attorney for matters associated with the Court; that disagreement with the conclusions of the Examiner does not constitute a "misrepresentation" as  a matter of law  and that those allegations may not constitutionally form the basis of a finding of judicial misconduct.  Alternatively, for the

reason that the state court proceeding can not cure the violation of the Plaintiff's constitutional rights, the Plaintiff seeks a permanent injunction against that proceeding.

Plaintiff is also seeking, in the alternative, to require the Defendants to produce evidence obtained illegally through an illegal search, by several of the Defendants herein, and a finding that Plaintiff's civil rights have been and are being violated in that that she also is being denied equal protection of the law, pursuant to federal law and the United States Constitution; and a finding that she is being subjected to an administrative prosecution, which alleges among other things, violation of the criminal laws of the State of Michigan, and that said prosecution is due to her race, African-American, in violation of the United States Constitution and federal law.

## JURISDICTION AND VENUE

1.      This is a civil action for declaratory and injunctive relief, damages and attorneys' fees to the extent allowed by applicable law,   under 42 U.S.C. ' 1981,  1982, 1983, 1985(3), 1988,  the Fourth and Fourteenth Amendments of the United States Constitution, applicable federal and state law.

2.      This Court has jurisdiction over the claims arising under 42 U.S.C. ' 1983 pursuant to 28 U.S.C. " 1331 and 1343(a)(3).

3.      This Court has jurisdiction over the claims arising under the Fourth Amendment and Fourteenth Amendment pursuant to 28 U.S.C. " 1331 and 1343(a).

4.      This Court has supplemental jurisdiction over the Michigan state  law claims pursuant to 28 U.S.C. ' 1367(a).

5.      Furthermore, this Court has jurisdiction pursuant to 28 U.S.C. " 2201 and 2202 to declare the rights of the parties and to grant all further relief found necessary and proper.

6.      Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. '

3

1391(b) and (e).

## PARTIES

7.      Plaintiff SYLVIA JAMES is a United States citizen who resides in Inkster, Michigan.  She is a district court judge for the 22nd District Court ("the Court") in the City of Inkster, and has held that position for more than 23 years.

8.      Defendant HILLIARD HAMPTON is the elected mayor of the City of Inkster.

9.      Defendant DAVID JONES is an attorney doing business in Detroit, Michigan.

10.      Defendant PAMELA ANDERSON is the Court Administrator for the district court in the City of Inkster.

11.      Defendant DEBORAH GREEN is the Regional Administrator for the Supreme Court Administrator's Office for the State of Michigan.

12.      Defendant PAUL FISCHER is the Examiner for the Michigan Judicial Tenure Commission.

13.      Defendant JUDICIAL TENURE COMMISSION is the duly authorized body established under Michigan law to investigate and recommend action against judicial officers of the State of Michigan.

14.      Defendant, CITY OF INKSTER , is a municipal corporation existing under the laws of the State of Michigan.

## FACTUAL ALLEGATIONS

15.      The City of Inkster is a municipality located in the State of Michigan and the funding unit for the Court, where Plaintiff has served as the only judge for over 23 years.

4

16.    The Mayor of the City of Inkster falsely accused the Plaintiff of financial improprieties in the administration of the Court in an attempt to create negative publicity which would lead to her removal from the office of judge.

17.    For a period of several years, after the Plaintiff successfully challenged the mayor's effort to change the City Charter to a "strong mayor" form of government, the Mayor attacked the Plaintiff in televised City Council meetings, attempted to have a state legislator seek an Attorney General ruling to remove her court officer, a member of the City Council, who was perceived as an ally of the Plaintiff; attempted to change the budget of the Court from a bottom line to a line-item budget in order to control the finances of the Court; directed the City Manager to require personnel for the court to sign a city personnel manual which would have changed the conditions of their employment, refused liability coverage to Court employees, stopped paying certain court bills, attempted to exclude the Court from a new justice center to be built in Inkster and, among other things, attempted to have the Court merged under state law so that the Inkster Court would be eliminated.

18.    Upon information and belief, in 2011, the Mayor Hilliard Hampton conspired with a reporter from WXYZ, Channel 7 news, Bill Proctor, to cover the controversy between him and the Plaintiff and a series of accusatory news reports were published accusing Plaintiff of criminal acts in her position as Judge of the Court.

19.    In 2011, Mayor Hilliard Hampton wrote a letter to the citizens of Inkster accusing the Plaintiff of "fraud".

20.    At all times pertinent to this complaint, Mayor Hilliard Hampton was the duly elected Mayor of the City of Inkster and a member of the Inkster City Council.

21.     In 2010, the Inkster City Council hired Defendant, attorney David Jones, to represent them in certain matters involving the Court. After the City refused to pay certain Court bills, the Plaintiff sought the direction of Defendant, Deborah Green, Regional Administrator for the Supreme Court Administrator's Office. With Ms. Green's assent, Plaintiff took control of the finances of the District Court, to insure that bills were paid. Defendant Hampton then directed Defendant Jones to issue a Freedom of Information Act ("FOIA")request for numerous documents, most of which were in the possession of the City of Inkster,as funding unit for the Court.

22.     Defendant Jones issued a FOIA request to the Court, which is not subject to FOIA under federal or state law. Thereafter, Defendant Jones , in televised interviews and at City Council meetings, accused the Plaintiff of "embezzlement" and other criminal acts in conspiracy with the Mayor of Inkster to defame Plaintiff and to cause her removal from the bench.

23.     In early 2011, Defendant Jones filed a judicial tenure complaint against the plaintiff with the Defendant, Judicial Tenure Commission.

24.     For more than 20 years, the City of Inkster and the Plaintiff cooperated in a Community Service Program which provided an alternative sentencing mechanism for persons that came before the Court accused of criminal acts and to support local schools and community organizations. The City of Inkster approved and issued the checks. Defendant Deborah Green and other regional administrators before her, audited the Court funds, including the community service account, for over 20 years and at no time suggested the elimination of the program. At some time during 2010, Defendant Deborah Green met with Plaintiff and suggested that all of the accusations relative to the CSP funds stemmed from "politics" and "none of the money went to you".

6

25.     After the publishing of accusations by WXYZ, reporter Bill Proctor, and with no evidence of any wrongful conduct on the part of Plaintiff, the Chief Justice of the Michigan Supreme Court took an informal vote of the associate justices to remove Plaintiff as Chief Judge. Thereafter, in violation of Michigan law, he placed Plaintiff on "administrative leave" and gave her less than 3 hours to leave her office, indicating to her that this action was "not fatal" and that she would be allowed to return to her office to retrieve her personal belongings from her office. Upon information and belief, the Chief Justice then made statements to the media in which he suggested guilt on the part of the Plaintiff.

26.     Defendant Deborah Green provided a list of judges to the Chief Judge of the Michigan Supreme Court and Defendant, retired judge Valdemar Washington was selected to serve as Interim Chief Judge of the Court.

27.     Upon information and belief, the day after Plaintiff was placed on administrative leave, the Defendants Washington and Green met with the staff of the Court and told them that they were to have no contact with Plaintiff.

28.     In May of 2011, Plaintiff and her attorney met with Defendant Green and her superior at SCAO's offices to discuss the procedures associated with the administrative leave. Defendant Green was advised that the safe in the Plaintiff's office contained personal documents and that there were personal documents in the private office of the Plaintiff . Defendant Green committed that she would not allow the violation of the Plaintiff's privacy rights and that no one would open her personal safe outside of her presence.  At some point in 2011, upon information and belief, Defendant Green and Defendant Washington failed to safeguard, authorized or broke into the personal safe of the Plaintiff , without a warrant and without any notice to the Plaintiff

7

29.     At some point during 2011, Defendant Green filed a complaint for judicial misconduct with Defendants Fischer and the Judicial Tenure Commission,

30.     On June 14, 2011, Defendants Green and Washington acted as investigators for the Defendants Fischer and the Judicial Tenure Commission, and at their direction, Court staff read and provided those documents to Defendant Fischer and his office.

31.     For more than 9 months during 2011 and 2012, Plaintiff was denied access to her personal and Court documents, including exculpatory documents that were in her office when she was placed on administrative leave. Court staff, once willing to assist in her defense, were told not to talk to Plaintiff and stopped returning calls from counsel for Plaintiff. However, Court staff were interviewed on Court premises multiple times by Defendant Fischer and his staff.

32.     During 2011, Plaintiff, by and through her counsel, submitted FOIA requests to Defendant Jones , which were not answered. Records sought by Plaintiff included bills that he submitted to the City of Inkster, which bills have never been produced. Upon information and belief, Defendant Jones cooperated with Defendants Fischer, Green and Washington in the investigation of Plaintiff.

33.     During 2011, Defendant Fischer had unfettered access to Court employees and interviewed them on numerous occasions. Upon information and belief, Defendant Pamela Anderson participated in a conspiracy to remove Plaintiff from her office by providing false information to Defendant Fischer in exchange for a promise from Defendant Green that she could "keep her license" if she cooperated in the investigation of Plaintiff.

34.     Upon information and belief, Defendant Anderson removed and/or destroyed exculpatory evidence, including that found in the Plaintiff's private safe and office, and altered Court documents to create the appearance of wrongful conduct on the part of Plaintiff.

8

35.     At some point during 2011, the Plaintiff was given one hour to come to the Court and supervised by Defendants Green and Washington, was allowed with her counsel to remove whatever items they could locate and carry.  It was at this time that the Plaintiff learned that the locks to her personal safe had been dismantled and that many of the documents that would be exculpatory were missing from her office and safe.

36.     During 2011, Defendant Fischer and the Judicial Tenure Commission authorized and filed Requests for Investigation, a "28 day letter" and a Complaint for judicial misconduct against the Plaintiff.  Despite the findings of a SCAO audit that Defendant Green authorized, that no funds were missing, Defendant Fischer and the Judicial Tenure Commission included in their official public documents, accusations of "embezzlement" and other accusations of violation of the criminal laws of the State of Michigan and the federal law.

37.     In late December of  2011, the Defendant Judicial Tenure Commission, on order of the Michigan Supreme Court, expedited the hearing on the complaint against the Plaintiff, which resulted in her being given the "evidence" against her on January 5, 2012 and thus, only 18 days to prepare for a trial hearing which is to start on January 23rd, 2012.  The "evidence" consisted of 7 volumes of over 2000 documents and a witness list of more than 30 witnesses.  In violation of Michigan Court Rules, which contemplate the exchange of evidence including, witness statements, Defendant Fischer took the position that he was not required to turn over statements of witnesses unless they were in writing , and since he had taken no written statements, he provided no information as to what the witnesses would say.

38.     In December 2011, the "Master", retired Judge Ann Mattson was appointed.  The Master is paid by Defendant Fischer's office.  On January 10, 2012, in a pre-trial hearing, the Master made rulings on substantive and procedural motions and, as a result of those rulings,

Plaintiff will not be allowed to present her federal constitutional claims during the state administrative proceeding. Plaintiff was denied due process as it related to information illegally obtained through a warrantless search of her office. The Master further declined to require Defendant Fischer to provide any documentation to Plaintiff, despite evidence that Fischer had provided illegible documents and that written requests and affidavits from Defendant Green do exist but have not been provided to Plaintiff, per the Michigan Court Rules.

39.     Defendant Fischer, the Examiner, has an obligation to provide the same due process rights to all judges that he investigates and to apply an unbiased standard relative to the issuance of Complaints against all such judges.  In violation of Michigan law and without any factual basis for so doing, Defendant Fischer: accused counsel for Plaintiff of doing personal work for the Plaintiff and being paid with public funds; attempted to have counsel for Plaintiff disqualified; subjected Plaintiff to public humiliation by including unproveable allegations of embezzlement and other criminal acts, which he knew or should have known, could not be proved; applied discretion to issuance of a complaint in this matter which discretion was exercised in bad faith and solely for the reason that Plaintiff is an African American woman, as is clear from his refusal to prosecute complaints against white male and female judges where the allegations were factually accurate and far more serious than those filed against Plaintiff.  See Exhibit 2, Affidavit of Phil Thomas.

40.     If the Defendant's case against the Plaintiff begins on January 23, 2012 as scheduled, Plaintiff will be required to proceed without any evidence as to the Defendant Examiner's case against her and thus, will be deprived further of the due process of the law in violation of the United States and Michigan Constitutions,   and the abstention doctrine will be invoked to prevent her from obtaining relief.  Moreover, the majority of the allegations of the

JTC complaint are based upon the fruits of the illegal search and are also not a proper subject of a judicial misconduct prosecution, in that the complainants are estopped from alleging misconduct due to their own involvement and authorization of the underlying acts.

## CLAIMS FOR RELIEF

I.    **Count I: Violations of the due process provisions of the United States Constitution**

41.    Plaintiffs restate and reallege each and every allegation set forth in all previous paragraphs and incorporates them herein by reference.

42.    The Fourth and Fourteenth Amendments of the United States Constitution protects citizens from unreasonable search and seizure by government personnel.  Persons lawfully on the premises of offices are entitled to Fourth Amendment protections.  Plaintiff had a reasonable expectation of privacy in the personal office that she occupied for 23 years as well as in the contents of a  personal safe, paid for with her own funds and used exclusively by her for the keeping of records personal and exculpatory.

43.    Warrantless searches and seizures are presumptively unreasonable under the Fourth Amendment. *United States v. Ross*, 456 U.S. 798, 824-25 (1982); *Katz v. United States*, 389 U.S. 347, 357 (1967).

44.    The Supreme Court has recognized that where a party has a reasonable expectation of privacy attaching to records, the Fourth Amendment requires a showing of probable cause before obtaining such records.  *United States v. Miller*, 425 U.S. 435, 444 (1976).The Supreme Court has recognized that a person has a reasonable expectation of privacy in his office premises and that an aggrieved individual has standing to object to an unreasonable search and seizure of the office when the records are offered in  evidence against him. *G. M. Leasing Corp. v. U.S.* , 429 U.S. 338 (1977)

45.     Because a person has a reasonable expectation of privacy as to the contents of his office, a governmental entity can obtain the contents of an office only by a showing of probable cause and the issuance of a search warrant.

46.     As of the date after Plaintiff was placed on judicial administrative leave, the premises of her private office were within the total control of the Defendants Washington, Green and Fischer.  There were other empty offices in the Court's chambers and no need to invade the private office of the Plaintiff.  If, as the Defendant Fischer has said, he had reason to believe that the contents of the Plaintiff's office contained proof of judicial misconduct or criminal acts, he was required to obtain a warrant to search the office and to open her personal safe, which was secured by two locks.

47.     The search of the contents of the private office and the personal safe of the Plaintiff was unconstitutional under the Fourth Amendment to the United States Constitution and as made applicable to the states by the Fourteenth Amendment.  42 U.S.C. ' 1983

**II.     Count II: Defendants Violated Plaintiffs Fourth Amendment Rights and Are Liable Pursuant to 42 U.S.C. ' 1983**

48.     Plaintiffs restate and reallege each and every allegation set forth in all previous paragraphs and incorporates them herein by reference.

49.     Defendant, in violation of the Michigan Court Rules and federal law, searched the Plaintiff's private office and broke into her personal safe, without the issuance of a subpoena, in violation of Michigan law,  and without obtaining a search warrant or demonstrating probable cause, in violation of the Fourth Amendment, made applicable to the states by the Fourteenth Amendment, and 42 U.S.C. ' 1983.

**III.    Count III: Defendants Violated the provisions of the Michigan Court Rules  and 42 U.S.C. ' 1983.**

50.    Plaintiffs restate and reallege each and every allegation set forth in all previous paragraphs and incorporates them herein by reference.

51.    Defendant Fischer is governed in his investigation by M.C.R. 9.208 which provides that he must produce to Plaintiff discovery in the form of "…all statements and affidavits given by those persons, and any material in their possession that they intend to introduce as evidence at the hearing, ….".  M.C.R. does not require that the statements must be "written" and the clear intent of the court rule is to provide the respondent , Plaintiff herein, with minimal due process, notice of the witnesses who will give evidence against her and the facts as specified in their interviews with the Defendant Fischer.  Defendant Washington, having directed the witnesses not to talk to the Plaintiff, created an exclusive opportunity for Defendant Fischer to interview and obtain evidence from the only witnesses who could testify as to the exculpatory evidence on behalf of the respondent, Plaintiff herein.

52.    Defendant Green, who induced the false testimony of former Court Administrator Pamela Anderson by promising her immunity if she would testify against the Plaintiff, also participated in the conspiracy to violate the Plaintiff's due process rights pursuant to federal and Michigan law. Defendant Green did not have authority to confer immunity on Defendant Anderson.

53.    Defendants Fischer, Judicial Tenure Commission and Green are subject to declaratory relief pursuant to 42 U.S.C. ' 1983.

**IV.    Count IV: Defendants Judicial Tenure Commission and Paul Fischer have violated the Plaintiff's right to equal protection of the law by prosecuting a complaint to remove her from the bench under circumstances that they routinely decline to pursue with matters involving respondents who are not African-American.**

54.    Plaintiffs restate and reallege each and every allegation set forth in all previous paragraphs and incorporates them herein by reference.

55.    Defendants Fischer and the Judicial Tenure Commission, pursuant to MCR 9.200, are obligated to protect the due process rights of judges and are governed by the Michigan Court Rules.  The court rules indicate that "An erroneous decision by a judge made in good faith and with due diligence is not judicial misconduct".  MCR 9.203 (B)  To the extent there are no court rules specifically applicable to the tenure proceedings, the General Court Rules apply to the proceedings.

56.    In 2008, Defendants Fischer and the Judicial Tenure Commission declined to issue a complaint against a white male judge in Traverse City: In that case, Judge David Stowe engaged in an improper relationship with his employee, while he administered child custody matters in her divorce case.  Stowe fired his court administrator, a whistleblower who reported Stowe's actions, and paid him $69,000 from court funds.  Defendant Fischer, in that case, said that "Occasionally, a judge's conduct falls short of the ideal judicial officer , yet does not warrant commencement of formal discipline proceedings" and the commission took "corrective action" short of filing of a complaint.

57.    In the matter of white male Judge Mark Somers, two juries had awarded more than one million dollars to court employees who said the judge dismissed them in violation of state law.  Judge Somers had questioned defendants about their church attendance, and retaliated when a court employee complained.  He terminated an employee for living with her fiancé  and a jury awarded her $732,000 which had to be paid by the funding unit or insurance company.

14

58.     In the matter of Judge James Kandrevas, also a white male, the judge invoked the Fifth Amendment 222 times when he was deposed, in a whistleblower suit, by a court clerk he had fired.  The judge settled the case for $300,000.

59.     In the matter of Judge Marc Baron and Judge Kimberly Small, a jury awarded 3.1 million to a longtime clerk who they conspired to fire for allegedly embarrassing the wife of Judge Baron.  In this case, neither judge was removed.

60.     The Complaint filed by Defendants Fischer and the Judicial Tenure Commission, in Plaintiff's tenure case, contains 11 issues, described in 190 paragraphs.   (Exhibit 1) Paragraphs 1-106 relate exclusively to expenditures from a Community Service Program fund ("CSP") for community and other expenses of the Court, including travel and mileage reimbursement.

61.     The CSP was initiated more than 20 years ago and has  been the subject of audit by the Defendant Green during her tenure as the Regional Administrator for the Supreme Court Administrator's Office.   The Defendants Mayor Hilliard Hampton and the City of Inkster approved the expenditure of funds from the CSP for such things as providing assistance to seniors in the City,etc.   Defendant Green was invited to events sponsored by the CSP and conducted audits which included the CSP.

62.     The Sixth Circuit Court of Appeals has adopted a four element definition that incorporates the fairness aspect of the defense of "entrapment by estoppel".  Essentially, this is a constitutional or due process defense which has been used in cases involving contempt of a state legislative commission. *Raley v. Ohio*, 360 U.S. 423 (1959) . In *Raley*, the Comnmission chair had erroneously led the defendants to believe that they had a right to rely on their privilege against self-incrimination.   The U.S. Supreme Court reversed their convictions, finding that

permitting the convictions to stand would sanction "the most indefensible sort of entrapment by the state, convicting a citizen for exercising a privilege which the they clearly had told him was available to him." The four elements are :

-an agent of the government announced that the charged act was legal

-the defendant relied upon the announcement

-the defendant's reliance was reasonable

-given the defendant's reliance, a conviction would be unfair

63.     In this case, Defendant Green and her predecessors participated in the management and approval of the use of the CSP for more than 20 years. Contrary to her practice in matters in- volving other judges, Defendant Green did not issue a directive to discontinue the CSP and is now estopped from using it as a basis for a complaint of judicial misconduct.

64.     Defendants Green, Fischer and the Judicial Tenure Commission are liable for injunctive and declaratory relief pursuant to 42 U.S.C. ' 1983.

## X.     Count X: Plaintiffs Action for Replevin As to Defendants Fischer, Judicial Tenure Commission, Green and Washington,  Pursuant to M.C.L.A. 600.2920

65.     Plaintiffs restate and reallege each and every allegation set forth in all previous paragraphs and incorporates them herein by reference.

66.     Under M.C.L.A. 600.2920, a civil action may be brought to recover possession of any goods or chattels which have been unlawfully taken or unlawfully detained.  The person bringing such action must at the time the action is commenced,... have a right to possession of the goods or chattels taken or detained.@[1]  M.C.L.A. 600.2920(1)[c].  Furthermore, a  person

---

[1]     Such a state action is allowed by Rule 64 of the Federal Rules of Civil Procedure, which states that A[a]t the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment.@  Rule 64(b) specifically includes the action of replevin.

who holds books or papers pertaining to an office and who is not the person in that office shall surrender them to the person entitled to that office.  The person entitled to possession of the books and papers may bring action to recover their possessions.@  M.C.L.A. 600.2920(2).

67.    In this case, the records from the Plaintiff's private office and safe were obtained in violation of the Fourth Amendment, and tortious intrusion into the Plaintiff's private space. Furthermore, Defendants have no right to continued possession of these records, and thus the records are being unlawfully detained and used against Plaintiff in a judicial tenure prosecution.

68.    The Fourth Amendment recognizes the Plaintiff's right of possession as to the contents of her office and safe.  The Fourth Amendment views the records as included in the right of the people to be secure in their persons, houses, papers, and effects....@  U.S. Const. amend. IV.

69.    Therefore, because the Plaintiff  has a right to possession of the contents of her safe and her private office and because the Defendants have wrongfully taken these records and continue to wrongfully detain these records, Plaintiff  has a right of action in replevin for return of these records pursuant to M.C.L.A. 600.2920.

**XI.    Count XI - The  Defendant Hilliard Hampton is liable to Plaintiff for defamation and for his involvement in the creation of and participation in a political conspiracy to remove her from her office, pursuant to Michigan law and to 42 U.S.C. 1983.**

The negative publicity underlying the improper removal of Plaintiff by placing her on administrative leave was initiated by Inkster Mayor, Hilliard Hampton, who, in retaliation for her opposition to his effort to revise the City Charter to create a "strong mayor" form of government, directed others to do acts in furtherance of his conspiracy to deny Plaintiff her civil rights as protected by the United States Constitution, federal and state law.

Both Plaintiff and Defendant Hampton are public figures within the meaning of the Law as it relates to defamation. Defendant Hampton, with actual malice, sought to deprive Plaintiff of her reputation and his acts personally and through others on his behalf, led to the removal of Plaintiff from her office.

## DEMANDS FOR RELIEF

WHEREFORE, Plaintiff, Sylvia James, demands the following relief:

1. Issue a Temporary Restraining Order to postpone the Judicial Tenure Commission from proceeding on January 23, 2012, until further order of this Honorable Court, to allow hearing on the due process and constitutional violations and to determine when, if ever, the proceedings should be dismissed.

2. If this Honorable Court decides that the proceedings of the Judicial Tenure Commission should continue, that an order issue requiring the Defendants to perform the required acts of providing exculpatory evidence and factual data from interviews of witnesses contained in the work product of the Defendant Fischer, while protecting his legal strategies and mental sense impressions , in order to afford the Plaintiff a fair hearing on the merits: In the alternative, if this Honorable Court decides that the proceedings of the Judicial Tenure Commission have been so tainted by the unconstitutional conspiracy of the Defendants to deprive Plaintiff of her civil rights under federal and state law, order a permanent injunction against the current proceedings of the Judicial Tenure Commission.

3. Declare that the Plaintiff had a reasonable expectation of privacy in the contents of her personal office and her private safe, and that the Defendants obtaining the contents of the Plaintiff's private office and breaking into her personal safe, without a warrant, is a violation of the Fourth Amendment, as made applicable to the states by the Fourteenth Amendment.

4. Declare that all illegally obtained evidence is inadmissible in any judicial tenure or other proceeding initiated against the Plaintiff.

5. Enjoin the Defendants and any individual or entity with knowledge of the injunction from disclosing the contents of the unlawfully obtained documents and records.

6. Issue a writ of replevin to recover the records of the confidential communications, in which the Plaintiff has a right to possession, that were unlawfully taken and are being unlawfully detained by the Defendants.

7.    Issue a mandatory injunction ordering the Defendants and any individual or entity with knowledge of the injunction to return any and all confidential communications, and any copies thereof, that were obtained or disclosed in violation of the Plaintiff's constitutional, federal, and state rights.

8.    Declare that all witnesses who were present at any meeting or were otherwise told by the defendants not to communicate with Plaintiff are barred from testifying at any proceeding of the Judicial Tenure Commission or any other entity initiated against the Plaintiff, whether administrative, civil or criminal.

9.    Award damages, attorneys' fees and costs against the Defendants and in favor of Plaintiff in an amount in excess of $75,000 and to the extent permitted by federal and state law.

Respectfully submitted,

MORGANROTH & MORGANROTH, PLLC

By: _____
MAYER MORGANROTH (P17966)
JEFFREY B. MORGANROTH (P41670)
Attorneys for Plaintiff

By: _____
ELLIOTT S. HALL (P14546)
Attorneys for Plaintiff

Dated:  January 20, 2012

I DECLARE THAT THE ABOVE STATEMENTS ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____
SYLVIA JAMES
PLAINTIFF

Subscribed and sworn to before
me this 20th day of January, 2012

_____
Notary Public

MARIA Y REED
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Dec 8, 2013
ACTING IN COUNTY OF  Oakland

19



# STATE OF MICHIGAN
## BEFORE THE MICHIGAN JUDICIAL TENURE COMMISSION

COMPLAINT AGAINST:

Hon. Sylvia A. James
22nd District Court
27331 S. River Park Drive
Inkster, Michigan 48141

**Formal Complaint No. 88**

_____/

## COMPLAINT

The Michigan Judicial Tenure Commission ("JTC") files this complaint against Honorable Sylvia A. James ("Respondent"), judge of the 22nd District Court, Inkster, Michigan. This action is taken pursuant to the authority of the Commission under Article 6, Section 30 of the Michigan Constitution of 1963, as amended, and MCR 9.200 *et seq*. The filing of this Complaint has been authorized and directed by resolution of the Commission.

1. Respondent is, and at all material times was, a judge of the 22nd District Court in Inkster, Michigan.

2. As a judge, Respondent is subject to all the duties and responsibilities imposed on her by the Michigan Supreme Court, and is subject to the standards for discipline set forth in MCR 9.104 and MCR 9.205.

## COUNT I
## FINANCIAL IMPROPRIETIES

### A. MISAPPROPRIATION OF COMMUNITY SERVICE FUNDS

3.   The Community Service Program, (CSP) was implemented as an alternative sentencing method, designed to provide constructive punishment for non-violent offenders, reduce jail overcrowding and serve the needs of the City of Inkster.

4.   The CSP is funded through fees and costs imposed on individuals convicted of non-violent crimes and ordered to perform community service as part of their sentence.

5.   The CSP funds are subject to MCL 775.22, MCL 780.766a, MCL 600.8379 and MCL 600.4803.

6.   MCL 775.22 and MCL 780.766a provide that of all money collected from an individual convicted of a criminal offense and subject to any combination of fines, costs, restitution, assessments, probation or parole supervision fees, or other payments, the first 50% shall be applied to payment of victim restitution.

7.   MCL 775.22 and MCL 780.766a further state that the balance of the money collected shall be applied to payment of "fines, costs, supervision fees, and other assessments or payments".

8. MCL 600.8379 and MCL 600.4803 provide that costs imposed for the violation of a penal law of this state, or ordered in a civil infraction action for the violation of this state, as well as any late penalties, "shall" be paid to the treasurer of the funding authority.

9. The CSP funds are subject to MCL 129.11, which provides that "all moneys which come into the hands of any officer of any county or township or any other municipal or public corporation within the state of Michigan, pursuant to any provision of law authorizing such officer to collect or receive the same shall be denominated as public moneys".

10. Respondent directed her staff that any payments received from defendants sentenced to participate in community service must be applied to the CPS oversight fees first. This caused the CSP account to have an inflated balance at the expense of the funds that should have been allocated to restitution and/or transmitted to the funding authority. This was in violation of MCL 775.22 and MCL 780.766a.

11. Based on Respondent's instruction to her staff, in August of 2010, $7,366.00 was deposited into the CSP account. After Respondent's directive was rescinded by the interim judge Valdemar Washington, only $430.00 was properly credited to the CSP account in August of 2011.

3

12.  Respondent failed to prepare a budget for the CSP as required by MCL 600.8271 and failed to report the CSP account balance at the end of each fiscal year, to the funding authority for its inclusion in the annual budget.

13.  In 2009, Respondent disbursed $2,244.84 more than the revenue deposited in the CSP account for that year.

14.  In 2010, Respondent disbursed $4,515.00 more than the revenue deposited in the CSP account for that year.

15.  Beginning in 2006/2007, Respondent established a separate checking account for the CSP and became the sole decision-making authority of how the funds were to be appropriated.

16.  Between 2006 and 2011, Respondent made the following, illegal and/or improper disbursements of the CSP funds, contrary to the Code of Judicial Conduct, MCL 750.174, MCL 750.175, MCL 750.218, Michigan court rules, and Michigan Supreme Court's administrative orders:

   a.  **Stipends**

17.  In 2008, Respondent appointed her niece, Nicole James, as a co-director of the CSP.  Respondent authorized the payment of "stipends" to Nicole James for her duties on behalf of the CSP.  At the time of her appointment, Nicole James was also a deputy court clerk at the 22nd District Court, and was compensated for that position by the funding authority.

4

18. In 2008, Respondent appointed Audray Hicks as a co-director of the CSP. Respondent authorized the payment of "stipends" to Audray Hicks for her duties on behalf of the CSP. At the time of her appointment, Audray Hicks was also a deputy clerk at the 22nd District Court, and was compensated for that position by the funding authority.

19. During the 2009 and 2010 fiscal years, Respondent authorized Nicole James and Audray Hicks to receive approximately $15,000.00 each, for their duties as co-directors of the CSP.

20. On November 30, 2010, Respondent's niece, Nicole James, resigned from her position as a co-director of the CSP.

21. Respondent continued to pay "stipend" payments to Nicole James, for the months of December of 2010 as well as January, February and March of 2011. Respondent's conduct is in violation of the embezzlement, embezzlement by public official, and obtaining money under false pretenses provisions contained in MCL 750.174, MCL 750.175 and MCL 750.218.

22. Respondent authorized the payment of "stipends" from the CSP account to various community service work supervisors without adequate documentation of the hours devoted and work performed. The authorized payments were excessive in view of the duties allegedly preformed.

23. Respondent failed to withhold, or pay, any income tax on the "stipend" compensation of Nicole James, Audray Hicks and the Community Service Work Supervisors, in violation of MCL 206.351 et. seq.

24. By appointing her niece as a co-director of the CSP in 2008, Respondent violated the Michigan Supreme Court's "anti-nepotism" rule, embodied in Administrative Order 1996-11, which went into effect on December 1, 1996.

25. By appointing Nicole James and Audray Hicks as co-directors of the CSP and authorizing "stipend" payments, Respondent supplemented Ms. James' and Ms. Hicks' existing wage scales.  As such, Respondent violated the Michigan Supreme Court's Administrative Order 1998-5, which prohibits line-item transfers to create new personnel positions or to supplement existing wage scales.

26. Respondent violated the Michigan Supreme Court's Administrative Order 1998-5 by failing to notify the funding authority of the line-item transfers she made each time she supplemented Ms. James and Ms. Hicks' existing wage scales.

   b.    **Charitable, Educational and Fraternal Contributions**

27. On March 31, 2009, Respondent authorized check no. 1259, in the amount of $500.00, from the CSP account to the Basketball Legends of Inkster organization.

6

28. On June 24, 2010, Respondent authorized check no. 1394, in the amount of $300.00, from the CSP account to the Basketball Legends of Inkster organization.

29. The Basketball Legends of Inkster organization has no relationship to the purpose and objectives of the CSP.

30. On April 14, 2008, Respondent authorized check no. 1168 in the amount of $100.00, from the CSP account, to the Khamalaw H. White Foundation as payment for an advertisement.

31. On April 16, 2009, Respondent authorized check no. 1267, in the amount of $400.00 from the CSP account for ten dinners and a brochure advertisement for the "Roast and Toast of Manuel W. Wilson" celebration. Manuel Wilson is the Chief of Operations of the Inkster Public Schools.

32. The Khamalaw H. White Foundation is an organization dedicated to finding ways for students to attend college. It has no relationship to the purpose or objectives of the CSP.

33. Respondent had previously served on the Board of the Khamalaw H. White Foundation.

34. On April 14, 2008, Respondent authorized check no. 1169, in the amount of $150.00, from the CSP account to the Booker & Flora Dozier Memorial Scholarship organization, as payment for an advertisement.

35.     On May 22, 2009, Respondent authorized check no. 1280, in the amount of $150.00, from the CSP account to the Booker & Flora Dozier Memorial Scholarship organization, as payment for an advertisement.

36.     On June 11, 2010, Respondent authorized check no. 1388, in the amount of $200.00, from the CSP account to the Booker & Flora Dozier Memorial Scholarship organization, as payment for an advertisement.

37.     The Booker & Flora Dozier Memorial Scholarship organization provides financial assistance to local students.  The Booker & Flora Dozier Memorial Scholarship organization has no relationship to the purpose and objectives of the CSP.

38.     Respondent had served as a scholarship committee member of the Booker & Flora Dozier Memorial Scholarship organization and voted on which applicants should receive scholarships.  Respondent's sister is the president of the Booker & Flora Dozier Memorial Scholarship organization.

39.     On September 24, 2009, Respondent authorized check no. 1313, in the amount of $200.00, from the CSP account, to the Michigan Municipal League, as payment for an advertisement in a brochure at one of the League's events.

40.    The Michigan Municipal League is an organization dedicated to supporting local government leadership and development.  The organization has no relationship to the purpose and objectives of the CSP.

41.    On November 26, 2007, Respondent authorized check no. 1148, in the amount of $100.00, from the CSP account, to the Inkster Goodfellows organization for an advertisement at one of their events.

42.    On September 30, 2008, Respondent authorized check no. 1225, in the amount of $100.00, from the CSP account to the Inkster Goodfellows for an advertisement at one of the organization's events.

43.    On September 30, 2009, Respondent authorized check no. 1315, in the amount of $100.00, from the CSP account, to the Inkster Goodfellows for an advertisement at one of the organization's events.

44.    On September 29, 2010, Respondent authorized check no. 2308, in the amount of $100.00, from the CSP account, to the Inkster Goodfellows for an advertisement at one of the organization's events.

45.    The Goodfellows organization has no relationship to the functions and objectives of the CSP.

46.    On July 9, 2010, Respondent authorized check no. 1401, in the amount of $200.00, from the CSP account to the Inkster Summer Music Festival, for a brochure advertisement. The Inkster Summer Music Festival has no

9

relationship to the purpose and objectives of the Community Service Program of the 22nd District Court.

47.   On September 4, 2007, Respondent authorized check no. 1140, in the amount of $100.00, from the CSP account to the Inkster Police Auxiliary, as a donation to the Auxiliary's annual picnic.

48.   On October 16, 2007, Respondent authorized check no. 1145, in the amount of $2500.00, from the CSP account, to the Inkster Police Auxiliary, for new equipment.

49.   On June 8, 2008, Respondent authorized check no. 1193, in the amount of $1,000.00, from the CSP account, to the Inkster Police Auxiliary, for training and equipment.

50.   On September 8, 2009, Respondent authorized check no. 1307, in the amount of $700.00, from the CSP account to the Inkster Police Auxiliary for training and equipment.

51.   The Inkster Police Auxiliary had been utilized by Respondent to provide occasional security at the 22nd District Court for absent court officers.  The organization has no relationship to the purpose and objectives of the CSP.

52.   On July 17, 2009, Respondent authorized check no. 1298, in the amount of $90.00, from the CSP account, to the Inkster High School Class of 1969, as payment for an advertisement at the re-union of the Inkster High School

Class of 1969.  The re-union of Inkster Class of 1969 had no relationship to the purpose and objectives of the CSP.

53.   Respondent and members of her family attended, and graduated from, Inkster High School.  Respondent's sister was a member of the Inkster Class of 1969.

54.   On November 23, 2009, Respondent authorized check no. 1324, in the amount of $115.00, from the CSP account to the Delta Sigma Theta Sorority, Inkster Alumnae, as payment for a full-page advertisement in a souvenir booklet published for the 50th Anniversary celebration of this organization.  This sorority has no relationship to the function and objectives of the CSP.

55.   Respondent is a lifetime member of the Delta Sigma Theta Sorority.

56.   On March 8, 2010, Respondent authorized check no. 1355, in the amount of $135.00, from the CSP account to the Eta Iota Omega, Chapter Alpha Kappa Alpha Sorority, for an advertisement which appeared at one of the functions of the organization.  This sorority has no relationship to the function and objectives of the CSP.

57.   On September 28, 2010, Respondent authorized check no. 2310, in the amount of $100.00, from the CSP account to the Inkster High School Class of 1970 Reunion, Loretta Walker, for an advertisement which appeared in a

11

brochure prepared for the re-union event. The Inkster High School Class of 1970 reunion had no relationship to the purpose of objectives of the CSP.

58.   Loretta Walker was the treasurer of the "Inkster High School Class of 1970" reunion event. Loretta Walker is also Respondent's sister.

59.   On January 8, 2010, Respondent authorized check no. 1337, in the amount of $400.00, from the CSP account, to the Inkster High School for the junior varsity cheerleading uniforms. The Inkster High School cheerleading team has no relationship to the purpose and objectives of the CSP.

60.   On July 8, 2008, Respondent authorized check no. 1204, in the amount of $1000.00 from the CSP account to the Inkster Public Schools as a contribution to their European Trip Fund. The Inkster High School's European Trip has no relationship to the purpose and objectives of the CSP.

61.   Between April and July of 2008, Respondent issued seven checks to various businesses, organizations and individuals, including herself, as payments for various articles and/or services for the 2008 Law Day event. These are as follows:

   a.   On April 15, 2008, Respondent authorized check no. 1171, in the amount of $73.75, from the CSP account, to the Written Word, as payment for "Law Day Flyers".

b.    On April 30, 2008, Respondent authorized check no. 1174, in the amount of $103.35, from the CSP account to the Golden Feather, as payment for refreshments for the 2008 Law Day event.

c.    On May 2, 2008, Respondent authorized check no. 1177, in the amount of $100.00, from the CSP account, to Jessie Shelby, as payment for punch for the 2008 Law Day event.

d.    On May 2, 2008, Respondent authorized check no. 1178, in the amount of $100.00, from the CSP account to Loretta Walker, as payment for cakes to be served at the 2008 Law Day event.  Loretta Walker is Respondent's sister.

e.    On May 2, 2008, Respondent authorized check no. 1179, in the amount of $339.70, to herself, as payment for refreshments for the 2008 Law Day event.

f.    On June 9, 2008, Respondent authorized check no. 1188, in the amount of $191.00, from the CSP account, to Anthony Jones, as payment for an advertisement and videos of the 2008 Law Day event.

g.    On July 3, 2008, Respondent authorized check no. 1203, in the amount of $225.00, from the CSP account, to Fatima's Flower Boutique, as payment for flowers for the 2008 Law Day event.

62.    Between May 15, 2009 and June 22, 2009, Respondent authorized four checks to various businesses, organizations and individuals, as payments for various articles and/or services for the 2009 Law Day event. These are as follows:

  a.    On May 15, 2009, Respondent authorized check no. 1274, in the amount of $150.00, from the CSP account, to Kenneth Burney, as payment for a banner, to be used at the 2009 Law Day event.

  b.    On May 20, 2009, Respondent authorized check no. 1277, in the amount of $500.00, from the CSP account, to Stardust Catering, as payment for the 2009 Law Day luncheon.

  c.    On June 3, 2009, Respondent authorized check no. 1287, in the amount of $19.50, from the CSP account, to the Associated Newspapers, as payment for 26 newspapers containing an article regarding the 2009 Law Day event.

  d.    On June 22, 2009, Respondent authorized check no. 1289, in the amount of $100.00, to the Real Love Business Center, as payment for programs used at the 2009 Law Day event.

63.    Between April 22, 2010 and June 11, 2010, Respondent authorized five checks to various businesses, organizations and individuals, as payments for

14

various articles, and/or services for the 2010 Law Day event.  These are as follows:

a.    On April 22, 2010, Respondent authorized check no. 1366, in the amount of $25.00, from the CSP account, to the Real Love Business Center, as payment for brochures for the 2010 Law Day event.

b.    On May 5, 2010, Respondent authorized check no. 1375, in the amount of $100.00, from the CSP account, to Delilah Darden, as the grand prize winner of the 2010 Law Day essay contest.

c.    On May 5, 2010, Respondent authorized check no. 1376, in the amount of $657.50, from the CSP account, to Stardust Catering, for the 2010 Law Day luncheon.

d.    On May 10, 2010, Respondent authorized check no. 1377, in the amount of $45.00, from the CSP account, to the Real Love Business Center for printing the Law Day, 2010, brochures.

e.    On June 11, 2010, Respondent authorized check no. 1387, in the amount of $180.00, from the CSP account, to Dawson Photo Studios as payment for photographs of the 2010 Law Day event and planning committee.  These photographs were published in the Detroit Legal News as well as the Inkster local newspaper.  A separate photograph

was provided to each Law Day Committee member.   Respondent appeared in each of the photographs.

64.   Between March 4, 2011 and March 18, 2011, Respondent authorized three checks to various businesses and individuals as payments for various articles and/or services for the 2011 Law Day event. These are as follows:

a.   On March 4, 2011, Respondent authorized check no. 2354, in the amount of $43.98, from the CSP account to Kevin Dokes, as reimbursement for the 2011 Law Day refreshments.

b.   On March 11, 2011, Respondent authorized check no. 2358, in the amount of $200.00, from the CSP account, to Dawson Photo Studios, as payment for Law Day, 2011, photographs.

c.   On March 18, 2011, Respondent authorized check no. 2359, in the amount of $200.00, from the CSP account, to the Real Love Business Center, as payment for the 2011 Law Day brochures.

65.   Law Day is an annual, one-day, educational event for Inkster High School students and Inkster citizens.   It has no relationship to the Community Service Program's function and objectives.

66.   On September 24, 2009, Respondent authorized check no. 1312, in the amount of $100.00, to the Smith Chapel African Methodist Episcopal Church, as payment for an advertisement in a souvenir journal for the

church's eighty-fifth anniversary banquet. This religious organization has no relationship to the CSP's purpose and objective.

67. On August 6, 2010, Respondent authorized check no. 1410, in the amount of $300.00, from the CSP account, to the Face to Face International Church Fellowship, as payment for an advertisement that appeared in a brochure at one of the church's events. This religious organization has no relationship to the purpose and objectives of the CSP.

68. Respondent issued three checks from the CSP account, to various individuals, including her niece, Nicole James, as payments and/or reimbursements for expenses associated with the 2009 Memorial Day Parade float. These checks are as follows:

    a.    On May 15, 2009, Respondent authorized check no. 1275, in the amount of $500.00, to Kenneth Burney, for a Memorial Day float.

    b.    On May 26, 2009, Respondent authorized check no. 1282, in the amount of $100.00, to Kenneth Burney, for a Memorial Day float banner.

    c.    On May 22, 2009, Respondent authorized check no. 1279, in the amount of $100.00, to her niece, Nicole James, as reimbursement for "miscellaneous" expenses associated with the 2009 Memorial Day parade.

69. The 2009 Memorial Day parade float consisted of a banner of an "eagle", stapled to a 4 by 8 foot piece of plywood, positioned upright inside the CSP trailer, and pulled by the CSP van, which prominently bore Respondent's name on both of its sides.

70. Respondent failed to require that any documentation be provided in support of the above expenses listed in paragraph 68 (a) and 68 (c), before authorizing said checks.

71. In May of 2009, Respondent authorized two checks to HDR Embroidery, for shirts to be worn by the CSP employees during the 2009 Memorial Day Parade as well as during the meetings of the Tax Increment Finance Authority (TIFA), where Respondent advocated the court's need for a new justice center. These checks are as follows:

   a. On May 20, 2009, Respondent authorized check no. 1276, in the amount of $161.00, from the CSP account, to HDR Embroidery, as partial payment for the shirts.

   b. On May 21, 2009, Respondent authorized check no. 1278, in the amount of $161.00, from the CSP account to HDR Embroidery for the balance on the cost of the shirts.

72. In June of 2010, Respondent issued two checks to HDR Embroidery for shirts to be worn by the Community Service Program employees during the

2010 Memorial Day Parade. The shirts were also to be worn during the TIFA meetings where Respondent advocated the court's need for a new justice center. These checks were as follows:

a. On June 18, 2010, Respondent authorized check no. 1389, in the amount of $150.00, from the CSP account, to HDR Embroidery as down payment for the shirts.

b. On June 22, 2010, Respondent authorized check no. 1390, in the amount of $139.00, from the CSP account, to HDR Embroidery, for the balance of the cost of the shirts.

73. The expenses Respondent authorized in paragraphs 71 and 72, above, are not related to the purpose and objectives of the CSP. The Memorial Day Parade served a means to promote Respondent's name and likeness.

74. On November 7, 2010, Respondent authorized check no. 2323, in the amount of $225.50, from the CSP account, to London Luggage, as payment for ten journals, designated by Respondent as gifts for the TIFA Board Members, to "thank" them for including the 22nd District Court in the new Justice Center plans. This expense was not related to the purpose and objectives of the CSP.

75. All advertisements purchased with funds from the CSP account, displayed Respondent's name and likeness and promoted Respondent more than the

Community Service Program.  All advertisements listed above represented a form of campaign advertising.

76.  Respondent's action in authorizing the disbursement of the CSP funds, as detailed above in paragraphs no. 27 through and including no. 74, was in violation of the Code of Judicial Conduct, Michigan court rules and Michigan statutes.

### c.    NADCP Seminars and Travel

77.  In 2009, Respondent and two employees she authorized, Pamela Anderson and Breana Berden, attended the National Association of Drug Court Professionals (NADCP) conference in Anaheim, California, despite the fact that the 22nd District Court did not have a drug court program.

78.  In 2010, Respondent, and three employees, she authorized, Pamela Anderson, Breana Berden and Steven Hilberg, attended to NADCP conference in Boston, Massachusetts despite the fact that the 22nd District Court did not have a drug court program.

79.  The funding authority allocated more than $15,000.00 for "conferences and workshops" in 2009 and 2010.  Respondent did not use the budgeted travel allocation to pay for these trips.

80. Rather, Respondent authorized over $13,000.00 from the checking account of the Community Service Program, to pay for the NADCP conferences in 2009 and 2010.

81. The Community Service Program is an alternative sentencing method, designed to provide constructive punishment for non-violent offenders, reduce jail overcrowding and serve the needs of the City of Inkster.

82. The Community Service Program's account is funded through oversight fees paid by non-violent defendants sentenced to participate in community service as part of their probation.

83. Respondent made the following disbursements from the CSP account for the 2009 NADCP conference:

    a. Check no. 1260, dated April 2, 2009, in the amount of $2,740.82, issued to Respondent.

    b. Check no. 1261, dated April 2, 2009, in the amount of $2,286.85 issued to Pamela Anderson.

    c. Check no. 1262, dated April 2, 2009, in the amount of $2,286.85 issued to Breana Berden.

84. Respondent made the following disbursements from the CSP account for the 2010 NADCP conference:

a. Check no. 1359, dated March 12, 2010, in the amount of $2318.01, issued to Respondent.

b. Check no. 1356, dated March 11, 2010, in the amount of $1,755.40, to Pamela Anderson.

c. Check no. 1360, dated March 12, 2010, in the amount of $50.00, to Pamela Anderson.

d. Check no. 1357, dated March 11, 2010, in the amount of $1,755.40, to Breana Berden.

e. Check no. 1361, dated March 12, 2010, in the amount of $50.00, to Breana Berden.

f. Check no. 1358, dated March 11, 2010, in the amount of $1,755.40, to Steven Hilberg.

g. Check no. 1362, dated March 12, 2010, in the amount of $50.00, to Steven Hilberg.

85. Respondent authorized each of the checks listed in paragraph no. 83 and paragraph no. 84, based on the *estimated* costs of each conference. The checks were issued and cashed prior to the date of each conference.

86. Respondent failed to require her employees to itemize and document the actual expenses of each conference, and to compare these actual costs to the

cost estimates, in order to determine whether the CSP account was entitled to credit.

87.   Respondent failed to itemize and document her own actual expenses of each conference and failed to compare such actual costs to the cost estimates, in order to determine whether the CSP account was entitled the credit.

88.   Respondent paid herself, from the CSP account, for meals which were provided as part of the NADCP registration fees at the 2009 and 2010 conferences.

89.   Respondent attended the 2010 NADCP conference in Boston, Massachusetts, from June 2, 2010 to June 5, 2010.

90.   Respondent used the CSP account funds to purchase a Delta Airline flight for June 2, 2010 from Detroit to Boston.

91.   Respondent used the CSP account funds to purchase another Delta Airline flight for June 5, 2010 from Boston to New York and a return flight from New York to Detroit for June 8, 2010.

92.   Respondent purchased those flights by redeeming "frequent flyer" miles accumulated from previous personal travels and/or travel paid for by the CSP account and/or the funding authority.

93.  Respondent then "reimbursed" herself $349.40 from the CSP account, for the flights listed in paragraphs no. 90 and no. 91, despite the fact that her actual out-of-pocket cost was only $7.50, the fee charged by Delta Airline.

94.  Respondent's flight from Boston to New York on June 5, 2010, and the time Respondent spent in New York until June 8, 2010, was unrelated to the NADCP conference in Boston, or to any other function of the 22nd District Court.

95.  The NADCP conference in Boston concluded on June 5, 2010, yet Respondent charged the cost of the flight from Boston to New York on June 5, 2010, and the return flight from New York to Detroit on June 8, 2010, to the CSP account.

96.  Respondent's conduct, as detailed in paragraph no. 77 through, and including, paragraph no. 95, is in violation of the Code of Judicial Conduct, Michigan Court Rules as well as MCL 750.174, MCL 750.175, and MCL 750.218.

d.  **Lawn Equipment/maintenance, mileage, supplies & flowers**

97.  Between 2006 and 2010, Respondent authorized over $10,000.00 from the CSP account for various lawn equipment, and lawn equipment maintenance, expenses. In the lawn equipment category, sixty percent of the "equipment" expenditures did not have supporting documentation.

98.  In the 2009/2010 fiscal year, Respondent authorized over $4,500.00 from the CSP account to pay for an edger, a trimmer and lawn mowers.

99.  In the 2009/2010 fiscal year, Respondent authorized funds from the CSP account to pay for landscaping supplies, retaining wall stones, trees, and deer barriers. Respondent failed to require, provide, or maintain proper supporting documentation for each of these expenses.

100.  Between 2006 and 2011, Respondent authorized in excess of $9,000.00 for "supplies" from the CSP account.  Fifteen percent of these expenditures were undocumented.  These expenses included the following:

a.  Check no. 1132, in the amount of $205.11, to Respondent, for undocumented "office supplies".

b.  Check no. 1136, in the amount of $175.80 to Home Depot, for "supplies"

c.  Check no. 1138, in the amount of $44.00 to Irene Boike, for flowers.

d.  Check no. 1189, in the amount of $792.00, to Respondent, for Landscaping bricks.

e.  Check no. 1190, in the amount of $259.38, to Respondent, for landscaping supplies.

f.  Check no. 1191, in the amount of $138.60, to Respondent, for landscaping supplies.

g.    Check no. 1194, in the amount of $642.88, to Respondent, for landscaping supplies.

h.    Check no. 1196, in the amount of $477.17, to Respondent, for landscaping supplies.

i.    Check no. 1198, in the amount of $535.31, to Respondent, for landscaping supplies.

j.    Check no. 1199, in the amount of $316.00, to Irene Boike, for flowers.

k.    Check no. 1201, in the amount of $473.00, to Artman's Nursery & Landscaping Supplies for "supplies".

l.    Check no. 1205, in the amount of $306.73, to Respondent, as reimbursement for undocumented landscaping supplies.

m.    Check no. 1206, in the amount of $71.60, to Respondent, as reimbursement for landscaping supplies.

n.    Check no. 1208, in the amount of $34.55, to Priscilla Gibbs, as reimbursement for landscaping supplies.

o.    Check no. 1209, in the amount of $35.34, to Eddie Griffin, as reimbursement for landscaping supplies.

p.    Check no. 1212, in the amount of $320.18, to Respondent, as reimbursement for landscaping supplies.

q.   Check no. 1218, in the amount of $326.87, to Respondent, as reimbursement for painting supplies.

r.   Check no. 1224, in the amount of $470.18, to Respondent, as reimbursement for undocumented "supplies".

s.   Check no. 1234, in the amount of $32.83, to Priscilla Gibbs, as reimbursement for painting supplies.

t.   Check no. 1293, in the amount of $505.00, to Irene Boike, for flowers.

u.   Check no. 1295, in the amount of $20.00, to Irene Boike, for flowers.

101.   In 2011, Respondent authorized over $800.00 from the CSP account for "office supplies", despite the fact that the funding authority's budget provided for office supply expenses of the 22nd District Court.

102.   Respondent authorized check no. 2324, in the amount of $127.49, from the CSP account, to herself, as reimbursement for copy paper used to print the "Justice for All" newsletter of the 22nd District Court.

103.   Respondent authorized check no. 1351, dated February 4, 2010, for $94.50, from the CSP account to Terry's Enchanted Flowers, for a flower arrangement for the funeral of a Community Service Supervisor, Jason Livingston's, grandmother.

27

104. Respondent paid herself, from the CSP funds, for mileage, without providing supporting documentation as to the destination, purpose or distance of the trip. These mileage reimbursements are as follows:

   a. Check no. 1170, in the amount of $90.00.

   b. Check no. 1183, in the amount of $64.64.

   c. Check no. 1207, in the amount of $43.94.

105. The expenditures listed above in paragraphs no. 98 through and including paragraph no. 104, were not related to the purpose and function of the CSP.

106. Respondent's conduct, as detailed in paragraph no. 97 through, and including, paragraph no. 104, is in violation of the Code of Judicial Conduct, Michigan Court Rules as well as MCL 750.174, MCL 750.175 and MCL 750.218.

## B. BANKING & REVENUE PRACTICES

107. The revenue disbursement process of the 22nd District Court is governed by MCL 600.8379, MCL 600.8381, and paragraph G9, section 6-05, of the Michigan Supreme Court's Administrative Guide. These directives provide that all fines and costs collected by the court "shall" be appropriated between the county treasurer and the funding unit on the 15th day of the month, or within 10 business days following the end of the month, or by another schedule *agreed to* by the district court and the funding unit.

108.   Prior to May of 2010, the established practice for the 22nd District Court was to transmit the collected revenue to the funding authority, City of Inkster, by the 15th day of each month.   Revenues collected, but pending transmittal, were deposited in a J.P. Morgan Chase, N.A. Bank, ("Chase"), in account no. ending in 7034, which had previously been opened under the funding authority's federal tax ID number.

109.   The 22nd District Court utilized two additional bank accounts at Chase. Account no. ending in 3791 was utilized for bonds and restitution funds, and account no. ending in 3395, was utilized for funds from oversight fees paid by individuals sentenced to participate in the Community Service Program.

110.   Prior to May of 2010, the 22nd District Court utilized a "bottom line" budget method, which required Respondent to submit check requests to the funding authority for the expenditures of the court.

111.   In early 2010, the City of Inkster questioned some of Respondent's check requests, including requests for payment of independent contractor fees to select individuals employed by the 22nd District Court as well as to some of the court officers.

112.   In May of 2010, the City of Inkster enacted Resolution No. 09-05-127, amending the budget method for all city departments as well as the 22nd District Court from "bottom line" to "line item".

113. When the funding authority denied Respondent's request to rescind the "line item" provision, and return the court to the "bottom line" budget method, Respondent began to engage in the retaliatory practice of withholding a portion of the revenue collected by the court through costs and fees.

114. By October of 2010, Respondent withheld all revenue collected by the 22nd District Court from the City of Inkster.

115. Respondent did not return the August and September of 2010 revenue to the City of Inkster, until after November 23, 2010. Respondent did not return the remainder of the funds collected by the 22nd District Court to the City of Inkster until after January 21, 2011.

116. During the time the funds were being withheld, Respondent authorized checks from the court's accounts without the consent or knowledge of the City of Inkster. Respondent's actions resulted in some duplication of payments.

117. During the time the funds were being withheld, and before Respondent returned all funds to the City of Inkster in January of 2011, only one month of the court's expenses were paid in full by Respondent.

118. During the time that Respondent was withholding the court's revenue from the City of Inkster, Respondent was advised by the Regional Court Administrator, Deborah Green, that funds beyond what was necessary to pay

the expenditures of the court should be transmitted to the City of Inkster on at least a monthly basis. Respondent was also advised that an accounting of the court's expenditures should be provided to the funding authority. Respondent failed to follow these directives.

119. In August of 2010, the City of Inkster requested to examine the court's bank accounts in order to ascertain the amount of revenue generated by the court and to review the expenditures authorized by Respondent. Respondent denied that request.

120. In order to obtain access to the court's accounts, on August 25, 2010, the City of Inkster enacted Resolution 08-228 S, adding the names of the city manager and city treasurer to the court's accounts held at Chase.

121. Respondent became aware of the above resolution within one to two days of its passage and immediately instructed her court administrator, Pamela Anderson, to withdraw the funds from each of the court's accounts at Chase. Respondent also instructed the court administrator to obtain a new federal tax ID number for the 22nd District Court.

122. On September 3, 2010, pursuant to Respondent's directions, Pamela Anderson withdrew over $292,800.00 from the accounts of the 22nd District Court held at Chase.

123. Only nominal amounts remained in the court's accounts at Chase. The Chase accounts were closed on September 8, 2010.

124. On September 10, 2010, pursuant to Respondent's directions, Pamela Anderson, opened new accounts for the 22nd District Court at Bank of America, under a new federal tax ID number. The new accounts were opened with only Respondent's and Pamela Anderson's names as authorized signatories. The accounts at Bank of America were as follows:

   a. Account no. ending in 4195 served as a depository account

   b. Account no. ending in 4128 served as a bond and restitution account

   c. Account no. ending in 4205 served as the CSP account

125. Respondent continued to authorize checks without the approval of the City of Inkster from the new accounts at Bank of America. Many of the expenditures were in violation of MCL 750.174, MCL 750.218, the Code of Judicial Conduct and MCR 9.205.

126. Respondent maintained a petty cash fund at the 22nd District Court, despite the 2006 internal audit's recommendation that it be eliminated. Respondent funded the petty cash fund, by directing the court staff to debit the court's revenue for "non sufficient funds" (NSF) checks received by the court as payment for fines, costs and oversight fees.

32

127. In 2010, Respondent withheld $1,690.65 from the City of Inkster's revenue for petty cash and authorized expenditures from that fund for unknown and undocumented purposes.

128. Respondent's conduct, as detailed above, is in violation of MCL 600.8379, MCL 600.8381, MCL 775.22, MCL 780.766a and the Code of Judicial Conduct and MCL 9.205.

## C. TRAVEL, REIMBURSEMENTS AND MILEAGE

129. Paragraph no. 77 through, and including, paragraph no. 95 above, are repeated herein as though fully set forth.

130. Respondent attended the National Bar Association's Judicial Council and Board of Governors Mid Winter Meeting in San Juan, Puerto Rico from January 26, 2011 until January 30, 2011.

131. On December 7, 2010, Respondent submitted to the funding authority, a "Conference Request Form" for the cost of a five night stay at the San Juan Marriott Hotel & Stellaris Casino and six full days of meals.

132. Prior to the conference, Respondent received $1,322.25 for hotel expenses and $300.00 for meal expenses in connection with the above conference.

133. The registration fee for the conference included at least one luncheon and one reception dinner.

134. The hotel rate for the conference was $180.00 plus $21.60 resort fee and $19.80 room tax, for a total daily rate of $221.40. The total actual cost of Respondent's stay at the San Juan Marriott Hotel & Stellaris Casino was $1,183.68.

135. Respondent failed to reimburse the funding authority for the difference between the estimated and actual expenses of the conference.

136. Respondent submitted numerous mileage requests to the funding authority, without documenting the purpose of the travel or the destination of the trip. These requests include the following:

a. On April 6, 2009, Respondent submitted a mileage reimbursement request for $126.50.

b. On April 28, 2009, Respondent submitted a mileage reimbursement request for $131.45.

c. On June 22, 2009, Respondent submitted a mileage reimbursement request for $193.05.

d. On June 30, 2010, Respondent submitted a mileage reimbursement request for $272.00.

e. On October 6, 2010, Respondent submitted a mileage reimbursement request for $189.00

f. On December 22, 2010, Respondent submitted a mileage reimbursement request for $232.50.

137. Respondent's conduct, as detailed in paragraph no. 129 through, and including, paragraph no. 136, is in violation of the Code of Judicial Conduct, Michigan Court Rules as well as MCL 750.174, MCL 750.175, and MCL 750.218.

## D. ATTORNEY FEES

138. Since June 2009, Respondent authorized the payment of more than $55,000.00 in legal fees by the funding authority to her attorney, Sharon McPhail. These legal fees are as follows:

   a. On June 30, 2009, Respondent authorized a payment of $13,700.00.

   b. On December 3, 2009, Respondent authorized a payment of $7,385.00.

   c. On June 24, 2010, Respondent authorized the payment of $5,600.00.

   d. On October 6, 2010, Respondent authorized the payment of 5,700.00.

   e. On December 9, 2010, Respondent authorized the payment of $9,400.00.

    f. On January 12, 2011, Respondent authorized the payment of $10,500.00.

    g. On February 2, 2011, Respondent authorized the payment of $2,800.00.

139. Respondent failed to require that Sharon McPhail provide a written retainer agreement specifying the nature and extent of the services, and the rate charged.

140. Respondent authorized majority of the payments, listed in paragraph no. 138, without any documentation as to the time spent and services rendered, while others were authorized based on statements which provided only vague accounting of the time spent and the legal services performed.

141. Respondent's conduct, as detailed in paragraphs no. 138 and paragraph no. 139, are in violation of the Code of Judicial Conduct and Michigan Court Rules, MCL 750.174, MCL 750.175 and MCL 750.218.

## COUNT II
## EMPLOYMENT IMPROPRIETIES

### A. EMPLOYMENT OF FAMILY MEMBER

142. In 1989, Respondent hired her niece, Nicole James, as a probation clerk for the 22nd District Court. Respondent has since then promoted Nicole James

several times, ultimately to the position of a judicial secretary/deputy court clerk.

143. Effective December 1, 1996, the Michigan Supreme Court adopted Administrative Order 1996-11, which established an "anti-nepotism" policy for all Michigan courts. AO 1996-11 is applicable to all full-time and part-time employees as well as independent contractors, and provides that "no person shall be transferred or promoted or enter into a nepotic relationship".

144. The policy specifically requires that all persons who are so employed at the time AO 1996-11 became effective, shall make a written disclosure to SCAO, of the existence of any familial relationships within thirty days of either the issuance of the order or the creation of the relationship.

145. On October 8, 2008, Ms. James resigned from her employment at the 22nd District Court.

146. On April 9, 2009, Respondent re-hired her niece, Nicole James, to her formerly held position of a deputy clerk, with a 6.5 percent increase in salary.

147. Between 1989 and 2009, Respondent authorized nineteen pay increases for Nicole James, many of which were applied retroactively to more than a year before. These pay increases, ranged from two to twenty two percent. Included was an eight percent increase Respondent authorized within six

months of Nicole James' employment, made retroactive to the date of hire, and a twenty-two percent increase three months thereafter.

148. On April 10, 2010, Respondent promoted her niece, Nicole James, to the position of a judicial secretary and authorized a 6.5 percent pay increase to $37,950.00.

149. Respondent's actions as detailed in paragraph no. 142 through, and including, paragraph no. 148, are in violation of AO 1996-11, Canon 2 C of the Code of Judicial Conduct and Michigan Court Rules.

## B. **EMPLOYMENT OF KEVIN DOKES**

150. On October 4, 2010, Respondent caused a letter to be mailed to her former court officer, Kevin Dokes, wherein she guaranteed his position until "such time as [he] decides to retire and/or leave".

151. Respondent had no authority to take such action.

152. Respondent violated Michigan Supreme Court's Administrative Order 1998-5, which provides that a chief judge may not enter into a multiple-year commitment concerning any personnel economic issue without the agreement of the funding unit.

153. Respondent's action was also in violation of the Code of Judicial Conduct and Michigan Court rules.

## C. **EMPLOYMENT OF MAGISTRATE**

154. In September of 2002, Respondent submitted a Local Administrative Order (LAO) 2002-02, appointing Jeffrey Bowdich as magistrate of the 22nd District Court.

155. At the time of the submission of the above referenced order, Jeffrey Bowdich was not a resident of the City of Inkster and not a registered elector, as required by MCL 600.8501.

156. On November 21, 2002, Respondent was advised by John D. Ferry, Jr. of the State Court Administrative Office (SCAO), that LAO 2002-02 was being revoked because Mr. Bowdich did not "meet the residency requirements for appointment of a magistrate".

157. On December 19, 2002, Respondent submitted a second order, LAO 2002-03 (submitted as 2002-05), again appointing Jeffrey Bowdich as a magistrate of the 22nd District Court and falsely representing that he met all requirements of that position. Respondent knowingly and purposefully filed a false document with the State Court Administrators Office.

158. Respondent permitted Mr. Bowdich to sign arrest warrants and search warrant and to perform marriages. Respondent's violation of MCL 600.8501 arguably rendered all documents issued by Mr. Bowdich, invalid.

159.   Respondent permitted thousands of warrants to be either signed improperly or "rubber stamped" by Mr. Bowdich.  This action resulted in the need for over fifteen thousand warrants to be re-issued.

160.   Respondent's conduct, as detailed in paragraph no. 154 th including paragraph no. 159, are in violation of the Code c Conduct, Michigan court rules, as well as in violation of MCL MCL 600.8507 and MCL 750.249.

## COUNT III
## ADMINISTRATIVE IMPROPRIETIES

### A. LEAVE DAYS/TARDINESS

161.   In the Judicial Leave Report filed pursuant to MCR 8.110 (D) (3), Respondent represented taking 16.5 days of annual leave and 10 days of professional/educational leave in 2010.

162.   Respondent was actually absent from the 22nd District Court for 59 days.  As such, Respondent had received compensation for 32.5 days on which she did not work, in violation of MCL 750.218, the Canons of Judicial Conduct and Michigan court rules.

163.   Respondent routinely arrived for work at the 22nd District Court at 10:30 a.m., or later, and routinely took in excess of two hours for lunch.

164.   Respondent's tardiness and lengthy lunches resulted in her failure to timely dispose of cases, and caused litigants, witnesses and court staff to remain in court until late evenings, necessitating overtime pay to court employees.

165.   On at least one occasion, Respondent kept the staff of the 22nd District Court working until 6:30 p.m. and on another occasion, Respondent kept the staff and potential jurors in court until 11:30 p.m.

166.   Respondent's conduct, as detailed in paragraphs no. 161 through, and including, paragraph no. 165, is in violation of MCL 750.218, the Code of Judicial Conduct, Michigan court rules and AO 1998-5, section IV which requires that the standard working hours of the court staff, shall be consistent with the standard working hours of the funding authority.

## B. FAILURE TO TIMELY DISPOSE OF CASES

167.   For 2011, Respondent improperly and without authority, designated 24 days as "no docket days".  Respondent designated February 14, 2011 as an "in house retreat day".  No cases were to be scheduled for those days.

168.   Respondent's actions contributed to her failure to resolve the 22nd District Court matters in a timely manner, as required by Michigan Supreme Court's Administrative Order 2003-7.  This resulted in the following:

a.   In 2010, eight percent of Respondent's civil cases were pending for more than 455 days from the date of filing.

b.      In 2010, fifty percent of Respondent's statute and ordinance misdemeanor cases, including drunk-driving matters, were pending for more than 63 days.

c.      In 2010, fifteen percent of Respondent's civil infraction proceedings, including traffic, non-traffic and parking cases, were pending for more than 84 days from the date of filing.

d.      In 2010, no landlord/tenant and land contract matters was adjudicated within the 126 days recommended by the Michigan Supreme Court's Administrative Order 2003-7.

169.  Respondent's conduct, as detailed in paragraphs no. 167 and paragraph no. 168 above, is in violation of the Administrative Order of the Michigan Supreme Court, the Code of Judicial Conduct and Michigan Court rules.

## C. BUSINESS ATTIRE POLICY

170.  Respondent implemented a "proper business attire" policy at the 22nd District Court requiring all persons entering the courtroom to wear "appropriate business attire".

171.  Respondent's policy was enforced at the door to the courthouse, rather than the door to the courtroom.  The policy was enforced by the court officers, who determined who was, and who was not, in compliance.

172. Persons deemed not in compliance with Respondent's policy, were denied entry to the courthouse for any reason, including to pay a fine or to re-schedule a pending matter with the clerk of the court.

173. Persons not in compliance with Respondent's policy were directed to the St. Vincent DePaul re-sale shop to purchase appropriate clothing.

174. Respondent's policy was not reasonable in its content or its application and in violation of Canon 3 A (2).

175. On April 1, 2010, Joseph Thomas Kassab, appeared at the 22nd District Court for a formal hearing in his civil infraction case No. 0904559. Mr. Kassab was denied entry into the courthouse because he wore black jeans. Mr. Kassab's jeans were clean and undamaged and did not display any gang affiliation.

176. On April 1, 2010, the St. Vincent DePaul re-sale shop was not opened to the public.

177. Mr. Kassab was not allowed to enter the courthouse to request an adjournment of his case and a default was entered against him.

178. Respondent's conduct as detailed in paragraph no. 170 through and including paragraph no. 177, is in violation of the Code of Judicial Conduct and Michigan court rules.

# COUNT IV
## MISREPRESENTATIONS

179. In her answers to the Commission, dated August 1, 2011, Respondent stated that the decision to close the bank accounts of the 22nd District Court at Chase National Bank was made by the bank.

180. In support of that statement, Respondent provided a September 8, 2010 letter from Chase, stating that "Chase and the Court" were closing the accounts.

181. Respondent further stated that Chase's September 8, 2010 decision "forced" her court administrator, Pamela Anderson, to obtain a new federal tax ID number and open new accounts with Bank of America.

182. Those statements were false.   A letter from Respondent's court administrator, in response to the September 8, 2010 letter from Chase, clearly states that the decision to close the accounts was the "court's and not the bank's". Respondent directed that the court administrator write that letter.

183. Respondent sent her own letter, dated September 3, 2010, to the mayor and city council informing them that "when outstanding checks have cleared, those accounts (referring to the accounts at Chase) will permanently be closed".

184. Before the letter from Chase National Bank was e-mailed to the 22nd District Court, Respondent instructed her court administrator to obtain a separate tax ID number.

185. In her answers to the Commission, dated August 1, 2011, Respondent stated that she was only an honorary member of the Booker & Flora Dozier Memorial Scholarship organization, that she never attended a board meeting, and that she did not have the right to vote based on her honorary status.

186. However, Respondent served as a Booker & Flora Dozier Memorial Scholarship committee member and voted on which applicants should receive monetary scholarships.

187. Respondent also stated that she belonged to the Delta Sigma Theta Sorority, Inkster Alumnae only in college. Respondent stated that she was not an active member of the sorority.

188. However, Respondent is a life-time member of the Delta Sigma Theta sorority.

189. In her answer to the Commission, dated August 1, 2011, Respondent stated that she derived no benefit from the issuance" of the various checks to the organizations listed in Count I of this complaint.

190.  Respondent authorized checks for advertisements, which prominently featured Respondent's name and photograph, which have the appearance of campaign literature.

191.  In her answer to the Commission, dated August 1, 2011, Respondent stated that the funding authority issued checks from the same CSP account to the organizations listed in Count I of the present complaint.

192.  However, the CSP checking account at Chase was never administered or managed by the funding authority. It was opened by Respondent in 2006/2007 when the funding authority questioned some of Respondent's check requests to the Inkster Goodfellows organization.

The conduct described in paragraphs 1-192, constitutes:

(a)  Misconduct in office, as defined by the Michigan Constitution of 1963, as amended, Article 6, Section 30 and MCR 9.205.

(b)  Conduct clearly prejudicial to the administration of justice, as defined by the Michigan Constitution of 1963, as amended, Article 6, Section 30, and MCR 9.205.

(c)  Failure to establish, maintain, enforce and personally observe high standards of conduct so that the integrity and



## AFFIDAVIT

Philip J. Thomas states under oath that if called as a witness in this matter he could testify as follows:

1. I am a licensed Michigan attorney who completed law school in December, 1979 and became licensed in May, 1980.

2. After spending approximately five years at the Wayne County Prosecutors Office, I worked at the Michigan Judicial Tenure Commission (JTC) from approximately 1985 – 1990.  I was transferred by the Michigan Supreme Court (MSC) to the Michigan Attorney Grievance Comission in mid – 1990 and worked at that agency until mid – 1998.  Since that time I have practiced law primarily in the fields of judicial and attorney discipline.

3. I am one of the attorneys representing Judge Sylvia A. James in the proceedings on Formal Compliant 88 (FC 88) in which the trial/hearing is scheduled to start on January 23, 2012.

4. It is my opinion that the MSC violated Judge James' constitutional rights and usurped the authority of the JTC.  Article 6, Sec. 30 of the Michigan Constitution  provides that the MSC may only take action to suspend/remove a judge upon recommendation from the JTC.  The MSC was goaded into imposing what is essentially a disciplinary suspension, under the guise of an administrative leave because of a few slanderous news stories published in 2010 and early 2011.  The stories described millions of dollars of 22nd District Court monies allegedly "missing," *i.e.*, misappropriated/stolen.  On April 13, 2011 the MSC removed Judge James from her duties and placed her on an administrative leave.

5. The MSC does not have authority to remove/suspend a judge from his/her duties without receiving a "recommendation" from the JTC. This separation of powers is manifest in MCR 9.200 *et seq.* which were adopted and amended by the MSC over the last century. Furthermore, Article 6, § 4 of the Michigan Constitution of 1963 as erroneously relied upon in the MSC's order of April 13th, restrains the MSC's ability to remove a respondent judge and specifically states:

> The supreme court shall have general superintending control over all courts; power to issue, hear and determine prerogative and remedial writs; and appellate jurisdiction as provided by rules of the supreme court. The supreme court **shall not** have the power to remove a judge (emphasis added).

6. Judge James has been denied the procedural safeguards afforded to a respondent judge under Michigan's Constitution, applicable court rules and the United States Constitution. Judge James was essentially removed from her duties as judge under the guise of an administrative leave.

7. On or about November 8, 2011, Judge James' counsel answered the FC 88 and the accompanying petition for interim suspension. Judge James also filed a motion for disqualification of the MSC justices. Despite the fact that the many constitutional violations Judge James suffered at the hands of the MSC were pointed out in Judge James' pleadings, the full MSC proceeded to hear the matter.

8. The MSC, whose own staff conducted the investigation which lead to the April 13, 2011 administrative leave, then voted on and approved the JTC's petition to place Judge James on interim suspension.

9. The MSC then ordered that the JTC expedite the proceedings on FC 88.

2

10. During the approximate 27 years that I have practiced disciplinary law, I have never seen the procedures described above implemented in any disciplinary case.  The treatment Judge James has received from the MSC and JTC is unprecedented.

11. More troublesome than the rights violations suffered by Judge James thus far, is the fact that the MSC and JTC which are responsible for those violations, are still presiding over this matter and will ultimately decide the outcome of her case

12. I do not believe that it will be possible to protect Judge James' constitutional rights in future state proceedings, since the public agencies which will ultimately decide her case have already pre-judged her.


The above statements are true to the best of my knowledge, information and belief.

Philip J. Thomas

Subscribed and Sworn to before
me in Wayne County, Michigan
on January 20, 2012.

Kathleen B. Willmer,  Notary Public
State of Michigan, County of Macomb
My Commission Expires 4/15/2017
Acting in the County of Wayne

3

℀JS 44  (Rev. 12/07)

# CIVIL COVER SHEET    County in which action arose  Wayne County

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| **I. (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| JUDGE SYLVIA JAMES, an Individual | HILLIARD HAMPTON, THE CITY OF INKSTER; DAVID JONES; DEBORAH GREEN; PAMELA ANDERSON; THE JUDICIAL TENURE COMMISSION OF THE STATE OF MICHIGAN; VALDEMAR WASHINTON |
| **(b)**  County of Residence of First Listed Plaintiff  Wayne County<br>(EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant  Wayne County<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE<br>LAND INVOLVED. |
| **(c)**  Attorney's (Firm Name, Address, and Telephone Number)<br>MAYER MORGANROTH (P17966) MORGANROTH & MORGANROTH, PLLC<br>344 N. Old Woodward, Suite 200, Birmingham, MI 48009 (248) 864-4000 | Attorneys (If Known) |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☒ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | **LABOR**<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act<br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus - Alien Detainee<br>☐ 465 Other Immigration Actions | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. Sections 1981, 1982, 1983, 1985(3), 1988; 28 U.S.C. Sec. 1331 and 1343; 28 USC Sec. 2201 and 2202
Brief description of cause:
Civil action for declaratory, injunctive relief and other damages for violation of Plaintiff's Constitutional Rights

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ $10,000,000.00    CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE  January 20, 2012    SIGNATURE OF ATTORNEY OF RECORD  _[signature]_

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

## PURSUANT TO LOCAL RULE 83.11

1.        Is this a case that has been previously dismissed?        ☐ Yes
                                                                    ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


2.        Other than stated above, are there any pending or previously
          discontinued or dismissed companion cases in this or any other       ☐ Yes
          court, including state court? (Companion cases are matters in which   ☒ No
          it appears substantially similar evidence will be offered or the same
          or related parties are present and the cases arise out of the same
          transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


Notes :