# Exhibit 8

1                    STATE OF MICHIGAN
         BEFORE THE MICHIGAN JUDICIAL TENURE COMMISSION
2   ------------------------------

3 COMPLAINT AGAINST:

4                       Formal Complaint No. 88

5 Hon. SYLVIA A. JAMES
  Judge, 22nd District Court
6 Inkster, Michigan 48141

7   ------------------------------

8            **P R O C E E D I N G S**

9 held before **Master Hon. Ann E. Mattson** at the 20th District

10 Court, 25637 Michigan Avenue, Dearborn Heights, Michigan, on

11 Tuesday, January 17, 2012, commencing at or about 10:00 a.m.

12 **APPEARANCES:**

13 For the MJTC:      MICHIGAN JUDICIAL TENURE COMMISSION
14                 3034 West Grand Boulevard, Suite 8-450
                Cadillac Place Building
15                 Detroit, Michigan  48202
     Examiner:       313.875.5110
16 Associate Examiner:   **BY: MS. MARGARET N. RYNIER (P34594)**
                  **MR. PAUL J. FISCHER (P35454)**

17 For the Respondent: PHILIP J. THOMAS, ATTORNEY AT LAW
18                 15450 East Jefferson, Suite 160
                Grosse Pointe Park, Michigan  48230
19                 313.821.2600
                **BY: MR. PHILIP J. THOMAS (P31298)**

20                 KEY GROUP LEGAL AND CONSULTING SERVICES PC
                567 Fiske Drive
21                 Detroit, Michigan  48214
22                 586.552.0335
                **BY: MS. SHARON McPHAIL (P26922)**

23   **REPORTER:**  Judith K. Jump, CSR/CER-7163

24   ALSO PRESENT:  Hon. Sylvia A. James and others

25

                         1

1

## TABLE OF CONTENTS

2

3    Pretrial Matters                              Page 3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    Dearborn Heights, Michigan
2                    Tuesday, January 17, 2012 - 10:04 a.m.
3                    THE MASTER:  Good morning.  We're here this
4        morning in the matter of Judicial Tenure Commission
5        Formal Complaint 88 involving Judge Sylvia James.
6                    Would you put your appearances on the record,
7        please?
8                    MS. RYNIER:  Margaret Rynier, Associate
9        Examiner.
10                   MR. FISCHER:  Paul Fischer, Examiner.
11                   MS. McPHAIL:  Sharon McPhail for Judge James.
12                   MR. THOMAS:  Phil Thomas, co-counsel for
13       Judge James.
14                   THE MASTER:  Thank you.  Good Morning.
15                   Before we get started on the substantive
16       issues for this morning, I'd like to talk a little bit
17       about procedure.  And I'm willing to do this in
18       chambers, if that would be helpful for everybody rather
19       than doing it on the record.  I don't think there's any
20       problem with doing it on the record, but I think we
21       might be able to be more efficient if we do it in
22       chambers.
23                   MR. THOMAS:  Fine with me.
24                   THE MASTER:  And I'll come out and I'll
25       announce what decisions we make, if any, with regard to
```

3

1       procedures to everybody who's here.  I just want to make

2       sure that we get some of our housekeeping things done

3       before we start the formal proceedings.  So if you want

4       to go back that way, I'll meet you back there.

5                    (A brief recess was taken at 10:05 a.m. to

6                    10:22 a.m.)

7                    THE MASTER:  Thank you.  You may be seated.

8                    We took a break to discuss some procedural

9       matters, and I don't know that there's really anything

10      to put on the record here.  It's more just background

11      stuff in terms of how the hearing will be staffed and

12      that type of things.

13                   Do any of you think there's anything that

14      should be placed on the record, because I'm more than

15      willing to do that, if you do?

16                   MS. RYNIER:  No, Your Honor.

17                   MR. THOMAS:  I don't believe so, Judge.

18                   THE MASTER:  Before we start with the motions,

19      I want to tell all of you that I have read all of the

20      materials that you've provided per the court rules, the

21      Michigan Rules of Professional Conduct.  I read most of

22      the authorities that you've cited in your multiple

23      motions and briefs.  And so what I will want to know

24      this morning is, whether you have anything additional

25      that you wish to say with regard to your motions so that

1    we're not going to go over all the material that I think

2    I've already gone over fairly thorough.

3              Address, first of all, the issue of media in

4    the courtroom.  When we were here last time, I indicated

5    that reporters, still photographers could be present,

6    and I left open the issue of auto and video recording,

7    because those motions -- those requests were presented

8    to me that day, and I wanted to have the opportunity to

9    think about it.

10             I did receive a motion from WXYZ-TV.  I don't

11   think that it is necessary for me to hear from anyone

12   from WXYZ-TV, but I will allow each of the parties to

13   make a statement or tell me what you think about

14   audio-visual recording of these proceedings, and then I

15   will make my decision.

16             MS. RYNIER:  Thank you, Your Honor.

17             THE MASTER:  Just state your name --

18             MS. RYNIER:  Certainly.  Margaret Rynier,

19   Associate Examiner.

20             Your Honor, we will join the motion made by

21   WXYZ Channel 7, Mr. Jim Stewart, who is present in the

22   courtroom.  Were are joining this motion because of the

23   right of the public to know the nature of these

24   proceedings, and the content of the allegations, and the

25   outcome of these proceedings.  We have filed a response

1          to -- or a motion joining WXYZ.  We are actually not

2          aware of any instance where Judicial Tenure Commission's

3          proceedings, or proceedings of this nature, have been

4          barred from the media.  The media is routinely allowed.

5          In fact, Administrative Order 1989-1, favors media

6          coverage.  It is stated in that rule that, "film or

7          electronic media shall be allowed upon request in all

8          court proceedings."

9                    I am not saying, Your Honor, that there are no

10         limitations.  I have spent 25 years with the

11         prosecutor's office.  I have prosecuted homicide cases.

12         I have prosecuted criminal sexual conduct cases.  There

13         are limitations that can be imposed on electronic media,

14         on the camera person, not to film certain witnesses, not

15         to show certain events, but to absolutely bar the media

16         from these proceedings basically prevents the public

17         from knowing what is going on.

18                    A lot of times, Judge, and perhaps you have

19         had these situations, where people tell you, Oh, I voted

20         for such and such judge, but we really don't know much

21         about them.  We go by name, we go by the fact that

22         they're an incumbent.  Nobody really knows.  And I

23         appreciate Your Honor and respect the fact that

24         investigation by the Tenure Commission are very

25         confidential up until the complaint is filed, then they

```
 1      become public record.  This is a way to allow the public

 2      to know what's going on, and specifically and especially

 3      in the case of this nature, where you have a situation

 4      where the allegations are of such incredible

 5      improprieties, including financial, including public

 6      funds that have been used or misused and in that

 7      situation, the public has a right to know where their

 8      money went.

 9              I read counsel's response, and one of the

10      arguments that he's making is that witnesses will be

11      intimidated.  No doubt, I can appreciate that counsel's

12      client doesn't want the media.  It's not a wonder why,

13      but the public has a right to know, perhaps the same

14      public that cannot be here today.  This courtroom is

15      open to the public.  Most of them cannot be here so why

16      not let them know.

17              And, counsel's argument is to intimidation.

18      Well, in a lot of his motions, he's arguing and pointing

19      out the difficulties that he had in contacting

20      witnesses.  Repeatedly, he's saying, "I tried calling

21      people, but they were told not to talk to me."  And,

22      yet, he knows that they will be intimidated.  I think

23      that's just simply an excuse.  There's no jury here.

24      The public has an absolute right to know what's going

25      on.  And the Michigan Supreme Court favors electronic
```

1          media to be allowed, with restrictions if this Court

2          sees fit to impose those, but not to bar them from these

3          proceedings altogether.  Thank you.

4                    THE MASTER:  Thank you.

5                    Mr. Thomas?

6                    MR. THOMAS:  Your Honor, your order's entered

7          to date that the media has a right to be here, they have

8          a right to have cameras here.  This is an open

9          courtroom.  There are members of the media in here right

10         now.  They protect the public's right to know.  You

11         haven't done anything up until today's date, and the

12         defense team has not asked you to do anything, to

13         exclude reporters from this courtroom so reporters are

14         going to be here.  I -- that's my understanding, that

15         photographers could be here and take still photographs,

16         et cetera.  There's the outside area where people and

17         witnesses could be interviewed or confronted by the

18         media.  We've never asked for any special treatment in

19         that regard.  This is an open hearing, open to

20         everybody, including the media.

21                    What we have argued to you in our answer to

22         the motion that was filed the request from Channel 7 to

23         have video coverage.  What we've attempted to point out

24         is our historical problem in getting witnesses to talk

25         to us and getting witnesses to return calls, and having

1      witnesses tell the people from the defense team that are

2      interviewing, "Look, I don't even know if I should be

3      doing this. I'm afraid for my job." These are current

4      employees of the court.

5              I will tell you that if you wanted to conduct

6      an evidentiary hearing on this point, I believe we'd be

7      able to produce at least one employee who was terminated

8      just the beginning of this winter, he believes, because

9      he was perceived as supporting Judge James. These

10     are -- these are issues that need to be decided before

11     you, before the Master. And I would say this, for

12     anybody to stand up and argue before you that a current

13     employee of the court being asked questions from that

14     witness stand would not be intimidated by the -- by the

15     fact that there is a video camera broadcasting all or a

16     portion of their testimony, Your Honor, it's very, very

17     real.

18             And I can tell you, my memory of things are a

19     little bit different than perhaps my opposing counsel, I

20     do remember times when electronic media was not allowed

21     in these types of hearings. I don't ever remember any

22     time when the media was excluded from a Judicial Tenure

23     Commission proceeding. I don't ever remember an order

24     being entered that said the reporters can't come into

25     the hearing room and listen to the evidence or draw

9

1        pictures of people as they testify or take pictures, but

2        the question is the electronic media coverage, the

3        prospect of individuals knowing, Hey, I'm employed at

4        the court, and I'm being asked questions about my former

5        employer and what impact that is going to have.  So we

6        are not asking that you close this courtroom to the

7        media, quite to the contrary.  We've never taken that

8        position, but when its come to the witnesses having to

9        face the prospect of knowing that their testimony is

10       going to be broadcast live, I believe a line has to be

11       drawn there.

12             And if you take a look at the Administrative

13       Order, if you take a look at 1989-1, Subparagraph (B),

14       while in Subparagraph (A) the Court says that, look,

15       this is the preference, Subparagraph (B) very clearly

16       gives Your Honor, or any judge in a court proceeding,

17       the ability to say no or to limit or exclude.  So our

18       request is that live video coverage not be permitted.

19       And in the alternative, if the Court is considering

20       permitting that, I think it should be limited to things

21       like opening statement or closing argument or things

22       along those lines.  I just don't believe that it's a

23       wholesome environment.

24             And, look, a few minutes ago, I made the offer

25       if Your Honor wanted to have an evidentiary hearing so

1       the testimony or evidence could be taken to support our

2       position, that this may end up having a very real impact

3       on our witnesses that we call, perhaps, even witnesses

4       that the other side call. We're not -- in my brief, I

5       didn't just say that witnesses that we call may be

6       intimidated. I believe the witnesses that the -- that

7       the Examiner calls may feel compelled to, perhaps,

8       ingratiate themselves and tell us something other than

9       the truth as they know it.

10              So for all those reasons, Your Honor, we're

11      asking that the electronic broadcasting of this

12      proceeding be prohibited. And if Your Honor is

13      considering any type of exception to that, I don't

14      believe it should be permitted for witnesses as they

15      testify. Thank you.

16              THE MASTER: Thank you.

17              MS. RYNIER: Your Honor, very briefly.

18              I don't know where counsel gets the idea that

19      this was going to be run live. It's not Court TV. This

20      is not live screening over the -- it's not being

21      broadcast in a live fashion so that's absolutely wrong.

22              Counsel's argument that the cameras would

23      disclose the names or faces of the witness, well, this

24      Court already allows still photography. Their names and

25      faces -- there's no issue as to that. That will already

11

```
 1      be broadcast.  And if counsel is so concerned about

 2      accuracy and truth why rely on the reporter.  Let the

 3      cameras in.  This Court can ask each witness, Do you

 4      want the camera off your face?

 5              Yes, I do.

 6              Fine.  Don't point it at them.

 7              It's very simple.  These arguments have been

 8      raised for years and the Michigan Supreme Court

 9      consistently is allowing, certainly through the

10      administrative order, allowing the media to remain in

11      these proceedings.

12              MR. THOMAS:  Your Honor, may I make a brief

13      response?

14              THE MASTER:  Yes, as brief as hers.

15              MR. THOMAS:  Okay.  Your Honor, look, if I

16      used the term "live," I didn't mean to imply that this

17      entire proceeding is going to be broadcast live on TV,

18      but when a witness comes in and sees a television camera

19      in front of them filming them, they know that whether

20      it's on the 5:00 news, or the 6:00, or the 10:00, or

21      11:00, all or any portion of their testimony may be

22      broadcast.  That's what we've argued in our answer to

23      Channel 7's motion, that's what we're arguing to you

24      here today.

25              THE MASTER:  All right.  Thank you.
```

1            All right.  Pursuant to Michigan Supreme Court

2      Administrative Order 1989-1, Section 2(a), film and

3      electronic media coverage is presumptively permitted in

4      court proceedings in Michigan, except upon a finding

5      that in the discretion of the court, the fair

6      administration of justice requires that such coverage be

7      limited or denied.

8            The Master is satisfied that at this point

9      there has been no such showing.

10           Film and electronic coverage along with still

11     photographic coverage, subject to limitations in MSCAO

12     1989-1, will be permitted, pending further order of the

13     Master.

14           And while we're on the issue of media, if you

15     have cell phones, they should be turned off or on

16     vibrate.  That is the policy in this court building.  I

17     just want to make sure that everyone who is present

18     understands that.  Thank you.

19           MS. RYNIER:  Thank you, Your Honor.

20           THE MASTER:  Next, we'll deal with the

21     Respondent's Motion for Summary Dismissal.  Which one of

22     you is going to do that?

23           MR. THOMAS:  Ms. McPhail.

24           MS. McPHAIL:  Good morning.

25           THE MASTER:  Additionally, do that.

                            13

1           MS. McPHAIL:  Yes, ma'am.  On behalf of the

2      Respondent Judge Sylvia James, I'm Sharon McPhail.  And

3      I'm here today to ask the Court to consider our motion

4      for partial summary disposition as to certain counts of

5      the complaint.

6           Essentially, Judge, I know you've read it, I

7      want to start with a statement that's really important

8      for us to all remember and it's a quote. "The mayor of

9      Inkster is resentful that the judge has more power than

10     he does and has declared war upon the Court."  That's a

11     statement from Deb Green at SCAO.  And everything that

12     we're talking about here, everything that has been

13     investigated, both by SCAO, and Judge Washington, the

14     designee as the interim judge, and the examiner's

15     office, has resulted in a complaint that deals with

16     issues involving something called a "Community Service

17     Program."

18          The Community Service Program has been in

19     existence for more than 20 years.  It's been audited by

20     SCAO.  It has been the subject of checks back and forth

21     between the City and the Court to pay for certain

22     things.  It is now being referred to as "shameless

23     self-promotion" and somehow "embezzlement."

24          Not only can we use the analogy of entrapment

25     in the criminal context to analyze whether or not this

14

```
 1        particular fund should be the subject of a Judicial
 2        Tenure proceeding, but, I mean, at some point laches
 3        applies, at some point estoppel applies.
 4              When you have an account of this nature for
 5        over 20 years and SCAO's been involved in it, and SCAO's
 6        one of the complainants in this case, it is unseemly
 7        that it should be the subject of a Judicial Tenure
 8        complaint.  At some point along the way, in the last 20
 9        years, somebody should have raised the issue.  That's
10        essentially our argument on the Community Service Fund.
11              With regard to the other issues in our motion,
12        they involve the expenditures from that same fund for
13        attendance at the drug court.  And I'm not going to deal
14        with the attorney's fees issue.  My co-counsel will
15        handle that.  But, you know, the drug court seminars
16        exist, as you know, educational seminars are a learning
17        tool, and for many, many years funds from the Community
18        Service Fund have been used for that and many other
19        things and there's never been a complaint about it, not
20        from SCAO, not from the City of Inkster.  So for it now
21        to be misconduct, if it's not flat out illegal, it's
22        unseemly and what we're asking the Court to do --
23        because there's no issue of material fact as to whether
24        or not these expenditures were made from this Community
25        Service Fund.  They were made, there are checks,
```

15

1          everybody gets that.  What we're saying is, 20 years ago

2          they were made, and 20 years ago you knew it, and you

3          did audits and you've said nothing about until now.  Why

4          is it now the subject of this complaint?

5                    THE MASTER:  Thank you.

6                    MS. McPHAIL:  Thank you.

7                    THE MASTER:  Ms. Rynier?

8                    MS. RYNIER:  Am I correct in understanding

9          that Mr. Thomas is going to handle some portion of this

10         motion or is this argument done by Ms. McPhail as to

11         this motion?

12                    THE MASTER:  That's it, right?

13                    MS. McPHAIL:  Mr. Thomas is going to handle

14         the attorney's fees.

15                    THE MASTER:  Well, let's do that.

16                    MS. RYNIER:  I think that --

17                    MS. McPHAIL:  It's a separate motion.

18                    MS. RYNIER:  Then that's fine.

19                    THE MASTER:  All right.

20                    MR. THOMAS:  She just indicated -- you said

21         you only wanted new things.

22                    THE MASTER:  That's your response to this

23         motion?

24                    MS. McPHAIL:  Yes.

25                    MR. THOMAS:  Correct.

                              16

1          THE MASTER:  Okay.

2          MS. RYNIER:  Your Honor, counsel is throwing a

3     lot of legal words, unfortunately for them, none of them

4     apply to a case like this.  A summary disposition motion

5     doesn't even apply to proceedings of this nature.  In

6     fact, the role of a Master in hearings of this nature is

7     to make a recommendation to the Supreme Court.

8          Now, I understand that under some

9     circumstances a summary disposition recommendation can

10    be made on interlocutory basis, but there's absolutely

11    no reason for that to be done in this case.  Although

12    counselor's argument was a lot shorter than their

13    motion, I will address some of the points of their

14    motion.

15         THE MASTER:  Ones you haven't addressed

16    previously?

17         MS. RYNIER:  Oh, yes.

18         In their motion, the first three pages, Your

19    Honor, are nothing but factual arguments.  In fact,

20    their arguments raise serious issues of fact and

21    questions of fact.  The affidavits that are provided

22    with the motion have absolutely nothing to do with this

23    complaint.  They are nothing but unsubstantiated

24    argument relating to a mayor of the City of Inkster.

25    He's not even a witness on my witness list.  He has

17

1      nothing do with these allegations.  All we have is this

2      conspiracy theory.  And I will say one thing,

3      Mayor Hampton apparently has an incredible power because

4      according to counsel for Judge James, he has power over

5      Inkster, he has power over Judicial Tenure Commission,

6      he has power over the Michigan Supreme Court, and he has

7      power over SCAO.  That is an absolutely ridiculous

8      argument to be made on a motion for summary disposition.

9            On page 5, counsel claims that the funds were

10     not converted for personal use -- second part of the

11     page.  Says who?  That's a question of fact.  Certainly,

12     that defeats motion for summary disposition of any kind.

13           On page 7, top of the page, "Well established

14     case will provide an essential element of the offense of

15     embezzlement is a felonious or fraudulent intent."

16           One of the cases that they cite is a *Fisk*

17     *case*, and, Your Honor, if I can cite -- if I can quote.

18     I pulled *Fisk*, it says, "The elements of embezzlement by

19     a public officer are; that the defendant held public

20     office or was the agent or servant of a public officer;

21     that he received money or property in his official

22     capacity; that he, or in this case she, "appropriated

23     the money or property for his or her own use or that

24     some or some other person; that he or she did so

25     knowingly and unlawfully, and that the value was more

18

1    than $50."

2              On page 4, "In our opinion, it was the

3    intention of the legislature to provide if any public

4    officer who devoted the public --

5              (Discussion held off the record.)

6              MS. RYNIER:  Let me start again.  "In our

7    opinion, it was the intention of the legislature to

8    provide if any public officer who devoted public funds

9    in his custody and control to any other purpose then

10   those to which the law authorized their appropriation,

11   must account for them to his successor or be guilty of a

12   felony no matter how good his intentions may have been."

13   What felonious intent?  That is not a requirement.

14             The bottom of page 7, reading from counsel's

15   brief.

16             "Law enforcement officials and administrative

17   prosecutors are assumed to be in good faith until

18   massive evidence to the contrary is produced by falsely

19   accused defendant."

20             The repeated reference to massive evidence.

21   What evidence has been presented?  That's the purpose

22   for this court to be convened, for this hearing to be

23   conducted.

24             You know what, Judge, in effect, what the

25   defense counsel is doing is this:  In a criminal case an

                            19

1     information is filed.  Counsel would have the law permit

2     a defense attorney for a criminal defendant to file a

3     motion saying none of the allegations in a complaint and

4     warrant criminal are true and, therefore, preliminary

5     hearing this should be dismissed.  That's not the case.

6     This is precisely the forum for that evidence to be

7     presented.

8          I will also add that most of the arguments

9     that are made in this motion are nothing but what we

10    call at the prosecutor -- prosecutor's office -- or what

11    we used to call, an "Octopus theory."  An Octopus, when

12    attacked by another creature, releases ink; muddy up the

13    waters, make his escape.  The arguments are irrelevant,

14    Mayor Hampton is irrelevant, and all other issues raise

15    the question of fact.

16         We ask that you deny the motion.

17         MS. McPHAIL:  Very quickly.  Well, at least

18    now I understand why we want cameras here.  Let me just

19    refocus this for a moment.  It is not that facts don't

20    exist, it is that the facts are not disputed.  If a

21    check was written and the judge signed it, it's a fact.

22    The issue to is to whether that constitutes judicial

23    misconduct as an issue of law.

24         Let me just go to the court rule which is very

25    clear.  The Judicial Tenure Court Rule 9.210 indicates:

1          "The Master shall rule on all motions and other

2          procedural matters incident to the complaint, answer and

3          hearing.  Recommendations on dispositive motions,"

4          meaning they're expecting the Master might have some,

5          "shall not be announced until the conclusion of the

6          hearing, except that the Master may refer to the

7          Commission on an interlocutory basis a recommendation

8          regarding a dispositive motion."

9                 Now, Ms. Rynier is not the only person in this

10         courtroom who was in the prosecutor's office.  In fact,

11         I was one of three division chiefs for ten years.  I was

12         an Assistant United States Attorney, a police

13         commissioner.

14                 In my 35 years of practice, I have never seen

15         a case less subject to agreement by the parties and more

16         of an overreaching case.  This is a series of factual

17         allegations by the other side, many of which we don't

18         dispute; there were checks written, there was a

19         Community Service Program, it was used for certain

20         things.  What we're not saying here is that we dispute

21         those things.  We're saying that as matter of law,

22         because many of those things are admitted, it is not

23         something that needs to be a part of this hearing.  And

24         we understand that the Master -- that, Your Honor, you

25         may refer -- defer your decision on this until after the

                                    21

1   hearing and we're not suggesting otherwise, but the

2   rules clearly provide for it and -- I don't know what

3   all that was about, but the rules provide for it and we

4   are asking that you grant our motion.  Thank you.

5           THE MASTER:  Anything else, Ms. Rynier?

6           MS. RYNIER:  No, Your Honor.

7           THE MASTER:  In the Respondent's Motion for

8   Partial Summary Dismissal, she asks the Master to

9   summarily dismiss the majority of the allegations in the

10  complaint for lack of a genuine issue of material fact,

11  pursuant to MCR 2.116(C)(10).

12          The Master is bound by MCR 9.210(B)(2), which

13  states, in relevant part, that the Master shall rule on

14  all motions and other procedural matters incident to the

15  complaint, answer and hearing.  Recommendations on

16  dispositive motions shall not be announced until the

17  conclusion of the hearing, except that the Master may

18  refer to the Commission on an interlocutory basis a

19  recommendation regarding a dispositive motion.

20          Because this is an expedited hearing, and

21  because the Master lacks authority to summarily dismiss

22  any of the allegations in the complaint, the Master

23  declines to state whether it believes there is a basis

24  for a dispositive recommendation.  The Master finds no

25  need to refer the matter to the Commission on an

                            22

1    interlocutory basis as allowed by 9.200(B)(2).

2          The motion is denied.

3          MS. RYNIER:  Thank you.

4          THE MASTER:  Next, let's deal with

5    Respondent's Motion to Exclude Evidence.

6          MR. THOMAS:  That's mine, Your Honor.

7          THE MASTER:  Okay.

8          MR. THOMAS:  May I?

9          THE MASTER:  Of course.

10          MR. THOMAS:  Your, Honor, on January 5th, we

11    met at the prosecutor -- at Mr. Fischer's office who

12    provided us with discovery pursuant to the court rule

13    and pursuant to your scheduling order that you had

14    entered previously.  It is our position that upon

15    reviewing the materials provided by Mr. Fischer and

16    Ms. Rynier, we noted in there that contrary to

17    MCR 9.212(A)(2), they had issued subpoenas after the

18    filing of the formal complaint and somehow they obtained

19    evidence sometime around, to the best of our knowledge,

20    December 14th and December 21st.

21          Now, in the brief that we filed, we have

22    argued to you that doing that violated the court rules

23    governing these proceedings.  What is significant about

24    that, Your Honor, is that I truly believe that if I ever

25    attempted that, if I -- if a Respondent's counsel ever

1     attempted to subpoena evidence prior to a hearing, great

2     hay would be made of it.  I have only seen that done in

3     one prior case.  And in Ms. Rynier's and Mr. Fischer's

4     brief, they made reference to the fact that, well -- I

5     don't think they named me by name, but they said,

6     "Respondent's counsel raised that same issue in a prior

7     formal complaint involving a Judge Beverly

8     Nettles-Nickerson."  And I will tell you, that that is a

9     true statement.  And I lost on that issue, and I filed a

10    motion for reconsideration before the Master and I lost.

11    But I want to tell you it is my recollection -- and I

12    have been unable to dig out the transcript cite, but it

13    is my recollection that the examiner's argument in that

14    case, and it was an examiner other than Mr. Fischer,

15    that the Examiner argued that even if the Master found

16    that a subpoena had been improperly issued, that it was

17    a nonprejudicial irregularity.  And if you take a look

18    at the response to our motion that was filed, that's

19    essentially what is being said.

20          But what we're arguing to you, Judge, is this:

21    I don't think that they have seriously contested the

22    fact that their office issued the subpoena.  I don't

23    have a copy of the subpoena, so I don't know what the

24    return date on it was.  I do know that in this

25    proceeding before Your Honor, I have issued subpoenas

24

1      that require the production of documents, and I have

2      picked various dates along the way from January 23rd,

3      when we started the hearing, for the return of those

4      items by custodians in this courtroom.  That's the way

5      the rules are supposed to work.  Why would this be

6      important to me?  Why would I be raising the issue?

7            Your Honor, it's because discovery in these

8      proceedings is so limited.  It is so limited.  The only

9      thing we get from the other side is a witness list and a

10     copy of exhibits that they may introduce at hearing and

11     that's what we have to give them.  But if they're

12     allowed advantages along the way, we are disadvantaged.

13     And I am telling you that if anybody at the Judicial

14     Tenure Commission felt that there was a need for an

15     early returned subpoena, a subpoena for records that

16     were going to be used at the hearing, I, my office, and

17     Ms. McPhail's office should have been put on notice and

18     said, "Hey, we're going to do this."  That wasn't done,

19     Judge.

20           Now, they argue in their response pleading

21     that, well, you know, the Master really doesn't have

22     authority to exclude evidence.  I say to that, Your

23     Honor, pshaw.  I think that the rules are very clear.

24     Unless there is a rule that limits your authority

25     somehow or in some way, shape, or form, the General

25

1       Rules of Civil Procedure apply.

2               And one of the other primary concerns raised

3       by the motion that we filed is as follows:  As Ms.

4       McPhail and I sit going through the evidence -- and we

5       know that two subpoenas were issued by the Examiner, and

6       we know that subpoenas were returned early.  Not in this

7       proceeding.  We don't know how many other subpoenas

8       might have been issued.  I will tell you here today, the

9       answer may be none, the answer may be some.

10              So this is what we've asked for.  We've asked

11      that, Your Honor, issue an order requiring that the

12      Examiner disclose any issues -- any subpoenas that were

13      issued, the issuance of any subpoena that either

14      provided for, or perhaps even in a cover letter alluded

15      to, the fact, you know, if these materials are provided

16      prior to the hearing on January 23rd you need not show

17      up.

18              Your Honor, I would just urge you to take a

19      look at the one and only discovery rule.  It's cited in

20      our brief.  It's so scant.  It's so brief.

21              We've complained about other areas that we're

22      going to be talking about throughout the morning, but

23      Your Honor, for the Examiner to file a response

24      indicating that a prior Master, in a prior case, a case

25      that was, to best of my recollection, litigated about

26

```
 1        three years ago denied my request without providing a
 2        copy of the decision of the transcript, it's inherently
 3        unfair.  They have much better access to that
 4        information than mine.  But I will tell you, as an
 5        officer of the court, it was my understanding back then,
 6        and it's my understanding today, that they argued
 7        nonprejudicial irregularity which is very, very close
 8        and akin to what's argued in their brief today.  So
 9        we're asking that Your Honor address the fact.
10             We've asked for two forms of relief, and we're
11        asking that you seriously consider both.  And for
12        anybody to stand up and submit a pleading in front of
13        you stating you don't have the authority to do so, both
14        sides have said here today, Your Honor, if one of the
15        rules found at Chapter 9.200 et seq. don't say that you
16        don't have authority or don't deal with an issue, then
17        you have all the other authority of a circuit court
18        judge hearing a civil trial without a jury.  Thank you,
19        Your Honor.
20                  THE MASTER:  Thank you.
21                  Ms. Rynier.
22                  MS. RYNIER:  In no way are we arguing that
23        this Court does not have the jurisdiction to make a
24        decision.  Counsel's motion raises the argument -- or it
25        makes the argument that the evidence was obtained and
```

1     produced.  And counsel is quoting the Michigan

2     Constitution due process clause claiming that because

3     there was a violation, somehow all the information

4     should be suppressed.  In effect, counsel's arguing the

5     exclusionary rule, because there was some kind of a

6     violation, exclusionary rule of the Fourth Amendment

7     should be applied and any of the evidence should be

8     suppressed.

9          Well, number one, the exclusionary rule in the

10    Fourth Amendment does not apply to these hearings.

11    That's number one.  Number two, if counsel recalls, and

12    I think at some point in time in his practice he did

13    come across the case of *United States vs. Miller*, the

14    records in question here are banking records.  There is

15    no expectation of privacy in one's banking records.  425

16    U.S. 435.  It's still a good law.  Exclusionary rule

17    would not apply.

18         We are not advocating that anything -- or

19    we're not conceding that anything that was done was done

20    improperly.  We did obtain records.  And counsel would

21    have this Court decide that the way that things should

22    work is that subpoena should be issued and records

23    should be produced on January 23rd.  Well, you know,

24    Judge, and I would say to this Court, at that point in

25    time there really would not be any need for the judge to

1       hear because we would need additional time to review

2       whatever it is that was produced.  And counsel has got

3       to agree or decide whether he wants to claim that we

4       gave him too much or that we gave them not enough.

5       Because the last time we were here the argument was "We

6       received 2,000 pages of documents."  In fact, in some of

7       his motions, he calls it "two document dumps."

8               As far as the Nettles and Nickerson case -- or

9       Nettles-Nickerson case, counsel never appealed that

10      decision to the Judicial Tenure Commission, which he

11      could have.  He never appealed that decision to the

12      Michigan Supreme Court, which he could have.  There is

13      no violation in this case.  The documents were provided

14      to counsel.  They were provided to counsel at the first

15      opportunity or the first date that this Court and this

16      Master, Your Honor, had told us to release all documents

17      that we had in our possession.  They were so released,

18      in fact, it's a continuous order.  We have been

19      supplying more additional information.  In fact, last

20      time we were here an issue of DVDs came up.  I told

21      counsel, "We're making copies for you."  I have two

22      copies.

23              We have complied with the rule, and I ask that

24      you deny this motion as well.

25              MR. THOMAS:  May I, Your Honor?

1            THE MASTER:   I'll give you one minute.

2            MR. THOMAS:   Pardon me?

3            THE MASTER:   One minute.

4            MR. THOMAS:   Well, Your Honor, the only thing

5    I would say, is that the court rule that I've cited

6    indicates that they have the right to subpoena

7    documentary evidence for production at the hearing.

8    Significantly, I did not hear one time from Ms. Rynier,

9    and I did not see in their answer to my motion, any

10   reference or any assertion that they did not issue these

11   two early returned subpoenas.  I have not heard that.

12   I'm somebody that rules mean something to.  Rules are

13   there to follow.  I will tell you, I followed them in

14   the Nettles-Nickerson case, and I'm following them in

15   this case, and I think that they have an obligation as

16   the individual prosecuting this complainant to following

17   the rules and they didn't do so.

18            THE MASTER:   Thank you.

19            Ms. Rynier, anything else?

20            MS. RYNIER:   No, Your Honor, I have nothing

21   else.

22            THE MASTER:   In Respondent's motion to exclude

23   evidence, she seeks exclusion of evidence based on the

24   examiner's purported violation of MCR 9.212(A)(2), which

25   provides that "... after the filing of the complaint,

                          30

1       the Commission may issue subpoenas either to secure

2       evidence for testing before the hearing or for the

3       attendance of witnesses and the production of documents

4       or other tangible evidence at the hearing."

5               Respondent argues that all documentary or

6       other evidence received by the Commission in response to

7       subpoenas issued by it after the date on which the

8       formal complaint was filed (October 26, 2011) and prior

9       to the date the hearing will start must be excluded.

10      Respondent further seeks a list of all such subpoenas

11      (with cover letters).  She relies on MCR 9.211, which

12      she says requires that if MCR 9.200, et seq., does not

13      provide a specific rule that governs these proceedings,

14      the general rules of court procedure apply.

15              MCR 9.212(A)(2) specifically allows the

16      commission to issue subpoenas and secure evidence,

17      including documents, after the complaint has been filed.

18      Respondent is entitled to limited discovery according to

19      MCR 9.208(C)(1).  She is entitled to receive the names

20      and addresses of all persons the Examiner intends to

21      call at the hearing and a copy of all statements and

22      affidavits given by them as well as any material that he

23      intends to introduce as evidence in the hearing.  The

24      Examiner is under a continuing duty to provide any

25      exculpatory material in the possession of the Commission

31

1    even if he does not intend to introduce it at the

2    hearing, as well as other materials in his possession.

3    MCR 9.208(C)(1)(a)(ii).

4            The Examiner has presented to the Master and

5    to the -- has represented to the Master and to the

6    Respondent that he has turned over everything in his

7    possession.  There has been no showing to the contrary.

8    Respondent has failed to cite authority that would

9    require the Examiner to turn over his work product.

10   Should the Examiner attempt to admit into evidence

11   material in his possession that has not been turned over

12   to the Respondent, the Master will deal with that issue

13   when it arises, including possible sanctions as allowed

14   by law.

15           And that's my ruling on this issue.

16           All right.  I'll next deal with Respondent's

17   Motion, which is a long one.  Respondent's motion for an

18   Order Referring this Matter to the Judicial Tenure

19   Commission with the Master's Recommendation for

20   Dismissal of this Action due to Prosecutorial Misconduct

21   of the Examiner, or in the alternative, for an Order

22   Adjourning this Matter to Allow In-Camera Submission of

23   all Interviews and Information in the Possession of the

24   Examiner, and Subsequent Production of all Factual Data

25   to the Respondent.

1           Ms. McPhail.

2           MS. McPHAIL:  Thank you, Your Honor.  I'm

3    going to do what you asked me to do, which is to go to

4    the things that are not already in the motion and talk

5    for a minute about the examiner's response.

6           In his response, he alleges that he's not a

7    prosecutor.  Well, he's not all wrong about that, but

8    neither is he right.  He has a prosecutorial role in

9    this matter.  He represents a governmental entity which

10   has the power to level punishment against the Judge and

11   to destroy her career.  His argument might be stronger

12   had he not included criminal charges in his complaint,

13   but he did include them.

14           As a person who has tried major civil,

15   criminal, and administrative cases, I know as a matter

16   of the state bar rules and all other rules that you're

17   required as an attorney not to represent things that are

18   not true, and to make sure that you -- that you provide

19   documents to the other side where the rules require

20   them.

21           Rule 9.208 requires the Examiner to produce

22   all exculpatory material in his possession.  It doesn't

23   just say one kind of exculpatory material.  And by the

24   way, exculpatory material includes information given to

25   the Examiner that could lead to other evidence that

                              33

1     would prove facts favorable to the defense.  The

2     standard for release of work product is undue hardship.

3     We don't have undue hardship.  We have impossibility.

4             The Judge is put on administrative leave on

5     April 13th.  That's nine month ago.  The next day

6     Deb Green from SCAO, and the newly appointed

7     Judge Valdemar Washington, tell court employees not to

8     talk to the Judge.  The Judge's personal safe is broken

9     into without a warrant.  For nine months SCAO and

10    Judge Washington provide documents to the Examiner, and

11    pursuant to the rules, they can do that.  And witnesses

12    are interviewed by the court staff on site at the court.

13    We issue FOIA requests to the City of Inkster, which

14    they ignore, and to this day, provide no response to

15    most of our requests.  We call witnesses who tell us

16    they cannot talk to us per Judge Washington.  We're

17    finally given one hour in nine months to come to the

18    court and take whatever documents we can carry.  The

19    Judge discovers that exculpatory documents, which she

20    knew were on her desk, are now missing, some of them

21    from a middle of a stapled package of documents.

22            On January 5th, 12 days ago, we get over 2,000

23    pages of documents and a witness list, but no witness

24    statements.

25           By January 10th, we have to file all motions,

1    so we get five days to do that after we get these

2    documents.  The hearing in this matter is scheduled for

3    January 23rd.  So while Mr. Fischer and his office have

4    had more than nine months to prepare, Judge James will

5    have had 18 days from the time that she received the

6    documents and a universe of uncooperative witnesses.

7         Further evidence of bad faith, the Examiner

8    did not produce the tape, WXYZ, that they were going to

9    draw their excerpt from in these seven volumes that they

10   gave us.  Yes, by the way, to produce the entire tape

11   per the court rules, not just the summary part he

12   intends to use.  He is here carrying water for the

13   media.

14        Under the Judicial Tenure Commission Rule

15   9.221, JTC refers matters to SCAO for investigation,

16   which what it did here, now attempts to cast the SCAO

17   investigation as somehow unknown to him.  The examiner's

18   office is the beneficiary of everything that SCAO and

19   Judge Washington did.

20        Finally, when you look at these proceedings,

21   as a division chief at a prosecutor's office, I would

22   have fired somebody who took no witness statements.  The

23   reason you take witness statements is to nail the

24   witness down to the factual allegations that witness is

25   making.  To let them walk out of the door without a

1    witness statement, it's just bad lawyering or it's

2    intentional, because you know if you take a witness

3    statement, you're going to have to produce it to the

4    other side. So here we are with very little time versus

5    their nine months to prepare for a hearing with 30 or

6    more -- 34, I think it is now, witnesses on their list,

7    nobody calling us back. Whether they did it on purpose

8    or not doesn't even matter. The fact is, we are in a

9    situation where we cannot properly prepare for this

10   hearing.

11           This is trial by ambush. What we're asking

12   you to order here, is that the bad faith of this

13   Examiner has resulted in an untenable situation for the

14   defense, and the case should be referred back to the

15   JTC, as the rules allow, with a recommendation for a

16   dismissal. Failing that, which I know is asking a lot,

17   alternatively we're going to ask that you adjourn the

18   proceedings, you require the Examiner to give us Deb

19   Green's complaint. She's one of the two complainants in

20   this case and they haven't even given us her complaint.

21           (Discussion held off the record.)

22           MS. McPHAIL: Sorry. One of three. Require

23   the Examiner to produce all of his evidence in-camera to

24   you.

25           Now, there are a lot of things the federal

36

1       rules and the State Supreme Court has suggested that

2       would make that less of an onerous task for you,

3       including he brings it all to the conference room and we

4       get to look at it, but not copy it, and then ask for

5       whatever it is we want so that you don't have to do it

6       all.  But there is a way for us to get the exculpatory

7       evidence, to get to look at it so we can determine

8       whether it's exculpatory that does not involve the Court

9       doing all of it.  We're also asking you to schedule an

10      evidentiary hearing before the trial at which time we

11      may question the court employees relative to direction

12      given to them by SCAO, Judge Washington, and the

13      examiner's office not to speak to Judge James and her

14      attorneys.

15          So I don't think there's any question that

16      nine months of preparation, witnesses refusing to talk

17      to us, and 2,000 documents on January 5th, cry out for

18      some kind of relief here, and we're asking you, Judge

19      Mattson, to give us some relief sufficient to allow us

20      to prepare for this.

21          THE MASTER:  Thank you.

22          MS. McPHAIL:  Thank you.  Oh, I'm sorry, one

23      more thing.  This was one of the documents they gave us.

24          THE MASTER:  Could you approach so I can

25      attempt to see it?  I see that it is fuzzy.  I guess I

37

1      want to see how fuzzy it is.

2               MS. McPHAIL:  This is a whole package of this

3      kind of thing, right here that we just got.

4               MR. THOMAS:  On Friday we got it.

5               THE MASTER:  Okay.

6               MS. McPHAIL:  If this isn't an example of bad

7      faith, I don't know what is.

8               (Discussion held off the record.)

9               MS. RYNIER:  May I respond?

10              MR. THOMAS:  One second.

11              MS. McPHAIL:  And, Your Honor, my co-counsel

12     reminded me to just make it clear, we didn't get one

13     witness statement, not one, and no exculpatory evidence

14     whatsoever.  And we know there is some, because some of

15     the witnesses who are afraid to come forward have told

16     us that they told Mr. Fischer and Ms. Rynier that this

17     is a good judge who did nothing wrong.

18              THE MASTER:  Ms. Rynier, before you start, I

19     want to make certain that I've understood what you've

20     told me, which is that you believe you have provided all

21     the materials in your possession?

22              MS. RYNIER:  Yes.

23              THE MASTER:  What about things that basically

24     are illegible?

25              MS. RYNIER:  Well, Your Honor, what counsel

                                  38

1    has been holding up is something was faxed over.  The

2    originals, which I'm certainly not going to release, are

3    pink in color.  If counsel wants to come to the office

4    and take a look at them, I absolutely have no problem.

5    If Mr. Thomas wants to come in, and we'll keep xeroxing

6    until the quality is better.  I think what's -- what was

7    mailed to their office is substantially better, but I

8    wanted to make sure that something was faxed over as

9    immediately --

10            THE MASTER:  Are you saying that you mailed

11   them --

12            MS. RYNIER:  Hard copies.

13            THE MASTER:  -- hard copies of these things --

14            MS. RYNIER:  Yes.

15            THE MASTER:  -- that you believe are --

16            MS. RYNIER:  Better.

17            THE MASTER:  -- more legible?

18            MS. RYNIER:  Yes.

19            THE MASTER:  And they received these faxes on

20   Friday?  There was no mail yesterday.

21            MS. RYNIER:  Correct.

22            THE MASTER:  Hopefully, the documents will be

23   in today's mail.  All right.  Go ahead.

24            MS. RYNIER:  Your Honor, in fact, I have one

25   set of copies of these with me, and we can take a look

                            39

1     at them right now.

2             THE MASTER:  You can do that after --

3             MS. RYNIER:  After the hearing, and then we

4     can see what counselor has.

5             In response to the motion, counselor is

6     absolutely incorrect in stating that this is all about

7     punishment.  This is not about punishment.  In fact, the

8     Supreme Court has stated, "The proceedings of a judicial

9     board or a Judicial Tenure Commission are investigatory

10    and advisory and are not binding upon the Supreme Court.

11    No determination of criminal guilt is made."  It's not

12    punishment.

13           The determination that ultimately will be made

14    by the Supreme Court following the recommendation by

15    this Court is whether Respondent is fit to continue

16    sitting as a judge.  It is not punishment.

17           As to the motion itself, the allegations that

18    are made against various individuals, those individuals

19    are not associated with the Examiner.  The Examiner at

20    this point in time is actually separate from the

21    Commission.

22           Counselor is saying that the Examiner is a

23    prosecutor.  We are not.  We simply present the evidence

24    that has been obtained.  As far as the taking of the

25    evidence, there is absolutely no rule that says you

1        shall take witness statements.

2               Ms. McPhail has been with the prosecutor's

3        office for a few years.  I have tried hundreds of cases,

4        and in many of them there were no witness statements for

5        whatever reason.  Sometimes the situation was that the

6        police department wanted to obtain those and somebody

7        said, "I don't want to talk to you."  We went with that.

8        I don't know where counselor gets her information as to

9        saying that they have statements.  We don't -- they

10       should have gotten statements.  I'm sorry.  Defense

11       attorneys will not tell the Examiners how to prepare a

12       case.  If we do not present sufficient evidence, that's

13       where it will stand, but we are confident we have more

14       than sufficient evidence for purpose of this hearing.

15              I don't know where counselor gets off saying

16       that we brought water for the media.  Mr. Fischer

17       brought me a bottle of water, he has one.  This is the

18       type of allegations that Ms. McPhail is talking about

19       and is making.  They are absolutely wrong and

20       irresponsible.

21              Counselor is talking about the fact that

22       witnesses are so terrified.  In fact, they're so afraid.

23       I know for a fact that at lease one of them spoke to

24       Mr. Thomas, because immediately thereafter, I got a

25       phone call from that witness who said, "Yes, I just hung

                              41

```
 1        up with Mr. Thomas, and I just wanted to call you and

 2        make sure that you didn't misunderstand everything I

 3        said."  Now, why would you think that?  If somebody

 4        wants to talk to Mr. Thomas or Ms. McPhail, they are

 5        free to do so.  If they do not wish to talk, they are

 6        free to do that too.

 7              As far as being terrified of Judge Washington,

 8        I would say, as an officer of this court, the staff of

 9        the 22nd District Court had written a collective letter

10        to SCAO asking for Judge Washington to remain in that

11        courtroom because of how efficiently that court is now

12        functioning.  That is not a staff that is being

13        terrorized.

14              Your Honor, counselor is making an accusation

15        that someone had told these witnesses not to talk to

16        Mr. Thomas or to Ms. McPhail.

17              Again, please choose your words carefully

18        before you make an allegation of that kind against

19        another attorney because that borders on slander.

20              At no time, date, did anyone from the

21        examiner's office would ever tell a witness "Do not tell

22        or talk to the opposing counsel."  There is absolutely

23        no basis for this motion other than we just want to

24        delay this.

25              I ask that you deny the motion.
```

1     Oh, one more point, Your Honor.  Counsel is

2  asking for the complaint of Deb Green.  That was

3  provided to Respondent with the request for comments.

4  That's the first thing that's sent.

5     THE MASTER:  You're not talking about the

6  affidavit.  You're talking about a complaint?

7     MS. RYNIER:  The complaint.  She asked for the

8  complaint.

9     MS. McPHAIL:  I never --

10     MS. RYNIER:  And that would have been in June

11  of 2011.

12     MR. THOMAS:  No.  Excuse me.  And I know

13  Ms. Rynier for a long time, and I know she's just

14  misspeaking.  I'm telling you, that did not occur.  That

15  wasn't even in existence at the time.  There were two

16  case numbers on there.

17     THE MASTER:  I don't know -- are you the --

18     MR. THOMAS:  I'm just letting them know that's

19  not accurate, what was just said.  But I would never

20  accuse Ms. Rynier of making an intentional

21  misrepresentation.  We got two requests for

22  investigations with the request for comment and they

23  were filed by two other individuals, but --

24     MS. RYNIER:  If that has not been provided,

25  I'm sorry.  Counsel we will be happy to make a xerox of

1       it and fax it over today.

2           MR. THOMAS:  Well, but you see, Judge -- you

3       see, that's what's significant to us.  We have a trial

4       three business days from now.  And, again, I'm not

5       quibbling with the voracity of their statement that she

6       has made, that she thought that was the case, but we

7       haven't gotten that yet.

8           MS. McPHAIL:  And, Your Honor, if I may,

9       that's not all we haven't gotten.  Let me just address a

10      couple of the things Ms. Rynier said.  This is why it's

11      very important to listen because we didn't say,

12      "someone" told the witnesses not to talk to us.

13          The day after Judge James was removed on

14      administrative leave and never allowed back into her

15      courtroom, again, there was a meeting at which Deb Green

16      from SCAO and Judge Washington were present, and the

17      staff members were told not to talk to us.  How do we

18      know that?  A couple of them called us and said, "We

19      can't talk to you."

20          Secondly, she says one witness called her and

21      told her that they had talked to us.  That's great.  You

22      know what, there's 34 of them, and we have a right to

23      know what we're facing at the trial.

24          The court rule is contemplated.  No, they

25      don't say, "You better take a witness statement," but if

44

1       you didn't do that, then you at least have to provide

2       the factual data and there is exculpatory evidence in

3       that.  We can hold an evidentiary hearing and prove that

4       to you.  What I say, what she says, doesn't matter.  We

5       can bring in the witnesses and prove to you that they

6       were told not to talk to us.  At a minimum, they

7       haven't.  So even if they're just the unintentional

8       beneficiaries of witnesses not liking us, we don't get

9       forced to go to trial with no information.  It's not

10      fair, it's not right, it's not due process.

11              Let me just tell you that, yeah, we were all

12      in the prosecutor's office.  I was a division chief.

13      Enough said.

14              And with regard to the water, I didn't accuse

15      her of bringing water to the media.  The term "carrying

16      water" is meaning, you're arguing for the media.

17              You know, let me just -- one thing I want to

18      address further.  This letter that said, "We want Judge

19      Washington to stay," it was drafted by the former court

20      administrator to Judge Pam Anderson, and the staff

21      refused to sign it.  How do we know that?  They didn't.

22      So, for her to come in here and use that as evidence

23      that they all loved Judge Washington, we're not here to

24      talk about Judge Washington.  What we're here to talk

25      about is the fact that we have been put in a position

                                45

```
 1       where we don't have any evidence.  And if you think it

 2       wasn't intentional, just take a look at the 2,000

 3       documents that we all got on January 5th, hundreds of

 4       pages, including such thing as Pam Anderson's calendars

 5       from when she was in practice and didn't even work for

 6       the court.  So maybe that was inadvertent too.  To me,

 7       it doesn't much matter whether it was inadvertent and

 8       they didn't mean it, and just like right now, it was an

 9       accident of speaking.  It doesn't matter.  We're without

10       the evidence before that hearing and we need to have it.

11       We have a right to have it.

12            MS. RYNIER:  They don't have a right to have

13       it.  Depending on what counsel's referring to as to the

14       complaint, they are not entitled to receive the

15       complaint, Your Honor.

16            MR. THOMAS:  It's a grievance.

17            MS. RYNIER:  I'm sorry.  The grievance.  There

18       is confidentiality, otherwise how many --

19            THE MASTER:  I'm sorry.  When you're using the

20       word "complaint," are you referring to a grievance?

21            MS. RYNIER:  Grievance.

22            THE MASTER:  I'm asking Ms. McPhail.  I want

23       to know --

24            MS. McPHAIL:  I don't know what she's talking

25       about because -- what are you talking about?
```

46

1              MS. RYNIER:  The grievance.  You want

2     Deb Green's --

3              MS. McPHAIL:  She's a witness on your witness

4     list.  Yes, I want whatever she's given you.

5              MR. THOMAS:  It would be a statement, Judge.

6     And just for clarification, and I think that we could

7     all agree before you, in this area of the law, the

8     request for an investigation, grievance, disciplinary

9     complaint sometimes they're all used interchangeably,

10    but I think what we're talking about now would be an

11    actual grievance/request for investigation.  And the

12    reason why we want that, Your Honor, no matter what

13    might have happened before, it would be a witness of the

14    statement of Deb Green.  Both sides have listed her as a

15    witness.  We were supposed to get it.

16             MS. RYNIER:  Judge, a couple things.  Number

17    one, I appreciate it's counsel's motions, but I would

18    ask that if one attorney argues, that we don't take the

19    back and forth between two attorneys.  I understand

20    that's Ms. McPhail's motion, so if we can just

21    procedurally give each other that kind of courtesy,

22    that's number one.  Number two, there is case law that

23    states that grievances are protected by

24    confidentiality -- just a minute, counselor.

25             This is not a criminal case.  This is an

                           47

1       administrative hearing.  We have provided everything

2       that is in our possession.  And, if Mr. Thomas or Ms.

3       McPhail wish to have the grievance of Ms. Green, we

4       shall provide it, even though we do not, by law, have

5       to.  I will turn that over.

6              And as to the comments made with reference to

7       Judge Washington, and the fact that Pam Anderson is the

8       author of this letter and that no one else agreed to

9       sign it, well, gee, then I guess you spoke to all the

10      other people who told you that they didn't wish to sign

11      it.  At least you spoke to a number of the individuals

12      who told you, "We refused to sign it."  I thought no one

13      spoke to you.  I thought no one was willing to talk to

14      the defense attorneys.

15             THE MASTER:  Just so I can clarify, was the

16      letter signed by staff or just by Ms. Anderson?

17             MS. RYNIER:  My understanding is that it was

18      signed by Ms. Anderson, written collectively on behalf

19      of the staff.  But my point is regardless of that, the

20      claim by counsel is, first, "Nobody would talk to us."

21      Now, well, "They all told us they refused to sign it."

22      Which one is it?  If they were told by a number of

23      people that they refused to sign it, they spoke to a

24      number of people.  There goes their allegation that

25      everyone is so intimidated that they will not speak to

1      the defense attorneys.

2            THE MASTER:  Or perhaps one person told them

3      that other people refused to sign it.

4            MS. RYNIER:  Well, as I recall, I believe

5      Ms. McPhail said, "We spoke to several people" or "a

6      number of people who said they refused to sign it."

7            THE MASTER:  Anything else?

8            MS. McPHAIL:  Just the one thing, Your Honor,

9      because an allegation --

10           (Discussion held off the record.)

11          MS. McPHAIL:  -- an allegation was made

12     regarding what the law is.  In a federal case, United

13     States District Court, the Western District, *Lawrence v.*

14     *Van Aiken*, after Mr. -- after the Examiner refused to

15     produce evidence in that case, the federal court

16     considered the matter of whether or not the records of

17     the --

18          (Discussion held off the record.)

19         MS. McPHAIL:  -- whether or not the records of

20     the Judicial Tenure Commission are completely privileged

21     and decided that, in fact, they were not.  In fact, the

22     Court said removal of the word "privilege" from the

23     title suggests the very opposite conclusion then what

24     the JTC asserts.  And in this regard they're talking

25     about the title of the rule.  So this was a 1983 case in

1       which documents from the JTC were required and the

2       federal court refused to recognize an absolute

3       privilege.

4               (Discussion held off the record.)

5               MS. McPHAIL:  This was 2004 and it was not

6       reversed.  We checked.  So, you know, I'm not going to

7       trouble you further with the allegation, but we're -- we

8       need to get some information here before this hearing.

9               THE MASTER:  Do you -- specifically, you've

10      requested the grievance or the complaint of Ms. Green.

11      And Ms. Rynier has stated that although she doesn't

12      believe she's required to give it to you, she will give

13      it to you.

14              MS. RYNIER:  Yes, ma'am.

15              THE MASTER:  Other than what is termed "work

16      product," and I think we understand what we're talking

17      about by that, are you aware of other documents you have

18      not received?

19              MS. McPHAIL:  Yes.

20              THE MASTER:  And if so, would you tell me what

21      they are now?

22              MS. McPHAIL:  Yes.  We have not received any

23      exculpatory material at all.  Because the Examiner took

24      notes instead of producing statements, any exculpatory

25      material, factual material, would be in those notes.  We

                              50

```
 1    are asking only for the factual part of those notes.

 2    We're not looking for his mental impressions.

 3               THE MASTER:  I understand that.  I am asking

 4    if there are any documents you specifically have not

 5    received.

 6               MS. McPHAIL:  Well, we -- we know we don't

 7    have the -- all of the grievances or complaints filed by

 8    individuals against our client.  We are missing the --

 9    there was a letter which was written by -- and I think

10    it's a -- is his name Ferry?

11               MR. THOMAS:  John Ferry.

12               MS. McPHAIL:  John Ferry.  At one point, there

13    was an investigation of the Inkster District Court, an

14    allegation that the judge wasn't, you know, getting

15    things done in a timely matter, and this letter

16    apologizes for that allegation and says, "Well, you need

17    three judges here and you have one."  So basically --

18               THE MASTER:  On or about -- when was that?

19               MS. McPHAIL:  I don't remember when that would

20    have been.  A few years back.

21               (Discussion held off the record.)

22               MS. McPHAIL:  It was on the judge's desk in

23    the middle of -- this was one of ones that was in the

24    middle of a package of stapled documents which somehow

25    is now gone.
```

1        There was also a study done by SCAO that we

2    asked for, and we don't have that study.  That indicated

3    that the number of cases, the sheer volume of the cases,

4    is bigger than any place -- any other district court,

5    and that this judge is handling two or three times as

6    many cases.

7        THE MASTER:  All right.  Do you have that in

8    your possession?

9        MS. RYNIER:  No, Your Honor.  That's in

10   possession of SCAO.  And counsel's talking about

11   something that I believe occurred in 2002, 2003, and

12   perhaps even 2004, where Judge James wanted a second

13   judge for the 22nd District Court that was denied by

14   SCAO following a study.  It has nothing to do with the

15   complaint or the allegations.

16       MS. McPHAIL:  Interesting that she knows that,

17   but doesn't have the documents.

18       MS. RYNIER:  That's --

19       MS. McPHAIL:  In any event, the -- you know,

20   what we're saying, Judge, is that after she's locked out

21   of the court -- Judge James was locked out of the court,

22   there was a -- I had a meeting with Deb Green, it was

23   SCAO, and Chad Schmucker, and we talked about these

24   issues.  They committed to us that they would not touch

25   her personal safe outside of her presence.  It came from

52

1        her law practice.  It had her personal tax records,

2        bills, and so forth in it.  They broke the door off of

3        the safe.  They refused to allow her to come in and get

4        the documents which would be the exculpatory.  So do we

5        know there are exculpatory documents?  Absolutely.

6                    THE MASTER:  Do we know they're in their

7        possession?

8                    MS. McPHAIL:  Absolutely, because Deb Green

9        was there the day --

10                   THE MASTER:  No, do we know they're in the

11       Commission's possession?

12                   MS. McPHAIL:  Yes.  Because SCAO has been

13       cooperating with the Commission and has given them the

14       documents.  There was actually a rule.  We are not ready

15       for trial on this matter because we have not received

16       any of the factual allegations given by the witnesses,

17       which for the most part, are exculpatory and we know

18       that.

19                   Whether or not a witness will call you up and

20       say, "Don't tell anybody I called, but this is what's

21       going on," that's not a factual assertion that we can --

22       first of all, that they take credit for; and, secondly,

23       that we can use at the hearing.  We have to be able to

24       see what these individuals told Mr. Fischer.  Just the

25       facts, not his strategy, not his impressions.  Thank

                                    53

1      you.

2              MS. RYNIER:  I don't know what counselor is

3      talking about and that's another accusation that she's

4      making, that I have something in my possession.  Did she

5      ever try writing to SCAO saying, We want a copy of that

6      study?  Did she ever try contacting us saying, Look,

7      could you assist me in obtaining a copy of that study?

8              MS. McPHAIL:  Dozens of times.

9              MS. RYNIER:  Counselor, I stopped talking when

10     you addressed the Court.  Give me the same courtesy.

11             MS. McPHAIL:  I take direction from her, not

12     you.

13             THE MASTER:  Sit down.

14             MS. RYNIER:  Thank you.  Counselor is saying,

15     interestingly, she, meaning me, knows that there was a

16     study, but doesn't have copies of it.  How could I not

17     know about the study.  Every single answer, the first

18     10, 15, 20 pages that the Respondent had filed with the

19     commission talks about how overworked she was, and a

20     study, and the results of that study.  If anything, they

21     have a copy of the study.  But I won't say that they do,

22     because I will not make that accusation against the

23     opposing side.  If they wanted assistance, be

24     professional enough about it to request it.

25             As far as producing my work product, I will

                                54

1      tell the Court, I did not obtain statements from these

2      witnesses.  I do not have statements.  If I did, they

3      would have had them.

4                THE MASTER:  All right.  I'm going to issue my

5      opinion in this, and I may add some things afterwards,

6      as I'm going to be thinking about this more as I go

7      through this.

8                In the motion, the Respondent first seeks

9      referral to the Judicial Tenure Commission with the

10     Master's recommendation of dismissal of the case in

11     response to alleged prosecutorial misconduct of the

12     Examiner.  She argues that her rights to procedural due

13     process have been violated and in this particular case

14     in which criminal acts are alleged, adherence to

15     fundamental due process principles is critical.  She

16     says the role of the Examiner in this case is that of a

17     prosecutor.

18               In support of her claim that the Examiner

19     committed prosecutorial misconduct, Respondent alleges

20     that numerous unidentified exculpatory documents were

21     removed from her office after she was suspended and are

22     not available for use in her defense.  She claims many

23     unidentified court employees will not talk to her or her

24     attorneys because the current judge has allegedly

25     directed them not to do so.  She claims the Examiner

55

```
 1      purposely did not "take statements" from witnesses,

 2      notably court employees; knowing he could claim his

 3      interview notes are protected work product.  And she

 4      claims the Examiner issued subpoenas without her

 5      knowledge for material that she says is irrelevant to

 6      the allegations of the complaint but may later serve as

 7      a basis to amend the complaint.  She claims that the

 8      information she has been deprived of is essential to her

 9      defense and without that she is irreparably prejudiced.

10              Examiner in his response argues that he is not

11      a "prosecutor" therefore, by definition, he cannot be

12      found to have committed prosecutorial misconduct.

13              For the Master to make a finding of

14      prosecutorial misconduct, the Master must make a finding

15      that the Examiner is, in this case, in fact, a

16      prosecutor.  The Examiner is the attorney who presents

17      evidence at a judicial disciplinary hearing before a

18      Master, the Commission or the Supreme Court.

19      MCR 9.201(E).  "Prosecutor" is a term that refers to one

20      who prosecutes criminal cases.  Judicial Tenure

21      proceedings are not criminal or quasi-criminal.  In the

22      Matter of Mikesell, 396 Mich 517 (1976).  This is not a

23      criminal proceeding.  While the roles of a prosecutor

24      and examiner are similar in that they each present

25      evidence against persons accused of improprieties, by
```

1    definition there can be no prosecutorial misconduct in a

2    non-criminal Judicial Tenure Commission proceeding even

3    where, as here, criminal acts are among the

4    improprieties alleged in the complaint.

5         While there are remedies to address violations

6    of the limited discovery permitted, MCR 9.208(c)(3), no

7    such showing has been made.  The motion to refer to the

8    Judicial Tenure Commission with the Master's

9    recommendation to dismiss the proceeding for

10   prosecutorial misconduct is respectfully denied.

11        In the alternative, based on the alleged

12   improprieties of the Examiner and others Respondent

13   seeks an Order Adjourning the hearing to allow the

14   Master to review the examiner's notes of his interviews

15   of any and all witnesses that his office interviewed,

16   any investigative materials in his possession, and all

17   additional documents that the Examiner may offer for any

18   purpose at the hearing.  She also seeks adjournment of

19   the hearing for a period sufficient to allow production

20   of the information and additional time for preparation

21   by counsel, and asks the Master to hold an evidentiary

22   hearing to determine why court employee witnesses are

23   unwilling to talk with Respondent or her counsel.

24        Respondent cites *Power v. City* of Troy, 28

25   Mich App 24 (1970), in support of her motion.  In that

57

1          case, the Court said that since the statement sought by

2          the plaintiff might be useful for impeachment purposes

3          or to test the credibility of witnesses, the statement

4          should be turned over.  Respondent claims that the

5          materials within the examiner's investigative files,

6          including his work product, might likewise be useful to

7          her for impeachment or other purposes.

8                    She also argues that her due process rights

9          have been so violated that the Master must grant the

10         relief requested or she will be irreparably prejudiced.

11                   *Power* is distinguishable from the matter

12         before the Master in that it is a civil case in which

13         the plaintiff sought a witness statement that was

14         recorded by a stenographer four hours after the accident

15         that was the subject of the trial.  The accident

16         occurred six years before the trial.  That case was

17         being tried for a second time as the first jury was

18         unable to reach a decision.  There was a significant

19         factual dispute that the court believed might be

20         resolved if the statement was provided.

21                   In this matter, the information sought by the

22         Respondent for in-camera review is primarily the

23         examiner's interview notes, that is, his work product,

24         and not recorded statements of witnesses.  The interview

25         notes are from interviews conducted within the past few

1    months.  Unlike the statements in *Powers*, these notes

2    were not made at or near the time that any of the

3    alleged improprieties of Respondent occurred.

4           Respondent does not claim that the Examiner

5    removed or caused removal of the alleged exculpatory

6    documents from her office, although she sort of is

7    claiming that now by agency, or that the Examiner

8    directed or caused anyone to direct the witnesses to

9    refuse to speak with her or her counsel, or that the

10   Examiner is required by statute or rule to reduce his

11   interview notes to statements, or that those interviews

12   occurred in close proximity to the events mentioned in

13   the complaint, or that the Examiner is precluded from

14   moving to amend the complaint.

15          The Examiner is an employee of the Judicial

16   Tenure Commission, an independent agency.  Citing the

17   Michigan Constitution (1963) Article 6, Section 30.  The

18   Commission is not a division of the Michigan Supreme

19   Court or the State Court Administrator's Office.  As an

20   employee of the independent Judicial Tenure Commission,

21   the Examiner is not responsible to either the Michigan

22   Supreme Court or the State Administrator's Office, nor

23   is he responsible for their actions.

24          Nevertheless, Respondent seeks to have the

25   Master hold the Examiner responsible for actions

59

1   allegedly committed by them or their agents by ordering

2   that the Examiner turn over all of his investigative

3   materials, including those that are clearly work

4   product, to the Master for in-camera review because of

5   alleged due process violations.

6          The Master will not hold the Examiner

7   responsible for alleged misdeeds of those who are not

8   responsible to him.  The Examiner has assured the Master

9   and the Respondent that he has turned over all materials

10   with the exception of those that we've discussed today

11   that he is required to provide.  Respondent has failed

12   to persuade the Master that an evidentiary hearing or an

13   in-camera review is necessary.  The Respondent can

14   question witnesses about the issues she raises in her

15   motion during the formal hearing.

16          As for the other improprieties Respondent

17   attributes to the Examiner, she does not claim that the

18   Examiner is required by statute or rule to reduce his

19   interview notes to statements, or that the examiner is

20   precluded from moving to amend the complaint.

21          Respondent is entitled to know what she is

22   accused of.  The improprieties she is alleged to have

23   committed must be stated in a manner that is

24   sufficiently specific to fairly inform her of the

25   charges against her and of the facts the Examiner seeks

60

1    to prove so that she is able to prepare her defense.

2          The Master is satisfied that Respondent knows

3    the charges that have been made against her.  They are

4    spelled out in great detail in the complaint.  While

5    Respondent may not know specifically how each witness

6    will testify, she knows which witnesses, including which

7    court employees, will testify.  The Examiner is under a

8    continuing duty to provide the Respondent with any and

9    all exculpatory material in his possession

10    MCR 9.208(C)(1)(a)(ii).

11          There has been no showing other than what has

12    been stated on the record today that the Examiner has

13    failed to comply.

14          On January 5th, 2012, Respondent's counsel and

15    the Examiner exchanged witness lists and exhibits.  They

16    could have met up to two and a half weeks earlier, but

17    that was the date they agreed on during a conference

18    call with the Master.

19          The purpose of this hearing is not to punish

20    the Respondent, but to make factual findings and

21    conclusions of law that will help to determine if the

22    Respondent is fit to continue holding the office of

23    Judge.  This Master is committed to providing both sides

24    with as fair a hearing as possible.

25          The motion to adjourn the hearing for

1          in-camera inspection of evidence and for an evidentiary

2          hearing is respectively denied.

3                    MS. RYNIER:   Thank you.

4                    THE MASTER:   Now, I will address the

5          examiner's Motion to Disqualify Sharon McPhail.

6                    MS. RYNIER:   Your Honor --

7                    THE MASTER:   Just a second.   All right.   Go

8          ahead.

9                    MS. RYNIER:   The basis for our filing this

10         motion is the fact that on October 26th, we had filed

11         Complaint No. 88 -- Formal Complaint No. 88, in which

12         one entire count deals with a financial impropriety

13         involving Ms. Sharon McPhail.   Specifically, in

14         Paragraphs 138 to 142 of the complaint, it is alleged

15         that from June 30th, 2009, through February 2nd, 2011,

16         Respondent authorized the payment of over $55,000 in

17         legal fees to Ms. McPhail.   Those legal fees were paid

18         by the City of Inkster pursuant to a request by the

19         Respondent.   Those legal fees were paid with public

20         funds.

21                   And in our motion to disqualify Ms. McPhail,

22         in Paragraph 2, we provide the breakdown of the amounts

23         that were authorized by Respondent each time, the last

24         one being February 2nd, 2011.   We know, and we will

25         represent to this tribunal, that Ms. McPhail and the

1    Respondent have been friends for a long, long time.   In

2    fact, one of the pieces of evidence that were submitted

3    and turned over to counsel for Judge James include

4    e-mails from Ms. McPhail to Judge Washington, interim

5    judge of the 22nd District Court, in which Ms. McPhail

6    stated, "I have represented Judge James in her -- "in

7    personal and professional matters for a long time."

8            The question, Judge, becomes what matters were

9    compensated with public funds.

10           THE MASTER:   I'm sorry.   What was the date of

11   that?

12           MS. RYNIER:   The e-mail date?   I do not have

13   that off the top of my head, but I anticipate -- or I

14   can guess that it was sometime in I believe April or May

15   of 2011, after Judge Washington was appointed by the

16   Supreme Court to the 22nd District Court.

17           We know from the answer that was filed on

18   behalf of Judge James that it is claimed that there was

19   no written agreement that was entered.   And in their

20   response, counsels are arguing that a written agreement

21   is not mandatory in all cases.   I believe that they

22   argued that only in contingent fee cases is that

23   mandatory.   But when you are dealing with public funds,

24   and there is evidence showing that an attorney

25   represented a judge personally and professionally, and

                              63

```
 1        invoices are not available, and that one or two invoices
 2        that are available do not justify that kind of
 3        expenditure, it becomes an issue and the issue is who
 4        paid for it.  Because if personal representation paid
 5        for is with public funds, that is improper.
 6               In their response to our motion and the
 7        companion motion to strike Ms. McPhail from the
 8        examiner's witness list, an argument is made -- in fact,
 9        I believe that the language is "When did the light bulb
10        go off in their heads," meaning the Examiners, that
11        Ms. McPhail may be a potential witness?  It is also
12        argued in that response/motion to strike that Ms.
13        McPhail is the primary attorney on this matter.
14               Your Honor, I have reviewed Respondent's
15        answer to the 28-day letter, and in there there are a
16        number of attachments provided.  This Court has to keep
17        in mind that the Request for Comments was filed, which
18        is the first document filed with the Judge on May 29th,
19        2011.  On June 29, 2011, their Attachment 1, there's an
20        e-mail from Judge Washington to --
21               (Discussion held off the record.)
22               MS. RYNIER:  -- to Vi Serifovski with a cc, or
23        copy, provided to Mr. Thomas, Deb Green, Pam Anderson,
24        City of Inkster, Esther Davis.  No Ms. McPhail.
25               July 7th, another e-mail, their Attachment 2,
```

1      same thing from Vi Serifovski to Val Washington, cc

2      Phil Thomas regarding Judge Sylvia James.  No mention of

3      Ms. McPhail.

4          All correspondence with Judicial Tenure

5      Commission has been made on the letterhead of

6      Mr. Philip J. Thomas.  In fact, the letter dated July

7      7th contains the signature of only Mr. Phil Thomas.

8      There is a cc to Sharon McPhail, Esq., and the first

9      line does say, "This letter will serve as a confirmation

10     that Judge James, Ms. McPhail, and I will come to the

11     court on July 14th."  There's no indication that

12     Ms. McPhail was going there as counsel for Judge James

13     in representing her interests before the Judicial Tenure

14     Commission or their investigation.

15          And the reason I bring that up, Judge, is

16     because the argument is being made that without

17     Ms. McPhail, this case cannot proceed.

18          Mr. Thomas is the attorney that had been on

19     this case from its beginning.  Mr. Thomas is the

20     individual who had received documents, correspondence

21     initially from Judicial Tenure Commission regarding this

22     matter.  So to answer their question with a question,

23     When did the light bulb go off in the head of an

24     attorney who clearly has notice that the investigation

25     centers around her representation of a judge in a

1      grievance filed against that judge, to know that, wait a

2      minute, maybe I have a conflict here?

3              On October 26, 2011, a formal complaint was

4      filed, and in that complaint an entire count revolves

5      around Ms. McPhail.  We have served the opposing side

6      with a witness list on January 5th, which is when we

7      were asked to do so.  And I will remind this Court that

8      in the telephone conference back in December, both Mr.

9      Fischer and I were willing to meet anytime.

10             Ultimately, everyone agreed to the date of

11     January 5th.  We complied with the order to produce the

12     witness list.  Ms. McPhail has been on that witness

13     list.  To strike her from our witness list, thereby

14     precluding us, precluding the Examiner from asking any

15     questions relating to the representation that was

16     provided to the 22nd District Court versus the

17     representation that was provided to Judge James

18     personally, and what entity and who paid for what,

19     virtually allows the defense instead of judge shopping,

20     count shopping.  It prevents the Examiner from being

21     able to produce the evidence and have you make a

22     decision.

23             In their motion, counselor's arguing that we

24     can extrapolate certain information.  Credibility is

25     crucial in these cases.  To say you cannot put the only

                                66

1          other witness who is privy to all this information, to

2          the agreement, the nature of the agreement, the extent

3          of the agreement, we can put limitations to what can be

4          asked so that nothing privileged will be requested to be

5          disclosed, but to prevent us from having Ms. McPhail

6          testify as to that count would essentially gut that

7          count for the Examiner.  And based on that, we are

8          asking that Ms. McPhail is disqualified from these

9          proceedings and remain on our witness list.

10                 MR. THOMAS:  Thank you, Your Honor.

11                 Your, Honor, I have to try to go through some

12         of the new facts that counsel has brought up here today.

13         I got to tell you, I don't know who I copied e-mails on

14         back in May or June, but I would say this, when I write

15         to somebody, I have the ability to copy different

16         individuals on it.  And if I did not copy Ms. McPhail on

17         an e-mail, well, shame on me.  I probably copied her on

18         15 or 20 other ones.

19                 You may also remember that at the time of our

20         telephone pretrial conference, I had to request of the

21         examiner's office that they begin copying Ms. McPhail on

22         communications that were sent back and forth.  Again, as

23         pointed out in my brief, at no time during that

24         telephone conference was any mention made by the

25         examiner's office that, "Look, Judge, something may

                                   67

1   happen in here in this case.  It's a little bit unusual.

2   We're talking about filing the witness list to two weeks

3   down the line rather than exchanging witness lists two

4   weeks down the line, There's something everybody should

5   need to know, We're going to be listing Ms. McPhail as a

6   witness."

7        I'll tell you, I've been involved in this case

8   going back to about -- I believe it was June 1st when I

9   may have entered my appearance with the Judicial Tenure

10  Commission, and it's my understanding that Ms. McPhail

11  has been involved in representing Judge James with the

12  Court Administrator's Office, and Judge Washington, and

13  every -- and even the Supreme Court going back to the

14  first part of the year, even going back into 2009.  And

15  one of the things that I noticed that sort of

16  contradicts much of what counsel has argued here today,

17  I looked over page 4 of their -- their motion to

18  disqualify Ms. McPhail, and if you look over the motion,

19  specifically page 4, Paragraph 16, they acknowledge that

20  disqualification of a attorney is a drastic measure.

21  And they go on in the following three Paragraphs, 17,

22  18, and 19, and they list all of the critical

23  communications from my office and Ms. McPhail's office

24  that answered inquiries from the Judicial Tenure

25  Commission.  And if you look at Paragraph 17, they

```
1    acknowledge it, both of her attorneys, Thomas and
2    McPhail, signed.  Paragraph 18, October 10, 2011, answer
3    to the Commission's request for comments, both of her
4    attorneys, Mr. Thomas and Ms. McPhail, signed.  Page 9
5    -- Paragraph 19 on the next page again.  So I don't know
6    what I have to prove or what Ms. McPhail has to prove to
7    an agency where we've both been representing Judge James
8    since the inception of these proceedings.  I don't know
9    what else I have to prove other than what's contained in
10   their motion to strike her.
11              But we filed a motion as well.  We filed a
12   motion to take her off their witness list and prevent
13   the disqualification of her.  And both sides have cited
14   case law, one case in particular, the Kubiak case.  And
15   I'm referring to Paragraph 12 -- Paragraph -- actually,
16   11 and 12 of the examiner's motion where they refer to
17   the Kubiak case.  And unfortunately when they filed
18   their motion they told, Your Honor, what the trial court
19   did.  And in that case the trial court did bump a trial
20   counsel out of a case, but what they didn't tell you
21   about Kubiak, and this is why when I filed my response I
22   actually -- Sharon and I actually included of a copy of
23   the Kubiak case, is that the Court of Appeals reversed
24   what the trial judge did.  And, look, in all cases cited
25   by both sides there's a constant thing, and the thing is
```

1         this:   In order for one side to call counsel for the

2         other side as a witnesses they've got to show three

3         things.   They've got to show necessity.

4                    In this case, Judge, they could never show

5         necessity, and I'll tell you why.  Both sides have

6         listed Judge James on the witness list.  She is the one

7         that is accused of wrongdoing, not this lawyer, not

8         Sharon McPhail.  And it's my understanding that they're

9         intending to call her.  And even if they didn't call

10        her, we would be calling her.  She's the one that is

11        accused of some level of impropriety regarding the

12        issuance of certain payments to Sharon.  If anything at

13        all was done wrong, it would be by Judge James.

14                   The case law said that there has to be -- and

15        I'm citing *Kubiak*, I'm citing *Susser*, I'm citing *Tesen*,

16        all of the cases come up with three elements; there has

17        to be a necessity.  So first of all, you look to the

18        fact, is this witnesses' testimony -- would it bear

19        credence in some respect to the allegations that

20        somebody is trying to prove.  I don't think that there

21        is a necessity in this case.  And the reason that I

22        don't think that there's necessity in this case is,

23        we've gotten from the Examiner records showing that

24        they're planning on calling a custodian of the records

25        to show that payments were made to Ms. McPhail.

1          Significantly, in the answer to the formal complaint,

2          we've never made any serious challenges.  As a matter of

3          fact, if I had some of the discovery material -- you

4          sort of have to remember that my client lost control

5          over her personal belongings and personal records back

6          on April 13th.

7                    THE MASTER:  I've been told that.

8                    MR. THOMAS:  So, yeah, she hasn't been able to

9          get in there and get a hold of those records, Judge.

10         But I can tell you right now, if we had the records

11         given to us on January 5th, we probably wouldn't have

12         admitted that allegation.  If they've got records that

13         show that the money were paid, Judge James would have

14         admitted.

15                   Now, why am I bringing up that point?  That

16         moves to the second prong of the *Kubiak*, and *Tesen*, and

17         *Susser*, and that is there has to be no other source for

18         the evidence.  No other source.

19                   In this case, you have a myriad of other

20         sources.  You have Judge James herself who had got the

21         legal services provided to her, who can answer to what

22         type of services were provided to her as chief judge of

23         the 22nd District Court, so you've got all these other

24         sources.

25                   And then lastly, there has to be notice to the

1        other side.  The other side had to have been put on

2        notice.  And I would say this, you know, a prosecutor

3        could sit back -- I truly believe that the light did go

4        off in their head sometime around December or January,

5        because I've handled cases with that agency, and I know

6        how they operate, and I think I would normally have

7        gotten notice of such a significant thing prior to that

8        date.  But for them to go back and say, Look, when you

9        got a 28-day letter back in August, or when you got the

10       formal complaint in October, you should have known that

11       Ms. McPhail could be a witness in this case.  You should

12       have received that.  You have been on notice of that.

13               That really misses the point.  They're an

14       agency, they're a public agency, and they had to put us

15       on notice if they believed it.  It's what would be my

16       position even if they had put us on notice a month or

17       two months ago.

18               Those aren't the significant prongs of the

19       *Kubiak* test that I want to talk to Your Honor about.

20       The significant prongs are necessity, and no other

21       source.  They had many, many other sources.  I think

22       that what this is about, truthfully speaking, I think

23       that a lot of what we see going on here today is an

24       attempt, whether intentional, whether unintentional,

25       regardless of who made the determination to put my

                                72

1       client on that witness list, it is a -- it is an effort

2       to bump her out of the case.  And I tell you, I take

3       great exception to this fact that anybody would say

4       something along the lines -- and I'm trying to think --

5                   THE MASTER:  I'm sorry to interrupt you.

6                   MR. THOMAS:  Yes.

7                   THE MASTER:  We're dealing with a motion to

8       disqualify.  Are you telling me that you're making your

9       arguments on both the disqualify --

10                  MR. THOMAS:  I assumed we were.

11                  THE MASTER:  -- and to strike at the same

12      time?  I just want to make sure that --

13                  MR. THOMAS:  Your Honor, I assumed that we

14      were.  And if I'm wrong, I'll try to break it up.

15                  THE MASTER:  That's fine.

16                  MR. THOMAS:  Okay.

17                  THE MASTER:  I don't have a problem with that

18      procedure.  I just want to make sure that that's how the

19      other side is viewing that, and how I should be viewing

20      it.

21                  MS. RYNIER:  Yeah, they're so interrelated.

22                  THE MASTER:  I agree.

23                  MR. THOMAS:  As a matter of fact, one of the

24      things I did in my answer, Judge, I actually

25      incorporated the brief that I submitted in support of my

1    motions, so I apologize for not making that clear.

2            But where I was going with this is, this in my

3    estimation totally inappropriate. Not only for the

4    reasons that I've cited, but to say in a conclusory

5    paragraph at the end of the -- and I think it's

6    Paragraph 20.

7            THE MASTER: In which motion?

8            MR. THOMAS: Of the examiner's motion to

9    disqualify her. It's page 5 of that motion, that the

10   other is fully capable of handling the matter.

11           Judge, we've divided up the work in this case

12   all along. Our names have gone on everything. We've

13   worked together on this file. I said, and now I'm

14   referring over to my motion to strike her, I believe

15   there's a very, very good argument under Michigan Rule

16   of Professional Conduct 1.10, that I would be

17   disqualified if she were disqualified. Why would I say

18   that? We have associated ourselves with each other for

19   the purpose of representing a client. And the fact that

20   my name didn't go up on the door of her office, or the

21   fact that her name didn't go up on the door of my

22   office, we've associated together. We've questioned our

23   client together when we came up with the answers to

24   these pleadings. We had sessions with our clients where

25   we reviewed evidence and came up with answer and

1     confidential attorney-client privileged communications

2     took place.  So for all of these reasons, Judge, we're

3     asking that their motion to disqualify her be denied and

4     that our motion to strike Ms. McPhail from the

5     examiner's witness list be granted.

6     And with that said, what I would like to do

7     for a moment is this.  We actually cited in our brief

8     the case of *People v. Tesen*, it's a 2007 Michigan Court

9     of Appeals case, and I'm telling you, I read the quote

10    contained in it at the time I read it over, and I

11    thought I understood the case.  But Judge, I read the

12    case again in its entirety last night at about midnight

13    and I got to tell you, it finally sunk in what the Court

14    of Appeals was saying.  And I think that case is

15    important for a multitude of reasons.

16    Number -- number one, it's one of the most

17    recent decisions by our Court of Appeals on the subject

18    that we're now dealing with.  And in that case what

19    happened was, a prosecutor of the prosecutor's office

20    made a determination that he was going to interview a

21    very young victim of a very, very tragic sexual assault

22    of some sort.  And that prosecutor made the

23    determination that he was the only person that was going

24    to go in the room with her and interview her.  Now,

25    there were some other people looking through a one-way

1     mirror, but he was the only person in the room and the

2     only person asking questions.

3           And in that case, it's my recollection that

4     the trial court made a determination that he should be

5     disqualified from acting as counsel in prosecuting the

6     case because the defense had the right to call him as a

7     witness.  But what the Court of Appeals let its decision

8     hinge on is, it was that lawyer that made the

9     determination to go into that room alone with the child.

10           You got to kind of remember in this situation

11     the child was so young, it appeared to me that the child

12     wasn't even going to be testifying.

13           Investigators that overheard -- that might

14     have overheard the conversation through that one-way

15     mirror were going to be available, and the Michigan

16     Court of Appeals said, no, this judge got it right,

17     because there was no -- no other way to obtain the type

18     of evidence and answers to the types of questions that

19     the defense sought to elicit from the prosecutor.

20           You don't have any of that in this case,

21     Judge.  I will tell you even if my client were on the

22     witness stand -- if this hearing were today, and my

23     client was on the witness stand and she's answering

24     questions -- and she's being asked questions and she's

25     answering, the majority of the evidence concerning this

1    count is going to come from records from the City of

2    Inkster, records that we already have, that we've

3    already gotten from the Examiner, so there is no

4    necessity, and Ms. McPhail should not be disqualified

5    from this case and our motion should be granted.

6           And where I want to end is this:  I want to

7    end my argument -- and I'm going to reserve the right to

8    make a comment, if necessary, when the Examiner is done.

9           The courts held -- in almost all of the cases

10   that both sides cited, the courts held this:  "When a

11   motion is brought that is going to disqualify a lawyer,

12   a lawyer that has been selected by a litigant in the

13   case, courts have to review that type of maneuvering

14   with extreme caution."

15          And that's what we're urging here.  And I'm

16   confident that when you exercise that extreme caution,

17   Ms. McPhail is not going to be knocked out this case.

18   Thank you, Your Honor.

19          THE MASTER:  Ms. Rynier.

20          MS. RYNIER:  Your Honor, I'll go backwards in

21   counsel's argument.  Counsel's arguing that most of the

22   evidence or all the evidence that we, as he presumes,

23   are after, will come from the records of the City of

24   Inkster and that is simply not true.  The only records

25   that the City of Inkster can produce is the fact that

1        they had made these payments.  These payments to Ms.

2        McPhail were pursuant to a request made by Respondent.

3        That's not the entire issue.  The issue is what services

4        were provided.  If the City of Inkster issued the check

5        for $10,500 to Ms. McPhail, what were they paying for.

6        That's the issue.

7                The *Tesen* case, counsel's right, the issue

8        there was no other way to obtain the information, and

9        that prosecutor was disqualified because he decided to

10       prosecute this case knowing he was a witness.

11       Ms. McPhail, decided to step into this case knowing she

12       is a witness.  Is it a necessary witness?  Is Ms.

13       McPhail a necessary witness?  Yes, she is very much a

14       necessary witness to the Examiner.  I do not believe,

15       and I disagree wholeheartedly, that Mr. Thomas would

16       have to be disqualified if Ms. McPhail is stricken -- is

17       disqualified from this case.

18               There are two attorneys.  One, in case I

19       forgot or failed to mention, Ms. Serifovski, is a

20       licensed attorney in the state of Michigan.  In fact, on

21       most occasions that's the person who would come to our

22       offices.  That's the person that I e-mailed back and

23       forth with, so there are two very competent attorneys.

24               Number two, a disqualification such that

25       Mr. Thomas is arguing, because Ms. McPhail's

                                    78

 1   disqualified and he has to be disqualified, Ms. McPhail

 2   is not going to go out and represent another individual.

 3   She's going to become a witness, which she has been all

 4   along in this matter.

 5            Once again, the issue is what the payments

 6   were for.  Counselor is arguing that Judge James can

 7   take the stand and be asked questions.  And just think

 8   about this, Judge.  I can predict that her answer will

 9   automatically be, "I have been locked out of my office,"

10   and "I have no idea.  I don't remember, and "I don't

11   know."  There sits the necessary witness.

12            And as this Court is well aware, when you have

13   to assess credibility, asking questions of one

14   individual with the other one out of the courtroom, and

15   then placing the other individual on the witness stand,

16   provides this Court and this Master with an opportunity

17   to assess the credibility of each necessary witness.

18   And under these circumstances, we're asking for this

19   Court to disqualify Ms. McPhail and to render her a

20   necessary witness.  Thank you.

21            THE MASTER:  Mr. Thomas.

22            MR. THOMAS:  Yes.  Thank you, your Honor.

23            Your Honor, I just thought of something when

24   Ms. Rynier was arguing, and I believe that both sides

25   may have made a bit of a mistake here today.

1           The allegations regarding the payment of fees

2       to Ms. McPhail was not -- I repeat, not brought up

3       during the early summer months of 2011.  As a matter of

4       fact, I'm looking at page 4 of the examiner's brief, and

5       when they say in Paragraph 17, "that on August 1st,

6       2011, Respondent submitted an answer to the Commission's

7       request for comments pursuant to MCR 9.207.  Both of her

8       attorneys signed," I am telling you, Judge, it is my

9       recollection -- it is my specific recollection, and I'm

10      telling you this as an officer of the court, there were

11      no allegations in the initial request for investigations

12      that we answered concerning Ms. McPhail.  What I do

13      remember is that the allegations concerning Ms. McPhail

14      never arose until very late summer, early fall.  And if

15      you look at their Paragraph 18 on page 4, it says, "On

16      October 10th, 2011, Respondent submitted an answer to

17      the Commission's request for comments."  And that was

18      the 28-day letter, if you see it, Judge.  It's in

19      parentheses.  That's sort of a term that lawyers that do

20      this kind of work -- refer to that notice from them.

21      And it says "both of her attorneys signed it."  I am

22      going on record and I'm telling you, as an officer of

23      the court, Judge, that was the first time that we had to

24      answer to any allegation regarding Ms. McPhail.  So for

25      anyone -- and even if I misspoke earlier -- if I

1     misspoke earlier, and I implied that the allegation

2     regarding my client and "Sharon McPhail," as her

3     attorney existed since the beginning of the

4     investigation, it did not.  And I'll tell you whose

5     memory I'll rely on for that.  I'll rely on my opposing

6     counsel's memory, if I'm wrong.

7           The only other thing that I want to do, Judge,

8     is this, I want to make a comment regarding what -- and

9     this is something that would have to be addressed in,

10    Your Honor's, mind what my client would even be able to

11    answer for the Examiner concerning questions regarding

12    her representation because Judge James may assert the

13    attorney-client privilege.  So there's a very good

14    possibility -- there's a very good possibility that the

15    -- depending on, you know, if you held an evidentiary

16    hearing and had them specify what questions they wanted

17    to ask, there's a very, very good possibility that

18    Sharon McPhail wouldn't even be able to answer those.

19          But -- and this is the but.  I thought of

20    something else when Ms. Rynier was arguing.  We've

21    indicated that if they specified at some juncture if the

22    Court denies this motion as we've -- we've asked that

23    you deny their motion and grant our motion, if you deny

24    the motion, it will revisit it, perhaps.  And I'm just

25    saying perhaps, depending on what they were looking for

```
 1      in the way of answers to questions, Judge James may

 2      authorize Ms. McPhail and I to enter into some type of

 3      stipulation.  Because when you take a look at that count

 4      concerning -- that meant -- that makes mention of Sharon

 5      McPhail being the attorney that Judge James retained,

 6      it's a very, very short count.  It truly is.  There's

 7      not a lot of facts in there.  There's big conclusions

 8      that the criminal law was violated and this was violated

 9      and that was violated, but there's not a lot of facts.

10      And what's in there already Judge James really hasn't

11      denied.  So I want to thank, Your Honor.  If you have

12      any other questions, I'll try to answer.

13               MS. RYNIER:  I don't know if I'm

14      misunderstanding counsel and whether he's offering to

15      stipulate to that particular count, but --

16               THE MASTER:  I don't think that's what he's

17      saying at this point.

18               MR. THOMAS:  Thank you, Your Honor.

19               MS. RYNIER:  A stipulation that would have to

20      be entered into would have to be the public funds were

21      used for private representation of Judge James.  Short

22      of that, Judge, there is absolutely no way that we can

23      enter into a stipulation.

24               As far as privilege, we are not going to ask

25      Ms. McPhail exactly what cases did you represent the
```

1    Judge, and what was -- I'm sorry, what were the nature

2    of the cases that you represented, what communication

3    did you have with Judge McPhail, about the substance of

4    those cases.  That's where the privilege would apply.

5    There's no privilege as to what we are seeking because

6    under the theory that counsel is advancing, then public

7    funds can be used for personal and private

8    representation and no one can ever discover that, no one

9    can ever learn of that, because the person who has used

10   the public funds are now going to say, "No, I'm

11   asserting privilege.  I will not allow my attorney to

12   testify as to the representation that was given to me,"

13   so, no, privilege is not applicable.

14          As to counsel's argument that the answer was

15   filed on October 10th, I'm not going to argue that it

16   was not -- I believe that it was due originally on

17   October 7th, and an extension was given to October 10th.

18   I'm not going to argue that.

19          The crucial point, however, is the 28-day

20   letter was submitted to Judge James months before that.

21   Because a 28-day letter is exactly that, it's due back

22   in 28 days, but Mr. Thomas requested a number of

23   postponements.  So we're not dealing with an

24   October 10th deadline -- or date.  We're dealing with a

25   date much earlier than that.  I believe, and again this

```
 1        is my belief, that the letter went out August 1st.  If

 2        not, then I know that we have a date of September 9th.

 3                 THE MASTER:  Okay.  So it went out

 4   September 9th?

 5                 MS. RYNIER:  Correct.  And certainly as of

 6   September 9th all those allegations were in there.  If

 7   something's not in a 28-day letter, it cannot be in the

 8   complaint.  It's that simple.

 9                 MR. THOMAS:  Well, Ms. Rynier --

10                 THE MASTER:  Two minutes.

11                 MR. THOMAS:  I'm not even going to take two

12   minutes.

13                 Your Honor, Ms Rynier has assisted me in

14   correcting any implication, that when the request for

15   investigation first went out, that my client, and me,

16   and Ms. McPhail would have been on notice that there

17   were allegations relating to her, that just wasn't true.

18                 And the other thing I want to make clear for

19   the record, and I'm not being flip, my client could

20   never stipulate to the type of matters that Ms. Rynier

21   mentioned that would indicate in any way, shape, or

22   form, that the matters that Ms. McPhail represented the

23   Court on were personal to my client because that would

24   be untrue, so that's never going to happen, and I don't

25   want anybody to be mislead on that.  Thank you.
```

1              THE MASTER:  Ms. Rynier, anything else?

2              MS. RYNIER:  No, Your Honor.

3              THE MASTER:  Okay.  Addressing first the

4     Motion to Disqualify.

5              The Examiner seeks to disqualify one of

6     Respondent's attorney's from representing her in this

7     matter.  In support of his position -- and I just want

8     to say, I know, Ms. Rynier, you've been arguing all

9     these motions, but Mr. --

10             MR. FISCHER:  Fischer.

11             THE MASTER:  I'm sorry.  Mr. Fischer is your

12    superior in the office and I'm referring --

13             MS. RYNIER:  Yes, Ma'am.

14             THE MASTER:  -- by gender because of that.

15    He's been supportive of his position.  He says that the

16    testimony of Ms. McPhail will be crucial to the

17    determination of certain allegations in the complaint.

18    These allegations relate to payments of public money to

19    Ms. McPhail for unspecified services allegedly for

20    Respondent's personal benefit or for work for the court

21    that was insufficiently documented to warrant payment

22    with public funds.  Citing *Kubiak v. Hurr*, 143 Mich App

23    465 (1985), he claims that Ms. McPhail ought to be

24    called and that if she is called, her testimony will be

25    prejudicial to Respondent.  He claims that if Ms.

1            McPhail testifies at the hearing, it will be a violation

2        of Michigan Rules of Professional Conduct 3.7.  He

3        further claims that Respondent will not be prejudiced by

4        the disqualification of Ms. McPhail because Mr. Thomas

5        is able to adequately defend her without Ms. McPhail's

6        participation.

7                The Respondent disagrees.  She asserts there

8        is no basis to disqualify Ms. McPhail.  Respondent says

9        the legal services for which she authorized payment to

10       Ms. McPhail that are mentioned in the complaint were for

11       the benefit of the Court, that there was a verbal

12       retainer agreement with Ms. McPhail.  She also says that

13       she was fully aware of the services Ms. McPhail provided

14       to the Court, that invoices were submitted and paid, and

15       that copies of those invoices are in the examiner's

16       possession.  Respondent further asserts that Ms. McPhail

17       is bound by attorney-client privilege not to divulge

18       confidential communications.  Michigan Rules of

19       Professional Conduct 1.6, and that the Examiner is not

20       able to demonstrate that Ms. McPhail is a necessary

21       witness, i.e, that the testimony he seeks cannot be

22       attained by other means, including possible

23       stipulations.  *People v. Tensen*, 276 Mich App

24       134,(2007).  She also claims that if Ms. McPhail is

25       disqualified, her other attorney may also have to be

1     disqualified because of his close professional

2     association with Ms. McPhail in the preparation of

3     Respondent's defense.   MRPC 1.10.

4            As the Court in *DeBiasi v. Charter County of*

5     *Wayne*, 284 F.Supp.2d 760 (2003), said, disqualification

6     of counsel is a drastic measure which courts should

7     hesitate to impose except when absolutely necessary.

8            The court in *Kubiak v. Hurr*, 143 Mich App 465

9     (1985), stated that disciplinary rule 5-102 (now

10    MRPC 3.7) was designed to protect the interest of all

11    parties and the reputation of the legal profession by

12    assuring the client and the bar of the independent

13    judgment of trial counsel in situations where it would

14    be in the client's interest to attack the credibility of

15    a lawyer.  It provides that ... A lawyer shall not act

16    as advocate at the trial in which the lawyer is likely

17    to be a necessary witness except where the testimony

18    relates to an uncontested issue; the testimony relates

19    to the nature and value of legal services rendered in

20    the case; disqualification of the lawyer would work

21    substantial hardship on the client.  It went on to say

22    that the party seeking disqualification bears the burden

23    of demonstrating specifically how and as to what issues

24    in the case the likelihood of prejudice will result and

25    that an attorney ought not to be called as a witness on

1    behalf of his client if the evidence may be obtained in

2    a manner which does not require him to testify and that

3    the prime factors to be considered in determining

4    whether disqualification is necessary or whether the

5    lawyer ought to be called and whether, if called by the

6    opposing party, the testimony is likely to be

7    prejudicial to the client.

8         In this case, Respondent, who is listed on

9    both parties' witness lists asserts that she authorized

10   all the work for which Ms. McPhail was paid and that all

11   the work was done for the benefit of the court.  The

12   Master is unaware of any specific work that the Examiner

13   identifies that Ms. McPhail did for Respondent's

14   personal benefit.  There does not at this time appear to

15   be a substantial conflict between the testimony that the

16   Respondent would offer and the testimony her attorney

17   would offer.  And it appears that the evidence sought by

18   the Examiner can be attained by means other than Ms.

19   McPhail's testimony, including by possible stipulation,

20   although, there's been some disagreement about that

21   today.  As the notes to MCPR 3.7, which are instructive,

22   say, "determining whether or not such a conflict exists

23   is primarily the responsibility of the lawyer involved."

24        In this case there has been an insufficient

25   showing that would override the Respondent's right to

1     have counsel of her choice.  The examiner's motion to

2     disqualify Sharon McPhail is respectively denied.

3                    MS. RYNIER:  Thank you.

4                    THE MASTER:  Moving on to Respondent's Motion

5     to Strike Attorney Sharon McPhail from the examiner's

6     Witness List.

7                    Respondent asks the Master to Strike Attorney

8     Sharon McPhail from the examiner's witness list.  She

9     says that although Ms. McPhail has been acting as her

10    attorney for many months during which Ms. McPhail has

11    met with the Examiner on numerous issues related to this

12    case, that the first time either Respondent, either of

13    her attorneys became aware that the Examiner was

14    considering calling Ms. McPhail as a witness was on

15    January 5th, 2012, when witness lists were exchanged.

16    Respondent says the Examiner knows that if he calls Ms.

17    McPhail as a witness she may well be disqualified from

18    serving as one of Respondent's attorneys in this matter.

19    Respondent argues that the Examiner is not able to show

20    that Ms. McPhail is a necessary witness because the

21    information he seeks is available from other sources.

22    *People v. Tesen*, 276 Mich App 134 (2007), and that the

23    purpose of MRPC 3.7 is to prevent problems that would

24    arise from a lawyer's having to argue the credibility

25    and the effect of his or her own testimony, to prevent

1      prejudice to the opposing party that might arise

2      therefrom, and to prevent prejudice to the client if the

3      lawyer is called as an adverse witness. The purpose is

4      not to permit the opposing party to seek

5      disqualification as a tactical device to gain an

6      advantage. Respondent asserts that Ms. McPhail should

7      be stricken from the examiner's list.

8           The Examiner disagrees. In addition to

9      relying on the facts and arguments in his motion to

10     disqualify Ms. McPhail, he makes statements that seem to

11     say that if Ms. McPhail was representing Respondent in

12     her official capacity (as chief judge of the 22nd

13     District Court), any claim Respondent might have with

14     regard to attorney-client privilege with regard to

15     communications in those matters is without basis because

16     they are public matters. He says -- he states it

17     differently at a different point in his motion.

18          He also says that Ms. McPhail could not have

19     been doing work for the benefit of the court because

20     SCAO Region 1 Administrator Deborah Green has asserted

21     by way of affidavit that no other court in Region 1 has

22     an attorney in private practice handling day-to-day

23     matters on behalf of the court, and that she is not

24     aware of any court in Michigan that has retained a

25     private attorney to act on its behalf without being

                            90

1     involved in litigation.  The implication is that if the

2     facts asserted in the affidavit are true, then Ms.

3     McPhail must have been paid with public funds for work

4     performed for the personal benefit of Respondent and

5     that, therefore, her testimony in this matter is both

6     crucial and adverse to Respondent.  The Examiner also

7     disputes that Respondent and her attorneys' claim that

8     they had no notice prior to January 5th, 2012, that Ms.

9     McPhail might be called as a witness.  He says claims as

10    to the nature of the work performed my Ms. McPhail have

11    been part of the substance of this case from its

12    inception although we have different information about

13    that today.

14          Because the motion to strike in this case is,

15    in most respects, the mirror opposite of the examiner's

16    motion to disqualify, in that if Ms. McPhail's is not

17    stricken from the examiner's witness list, she will in

18    effect be disqualified as Respondent's attorney, the

19    same legal analysis applies.  I'm going to repeat some

20    of this, but that is for the record.

21          As the court in *DeBiasi v. Charter County of*

22    *Wayne*, 284 F.Supp.2nd 760 (2003), said, disqualification

23    of counsel is a drastic measure which courts should

24    hesitate to impose except when absolutely necessary.

25          The court in *Kubiak v. Hurr*, 143 Mich App 465

1      (1985), stated that disciplinary rule 5.102 (now MRPC

2      3.7) was designed to protect the interests of all

3      parties' and the reputation of the legal profession by

4      assuring the client and the bar of the independent

5      judgment of trial counsel in situations where it would

6      be in the client's interest to attack the credibility of

7      a lawyer.  It provides that ...A lawyer shall not act as

8      advocate at a trial in which the lawyer is likely to be

9      a necessary witness except where:  The testimony relates

10     to an uncontested issue; or the testimony relates to the

11     nature and value of legal services rendered in the case;

12     or disqualification of the lawyer puts substantial

13     hardship on the client.  It went on to say that the

14     party seeking disqualification bears the burden of

15     demonstrating specifically how and as to what issues in

16     the case the likelihood of prejudice will result and

17     that an attorney ought not be called as a witness on

18     behalf of his client if the evidence may be obtained in

19     a manner which does not require him to testify and that

20     the prime factors to be considered in determining

21     whether disqualification is necessary or whether the

22     lawyer ought to be called and whether, if called by the

23     opposing party, the testimony is likely to be

24     prejudicial to the client.

25              In this case, Respondent, who is listed on

 1       both parties' witness lists asserts that she authorized

 2       all the work for which Ms. McPhail was paid and that all

 3       the work was done for the benefit of the court.   The

 4       Master is unaware of any specific work that the Examiner

 5       identifies that Ms. McPhail did for Respondent's

 6       personal benefit.   At this time there does not appear to

 7       be a substantial conflict between the testimony that the

 8       Respondent would offer and the testimony her attorney

 9       would offer.   And it appears that the evidence sought by

10       the Examiner may be attained by means other than Ms.

11       McPhail's testimony.   As the notes to MCPR 3.7, which

12       are instructive, say, "determining whether or not such a

13       conflict exists is primarily the responsibility of the

14       lawyer involved."

15               In this case, there has been an insufficient

16       showing that Ms. McPhail is a necessary witness.   If it

17       becomes clear as the hearing progresses that this is not

18       so, the matter will be addressed at that time.   The

19       examiner's motion to strike Attorney Sharon McPhail from

20       the examiner's witness list is respectively denied at

21       this time without prejudice.

22               MS. RYNIER:   Thank you, Your Honor.

23               MR. FISCHER:   You said the examiner's motion

24       to strike.

25               THE MASTER:   I apologize.   I stated that

1        incorrectly.  It's the Respondent's motion.

2                    MR. THOMAS:  Judge, could I --

3                    THE MASTER:  Let me just --

4                    MR. THOMAS:  Okay.

5                    THE MASTER:  I'm sorry.

6                    MR. THOMAS:  I thought you --

7                    MR. FISCHER:  Could we go off the record for a

8        second?

9                    THE MASTER:  Yes.

10                   (Discussion held off the record.)

11                   THE MASTER:  I'll read the last paragraph

12       again.

13                   "In this case, there has been an insufficient

14       showing that Ms. McPhail is a necessary witness.  If it

15       becomes clear as the hearing progresses that this is not

16       so, the matter will be addressed at that time.  The

17       Respondent's motion" -- am I getting that --

18                   MR. FISCHER:  Yes, it is Respondent's.

19                   THE MASTER:  "Respondent's motion to strike

20       Attorney Sharon McPhail from the examiner's witness list

21       is respectively denied at this time without prejudice."

22                   All right.  I think that is all the motions

23       that are before the court today.

24                   MR. FISCHER:  Yes.

25                   THE MASTER:  Can we go off the record, please,

                                    94

1          and will the counsel approach?

2                    (Discussion held off the record.)

3                    THE MASTER:  All right.  I'm very sorry.  This

4          will be the third time that I'm going to reiterate the

5          last paragraph of the last opinion.  And as somebody

6          earlier said, that at midnight they were doing

7          something, please forgive me for typing that incorrectly

8          in an very late hour.  Let me read the last paragraph

9          for a third time.  And you all know what I intend to

10         say, so if I say it wrong, please correct me.

11                   "In this case, there has been an insufficient

12         showing that Ms. McPhail is a necessary witness.  If it

13         becomes clear as the hearing progresses that this is not

14         so, the matter will be addressed at that time.  The

15         Respondent's motion to strike Attorney Sharon McPhail

16         from the examiner's witness list is respectfully granted

17         at this time without prejudice."

18                   All right.  I called you all to the bench, and

19         I asked if there was anything else that we need to talk

20         about.  Ms. Rynier, you indicated there was something

21         else, so let's get it on the record.

22                   MS. RYNIER:  Yes, Your Honor.  We have

23         filed -- and I will keep my voice quieter.  We have

24         filed a stipulation as to --

25                   THE MASTER:  I'm sorry.  You have filed a

```
1      stipulation?

2                  MS. RYNIER:  Yes.

3                  THE MASTER:  I know we talked about it.  Is

4      there a written stipulation?

5                  MS. RYNIER:  Yes, there is, and I have

6      provided -- I'm sorry.  I have provided counsel with it.

7                  MR. THOMAS:  Your Honor.

8                  THE MASTER:  Yes.

9                  MR. THOMAS:  Can I just take a look at it?

10                 THE MASTER:  Sure.

11                 MR. THOMAS:  Let me just tell you, Judge, I'm

12     going to have to go over it with my client.  You know,

13     we have a client --

14                 THE MASTER:  All right.  Go over it with your

15     client.  And if, in fact, there is a stipulation,

16     please mail it to me.

17                 MR. THOMAS:  We'll get it to you.

18                 MS. RYNIER:  And counsel has assured me that

19     he will not request that we bring all the keepers of

20     records.  My only concern is, Judge, I understand he has

21     a client, however, we were here approximately one week

22     ago and we have sent this out on January 12th.  I know

23     by talking to Ms. Serifovski that it was received by

24     Mr. Thomas's office.  I'm only concerned to the extent

25     that counsel verbally is telling me that we do not need
```

1      to produce any of the keepers of records from any of the

2      records that we are going to be introducing in this

3      hearing.  I just don't want to get to -- in a situation

4      where come January 23rd he informs me that his client

5      will not agree to, let's say, three of them, and now I'm

6      in a position where I have to start issuing subpoenas

7      and perhaps getting these individuals into court at a --

8      on a very short notice.

9           MR. THOMAS:  Well, Judge, you know, just to

10     shorten things up, I -- really, I can't put my name on a

11     stipulation and neither can Ms. McPhail until we go over

12     it with our client.  I am representing this to you right

13     now, it's not my style to slow proceedings up by

14     requiring custodians of records that come in.

15          THE MASTER:  That one.

16          MR. THOMAS:  I kind of have -- I kind of have

17     a gentleman and lady's agreement with Ms. Rynier that,

18     look, neither side is going to require that.  And, by

19     gosh, if there was some need for that, we'll let the

20     other know.  But for right now, I want you to know --

21          THE MASTER:  When will you be meeting with

22     your client?

23          MR. THOMAS:  I think that Ms. McPhail is going

24     to take care of that with the client.  We'll try to get

25     back to her --

                              97

1              MS. McPHAIL:  She'll be in later today.

2              MR. THOMAS:  -- I think maybe tomorrow.

3              THE MASTER:  So you can take care of this

4     hopefully within 24 hours?

5              MR. THOMAS:  Yes, I think we could, Judge.

6              THE MASTER:  Okay. if there is a problem,

7     please let me know within 36 hours.

8              MR. THOMAS:  Yes.

9              MS. RYNIER:  Also the last time that we were

10    in court, Your Honor, counsel asked where is -- I

11    believe it was Exhibit No. 243 --

12             MR. THOMAS:  I don't remember, but they're the

13    tapes of the news programs.

14             MS. RYNIER:  -- the DVDs of the news.  I

15    indicated to him at that time that they were being

16    copied.  For the record, we do have copies.  I am

17    turning them over to counsel, and so they do have the

18    two DVDs.  They are very, very, very short.  We're not

19    talking about extensive DVDs they have to review.  They

20    are probably less than three minutes.

21             THE MASTER:  Each?

22             MS. RYNIER:  Each.

23             MS. McPHAIL:  It says under the court rule, we

24    have to have the -- all of the footage, and if they're

25    going to introduce a portion or a summary, they have to

                              98

1        produce it all.

2                    MS. RYNIER:  That's all that we have.

3                    THE MASTER:  Is that all the footage?

4                    MS. McPHAIL:  This is everything that they got

5        from Channel 7?

6                    MS. RYNIER:  This is all we have received from

7        Channel 7, yes.

8                    THE MASTER:  And that's all you have in your

9        possession?

10                   MS. RYNIER:  Yes, ma'am.

11                   MS. McPHAIL:  All right.

12                   THE MASTER:  That's all I can deal with at

13       this point.

14                   MR. THOMAS:  And one other -- and a couple of

15       other things, Judge --

16                   THE MASTER:  Wait a minute.  She's not done

17       yet, I don't think.

18                   MR. THOMAS:  Oh, are you not?

19                   MS. RYNIER:  Are we going to be dealing with

20       the DVDs?

21                   MR. THOMAS:  No.

22                   MS. RYNIER:  Okay.

23                   THE MASTER:  So I will note for the record

24       that the DVDs have been provided to Respondent, and that

25       Ms. Rynier has asserted, here on the record as an

1    officer of the court, that is all the DVD material they

2    have in their possession.

3              MS. RYNIER:  Yes, ma'am.

4              Also, yesterday, as I was in the office, I

5    received a memo or a report from Judge Washington, and I

6    am turning it over.  It's a report that was provided to

7    us.  It was not solicited.  It was delivered by e-mail.

8    I have printed a copy for counsel and I am turning

9    over --

10             THE MASTER:  You got that yesterday?  That's

11   the first time you were aware of that?

12             MS. RYNIER:  I believe that we received an

13   e-mail, that he was preparing one on Friday, then I left

14   my office.  But I worked over the weekend, and I printed

15   it.

16             THE MASTER:  And you're saying you did not

17   solicit this?

18             MS. RYNIER:  No.

19             THE MASTER:  This was something that he

20   generated of his --

21             MS. RYNIER:  Correct.

22             THE MASTER:  -- own volition?  And you've now

23   got it.  I don't know what it says obviously.

24             MS. RYNIER:  I believe --

25             THE MASTER:  If, at some point, I should know

                              100

```
 1        what it says, I'm sure I will, otherwise, I won't.

 2                 MS. RYNIER:  And just for the record, there

 3        are seven pages and all seven pages have been turned

 4        over.

 5                 THE MASTER:  All right.  Anything else?

 6                 MS. RYNIER:  I just wanted an acknowledgment

 7        from Mr. Thomas, there was an additional exhibit list

 8        that I believe was provided ever prior to the previous

 9        hearing.

10                 THE MASTER:  I received exhibit lists from

11        each of you with additional exhibits, and I received --

12        I'm sorry.  Witness lists from each you with additional

13        witnesses.  I received exhibit lists, and I don't know

14        if I -- I'm sorry, I don't have them here with me today.

15        I just want to make sure that I have everything that --

16                 MR. THOMAS:  If she says that we got it,

17        Judge, I'll check when I get back, because I honestly

18        don't remember.

19                 THE MASTER:  And you're saying I did as well?

20                 MS. RYNIER:  I believe so, yes.

21                 THE MASTER:  Okay.

22                 MS. RYNIER:  And the last thing is this:  I

23        was going through a number of exhibits, and I noticed

24        only one instance where there were a couple of pages

25        that did not xerox.  And I don't know whether the copy
```

1    that was provided to counsel did xerox or not. It would

2    be in the Exhibit 83 number. I re-xeroxed those pages,

3    and I would like to provide it. I believe that most of

4    this was already encompassed in other exhibits. I don't

5    think there's going to be anything that was not provided

6    previously, but this was the packet.

7              THE MASTER: Are you giving the entire

8    Exhibit 83, or just the pages that you think --

9              MS. RYNIER: The missing pages.

10             THE MASTER: -- just so they know?

11             MR. THOMAS: Yeah, well, we'll go through it.

12             THE MASTER: All right.

13             MS. RYNIER: I think that's it, Judge, from

14   us.

15             MR. THOMAS: Well, we have a couple of matters

16   here, Your Honor.

17             THE MASTER: I'm sure.

18             MR. THOMAS: Judge, I just want to make sure

19   that we're clear. I think I heard the Examiner say

20   earlier today that she was going to provide my office,

21   and Sharon's office with a copy of the complaint or

22   request for investigation, whatever --

23             THE MASTER: From Deborah Green.

24             MR. THOMAS: -- from Deborah Green.

25             THE MASTER: I heard that.

1              MR. THOMAS:  Okay.

2              MS. RYNIER:  Yes.

3              THE MASTER:  Would you confirm that?

4              MS. RYNIER:  Yes, Your Honor, we will.

5              MR. THOMAS:  The other thing that I would

6    indicate, Judge, I honestly would say this, I have no

7    reason to believe that Ms. Green may have submitted

8    additional documents, but just from experience, when the

9    court administrator's office sends in a request for

10   investigation or a complaint, I know that it's quite

11   often that they supplement that, you know, in the weeks

12   that follow.  So what I would like to go on record as

13   doing today -- first of all, I want to thank Ms. Rynier

14   and Ms. Fischer for agreeing to give me Ms. Green's

15   Request for Investigation, but I would also say, that

16   I'm entitled to any follow-up that she may have

17   submitted.  Sometimes they provide -- SCAO will provide

18   follow-up documentation and things like that.

19              THE MASTER:  That you're saying would be

20   supplementary to the complaint --

21              MR. THOMAS:  Correct.

22              THE MASTER:  -- and therefore part of the

23   complaint?

24              MR. THOMAS:  Correct.  And then -- and then,

25   lastly, Your Honor, I also heard --

                            103

```
1                THE MASTER:  Wait a minute.  Let's talk about
2        that.  Are you aware of any?
3                MS. RYNIER:  Well, Judge, that kind of
4        presents a somewhat unusual or difficult situation for
5        us because whatever was supplemented, if it was
6        supplemented, has already been provided to counsel.  In
7        effect --
8                THE MASTER:  So you're saying you don't have
9        anything other than that original complaint or
10       grievance?
11               MS. RYNIER:  Well, our file contains all sorts
12       of records.  I mean, in effect, I would have to spend a
13       number of hours comparing to what is in there and what
14       has been supplemented, and I believe everything has been
15       provided to counsel already.
16               THE MASTER:  If everything has been provided,
17       I don't have a problem with this.  If it comes to your
18       attention that something was not provided, I am
19       requiring you, and you are required by the court rule --
20       well, you're required by what we're doing here today, to
21       give it to them immediately upon your becoming aware
22       that it hasn't been provided.  And I'm trusting, and I'm
23       hoping that there is nothing else, and that you've given
24       them everything.  But should it occur, you need to give
25       it to them.
```

1              MS. RYNIER:  Yes, ma'am.

2              MS. McPHAIL:  Your Honor, maybe it's just me

3     being confused, but I was up until past midnight too,

4     but I thought my co-counsel said there were three

5     requests for investigation.

6              THE MASTER:  I think he said one from --

7              MS. McPHAIL:  Ms. Green.

8              THE MASTER:  That's what he was asking for.

9              MS. McPHAIL:  One from Ms. Green, one from

10    Mr. Jones -- and there's a third one?

11             MR. THOMAS:  There's a third one provided by

12    David Finley's client, but I all ready got those.

13             MS. McPHAIL:  You already got that one?

14             MR. THOMAS:  I've got that one and I got the

15        Jones.

16             MS. McPHAIL:  And just, Your Honor, the only

17    additional thing is that I want it to be clear that as

18    officers of the court, the examiner's are saying here

19    today that they have given us everything that could be

20    exculpatory.

21             THE MASTER:  I have asked that repeatedly.

22             MS. McPHAIL:  Not --

23             THE MASTER:  Well, I've asked everything in

24    their possession, which would include exculpatory

25    materials.

1          MS. McPHAIL:  All right.

2          THE MASTER:  I would like you to reiterate

3     that just for the record.

4          MR. FISCHER:  I'll reiterate that, but I heard

5     Ms. McPhail say exculpatory evidence was, by example, a

6     witness saying, "Judge James is a great judge" --

7          THE MASTER:  No.  I did not order --

8          MR. THOMAS:  -- and that's not the definition

9     of exculpatory.

10          THE MASTER:  Within the framework of my Order,

11     I did not order the work product or those be personal --

12     the notes in your files as opposed to statements.

13          MR. FISCHER:  Well, I'm just saying that --

14     here's the scenario.  They bring in a witness and the

15     witness says, Did you talk to the JTC?

16          Yes, I did.

17          Did you tell the JTC that Judge James is a

18     great judge?

19          Yes, I did.  She's the greatest thing since

20     sliced bread.

21          Aha, the JTC did not provide us with

22     exculpatory evidence.

23          I'm saying that that's not exculpatory

24     evidence.  I'm going by what is really defined as

25     exculpatory evidence, evidence that will exculpate

1      rather than somebody's opinion that somebody's a great

2      judge or something like that.  So with that

3      understanding, we will -- we have provided everything

4      there is, and we did not receive -- we do not have in

5      our files anything that would be deemed exculpatory.

6                 MS. McPHAIL:  That's not the scenario.

7      Scenario is, witness testifies that, I was at the court

8      every day.  I worked there full-time.  Judge James did

9      not take 56 days off.  I know she didn't because I saw

10     her everyday.  That's exculpatory.  It's not opinion.

11     And if they're representing today there's no exculpatory

12     evidence of that nature, that's fine.

13                MS. RYNIER:  But that flies in the face of

14     this court's order that work product is not --

15                THE MASTER:  I am not ordering that.  And

16     should that scenario arise, I'm sure we'll be dealing

17     with it here at length.  Hopefully, should it arise, we

18     can deal with it once.  And you can make a record of a

19     continuing objection, if you have an objection, but

20     that's my ruling.  You can certainly disagree with my

21     ruling.

22                MS. McPHAIL:  No, I understand your ruling,

23     Judge, and I'm not saying I disagree with it.  I'm just

24     saying that because you cited case law which clearly

25     establishes that factual allegations in an interview are

                              107

```
 1        not work product, you've given them to us, we understand

 2        that, and we accept that.

 3                    THE MASTER:  Okay.  Anything else?

 4                    MR. FISCHER:  No, Your Honor.

 5                    MS. RYNIER:  No, Your Honor.

 6                    MR. THOMAS:  Not on behalf of Respondent, Your

 7        Honor.

 8                    THE MASTER:  All right.  That concludes

 9        today's hearing.  I'll see you all on Monday, the 23rd.

10                    MR. THOMAS:  9:30.

11                    MR. FISCHER:  9 a.m.

12                    MS. RYNIER:  9 a.m.

13                    THE MASTER:  Nine o'clock.

14                    (Concluded at 12:45 p.m.)

15

16

17

18

19

20

21

22

23

24

25
```

1   State of Michigan   )

2   County of Wayne     )

3                       Certificate of Notary Public

4        I certify that this transcript is a complete, true, and

5   correct record of the testimony of the witness held in this

6   case.

7        I also certify that prior to taking this deposition, the

8   witness was duly sworn or affirmed to tell the truth.

9        I further certify that I am not a relative or an employee

10  of or an attorney for a party; and that I am not financially

11  interested, directly or indirectly, in the matter.

12

13

14                  January 22, 2012

15

16

17

18              _____

19              Judith K. Jump, CSR/CER (7163)

20              Notary Public, Wayne County, Michigan

21              My Commission Expires:  11/20/2013

22

23

24

25