# EXHIBIT 1

# JAMES v. HILLIARD HAMPTON, ET AL.

# DEBORAH LYNN EVANS GREEN

## August 11, 2017

*Prepared for you by*





**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

DEBORAH LYNN EVANS GREEN
August 11, 2017

---

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SYLVIA JAMES,
        Plaintiff,
    vs.        Case No. 2:12-cv-10273
               Hon. Paul D. Borman
               Magistrate Judge R. Steven Whalen
HILLIARD HAMPTON, et al.,
        Defendants.

_____

The Deposition of DEBORAH LYNN EVANS GREEN,
Taken 3030 W. Grand Boulevard, 10th Floor,
Detroit, Michigan,
Commencing at 9:25 a.m.,
Friday, August 11, 2017,
Before Sharon Campbell, CSR-3406.

---

Page 2

1   APPEARANCES:
2
3   JASON R. HIRSCH
4   Morganroth & Morganroth, PLLC
5   344 North Old Woodward Avenue
6   Suite 200
7   Birmingham, Michigan  48009
8   248.864.4000
9   jhirsch@morganrothlaw.com
10      Appearing on behalf of the Plaintiff.
11
12  JEANMARIE MILLER
13  Michigan Attorney General
14  PO Box 30736
15  Lansing, Michigan 48909
16  517.373.6434
17  millerj51@michigan.gov
18      Appearing on behalf of the Defendant, JTC, Washington,
19      and Green.
20
21
22
23
24
25

---

Page 3

1   BRETT A. ASHER
2   The Mike Cox Law Firm, PLLC
3   17430 Laurel Park Drive North
4   Suite 120E
5   Livonia, Michigan 48152
6   734.591.4002
7   basher@mikecoxlaw.com
8       Appearing on behalf of the Defendant, Anderson.
9
10  ADAM T. RATLIFF
11  Warner, Norcross & Judd, LLP
12  111 Lyon Street NW
13  Grand Rapids, Michigan 49503-2487
14  616.752.2539
15  aratliff@wnj.com
16      Appearing on behalf of the Defendant, Fischer.
17
18
19
20
21
22
23
24
25

---

Page 4

1           TABLE OF CONTENTS
2
3   WITNESS                         PAGE
4   DEBORAH LYNN EVANS GREEN
5
6   EXAMINATION
7   BY MR. HIRSCH:                     5
8
9           EXHIBITS
10
11  Exhibit                        Page
12  (Exhibits attached to transcript.)
13

14  DEPOSITION EXHIBIT 1            16
15  DEPOSITION EXHIBIT 2            56
16  DEPOSITION EXHIBIT 3            58
17  DEPOSITION EXHIBIT 4            63
18  DEPOSITION EXHIBIT 5            79
19
20
21
22
23
24
25

---



DEBORAH LYNN EVANS GREEN
August 11, 2017

---

Page 5

1   Detroit, Michigan
2   Friday, August 11, 2017
3   9:25 a.m.
4
5           DEBORAH LYNN EVANS GREEN,
6   was thereupon called as a witness herein, and after
7   having first been duly sworn to testify to the truth,
8   the whole truth and nothing but the truth, was
9   examined and testified as follows:
10          MR. HIRSCH:  Good morning.  My name is
11  Jason Hirsch.  I'm one of the attorneys for the
12  plaintiff in this matter.  Let the record show that
13  this is the deposition of Deborah Green taken pursuant
14  to notice under the Federal Rules of Civil Procedure.
15          EXAMINATION
16  BY MR. HIRSCH:
17  Q.  Ms. Green, I will be asking you a series of questions.
18      You were just sworn in.  You understand your answers
19      are under oath?
20  A.  Yes.
21  Q.  And please answer verbally so that we can make sure
22      your answer gets recorded, okay?
23  A.  Yes.
24  Q.  And if at any time you don't understand a question,
25      please say so and I will try to clarify, okay?

---

Page 6

1   A.  Yes.
2   Q.  And please make sure to let me finish my entire
3       question before you answer, both to make sure that you
4       understand my question and because the court reporter
5       can't record two of us talking at once, okay?
6   A.  Yes.
7   Q.  And if at any time I interrupt you or you haven't
8       completed your answer, please let me know, and I will
9       permit you to finish your answer for the record, okay?
10  A.  Okay.
11  Q.  And if at any time you need a break, preferably not
12      mid question, but other than that, just let me know,
13      and we can take a break, okay?
14  A.  Okay.
15  Q.  Can I have your full name for the record, please?
16  A.  Deborah Lynn Evans Green.
17  Q.  Can I have your date of birth, ma'am?
18  A.  October 17, 1957.
19  Q.  You attended undergraduate at Penn State University;
20      is that correct?
21  A.  Correct.
22  Q.  What time period?
23  A.  Oh, goodness.  I graduated in 1978.
24  Q.  And what was your degree?
25  A.  History.

---

Page 7

1   Q.  That would be a BA in history?
2   A.  Correct.
3   Q.  And you attended law school, correct?
4   A.  Correct.
5   Q.  And that was at Wayne State University, correct?
6   A.  Correct.
7   Q.  And when did you get your law degree?
8   A.  1984.
9   Q.  That would be a JD, correct?
10  A.  Correct.
11  Q.  And are you a member of the State Bar of Michigan?
12  A.  Yes.
13  Q.  Are you a member of the state bars of any other
14      states?
15  A.  No.
16  Q.  Are you admitted to any Federal courts?
17  A.  No.  I think I used to be, but I'm not now.
18  Q.  Where did you used to be admitted?
19  A.  A long, long, long time ago I started out at Miller
20      Canfield, and I believe I was admitted to the 6th
21      Circuit in Cincinnati just as an associate on some
22      long ago case.  That's my memory talking.
23  Q.  Have you ever been subject to any professional
24      discipline?
25  A.  No.

---

Page 8

1   Q.  Are you a member of any professional associations,
2       like the ABA, for example?
3   A.  No.  I don't know if this is part of your question,
4       but when I retired a year ago, I got certified as a
5       court reporter, so I actually do transcripts on my
6       own.  So --
7   Q.  I'm sorry, go ahead.
8   A.  So I don't know if that's the kind of professional
9       organization, but I am now a certified court reporter.
10  Q.  So that's a certification from the State of Michigan,
11      correct?
12  A.  Correct.
13  Q.  But you're not a member of the American Bar
14      Association, for example?
15  A.  No.  I used to be, but I'm not now.
16  Q.  You are still a member of the State Bar of Michigan,
17      correct?
18  A.  Oh, yes.
19  Q.  So you maintain that?
20  A.  Correct.
21  Q.  Could you -- well, strike that.
22          You mentioned that you are now retired,
23      correct?
24  A.  Correct.
25  Q.  Although you are doing some court reporting, correct?

---



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
A U.S. Legal Support Company

US LEGAL SUPPORT
The Power of Commitment™

DEBORAH LYNN EVANS GREEN
August 11, 2017

## Page 9

1    A.   Correct.

2    Q.   When did you retire?

3    A.   June 1 of last year, 2016.

4    Q.   And you retired from the State Court Administrator's

5       Office, correct?

6    A.   Correct.

7    Q.   Was there a reason or it was just time to retire?

8    A.   My husband has Parkinson's disease. I needed to stay

9       home more, which is why it's nice to do the

10      transcripts from home.

11    Q.   Could you give me your employment history from the

12      time you graduated law school forward?

13    A.   Okay. I started out at Miller, Canfield, Paddock and

14      Stone. I was there approximately two to three years.

15      I left there when my first child was born, stayed home

16      for a bit, taught law, taught prelaw at Henry Ford

17      College. I then went back to work. I'm sorry I

18      forgot -- the small firm downriver who doesn't exist

19      anymore. I will remember the name. They were in

20      Trenton. I was only with them for a year, and then I

21      joined Pagnucco, Kruze, Tamsen and Labadie, and was

22      the city attorney for the City of Allen Park for about

23      six years. Then I left there. So I did their

24      criminal prosecution. And then I became the court

25      administrator at the 24th District Court in Allen

## Page 10

1      Park. I was there for about two years, became a court

2      administrator at the 33rd District Court in Woodhaven,

3      was there for about five or six years, and then joined

4      the State Court Administrative Office.

5    Q.   If we could just go through this just so I can get

6      some timeframes. You started at Miller Canfield --

7    A.   Correct.

8    Q.   -- after you obtained your law degree, so that would

9      beginning around 1984?

10    A.   I actually clerked with them while I was still in law

11      school for a year and a half maybe from my second

12      summer on and then got officially hired by them when I

13      graduated, yes.

14    Q.   So two to three years as an associate from 1984 to --

15    A.   Ish.

16    Q.   -- for two to three years?

17    A.   To '86 is when my son was born, so yes.

18    Q.   And what sort of work did you do as an associate at

19      Miller, Canfield?

20    A.   I was in the business division. I started out in the

21      now defunct field of antitrust law, not a good choice,

22      and then primarily worked on banking cases.

23    Q.   And then you mentioned you spent some time away from

24      employment after your son was born, and then you went

25      back and taught prelaw at Henry Ford, correct?

## Page 11

1    A.   Yes.

2    Q.   Do you remember the timeframe of that?

3    A.   Well, let's see. He was born in '86, and my second --

4      my daughter was born in '89, so it would have been

5      '87, '88, and it was a very, very part-time job.

6    Q.   And those were undergraduate courses --

7    A.   Yes.

8    Q.   -- or e-course, correct?

9    A.   Right, Intro to Law.

10    Q.   And then you mentioned you couldn't recall the name,

11      but you said a small firm located in Trenton, correct?

12      Do you recall the time period of that?

13    A.   Burley, Barton, Misco and Falzone. That would have

14      been in 1990.

15    Q.   And do you recall the sort of work you did for Burley,

16      Barton?

17    A.   I was for lack of a better word a general

18      practitioner. I represented a lot of small businesses

19      in the downriver area.

20    Q.   I think after that you mentioned, and I hope I got the

21      name right, I think you said Pagnucco, Kruze?

22    A.   Pagnucco, P-A-G-N-U-C-C-O.

23    Q.   And what period of time were you at Pagnucco, Kruze?

24    A.   That would have been '91 to '96-ish.

25    Q.   And you were an associate there?

## Page 12

1    A.   Correct.

2    Q.   And I think one aspect that you mentioned of your work

3      there was a city attorney for Allen Park, correct?

4    A.   Correct.

5    Q.   Was that really what you specialized in or any other

6      area you worked in?

7    A.   I still maintained my private clients. I still

8      represented a lot of small businesses in the city area

9      along with being city attorney.

10    Q.   I think next you said you became the court

11      administrator for the 24th District Court, correct?

12    A.   Correct.

13    Q.   And you said that was for about two years. Do you

14      recall the year, years for that?

15    A.   It must have been '96 to '97 and maybe into '98.

16    Q.   And then following that position you served as court

17      administrator for the 33rd District Court, correct?

18    A.   Correct.

19    Q.   And you said that was for the five to six years, I

20      assume that was immediately following?

21    A.   Correct. And I think I'm actually right on my years,

22      because I started this job in June of 2003, so that's

23      actually five years from '98.

24    Q.   And so June of 2003 is when you started at the State

25      Court Administrator's Office, correct?



DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 13

1  A.  Correct.
2  Q.  In terms of your job as a court administrator, and
3      certainly if there was differences between the 24th
4      District Court and the 33rd District Court, you can
5      tell me, if not I will try to ask you just generally
6      what were your duties as a court administrator in
7      those district courts?
8  A.  Okay.  Generally I was -- I managed the business
9      operations of the court, the human resources, the
10     budget, the benefits.  Every court administrator is
11     basically acting under the authority of the chief
12     judge, so it's chief judge really has the
13     administrative authority per court rule over every
14     court, but then they also have the ability to
15     delegate.  So I will say that between the 24th and the
16     33rd, the exact ways that I achieved those things was
17     different, but the responsibilities were still the
18     same for the business operations of the court, the
19     case flow management, budget management, HR functions,
20     facilities management.
21 Q.  Now, in June of 2003 you started at the State Court
22     Administrator's Office, correct?
23 A.  Correct.
24 Q.  And you were a regional administrator: is that
25     correct?

Page 14

1  A.  Correct.
2  Q.  And which region did you administer?  They are
3      numbered, correct?
4  A.  Region 1.  At that time there were four regions in the
5      state, and I was Region 1.
6  Q.  And what did Region 1 include at the time you started?
7  A.  The seven counties of southeast Michigan, Wayne,
8      Oakland, Macomb, Genesee, Washtenaw, Monroe.  What am
9      I missing?
10 Q.  Livingston?
11 A.  Not Livingston, thank goodness.
12     MS. MILLER:  Lapeer?
13 A.  Not Lapeer.  Oh, Saint Clair, Port Huron.
14 BY MR. HIRSCH:
15 Q.  Okay.  Now, was that your region the entire time you
16     were employed by the State Court Administrator's
17     Office?
18 A.  No.  In 2013 we took over superintendent control of
19     the 36th District Court in downtown Detroit, and at
20     that time the supreme court felt that Region 1 was
21     sort of overloaded, and so at that time Region 1
22     became just the three counties of Wayne, Oakland, and
23     Macomb, and the other four counties were sort of
24     divvied up into a fifth region, and so from that point
25     on there were five regions in the state.

Page 15

1  Q.  So at that time in 2013, though, you stayed with
2      Region 1 --
3  A.  Correct.
4  Q.  -- you stayed with the originator?
5          The makeup of Region 1 changed?
6  A.  Correct.
7  Q.  Are you aware that there was subsequently a change
8      where Wayne County was separated into its own region?
9  A.  Yes.
10 Q.  Did that happen while you were there or was that
11     later?
12 A.  It happened upon my leaving, because I wouldn't do it
13     while I was still there.
14 Q.  I'm not sure I understand exactly --
15 A.  I didn't want to be a one county region.
16 Q.  Okay.
17 A.  And so they had wanted to change the makeup of the
18     regions for quite some time, and I really was not
19     interested in only working -- covering Wayne County,
20     so it was -- it's not a coincidence that the regions
21     changed in June 2016 when I left.
22 Q.  Okay.  So those two events, that was your decision,
23     they were going to change the region, and --
24 A.  When I left.
25 Q.  When you left?

Page 16

1  A.  That was the deal.
2  Q.  Okay.  And do you know why there was this change to
3      make Region 1 Wayne County only?
4  A.  My answer is because it took three people to do what I
5      had done for 13 years, but they really felt that Wayne
6      County needed more direct attention.  The third
7      circuit, 36th District Court, they felt that given the
8      issues in Genesee, for instance, in Flint, and some of
9      the other courts that were part of my original region,
10     they just felt that Wayne County needed its own
11     separate attention.
12 Q.  And Wayne County is the biggest county, correct?
13 A.  Yes, in number of judges, yes.
14 Q.  Okay.  Fair enough.  When you said they felt, who was
15     the they --
16 A.  The supreme court.
17 Q.  -- in your sentence?
18 A.  I'm sorry.  I'm interrupted you.
19 Q.  You are familiar with Judge Sylvia James, correct?
20 A.  Yes.
21     MR. HIRSCH:  Can you mark this, please?
22     MARKED FOR IDENTIFICATION:
23     DEPOSITION EXHIBIT 1
24     9:41 a.m.
25 BY MR. HIRSCH:



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
A U.S. Legal Support Company

US LEGAL SUPPORT
The Power of Commitment™

DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 17

1    Q.   Ms. Green, our court reporter has just handed you what
2         we have marked as Deposition Exhibit 1.  Do you have
3         that in front of you?
4    A.   Yes.
5    Q.   Do you recognize that document?
6    A.   Yes.
7    Q.   That is a grievance that you filed against Judge
8         James; is that correct?
9    A.   Correct.
10   Q.   Now, the front page is dated June 14, 2011.  Do you
11        see that?
12   A.   Yes.
13   Q.   And do you see the subsequent pages, there is a header
14        that is actually dated June 10th.  Do you see that?
15   A.   Yes.
16   Q.   Do you know why there is any difference of dates?
17   A.   The only thing that I can think of is that Microsoft
18        Word will like date stuff the date you open it, so my
19        guess is I drafted this on the 10th and then somehow
20        reopened it on the 14th, and so it redated the first
21        page.  I shouldn't have -- I don't know.
22   Q.   Okay.  You would agree with me that you submitted this
23        to Paul Fischer at the Judicial Tenure Commission
24        around June 14th?
25   A.   Yes.

Page 18

1    Q.   What prompted you to file this request for
2         investigation?
3    A.   Well, I think it stated in the letter.  We had been
4         looking into a series of issues with the court, and
5         they had risen to the level that I felt needed the
6         tenure commission's attention.
7    Q.   So to the best of your knowledge, this letter was true
8         and accurate certainly as of the date it was
9         written --
10   A.   Yes.
11   Q.   -- in terms of the facts you had at that time,
12        correct?
13   A.   Yes.
14   Q.   You knew Judge James prior to this time, correct?
15   A.   Ever since I took my job, yes.
16   Q.   And you had met her in person prior to June of 2011,
17        correct?
18   A.   Oh, yes.
19   Q.   Okay.  You knew Judge James was African American,
20        correct?
21   A.   Yes.
22   Q.   Now, do you recall there was a time when Judge James
23        had been placed on administrator leave by the Supreme
24        Court?
25   A.   Yes.

Page 19

1    Q.   Okay.  Do you recall whether that was before or after
2         June 14, 2011?
3    A.   It was before, I believe, in April, I think, but I
4         don't really remember the date.
5    Q.   Okay.  Did you have any involvement in the decision to
6         place Judge James on administrative leave?
7    A.   Well, involvement in the decision, no.  The decision
8         came from the Supreme Court, but I had raised some of
9         my concerns to them, which caused them to choose the
10        action of putting her on administrative leave.
11   Q.   When you say you had raised concerns to the Supreme
12        Court, did you do that in writing?
13   A.   I don't remember.  I know I went in front of them.
14        They have an administrative hearing day.  I went in
15        front of them and presented that to them in person en
16        banc.
17   Q.   Do you know if that's on the record?
18   A.   It is not on the record.  I must have put something in
19        writing prior to that because I don't think you get on
20        their agenda without giving them something in writing.
21   Q.   So in terms of actual discussion you had with the
22        justices, was that the only discussion at this en banc
23        hearing as part of the administrative docket?
24   A.   Yes.
25   Q.   No other discussions with the chief justice?

Page 20

1    A.   Not prior to the hearing, no, afterwards, yes, but not
2         prior.
3    Q.   And no other discussions with any of the associate
4         justices prior to the hearing?
5    A.   No.
6    Q.   Now, you said you did have some discussions with the
7         chief justice about Judge James after the hearing on
8         the administrative docket, correct?
9    A.   Yes.
10   Q.   Did you also have any discussions with any of the
11        other justices after the hearing on the administrative
12        docket?
13   A.   I don't believe so, no, that's -- I don't normally
14        speak with the associate justices.
15   Q.   Do you recall when you had this discussion -- well,
16        strike that.
17             Was it one discussion with the chief
18        justice?
19   A.   There was one that I remember, yes, one.
20   Q.   Okay.  What was the nature of that discussion with the
21        chief justice?
22   A.   It was still that day, but it was after the hearing
23        and it was basically how to implement their decision.
24   Q.   Did the court make a decision then during that hearing
25        on the administrative docket?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
A U.S. Legal Support Company

US LEGAL SUPPORT
The Power of Commitment™

DEBORAH LYNN EVANS GREEN
August 11, 2017

---

Page 21

1   A.  Yes.
2   Q.  And what was the decision they made during the
3      administrative docket?
4   A.  To put her on administrative leave and for me to
5      appoint an outside chief judge to come in and operate
6      the court.
7   Q.  And that decision is memorialized in an order,
8      correct --
9   A.  Yes.
10   Q.  -- an administrative order?
11   A.  Yes.
12   Q.  Was there a vote then for that decision?
13   A.  I believe they did vote, yes.
14   Q.  Do you recall if anyone voted against that?
15   A.  It was unanimous.
16   Q.  Now, do you recall when this hearing on the
17      administrative docket took place?
18   A.  Whatever day -- I think it was in April -- that she
19      was put on administrative leave, it was that day.
20   Q.  Okay.  So the order came down that same day, and she
21      was put on administrative leave as soon as the order
22      gets entered, correct?
23   A.  Correct.  The order might have actually come out the
24      next day, but I believe the action was taken that day.
25      I really -- but, yeah, right contemporaneous, the

---

Page 22

1      whole thing.
2   Q.  Very close in time?
3   A.  Yes, yes.
4   Q.  Do you know why it is then that the grievance was not
5      filed until around June 14th, 2011, when Judge James
6      had been placed on administrative leave in April 2011?
7   A.  Part of why she was placed on administrative leave was
8      the concern that if she was still there, she would
9      tamper with evidence.  We didn't think that at that
10      time in April -- we knew plenty, as you can tell from
11      my letter, but we didn't think we knew everything, and
12      so that was the reason.  I wanted to basically gather
13      any other evidence, see if this thing mushroomed even
14      more than it already had, and then so by June I felt I
15      had enough evidence and enough tangible things to
16      report and report it to the JTC.
17   Q.  When you say there was a concern that she would tamper
18      with evidence, was that a concern you expressed?
19   A.  Yes.
20   Q.  Was that a concern the chief justice expressed?
21   A.  It was a concern all the justices expressed at the
22      hearing.
23   Q.  Did you make a request as to what should happen at the
24      administrative hearing, in other words, did you say I
25      think she should be placed on leave?

---

Page 23

1   A.  That was one of the options.  I had also suggested
2      or -- suggested is pretty important -- but that
3      possibly we bring in an outside chief judge, let her
4      still handle the cases, but just bring in an outside
5      chief judge to handle the management of the court, the
6      financial side.  So I didn't recommend any one course
7      of action to them.  I said here is the thing, and we
8      need -- I was most concerned about the financial
9      situation of the court, and so that's when they made
10      the decision, because of the concerns about tampering
11      and all that, to put her on administrative leave so
12      that we could move forward.
13   Q.  Was there a decision made at the time she was, Judge
14      James was placed on administrative leave, to go
15      forward to pursue a grievance?
16   A.  Not at that moment in time, no.
17   Q.  Did the Supreme Court direct you to take any steps
18      then?
19   A.  As regional administrator I have the authority to
20      appoint outside judges to sit in any court in the
21      land, so their direction to me was to bring in an
22      outside judge to operate the court in Judge James'
23      absence while we basically got our hands on everything
24      that like the auditor had found and some of these
25      other things that we believed were going on, and so it

---

Page 24

1      was -- I can't say that -- it was certainly in my
2      mind, and I think in a lot of people's minds, that
3      this would lead to a tenure complaint, but it wasn't
4      on April, whatever date we were there, that wasn't my
5      main focus.
6   Q.  So just so I'm clear, it sounds like, and you will
7      correct me on this, but it sounds like there were two
8      things you were directed to do.  One is since the
9      Supreme Court had made the decision to place her on
10      administrative leave, in your role as administrator I
11      presume you would have had to appoint some other
12      judge, right, I mean somebody has to get in there?
13   A.  Correct.
14   Q.  And the second thing was to continue to investigate
15      the concerns that had led to the administrative leave;
16      is that fair?
17   A.  No, they didn't order me to continue to investigate.
18      You know, Val Washington, we brought him in.  I
19      actually was very infrequently feet on the ground at
20      the court, so I wasn't investigating, but I think my
21      auditor followed up on a few things, and then Val
22      Washington would bring his concerns to me.  I wasn't
23      there investigating, and they certainly didn't order
24      me to investigate.  They ordered me -- Chief Justice
25      Young put her on administrative leave, called her and

---



DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 25

1  he put her on administrative leave, I didn't, and I
2  appointed a chief judge to come in and run the court
3  and found other judges to manage the caseload as well.
4  That didn't last long, but and then basically sort of
5  put all this together.
6  Q.  So did you then begin to assemble your grievance
7     complaint as soon as Judge James was placed on
8     administrative leave?
9  A.  Well, I would have to go through this point by point,
10    but some of this stuff I already had, like the items
11    from Charlene McLemore's audit.  The travel stuff,
12    that kind of evolved.  And again, let me go back and
13    add to your previous question about the time between
14    April and June.  It kept growing, and so I didn't want
15    to file a complaint and then have to file another one,
16    you know, and so as we are going on almost daily it
17    kept growing until I felt, at this point in time
18    finally, I felt like I had the whole picture.
19 Q.  Well, but you said you weren't actually actively
20    investigating, correct?
21 A.  Correct, no.
22 Q.  But you said that Ms. McLemore -- who is the auditor,
23    correct?
24 A.  Correct.
25 Q.  She was continuing her audit work, I assume, correct?

Page 26

1  A.  Following up, yes.
2  Q.  Did you direct her to do that?
3  A.  Yes.
4  Q.  And you also said that you would -- well, strike that.
5          First so the record is clear, Judge
6     Washington was the judge appointed to take over after
7     Judge James was placed on administrative leave,
8     correct?
9  A.  He was appointed as the chief judge to take over the
10    administrative duties.  We appointed some other judges
11    from Wayne County to take over the cases.
12 Q.  Okay.  So would his position be the interim chief
13    judge at that time?
14 A.  I believe we called him acting chief, yes.
15 Q.  But he was not handling the docket, he was just
16    handling administrative duties?
17 A.  At that point in time, that's correct.  After awhile
18    we couldn't get visiting judges.  It went on way
19    longer than we thought, and so he ended up taking
20    cases as well.
21 Q.  So when you say at that time, is that the time
22    from roughly the time she is placed on administrative
23    leave until the grievance is filed?
24 A.  At that time what?  I forget.
25 Q.  That Judge Washington was just handling the

Page 27

1  administrative aspect, but visiting judges were coming
2  in to actually handle the caseload?
3  A.  I think Judge Washington was still solely acting as
4     chief administrative judge when I filed this.  I
5     believe it was later in the summer when we needed him
6     to take on caseload.
7  Q.  So prior to this Judge James had been the chief judge,
8     correct?
9  A.  Correct.  It's a one judge court.
10 Q.  And she handled both the administrative aspect and the
11    cases, correct?
12 A.  Yes.
13 Q.  Why was it that Judge Washington when he became acting
14    chief judge could only handle the administrative side
15    and not also handle the cases?
16 A.  It wasn't that he couldn't, it's that we wanted him to
17    focus on the business side of the court, the
18    administrative side of the court, and that was
19    initially what he agreed to do.  He didn't want to
20    handle the caseload.  So it wasn't that he couldn't
21    have, it's that that wasn't why we brought him in.
22 Q.  So when you say focus on the business side, what
23    direction did you give him as to what he was to do on
24    the business side?
25 A.  Really very little.  We brought him in as chief, and

Page 28

1  intentionally sort of brought him in and said you have
2  been a chief judge before, go look around, see what's
3  what, fix what needs fixing, tell us what you need
4  help with, what you are worried about, gave him a
5  couple of directive -- not directives, but like there
6  had been a previous audit that had findings in it, and
7  sort of used that as kind of a roadmap here, look at
8  these things, Charlene's audit, here, look at these
9  things, but other than that, you go be chief judge.
10 Q.  Now, you did say -- Charlene is Ms. McLemore, correct?
11 A.  Correct, I'm sorry.
12 Q.  And so she was continuing to follow up on her audit,
13    right?
14 A.  Yes.
15 Q.  And during that time then, in that time I mean while
16    Judge James was on administrative leave but before the
17    grievance was filed, she would give you some feedback?
18 A.  Yes.
19 Q.  Okay.  And so some of that you were using to compile
20    what ended up being the June grievance, right?
21 A.  Yes.
22 Q.  And I think you also mentioned that you received some
23    information from Judge Washington, correct?
24 A.  Yes.
25 Q.  Okay.  You didn't solicit the information, correct?

Pages 25 to 28

 

DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 29

1  A.  Correct.
2  Q.  But Judge Washington would call you up when he
3      discovered certain things, correct?
4  A.  Correct, or shoot me an e-mail or whatever, but
5      communicate with me.
6  Q.  All right.  So what information he provided to you,
7      that was in his discretion?
8  A.  Correct.
9  Q.  So attached to the grievance you have some back-up
10     material, correct?
11  A.  Yes.
12  Q.  You have a bunch of exhibits here.  If we could look
13     at some of them, if you turn, for example, to Exhibit
14     A or Tab A, I guess, to the grievance --
15  A.  Okay.
16  Q.  -- that's a March 18th, 2011 letter from you to Judge
17     James, correct?
18  A.  Yes.  This is from Charlene McLemore.
19  Q.  Okay.  I apologize, it's from Ms. McLemore.  You were
20     copied on it, correct?
21  A.  Correct.
22  Q.  And it's sort of under your letterhead, right --
23  A.  Correct.
24  Q.  -- you are in the upper left on page 1?
25  A.  Yes.

Page 30

1  Q.  You were familiar with this letter, though, in the
2      March 2011 timeframe: is that fair?
3  A.  Oh, yes.
4  Q.  So this letter raised, I think Ms. McLemore's words
5      are some areas of concern, do you see that?
6  A.  Yes.
7  Q.  And it had to do with the Community Service Fund Bank
8      Account, correct?
9  A.  Yes.  I think -- I believe this letter is just
10     concerned about the Community Service Account, yes.
11  Q.  So as of March 2011, the -- and if I call it the SCAO
12     you will know what I'm referring to?
13  A.  Absolutely.
14  Q.  The SCAO knew about -- well, strike that.
15         As of March 2011 the SCAO had expressed
16     concerns about the Community Service fund, right?
17  A.  Correct.
18  Q.  And that's before Judge James is placed on
19     administrative leave?
20  A.  Yes.
21  Q.  If we could turn to Tab B, and this looks like check
22     register info from that account?
23  A.  Yes.
24  Q.  And I think that was -- well, strike that.
25         Was that part of what was reviewed prior to

Page 31

1      the March 18, 2011 letter?
2  A.  This is Charlene McLemore's document, so yes, this is
3      what she prepared to show me.
4  Q.  Okay.  But all I'm trying to get at, though, is that
5      was part of the backup initially for the March 18th
6      letter, correct?
7  A.  Yes.
8  Q.  Okay.  So that information was known before Judge
9      James was placed on administrative leave?
10  A.  Yes.
11  Q.  And if we could look at Tab C, that's an April 7th,
12     2011 letter from you to Judge James, correct?
13  A.  Yes.
14  Q.  And you are providing Judge James some questions that
15     you say were directed to her by the chief justice,
16     correct?
17  A.  Correct.
18  Q.  Now, do you recall, was this letter written before or
19     after that administrative docket hearing?
20  A.  Before.  This notified her to provide a response --
21     oh, here, the administrative conference was on
22     Wednesday, April 13th.  We needed to receive her
23     response prior to that conference.
24  Q.  So this helps us with some timing, right?
25  A.  Yes.

Page 32

1  Q.  Now, I thought you had told me that you had not had
2      discussions with Justice Young before the
3      administrative conference: was that correct?
4  A.  Yes, that's what I said.
5  Q.  Okay.  Does this perhaps refresh your recollection
6      that maybe you did have a conversation with Justice
7      Young that at least resulted in these questions?
8  A.  I don't know that I spoke directly with Justice Young
9      about this.  I believe typically the way things work
10     is us peons would talk to Chad Schmucker at the
11     time -- he was also a judge -- and the state court
12     administrator would talk to the chief justice, so I
13     don't believe I personally talked to Chief Justice
14     Young prior to that administrative hearing.  I believe
15     Chad Schmucker did.
16  Q.  Well, do you recall having discussions with Mr.
17     Schmucker about Judge James prior to the, what we now
18     can put as an April 13th administrative hearing?
19  A.  Yes.
20  Q.  What were your discussions with Mr. Schmucker?
21  A.  That I felt we, at the very least needed to appoint an
22     outside chief judge, which requires Supreme Court,
23     they are the ones that make the appointment, so I
24     talked to Chad about, Mr. Schmucker, about that I
25     needed to get in front of the Supreme Court.



DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 33

1  Q.  Now, at that administrative hearing we talked about
2      you were there, you told us that, right?
3  A.  Yes.
4  Q.  Did Mr. Schmucker also appear there?
5  A.  Yes.
6  Q.  Did he speak also?  On this particular issue I'm
7      focussing on.
8  A.  I don't believe so.  If he did, it was very cursory.
9  Q.  If we could turn to Tab D, this would appear to be the
10     response from Judge James to your April 7th letter,
11     correct?
12 A.  Correct.
13 Q.  And just to be clear, do you recall receiving this
14     before that administrative hearing?  I mean it doesn't
15     say how this letter was delivered.  I mean it's dated
16     April 11.
17 A.  I did receive it before the administrative hearing,
18     yes.
19 Q.  Did this letter change at all any of your opinions
20     about what you were going to say at the administrative
21     hearing?
22 A.  No.
23 Q.  Did this letter get passed along to Mr. Schmucker?
24 A.  Yes.
25 Q.  Did this letter get passed along to the chief justice?

Page 34

1  A.  Yes.
2  Q.  If we could look at Tab E, that's a document entitled
3      22nd District Court Community Service Account
4      Disbursement Summary, do you see that?
5  A.  Yes.
6  Q.  Do you know what that document is?
7  A.  This I believe was also created by Charlene McLemore.
8      She sort of presented the same information to us in a
9      number of different ways.  The first one was the basic
10     check register that is sort of by check number, and
11     then she grouped things into similar types of
12     expenses, and so I believe that's what she called the
13     disbursement summary.
14 Q.  And you will see in the -- sort of if you turn the
15     document -- well, you have the right orientation, but
16     you will see in the lower left when it's orientated in
17     sort of landscape, right --
18 A.  Yes.
19 Q.  -- you see it says Monday, May 2, 2011?
20 A.  Correct.
21 Q.  Do you recall if you would have received this document
22     in or around, on or around May 2, 2011?
23 A.  That would make sense.
24 Q.  So this would probably be something that you received
25     after Judge James was placed on administrative leave?

Page 35

1  A.  Yes.
2  Q.  It certainly couldn't be earlier than May 2nd if we
3      believe that date, and we have no reason not to,
4      right?
5  A.  Correct.
6  Q.  And if we can turn to Tab F, and this one is entitled
7      22nd District Court Community Service Account Checks
8      by Payee at the top, do you see that?
9  A.  Yes.
10 Q.  Is this also -- well, strike that.
11         Do you know if this is also a document
12     prepared by Ms. McLemore?
13 A.  It is.
14 Q.  And you see also in the lower left when we look at
15     this in landscape, it has the same date, Monday, May
16     2, 2011, correct?
17 A.  Correct.
18 Q.  So this would also be a document that you would have
19     received after Judge James was placed on
20     administrative leave?
21 A.  Correct.  Again, this is just reorganizing the
22     information from the check register.  It's not new
23     information.
24 Q.  So it's not new information, it's just a different
25     presentation?

Page 36

1  A.  Correct.
2  Q.  If we could turn to Tab G, and that looks to be a
3      series of checks and check requests.  I'm not going to
4      go through every page, but would you generally agree
5      with me?
6  A.  Yes.
7  Q.  Okay.  Do you know what these were?
8  A.  Checks and check requests.
9  Q.  What was the purpose of attaching these to your
10     grievance, what were these meant to support?
11 A.  I would have to go through them, but I believe this
12     section had to do with the concerns about travel
13     expenses.
14 Q.  Okay.
15 A.  I don't know if that's everything that's in here, but
16     I think that was what this section was about.
17 Q.  Okay.  And do you recall whether you had this group of
18     documents before Judge James was placed on
19     administrative leave?
20 A.  I don't believe I did.
21 Q.  Do you know where you got this group of documents
22     from?
23 A.  From the court, from either Judge Washington or Pamela
24     Anderson, or it might -- either -- Charlene might have
25     requested some of it.  I'm not sure, but it would have



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
A U.S. Legal Support Company

US LEGAL SUPPORT
The Power of Commitment™

DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 37

1    come from the court itself.
2    Q.  You will also note, for example, the very first
3        document, it's a check, but it is from an account by
4        the City of Inkster, right?
5    A.  Yes.
6    Q.  Okay.
7    A.  I mean that's what it looks to be to me.
8    Q.  In other words, it's not an account where the holder
9        is the District Court, right, I mean it says City of
10       Inkster?
11   A.  It says City of Inkster, yes.
12   Q.  Okay.  If you could look at the next Tab, Tab H --
13   A.  Okay.
14   Q.  First of all, do you recall who prepared -- well, I
15       guess I'm sorry.  There is a few pages here.  Let's
16       focus on the first page.
17   A.  Okay.
18   Q.  Do you recall who prepared that first page, entitled
19       Judge James' Leave at the top?
20   A.  I don't know exactly who prepared it, but it came to
21       me from the court.
22   Q.  Do you recall from who, who at the court sent it to
23       you?
24   A.  Sent it to me, I believe it was Pamela Anderson, but I
25       don't know that she created it.

Page 38

1    Q.  Okay.  Now, behind that it looks to be a number of
2        pages, similar pages that are memos from Judge James
3        to SCAO Region 1.  Do you see those?
4    A.  Correct, yes.
5    Q.  And some of them are a little different in format,
6        right, but they look similar?
7    A.  Yes.
8    Q.  And it looks to me like these are summaries of Judge
9        James' leave for various time periods.  Would that be
10       correct?
11   A.  These are her annual leave reports to me, which is
12       required.
13   Q.  So that's a document that -- well, strike that.
14           Is each judge required to provide that
15       document or is it each District Court?
16   A.  Well, each judge has to report their leave.  It
17       comes -- the chief judge of every court files it with
18       us, so if you are multi judge court, the judges report
19       to their chief and the chief sends a report to us.
20   Q.  Okay.  So in this case it doesn't matter, it happens
21       to be a single judge court?
22   A.  Exactly.
23   Q.  Okay.  So the SCAO received these reports from Judge
24       James each year, correct?
25   A.  Yes.

Page 39

1    Q.  And do you recall why you were attaching -- well,
2        strike that.
3           First of all, did you go into the SCAO
4        records to get these copies?
5    A.  Yes.
6    Q.  Okay.  And were you attaching them -- well, strike
7        that.
8           Was the purpose of attaching them behind
9        this first page with this leave summary to show there
10       was some disparity between whoever prepared this
11       summary and the memorandums that were submitted?
12   A.  Well, partially, because I think there is other
13       summaries from other years.  Yeah, later on in the
14       exhibit there is '06 of internal documents from the
15       court, but yes, to show that there was a discrepancy
16       between the records that the court had and what had
17       been reported to me, to SCAO.
18   Q.  But as you said, you did not know who prepared the
19       first page of this document, correct?
20   A.  Correct.
21   Q.  So you would have no way of knowing whether this
22       document, page 1, that the first page of Tab H was
23       accurate or whether the reports were accurate,
24       correct?
25   A.  Correct.

Page 40

1    Q.  And did you do any further investigation to try to
2        figure out which one of those was accurate?
3    A.  Well, I believe that's how we got these later internal
4        memorandums, memoranda, because I asked for the actual
5        documentation that the court had, which I think they
6        had for some years but not others, if I remember, so,
7        yeah, I followed up, but it was clear to me that there
8        were definitely some discrepancies.
9    Q.  And if we could look at an example maybe of what you
10       are talking about, you will see there is, I think it
11       would be a Bates number in the center of the page --
12   A.  I don't know what you are looking at.
13   Q.  If we look at the little sort of --
14   A.  Oh, yeah, on all these.
15   Q.  -- that black box with the little numbers, so if we
16       could refer to that.  If we look at 2327, would that
17       be an example of an internal memorandum?
18   A.  2327, yes.
19   Q.  Okay.  And do you recall where you received these
20       internal memorandum?
21   A.  The court sent them to me, whether it was Val
22       Washington or Pam Anderson, or if I got them through
23       Charlene, because she was on site much more than me,
24       but I got them from the court.
25   Q.  This is not something that is submitted to the SCAO,



DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 41

1  correct, this was internal, meaning internal to the
2  22nd District Court so far as you understand?
3  A. Correct.
4  Q. And you understood these to reflect dates that Judge
5  James was on leave?
6  A. Yes. She is the only judge.
7  Q. Well, for example, in the one we were looking at, page
8  2327, the subject is requests for assignment 2006,
9  correct?
10 A. Correct.
11 Q. And it's from Gerry Hearn, do you see that?
12 A. Yes.
13 Q. Do you know who he is?
14 A. He's the former court administrator.
15 Q. And in the first sort of section is annual leave, do
16 you see that?
17 A. Yes.
18 Q. And you understood that to mean annual leave by Judge
19 James, not some other employee of the 22nd District
20 Court, correct?
21 A. Correct, because requests for assignment is requests
22 for assignment of an outside judge.
23 Q. Now, every day that a judge is out, there is not a
24 request for assignment for another judge, correct?
25 A. Not necessarily.

Page 42

1  Q. Do you see the heading that says Assist With Docket?
2  A. Yes.
3  Q. Do you know what that means?
4  A. Yes.
5  Q. What does that mean?
6  A. We do several kinds of assignments, and assist with
7  docket basically means another judge is coming into
8  the court to do just that, assist with the docket
9  because the judge is out sick or on vacation. It
10 differentiates -- we have different rules for assist
11 with docket assignments as opposed to assignments
12 where a judge has disqualified themselves. So this
13 was a simple assist with docket -- or that shows
14 assist with docket assignments.
15 Q. So assist with docket would mean that the sitting
16 judge is there?
17 A. No.
18 Q. Okay. Explain it again. I apologize.
19 A. I mean not -- it wouldn't make any sense for the judge
20 to be there, I mean unless they needed help, and we do
21 occasionally do that, assist with docket assignments.
22 Like let's say you get the Kwame Kilpatrick trial --
23 Q. I remember.
24 A. -- and it's going to eat your whole docket, and you
25 need somebody to come in and help you with the rest of

Page 43

1  your docket.
2  Q. Right.
3  A. So it's not unheard of that the judges are still
4  there, but usually it's not a day-to-day thing.
5  Usually it's because a judge is missing, especially in
6  a one judge court, if you are going to be gone, you
7  can't leave your court sitting fallow for a week or
8  more, so you need another judge to come in and keep
9  the cases going while you are gone.
10 Q. So just so you can help me out in terms of how you
11 interpreted these dates, because I'm a little
12 confused, so for example, under annual leave, and I'm
13 still looking at the same page, right, 2327 --
14 A. Yes.
15 Q. -- for example, the first date under annual leave is
16 2-21, right, you see that?
17 A. Correct, yeah.
18 Q. But there is no assist with docket for 2-21, correct?
19 A. Correct.
20 Q. Okay. And conversely, for example, you see assist
21 with docket on 1-3, do you see that, that's the first
22 one?
23 A. Yes.
24 Q. But there is no leave noted for 1-3, correct?
25 A. Yes.

Page 44

1  Q. Okay. So how did you interpret this?
2  A. I didn't.
3  Q. Okay. So when you were concerned about the numbers,
4  what were you comparing?
5  A. Well, first off, just annual leave alone she reported
6  far less days to us than apparently her court had
7  records for internally.
8  Q. So in other words, you are saying just so I
9  understand, that on the page we were looking at, you
10 were looking at the 31, the total for annual leave: is
11 that correct?
12 A. Well, and I was also looking at -- we had a general
13 concern for her attendance, and so -- but yes, because
14 if you look at what she reported to us for '06, she
15 reports 19 days of annual leave -- or wait, this is
16 '06. This is what she reported for '05. But none of
17 it matched up, and plus it was an excessive amount of
18 time off the bench.
19 Q. But just so I'm understanding this, was it the
20 suggestion that it was the 31 days plus the 20 assist
21 with docket days that Judge James wasn't there, was
22 that the interpretation of this document?
23 A. That was part of my interpretation. Like I said, I
24 had two concerns, one was misreporting, the other was
25 just an excessive amount of time off the bench,



DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 45

1    whether it was reported or not.
2  Q.  And you said that this had been an existing concern;
3       is that right?
4  A.  Yes.
5  Q.  And when you say existing, you mean prior to Judge
6       James being placed on administrative leave in April
7       2011?
8  A.  Yes.
9  Q.  Okay. Had the SCAO taken any steps to investigate
10      that at any time prior to April 2011?
11  A.  No.
12  Q.  Had you expressed that particular concern to anyone
13      prior to April 2011?
14  A.  To anyone? Probably internally in my office, but not
15      in any official manner, no.
16  Q.  And then that would mean not to the justices: is that
17      correct?
18  A.  Correct.
19  Q.  Okay. Was this part of the concerns raised in April
20      2011 in connection with the administrative docket
21      hearing, was attendance an issued raised?
22  A.  No.
23  Q.  Okay. Let me just ask you one more question on these,
24      and if you could look sort of -- I want to compare two
25      of these. If you look at the document we were just

Page 46

1       looking at and the Bates stamp, we will call it as
2       2327, and if you look also if you could at the next
3       page, which is 2328 --
4  A.  Yes.
5  Q.  -- and you see that both of those say requests for
6       assignment 2006, right, under the subject?
7  A.  Yes.
8  Q.  But one appears to be dated, page 2328 is dated
9       December 6, 2005, but 2327 is dated January 5, 2007.
10      Do you see that?
11  A.  Yes.
12  Q.  How did you figure out what year these were actually
13      supposed to reflect?
14  A.  I don't know.
15  Q.  Okay. If we could look next at Tab I, and the first
16      page sort as a title is the Cover Sheet, 2011
17      Preliminary Internal Calendar. Do you see that?
18  A.  Yes.
19  Q.  Do you know what this document is?
20  A.  I believe it's an internal document that the court
21      used to manage their docket on an annual basis.
22  Q.  Was this something that is provided to the SCAO?
23  A.  No.
24  Q.  Do you recall where you got this document from?
25  A.  From the court. I don't know from exactly who.

Page 47

1  Q.  Do you know when you got this document?
2  A.  It would have been after she was put on administrative
3       leave.
4  Q.  So this was some new bit of information after she was
5       placed on administrative leave, correct?
6  A.  Correct.
7  Q.  Could we look now, could I ask you to turn now to Tab
8       J?
9  A.  Okay. All right.
10  Q.  And that's a document, the title at the top is Budget
11      Report for City of Inkster. Do you see that?
12  A.  Yes.
13  Q.  Okay. And a little bit below that it says
14      calculations as of 4-30-2011. Do you see that?
15  A.  Yes.
16  Q.  And I guess in the upper right it looks like perhaps
17      that's a printed date, and it gives the date of April
18      19, 2011. Do you see that?
19  A.  Upper left? Yes.
20  Q.  Maybe it's hard to see. I'm sorry. It's stapled. Do
21      you want to look at mine?
22  A.  No, I have got it.
23  Q.  So this would be a document that you received after
24      Judge James was placed on administrative leave; would
25      that be correct?

Page 48

1  A.  Yes.
2  Q.  Do you recall how you received this document?
3  A.  No.
4  Q.  Do you recall from whom you received this document?
5  A.  It would have come to me from the court. I don't know
6       who exactly sent it to me.
7  Q.  You to see at the top where it says User:
8       PANDERSON --
9  A.  Correct.
10  Q.  -- the upper left second line?
11  A.  Yes.
12  Q.  And you did know that Pam Anderson was a clerk at the
13      22nd District Court at that time, correct?
14  A.  She was the court administrator.
15  Q.  Court administrator, I apologize.
16  A.  Right.
17  Q.  If we could flip now to Tab K, and that's a document
18      entitled 2010 Case Age Summary Report, do you see
19      that?
20  A.  Yes.
21  Q.  And that looks to be for the calendar year 2010: is
22      that right?
23  A.  Correct.
24  Q.  Was this an SCAO document?
25  A.  It is.




DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 49

1  Q.  Okay.  So this would be a document that you would have
2      had access to prior to April of 2011, correct?
3  A.  Yes.
4  Q.  Okay.  So that's not new?
5  A.  No.
6  Q.  If you could turn with me to Tab L, and it looks to be
7      a compilation of documents regarding the appointment
8      of a magistrate in the 22nd District Court --
9  A.  Yes.
10 Q.  -- is that correct?
11 A.  Yes.
12 Q.  And would you agree with me that the first portion of
13     these documents, and that would be Bates numbers 2369
14     through 2376, appear to be from the December 2002
15     timeframe; is that correct?
16 A.  Yes.
17 Q.  And that would be material that the SCAO would have
18     had in 2002; is that correct?
19 A.  Yes.
20 Q.  Okay.  The next document, and I think it's one
21     document, appears to be a fax because you can see a
22     fax line at the top consecutively numbered, appears to
23     be a fax from Ms. Anderson to you, do you see that,
24     starting at page 2377 through page 2379?
25 A.  Yes.

Page 50

1  Q.  And the date on the first page is May 9, 2011?
2  A.  Yes.
3  Q.  And that actually matches up with the fax line at the
4      top, right?
5  A.  Yes.
6  Q.  Do you recall receiving this?
7  A.  Yes.
8  Q.  Okay.  So this would have been something you received
9      in May 2011?
10 A.  Correct.
11 Q.  Okay.  And that would be after Judge James was placed
12     on administrative leave?
13 A.  Yes.
14 Q.  The next page, Bates numbers 2380, at the top it looks
15     like Search Real Estate Index, Wayne County Land
16     Records Internet Search, do you see that?
17 A.  I'm sorry?  Oh, I'm sorry, 2380?
18 Q.  Just for the purposes of the title.
19 A.  Yes, yep.
20 Q.  Do you know what this document is?
21 A.  It is I think like a Google search of Wayne County
22     land records to show property owners.
23 Q.  And do you recall if you performed this search?
24 A.  My secretary did.
25 Q.  Okay.  And this is on Jeffrey Bowdich, he is the

Page 51

1      magistrate that was at issue, correct?
2  A.  Correct.
3  Q.  And it looks like in the lower right the date says May
4      11, 2011, do you see that?
5  A.  Yes.
6  Q.  So fair to say this was something that was generated
7      after Judge James was placed on administrative leave?
8  A.  Yes.
9  Q.  And then the next five pages are amended
10     administrative order, 2002, dash -- there is some
11     handwriting, I guess it's hard for me to tell if
12     that's a 2, but I'm talking about pages 2381 to 2386,
13     do you see that?
14 A.  Yes.
15 Q.  Do you know if this is -- well, strike that.
16         This appears to be an administrative order
17     from the 22nd District Court, correct?
18 A.  Correct.
19 Q.  And those need to be approved by the SCAO; is that
20     correct?
21 A.  Correct.
22 Q.  Okay.  To your knowledge was this something that the
23     SCAO had approved in around the 2002 timeframe?
24 A.  I don't know.  I know this predates me joining the
25     SCAO.

Page 52

1  Q.  Did you search the SCAO's records to locate this or
2      was this something that was provided to you, if you
3      recall?
4  A.  I believe I pulled it up.
5  Q.  Okay.  So it was certainly something that you had
6      access to prior to April of 2011, correct?
7  A.  Yes.
8  Q.  The next document that's part of Tab J, it's pages
9      2386 and 2387 --
10 A.  I think we are on Tab L.
11 Q.  You are right, I'm sorry, Tab L.
12 A.  So yeah.
13 Q.  So it's pages 2386 and 2387.
14 A.  Okay.
15 Q.  It appears to be a memorandum dated November 4, 2002.
16     Do you see that?
17 A.  Yes.
18 Q.  And it's to John D. Ferry, do you see that?
19 A.  Yes.
20 Q.  Do you know who Mr. Ferry is?
21 A.  Yes.
22 Q.  Who is he?
23 A.  Former state court administrator, probably left in
24     '04.
25 Q.  Was he a Region 1 administrator?



DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 53

1    A.   State, the whole state of Michigan.
2    Q.   State.  Okay.
3    A.   He was my boss.
4    Q.   Okay.  So fair to say this is a document the SCAO had
5         prior to April of 2011?
6    A.   Yes.
7    Q.   The next document is a letter dated November 21, 2002
8         from Mr. Ferry to Judge James, the Bates number at the
9         bottom is 2388.  Do you see that?
10   A.   Yes.
11   Q.   Was this a document that you pulled from the SCAO
12        file?
13   A.   Yes.
14   Q.   And fair to say that the SCAO had this document well
15        before April 2011?
16   A.   Correct.
17   Q.   The last document in Tab L is Bates number 2389, do
18        you see that?
19   A.   Uh-huh.
20   Q.   That's another letter from Mr. Ferry to Judge James,
21        this one dated October 21st, 2002.  Do you see that?
22   A.   Yes.
23   Q.   And was this also a document that you pulled from the
24        SCAO files?
25   A.   Yes.

Page 54

1    Q.   And fair to say that this is also a document that the
2         SCAO had prior to April 2011?
3    A.   Yes.
4    Q.   If we could look now at the last Tab, Tab M, and again
5         it looks to be something of a compilation of documents
6         with some checks and check activity reports, I think;
7         would that be a fair description?
8    A.   Yes.
9    Q.   And were you attaching these documents because you had
10        some concerns about certain checks being paid out for
11        legal services?
12   A.   It was not about the checks -- well, yes.
13   Q.   And do you recall where you got this set of documents
14        from?  Or if it's different for any particular
15        document, you can certainly tell me that.
16   A.   I believe we got these from the courts.  I don't think
17        I got any of these from Sharon McPhail directly, but I
18        believe these came to us through the court.
19   Q.   So it is fair to say that some of the issues that
20        ended up in the grievance the SCAO had known about
21        well in advance of the grievance, correct?
22   A.   I don't know which ones you are referring to.  If you
23        are referring to the magistrate one, we had been told
24        he moved into the district, so I mean, yeah, there had
25        been concerns, but we thought it had been rectified

Page 55

1         until we got there.
2    Q.   Well, let's --
3    A.   What else?
4    Q.   Well, let's talk about, for example, the attendance.
5         You agreed with me that that had been a concern that
6         you had at least well before April 2011, correct?
7    A.   Yes.
8    Q.   Okay.  But you hadn't done anything to investigate
9         that any further, correct?
10   A.   No.
11   Q.   Because you hadn't --
12   A.   Correct.
13   Q.   -- gotten some of these documents that we looked at
14        related to attendance until later, right?
15   A.   Yes.
16   Q.   Okay.
17   A.   Sadly judicial attendance is not a singular judge
18        problem, it's a judge issue.
19   Q.   Now, the other concern -- well, another concern that
20        was part of the grievance was the Community Service
21        Fund, correct?
22   A.   Yes.
23   Q.   Okay.  And in fact the SCAO had looked into the
24        Community Service fund in 2009, correct?
25   A.   Looked in to it, I don't know what you are referring

Page 56

1         to.
2                   MR. HIRSCH:  Can we mark this, please?
3                   MARKED FOR IDENTIFICATION:
4                   DEPOSITION EXHIBIT 2
5                   10:36 a.m.
6    BY MR. HIRSCH:
7    Q.   Ma'am, our court reporter has just handed you what we
8         have marked as Exhibit 2 to your deposition.  It looks
9         to be a memorandum dated October 21, 2009, to you from
10        Ms. McLemore.  Do you have that in front of you?
11   A.   Yes.
12   Q.   Does this refresh your recollection that your office
13        had looked into the Community Service Fund in 2009?
14   A.   We hadn't really looked into it at this stage.  We had
15        gotten an anonymous tip, and the anonymous tip had
16        actually come into the audited section in Lansing, not
17        directly to my office, and so we were aware of it,
18        which is what caused me to look into the fact that it
19        appeared in an outside audit, and so I felt -- yeah,
20        Darnell and Meyering.  And so I confirmed that the
21        court had a copy of Darnell and Meyering's audit and
22        so did the city, and so therefore it was out in front
23        of them, so I didn't do anything further.  So to say I
24        looked at it at this point, no, I didn't.
25   Q.   Well, fair to say then that you didn't think there was



DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 57

1    a need to look into it any further at that time,
2    correct?
3    **A.  Because I thought all the parties were already aware.**
4    Q.  I take it given that you called it an anonymous tip,
5        you never came to learn who left that tip: is that
6        correct?
7    **A.  Correct.**
8    Q.  And clearly no grievance was filed in 2009, correct?
9    **A.  Correct.**
10   Q.  So you certainly did not think it rose to that level,
11       correct?
12   **A.  Correct, not at that time.**
13   Q.  And we looked earlier at Exhibit 1, the grievance that
14       you submitted in June of 2011, right?
15   **A.  Correct.**
16   Q.  Do you know if anyone else submitted any other
17       grievances with respect to Judge James in or around
18       that time period?
19   **A.  I do not know.**
20   Q.  Do you know who David Jones is?
21   **A.  Boy, the name rings a bell.**
22   Q.  Well, let me ask if this refreshes your memory.  Do
23       you recall that David Jones was an attorney for the
24       City of Inkster?
25   **A.  Okay.  I thought he was a treasurer, but, okay, an**

Page 58

1    **attorney, I will take it.**
2    Q.  Okay.
3    **A.  I recognize the name, and he had something to do with**
4    **the city.**
5    Q.  Okay.  Do you recall then if you had any conversations
6        with Mr. Jones about this issue?
7        MS. MILLER:  When you say this issue, do
8        you mean the audit or the Judge James in general?
9    BY MR. HIRSCH:
10   Q.  I'm sorry, Judge James in general, do you recall if
11       you had any conversations with Mr. Jones?
12   **A.  I believe I may have once, but I honestly don't**
13   **remember any details or anything about it or if I even**
14   **really did talk to him, but the name rings a bell, so**
15   **it must ring a bell for a reason.**
16   Q.  Okay.  Let me see if I can help you a little bit more.
17       MR. HIRSCH:  Can we mark this, please?
18   **A.  It was a long time ago.**
19       MARKED FOR IDENTIFICATION:
20       DEPOSITION EXHIBIT 3
21       10:39 a.m.
22   BY MR. HIRSCH:
23   Q.  Our court reporter has just handed you what we have
24       marked Exhibit 3 to your deposition.  It appears to be
25       a November 16, 2010 letter from you to David Jones.

Page 59

1    Q.  Do you have that in front of you?
2    **A.  Yes, I do.**
3    Q.  Does this refresh your recollection as to who Mr.
4        Jones is?
5    **A.  Yes.**
6    Q.  Okay.  And this letter is in reference to a Freedom of
7        Information Request issued by Mr. Jones, correct?
8    **A.  Yes.**
9    Q.  And you write back to Mr. Jones and you tell him
10       please be advised that the courts are not subject to
11       the Freedom of Information Act, correct?
12   **A.  Correct.**
13   Q.  And that's accurate, right?
14   **A.  Correct.**
15   Q.  Do you recall what information Mr. Jones was seeking?
16   **A.  There were concerns about the fact that the city was**
17   **attempting to order the court -- telling the court**
18   **that they couldn't shift money amongst line items in**
19   **their budget, and therefore the city was refusing to**
20   **pay some of the court's bills.  So the court was, I**
21   **don't know where they were in the process in November,**
22   **but had taken over paying some of their own bills or**
23   **were in the process, and the -- he was claiming that**
24   **the court was violating 98-5, but really 98-5 says the**
25   **court can shift money amongst line items.  So anyway,**

Page 60

1    **it had to do with that whole business of shifting line**
2    **item money from line items in the budget and the court**
3    **then taking it upon themselves to start paying its own**
4    **bills.**
5    Q.  And that's the reference in the next sentence to
6        administrative order, 1998-5, right?
7    **A.  Correct.**
8    Q.  That discusses how a court can handle its budget,
9        right?
10   **A.  Yes.**
11   Q.  Among other things, right --
12   **A.  Yes.**
13   Q.  -- but that's one thing, right?
14   **A.  Yes.**
15   Q.  Now, you also say in here that you plan to meet with
16       the chief judge and court administrator in the near
17       future to discuss the issues you have raised, do you
18       see that?
19   **A.  Yes.**
20   Q.  And that would be referring to Judge James, right?
21   **A.  Judge James and -- yes, the chief judge is referencing**
22   **Judge James, yes.**
23   Q.  She is copied at the bottom, right?
24   **A.  Correct.**
25   Q.  And I guess whoever the court administrator was in


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
A U.S. Legal Support Company

US LEGAL SUPPORT
The Power of Commitment™

DEBORAH LYNN EVANS GREEN
August 11, 2017

## Page 61

1    2010?
2  A.  Carl Gromek.
3  Q.  Did you in fact have that meeting?
4  A.  Yes.
5  Q.  Do you recall when you had that meeting?
6  A.  Well, it was later in that year, I'm pretty sure it
7      was still in fiscal year or calendar year 2010.  I
8      don't remember exactly.  It might have been early --
9      it was still that winter.  It might have been early
10     the next year.
11 Q.  And you think Mr. Gromek was the court administrator
12     at that time, not Ms. Anderson?
13 A.  No, no, no, Carl Gromek --
14 Q.  I'm sorry.
15 A.  -- was the state court administrator.
16 Q.  I'm sorry, he was the state court administrator, I
17     apologize.  But when you say in here you are going to
18     meet with the court administrator, were you referring
19     to Mr. Gromek or were you referring to the
20     administrator at the 22nd District Court?
21 A.  The administrator at the 22nd District Court.
22 Q.  Okay.  Now, when you did have that meeting, Judge
23     James was there; is that correct?
24 A.  Correct.
25 Q.  Okay.  Was anybody else there?

## Page 62

1  A.  I believe Pam Anderson was there.
2  Q.  And she was the 22nd District Court administrator,
3      right?
4  A.  Correct.
5  Q.  And you were there, correct?
6  A.  Yes.
7  Q.  Was anybody else there from the SCAO?
8  A.  I don't recall.  The only other person that might have
9      been there would have been Charlene McLemore.  I don't
10     recall if she was actually at that meeting.
11 Q.  Fair to say that you did not determine that there had
12     been any violation of administrator order 1998-5?
13 A.  No, that's not fair to say.
14 Q.  Okay.
15 A.  I believe at the time of that meeting had some concern
16     about the fact that the court while it had taken on
17     paying its own bills, once you pay those bills you are
18     supposed to forward the rest of the money over to the
19     funding unit, which with a this case was the City of
20     Inkster, and the court hadn't done that.  They were
21     holding on to all the money, and so I believe at that
22     meeting was my first talk to her about, here, this is
23     how -- you know, there is a right way and a wrong way
24     to have a court pay its own bills.  It's fairly
25     unusual but not unheard of for a court to pay its own

## Page 63

1      bills, but you don't just get to keep all the money.
2      The courts of pass-throughs of money, so I believe I
3      informed her at that meeting that you are in essence
4      violating 98-5 because you're not forwarding the rest
5      of it.
6  Q.  And I presume then that you told them to correct that
7      to comply with 1998-5: is that right?
8  A.  Yes.
9  Q.  Do you know whether they did that?
10 A.  They did months and months and months later.
11 Q.  You certainly did not think that this violation rose
12     to the level of filing a grievance, right?
13 A.  Correct.
14 Q.  And you did not in fact file a grievance --
15 A.  Correct.
16 Q.  -- on this issue, right?
17 A.  Right.  It takes a lot to get me to file a grievance.
18     MR. HIRSCH:  Can we mark this, please?
19     MARKED FOR IDENTIFICATION:
20     DEPOSITION EXHIBIT 4
21     10:45 a.m.
22 BY MR. HIRSCH:
23 Q.  Ma'am, the court reporter has just handed you what we
24     have marked as Exhibit Number 4 to your deposition.
25     It appears to be a memorandum from you to Mr.

## Page 64

1      Gromek --
2  A.  Correct.
3  Q.  -- dated 12-1-2010, correct?
4  A.  Yes.
5  Q.  This is a memo you prepared?
6  A.  Yes.
7  Q.  And you copied Judge James on this memo, right?
8  A.  Yes.
9  Q.  You copied Ms. Anderson?
10 A.  Yes.
11 Q.  And Ron Stadnika?
12 A.  Correct.
13 Q.  Who is Mr. Stadnika?
14 A.  He at the time was the head of the State Court
15     Administrative Offices auditing division.
16 Q.  And this is a memo memorializing your -- the way you
17     addressed the issue about the court's handling of
18     funds, right, the issue we were just discussing from
19     the David Jones letter?
20 A.  Yes.
21 Q.  Okay.  And you determined that no further mediation
22     was necessary, correct, that's under your conclusion
23     on page 3?
24 A.  Do I say that?  Okay.
25 Q.  First sentence under conclusion, right, you agree with



DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 65

1    that?
2  A.  Right, because there was a council meeting coming up.
3      We thought that was going to resolve everything.
4  Q.  Right.  You indicated that you had some hope that the
5      City of Inkster would pass a resolution allowing the
6      court to move money between line items, right, without
7      city prior approval, right?
8  A.  Correct.
9  Q.  By the way, do you know if that ever happened?
10 A.  I don't.  I don't remember.
11 Q.  And in fact you determined that at its core this was
12     not really a dispute about funding of the court,
13     right?
14 A.  Right.
15 Q.  And you also determined that the city's allegations
16     that the court refused to communicate or meet with it
17     was not true, right?
18 A.  Do I say that?
19 Q.  You do.
20 A.  Okay, then yeah.
21 Q.  I'm happy to refer you if you want to look at it.
22 A.  No, no, that's okay.
23 Q.  And take your time, as with any document, by the way.
24 A.  No, if I said it, I believe it.
25 Q.  Okay.  Focussing again on the grievance you did file,

Page 66

1      Exhibit 1 in June 2011, did you speak to anyone at the
2      JTC prior to filing your grievance in June 2011?  And
3      I'm referring of course about Judge James.
4  A.  I don't believe I did.
5  Q.  After you filed the grievance, did you have
6      communications with anyone from the JTC?
7  A.  Typically they would contact our office and ask for
8      comments, so I would respond to whatever they
9      requested.
10 Q.  You recall that you gave some testimony at the formal
11     hearing on Judge James' complaint, correct?
12 A.  Yes.
13 Q.  I'm sure not fondly, I can tell, right?
14 A.  It made me a TV star, though, so I got that going for
15     me.
16 Q.  Okay.  Your testimony was true and accurate, correct?
17 A.  Yes.
18 Q.  You testified at that time that you, you think you
19     met with the examiner's office twice.  Would that be
20     accurate?
21 A.  That would sound right, yes.
22 Q.  And do you recall who you met with in each of those
23     meetings?
24 A.  I believe it was Maggie Ryneir.
25 Q.  Was anyone else present during either of those

Page 67

1      meetings?
2  A.  I don't really recall.  It's possible Paul Fischer
3      was, but I don't really recall.  Maggie was the lead
4      attorney on it.
5  Q.  What was the nature of your discussion with Ms.
6      Ryneir, Maggie?
7  A.  Answering her questions about, you know, the
8      background and providing documents and that kind of
9      thing.
10 Q.  Do you recall what questions she asked you about the
11     background?
12 A.  No.
13 Q.  Okay.  Do you recall what documents you provided
14     beyond what is attached, if anything, beyond what's
15     attached to your grievance?
16 A.  I can't imagine what else I would have had other than
17     what's attached here.
18 Q.  And just so the record is clear, you said Mr. Fischer
19     may or may not have been there, you're not sure,
20     correct?
21 A.  I don't actually remember him being there.  I remember
22     meeting with Maggie, but whether he was in the same
23     room at any time, it could have happened.  I don't
24     know.
25 Q.  Did you have any conversations with Mr. Fischer about

Page 68

1      Judge James' matter?  And I guess to make the
2      timeframe I guess more accurate, I'm talking about in
3      or around, you know, June 2011 when the complaint was
4      being considered.
5  A.  No.  I believe I talked to him briefly just before the
6      hearing just about, you know, here is what is going to
7      happen, but no, at this time not at all.
8  Q.  So that would be before the formal hearing which took
9      place in January of 2012 --
10 A.  Okay.
11 Q.  -- mid to late January?  It went on for a number of
12     days, right?
13 A.  Yes.
14 Q.  Do you know a gentleman named Cas Swastek?
15 A.  Yes.
16 Q.  Okay.  Who is he?
17 A.  He's another attorney in the Tenure Commission's
18     office.
19 Q.  Did you ever have any conversation was Mr. Swastek
20     about Judge James' matter?
21 A.  Boy, it's possible.  I hate to belittle Cas, but he
22     was kind of a lower echelon guy, so he may have been
23     the one who called and contacted and said I need a
24     copy of her attendance reports for these years, so it
25     would have been that kind of conversation, nothing in




DEBORAH LYNN EVANS GREEN
August 11, 2017

---

Page 69

1    depth.
2    Q.  And not to belittle him at all, but you are saying you
3        don't remember one way or the other whether you talked
4        to him about this matter?
5    A.  I don't remember, but it's certainly possible.
6    Q.  You do know him, and you may have talked to him about
7        other things, right?
8    A.  Yes, oh, of course.
9    Q.  Okay.  Now, when you had these meetings with at least
10       Ms. Ryneir, did she call you and say I want to have a
11       meeting or did you call her to arrange a meeting?
12   A.  She would have called me.
13   Q.  Now, after Judge James was placed on administrative
14       leave and before you actually submitted the grievance
15       in June 2011, did you have any further conversations
16       with the chief justice about Judge James' matter?
17   A.  So between April and June?  I don't believe so.  If I
18       reported any progress, I would have reported it to my
19       state board administrator, I would not have reported
20       it straight to the chief, so I doubt it.
21   Q.  That would be Mr. Schmucker, correct, or did that
22       change?
23   A.  It was kind of a revolving door there for a while.
24   Q.  Okay.
25   A.  Chad was only there for a year.  So yes.

---

Page 70

1    Q.  Do you recall one way or another whether you had
2        conversations with your administrator between the time
3        Judge James had been placed on administrative leave
4        but before you had filed the grievance?
5    A.  Yes.  I'm sure I would have.
6    Q.  Okay.  What were the nature of those discussions?
7    A.  Basically just an update, here is what is going on,
8        here is what we found, and I wouldn't normally file --
9        I would never file a complaint with the JTC without
10       clearing it, running it by my state court
11       administrator first, so I would have kept him up to
12       date as to what my plans were going forward.
13   Q.  So in order to file the grievance, you had to get the
14       approval of whoever was the state court administrator
15       at that time: is that correct?
16   A.  Approval is kind of a strong word.  I would certainly
17       run it by them and let them know.
18   Q.  So it would be fair to say that the state court
19       administrator agreed with your filing the grievance in
20       June of 2011?
21   A.  Absolutely.
22   Q.  Okay.  And did you require the approval of the chief
23       justice to file the grievance?
24   A.  Not at all, no.  We would never do that.
25   Q.  And I take it nor any of the other associate justices,

---

Page 71

1        correct?
2    A.  No, never.
3    Q.  You have filed other requests for investigation as to
4        other judges, correct?
5    A.  I have.
6    Q.  Are you familiar with Judge James Kandrevas?
7    A.  Yes.
8    Q.  Was he in your region?
9    A.  Yes.
10   Q.  Are you familiar that there was a civil case involving
11       Judge Kandrevas that questioned the way he handled
12       some funds?
13   A.  Yes.
14   Q.  Did you file a grievance against Judge Kandrevas?
15       MS. MILLER:  I'm going to place an
16       objection and instruct her not to answer with regard
17       to whether a grievance was filed unless it ultimately
18       resulted in a formal complaint, based upon the
19       agreement that we had reached during the discovery of
20       this case.
21       MR. HIRSCH:  Well, I don't think we reached
22       an agreement that I couldn't ask a potential grievant
23       whether that person filed a grievance.  I mean that's
24       not privileged.  The grievant is free to disclose what
25       they filed.

---

Page 72

1        MS. MILLER:  Actually if you look at the
2        court rules, all of the information prior to the
3        complaint, the grievant's name, whether the grievance
4        was filed, is confidential until there is a formal
5        complaint.  That was the basis for our motion.
6        MR. HIRSCH:  So are you directing her not
7        to answer?
8        MS. MILLER:  I am.
9    BY MR. HIRSCH:
10   Q.  Are you aware of whether there was any formal
11       complaint filed against Judge Kandrevas?
12   A.  I don't recall one, but I don't really remember.  I
13       don't believe there was.
14   Q.  Judge Kandrevas was not placed on administrative
15       leave, correct?
16   A.  Not to my knowledge, no.
17   Q.  Well, he was in your region, right --
18   A.  Correct.
19   Q.  -- so you would probably know that?
20   A.  I would.
21   Q.  Judge Kandrevas is Caucasian, right?
22   A.  Correct.
23   Q.  Are you familiar with Judge James Byron Konschuh?  I
24       may be pronouncing this incorrectly, but for our court
25       reporter, K-O-N-S-C-H-U-H?

---



DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 73

1   A.   Not in my region.
2   Q.   Are you familiar with him generally, though?
3   A.   Not really.  I vaguely recognize the name.
4   Q.   Okay.  Are you familiar with Judge David Stowe?
5   A.   Again, not in my region.  I recognize the name.  I
6        think he's up north.
7   Q.   Okay.  Are you familiar with Judge Mary Waterstone?
8   A.   A long time ago judge in Detroit.
9   Q.   She was a judge on the Wayne County Circuit Court if
10       that refreshes your recollection.
11  A.   Vaguely.
12  Q.   Do you recall that she was in your region while you
13       were the regional administrator?
14  A.   Yes.
15  Q.   Do you recall that there were allegations against
16       Judge Waterstone alleging she suborned perjury?
17  A.   I do recall that.  I didn't file it.
18  Q.   Judge Waterstone was Caucasian, correct?
19  A.   I honestly don't know.
20  Q.   And just so the record is clear -- because I know
21       you're going to object -- but you did not file a
22       grievance against Judge Waterstone?
23            MS. MILLER:  I am going to object and
24       instruct you not to answer that.
25  BY MR. HIRSCH:

Page 74

1   Q.   Okay.  Are you familiar with Judge Mark Somers?
2   A.   Yes.
3   Q.   Was he a judge in your region?
4   A.   Yes.
5   Q.   Do you recall that there was a jury award rendered
6        against Judge Somers?
7   A.   Yes.
8   Q.   You recall it was substantial, right?
9   A.   Yes.
10  Q.   Judge Somers is Causation, correct?
11  A.   Correct.
12  Q.   And again, did you file a grievance against Judge
13       Somers?
14            MS. MILLER:  Same objection, don't answer.
15  BY MR. HIRSCH:
16  Q.   Are you familiar with Judge Mark Barron?
17  A.   Yes.
18  Q.   And Judge Barron is in your region, correct?
19  A.   Correct.
20  Q.   48th District Court, right?
21  A.   Oakland County, yes.
22  Q.   Are you familiar with Judge Kimberly Small?
23  A.   Yes.
24  Q.   She is also in your region, correct?
25  A.   Correct.

Page 75

1   Q.   Also in the 48th District Court, correct?
2   A.   Right.
3   Q.   Do you recall that there was a civil case filed by a
4        former clerk of the 48th District Court alleging
5        improper termination and defamation?
6   A.   I learned of that after the fact, but yes, I do -- I
7        know about it just from what I read in the newspaper.
8   Q.   Did this occur during the time you were regional
9        administrator for the region that included the 48th
10       District Court?
11  A.   Yes.
12  Q.   Judge Barron is Caucasian; is that correct?
13  A.   Correct.
14  Q.   Judge Small is Caucasian; is that correct?
15  A.   Correct.
16  Q.   And again, just so the record is clear, did you file a
17       grievance against Judge Barron?
18            MS. MILLER:  Same objection, don't answer.
19  BY MR. HIRSCH:
20  Q.   Did you file a grievance against Judge Small?
21            MS. MILLER:  Same objection.
22            MR. HIRSCH:  I think we can take a short
23       break maybe for the restroom, and we will start a
24       somewhat new topic.
25  A.   Okay.

Page 76

1            (Recess taken at 11:00 a.m.)
2            (Back on the record at 11:05 a.m.)
3   BY MR. HIRSCH:
4   Q.   Judge Washington was appointed as the acting chief
5        judge of the 22nd District Court, correct?
6   A.   Correct.
7   Q.   How was Judge Washington selected?
8   A.   Well, I tried to put together a list of retired judges
9        that were not so local that they would either know or
10       have any feelings or bias about Judge James.  I had
11       worked with Judge Washington, he was with a retired
12       judge, and he was working with the treasurer's office,
13       the state treasurer's office, and I had dealt with him
14       on a number of occasions in courts that had funding
15       units that had emergency management, and so it was
16       always this struggle when cities or counties -- well,
17       it was all cities -- had emergency managers as to who
18       really ran the court at that moment in time, so there
19       was always this conflict, and so Judge -- Val
20       Washington and I had worked together on more than one
21       court and their funding unit disputes with emergency
22       management, so I knew he had a good financial
23       background.  And so retired, didn't want to be so
24       local that they would have prior thoughts about Sylvia
25       James, and then Judge Washington, because of his



DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 77

1  financial background, was sort of our go-to guy.
2  Q.  So was he the only judge that was suggested for this
3      position?
4  A.  He was the only one that we approached because he was
5      our first choice, and he eventually did say yes.  We
6      did have others on the list, and you are going to ask
7      me who, and I don't remember.
8  Q.  So who made the decision that Judge Washington was the
9      first choice?
10 A.  Well, ultimately me, he was my first choice, and then
11     I believe Chad and the chief justice agreed that he
12     was a good selection.
13 Q.  Why would it matter if the potential judge had any
14     affiliation with Judge James?
15 A.  There were a lot of judges in Wayne County that had a
16     very negative opinion of Judge James, and so we
17     didn't -- we wanted somebody to come in that had no
18     bias for her or against her.
19 Q.  But why was whether they had a bias for or against her
20     important?
21 A.  Because we wanted to get a clear picture and a fair
22     picture of what was going on in this court.  We didn't
23     want to to be colored or tainted by anybody's prior
24     opinion of her.
25 Q.  Because you were doing some investigation as to what

Page 78

1      had occurred, correct?
2  A.  Yeah.
3  Q.  And you said that a lot of judges in Wayne County had
4      a poor opinion of Judge James; is that correct?
5  A.  Yes.
6  Q.  How did you know that?
7  A.  They told me.
8  Q.  When did you have occasion to discuss opinions of
9      Judge James with judges in Wayne County?
10 A.  Meetings, conferences, you name it.
11 Q.  And it just came up?
12 A.  Sometimes.
13 Q.  And this was before she was placed on administrative
14     leave; is that correct?
15 A.  Yes.
16 Q.  Because you knew this when you were considering
17     selecting a judge to become acting chief judge?
18 A.  Yes.  I had difficulty getting judges that would go in
19     there as a visiting judge because they had had prior
20     contact with Judge James and didn't want anything to
21     do with it.
22 Q.  So what sorts of complaints were raised about Judge
23     James?
24 A.  That she ran a terrible caseload, that judges didn't
25     want to touch the cases because the documentation was

Page 79

1      so poor.  Cases were so old that sometimes they would
2      come in and handle cases while Judge James was off
3      going to lunch or something like that.  They felt that
4      they were being used.
5  Q.  So none of those complaints, though, whenever you may
6      have received them, prompted any investigation by the
7      SCAO, correct?
8  A.  Correct.
9          MR. HIRSCH:  Can we mark this, please?
10         MARKED FOR IDENTIFICATION:
11         DEPOSITION EXHIBIT 5
12         11:10 a.m.
13 BY MR. HIRSCH:
14 Q.  Ms. Green, our court reporter has just handed you what
15     we have marked as Exhibit 5.  It is a letter dated
16     April 15, 2011 from Mr. Schmucker to Judge Washington.
17     Do you have that in front of you?
18 A.  Yes.
19 Q.  It looks like you were cc-ed on this letter on the
20     third page; is that correct?
21 A.  Yes.
22 Q.  Do you recall this letter?
23 A.  Yes.
24 Q.  Did you draft this letter?
25 A.  No.

Page 80

1  Q.  Do you know who did?
2  A.  No.
3  Q.  Do you see starting on page 2 and going over to page 3
4      there is a listing of seven points that says we would
5      like you to investigate and resolve, do you see that?
6  A.  Yes.
7  Q.  Do you know who prepared that list of seven points?
8  A.  Well, it's probably based on some of my information,
9      but I'm assuming whoever wrote this letter, Chad or I
10     don't know.
11 Q.  And you would agree with me that this letter is asking
12     Judge Washington to conduct some investigation, right?
13 A.  Yes.
14 Q.  And some of the items are requesting Judge Washington
15     to locate documents, correct, for example, item 2?
16 A.  Yes.
17 Q.  And also item 4 is asking Judge Washington to attempt
18     to locate records about a National Drug Court
19     Conference, do you see that?
20 A.  Yes.
21 Q.  And that was an issue in fact that you had raised in
22     your June 2011 grievance, correct?
23 A.  Yes.
24 Q.  Now, at this point in April 2015, you indicated you
25     had not spoken to anyone at the JTC, correct?





DEBORAH LYNN EVANS GREEN
August 11, 2017

---

Page 81

1   A.   Correct.
2   Q.   Do you know whether Mr. Schmucker had spoken to anyone
3        at the JTC?
4   A.   I would not know that.
5   Q.   So as far as far as you know this investigation was
6        being conducted for the SCAO, correct?
7   A.   Yes.
8   Q.   Do you know whether Judge Washington found the 1099s
9        referenced in item number 2?
10  A.   I don't know for specific, no.
11  Q.   So you don't recall whether those were provided to the
12       SCAO?
13  A.   I know we have some 1099s.  I don't know like this
14       says, you know, missing -- I don't know if these are
15       exactly what Chad was asking for.
16  Q.   Okay.  Item number 4, talking about records related to
17       National Drug Conference in Boston in 2010, do you see
18       that?
19  A.   Yes.
20  Q.   Do you know if Judge Washington provided you with any
21       records -- provided the SCAO with any records related
22       to that?
23  A.   I have seen some of the check requests stuff, so I
24       believe that was in response to that.
25  Q.   Judge James of course had an office at the 22nd

---

Page 82

1        District Court, correct?
2   A.   Yes.
3   Q.   Do you know whether that office was locked when Judge
4        James was placed on administrative leave?
5   A.   That day, I don't remember.
6   Q.   Do you know who had keys to her office?
7   A.   No.
8   Q.   So I take it you don't know how Judge Washington got
9        keys to her office, correct?
10  A.   I don't remember.
11  Q.   Okay.  You have been to the 22nd District Court,
12       correct?
13  A.   Many times.
14  Q.   You have seen that office, correct?
15  A.   A couple of times.
16  Q.   There was a safe located in Judge James' office; is
17       that correct?
18  A.   Well, I know that now, but I didn't know that then.
19  Q.   So you didn't personally observe the safe at any time?
20  A.   No.
21  Q.   Okay.  So you don't know whether the safe was locked
22       at the time Judge James was placed on leave?
23  A.   No.
24  Q.   Do you recall that you had a discussion about
25       accessing Judge James' office and safe with Judge

---

Page 83

1        James' counsel after she was placed on leave?
2   A.   I believe it was in a meeting -- it wasn't just with
3        Sharon McPhail, I believe it was at a meeting with her
4        and the judge and Chad and me.
5   Q.   And do you recall that you and Mr. Schmucker agreed
6        that you would not invade Judge James' safe without
7        her being there?
8   A.   I remember talking about her personal privacy.  She
9        was worried about her desk and her credenza, and she
10       may have mentioned a safe, I don't remember a safe,
11       but it was her stuff.
12  Q.   Do you recall this question and answer during your
13       January 24, 2012 testimony at the JTC proceeding, the
14       question:  At that time that you and Mr. Schmucker
15       indicated to me -- and that's Sharon McPhail I believe
16       asking these questions -- that you would not invade
17       the judge's personal safe without her being there?
18       Answer:  Correct.
19  A.   Okay.
20  Q.   That would be accurate, correct?
21  A.   Yes.
22  Q.   And did you at any time enter Judge James' office
23       after she was placed on leave?
24  A.   Yes.
25  Q.   And you did that with Judge Washington, correct?

---

Page 84

1   A.   Correct.
2   Q.   Was that on April 14th, 2011?
3   A.   I can't say that's the only time I have ever been in
4        her office.
5   Q.   Fair to say that would be the first time after she was
6        placed on leave that you were in her office?
7   A.   Well, I mean there when -- on day one -- is that the
8        day she was placed on leave?
9   Q.   Well, I think we have determined it was either the
10       13th or it could have been the 14th, but yes.
11  A.   Then yes, sorry.  Yes, that's the date.
12  Q.   Okay.  So on that date, whether it was the 13th or the
13       14th, but that first time at Judge James' office, what
14       did you do?
15  A.   I basically showed Judge Washington in, and I don't
16       know what happened after that, but I was basically
17       just sort of the escort.
18  Q.   Okay.  And you told me that you did not notice a safe
19       at that time or any time you were there, correct?
20  A.   Correct.
21  Q.   Okay.  You did not have any trouble opening the door
22       to her office, I assume?
23  A.   I don't remember any trouble.
24  Q.   Okay.
25  A.   I don't know how we got in, but we were in.

---

Pages 81 to 84



DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 85

1 Q. You do recall that subsequently Judge James mentioned
2     that she thought someone had tampered with her safe,
3     correct?
4 A. Yes.
5 Q. Do you recall that you met with Judge James and some
6     of her attorneys, Mr. Thomas and Ms. McPhail on July
7     14, 2011?
8 A. Boy, I don't remember that.
9 Q. Let me see if I can refresh your recollection again
10    from your testimony on January 24th, 2012. Question:
11    You were present on July 14, 2011 when Mr. Thomas and
12    I -- and again I believe this is Ms. McPhail asking
13    the questions -- and Judge James were allowed the one
14    hour to come in and pick up whatever documents we
15    could get? Answer: Yes. Does refresh your
16    recollection?
17 A. Yes, yes. It wasn't a meeting. We were there at our
18    court for her to gather her personal belongings.
19 Q. And you recall she was allowed one hour to do that?
20 A. Yes.
21 Q. Do you remember why there was a one hour limit?
22 A. Again, concerns about tampering and basically just
23    felt if she needed to get personal belongings, that
24    was enough time.
25 Q. Do you know who set that limit?

Page 86

1 A. No.
2 Q. Was it you?
3 A. It might have been. I don't know. I can't remember.
4 Q. You were physically there that day, right?
5 A. Yes, I was.
6 Q. So you could have observed if there was any tampering
7     or anything else going on, right?
8 A. Yes.
9 Q. And again, you did not notice the safe on that day
10    either, right?
11 A. I never saw it.
12 Q. You did tell Judge Washington that no one was supposed
13    to go into Judge James' personal safe, correct?
14 A. I don't know that I said personal safe. He and I
15    discussed the fact that her personal belongings were
16    going to be left alone, and he and I agreed we
17    didn't -- that wasn't why we were there. We didn't
18    care.
19 Q. Do you recall when you told Judge Washington that?
20 A. Whatever date that meeting was with Sharon McPhail and
21    Sylvia and Chad, it would have either been -- I don't
22    think it was later that day. I think it would have
23    been the next day.
24 Q. So that was the meeting that took place in April,
25    right? We are not talking about the July meeting. I

Page 87

1     just want to be clear.
2 A. April 14th is when we put her on admin leave, right?
3 Q. 13th or 14th, I think.
4 A. And then sometime after that Sharon McPhail, Sylvia
5     James, Chad Schmucker are in my office, and that's
6     where they were very concerned about her personal
7     belongings, and I made her assurances that that's not
8     what we were interested in. We would not mess with
9     her personal stuff, so I don't remember what date that
10    was.
11 Q. Okay. You did not have any meetings with the
12    employees of the 22nd District Court after Judge James
13    was placed on leave, correct?
14 A. No.
15 Q. You did, however, speak with Pamela Anderson, correct?
16 A. Yes.
17 Q. And again, Ms. Anderson was the court administrator,
18    right?
19 A. Correct.
20 Q. And she continued as court administrator when Judge
21    Washington became acting chief judge, correct?
22 A. Yes.
23 Q. How many conversations did you have with Ms. Anderson?
24 A. I don't remember exactly. Not many.
25 Q. Do you recall the nature of the conversations with Ms.

Page 88

1     Anderson?
2 A. Typically it was to ask for follow-up information.
3 Q. And that would be follow-up information in connection
4     with your preparation of the grievance between April
5     and June 2011: is that right?
6 A. Yes, or to assist Judge Washington in effectuating
7     some of the changes that he wanted to make.
8 Q. Well, Judge Washington was actually at the court,
9     right?
10 A. Correct.
11 Q. And he had authority to direct Ms. Anderson, right?
12 A. Right.
13 Q. Okay. Did you ever make any offer to Ms. Anderson
14    that if she cooperated in the investigation of Judge
15    James, she would be given immunity?
16 A. No. I would have no authority to do that.
17 Q. Did you ever indicate to Ms. Anderson that if she
18    cooperated, you would not pursue a bar complaint
19    against her?
20 A. I know she was worried about what had happened at the
21    court and her involvement and all of that and was very
22    concerned about her bar card. Would I have told her I
23    wouldn't file an AGC complaint? I may have, but I
24    don't remember that.
25 Q. You didn't file a bar complaint against Ms. Anderson,

Pages 85 to 88



DEBORAH LYNN EVANS GREEN
August 11, 2017

### Page 89

1    correct?
2    **A. Correct.**
3    Q. Were you present for Ms. Anderson's testimony at the
4    JTC hearing?
5    **A. No.**
6    Q. Did you ever review a transcript of Ms. Anderson's
7    testimony from the JTC hearing?
8    **A. No.**
9    Q. What did you do to prepare for this deposition?
10   **A. She sent me my testimony from the JTC trial. I read**
11   **it.**
12   Q. So you did review your own transcript testimony from
13   the JTC hearing?
14   **A. I did.**
15   Q. Other than conversations you may have had with
16   counsel, have you had any other conversations about
17   this matter that we didn't discuss today?
18   **A. No.**
19      MR. HIRSCH: Okay. If I could take one
20   moment to look through my list, but I think I'm
21   probably done.
22      (Off the record at 11:26 a.m.)
23      (Back on the record at 11:27 a.m.)
24      MR. HIRSCH: Thank you, Ms. Green, I have
25   nothing further.

### Page 90

1      MS. MILLER: I have no questions for you.
2      MR. RATLIFF: No questions.
3      MR. ASHER: No questions.
4      (The deposition was concluded at 11:27 a.m.
5   Signature of the witness was not requested by
6   counsel for the respective parties hereto.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### Page 91

1          CERTIFICATE OF NOTARY
2   STATE OF MICHIGAN )
3        ) SS
4   COUNTY OF WAYNE )
5
6       I, SHARON CAMPBELL, certify that this
7   deposition was taken before me on the date
8   hereinbefore set forth: that the foregoing questions
9   and answers were recorded by me stenographically and
10   reduced to computer transcription; that this is a
11   true, full and correct transcript of my stenographic
12   notes so taken; and that I am not related to, nor of
13   counsel to, either party nor interested in the event
14   of this cause.
15
16
17
18
19
20
21
22      SHARON CAMPBELL, CSR-3406
23      Notary Public,
24      Wayne County, Michigan
25   My Commission expires: June 9, 2019



DEBORAH LYNN EVANS GREEN
August 11, 2017

**A**

**a.m** 1:17 5:3 16:24 56:5 58:21 63:21 76:1,2 79:12 89:22,23 90:4
**ABA** 8:2
**ability** 13:14
**absence** 23:23
**Absolutely** 30:13 70:21
**access** 49:2 52:6
**accessing** 82:25
**account** 30:8,10 30:22 34:3 35:7 37:3,8
**accurate** 18:8 39:23,23 40:2 59:13 66:16,20 68:2 83:20
**achieved** 13:16
**Act** 59:11
**acting** 13:11 26:14 27:3,13 76:4 78:17 87:21
**action** 19:10 21:24 23:7
**actively** 25:19
**activity** 54:6
**actual** 19:21 40:4
**ADAM** 3:10
**add** 25:13
**addressed** 64:17
**admin** 87:2
**administer** 14:2
**administrative** 10:4 13:13 19:6,10,14,23 20:8,11,25 21:3,4,10,17 21:19,21 22:6 22:7,24 23:11

23:14 24:10,15 24:25 25:1,8 26:7,10,16,22 27:1,4,10,14 27:18 28:16 30:19 31:9,19 31:21 32:3,14 32:18 33:1,14 33:17,20 34:25 35:20 36:19 45:6,20 47:2,5 47:24 50:12 51:7,10,16 60:6 64:15 69:13 70:3 72:14 78:13 82:4
**administrator** 9:25 10:2 12:11,17 13:2 13:6,10,24 18:23 23:19 24:10 32:12 41:14 48:14,15 52:23,25 60:16 60:25 61:11,15 61:16,18,20,21 62:2,12 69:19 70:2,11,14,19 73:13 75:9 87:17,20
**Administrator's** 9:4 12:25 13:22 14:16
**admitted** 7:16 7:18,20
**advance** 54:21
**advised** 59:10
**affiliation** 77:14
**African** 18:19
**AGC** 88:23
**Age** 48:18
**agenda** 19:20
**ago** 7:19,22 8:4

58:18 73:8
**agree** 17:22 36:4 49:12 64:25 80:11
**agreed** 27:19 55:5 70:19 77:11 83:5 86:16
**agreement** 71:19,22
**ahead** 8:7
**al** 1:10
**allegations** 65:15 73:15
**alleging** 73:16 75:4
**Allen** 9:22,25 12:3
**allowed** 85:13 85:19
**allowing** 65:5
**amended** 51:9
**American** 8:13 18:19
**amount** 44:17 44:25
**Anderson** 3:8 36:24 37:24 40:22 48:12 49:23 61:12 62:1 64:9 87:15,17,23 88:1,11,13,17 88:25
**Anderson's** 89:3 89:6
**annual** 38:11 41:15,18 43:12 43:15 44:5,10 44:15 46:21
**anonymous** 56:15,15 57:4
**answer** 5:21,22 6:3,8,9 16:4

71:16 72:7 73:24 74:14 75:18 83:12,18 85:15
**Answering** 67:7
**answers** 5:18 91:9
**antitrust** 10:21
**anybody** 61:25 62:7
**anybody's** 77:23
**anymore** 9:19
**anyway** 59:25
**apologize** 29:19 42:18 48:15 61:17
**apparently** 44:6
**appear** 33:4,9 49:14
**APPEARAN...** 2:1
**appeared** 56:19
**Appearing** 2:10 2:18 3:8,16
**appears** 46:8 49:21,22 51:16 52:15 58:24 63:25
**appoint** 21:5 23:20 24:11 32:21
**appointed** 25:2 26:6,9,10 76:4
**appointment** 32:23 49:7
**approached** 77:4
**approval** 65:7 70:14,16,22
**approved** 51:19 51:23
**approximately** 9:14
**April** 19:3 21:18

22:6,10 24:4 25:14 31:11,22 32:18 33:10,16 45:6,10,13,19 47:17 49:2 52:6 53:5,15 54:2 55:6 69:17 79:16 80:24 84:2 86:24 87:2 88:4
**aratliff@wnj....** 3:15
**area** 11:19 12:6 12:8
**areas** 30:5
**arrange** 69:11
**ASHER** 3:1 90:3
**asked** 40:4 67:10
**asking** 5:17 80:11,17 81:15 83:16 85:12
**aspect** 12:2 27:1 27:10
**assemble** 25:6
**assignment** 41:8 41:21,22,24 46:6
**assignments** 42:6,11,11,14 42:21
**assist** 42:1,6,8 42:10,13,14,15 42:21 43:18,20 44:20 88:6
**associate** 7:21 10:14,18 11:25 20:3,14 70:25
**Association** 8:14
**associations** 8:1
**assume** 12:20 25:25 84:22




DEBORAH LYNN EVANS GREEN
August 11, 2017

**assuming** 80:9
**assurances** 87:7
**attached** 4:12
  29:9 67:14,15
  67:17
**attaching** 36:9
  39:1,6,8 54:9
**attempt** 80:17
**attempting**
  59:17
**attendance**
  44:13 45:21
  55:4,14,17
  68:24
**attended** 6:19
  7:3
**attention** 16:6
  16:11 18:6
**attorney** 2:13
  9:22 12:3,9
  57:23 58:1
  67:4 68:17
**attorneys** 5:11
  85:6
**audit** 25:11,25
  28:6,8,12
  56:19,21 58:8
**audited** 56:16
**auditing** 64:15
**auditor** 23:24
  24:21 25:22
**August** 1:18 5:2
**authority** 13:11
  13:13 23:19
  88:11,16
**Avenue** 2:5
**award** 74:5
**aware** 15:7
  56:17 57:3
  72:10
**awhile** 26:17

—————
**B**
—————
**B** 30:21
**BA** 7:1

**back** 9:17 10:25
  25:12 59:9
  76:2 89:23
**back-up** 29:9
**background**
  67:8,11 76:23
  77:1
**backup** 31:5
**banc** 19:16,22
**Bank** 30:7
**banking** 10:22
**bar** 7:11 8:13,16
  88:18,22,25
**Barron** 74:16,18
  75:12,17
**bars** 7:13
**Barton** 11:13,16
**based** 71:18
  80:8
**basher@mike...**
  3:7
**basic** 34:9
**basically** 13:11
  20:23 22:12
  23:23 25:4
  42:7 70:7
  84:15,16 85:22
**basis** 46:21 72:5
**Bates** 40:11 46:1
  49:13 50:14
  53:8,17
**beginning** 10:9
**behalf** 2:10,18
  3:8,16
**believe** 7:20
  19:3 20:13
  21:13,24 26:14
  27:5 30:9 32:9
  32:13,14 33:8
  34:7,12 35:3
  36:11,20 37:24
  40:3 46:20
  52:4 54:16,18
  58:12 62:1,15

62:21 63:2
  65:24 66:4,24
  68:5 69:17
  72:13 77:11
  81:24 83:2,3
  83:15 85:12
**believed** 23:25
**belittle** 68:21
  69:2
**bell** 57:21 58:14
  58:15
**belongings**
  85:18,23 86:15
  87:7
**bench** 44:18,25
**benefits** 13:10
**best** 18:7
**better** 11:17
**beyond** 67:14,14
**bias** 76:10 77:18
  77:19
**bigger** 55:18
**biggest** 16:12
**bills** 59:20,22
  60:4 62:17,17
  62:24 63:1
**Birmingham**
  2:7
**birth** 6:17
**bit** 9:16 47:4,13
  58:16
**black** 40:15
**board** 69:19
**Borman** 1:8
**born** 9:15 10:17
  10:24 11:3,4
**boss** 53:3
**Boston** 81:17
**bottom** 53:9
  60:23
**Boulevard** 1:15
**Bowdich** 50:25
**box** 2:14 40:15
**Boy** 57:21 68:21

85:8
**break** 6:11,13
  75:23
**BRETT** 3:1
**briefly** 68:5
**bring** 23:3,4,21
  24:22
**brought** 24:18
  27:21,25 28:1
**budget** 13:10,19
  47:10 59:19
  60:2,8
**bunch** 29:12
**Burley** 11:13,15
**business** 10:20
  13:8,18 27:17
  27:22,24 60:1
**businesses** 11:18
  12:8
**Byron** 72:23

—————
**C**
—————
**C** 31:11
**calculations**
  47:14
**calendar** 46:17
  48:21 61:7
**call** 29:2 30:11
  46:1 69:10,11
**called** 5:6 24:25
  26:14 34:12
  57:4 68:23
  69:12
**Campbell** 1:19
  91:6,22
**Canfield** 7:20
  9:13 10:6,19
**card** 88:22
**care** 86:18
**Carl** 61:2,13
**Cas** 68:14,21
**case** 1:7 7:22
  13:19 38:20
  48:18 62:19
  71:10,20 75:3

**caseload** 25:3
  27:2,6,20
  78:24
**cases** 10:22 23:4
  26:11,20 27:11
  27:15 43:9
  78:25 79:1,2
**Caucasian**
  72:21 73:18
  75:12,14
**Causation** 74:10
**cause** 91:14
**caused** 19:9
  56:18
**cc-ed** 79:19
**center** 40:11
**certain** 29:3
  54:10
**certainly** 13:3
  18:8 24:1,23
  35:2 52:5
  54:15 57:10
  63:11 69:5
  70:16
**CERTIFICA...**
  91:1
**certification**
  8:10
**certified** 8:4,9
**certify** 91:6
**Chad** 32:10,15
  32:24 69:25
  77:11 80:9
  81:15 83:4
  86:21 87:5
**change** 15:7,17
  15:23 16:2
  33:19 69:22
**changed** 15:5,21
**changes** 88:7
**Charlene** 25:11
  28:10 29:18
  31:2 34:7
  36:24 40:23




62:9
**Charlene's** 28:8
**check** 30:21
34:10,10 35:22
36:3,8 37:3
54:6 81:23
**checks** 35:7 36:3
36:8 54:6,10
54:12
**chief** 13:11,12
19:25 20:7,17
20:21 21:5
22:20 23:3,5
24:24 25:2
26:9,12,14
27:4,7,14,25
28:2,9 31:15
32:12,13,22
33:25 38:17,19
38:19 60:16,21
69:16,20 70:22
76:4 77:11
78:17 87:21
**child** 9:15
**choice** 10:21
77:5,9,10
**choose** 19:9
**Cincinnati** 7:21
**circuit** 7:21 16:7
73:9
**cities** 76:16,17
**city** 9:22,22 12:3
12:8,9 37:4,9
37:11 47:11
56:22 57:24
58:4 59:16,19
62:19 65:5,7
**city's** 65:15
**civil** 5:14 71:10
75:3
**claiming** 59:23
**Clair** 14:13
**clarify** 5:25
**clear** 24:6 26:5

33:13 40:7
67:18 73:20
75:16 77:21
87:1
**clearing** 70:10
**clearly** 57:8
**clerk** 48:12 75:4
**clerked** 10:10
**clients** 12:7
**close** 22:2
**coincidence**
15:20
**College** 9:17
**colored** 77:23
**come** 21:5,23
25:2 37:1
42:25 43:8
48:5 56:16
77:17 79:2
85:14
**comes** 38:17
**coming** 27:1
42:7 65:2
**Commencing**
1:17
**comments** 66:8
**Commission**
17:23 91:25
**commission's**
18:6 68:17
**communicate**
29:5 65:16
**communicatio...**
66:6
**Community**
30:7,10,16
34:3 35:7
55:20,24 56:13
**compare** 45:24
**comparing** 44:4
**compilation**
49:7 54:5
**compile** 28:19
**complaint** 24:3

25:7,15 66:11
68:3 70:9
71:18 72:3,5
72:11 88:18,23
88:25
**complaints**
78:22 79:5
**completed** 6:8
**comply** 63:7
**computer** 91:10
**concern** 22:8,17
22:18,20,21
30:5 44:13
45:2,12 55:5
55:19,19 62:15
**concerned** 23:8
30:10 44:3
87:6 88:22
**concerns** 19:9
19:11 23:10
24:15,22 30:16
36:12 44:24
45:19 54:10,25
59:16 85:22
**concluded** 90:4
**conclusion**
64:22,25
**conduct** 80:12
**conducted** 81:6
**conference**
31:21,23 32:3
80:19 81:17
**conferences**
78:10
**confidential**
72:4
**confirmed** 56:20
**conflict** 76:19
**confused** 43:12
**connection**
45:20 88:3
**consecutively**
49:22
**considered** 68:4

**considering**
78:16
**contact** 66:7
78:20
**contacted** 68:23
**contemporane...**
21:25
**CONTENTS**
4:1
**continue** 24:14
24:17
**continued** 87:20
**continuing**
25:25 28:12
**control** 14:18
**conversation**
32:6 68:19,25
**conversations**
58:5,11 67:25
69:15 70:2
87:23,25 89:15
89:16
**conversely**
43:20
**cooperated**
88:14,18
**copied** 29:20
60:23 64:7,9
**copies** 39:4
**copy** 56:21
68:24
**core** 65:11
**correct** 6:20,21
7:2,3,4,5,6,9
7:10 8:11,12
8:17,20,23,24
8:25 9:1,5,6
10:7,25 11:8
11:11 12:1,3,4
12:11,12,17,18
12:21,25 13:1
13:22,23,25
14:1,3 15:3,6
16:12,19 17:8

17:9 18:12,14
18:17,20 20:8
21:8,22,23
24:7,13 25:20
25:21,23,24,25
26:8,17 27:8,9
27:11 28:10,11
28:23,25 29:1
29:3,4,8,10,17
29:20,21,23
30:8,17 31:6
31:12,16,17
32:3 33:11,12
34:20 35:5,16
35:17,21 36:1
38:4,10,24
39:19,20,24,25
41:1,3,9,10,20
41:21,24 43:17
43:18,19,24
44:11 45:17,18
47:5,6,25 48:9
48:13,23 49:2
49:10,15,18
50:10 51:1,2
51:17,18,20,21
52:6 53:16
54:21 55:6,9
55:12,21,24
57:2,6,7,8,9,11
57:12,15 59:7
59:11,12,14
60:7,24 61:23
61:24 62:4,5
63:6,13,15
64:2,3,12,22
65:8 66:11,16
67:20 69:21
70:15 71:1,4
72:15,18,22
73:18 74:10,11
74:18,19,24,25
75:1,12,13,14
75:15 76:5,6

 

DEBORAH LYNN EVANS GREEN
August 11, 2017

78:1,4,14 79:7
79:8,20 80:15
80:22,25 81:1
81:6 82:1,9,12
82:14,17 83:18
83:20,25 84:1
84:19,20 85:3
86:13 87:13,15
87:19,21 88:10
89:1,2 91:11
**council** 65:2
**counsel** 83:1
  89:16 90:6
  91:13
**counties** 14:7,22
  14:23 76:16
**county** 15:8,15
  15:19 16:3,6
  16:10,12,12
  26:11 50:15,21
  73:9 74:21
  77:15 78:3,9
  91:4,24
**couple** 28:5
  82:15
**course** 23:6 66:3
  69:8 81:25
**courses** 11:6
**court** 1:1 6:4 8:5
  8:9,25 9:4,24
  9:25 10:1,2,4
  12:10,11,16,17
  12:25 13:2,4,4
  13:6,9,10,13
  13:14,18,21
  14:16,19,20
  16:7,16 17:1
  18:4,24 19:8
  19:12 20:24
  21:6 23:5,9,17
  23:20,22 24:9
  24:20 25:2
  27:9,17,18
  32:11,22,25

34:3 35:7
36:23 37:1,9
37:21,22 38:15
38:17,18,21
39:15,16 40:5
40:21,24 41:2
41:14,20 42:8
43:6,7 44:6
46:20,25 48:5
48:13,14,15
49:8 51:17
52:23 54:18
56:7,21 58:23
59:17,17,20,24
59:25 60:2,8
60:16,25 61:11
61:15,16,18,20
61:21 62:2,16
62:20,24,25
63:23 64:14
65:6,12,16
70:10,14,18
72:2,24 73:9
74:20 75:1,4
75:10 76:5,18
76:21 77:22
79:14 80:18
82:1,11 85:18
87:12,17,20
88:8,21
**court's** 59:20
  64:17
**courts** 7:16 13:7
  16:9 54:16
  59:10 63:2
  76:14
**Cover** 46:16
**covering** 15:19
**Cox** 3:2
**created** 34:7
  37:25
**credenza** 83:9
**criminal** 9:24
**CSR-3406** 1:19

91:22
**cursory** 33:8

**D**

**D** 1:8 33:9 52:18
**daily** 25:16
**Darnell** 56:20
  56:21
**dash** 51:10
**date** 6:17 17:18
  17:18 18:8
  19:4 24:4 35:3
  35:15 43:15
  47:17,17 50:1
  51:3 70:12
  84:11,12 86:20
  87:9 91:7
**dated** 17:10,14
  33:15 46:8,8,9
  52:15 53:7,21
  56:9 64:3
  79:15
**dates** 17:16 41:4
  43:11
**daughter** 11:4
**David** 57:20,23
  58:25 64:19
  73:4
**day** 19:14 20:22
  21:18,19,20,24
  21:24 41:23
  82:5 84:7,8
  86:4,9,22,23
**day-to-day** 43:4
**days** 44:6,15,20
  44:21 68:12
**deal** 16:1
**dealt** 76:13
**Deborah** 1:14
  4:4 5:5,13 6:16
**December** 46:9
  49:14
**decision** 15:22
  19:5,7,7 20:23
  20:24 21:2,7

21:12 23:10,13
24:9 77:8
**defamation** 75:5
**Defendant** 2:18
  3:8,16
**Defendants** 1:11
**definitely** 40:8
**defunct** 10:21
**degree** 6:24 7:7
  10:8
**delegate** 13:15
**delivered** 33:15
**deposition** 1:14
  4:14,15,16,17
  4:18 5:13
  16:23 17:2
  56:4,8 58:20
  58:24 63:20,24
  79:11 89:9
  90:4 91:7
**depth** 69:1
**description** 54:7
**desk** 83:9
**details** 58:13
**determine** 62:11
**determined**
  64:21 65:11,15
  84:9
**Detroit** 1:16 5:1
  14:19 73:8
**difference** 17:16
**differences** 13:3
**different** 13:17
  34:9 35:24
  38:5 42:10
  54:14
**differentiates**
  42:10
**difficulty** 78:18
**direct** 16:6
  23:17 26:2
  88:11
**directed** 24:8
  31:15

**directing** 72:6
**direction** 23:21
  27:23
**directive** 28:5
**directives** 28:5
**directly** 32:8
  54:17 56:17
**disbursement**
  34:4,13
**discipline** 7:24
**disclose** 71:24
**discovered** 29:3
**discovery** 71:19
**discrepancies**
  40:8
**discrepancy**
  39:15
**discretion** 29:7
**discuss** 60:17
  78:8 89:17
**discussed** 86:15
**discusses** 60:8
**discussing** 64:18
**discussion** 19:21
  19:22 20:15,17
  20:20 67:5
  82:24
**discussions**
  19:25 20:3,6
  20:10 32:2,16
  32:20 70:6
**disease** 9:8
**disparity** 39:10
**dispute** 65:12
**disputes** 76:21
**disqualified**
  42:12
**district** 1:1,2
  9:25 10:2
  12:11,17 13:4
  13:4,7 14:19
  16:7 34:3 35:7
  37:9 38:15
  41:2,19 48:13





49:8 51:17 54:24 61:20,21 62:2 74:20 75:1,4,10 76:5 82:1,11 87:12
**division** 1:3 10:20 64:15
**divvied** 14:24
**docket** 19:23 20:8,12,25 21:3,17 26:15 31:19 42:1,7,8 42:11,13,14,15 42:21,24 43:1 43:18,21 44:21 45:20 46:21
**document** 17:5 31:2 34:2,6,15 34:21 35:11,18 37:3 38:13,15 39:19,22 44:22 45:25 46:19,20 46:24 47:1,10 47:23 48:2,4 48:17,24 49:1 49:20,21 50:20 52:8 53:4,7,11 53:14,17,23 54:1,15 65:23
**documentation** 40:5 78:25
**documents** 36:18,21 39:14 49:7,13 54:5,9 54:13 55:13 67:8,13 80:15 85:14
**doing** 8:25 77:25
**door** 69:23 84:21
**doubt** 69:20
**downriver** 9:18 11:19
**downtown** 14:19

**draft** 79:24
**drafted** 17:19
**Drive** 3:3
**Drug** 80:18 81:17
**duly** 5:7
**duties** 13:6 26:10,16

**E**

**E** 34:2
**e-course** 11:8
**e-mail** 29:4
**earlier** 35:2 57:13
**early** 61:8,9
**EASTERN** 1:2
**eat** 42:24
**echelon** 68:22
**effectuating** 88:6
**either** 36:23,24 66:25 76:9 84:9 86:10,21 91:13
**emergency** 76:15,17,21
**employed** 14:16
**employee** 41:19
**employees** 87:12
**employment** 9:11 10:24
**en** 19:15,22
**ended** 26:19 28:20 54:20
**enter** 83:22
**entered** 21:22
**entire** 6:2 14:15
**entitled** 34:2 35:6 37:18 48:18
**escort** 84:17
**especially** 43:5
**essence** 63:3
**Estate** 50:15

**et** 1:10
**Evans** 1:14 4:4 5:5 6:16
**event** 91:13
**events** 15:22
**eventually** 77:5
**evidence** 22:9,13 22:15,18
**evolved** 25:12
**exact** 13:16
**exactly** 15:14 37:20 38:22 46:25 48:6 61:8 81:15 87:24
**EXAMINATI...** 4:6 5:15
**examined** 5:9
**examiner's** 66:19
**example** 8:2,14 29:13 37:2 40:9,17 41:7 43:12,15,20 55:4 80:15
**excessive** 44:17 44:25
**exhibit** 4:11,14 4:15,16,17,18 16:23 17:2 29:13 39:14 56:4,8 57:13 58:20,24 63:20 63:24 66:1 79:11,15
**exhibits** 4:9,12 29:12
**exist** 9:18
**existing** 45:2,5
**expenses** 34:12 36:13
**expires** 91:25
**Explain** 42:18
**expressed** 22:18

22:20,21 30:15 45:12

**F**

**F** 35:6
**facilities** 13:20
**fact** 55:23 56:18 59:16 61:3 62:16 63:14 65:11 75:6 80:21 86:15
**facts** 18:11
**fair** 16:14 24:16 30:2 51:6 53:4 53:14 54:1,7 54:19 56:25 62:11,13 70:18 77:21 84:5
**fairly** 62:24
**fallow** 43:7
**Falzone** 11:13
**familiar** 16:19 30:1 71:6,10 72:23 73:2,4,7 74:1,16,22
**far** 41:2 44:6 81:5,5
**fax** 49:21,22,23 50:3
**Federal** 5:14 7:16
**feedback** 28:17
**feelings** 76:10
**feet** 24:19
**felt** 14:20 16:5,7 16:10,14 18:5 22:14 25:17,18 32:21 56:19 79:3 85:23
**Ferry** 52:18,20 53:8,20
**field** 10:21
**fifth** 14:24
**figure** 40:2 46:12

**file** 18:1 25:15 25:15 53:12 63:14,17 65:25 70:8,9,13,23 71:14 73:17,21 74:12 75:16,20 88:23,25
**filed** 17:7 22:5 26:23 27:4 28:17 57:8 66:5 70:4 71:3 71:17,23,25 72:4,11 75:3
**files** 38:17 53:24
**filing** 63:12 66:2 70:19
**finally** 25:18
**financial** 23:6,8 76:22 77:1
**findings** 28:6
**finish** 6:2,9
**firm** 3:2 9:18 11:11
**first** 5:7 9:15 17:20 26:5 34:9 37:2,14 37:16,18 39:3 39:9,19,22 41:15 43:15,21 44:5 46:15 49:12 50:1 62:22 64:25 70:11 77:5,9 77:10 84:5,13
**fiscal** 61:7
**Fischer** 3:16 17:23 67:2,18 67:25
**five** 10:3 12:19 12:23 14:25 51:9
**fix** 28:3
**fixing** 28:3
**Flint** 16:8




DEBORAH LYNN EVANS GREEN
August 11, 2017

**flip** 48:17
**Floor** 1:15
**flow** 13:19
**focus** 24:5 27:17
  27:22 37:16
**focussing** 33:7
  65:25
**follow** 28:12
**follow-up** 88:2,3
**followed** 24:21
  40:7
**following** 12:16
  12:20 26:1
**follows** 5:9
**fondly** 66:13
**Ford** 9:16 10:25
**foregoing** 91:8
**forget** 26:24
**forgot** 9:18
**formal** 66:10
  68:8 71:18
  72:4,10
**format** 38:5
**former** 41:14
  52:23 75:4
**forth** 91:8
**forward** 9:12
  23:12,15 62:18
  70:12
**forwarding** 63:4
**found** 23:24
  25:3 70:8 81:8
**four** 14:4,23
**free** 71:24
**Freedom** 59:6
  59:11
**Friday** 1:18 5:2
**front** 17:3,10
  19:13,15 32:25
  56:10,22 59:1
  79:17
**full** 6:15 91:11
**functions** 13:19
**fund** 30:7,16

55:21,24 56:13
**funding** 62:19
  65:12 76:14,21
**funds** 64:18
  71:12
**further** 40:1
  55:9 56:23
  57:1 64:21
  69:15 89:25
**future** 60:17

---
**G**

**G** 36:2
**gather** 22:12
  85:18
**general** 2:13
  11:17 44:12
  58:8,10
**generally** 13:5,8
  36:4 73:2
**generated** 51:6
**Genesee** 14:8
  16:8
**gentleman**
  68:14
**Gerry** 41:11
**getting** 78:18
**give** 9:11 27:23
  28:17
**given** 16:7 57:4
  88:15
**gives** 47:17
**giving** 19:20
**go** 8:7 10:5
  23:14 25:9,12
  28:2,9 36:4,11
  39:3 78:18
  86:13
**go-to** 77:1
**going** 15:23
  23:25 25:16
  33:20 36:3
  42:24 43:6,9
  61:17 65:3
  66:14 68:6

70:7,12 71:15
  73:21,23 77:6
  77:22 79:3
  80:3 86:7,16
**good** 5:10 10:21
  76:22 77:12
**goodness** 6:23
  14:11
**Google** 50:21
**gotten** 55:13
  56:15
**graduated** 6:23
  9:12 10:13
**Grand** 1:15 3:13
**Green** 1:14 2:19
  4:4 5:5,13,17
  6:16 17:1
  79:14 89:24
**grievance** 17:7
  22:4 23:15
  25:6 26:23
  28:17,20 29:9
  29:14 36:10
  54:20,21 55:20
  57:8,13 63:12
  63:14,17 65:25
  66:2,5 67:15
  69:14 70:4,13
  70:19,23 71:14
  71:17,23 72:3
  73:22 74:12
  75:17,20 80:22
  88:4
**grievances**
  57:17
**grievant** 71:22
  71:24
**grievant's** 72:3
**Gromek** 61:2,11
  61:13,19 64:1
**ground** 24:19
**group** 36:17,21
**grouped** 34:11
**growing** 25:14

25:17
**guess** 17:19
  29:14 37:15
  47:16 51:11
  60:25 68:1,2
**guy** 68:22 77:1

---
**H**

**H** 37:12 39:22
**half** 10:11
**HAMPTON**
  1:10
**handed** 17:1
  56:7 58:23
  63:23 79:14
**handle** 23:4,5
  27:2,14,15,20
  60:8 79:2
**handled** 27:10
  71:11
**handling** 26:15
  26:16,25 64:17
**hands** 23:23
**handwriting**
  51:11
**happen** 15:10
  22:23 68:7
**happened** 15:12
  65:9 67:23
  84:16 88:20
**happens** 38:20
**happy** 65:21
**hard** 47:20
  51:11
**hate** 68:21
**head** 64:14
**header** 17:13
**heading** 42:1
**hearing** 19:14
  19:23 20:1,4,7
  20:11,22,24
  21:16 22:22,24
  31:19 32:14,18
  33:1,14,17,21
  45:21 66:11

68:6,8 89:4,7
  89:13
**Hearn** 41:11
**help** 28:4 42:20
  42:25 43:10
  58:16
**helps** 31:24
**Henry** 9:16
  10:25
**hereinbefore**
  91:8
**hereto** 90:6
**HILLIARD**
  1:10
**hired** 10:12
**Hirsch** 2:3 4:7
  5:10,11,16
  14:14 16:21,25
  56:2,6 58:9,17
  58:22 63:18,22
  71:21 72:6,9
  73:25 74:15
  75:19,22 76:3
  79:9,13 89:19
  89:24
**history** 6:25 7:1
  9:11
**holder** 37:8
**holding** 62:21
**home** 9:9,10,15
**Hon** 1:8
**honestly** 58:12
  73:19
**hope** 11:20 65:4
**hour** 85:14,19
  85:21
**HR** 13:19
**human** 13:9
**Huron** 14:13
**husband** 9:8

---
**I**

**IDENTIFICA...**
  16:22 56:3
  58:19 63:19




79:10
imagine 67:16
immediately
12:20
immunity 88:15
implement
20:23
important 23:2
77:20
improper 75:5
include 14:6
included 75:9
incorrectly
72:24
Index 50:15
indicate 88:17
indicated 65:4
80:24 83:15
info 30:22
information
28:23,25 29:6
31:8 34:8
35:22,23,24
47:4 59:7,11
59:15 72:2
80:8 88:2,3
informed 63:3
infrequently
24:19
initially 27:19
31:5
Inkster 37:4,10
37:11 47:11
57:24 62:20
65:5
instance 16:8
instruct 71:16
73:24
intentionally
28:1
interested 15:19
87:8 91:13
interim 26:12
internal 39:14

40:3,17,20
41:1,1 46:17
46:20
internally 44:7
45:14
Internet 50:16
interpret 44:1
interpretation
44:22,23
interpreted
43:11
interrupt 6:7
interrupted
16:18
Intro 11:9
invade 83:6,16
investigate
24:14,17,24
45:9 55:8 80:5
investigating
24:20,23 25:20
investigation
18:2 40:1 71:3
77:25 79:6
80:12 81:5
88:14
involvement
19:5,7 88:21
involving 71:10
Ish 10:15
issue 33:6 51:1
55:18 58:6,7
63:16 64:17,18
80:21
issued 45:21
59:7
issues 16:8 18:4
54:19 60:17
item 60:2 80:15
80:17 81:9,16
items 25:10
59:18,25 60:2
65:6 80:14

——— J ———

J 47:8 52:8
James 1:5 16:19
17:8 18:14,19
18:22 19:6
20:7 22:5
23:14 25:7
26:7 27:7
28:16 29:17
30:18 31:9,12
31:14 32:17
33:10 34:25
35:19 36:18
38:2,24 41:5
41:19 44:21
45:6 47:24
50:11 51:7
53:8,20 57:17
58:8,10 60:20
60:21,22 61:23
64:7 66:3
69:13 70:3
71:6 72:23
76:10,25 77:14
77:16 78:4,9
78:20,23 79:2
81:25 82:4,22
85:1,5,13 87:5
87:12 88:15
James' 23:22
37:19 38:9
66:11 68:1,20
69:16 82:16,25
83:1,6,22
84:13 86:13
January 46:9
68:9,11 83:13
85:10
Jason 2:3 5:11
JD 7:9
JEANMARIE
2:12
Jeffrey 50:25
jhirsch@mor...
2:9

job 11:5 12:22
13:2 18:15
John 52:18
joined 9:21 10:3
joining 51:24
Jones 57:20,23
58:6,11,25
59:4,7,9,15
64:19
JTC 2:18 22:16
66:2,6 70:9
80:25 81:3
83:13 89:4,7
89:10,13
Judd 3:11
judge 1:9 13:12
13:12 16:19
17:7 18:14,19
18:22 19:6
20:7 21:5 22:5
23:3,5,13,22
23:22 24:12
25:2,7 26:5,6,7
26:9,13,25
27:3,4,7,9,13
27:14 28:2,9
28:16,23 29:2
29:16 30:18
31:8,12,14
32:11,17,22
33:10 34:25
35:19 36:18,23
37:19 38:2,8
38:14,16,17,18
38:21,23 41:4
41:6,18,22,23
41:24 42:7,9
42:12,16,19
43:5,6,8 44:21
45:5 47:24
50:11 51:7
53:8,20 55:17
57:17 58:8,10
60:16,20,21,21

60:22 61:22
64:7 66:3,11
68:1,20 69:13
69:16 70:3
71:6,11,14
72:11,14,21,23
73:4,7,8,9,16
73:18,22 74:1
74:3,6,10,12
74:16,18,22
75:12,14,17,20
76:4,5,7,10,11
76:12,19,25
77:2,8,13,14
77:16 78:4,9
78:17,17,19,20
78:22 79:2,16
80:12,14,17
81:8,20,25
82:3,8,16,22
82:25,25 83:4
83:6,22,25
84:13,15 85:1
85:5,13 86:12
86:13,19 87:12
87:20,21 88:6
88:8,14
judge's 83:17
judges 16:13
23:20 25:3
26:10,18 27:1
38:18 43:3
71:4 76:8
77:15 78:3,9
78:18,24
judicial 17:23
55:17
July 85:6,11
86:25
June 9:3 12:22
12:24 13:21
15:21 17:10,14
17:24 18:16
19:2 22:5,14




DEBORAH LYNN EVANS GREEN
August 11, 2017

25:14 28:20
57:14 66:1,2
68:3 69:15,17
70:20 80:22
88:5 91:25
**jury** 74:5
**justice** 19:25
  20:7,18,21
  22:20 24:24
  31:15 32:2,6,8
  32:12,13 33:25
  69:16 70:23
  77:11
**justices** 19:22
  20:4,11,14
  22:21 45:16
  70:25

       **K**
**K** 48:17
**K-O-N-S-C-H...**
  72:25
**Kandrevas** 71:6
  71:11,14 72:11
  72:14,21
**keep** 43:8 63:1
**kept** 25:14,17
  70:11
**keys** 82:6,9
**Kilpatrick**
  42:22
**Kimberly** 74:22
**kind** 8:8 25:12
  28:7 67:8
  68:22,25 69:23
  70:16
**kinds** 42:6
**knew** 18:14,19
  22:10,11 30:14
  76:22 78:16
**know** 6:8,12 8:3
  8:8 16:2 17:16
  17:21 19:13,17
  22:4 24:18
  25:16 30:12

32:8 34:6
35:11 36:7,15
36:21 37:20,25
39:18 40:12
41:13 42:3
46:14,19,25
47:1 48:5,12
50:20 51:15,24
51:24 52:20
54:22 55:25
57:16,19,20
59:21 62:23
63:9 65:9 67:7
67:24 68:3,6
68:14 69:6
70:17 72:19
73:19,20 75:7
76:9 78:6 80:1
80:7,10 81:2,4
81:5,8,10,13
81:13,14,14,20
82:3,6,8,18,18
82:21 84:16,25
85:25 86:3,14
88:20
**knowing** 39:21
**knowledge** 18:7
  51:22 72:16
**known** 31:8
  54:20
**Konschuh** 72:23
**Kruze** 9:21
  11:21,23
**Kwame** 42:22

       **L**
**L** 49:6 52:10,11
  53:17
**Labadie** 9:21
**lack** 11:17
**land** 23:21 50:15
  50:22
**landscape** 34:17
  35:15
**Lansing** 2:15

56:16
**Lapeer** 14:12,13
**late** 68:11
**Laurel** 3:3
**law** 3:2 7:3,7
  9:12,16 10:8
  10:10,21 11:9
**lead** 24:3 67:3
**learn** 57:5
**learned** 75:6
**leave** 18:23 19:6
  19:10 21:4,19
  21:21 22:6,7
  22:25 23:11,14
  24:10,15,25
  25:1,8 26:7,23
  28:16 30:19
  31:9 34:25
  35:20 36:19
  37:19 38:9,11
  38:16 39:9
  41:5,15,18
  43:7,12,15,24
  44:5,10,15
  45:6 47:3,5,24
  50:12 51:7
  69:14 70:3
  72:15 78:14
  82:4,22 83:1
  83:23 84:6,8
  87:2,13
**leaving** 15:12
**led** 24:15
**left** 9:15,23
  15:21,24,25
  29:24 34:16
  35:14 47:19
  48:10 52:23
  57:5 86:16
**legal** 54:11
**let's** 11:3 37:15
  42:22 55:2,4
**letter** 18:3,7
  22:11 29:16

30:1,4,9 31:1,6
31:12,18 33:10
33:15,19,23,25
53:7,20 58:25
59:6 64:19
79:15,19,22,24
80:9,11
**letterhead** 29:22
**level** 18:5 57:10
  63:12
**limit** 85:21,25
**line** 48:10 49:22
  50:3 59:18,25
  60:1,2 65:6
**list** 76:8 77:6
  80:7 89:20
**listing** 80:4
**little** 27:25 38:5
  40:13,15 43:11
  47:13 58:16
**Livingston**
  14:10,11
**Livonia** 3:5
**LLP** 3:11
**local** 76:9,24
**locate** 52:1
  80:15,18
**located** 11:11
  82:16
**locked** 82:3,21
**long** 7:19,19,19
  7:22 25:4
  58:18 73:8
**longer** 26:19
**look** 28:2,7,8
  29:12 31:11
  34:2 35:14
  37:12 38:6
  40:9,13,16
  44:14 45:24,25
  46:2,15 47:7
  47:21 54:4
  56:18 57:1
  65:21 72:1

89:20
**looked** 55:13,23
  55:25 56:13,14
  56:24 57:13
**looking** 18:4
  40:12 41:7
  43:13 44:9,10
  44:12 46:1
**looks** 30:21 36:2
  37:7 38:1,8
  47:16 48:21
  49:6 50:14
  51:3 54:5 56:8
  79:19
**lot** 11:18 12:8
  24:2 63:17
  77:15 78:3
**lower** 34:16
  35:14 51:3
  68:22
**lunch** 79:3
**Lynn** 1:14 4:4
  5:5 6:16
**Lyon** 3:12

       **M**
**M** 54:4
**ma'am** 6:17
  56:7 63:23
**Macomb** 14:8
  14:23
**Maggie** 66:24
  67:3,6,22
**magistrate** 1:9
  49:8 51:1
  54:23
**main** 24:5
**maintain** 8:19
**maintained** 12:7
**makeup** 15:5,17
**manage** 25:3
  46:21
**managed** 13:8
**management**
  13:19,19,20




DEBORAH LYNN EVANS GREEN
August 11, 2017

23:5 76:15,22
**managers** 76:17
**manner** 45:15
**March** 29:16
  30:2,11,15
  31:1,5
**mark** 16:21 56:2
  58:17 63:18
  74:1,16 79:9
**marked** 16:22
  17:2 56:3,8
  58:19,24 63:19
  63:24 79:10,15
**Mary** 73:7
**matched** 44:17
**matches** 50:3
**material** 29:10
  49:17
**matter** 5:12
  38:20 68:1,20
  69:4,16 77:13
  89:17
**McLemore**
  25:22 28:10
  29:18,19 34:7
  35:12 56:10
  62:9
**McLemore's**
  25:11 30:4
  31:2
**McPhail** 54:17
  83:3,15 85:6
  85:12 86:20
  87:4
**mean** 24:12
  28:15 33:14,15
  37:7,9 41:18
  42:5,15,19,20
  45:5,16 54:24
  58:8 71:23
**meaning** 41:1
**means** 42:3,7
**meant** 36:10
**mediation** 64:21

**meet** 60:15
  61:18 65:16
**meeting** 61:3,5
  61:22 62:10,15
  62:22 63:3
  65:2 67:22
  69:11,11 83:2
  83:3 85:17
  86:20,24,25
**meetings** 66:23
  67:1 69:9
  78:10 87:11
**member** 7:11,13
  8:1,13,16
**memo** 64:5,7,16
**memoranda**
  40:4
**memorandum**
  40:17,20 52:15
  56:9 63:25
**memorandums**
  39:11 40:4
**memorialized**
  21:7
**memorializing**
  64:16
**memory** 7:22
  57:22
**memos** 38:2
**mentioned** 8:22
  10:23 11:10,20
  12:2 28:22
  83:10 85:1
**mess** 87:8
**met** 18:16 66:19
  66:22 85:5
**Meyering** 56:20
**Meyering's**
  56:21
**Michigan** 1:2,16
  2:7,13,15 3:5
  3:13 5:1 7:11
  8:10,16 14:7
  53:1 91:2,24

**Microsoft** 17:17
**mid** 6:12 68:11
**Mike** 3:2
**Miller** 2:12 7:19
  9:13 10:6,19
  14:12 58:7
  71:15 72:1,8
  73:23 74:14
  75:18,21 90:1
**millerj51@mi...**
  2:17
**mind** 24:2
**minds** 24:2
**mine** 47:21
**Misco** 11:13
**misreporting**
  44:24
**missing** 14:9
  43:5 81:14
**moment** 23:16
  76:18 89:20
**Monday** 34:19
  35:15
**money** 59:18,25
  60:2 62:18,21
  63:1,2 65:6
**Monroe** 14:8
**months** 63:10,10
  63:10
**Morganroth** 2:4
  2:4
**morning** 5:10
**motion** 72:5
**move** 23:12 65:6
**moved** 54:24
**multi** 38:18
**mushroomed**
  22:13

**N**

**name** 5:10 6:15
  9:19 11:10,21
  57:21 58:3,14
  72:3 73:3,5
  78:10

**named** 68:14
**National** 80:18
  81:17
**nature** 20:20
  67:5 70:6
  87:25
**near** 60:16
**necessarily**
  41:25
**necessary** 64:22
**need** 6:11 23:8
  28:3 42:25
  43:8 51:19
  57:1 68:23
**needed** 9:8 16:6
  16:10 18:5
  27:5 31:22
  32:21,25 42:20
  85:23
**needs** 28:3
**negative** 77:16
**never** 57:5 70:9
  70:24 71:2
  86:11
**new** 35:22,24
  47:4 49:4
  75:24
**newspaper** 75:7
**nice** 9:9
**Norcross** 3:11
**normally** 20:13
  70:8
**north** 2:5 3:3
  73:6
**Notary** 91:1,23
**note** 37:2
**noted** 43:24
**notes** 91:12
**notice** 5:14
  84:18 86:9
**notified** 31:20
**November**
  52:15 53:7
  58:25 59:21

**number** 16:13
  34:9,10 38:1
  40:11 53:8,17
  63:24 68:11
  76:14 81:9,16
**numbered** 14:3
  49:22
**numbers** 40:15
  44:3 49:13
  50:14
**NW** 3:12

**O**

**Oakland** 14:8
  14:22 74:21
**oath** 5:19
**object** 73:21,23
**objection** 71:16
  74:14 75:18,21
**observe** 82:19
**observed** 86:6
**obtained** 10:8
**occasion** 78:8
**occasionally**
  42:21
**occasions** 76:14
**occur** 75:8
**occurred** 78:1
**October** 6:18
  53:21 56:9
**offer** 88:13
**office** 9:5 10:4
  12:25 13:22
  14:17 45:14
  56:12,17 66:7
  66:19 68:18
  76:12,13 81:25
  82:3,6,9,14,16
  82:25 83:22
  84:4,6,13,22
  87:5
**Offices** 64:15
**official** 45:15
**officially** 10:12
**oh** 6:23 8:18




14:13 18:18
30:3 31:21
40:14 50:17
69:8
okay 5:22,25 6:5
6:9,10,13,14
9:13 13:8
14:15 15:16,22
16:2,14 17:22
18:19 19:1,5
20:20 21:20
26:12,21 28:19
28:25 29:15,19
31:4,8 32:5
36:7,14,17
37:6,12,13,17
38:1,20,23
39:6 40:19
42:18 43:20
44:1,3 45:9,19
45:23 46:15
47:9,13 49:1,4
49:20 50:8,11
50:25 51:22
52:5,14 53:2,4
55:8,16,23
57:25,25 58:2
58:5,16 59:6
61:22,25 62:14
64:21,24 65:20
65:22,25 66:16
67:13 68:10,16
69:9,24 70:6
70:22 73:4,7
74:1 75:25
81:16 82:11,21
83:19 84:12,18
84:21,24 87:11
88:13 89:19
old 2:5 79:1
once 6:5 58:12
62:17
ones 32:23 54:22
open 17:18

opening 84:21
operate 21:5
23:22
operations 13:9
13:18
opinion 77:16
77:24 78:4
opinions 33:19
78:8
opposed 42:11
options 23:1
order 21:7,10,20
21:21,23 24:17
24:23 51:10,16
59:17 60:6
62:12 70:13
ordered 24:24
organization 8:9
orientated 34:16
orientation
34:15
original 16:9
originator 15:4
outside 21:5
23:3,4,20,22
32:22 41:22
56:19
overloaded
14:21
owners 50:22

───────
**P**
P-A-G-N-U-C...
11:22
Paddock 9:13
page 4:3,11
17:10,21 29:24
36:4 37:16,18
39:9,19,22,22
40:11 41:7
43:13 44:9
46:3,8,16
49:24,24 50:1
50:14 64:23
79:20 80:3,3

pages 17:13
37:15 38:2,2
51:9,12 52:8
52:13
Pagnucco 9:21
11:21,22,23
paid 54:10
Pam 40:22
48:12 62:1
Pamela 36:23
37:24 87:15
PANDERSON
48:8
Park 3:3 9:22
10:1 12:3
Parkinson's 9:8
part 8:3 16:9
19:23 22:7
30:25 31:5
44:23 45:19
52:8 55:20
part-time 11:5
partially 39:12
particular 33:6
45:12 54:14
parties 57:3
90:6
party 91:13
pass 65:5
pass-throughs
63:2
passed 33:23,25
Paul 1:8 17:23
67:2
pay 59:20 62:17
62:24,25
Payee 35:8
paying 59:22
60:3 62:17
Penn 6:19
peons 32:10
people 16:4
people's 24:2
performed

50:23
period 6:22
11:12,23 57:18
periods 38:9
perjury 73:16
permit 6:9
person 18:16
19:15 62:8
71:23
personal 83:8,17
85:18,23 86:13
86:14,15 87:6
87:9
personally
32:13 82:19
physically 86:4
pick 85:14
picture 25:18
77:21,22
place 19:6 21:17
24:9 68:9
71:15 86:24
placed 18:23
22:6,7,25
23:14 25:7
26:7,22 30:18
31:9 34:25
35:19 36:18
45:6 47:5,24
50:11 51:7
69:13 70:3
72:14 78:13
82:4,22 83:1
83:23 84:6,8
87:13
plaintiff 1:6
2:10 5:12
plan 60:15
plans 70:12
please 5:21,25
6:2,8,15 16:21
56:2 58:17
59:10 63:18
79:9

plenty 22:10
PLLC 2:4 3:2
plus 44:17,20
PO 2:14
point 14:24 25:9
25:9,17 26:17
56:24 80:24
points 80:4,7
poor 78:4 79:1
Port 14:13
portion 49:12
position 12:16
26:12 77:3
possible 67:2
68:21 69:5
possibly 23:3
potential 71:22
77:13
practitioner
11:18
predates 51:24
preferably 6:11
prelaw 9:16
10:25
Preliminary
46:17
preparation
88:4
prepare 89:9
prepared 31:3
35:12 37:14,18
37:20 39:10,18
64:5 80:7
present 66:25
85:11 89:3
presentation
35:25
presented 19:15
34:8
presume 24:11
63:6
pretty 23:2 61:6
previous 25:13
28:6

 

DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 102

**primarily** 10:22
**printed** 47:17
**prior** 18:14,16
  19:19 20:1,2,4
  27:7 30:25
  31:23 32:14,17
  45:5,10,13
  49:2 52:6 53:5
  54:2 65:7 66:2
  72:2 76:24
  77:23 78:19
**privacy** 83:8
**private** 12:7
**privileged** 71:24
**probably** 34:24
  45:14 52:23
  72:19 80:8
  89:21
**problem** 55:18
**Procedure** 5:14
**proceeding**
  83:13
**process** 59:21,23
**professional**
  7:23 8:1,8
**progress** 69:18
**prompted** 18:1
  79:6
**pronouncing**
  72:24
**property** 50:22
**prosecution**
  9:24
**provide** 31:20
  38:14
**provided** 29:6
  46:22 52:2
  67:13 81:11,20
  81:21
**providing** 31:14
  67:8
**Public** 91:23
**pulled** 52:4
  53:11,23

**purpose** 36:9
  39:8
**purposes** 50:18
**pursuant** 5:13
**pursue** 23:15
  88:18
**put** 19:18 21:4
  21:19,21 23:11
  24:25 25:1,5
  32:18 47:2
  76:8 87:2
**putting** 19:10

**—— Q ——**
**question** 5:24
  6:3,4,12 8:3
  25:13 45:23
  83:12,14 85:10
**questioned**
  71:11
**questions** 5:17
  31:14 32:7
  67:7,10 83:16
  85:13 90:1,2,3
  91:8
**quite** 15:18

**—— R ——**
**R** 1:9 2:3
**raised** 19:8,11
  30:4 45:19,21
  60:17 78:22
  80:21
**ran** 76:18 78:24
**Rapids** 3:13
**RATLIFF** 3:10
  90:2
**reached** 71:19
  71:21
**read** 75:7 89:10
**Real** 50:15
**really** 12:5
  13:12 15:18
  16:5 19:4
  21:25 27:25

  56:14 58:14
  59:24 65:12
  67:2,3 72:12
  73:3 76:18
**reason** 9:7 22:12
  35:3 58:15
**recall** 11:10,12
  11:15 12:14
  18:22 19:1
  20:15 21:14,16
  31:18 32:16
  33:13 34:21
  36:17 37:14,18
  37:22 39:1
  40:19 46:24
  48:2,4 50:6,23
  52:3 54:13
  57:23 58:5,10
  59:15 61:5
  62:8,10 66:10
  66:22 67:2,3
  67:10,13 70:1
  72:12 73:12,15
  73:17 74:5,8
  75:3 79:22
  81:11 82:24
  83:5,12 85:1,5
  85:19 86:19
  87:25
**receive** 31:22
  33:17
**received** 28:22
  34:21,24 35:19
  38:23 40:19
  47:23 48:2,4
  50:8 79:6
**receiving** 33:13
  50:6
**Recess** 76:1
**recognize** 17:5
  58:3 73:3,5
**recollection**
  32:5 56:12
  59:3 73:10

  85:9,16
**recommend**
  23:6
**record** 5:12 6:5
  6:9,15 19:17
  19:18 26:5
  67:18 73:20
  75:16 76:2
  89:22,23
**recorded** 5:22
  91:9
**records** 39:4,16
  44:7 50:16,22
  52:1 80:18
  81:16,21,21
**rectified** 54:25
**redated** 17:20
**reduced** 91:10
**refer** 40:16
  65:21
**reference** 59:6
  60:5
**referenced** 81:9
**referencing**
  60:21
**referring** 30:12
  54:22,23 55:25
  60:20 61:18,19
  66:3
**reflect** 41:4
  46:13
**refresh** 32:5
  56:12 59:3
  85:9,15
**refreshes** 57:22
  73:10
**refused** 65:16
**refusing** 59:19
**regard** 71:16
**regarding** 49:7
**region** 14:2,4,5
  14:6,15,20,21
  14:24 15:2,5,8
  15:15,23 16:3

  16:9 38:3
  52:25 71:8
  72:17 73:1,5
  73:12 74:3,18
  74:24 75:9
**regional** 13:24
  23:19 73:13
  75:8
**regions** 14:4,25
  15:18,20
**register** 30:22
  34:10 35:22
**related** 55:14
  81:16,21 91:12
**remember** 9:19
  11:2 19:4,13
  20:19 40:6
  42:23 58:13
  61:8 65:10
  67:21,21 69:3
  69:5 72:12
  77:7 82:5,10
  83:8,10 84:23
  85:8,21 86:3
  87:9,24 88:24
**rendered** 74:5
**reopened** 17:20
**reorganizing**
  35:21
**report** 22:16,16
  38:16,18,19
  47:11 48:18
**reported** 39:17
  44:5,14,16
  45:1 69:18,18
  69:19
**reporter** 6:4 8:5
  8:9 17:1 56:7
  58:23 63:23
  72:25 79:14
**reporting** 8:25
**reports** 38:11,23
  39:23 44:15
  54:6 68:24




represented
  11:18 12:8
request 18:1
  22:23 41:24
  59:7
requested 36:25
  66:9 90:5
requesting
  80:14
requests 36:3,8
  41:8,21,21
  46:5 71:3
  81:23
require 70:22
required 38:12
  38:14
requires 32:22
resolution 65:5
resolve 65:3
  80:5
resources 13:9
respect 57:17
respective 90:6
respond 66:8
response 31:20
  31:23 33:10
  81:24
responsibilities
  13:17
rest 42:25 62:18
  63:4
restroom 75:23
resulted 32:7
  71:18
retire 9:2,7
retired 8:4,22
  9:4 76:8,11,23
review 89:6,12
reviewed 30:25
revolving 69:23
right 11:9,21
  12:21 21:25
  24:12 28:13,20
  29:6,22 30:16

31:24 33:2
34:15,17 35:4
37:4,9 38:6
43:2,13,16
45:3 46:6 47:9
47:16 48:16,22
50:4 51:3
52:11 55:14
57:14 59:13
60:6,9,11,13
60:20,23 62:3
62:23 63:7,12
63:16,17 64:7
64:18,25 65:2
65:4,6,7,13,14
65:17 66:13,21
68:12 69:7
72:17,21 74:8
74:20 75:2
80:12 86:4,7
86:10,25 87:2
87:18 88:5,9
88:11,12
ring 58:15
rings 57:21
  58:14
risen 18:5
roadmap 28:7
role 24:10
Ron 64:11
room 67:23
rose 57:10 63:11
roughly 26:22
rule 13:13
rules 5:14 42:10
  72:2
run 25:2 70:17
running 70:10
Ryneir 66:24
  67:6 69:10

_____ S _____

Sadly 55:17
safe 82:16,19,21
  82:25 83:6,10

83:10,17 84:18
85:2 86:9,13
86:14
Saint 14:13
saw 86:11
saying 44:8 69:2
says 34:19 37:9
  37:11 42:1
  47:13 48:7
  51:3 59:24
  80:4 81:14
SCAO 30:11,14
  30:15 38:3,23
  39:3,17 40:25
  45:9 46:22
  48:24 49:17
  51:19,23,25
  53:4,11,14,24
  54:2,20 55:23
  62:7 79:7 81:6
  81:12,21
SCAO's 52:1
Schmucker
  32:10,15,17,20
  32:24 33:4,23
  69:21 79:16
  81:2 83:5,14
  87:5
school 7:3 9:12
  10:11
search 50:15,16
  50:21,23 52:1
second 10:11
  11:3 24:14
  48:10
secretary 50:24
section 36:12,16
  41:15 56:16
see 11:3 17:11
  17:13,14 22:13
  28:2 30:5 34:4
  34:14,16,19
  35:8,14 38:3
  40:10 41:11,16

42:1 43:16,20
43:21 46:5,10
46:17 47:11,14
47:18,20 48:7
48:18 49:21,23
50:16 51:4,13
52:16,18 53:9
53:18,21 58:16
60:18 80:3,5
80:19 81:17
85:9
seeking 59:15
seen 81:23 82:14
selected 76:7
selecting 78:17
selection 77:12
sends 38:19
sense 34:23
  42:19
sent 37:22,24
  40:21 48:6
  89:10
sentence 16:17
  60:5 64:25
separate 16:11
separated 15:8
series 5:17 18:4
  36:3
served 12:16
Service 30:7,10
  30:16 34:3
  35:7 55:20,24
  56:13
services 54:11
set 54:13 85:25
  91:8
seven 14:7 80:4
  80:7
Sharon 1:19
  54:17 83:3,15
  86:20 87:4
  91:6,22
Sheet 46:16
shift 59:18,25

shifting 60:1
shoot 29:4
short 75:22
show 5:12 31:3
  39:9,15 50:22
showed 84:15
shows 42:13
sick 42:9
side 23:6 27:14
  27:17,18,22,24
Signature 90:5
similar 34:11
  38:2,6
simple 42:13
single 38:21
singular 55:17
sit 23:20
site 40:23
sitting 42:15
  43:7
situation 23:9
six 9:23 10:3
  12:19
small 9:18 11:11
  11:18 12:8
  74:22 75:14,20
solely 27:3
solicit 28:25
somebody 24:12
  42:25 77:17
Somers 74:1,6
  74:10,13
somewhat 75:24
son 10:17,24
soon 21:21 25:7
sorry 8:7 9:17
  16:18 28:11
  37:15 47:20
  50:17,17 52:11
  58:10 61:14,16
  84:11
sort 10:18 11:15
  14:21,23 25:4
  28:1,7 29:22




DEBORAH LYNN EVANS GREEN
August 11, 2017

34:8,10,14,17
40:13 41:15
45:24 46:16
77:1 84:17
**sorts** 78:22
**sound** 66:21
**sounds** 24:6,7
**southeast** 14:7
**SOUTHERN**
1:3
**speak** 20:14
33:6 66:1
87:15
**specialized** 12:5
**specific** 81:10
**spent** 10:23
**spoke** 32:8
**spoken** 80:25
81:2
**SS** 91:3
**Stadnika** 64:11
64:13
**stage** 56:14
**stamp** 46:1
**stapled** 47:20
**star** 66:14
**start** 60:3 75:23
**started** 7:19
9:13 10:6,20
12:22,24 13:21
14:6
**starting** 49:24
80:3
**state** 6:19 7:5,11
7:13 8:10,16
9:4 10:4 12:24
13:21 14:5,16
14:25 32:11
52:23 53:1,1,2
61:15,16 64:14
69:19 70:10,14
70:18 76:13
91:2
**stated** 18:3

**states** 1:1 7:14
**stay** 9:8
**stayed** 9:15 15:1
15:4
**stenographic**
91:11
**stenographica...**
91:9
**steps** 23:17 45:9
**Steven** 1:9
**Stone** 9:14
**Stowe** 73:4
**straight** 69:20
**Street** 3:12
**strike** 8:21
20:16 26:4
30:14,24 35:10
38:13 39:2,6
51:15
**strong** 70:16
**struggle** 76:16
**stuff** 17:18
25:10,11 81:23
83:11 87:9
**subject** 7:23
41:8 46:6
59:10
**submitted** 17:22
39:11 40:25
57:14,16 69:14
**suborned** 73:16
**subsequent**
17:13
**subsequently**
15:7 85:1
**substantial** 74:8
**suggested** 23:1,2
77:2
**suggestion**
44:20
**Suite** 2:6 3:4
**summaries** 38:8
39:13
**summary** 34:4

34:13 39:9,11
48:18
**summer** 10:12
27:5
**superintendent**
14:18
**support** 36:10
**supposed** 46:13
62:18 86:12
**supreme** 14:20
16:16 18:23
19:8,11 23:17
24:9 32:22,25
**sure** 5:21 6:2,3
15:14 36:25
61:6 66:13
67:19 70:5
**Swastek** 68:14
68:19
**sworn** 5:7,18
**Sylvia** 1:5 16:19
76:24 86:21
87:4

---

**T**

**T** 3:10
**Tab** 29:14 30:21
31:11 33:9
34:2 35:6 36:2
37:12,12 39:22
46:15 47:7
48:17 49:6
52:8,10,11
53:17 54:4,4
**TABLE** 4:1
**tainted** 77:23
**take** 6:13 23:17
26:6,9,11 27:6
57:4 58:1
65:23 70:25
75:22 82:8
89:19
**taken** 1:15 5:13
21:24 45:9
59:22 62:16

76:1 91:7,12
**takes** 63:17
**talk** 32:10,12
55:4 58:14
62:22
**talked** 32:13,24
33:1 68:5 69:3
69:6
**talking** 6:5 7:22
40:10 51:12
68:2 81:16
83:8 86:25
**tamper** 22:9,17
**tampered** 85:2
**tampering**
23:10 85:22
86:6
**Tamsen** 9:21
**tangible** 22:15
**taught** 9:16,16
10:25
**tell** 13:5 22:10
28:3 51:11
54:15 59:9
66:13 86:12
**telling** 59:17
**tenure** 17:23
18:6 24:3
68:17
**termination**
75:5
**terms** 13:2
18:11 19:21
43:10
**terrible** 78:24
**testified** 5:9
66:18
**testify** 5:7
**testimony** 66:10
66:16 83:13
85:10 89:3,7
89:10,12
**thank** 14:11
89:24

**thing** 17:17 22:1
22:13 23:7
24:14 43:4
60:13 67:9
**things** 13:16
22:15 23:25
24:8,21 28:8,9
29:3 32:9
34:11 60:11
69:7
**think** 7:17 11:20
11:21 12:2,10
12:21 17:17
18:3 19:3,19
21:18 22:9,11
22:25 24:2,20
27:3 28:22
30:4,9,24
36:16 39:12
40:5,10 49:20
50:21 52:10
54:6,16 56:25
57:10 61:11
63:11 66:18
71:21 73:6
75:22 84:9
86:22,22 87:3
89:20
**third** 16:6 79:20
**Thomas** 85:6,11
**thought** 26:19
32:1 54:25
57:3,25 65:3
85:2
**thoughts** 76:24
**three** 9:14 10:14
10:16 14:22
16:4
**time** 5:24 6:7,11
6:22 7:19 9:7
9:12 10:23
11:12,23 14:4
14:6,15,20,21
15:1,18 18:11

 

DEBORAH LYNN EVANS GREEN
August 11, 2017

18:14,22 22:2
22:10 23:13,16
25:13,17 26:13
26:17,21,21,22
26:24 28:15,15
32:11 38:9
44:18,25 45:10
48:13 57:1,12
57:18 58:18
61:12 62:15
64:14 65:23
66:18 67:23
68:7 70:2,15
73:8 75:8
76:18 82:19,22
83:14,22 84:3
84:5,13,19,19
85:24
**timeframe** 11:2
30:2 49:15
51:23 68:2
**timeframes** 10:6
**times** 82:13,15
**timing** 31:24
**tip** 56:15,15
57:4,5
**title** 46:16 47:10
50:18
**today** 89:17
**told** 32:1 33:2
54:23 63:6
78:7 84:18
86:19 88:22
**top** 35:8 37:19
47:10 48:7
49:22 50:4,14
**topic** 75:24
**total** 44:10
**touch** 78:25
**transcript** 4:12
89:6,12 91:11
**transcription**
91:10
**transcripts** 8:5

9:10
**travel** 25:11
36:12
**treasurer** 57:25
**treasurer's**
76:12,13
**Trenton** 9:20
11:11
**trial** 42:22 89:10
**tried** 76:8
**trouble** 84:21,23
**true** 18:7 65:17
66:16 91:11
**truth** 5:7,8,8
**try** 5:25 13:5
40:1
**trying** 31:4
**turn** 29:13 30:21
33:9 34:14
35:6 36:2 47:7
49:6
**TV** 66:14
**twice** 66:19
**two** 6:5 9:14
10:1,14,16
12:13 15:22
24:7 44:24
45:24
**types** 34:11
**typically** 32:9
66:7 88:2

___

**U**

**Uh-huh** 53:19
**ultimately** 71:17
77:10
**unanimous**
21:15
**undergraduate**
6:19 11:6
**understand** 5:18
5:24 6:4 15:14
41:2 44:9
**understanding**
44:19

**understood** 41:4
41:18
**unheard** 43:3
62:25
**unit** 62:19 76:21
**UNITED** 1:1
**units** 76:15
**University** 6:19
7:5
**unusual** 62:25
**update** 70:7
**upper** 29:24
47:16,19 48:10
**User** 48:7
**usually** 43:4,5

___

**V**

**vacation** 42:9
**vaguely** 73:3,11
**Val** 24:18,21
40:21 76:19
**various** 38:9
**verbally** 5:21
**violating** 59:24
63:4
**violation** 62:12
63:11
**visiting** 26:18
27:1 78:19
**vote** 21:12,13
**voted** 21:14
**vs** 1:7

___

**W**

**W** 1:15
**wait** 44:15
**want** 15:15
25:14 27:19
45:24 47:21
65:21 69:10
76:23 77:23
78:20,25 87:1
**wanted** 15:17
22:12 27:16
77:17,21 88:7

**Warner** 3:11
**Washington**
2:18 24:18,22
26:6,25 27:3
27:13 28:23
29:2 36:23
40:22 76:4,7
76:11,20,25
77:8 79:16
80:12,14,17
81:8,20 82:8
83:25 84:15
86:12,19 87:21
88:6,8
**Washtenaw**
14:8
**wasn't** 24:3,4,20
24:22 27:16,20
27:21 44:21
83:2 85:17
86:17
**Waterstone**
73:7,16,18,22
**way** 26:18 32:9
39:21 62:23,23
64:16 65:9,23
69:3 70:1
71:11
**Wayne** 7:5 14:7
14:22 15:8,19
16:3,5,10,12
26:11 50:15,21
73:9 77:15
78:3,9 91:4,24
**ways** 13:16 34:9
**Wednesday**
31:22
**week** 43:7
**went** 9:17 10:24
19:13,14 26:18
68:11
**weren't** 25:19
**Whalen** 1:9
**winter** 61:9

**witness** 4:3 5:6
90:5
**Woodhaven**
10:2
**Woodward** 2:5
**word** 11:17
17:18 70:16
**words** 22:24
30:4 37:8 44:8
**work** 9:17 10:18
11:15 12:2
25:25 32:9
**worked** 10:22
12:6 76:11,20
**working** 15:19
76:12
**worried** 28:4
83:9 88:20
**wouldn't** 15:12
42:19 70:8
88:23
**write** 59:9
**writing** 19:12,19
19:20
**written** 18:9
31:18
**wrong** 62:23
**wrote** 80:9

___

**X**

___

**Y**

___

**yeah** 21:25
39:13 40:7,14
43:17 52:12
54:24 56:19
65:20 78:2
**year** 8:4 9:3,20
10:11 12:14
38:24 46:12
48:21 61:6,7,7
61:10 69:25
**years** 9:14,23
10:1,3,14,16
12:13,14,19,21




DEBORAH LYNN EVANS GREEN
August 11, 2017

Page 106

12:23 16:5
39:13 40:6
68:24
**yep** 50:19
**Young** 24:25
32:2,7,8,14

___

**Z**

___

**0**
**04** 52:24
**05** 44:16
**06** 39:14 44:14
44:16

___

**1**
**1** 4:14 9:3 14:4,5
14:6,20,21
15:2,5 16:3,23
17:2 29:24
38:3 39:22
52:25 57:13
66:1
**1-3** 43:21,24
**10:36** 56:5
**10:39** 58:21
**10:45** 63:21
**1099s** 81:8,13
**10th** 1:15 17:14
17:19
**11** 1:18 5:2
33:16 51:4
**11:00** 76:1
**11:05** 76:2
**11:10** 79:12
**11:26** 89:22
**11:27** 89:23 90:4
**111** 3:12
**12-1-2010** 64:3
**120E** 3:4
**13** 16:5
**13th** 31:22 32:18
84:10,12 87:3
**14** 17:10 19:2
85:7,11

**14th** 17:20,24
22:5 84:2,10
84:13 87:2,3
**15** 79:16
**16** 4:14 58:25
**17** 6:18
**17430** 3:3
**18** 31:1
**18th** 29:16 31:5
**19** 44:15 47:18
**1957** 6:18
**1978** 6:23
**1984** 7:8 10:9,14
**1990** 11:14
**1998-5** 60:6
62:12 63:7

___

**2**
**2** 4:15 34:19,22
35:16 51:12
56:4,8 80:3,15
81:9
**2-21** 43:16,18
**2:12-cv-10273**
1:7
**20** 44:20
**200** 2:6
**2002** 49:14,18
51:10,23 52:15
53:7,21
**2003** 12:22,24
13:21
**2005** 46:9
**2006** 41:8 46:6
**2007** 46:9
**2009** 55:24 56:9
56:13 57:8
**2010** 48:18,21
58:25 61:1,7
81:17
**2011** 17:10
18:16 19:2
22:5,6 29:16
30:2,11,15
31:1,12 34:19

34:22 35:16
45:7,10,13,20
46:16 47:18
49:2 50:1,9
51:4 52:6 53:5
53:15 54:2
55:6 57:14
66:1,2 68:3
69:15 70:20
79:16 80:22
84:2 85:7,11
88:5
**2012** 68:9 83:13
85:10
**2013** 14:18 15:1
**2015** 80:24
**2016** 9:3 15:21
**2017** 1:18 5:2
**2019** 91:25
**21** 53:7 56:9
**21st** 53:21
**22nd** 34:3 35:7
41:2,19 48:13
49:8 51:17
61:20,21 62:2
76:5 81:25
82:11 87:12
**2327** 40:16,18
41:8 43:13
46:2,9
**2328** 46:3,8
**2369** 49:13
**2376** 49:14
**2377** 49:24
**2379** 49:24
**2380** 50:14,17
**2381** 51:12
**2386** 51:12 52:9
52:13
**2387** 52:9,13
**2388** 53:9
**2389** 53:17
**24** 83:13
**248.864.4000**

**2:8**
**24th** 9:25 12:11
13:3,15 85:10
**2nd** 35:2

___

**3**
**3** 4:16 58:20,24
64:23 80:3
**3030** 1:15
**30736** 2:14
**31** 44:10,20
**33rd** 10:2 12:17
13:4,16
**344** 2:5
**36th** 14:19 16:7

___

**4**
**4** 4:17 52:15
63:20,24 80:17
81:16
**4-30-2011** 47:14
**48009** 2:7
**48152** 3:5
**48909** 2:15
**48th** 74:20 75:1
75:4,9
**49503-2487** 3:13

___

**5**
**5** 4:7,18 46:9
79:11,15
**517.373.6434**
2:16
**56** 4:15
**58** 4:16

___

**6**
**6** 46:9
**616.752.2539**
3:14
**63** 4:17
**6th** 7:20

___

**7**
**734.591.4002**

**3:6**
**79** 4:18
**7th** 31:11 33:10

___

**8**
**86** 10:17 11:3
**87** 11:5
**88** 11:5
**89** 11:4

___

**9**
**9** 50:1 91:25
**9:25** 1:17 5:3
**9:41** 16:24
**91** 11:24
**96** 12:15
**96-ish** 11:24
**97** 12:15
**98** 12:15,23
**98-5** 59:24,24
63:4




JAMES v. HAMPTON, ET AL.

DEBORAH GREEN

II

January 5, 2018

*Prepared for you by*



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

DEBORAH GREEN
January 5, 2018

## Page 92

1    IN THE DISTRICT COURT OF THE UNITED STATES
2    FOR THE EASTERN DISTRICT OF MICHIGAN
3    SOUTHERN DIVISION
4
5    SYLVIA JAMES,
6            Plaintiff,
7    vs.            Case No. 2:12-CV-10273
8            Hon. Paul Borman
9    HILLIARD HAMPTON, et al,
10           Defendants.
11                    /
12
13
14   The Deposition of DEBORAH GREEN, Vol. II
15   Taken at 3030 West Grand Boulevard,
16   Detroit, Michigan,
17   Commencing at 9:56 a.m.
18   Friday, January 5, 2018,
19   Before  Nora Morrissy, CSR-2642.
20
21
22
23
24
25

## Page 93

1    APPEARANCES:
2
3    JASON HIRSCH
4    Morganroth & Morganroth, P.L.L.C.
5    344 North Old Woodward
6    Suite 200
7    Birmingham, Michigan  48009
8    248.864.4000
9    jhirsch@morganrothlaw.com
10       Appearing on behalf of the Plaintiff.
11
12   JEANMARIE MILLER
13   Assistant Attorney General
14   State of Michigan
15   Department of Attorney General
16   525 West Ottawa Street
17   Floor 5
18   Lansing, Michigan 48933
19   517.373.6434
20   millerj51@michigan.gov
21       Appearing on behalf of the Defendant.
22
23
24
25

## Page 94

1    ALLYSON TERPSMA
2    Warner, Norcross & Judd, L.L.P.
3    111 Lyon Street, NW
4    Suite 900
5    Grand Rapids, Michigan  49503
6    616.752.2539
7    aterpsma@wnj.com
8       Appearing on behalf of the Defendant Fischer.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 95

1            TABLE OF CONTENTS
2
3    Witness                    Page
4    DEBORAH GREEN
5
6    EXAMINATION
7    BY MR. HIRSCH:                 97
8
9            EXHIBITS
10
11   Exhibit                    Page
12   (Exhibits not offered.)
13
14
15
16
17
18
19
20
21
22
23
24
25



Pages 92 to 95

DEBORAH GREEN
January 5, 2018

---

**Page 96**

```
1    Detroit, Michigan
2    Friday, January 5, 2018
3    9:56 a.m.
4
5            DEBORAH GREEN,
6    was thereupon called as a witness herein, and after
7    having first been duly sworn to testify to the truth,
8    the whole truth and nothing but the truth, was
9    examined and testified as follows:
10           MR. HIRSCH:  Good morning, Miss Green.  We
11   met before, but my name is Jason Hirsch.  I'm one of
12   the attorney for plaintiffs in this matter.
13           Let the record show that this is the
14   continuation of the deposition of Deborah Green taken
15   pursuant to notice under the Federal Rules of Civil
16   Procedure.
17           At our last session I went over some ground
18   rules.
19           Do you need me to go over those again or do
20   you have a pretty good recollection?
21           THE WITNESS:  That's fine, I understand.
22           MR. HIRSCH:  And I certainly don't expect
23   this is going to be very long, but if you do need a
24   break at any time, let me know.  In fact I think it's
25   going to be short.
```

---

**Page 97**

```
1            EXAMINATION
2    BY MR. HIRSCH:
3    Q.   There were a few questions that I asked you last time
4         that you declined to answer based on the advice of
5         counsel and assertion of privilege.
6              Do you recall that?
7    A.   Yes.
8    Q.   And we had a session with Magistrate Judge Whalen who
9         determined that some of those questions should be
10        answered.
11             Do you understand that?
12   A.   Yes.
13   Q.   I'm going to ask you some of those questions now,
14        okay?
15   A.   Okay.
16   Q.   You told me in our last session that you are familiar
17        with Judge James Kandrevas, correct?
18   A.   Correct.
19   Q.   And he was one of the judges in your region when you
20        were a regional administrator, correct?
21   A.   Yes.
22   Q.   And you told me that you were familiar with a civil
23        case that had allegations about the way Judge
24        Kandrevas had handled some funds, correct?
25   A.   Yes.  To the best of my knowledge that was part -- I
```

---

**Page 98**

```
1    don't know if that was the entire issue in the civil
2    case but I know it was part of the issues.
3    Q.   It was at least one of the allegations that you
4         recall?
5    A.   Yes.
6    Q.   Did you file a grievance against Judge Kandrevas?
7    A.   A Tenure Commission grievance, no.
8    Q.   Why not?
9    A.   The issue had come -- by court rule you can file a
10        complaint with the State Court Administrative Office
11        or the Tenure Commission.  If you file a complaint
12        with the State Court Administrative Office, I'm going
13        to seek an administrative solution.  It's an
14        administrative office.  We have no disciplinary
15        authority.
16             So, when the issue with regard to -- he had
17        written a letter to a local grocery store soliciting,
18        arguably soliciting food for a softball game, and that
19        letter came to my attention, actually the court
20        administrator filed a complaint with me.
21             I looked at the letter, contacted Judge
22        Kandrevas, talked to him about it, he understood the
23        letter was wrong.  He didn't see it as solicitation
24        because the grocery store had donated food to this
25        baseball game for like 20 years.  He was just letting
```

---

**Page 99**

```
1    them know how much.
2             Anyway, I talked to him, he agreed it was
3         wrong, he agreed to never do it again.  That was my
4         administrative solution.
5             I did not see any need to forward that to
6         the Tenure Commission.  To me the problem was
7         solved.
8    Q.   So, with respect to what you had seen in that letter,
9         you believe that the administrative solution was the
10        right solution with respect to Judge Kandrevas,
11        correct?
12   A.   Correct.
13   Q.   Did you hear any other allegations regarding Judge
14        Kandrevas that concerned you?
15   A.   No.
16   Q.   I'm going to move on to the next one now.
17   A.   Okay.
18   Q.   In our last session you told me that you were familiar
19        with Judge Mary Waterstone, correct?
20   A.   If I said familiar, I misspoke.  I barely knew the
21        woman, and she was a member of one of the larger
22        courts.  I think she was Third Circuit or 36th
23        District, I can't remember, and oftentimes I know very
24        little about the individual judges.  I tend to deal in
25        the larger courts with the chief judge and the heads
```

---



DEBORAH GREEN
January 5, 2018

---

Page 100

1    of the divisions.
2    Q.  And to be fair the question I asked you about Judge
3        Waterstone was, question, she was a judge in the Wayne
4        County Circuit Court if that refresh your
5        recollection, and you answered vaguely.
6              That would be fair?
7    A.  That would be fair.
8    Q.  You did tell me you recall that she was a judge in
9        your region?
10   A.  Correct.
11   Q.  And you did tell me that you recalled that there were
12       some allegations regarding Judge Waterstone suborning
13       perjury, correct?
14   A.  If I recalled that then, I don't recall it now.  I
15       know there was some issues regarding Judge Waterstone.
16       I believe I learned about them from the Tenure
17       Commission.
18   Q.  So, given what you just told me you learned it from
19       the Tenure Commission, I take it you did not file a
20       grievance against Judge Waterstone, correct?
21   A.  Correct.
22   Q.  Do you have some understanding that a grievance had
23       already been filed against Judge Waterstone?
24   A.  I knew she was already in trouble.  I don't know how
25       the -- the Tenure Commission can take issues up on

---

Page 101

1    their own without a grievance being filed.  So, I
2    don't know how it got to their attention.  I just knew
3    she was already in trouble.
4    Q.  Is that the reason then that you did not file a
5        grievance?
6    A.  That and I had absolutely no firsthand knowledge of
7        anything she had done.
8    Q.  At our last session you told me you were familiar with
9        Judge Mark Somers, correct?
10   A.  Correct.
11   Q.  And he was a judge in your region, correct?
12   A.  Correct.
13   Q.  And you told me that you recalled there was a civil
14       jury award rendered against Judge Somers, correct?
15   A.  Yes.
16   Q.  Did you file a grievance against Judge Somers?
17   A.  No.
18   Q.  Why not?
19   A.  Two parts to that answer.  First is, the first problem
20       that came to my attention with Judge Somers was
21       similar to Judge Kandrevas in that the court
22       administrator brought to my attention Judge Somers had
23       a biblical reference at the bottom of his judicial
24       letterhead.  That's wrong.
25              I met with Judge Somers, I said that's

---

Page 102

1    wrong, don't do it, take it off.  He did that
2    immediately, never used it again.
3              Secondly is it's my understanding that the
4    primary reason for that civil lawsuit had to do with
5    personnel, HR issues which SCAO does not get involved
6    in.  Every court has its own personnel policies, they
7    often mirror their funding units policies.  We don't
8    have any rules about it, it's not our issue.
9              So, I don't get involved in HR decisions at
10   local courts.
11   Q.  But if you heard about something happening at a local
12       court that was not an administrative issue but you
13       felt warranted referral to the JTC, could you file a
14       grievance?
15   A.  Anybody can file a grievance.  Doesn't have to come
16       from me.  So, yeah.
17   Q.  Would you consider that part of your duties as a
18       regional administrator?
19   A.  Duties, no.
20   Q.  At our last session you told me that you are familiar
21       with Judge Marc Barron of the 48th District Court.  Is
22       that correct?
23   A.  Yes.
24   Q.  And you also told me that you were familiar with Judge
25       Kimberly Small also of the 48th District Court,

---

Page 103

1    correct?
2    A.  Yes.
3    Q.  And the 48th District Court was in your region,
4        correct?
5    A.  Yes.
6    Q.  And you told me in our last session that you were
7        aware there was a civil case filed by a former clerk
8        of the 48th District Court alleging improper
9        termination and defamation, correct?
10   A.  Correct.
11   Q.  You told me in our last session you didn't know about
12       the civil case until after the fact, correct?
13   A.  Correct.
14   Q.  When you said that, did you mean after the civil case
15       had been initiated or did you mean after the judgment
16       had been entered?
17   A.  I learned about it from reading about it in the
18       newspaper, so, I believe that was after the judgment.
19   Q.  And did you file a grievance against Judge Barron?
20   A.  No.
21   Q.  Why not?
22   A.  It was already public knowledge.  The Tenure
23       Commission can start cases on their own.  I figured
24       they could have read the newspaper too.  I didn't see
25       the need for me to initiate anything.


US LEGAL SUPPORT
The Power of Commitment™

DEBORAH GREEN
January 5, 2018

Page 104

1        **Again personnel issue, no firsthand**
2    **knowledge on my part.**
3    Q.  And you said it was also because you felt the JTC
4        already knew or could know about it, correct?
5    **A.  Correct.**
6    Q.  So, there's no need for you to bring it to their
7        attention again, correct?
8    **A.  Correct.**
9    Q.  And not to put words in your mouth but I would ask you
10       the same question about Judge Small.  Would your
11       answer be the same?
12   **A.  Yes, it would.**
13   Q.  And what did you do to prepare for the continuation of
14       your deposition today?
15   **A.  I talked to the Assistant Attorney General for about**
16   **five minutes yesterday.**
17           MR. HIRSCH:  I have nothing further.  Thank
18   you.
19           MS. MILLER:  I don't have anything.
20           MS. TERPSMA:  Neither do I.
21           (The deposition was concluded at 10:08 a.m.
22       Signature of the witness was not requested by
23           counsel for the respective parties hereto.)
24
25

Page 105

1            CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN )
3             ) SS
4    COUNTY OF WAYNE)
5
6            I, Nora Morrissy, certify that this
7        deposition was taken before me on the date
8        hereinbefore set forth: that the foregoing questions
9        and answers were recorded by me stenographically and
10       reduced to computer transcription: that this is a
11       true, full and correct transcript of my stenographic
12       notes so taken; and that I am not related to, nor of
13       counsel to, either party nor interested in the event
14       of this cause.
15
16
17
18
19
20
21
22       Nora Morrissy, CSR-2642
23       Notary Public,
24       Wayne, County, Michigan.
25   My Commission expires: 9-13-19



DEBORAH GREEN
January 5, 2018

Page 106

**A**

**a.m** 92:17 96:3
  104:21
**absolutely** 101:6
**administrative**
  98:10,12,13,14
  99:4,9 102:12
**administrator**
  97:20 98:20
  101:22 102:18
**advice** 97:4
**agreed** 99:2,3
**al** 92:9
**allegations**
  97:23 98:3
  99:13 100:12
**alleging** 103:8
**ALLYSON** 94:1
**answer** 97:4
  101:19 104:11
**answered** 97:10
  100:5
**answers** 105:9
**Anybody** 102:15
**Anyway** 99:2
**APPEARAN...**
  93:1
**Appearing**
  93:10,21 94:8
**arguably** 98:18
**asked** 97:3
  100:2
**assertion** 97:5
**Assistant** 93:13
  104:15
**aterpsma@w...**
  94:7
**attention** 98:19
  101:2,20,22
  104:7
**attorney** 93:13

93:15 96:12
  104:15
**authority** 98:15
**award** 101:14
**aware** 103:7

**B**

**barely** 99:20
**Barron** 102:21
  103:19
**baseball** 98:25
**based** 97:4
**behalf** 93:10,21
  94:8
**believe** 99:9
  100:16 103:18
**best** 97:25
**biblical** 101:23
**Birmingham**
  93:7
**Borman** 92:8
**bottom** 101:23
**Boulevard**
  92:15
**break** 96:24
**bring** 104:6
**brought** 101:22

**C**

**called** 96:6
**case** 92:7 97:23
  98:2 103:7,12
  103:14
**cases** 103:23
**cause** 105:14
**certainly** 96:22
**CERTIFICA...**
  105:1
**certify** 105:6
**chief** 99:25
**Circuit** 99:22

100:4
**civil** 96:15 97:22
  98:1 101:13
  102:4 103:7,12
  103:14
**clerk** 103:7
**come** 98:9
  102:15
**Commencing**
  92:17
**Commission**
  98:7,11 99:6
  100:17,19,25
  103:23 105:25
**complaint** 98:10
  98:11,20
**computer**
  105:10
**concerned** 99:14
**concluded**
  104:21
**consider** 102:17
**contacted** 98:21
**CONTENTS**
  95:1
**continuation**
  96:14 104:13
**correct** 97:17,18
  97:20,24 99:11
  99:12,19
  100:10,13,20
  100:21 101:9
  101:10,11,12
  101:14 102:22
  103:1,4,9,10
  103:12,13
  104:4,5,7,8
  105:11
**counsel** 97:5
  104:23 105:13
**County** 100:4

105:4,24
**court** 92:1 98:9
  98:10,12,19
  100:4 101:21
  102:6,12,21,25
  103:3,8
**courts** 99:22,25
  102:10
**CSR-2642** 92:19
  105:22

**D**

**date** 105:7
**deal** 99:24
**Deborah** 92:14
  95:4 96:5,14
**decisions** 102:9
**declined** 97:4
**defamation**
  103:9
**Defendant**
  93:21 94:8
**Defendants**
  92:10
**Department**
  93:15
**deposition** 92:14
  96:14 104:14
  104:21 105:7
**determined** 97:9
**Detroit** 92:16
  96:1
**disciplinary**
  98:14
**District** 92:1,2
  99:23 102:21
  102:25 103:3,8
**DIVISION** 92:3
**divisions** 100:1
**donated** 98:24
**duly** 96:7

**duties** 102:17,19

**E**

**EASTERN** 92:2
**either** 105:13
**entered** 103:16
**entire** 98:1
**et** 92:9
**event** 105:13
**EXAMINATI...**
  95:6 97:1
**examined** 96:9
**Exhibit** 95:11
**Exhibits** 95:9,12
**expect** 96:22
**expires** 105:25

**F**

**fact** 96:24
  103:12
**fair** 100:2,6,7
**familiar** 97:16
  97:22 99:18,20
  101:8 102:20
  102:24
**Federal** 96:15
**felt** 102:13 104:3
**figured** 103:23
**file** 98:6,9,11
  100:19 101:4
  101:16 102:13
  102:15 103:19
**filed** 98:20
  100:23 101:1
  103:7
**fine** 96:21
**first** 96:7 101:19
  101:19
**firsthand** 101:6
  104:1
**Fischer** 94:8



DEBORAH GREEN
January 5, 2018

**five** 104:16
**Floor** 93:17
**follows** 96:9
**food** 98:18,24
**foregoing** 105:8
**former** 103:7
**forth** 105:8
**forward** 99:5
**Friday** 92:18
  96:2
**full** 105:11
**funding** 102:7
**funds** 97:24
**further** 104:17

**G**
**game** 98:18,25
**General** 93:13
  93:15 104:15
**given** 100:18
**go** 96:19
**going** 96:23,25
  97:13 98:12
  99:16
**good** 96:10,20
**Grand** 92:15
  94:5
**Green** 92:14
  95:4 96:5,10
  96:14
**grievance** 98:6,7
  100:20,22
  101:1,5,16
  102:14,15
  103:19
**grocery** 98:17
  98:24
**ground** 96:17

**H**
**HAMPTON**

92:9
**handled** 97:24
**happening**
  102:11
**heads** 99:25
**hear** 99:13
**heard** 102:11
**hereinbefore**
  105:8
**hereto** 104:23
**HILLIARD**
  92:9
**Hirsch** 93:3 95:7
  96:10,11,22
  97:2 104:17
**Hon** 92:8
**HR** 102:5,9

**I**
**II** 92:14
**immediately**
  102:2
**improper** 103:8
**individual** 99:24
**initiate** 103:25
**initiated** 103:15
**interested**
  105:13
**involved** 102:5,9
**issue** 98:1,9,16
  102:8,12 104:1
**issues** 98:2
  100:15,25
  102:5

**J**
**James** 92:5
  97:17
**January** 92:18
  96:2
**Jason** 93:3

96:11
**JEANMARIE**
  93:12
**jhirsch@mor...**
  93:9
**JTC** 102:13
  104:3
**Judd** 94:2
**judge** 97:8,17,23
  98:6,21 99:10
  99:13,19,25
  100:2,3,8,12
  100:15,20,23
  101:9,11,14,16
  101:20,21,22
  101:25 102:21
  102:24 103:19
  104:10
**judges** 97:19
  99:24
**judgment**
  103:15,18
**judicial** 101:23
**jury** 101:14

**K**
**Kandrevas**
  97:17,24 98:6
  98:22 99:10,14
  101:21
**Kimberly**
  102:25
**knew** 99:20
  100:24 101:2
  104:4
**know** 96:24 98:1
  98:2 99:1,23
  100:15,24
  101:2 103:11
  104:4
**knowledge**

97:25 101:6
103:22 104:2

**L**
**L.L.P** 94:2
**Lansing** 93:18
**larger** 99:21,25
**lawsuit** 102:4
**learned** 100:16
  100:18 103:17
**letter** 98:17,19
  98:21,23 99:8
**letterhead**
  101:24
**letting** 98:25
**little** 99:24
**local** 98:17
  102:10,11
**long** 96:23
**looked** 98:21
**Lyon** 94:3

**M**
**Magistrate** 97:8
**Marc** 102:21
**Mark** 101:9
**Mary** 99:19
**matter** 96:12
**mean** 103:14,15
**member** 99:21
**met** 96:11
  101:25
**Michigan** 92:2
  92:16 93:7,14
  93:18 94:5
  96:1 105:2,24
**MILLER** 93:12
  104:19
**millerj51@mi...**
  93:20
**minutes** 104:16

**mirror** 102:7
**misspoke** 99:20
**Morganroth**
  93:4,4
**morning** 96:10
**Morrissy** 92:19
  105:6,22
**mouth** 104:9
**move** 99:16

**N**
**name** 96:11
**need** 96:19,23
  99:5 103:25
  104:6
**Neither** 104:20
**never** 99:3 102:2
**newspaper**
  103:18,24
**Nora** 92:19
  105:6,22
**Norcross** 94:2
**North** 93:5
**Notary** 105:1,23
**notes** 105:12
**notice** 96:15
**NW** 94:3

**O**
**offered** 95:12
**office** 98:10,12
  98:14
**oftentimes**
  99:23
**okay** 97:14,15
  99:17
**Old** 93:5
**Ottawa** 93:16

**P**
**P.L.L.C** 93:4



DEBORAH GREEN
January 5, 2018

**Page** 95:3,11
**part** 97:25 98:2
  102:17 104:2
**parties** 104:23
**parts** 101:19
**party** 105:13
**Paul** 92:8
**perjury** 100:13
**personnel** 102:5
  102:6 104:1
**Plaintiff** 92:6
  93:10
**plaintiffs** 96:12
**policies** 102:6,7
**prepare** 104:13
**pretty** 96:20
**primary** 102:4
**privilege** 97:5
**problem** 99:6
  101:19
**Procedure**
  96:16
**public** 103:22
  105:23
**pursuant** 96:15
**put** 104:9

**Q**

**question** 100:2,3
  104:10
**questions** 97:3,9
  97:13 105:8

**R**

**Rapids** 94:5
**read** 103:24
**reading** 103:17
**reason** 101:4
  102:4
**recall** 97:6 98:4
  100:8,14

**recalled** 100:11
  100:14 101:13
**recollection**
  96:20 100:5
**record** 96:13
**recorded** 105:9
**reduced** 105:10
**reference**
  101:23
**referral** 102:13
**refresh** 100:4
**regard** 98:16
**regarding** 99:13
  100:12,15
**region** 97:19
  100:9 101:11
  103:3
**regional** 97:20
  102:18
**related** 105:12
**remember**
  99:23
**rendered** 101:14
**requested**
  104:22
**respect** 99:8,10
**respective**
  104:23
**right** 99:10
**rule** 98:9
**rules** 96:15,18
  102:8

**S**

**SCAO** 102:5
**Secondly** 102:3
**see** 98:23 99:5
  103:24
**seek** 98:13
**seen** 99:8
**session** 96:17

97:8,16 99:18
  101:8 102:20
  103:6,11
**set** 105:8
**short** 96:25
**show** 96:13
**Signature**
  104:22
**similar** 101:21
**Small** 102:25
  104:10
**softball** 98:18
**solicitation**
  98:23
**soliciting** 98:17
  98:18
**solution** 98:13
  99:4,9,10
**solved** 99:7
**Somers** 101:9,14
  101:16,20,22
  101:25
**SOUTHERN**
  92:3
**SS** 105:3
**start** 103:23
**State** 93:14
  98:10,12 105:2
**STATES** 92:1
**stenographic**
  105:11
**stenographica...**
  105:9
**store** 98:17,24
**Street** 93:16
  94:3
**suborning**
  100:12
**Suite** 93:6 94:4
**sworn** 96:7
**SYLVIA** 92:5

**T**

**TABLE** 95:1
**take** 100:19,25
  102:1
**taken** 92:15
  96:14 105:7,12
**talked** 98:22
  99:2 104:15
**tell** 100:8,11
**tend** 99:24
**Tenure** 98:7,11
  99:6 100:16,19
  100:25 103:22
**termination**
  103:9
**TERPSMA** 94:1
  104:20
**testified** 96:9
**testify** 96:7
**Thank** 104:17
**think** 96:24
  99:22
**Third** 99:22
**time** 96:24 97:3
**today** 104:14
**told** 97:16,22
  99:18 100:18
  101:8,13
  102:20,24
  103:6,11
**transcript**
  105:11
**transcription**
  105:10
**trouble** 100:24
  101:3
**true** 105:11
**truth** 96:7,8,8
**Two** 101:19

**U**

**understand**
  96:21 97:11
**understanding**
  100:22 102:3
**understood**
  98:22
**UNITED** 92:1
**units** 102:7

**V**

**vaguely** 100:5
**Vol** 92:14
**vs** 92:7

**W**

**Warner** 94:2
**warranted**
  102:13
**Waterstone**
  99:19 100:3,12
  100:15,20,23
**way** 97:23
**Wayne** 100:3
  105:4,24
**went** 96:17
**West** 92:15
  93:16
**Whalen** 97:8
**witness** 95:3
  96:6,21 104:22
**woman** 99:21
**Woodward** 93:5
**words** 104:9
**written** 98:17
**wrong** 98:23
  99:3 101:24
  102:1

**X**

**Y**



DEBORAH GREEN
January 5, 2018

Page 109

| | | | | |
|---|---|---|---|---|
| **yeah** 102:16<br>**years** 98:25<br>**yesterday**<br>  104:16<br><br>___ **Z** ___<br><br>___ **0** ___<br><br>___ **1** ___<br>**10:08** 104:21<br>**111** 94:3<br><br>___ **2** ___<br>**2:12-CV-10273**<br>  92:7<br>**20** 98:25<br>**200** 93:6<br>**2018** 92:18 96:2<br>**248.864.4000**<br>  93:8<br><br>___ **3** ___<br>**3030** 92:15<br>**344** 93:5<br>**36th** 99:22<br><br>___ **4** ___<br>**48009** 93:7<br>**48933** 93:18<br>**48th** 102:21,25<br>  103:3,8<br>**49503** 94:5<br><br>___ **5** ___<br>**5** 92:18 93:17<br>  96:2<br>**517.373.6434**<br>  93:19<br>**525** 93:16<br><br>___ **6** ___ | **616.752.2539**<br>  94:6<br><br>___ **7** ___<br><br>___ **8** ___<br><br>___ **9** ___<br>**9-13-19** 105:25<br>**9:56** 92:17 96:3<br>**900** 94:4<br>**97** 95:7 | | | |

