# EXHIBIT 2

JAMES v. HAMPTON, ET AL.

PAUL FISCHER

July 28, 2017

*Prepared for you by*




**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                     SOUTHERN DIVISION
 4
 5   SYLVIA JAMES,
 6             Plaintiff,
 7        vs.        Case No. 2:12-cv-10273
 8                   Hon. Paul D. Borman
 9                   Magistrate Judge R. Steven Whalen
10   HILLIARD HAMPTON, et al.,
11             Defendants.
12   _____
13
14
15   The Confidential Deposition of PAUL FISCHER,
16   Taken at 2000 Town Center, Suite 2700,
17   Southfield, Michigan,
18   Commencing at 9:03 a.m.,
19   Friday, July 28, 2017,
20   Before Becky L. Johnson, CSR-5395.
21
22
23
24
25
```

## Page 3

```
 1   JEANMARIE MILLER
 2   State of Michigan, Department of Attorney General
 3   525 West Ottawa Street
 4   Fifth Floor
 5   Lansing, Michigan  48909
 6   (517) 373-6434
 7   millerj51@michigan.gov
 8        Appearing on behalf of the Defendants, JTC, Val
 9        Washington and Deb Green.
10
11   BRETT A. ASHER
12   The Mike Cox Law Firm, P.L.L.C.
13   17430 Laurel Park Drive North
14   Suite 120E
15   Livonia, Michigan  48152
16   (734) 591-4002
17   basher@mikecoxlaw.com
18        Appearing on behalf of the Defendant, Pamela Anderson.
19
20
21
22
23
24
25
```

## Page 2

```
 1   APPEARANCES:
 2
 3   JASON R. HIRSCH
 4   JOSHUA A. FISHER
 5   Morganroth & Morganroth, P.L.L.C.
 6   344 North Old Woodward Avenue
 7   Suite 200
 8   Birmingham, Michigan  48009
 9   (248) 864-4000
10   jhirsch@morganrothlaw.com
11   jfisher@morganrothlaw.com
12        Appearing on behalf of the Plaintiff.
13
14   MATTHEW T. NELSON
15   Warner, Norcross & Judd, L.L.P.
16   111 Lyon Street NW
17   Suite 900
18   Grand Rapids, Michigan  49503
19   (616) 752-2539
20   mnelson@wnj.com
21        Appearing on behalf of the Defendant, Paul Fischer,
22        Esq.
23
24
25
```

## Page 4

```
 1              TABLE OF CONTENTS
 2
 3   WITNESS                          PAGE
 4   PAUL FISCHER
 5
 6   EXAMINATION
 7   BY MR. HIRSCH:                     9
 8
 9              EXHIBITS
10
11   EXHIBIT                          PAGE
12   (Exhibits attached to transcript.)
13
```
```
14   DEPOSITION EXHIBIT 1              33
15   DEPOSITION EXHIBIT 2              55
16   DEPOSITION EXHIBIT 3              96
17   DEPOSITION EXHIBIT 4              97
18   DEPOSITION EXHIBIT 5             100
19   DEPOSITION EXHIBIT 6             101
20   DEPOSITION EXHIBIT 7             129
21   DEPOSITION EXHIBIT 8             130
22   DEPOSITION EXHIBIT 9             132
23   DEPOSITION EXHIBIT 10            138
24   DEPOSITION EXHIBIT 11            148
25   DEPOSITION EXHIBIT 12            154
```



PAUL FISCHER
July 28, 2017

|  |  | Page 5 |
|---|---|---|
| 1 | DEPOSITION EXHIBIT 13 | 167 |
| 2 | DEPOSITION EXHIBIT 14 | 168 |
| 3 | DEPOSITION EXHIBIT 15 | 180 |
| 4 | DEPOSITION EXHIBIT 16 | 184 |

**Page 6**

1  Southfield, Michigan
2  Friday, July 28, 2017
3  9:03 a.m.
4
5  PAUL FISCHER,
6  was thereupon called as a witness herein, and after
7  having first been duly sworn to testify to the truth,
8  the whole truth and nothing but the truth, was
9  examined and testified as follows:
10  MR. NELSON: Before we get started, I just
11  wanted -- the defense counsel just wanted to put a
12  note for the record.
13  I'm sure you're already aware of this, but
14  we do anticipate that there will be areas of
15  questioning that are going to implicate privilege,
16  work product, attorney/client and deliberative
17  process. We just wanted to make that point at the
18  beginning so if there were any questions we could
19  resolve that, rather than have issues come up later
20  so --
21  MR. HIRSCH: Yeah, and I agree, Matt, so I
22  think, you know, probably to make it easier, you guys
23  will probably -- for the moment we'll just designate
24  the whole thing as confidential pursuant to the terms
25  of the protective order and -- but, you know, I guess

**Page 7**

1  on a section-by-section basis we may need to -- but
2  that may be better addressed later. In other words,
3  nobody will use anything for the moment --
4  MR. NELSON: Sure.
5  MR. HIRSCH: -- is I think probably --
6  MR. NELSON: But there also will be
7  questions -- there will also be questions that
8  Mr. Fischer will not be able to answer because of
9  privileges.
10  MR. HIRSCH: And those -- I mean, I'll
11  still ask whatever questions I ask and to the extent
12  you make that direction or objection to him, then --
13  MR. NELSON: Fair game.
14  MR. HIRSCH: -- we'll go from there.
15  Okay, thank you.
16  Good morning, sir, my name is Jason Hirsch,
17  I'm one of the attorneys for Plaintiff in this matter.
18  Let the record show that this is the
19  deposition of Paul J. Fischer taken pursuant to notice
20  under the Federal Rules of Civil Procedure.
21  Mr. Fischer, I know you've done this
22  before, but we'll go over some rules to make sure
23  we're on the same page, okay? I'm going to ask you a
24  series of questions. You understand you were just
25  sworn in and your answers are going to be under oath,

**Page 8**

1  okay?
2  THE WITNESS: Yes.
3  MR. HIRSCH: And if you could answer
4  verbally, as you know, the court reporter, it is
5  difficult for her to take down head shakes or other
6  motions, okay?
7  THE WITNESS: Yes.
8  MR. HIRSCH: And if at any time you don't
9  understand a question I ask, please say so and I'll
10  try to clarify, okay?
11  THE WITNESS: Yes.
12  MR. HIRSCH: Please let me finish my entire
13  question before you --
14  THE WITNESS: Yes.
15  MR. HIRSCH: -- before you -- before you --
16  I don't know if humor works on the record.
17  We get it. Let me finish my entire
18  question to make sure you understand what I'm asking
19  and because it's difficult for the court reporter to
20  record any of us talking over each other, okay?
21  THE WITNESS: Yes.
22  MR. HIRSCH: And if at any time I should
23  interrupt you or you have not completed your answer,
24  please let me know and we'll let you finish it for the
25  record, okay?

Pages 5 to 8




PAUL FISCHER
July 28, 2017

---

Page 9

1    THE WITNESS: Yes.
2        MR. HIRSCH: And if at any time you need a
3    break just let me know, preferably not mid-question,
4    any other time and we'll certainly take a break for
5    anybody that needs the restroom or anything else,
6    okay?
7        THE WITNESS: Yes.
8            EXAMINATION
9    BY MR. HIRSCH:
10   Q.  Okay. Sir, just for the record could we have your
11       full name?
12   A.  Paul Jeffrey Fischer, F-I-S-C-H-E-R.
13   Q.  And your date of birth, sir?
14   A.  11-15-57.
15   Q.  Sir, could you tell me your formal education from
16       undergraduate college forward?
17   A.  I graduated University of Michigan in 1979, graduated
18       Wayne State Law School in 1983.
19   Q.  And I presume you received a J.D. degree from Wayne
20       State Law School; is that correct?
21   A.  Yes.
22   Q.  And what was the degree you received undergrad from
23       University of Michigan?
24   A.  Ancient history -- I mean, it wasn't ancient history
25       and it's now ancient history.

---

Page 10

1    Q.  It was a bachelor's of arts degree --
2    A.  Yes.
3    Q.  -- in ancient history, correct?
4    A.  Yes.
5    Q.  Okay. Are you a member of any professional
6        associations?
7    A.  You mean like the State Bar?
8    Q.  Let's set Bar -- well, let me ask you some more
9        specific questions.
10   A.  Well, I don't understand the question.
11   Q.  I understand. Are you a member of the American Bar
12       Association?
13   A.  No.
14   Q.  Okay. You are a member of the Michigan Bar, correct?
15   A.  Yes.
16   Q.  Are you a member of any other State Bars?
17   A.  No.
18   Q.  And are you admitted to practice law in any federal
19       courts?
20   A.  Yes.
21   Q.  Which ones?
22   A.  Eastern District of Michigan, 6th Circuit and the U.S.
23       Supreme Court.
24   Q.  Any other similar associations, like any other -- not
25       State Bar associations, but associations like the

---

Page 11

1    American Bar Association?
2    A.  No, no local bar associations, if that's what you
3        mean.
4    Q.  Okay. Sir, could you tell me your employment history
5        starting from --
6    A.  Let me ask you, you meant currently, whether I was
7        formally a member of anything you're not interested
8        in?
9    Q.  Well, I guess thanks for bringing that up then. So I
10       think a moment ago when I asked you are you a member
11       of the American Bar Association you said no?
12   A.  I used to be.
13   Q.  Have you ever been a member of the American Bar
14       Association?
15   A.  Yes.
16   Q.  Okay. For what period of time were you a member?
17   A.  A short period, few years, probably in the early '80s.
18   Q.  Okay.
19   A.  Oakland County Bar Association for a similar period,
20       short period.
21   Q.  Okay.
22   A.  And a former member of the Association of Judicial
23       Disciplinary Council.
24   Q.  Okay. Could you tell me about your employment history
25       from the time you graduated law school forward?

---

Page 12

1    A.  Yes. So for maybe six months after law school I
2        worked for a private firm here in this complex,
3        Bushnell, Gage, Doctoroff & Reizen for about six
4        months, probably March of 1984. And then I started at
5        the Oakland County Prosecutor's Office until about
6        maybe November of 1990 when I started at the Judicial
7        Tenure Commission as a staff attorney and I was there
8        until March of 1992.
9            From there I went to a firm in Birmingham,
10       Hyman Lippitt, and I was there until December of 2000.
11       And on January 1st, 2001 I started with the Tenure
12       Commission, the Judicial Tenure Commission, as the
13       executive director and I was there until September
14       12th, 2016.
15   Q.  And have you held any employment since September of
16       2016?
17   A.  No.
18   Q.  Going back to the first private firm you worked at,
19       Bushnell, what kind of practice did you focus on at
20       that firm?
21   A.  It was a general practice firm. It did a lot of
22       product liability defense and some plaintiff work.
23       They did some medical malpractice, they did divorce,
24       they did probate. I clerked there earlier so I had
25       done a lot of -- a lot of little different things here

---




PAUL FISCHER
July 28, 2017

Page 13

1  and there, nothing specific, no -- nothing in
2  particular, just general first year, here, your turn
3  to do this.
4  Q.  So a broad general practice kind of firm?
5  A.  Yes.
6  Q.  Your other work in private practice was with Hyman
7  Lippitt, correct?
8  A.  Yes.
9  Q.  And did you focus on any particular area of law at
10  Hyman Lippitt?
11  A.  So it was mostly complex commercial litigation,
12  domestic law, family law and appeals from both of
13  those areas and some judicial defense and attorney
14  defense in the Attorney Grievance Commission, Attorney
15  Discipline Board and in front of the Judicial Tenure
16  Commission.
17  Q.  Focusing on your time as executive director of the
18  Judicial Tenure Commission starting in January of
19  2001, what were your duties as executive director?
20  A.  There are many of them.  The executive director -- I
21  would frequently refer to this, to the commission, as
22  they were the store owners and the executive director
23  is like the store manager, making sure everything runs
24  while the owners aren't there.
25       So you're the spokesperson to the

Page 14

1  commission, for the commission, to the public,
2  receiving grievances, complaints from the public and
3  anybody else who may file one, conducting
4  investigations at the commission's direction and then
5  if a matter goes to a formal complaint, being in
6  charge of the trial of that matter.
7  Q.  And --
8  A.  And I guess I should further up, arguing in front of
9  the commission if there is a decision in a formal
10  complaint and in front of the Michigan Supreme Court
11  as well.
12  Q.  You also -- your title was also general counsel for
13  the JTC --
14  A.  Yes.
15  Q.  -- during that time period; is that correct?
16  A.  Sorry, yes.
17  Q.  Are there any different duties you had as general
18  counsel?
19  A.  It's hard to say that at any one time I was acting as
20  executive director or as general counsel, it's more of
21  a combined function.  I would think that whenever the
22  commission asked me a question that one would ask a
23  lawyer, I was functioning more as their general
24  counsel.
25  Q.  So the duties you just described to me would cover

Page 15

1  both your roles as executive director and general
2  counsel, correct?
3  A.  Yeah, I don't think -- as the general counsel I
4  don't -- I would not be arguing a case in front of the
5  court -- in front of the commission or in front of the
6  court.  There's a -- the commission has a dual
7  function as an investigative unit and as a judicial
8  unit, an adjudicative unit.
9       As those roles changed, my role would
10  change as well, it would become less of the executive
11  director and more of what I call the examiner, a
12  prosecutorial role, and there would be no counsel from
13  me to the commission when acting as the examiner
14  because they're in their adjudicative role and I could
15  not be giving them advice on a matter that I'm also an
16  advocate on.
17  Q.  And that shift from your role as counsel maybe to the
18  JTC to your role as examiner occurs upon the filing of
19  a formal complaint; is that correct?
20  A.  Right, the issuance of a formal complaint, then we
21  file it, yes.
22  Q.  The issuance, correct?
23  A.  The issuance -- the commission itself issues the
24  complaint and then at that point I no longer am their
25  counsel, I become the examiner and they become the

Page 16

1  adjudicative body.
2  Q.  In your role as executive director would you also
3  speak at seminars sometimes?
4  A.  Yes.
5  Q.  Judicial meetings?
6  A.  Yes.
7  Q.  Which ones, do you recall?
8  A.  There are so many of them, I mean, I would do
9  presentations for MJI, the Michigan Judicial
10  Institute; very often SCAO, the State Court
11  Administrative Office, would ask me to speak when they
12  would have meetings; the Supreme Court had me speak
13  many times at their annual conferences; I spoke at
14  ICLE, Institute of Continuing Legal Education,
15  seminars.
16  Q.  Would you also sometimes speak at various judges'
17  associations?
18  A.  Yes.
19  Q.  Do you recall any of the specific ones you may have
20  spoken at?
21  A.  No, I mean, I know I've -- I know I've been to
22  Mackinac Island to speak to the MJA, the Michigan
23  Judges Association, and I know I've been to some other
24  resorts and -- I think the Probate Judges Association
25  and some of the referees, the magistrates, went to the

Pages 13 to 16



PAUL FISCHER
July 28, 2017

Page 17

1    different organizations.
2    Q.  So fair to say a lot of speeches over the course of
3    your long tenure as executive director, correct?
4    A.  Yes.
5    Q.  What was the purpose of those speeches?
6    A.  So I'll say I wouldn't call them speeches, I would
7    call them presentations.  I would frequently do a --
8    generally do a PowerPoint presentation, giving
9    examples on specific topics that the organization had
10   asked me to speak on or if they wanted just a general
11   update on matters that had been going on with the
12   commission, to just advise and allow other people to
13   know the kinds of things that the commission is doing
14   and the types of things that judges have gotten in
15   trouble for or not gotten in trouble for.
16   Q.  So would it be fair to say that it was educational to
17   convey what the commission was doing and to assist
18   judges in complying with the Michigan Code of Judicial
19   Conduct?
20   A.  Yeah, that's what I understood I was doing.
21   Q.  Okay.  And you would sometimes meet particular judges
22   at these events, correct?
23   A.  I'm not sure I know what you mean.
24   Q.  Well, would you -- well, strike that.
25        Judges would attend some of these events,

Page 18

1    correct?
2    A.  Yes.
3    Q.  Okay.  Would you sometimes actually meet the judges
4    before or after, mingling, during these events?
5    A.  So if you mean -- I hear meet, you know, like sit --
6    like we're meeting now, like sitting down.  I mean,
7    did I encounter somebody, did I say hello to somebody,
8    yes, sure.
9    Q.  I mean, would you -- so it sounds like you're drawing
10   a distinction between maybe saying hello to somebody
11   and doing sort of a greeting and actually sitting down
12   and having conversation, correct?
13   A.  Yes, a one-on-one sit-down, right.
14   Q.  Would you deliberately not have the sort of one-on-one
15   sit-downs?
16   A.  No, no, I mean, at the end of presentations frequently
17   judges would come up and ask questions.  I would refer
18   to the type of thing where I would say I know, you
19   want to come up and ask a question:  I have a friend
20   who -- you know, that's fine.  You want to ask a
21   question about an ethical matter, I'll be happy to try
22   and talk it through with you.
23   Q.  So in the course of those sorts of meetings you would
24   come to know many judges in the state of Michigan,
25   correct?

Page 19

1    A.  Yes.
2    Q.  Okay.  Sometimes as part of your introduction at these
3    meetings you would say I am the boogeyman you tell
4    your kids ghost stories about at bedtime, correct?
5    A.  Yes.
6    Q.  And you were joking when you made that statement,
7    correct?
8    A.  Yes, and I usually get a laugh too.
9    Q.  But there is a fear of the JTC among judges, correct?
10        MR. NELSON:  Objection, calls for
11   speculation.
12   BY MR. HIRSCH:
13   Q.  Do you know if there is a fear of the JTC among judges
14   in Michigan?
15   A.  I don't know.
16   Q.  That wasn't how you came up with the joke that you are
17   the boogeyman?
18   A.  I thought it was -- of it as an icebreaker.  I know
19   that I would frequently say that the Tenure Commission
20   was like the IAB division of -- the internal affairs
21   division for the police, so I was trying to be -- make
22   a little bit of a light moment and an icebreaker.  As
23   I said, I usually got a laugh.
24   Q.  It is true though that the JTC has significant power
25   over judges in the state of Michigan, correct?

Page 20

1    A.  I don't think the commission has any power over
2    judges, the Supreme Court does.
3    Q.  The Supreme Court generally exercises its power over
4    judges in the state of Michigan through the commission
5    though, correct?
6    A.  No.
7    Q.  Okay.  The JTC can certainly recommend that a judge be
8    removed from office, correct?
9    A.  Yes.
10   Q.  The JTC can authorize the filing of a public formal
11   complaint against --
12   A.  Yes.
13   Q.  -- a judge, correct?
14   A.  Yes.
15   Q.  And judges in Michigan have to run for election,
16   correct?
17   A.  Yes.
18   Q.  Okay.  And the JTC also has jurisdiction over some
19   appointed positions too, correct, magistrates and --
20   A.  Yes.
21   Q.  Okay.  But circuit court and district court judges
22   have to run for election, correct?
23   A.  Yes.
24   Q.  As do appellate court judges, in fact, in Michigan,
25   correct?

Pages 17 to 20


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
A U.S. Legal Support Company

US LEGAL SUPPORT
The Power of Commitment™

PAUL FISCHER
July 28, 2017

Page 21

1    A.  Yes, yes.
2    Q.  In your role as executive director were you also
3        responsible for the hiring of the JTC's professional
4        staff?
5    A.  Yes, but there was a staff already in place when I got
6        there, so yes and no.
7    Q.  Okay.  So at the time you got there as executive
8        director in January 2001, of course it was staffed up,
9        correct?
10   A.  Yes.
11   Q.  So you weren't responsible for those hirings?
12   A.  Right, yes, correct.
13   Q.  You would have had the power to terminate some of the
14       professional staff if you were dissatisfied; would
15       that be correct?
16   A.  I don't know.
17   Q.  Okay.  What was the composition of the professional
18       staff during your time as executive director, and if
19       it changed over time you can certainly give me the
20       time frames?
21           MR. NELSON:  Objection, vague.
22   A.  I don't understand the question.
23   BY MR. HIRSCH:
24   Q.  Okay.  Let me ask more specific questions.  Were there
25       two staff attorneys during your entire tenure?

Page 22

1    A.  There were more than two, yes.
2    Q.  More than two, okay.  How many were there at various
3        times?
4    A.  Three.
5    Q.  Okay.  Was that the entire time you were there or did
6        that change at some point?
7    A.  Well, somebody retired and then sometimes we'd have
8        two until I then hired a third -- or the commission
9        hired a third.
10   Q.  So generally during your time there there would be
11       three staff attorneys unless you were sort of between
12       filling a position; is that correct then?
13   A.  Yes.
14   Q.  Okay.  Was there a deputy executive director during
15       the time you served as executive director?
16   A.  No.
17   Q.  Okay.  Can you identify for me the staff attorneys who
18       worked at the JTC while you were executive director?
19   A.  Yes.
20   Q.  Can you give me the names, please?
21   A.  Yes.  So starting when I came January of 2001 the
22       senior staff attorney was Tom Prowse, P-R-O-W-S-E.
23       There was Anna Marie Noeske, N-O-E-S-K-E.  And there
24       was Cas, C-A-S, Swastek, S-W-A-S-T-E-K.  And at some
25       point Tom retired and the commission hired Glenn Page,

Page 23

1        G-L-E-N-N, P-A-G-E.  Then maybe a year or two or three
2        later Anna retired and the commission hired Margaret,
3        M-A-R-G-A-R-E-T, Rynier, R-Y-N-I-E-R.  And that was
4        the composition of the commission until I was no
5        longer there, of the legal staff.
6    Q.  Correct, when I said professional staff, that's what I
7        meant.  So you've already told me, of course, that you
8        didn't hire Mr. Prowse and Ms. Noeske, they were there
9        when you got there?
10   A.  Noeske.
11   Q.  Noeske, I'm sorry.
12   A.  If you don't mind, I'll say they were also there when
13       I was there a staff attorney from '90 until '92.
14   Q.  Okay.  Now, you in your answer said that the
15       commission hired the folks who came after, correct?
16   A.  Yes.
17   Q.  Would you make a recommendation to the commission as
18       to some applicants who you favored who you thought
19       should be hired?
20   A.  So with the -- I hired -- or the commission hired two
21       attorneys while I was there.  In both cases we did,
22       you know, a search and I presented three names to the
23       commission and the commission ultimately picked which
24       one it was.
25           There were also a couple other times we

Page 24

1        hired attorneys, not as -- I should mention this
2        separately, I suppose.  Not as part of the legal
3        staff, but, as I mentioned, the commission shifts
4        roles into its adjudicative role and then I am, as the
5        executive director, the examiner and no longer provide
6        counsel to the commission.  The commission will want
7        to get advice and have somebody help them write their
8        opinion and for the last 10, 12 years they have hired
9        what they call an adjunct counsel.
10           I helped the commission find those adjunct
11       counsels by, same thing, runs ads, et cetera, doing
12       some preliminary interviews, and then giving them, you
13       know, three, four names, whatever it was, and they
14       would then interview the people themselves and decide
15       which one they were going to hire.
16   Q.  So were the adjunct counsel actually hired as
17       employees or were they just used on a case-by-case,
18       you know, sort of task basis?
19   A.  Case by case, independent contractor type.
20   Q.  Okay.  Now, you said that for the two hirings you were
21       involved in, which ultimately would end up being
22       Mr. Page and Ms. Rynier, you would present two or
23       three names, I think you said, to the commission?
24   A.  Yes.
25   Q.  You'd give them some options, correct?



PAUL FISCHER
July 28, 2017

Page 25

1    A.  Yes.
2    Q.  Did you recommend one or the other or did you just
3        present straight options, that these are the two or
4        three best candidates?
5    A.  I don't recall.
6    Q.  Okay.  Did you know Mr. Page before he was hired?
7    A.  No.
8    Q.  Did you know Ms. Rynier before she was hired?
9    A.  No.
10   Q.  Mr. Swastek was there at the time that you arrived,
11       correct?
12   A.  As executive director in 2001, yes.
13   Q.  Correct, as executive director?
14   A.  Yes.
15   Q.  He had not been there at the time you served as staff
16       attorney, correct?
17   A.  Correct, yes, correct.
18   Q.  Did you know Mr. Swastek before the time you arrived
19       as executive director?
20   A.  No.
21   Q.  Do you know what his background is?
22   A.  I don't understand the question.
23   Q.  Do you know if he was a former prosecutor?
24   A.  I know that he was not.
25   Q.  Was Mr. Swastek ever disciplined by you in your role

Page 26

1        as executive director?
2    A.  I don't understand the question.
3    Q.  Would it be fair to say that you were the superior for
4        each of the staff attorneys during your time as
5        executive director?
6    A.  Yes, I would be their manager, so to speak, yes.
7    Q.  Okay.  Would you, for example, conduct performance
8        reviews?
9    A.  For a time we did.  We didn't always, but, yes.
10   Q.  As his manager did Mr. Swastek ever do anything that
11       you didn't approve of?
12   A.  That's also pretty general, I don't know that I could
13       answer.  Were there times over the 16 years that I was
14       there that I had to tell him I would like him to do X
15       this way and not this way, I'm sure there were.
16   Q.  And just so we're clear for the record, I presume your
17       answer would be the same then for Mr. Page when you
18       served as his supervisor, correct?
19   A.  Yes.
20   Q.  And the same for Ms. Rynier?
21   A.  Yes.
22   Q.  Okay.
23   A.  And for the other two as well.
24   Q.  And -- correct, and for the other two who you didn't
25       hire, but who were already there and you were their

Page 27

1        supervisor for a time?
2    A.  Yes.
3    Q.  Okay.  And I presume during your time as executive
4        director none of the staff attorneys were ever
5        professionally disciplined, correct, in other words,
6        by the State Bar?
7    A.  That's correct.
8    Q.  Or by any state bar, I don't know where they were
9        members of?
10   A.  Yes, that's correct.  There was no professional
11       discipline whatsoever on anybody.
12   Q.  And I take it you have never been the subject of any
13       professional discipline, correct?
14   A.  When you say subject of, do you -- do you also mean
15       investigations and -- that is subject of to me?  I
16       don't want to mislead you.
17   Q.  Well, let me ask you a different question.  Have you
18       ever been disciplined by the State Bar of Michigan?
19   A.  No.
20   Q.  Have you ever been investigated by the State Bar of
21       Michigan?
22   A.  Yes.
23   Q.  How many times?
24   A.  I'm aware of three grievances that were filed against
25       me; two of which were dismissed, I'll just say

Page 28

1        summarily, I didn't even have to reply; and one which
2        resulted in a dismissal by the attorney grievance
3        commission itself after their investigation.  I
4        remember giving a sworn statement and all and then the
5        grievant in the matter appealed to the Michigan
6        Supreme Court, as they're allowed to do under the
7        Court Rule, and the Supreme Court dismissed it -- or
8        affirmed the dismissal.
9    Q.  Can you give me the time period for each of those?
10   A.  I don't remember the two that were summarily
11       dismissed, I mean, at all.  I'll say that the only
12       times I ever had a grievance filed against me was when
13       I was with the Tenure Commission, never in any of the
14       other places that I had worked.  So I can't remember
15       the other two, but the one that had gone up to the
16       Supreme Court would have been in 2008, '9, something
17       like that.
18   Q.  Do you recall -- well, strike that.
19           You said you can't recall the exact time of
20       any of these three, but they did occur during your
21       tenure as executive director, correct?
22   A.  No, no, I said I don't recall the two.  The one that
23       went up to the Supreme Court, I'm saying, was 2008 or
24       2009.
25   Q.  Were the other two also during the time you served as




PAUL FISCHER
July 28, 2017

## Page 29

1   executive director?
2   A.   Yes.
3   Q.   Okay.  Do you recall what the nature of the grievances
4       were for each of them?
5   A.   The two that were dismissed, as I recall, had
6       something to do with the grievant being unhappy that
7       the commission, and they used my name, that I didn't
8       pursue their grievance that would get the judge
9       removed or whatever it may have been.  The third one,
10      the one at the Supreme Court had to do with a case
11      that had been prosecuted as a formal complaint and
12      there were some supporters of that judge who filed the
13      grievance against me.
14  Q.   Do you recall which judge that was who was the subject
15      of formal complaint that formed the basis of the
16      grievance against you?
17  A.   Yes.
18  Q.   Which judge was that?
19  A.   It would have been Judge Servaas, S-E-R-V-A-A-S.
20  Q.   Sir, I know you're experienced at this, but have you
21      ever been deposed before?
22  A.   Yes.
23  Q.   Okay.  How many times?
24  A.   That's a good one.  I was deposed a few weeks ago and
25      that was the first time in a long time.  I don't

## Page 30

1   remember much before that.  I know I was deposed --
2       that might have been the only time.  I mean, I
3       testified as an expert witness in a criminal case, but
4       I can't remember if it was by deposition or I was
5       actually in court.
6   Q.   Going to the one, the deposition you said you had a
7       few weeks ago, what was the nature of that matter?
8   A.   The nature of the litigation, is that what you're
9       asking?
10  Q.   Yes.
11  A.   I have filed a civil complaint against the Judicial
12      Tenure Commission and it was -- they're taking the
13      deposition of me in that matter.
14  Q.   Was that in the federal case or in the state court
15      case?
16  A.   I think the attorneys agreed they would combine them
17      and it was for both.
18  Q.   Okay.  You mentioned, I think, that you gave a
19      deposition as an expert in a criminal matter -- or you
20      weren't sure if it was testimony in court or
21      deposition, correct?
22  A.   Correct.
23  Q.   Were there any other times you've given testimony in
24      court?
25  A.   Pro/con divorce, but that would be about it.

## Page 31

1   Q.   I'm sorry, I missed the first word?
2   A.   Procon divorce.  I got divorced.
3   Q.   I'm sorry, okay.
4   A.   That was in the '80s.  I'm sure they took testimony.
5   Q.   Okay.
6   A.   I don't recall anything else.
7   Q.   You currently have two pending cases that we
8       mentioned, correct, where you're a party?
9   A.   Yes.
10  Q.   Okay.  Other than those two cases and other than the
11      divorce are there any other cases where you've been a
12      party?
13  A.   Besides the one we're sitting here in right now?
14  Q.   And besides this one, fair enough.
15  A.   Yes, I've been sued a couple of times, all stemming
16      from work with the Tenure Commission.  I don't believe
17      there's been anything else.
18  Q.   Did any of those cases where -- well, strike that.
19          In those cases you were sued, you were a
20      named defendant in some cases that involved your work
21      at the Tenure Commission, correct?
22  A.   Yes.
23  Q.   Was there ever any judgment rendered in any of those
24      cases?
25  A.   No, so other than an order of dismissal.

## Page 32

1   Q.   Fair enough.  But there was no order of any liability
2       as to you, correct?
3   A.   Correct.
4   Q.   Okay.  We sort of talked about your role as executive
5       director, but can you tell me what the role of the
6       commission itself is?
7   A.   The commission receives the grievances that are filed,
8       they receive and review every single one.  They
9       receive a report from the staff and the executive
10      director -- if I say me, I don't mean me now, I'm
11      talking about me from then -- and from me, with a
12      recommendation as to each one, whether it should be
13      summarily dismissed or whether further investigation
14      is warranted.
15          The commission meets once a month
16      basically, basically just 11 times a year for the most
17      part, so once a month, and they review all the cases
18      that are presented to them and then they decide and
19      give direction to the executive director what they
20      want done in each case; dismiss this group of 30,
21      let's continue investigation on A, B and C, et cetera.
22  Q.   And the -- if we call it the JTC you'll know we're
23      talking about the Judicial Tenure Commission --
24  A.   Yes.
25  Q.   -- that's a common acronym for it?

Pages 29 to 32



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
A U.S. Legal Support Company

US LEGAL SUPPORT
The Power of Commitment™

PAUL FISCHER
July 28, 2017

---

Page 33

1    A.  Yes.
2    Q.  The JTC was established by the Michigan constitution,
3        correct?
4    A.  Yes, by amendment to the constitution in 1968.
5    Q.  Okay.
6                MARKED FOR IDENTIFICATION:
7                DEPOSITION EXHIBIT 1
8                9:37 a.m.
9    BY MR. HIRSCH:
10   Q.  Sir, our court reporter has just handed you what we've
11       marked as Exhibit Number 1.  The cover page says State
12       of Michigan Judicial Tenure Commission, annual report
13       2014.  Do you have that in front of you, sir?
14   A.  Yes.
15   Q.  Okay.  And you were executive director during 2014 --
16   A.  Yes.
17   Q.  -- correct?
18   A.  Yes.
19   Q.  Sir, if you could look at page 1, not the Roman
20       numeral, but the actual number 1?  So it's a few pages
21       in.  It starts with a Roman numeral one at the top,
22       commission jurisdiction and legal authority, I just
23       want to orient you to that page?
24   A.  Yes.
25   Q.  And you see there's a paragraph -- well, let's start

---

Page 34

1        with paragraph -- or heading A, okay, and that's
2        titled the authority of the Judicial Tenure
3        Commission.  Do you see that, sir?
4    A.  Yes.
5    Q.  And as with anything I show you, you can certainly
6        take your time to read it at any time if you need to,
7        but I'll ask the question and if you need time to look
8        at it, feel free.  Is that accurate in terms of
9        describing the authority of the Judicial Tenure
10       Commission?
11   A.  I've read it.  What was your question, please?
12   Q.  My question just is is that accurate in terms of
13       describing the authority of the Judicial Tenure
14       Commission?
15   A.  I think I would have to answer your question that the
16       constitutional provision sets forth the authority of
17       the commission as well as the Court Rules.
18   Q.  So to the extent this differs in any way from that,
19       the constitution and the Court Rules would govern,
20       correct?
21   A.  Yes.
22   Q.  Okay.  Same question I guess as to section B, what the
23       commission -- it's titled what the commission cannot
24       do?
25   A.  Right, yes.

---

Page 35

1    Q.  Same answer?
2    A.  Yes.
3    Q.  Okay.  And as to paragraph C on the same page titled
4        judicial misconduct?
5    A.  Yes.
6    Q.  This particular report is for 2014, correct?
7    A.  Yes.
8    Q.  Okay.  Did you have any involvement in preparing this
9        report?
10   A.  Yes.
11   Q.  What was your involvement?
12   A.  I'll step back just a little bit and say that the
13       commission had always issued annual reports.  When I
14       came as the executive director or shortly thereafter,
15       another year or so, I revamped the report to make it
16       what I thought would be more user-friendly, would
17       explain things to the public and to judges and to
18       attorneys on what goes on.
19           For example, the page that you were talking
20       about, this page that's Arabic numeral one, Roman
21       numeral one, A, B and C, this type of a text was
22       prepared by me at some point when I started and
23       approved by the commission.  Every single year they
24       have to approve the report before it gets issued.
25           So this page here became more like

---

Page 36

1        boilerplate language and then each year you would get
2        to page -- for example -- like for example, page 2,
3        recent -- 2, section E, recent and anticipated changes
4        at the commission.  If there were going to be
5        something new, I would add things there, but mostly
6        was starting with Section 3, which in this exhibit is
7        on page 6, to put together the statistics to show
8        that -- the kinds of -- you know, the work that had
9        been done over the course of the year.
10           Going on to page 4 -- excuse me, page 14,
11       Roman numeral four, the case summaries, the staff
12       attorneys would prepare summaries of the various cases
13       that -- you know, public ones, the nonpublic ones,
14       and -- to try and give, again, the public judges and
15       judges some idea of the types of things that were
16       going on, maybe perhaps give example of the type of
17       behavior they shouldn't engage in.  This would all
18       then be put together, presented to the commission for
19       the commission's consideration and approval or
20       modification.
21   Q.  And so would it be fair to say that during your term
22       as executive director a report like this would be
23       submitted for the commission's approval each year?
24   A.  Yes.
25   Q.  And you and your staff would prepare the sections that

---

Pages 33 to 36



PAUL FISCHER
July 28, 2017

## Page 37

1  you just delineated?
2  A. Yes. And perhaps more, I was just looking at ones to
3  give you an idea.
4  Q. This is an example for one year and the format, you
5  would agree, was probably similar from year to year
6  but --
7  A. Yes.
8  Q. -- there would be specific things depending on a given
9  year, correct?
10 A. Yes.
11 Q. Okay. The commission itself is comprised of nine
12 members?
13 A. Yes.
14 Q. How are those members selected?
15 A. There are five judges. Four judges are selected by
16 the organization's -- their judicial organizations, so
17 the Court of Appeals has a judge, the 28 or whatever
18 number they are today, just vote and they select one
19 as a vote. I think their vote is run through SCAO as
20 well, but I'm not sure considering how small they are.
21     The circuit court judges elect one through
22 an election conducted by MJA -- may make the Court of
23 Appeals judges through MJA too as well, I just don't
24 know. District Court judges have an association the
25 election is run through -- is conducted through them

## Page 38

1  through SCAO and the probate judges as well. One
2  judge is elected by the members of the State Bar, so
3  all lawyers have the right to vote for one, and that
4  can be any of the different kind of judges; probate,
5  circuit, district, whatever.
6     No supreme justice can be elected to the
7  commission. And the State Bar members also elect two
8  lawyers to the commission and the governor appoints
9  two laypeople who are neither lawyers nor judges.
10 Q. Looking again at the 2014 report, the page we were on
11 before, Arabic numeral one, paragraph C, do you see
12 about halfway through that paragraph it gives some
13 examples of judicial misconduct that the commission
14 may investigate, correct?
15 A. Yes.
16 Q. Do you agree with those examples?
17 A. Yes.
18 Q. Can you think of any other types of conduct the
19 commission may investigate?
20 A. Anything that violates the code of conduct.
21 Q. If we could flip now to page -- to the next page,
22 page 2? Do you see about two-thirds of the way down,
23 Roman numeral -- heading titled overview of the
24 complaint to process? Do you see that?
25 A. Yes.

## Page 39

1  Q. Would that be an accurate -- and it continues on, by
2  the way, but would that be an accurate overview of the
3  complaint process for the time you served as executive
4  director?
5  A. Just look at the section A?
6  Q. Well, no, I think everything under heading Roman
7  numeral two, right, that discusses the entire
8  complaint process, correct, I mean, that's the title
9  for Roman numeral two, right?
10 A. That is the title, yes.
11 Q. Okay.
12 A. Your question is whether the description, Roman
13 numeral two, which is from pages 2 through 6, is a
14 more or less accurate description?
15 Q. Correct.
16 A. More or less accurate, yes.
17 Q. And you in fact were involved in the preparation,
18 correct?
19 A. Yes.
20 Q. Now, the JTC's objective is to enforce high standards
21 of ethical conduct for judges, correct?
22 A. Yes.
23 Q. And judges must be held accountable by an independent
24 disciplinary system when they commit misconduct,
25 correct?

## Page 40

1  A. I don't know, I mean, I'm not sure what you're quoting
2  from the constitution. It's not in the constitution,
3  so I don't know.
4  Q. Well, let me refer you then -- going back to
5  paragraph -- I'm sorry, page 1 of Exhibit 1, Arabic
6  numeral one, section 1A. And it's about -- a little
7  more than halfway down and there's a sentence that
8  reads however, they must also be held accountable by
9  an independent disciplinary system should they commit
10 misconduct. Do you see that sentence?
11 A. Yes.
12 Q. Okay. And the they in that sentence is referring to
13 judges, correct?
14 A. Yes.
15 Q. Okay. And so do you agree with that statement?
16 A. Do I personally agree with that?
17 Q. Yes.
18 A. Yes, I do.
19 Q. And you agreed with it professionally in your capacity
20 as executive director, correct?
21 A. Yes, I do.
22 Q. You may have written that statement, right?
23 A. I may have. I may have written it for the commission,
24 it's the commission's statement.
25 Q. Correct. You may have been the drafter who submitted



PAUL FISCHER
July 28, 2017

Page 41

1 it to the commission for approval, right?
2 **A. Correct, yes.**
3 Q. So the commission certainly agrees with that
4 statement, correct?
5 **A. I know that they approve it. I can't tell you if they**
6 **agree with it or not.**
7 Q. Unlikely they would approve something they didn't
8 agree with, correct?
9 **A. I don't know.**
10 Q. So we're not sure if the commission may be approving
11 things that they don't agree with; is that right?
12 **A. I don't know.**
13 Q. Okay. During your time as executive director did you
14 ever come across a situation where a judge engaged in
15 conduct that appeared to violate the Code of Judicial
16 Conduct but the commission chose not to investigate?
17 MR. NELSON: I'm sorry, could you repeat
18 the question, I'm not sure I caught it all?
19 BY MR. HIRSCH:
20 Q. Okay. During your time as executive director -- well,
21 let me ask a slightly -- I'll rephrase it slightly.
22 So during your time as executive director
23 were you ever aware of a situation where a judge
24 appeared to engage in conduct that violated the Code
25 of Judicial Conduct, but the JTC chose not to

Page 42

1 investigate further?
2 **A. I'm sure there were, I can't specifically recall.**
3 Q. So you couldn't recall any particular matters,
4 correct?
5 **A. I can recall certain cases that the commission chose**
6 **not to pursue things after an investigation, but**
7 **that's their right. I'm not aware of the commission**
8 **ever saying no, do not investigate a matter.**
9 Q. Well, let me ask a slightly different question based
10 on your answer --
11 **A. I should say they may say we're not opening a file,**
12 **but they've never said we're not going to investigate**
13 **a matter.**
14 Q. Let me ask a slightly different question to make sure
15 I understand. In your capacity as executive director
16 have you ever become aware of behavior that might on
17 its face appear to violate the Code of Judicial
18 Conduct and you did not request authority from the
19 commission to investigate?
20 **A. Did I ever become aware and I -- and then in that case**
21 **I did not request authority?**
22 Q. You let --
23 **A. Can I say it my way?**
24 Q. Yeah, go ahead.
25 **A. If I became aware of what seemed to be judicial**

Page 43

1 **misconduct, in every such case that I can recall I**
2 **would recommend the commission do something, open a**
3 **file and do some investigation.**
4 Q. Okay.
5 **A. Is that what you were trying to ask?**
6 Q. Yes, I think you got it right. And the commission you
7 said may have on some occasions not granted your
8 request to investigate, correct?
9 **A. Yes.**
10 Q. You couldn't remember any particular ones now,
11 correct?
12 **A. Correct.**
13 Q. There are a number of ways that an investigation can
14 commence in the JTC, correct?
15 **A. Yes.**
16 Q. Okay. The executive director can choose to open and
17 investigative file in his discretion; is that
18 correct?
19 **A. That's what the internal operating procedures allow,**
20 **but when I was executive director I never did that.**
21 **So the answer to your question is yes.**
22 Q. But during your time as executive director you did not
23 ever open an investigative file in your own
24 discretion?
25 **A. Correct.**

Page 44

1 Q. You would always ask the commission, correct?
2 **A. Yes, always.**
3 Q. And only if they approved the request would you
4 continue the investigation during your time, correct?
5 **A. Correct.**
6 Q. The commission itself can open an investigation on its
7 own initiative; is that correct?
8 **A. Yes.**
9 Q. And if the commission did that would they communicate
10 that to the executive director?
11 **A. Yes.**
12 Q. Okay. And how would that get communicated to the
13 executive director?
14 **A. Generally would be at one of the monthly meetings. It**
15 **could also be by -- you know, sometimes things are**
16 **done by e-mail.**
17 Q. Was there ever a time during your tenure as executive
18 director that the commission told you they wanted or
19 they were going to open an investigation that you had
20 not previously brought to their attention?
21 **A. It's possible, I don't specifically recall, but what**
22 **you just said doesn't seem so far-fetched that it**
23 **never happened, so if it did it would have been one or**
24 **two times. I don't specifically recall any instances**
25 **though.**




PAUL FISCHER
July 28, 2017

Page 45

1  Q.  The Michigan Supreme Court can also make a request for
2      investigation: is that correct?
3  A.  I'm not sure if it's the court or if it's the chief
4      justice, but, yes.
5  Q.  Okay.  If the Supreme Court or the chief justice makes
6      a request does the commission also have to approve
7      going forward with the investigation?
8  A.  Yes.
9  Q.  Do you recall if it ever happened during your tenure
10     that the Supreme Court or the chief justice made a
11     request for investigation?
12 A.  Yes.
13 Q.  Okay.  Do you recall what cases that occurred in, case
14     or cases?
15         MR. NELSON:  Just a second here.
16         MS. MILLER:  I'm going to place an
17     objection as to any specific cases that did not result
18     in formal complaints, in that that would not be
19     covered by the list that was already provided.
20 BY MR. HIRSCH:
21 Q.  Okay.  Well, based on that objection then let me first
22     limit that particular question to cases that then
23     resulted in formal complaints, if you know?
24 A.  So can you give me the whole question again now?
25 Q.  So let's limit it -- we'll start by limiting it to

Page 46

1      cases that resulted in formal complaints because --
2  A.  Give me it again.
3  Q.  Okay.  The it is do you recall a situation -- I think
4      I may have forgotten the it.
5  A.  See.
6  Q.  There you go.
7      Actually, can you read back the question?
8      (The following requested portion of the
9      record was read by the reporter at
10     9:59 a.m.:
11     Q.  Do you recall if it ever happened during
12     your tenure that the Supreme Court or the
13     chief justice made a request for
14     investigation?
15     A.  Yes.
16     Q.  Okay.  Do you recall what cases that
17     occurred in, case or cases?)
18 BY MR. HIRSCH:
19 Q.  So can we limit it to cases that resulted in formal
20     complaints, do you recall the ones that were initiated
21     by the Supreme Court or the chief justice making the
22     request?
23 A.  There were none.
24 Q.  Okay.  But that did occur in some cases, without
25     identifying which cases those were, correct?

Page 47

1  A.  I can only remember one, yes.
2  Q.  Okay.
3  A.  It was not your client, by the way.
4  Q.  Well, it couldn't be, right, because hers resulted in
5      a formal complaint, right, and you would have named
6      that one?
7          With respect to the one you can recall,
8      without mentioning the name, did the commission then
9      approve the investigation?
10 A.  I don't recall.
11 Q.  Okay.  With respect to matters that begin on the
12     commission's own initiative, do you know how those
13     matters would come to the commission's attention?
14 A.  Yes.
15 Q.  How?
16 A.  There would be a number of ways.  One, I would suggest
17     it to them by presenting them with a recommendation
18     that they open a file and do X, Y or Z as part of a
19     preliminary investigation.  Sometimes the
20     commissioners themselves would see a story on the news
21     or in the paper or the like.
22         We would sometimes get anonymous letters
23     complaining about a particular judge.  And if I -- I
24     mean, I don't mean to go back to what you were saying
25     before where the commission didn't open up a case, but

Page 48

1      that would be the most frequent time where they would
2      not open up a case, an anonymous letter alleging some
3      type of misconduct.  So that's what I can -- all I can
4      recall.
5  Q.  So those are some examples --
6  A.  Yes.
7  Q.  -- anonymous letters, the media, suggestion from you
8      as executive director, correct?
9  A.  Correct, right, yes.  My suggestions, it would also
10     come from these anonymous letters or from the media or
11     something like that.
12 Q.  Because you would read letters that would come into
13     the commission, correct?
14 A.  Yes.
15 Q.  Including anonymous letters?
16 A.  Yes, yes.
17 Q.  You might hear reports in the media, correct?
18 A.  Yes.
19 Q.  Or someone may bring those reports to your attention,
20     correct?
21 A.  Yes.
22 Q.  Okay.  Now, in those cases there would not be a
23     request for investigation, correct?
24 A.  Ones that -- where I had suggested to the commission
25     or the commission itself had come up with the notion

Pages 45 to 48



PAUL FISCHER
July 28, 2017

## Page 49

1    to open a file?
2    Q.   Correct.
3    A.   Correct, there would not be a request for an
4         investigation form.
5    Q.   Okay.  So if we were reviewing the files, the way we
6         could determine which requests began sort of
7         internally at the JTC, we could identify those because
8         there would not be a request for investigation; is
9         that correct?
10   A.   That would probably work.  Cases are also coded, who
11        the grievant is, the status of the grievant, whether
12        it's, you know, a litigant, a non-litigant, a
13        prisoner, a prisoner is a subset of litigant, litigant
14        on the underlying cases, and the JTC itself had a code
15        so that would show up as the grievant status code.
16        Those are the types of things that are reported in the
17        annual report.
18   Q.   Okay.  So the example -- when you say that those are
19        cited in the annual report, if you look at Exhibit 1,
20        page 9, section G, that's -- that would be the -- an
21        example of the section you're talking about, correct?
22   A.   Yes.
23   Q.   Okay.  And so in this particular example it was .78
24        percent were initiated by the JTC in this particular
25        year.  Am I reading that correctly?

## Page 50

1    A.   Yes.
2    Q.   What's the section then that's labeled other, if you
3         see towards the right and it says .47 percent, what
4         would fall into that category?
5    A.   I don't recall.
6    Q.   Okay.  And the section -- I'm sorry, still looking at
7         that pie chart, page 9, the section labeled state
8         court administrator?
9    A.   Yes.
10   Q.   Would that also include the Supreme Court?
11   A.   No.
12   Q.   Okay.  What would any request from the Supreme Court
13        fall under?
14   A.   That might fall under other because I don't think we
15        had a specific category for Supreme Court justices, as
16        I say, I only remember the one time.  It might fall
17        under other judges, I don't know.
18   Q.   Okay.  Would the commission ever independently review
19        court records without receiving a request for
20        investigation?
21   A.   When you say the commission, do you mean the
22        commissioners themselves or the staff of the
23        commission?
24   Q.   Well, when we talk about investigation, right, the
25        commission would act through you and your staff,

## Page 51

1    correct, at the investigation stage; is that fair?
2    A.   Yes.
3    Q.   Okay.  The commissioners wouldn't personally conduct
4         the investigation, right?
5    A.   Not to the best of my knowledge.
6    Q.   Okay.  And so at that point before a formal complaint,
7         that's when you were acting in a capacity as
8         performing investigation for the commission, correct?
9    A.   Yes.
10   Q.   And that's what we talked about earlier where the
11        duties changed at some point?
12   A.   Yes.
13   Q.   And the point was the filing of a formal complaint?
14   A.   Yes.
15   Q.   Okay.  So barring the commission doing --
16        commissioners personally doing anything you didn't
17        know about, would you, directly or through your staff,
18        ever investigate court files without receiving a
19        request for investigation?
20   A.   No, not that I can recall.
21   Q.   Now, the State Court Administrator's Office can file a
22        request for investigation, correct?
23   A.   Yes.
24   Q.   Okay.  Those don't need to be under oath from the
25        State Court Administrator's Office, correct?

## Page 52

1    A.   Yes.
2    Q.   Could the State Court Administrator's Office ever just
3         provide some information to the JTC about some judge?
4    A.   Could they?  I suppose they could.
5    Q.   Okay.  Did they during your tenure?
6    A.   Not -- so I'll have to answer the question I think
7         this way, is that occasionally -- frequently I'm --
8         from time to time I would encounter members of the
9         State Court Administration, different regional
10        administrators at different meetings we would have and
11        sometimes they would talk about judges.  So is that
12        providing information?  I don't know if I can answer
13        that.  The topic of judges and specific judges would
14        come up during these encounters.
15   Q.   Did any of those encounters ever lead to an
16        investigation during your tenure as executive
17        director?
18   A.   Not without a written request from the State Court
19        Administrator or the Regional.
20   Q.   And, sir, just for some clarity on language, I think
21        I've generally been calling them request for
22        investigation.  I've also heard it called a grievance,
23        correct?
24   A.   Correct.
25   Q.   Are those terms synonymous?

Pages 49 to 52




PAUL FISCHER
July 28, 2017

Page 53

1  A.  Interchangeable, yes.
2  Q.  Okay.  Anyone may file a request for investigation,
3     correct?
4  A.  Yes.
5  Q.  Those have to be under oath, other than from the State
6     Court Administrator's Office or the Supreme Court,
7     correct?
8  A.  Yes.  Again, I think it's the chief justice, but, yes.
9  Q.  Okay.  You may be right, I'm not sure, but fair
10    enough.  In those cases where there is a request for
11    investigation submitted, who first reviews it when it
12    arrives at the JTC?
13 A.  So the first person would be one of the administrative
14    staff who is opening up the mail and puts them -- all
15    the request for investigations that have come in for
16    that day or that week in a pile.
17 Q.  That's just a sort functioning, they're not doing any
18    analysis, correct?
19 A.  There's some.  They'll take a look at the name of the
20    judge and run a report on the database to see how many
21    other grievances have been filed against that
22    particular judge and do the same type of thing for the
23    grievant, to see how many judges that particular
24    grievant has filed against.
25 Q.  Okay.  And would they print out that information or

Page 54

1     make a note of it then along with the grievance that
2     came in?
3  A.  It would be printed out, yes.
4  Q.  And so then those got put in a stack of grievances to
5     be reviewed, correct?
6  A.  Yes.
7  Q.  Okay.  Then what was the next step in the process?
8  A.  They would come to me.
9  Q.  Okay.  And then what would you do when you would go
10    through each grievance on that stack?
11 A.  I would review the grievance.  I would read through
12    what was there, see what the nature of the grievance
13    was so that I could give it the nature of grievance
14    code, the numbers that we had provided you certain
15    grievances with under the discovery request.
16        So for example, and I don't remember the
17    specific numbers anymore, but, you know, like put a
18    one in it or a six and -- I think six was -- or no,
19    ten.  Ten is the one that's a review -- or appellate
20    review, if I remember right.  So you could see that it
21    was just asking to have the matter reviewed, they
22    weren't happy with the decision, get a ten.
23        I would assign it to an attorney, one of
24    the staff attorneys, and then I would make a
25    recommendation of some kind; I think this is just a

Page 55

1     summary dismissal, please review, or I think this
2     needs to get investigated, we need to do -- you know,
3     talk to X, Y or Z, let's talk.
4  Q.  So, first of all, we talked a little bit about codes a
5     second ago, right, in your answer?
6  A.  Yes.
7  Q.  Let's make sure we're on the same page on those.
8             MARKED FOR IDENTIFICATION:
9             DEPOSITION EXHIBIT 2
10            10:12 a.m.
11 BY MR. HIRSCH:
12 Q.  Sir, our court reporter has just handed you what we've
13    marked as Exhibit Number 2, a document.  At the top it
14    says grievance codes.  Do you have that in front of
15    you, sir?
16 A.  Yes.
17 Q.  Okay.  And that's a list of the codes you were
18    referring to in your answer; is that correct?
19 A.  Yes.
20 Q.  And the review you spoke of, that would be the initial
21    review that you'd perform under the internal operating
22    procedures, correct?
23 A.  Yes.
24 Q.  Okay.  And when you said -- I think you said you wrote
25    down the code; is that correct?

Page 56

1  A.  I used to write it down on a little pad.  Now it would
2     get entered into the computer on the database.
3  Q.  Okay.  So now they're coded electronically in a
4     computer system?
5  A.  Yes.
6  Q.  Okay.  Before that would you write it on the grievance
7     itself or you had some other --
8  A.  A notepad.
9  Q.  Okay.  And so -- just so I understand what was written
10    on the notepad, how would you know that the code was
11    associated with a particular grievance, it would be by
12    the name of the grievant, the name of the judge, what
13    would be the connection --
14 A.  So --
15 Q.  -- if you recall?
16 A.  -- in the notepad days, is that what you're asking,
17    how was --
18 Q.  I guess in -- well, strike that.  Let me maybe ask a
19    simpler question.
20        Do you remember when the notepad days ended
21    and the computer days began?
22 A.  Not really.  It's shortly after I came because I tried
23    to computerize the system.  It was difficult to find
24    older cases and generate the list for a judge, what
25    that judge -- previous contacts with the commission

Pages 53 to 56



PAUL FISCHER
July 28, 2017

## Page 57

1    had been. Computerizing it made it easier and it was
2    sometime shortly after I came, but I can't say exactly
3    when.
4  Q.  Okay. So there was a period of time when you were
5    notating these codes without the use of the computer
6    system, correct?
7  A.  Yes.
8  Q.  Okay. So just do you recall then how you linked up
9    the code to a particular grievance precomputer?
10 A.  Yes. So there were computerized records just kept,
11   they just weren't in a database where they could be
12   easily accessed. And when I would write, like let's
13   just say a ten, you know, a review of the ruling, on
14   the sheet, it would go into the file with that judge's
15   case. It would go to one of the other executive
16   assistants, who would then type it into the computer.
17      So it was -- you know, I don't want to call
18   it an Excel spreadsheet, but maybe it was something
19   like that that was -- maybe things were kept track of.
20   And then, because we had this -- maybe 10 or 15 years
21   worth of data in this non-searchable kind of database,
22   when they tried to make a computer system, a database
23   system for us, it had to incorporate those. It became
24   a little bit difficult, which was why we couldn't
25   change or modify some of these categories. So we

## Page 58

1    would be able to search into the older recorded system
2    and still continue making a database that would be
3    searchable, if that makes sense.
4  Q.  Okay. In any event, you as executive director would
5    be the one who assigned the code, correct?
6  A.  Yes.
7  Q.  A particular grievance could have more than one code;
8    is that correct?
9  A.  Yes.
10 Q.  And you would use your judgment to put a particular
11   grievance into one of these code categories that we
12   have in Exhibit 2, correct?
13 A.  One or more, yes.
14 Q.  One or more. Could the codes change then over the
15   course of the, I guess, investigation until there was
16   a resolution?
17 A.  I guess it could. I'm not aware that it ever did.
18 Q.  Were you the only person who was allowed to assign
19   codes?
20 A.  I don't know that I was the only one allowed to, I was
21   the only one who did.
22 Q.  Okay. I mean, did you have any policy as to whether a
23   staff attorney could modify a code you would assign?
24 A.  I know that there were times when we did change
25   something, but I don't know if it was the nature of

## Page 59

1    the litigation or the nature of the grievance. I know
2    that we did change things very rarely, I mean, I
3    couldn't tell you how many times, but it was a rare
4    thing. You know, perhaps I wrote the wrong number
5    down or they thought it should have been something
6    else, but rare.
7  Q.  I just want to make sure I'm clear then on some of
8    these codes. So I'm looking at Exhibit 2?
9  A.  Yes.
10 Q.  Code one is courtroom demeanor, correct?
11 A.  Yes.
12 Q.  And you recall in this case we had some discussion
13   about producing files based on these codes, correct?
14 A.  Yes.
15 Q.  Do you remember that discussion?
16 A.  Yes.
17 Q.  And courtroom demeanor was a code that was not going
18   to be included in the production because there were
19   too many of those. Do you recall that?
20 A.  I don't recall, no.
21 Q.  Okay. Would you agree with me that there were a lot
22   of files that got coded one?
23 A.  Yes.
24 Q.  Okay.
25 A.  One, six and ten were the biggies.

## Page 60

1  Q.  Okay. Would it also be fair to say, and I want to
2    focus on just number one now --
3  A.  Yes.
4  Q.  -- that those generally would not result in a formal
5    complaint, correct?
6  A.  There were formal complaints that came from grievances
7    that had -- that were coded 01.
8  Q.  But not during the time period we've been discussing
9    in this case, correct?
10 A.  What time period is that?
11 Q.  From 2001 through 2011 roughly?
12 A.  No, that's not true, there was definitely one.
13 Q.  Do you recall which one that was?
14 A.  Warfield Moore.
15 Q.  Was that the -- well, strike that.
16      Do you recall if that was the only code
17   assigned to the Warfield Moore matter?
18 A.  No, I don't, I don't recall.
19 Q.  If we could look over at Exhibit 1 now, on page 10,
20   that's the page following the pie chart we looked at
21   before?
22 A.  Okay.
23 Q.  And this seems to have a pie chart labeled type of
24   grievances. Do you see that?
25 A.  Yes.




PAUL FISCHER
July 28, 2017

Page 61

1  Q.  One thing it says here, for example, is demeanor.  Do
2     you see that?
3  A.  Yes.
4  Q.  Okay.  And it says -- I think it says 1 percent, it is
5     a little hard to read?
6  A.  Yes.
7  Q.  Okay.  And that 1 percent on this chart is referring
8     to 1 percent of the total grievances received by the
9     commission in this particular year, 2014, 1 percent of
10    those were categorized as courtroom demeanor; is that
11    correct?
12 A.  Yeah.  Again, I don't know how entirely accurate these
13    are, given that some of them could have more than one
14    and it was, again, part of the problem that it was
15    kind of a jerry-rigged system so we could keep track
16    of things.  The subject matter grievance, the code,
17    was less important than getting the file open, but we
18    needed something just because as bureaucrats we like
19    to keep track of things.  So I don't know that it's --
20    that that's what it was, 1 percent, or it would be
21    something other than that.
22 Q.  Well, let me ask you this then about the chart --
23 A.  Yeah.
24 Q.  -- to the extent a grievance had only one code, purely
25    hypothetically, let's say it was only coded one for

Page 62

1     courtroom demeanor, that would be put in the category
2     labeled demeanor on this chart; is that correct?
3  A.  That's what I would understand.
4  Q.  And if it had -- if a particular grievance had more
5     than one code you would choose a category from the
6     categories that had been assigned to the grievance, it
7     would go in only one of those, right?
8  A.  Yeah, I don't know.
9  Q.  Okay.  Well, if it went in more than one you might
10    have a problem because you might get more than 100
11    percent, right?
12 A.  But that's what would happen.  I think there's notes
13    in there somewhere that they don't necessarily always
14    add up because of that.
15 Q.  Okay.  Looking at code number two, which the
16    description says intemperance.  Do you see that?  And,
17    I'm sorry, I'm looking on, again, at Exhibit Number 2.
18 A.  Yes.
19 Q.  Do you have that in front of you?
20 A.  Yes.
21 Q.  What's the difference between, if there is any,
22    between intemperance and courtroom demeanor?
23 A.  Well, I didn't make these codes, they were there when
24    I came and I think that that intemperance was meant
25    more for being drunk, that kind of intemperance.

Page 63

1  Q.  So something of -- a more antiquated --
2  A.  Yes.
3  Q.  -- definition of the word intemperance, correct?
4  A.  Yes.
5  Q.  Okay.  So to the extent you applied the codes at
6     least, that's how you would have applied them,
7     right --
8  A.  Yes.
9  Q.  -- intemperance to mean drunk, let's say?
10 A.  I mean, I think there was a Supreme Court case that
11    talked about it, you know, it was a judicial
12    discipline decision.  I think they specifically talked
13    about intemperance meaning being drunk in court.
14 Q.  Okay.
15 A.  I don't think I ever used that code.
16 Q.  Okay.  Good, glad that didn't come up, I guess.
17 A.  I didn't say that.
18 Q.  Okay.  Code three, practicing law.  Just to make sure
19    I'm clear, I assume that means a judge engaging in
20    some kind of private practice of law outside his or
21    her judicial duties; is that correct?
22 A.  Yes.
23 Q.  Okay.  Code six talks about prejudice or partiality.
24    What sort of grievances would fall into that category?
25 A.  If it seemed that the judge was more favorable towards

Page 64

1     or anti one of the parties or the lawyers for whatever
2     reason, it may be friends, anything.
3  Q.  And we talked a little bit earlier, that was one of
4     the codes that was not produced in this case, correct?
5  A.  I don't know.
6  Q.  Okay.  Well, I think you said earlier codes one, six
7     and ten were the big number -- together were the big
8     number of grievances --
9  A.  Yes.
10 Q.  -- correct?
11 A.  Yes.
12 Q.  Okay.  But if you look again over at Exhibit 1 on the
13    same chart, page 10, it looks to me like prejudice,
14    partiality -- and again, it's slightly hard to read,
15    but I think it is saying 1 percent; am I reading that
16    correctly?
17 A.  Yes, that's what it looks like to me.
18 Q.  Okay.  Skipping down to code eight, that says -- the
19    description is physical or mental.  Do you see that?
20 A.  Yes.
21 Q.  And just so I'm clear, that would be referring to
22    either a physical or a mental disability of some kind;
23    is that correct?
24 A.  Yes.
25 Q.  Okay.  And going down to code number ten, the



PAUL FISCHER
July 28, 2017

---

Page 65

1   description is review rulings.  Do you see that?
2   A.  Yes.
3   Q.  And again, I think we said that together code one, six
4       and ten made up a big portion, correct?
5   A.  Yes.
6   Q.  Now, if we look at the chart again on Exhibit 1, page
7       10, review legal ruling.  At first I assume that's the
8       same as review ruling, correct?
9   A.  Yes.
10  Q.  That's code ten.  So that is a big percentage, right,
11      it looks like 91 percent for 2014?
12  A.  But that seems really outside the --
13  Q.  Is it by far the biggest, right?
14  A.  Yeah.
15  Q.  Okay.  And that would be something that the JTC in
16      fact does not review, right, that's outside its
17      authority, right?
18  A.  Right.  So it reviews it in the sense that they decide
19      that they're not going to review it.  They review
20      every single case, as I said.
21  Q.  Correct.  But addressing the substance of a legal
22      ruling is not something the JTC does, correct?
23  A.  Correct.
24  Q.  That's the job of a higher court, if there is one,
25      right?

---

Page 66

1   A.  Correct.
2   Q.  Okay.
3   A.  Yes.
4   Q.  Code 14, the description is miscellaneous and, you
5       know, I assume that's something of a catchall,
6       correct?
7   A.  Yes.
8   Q.  But I guess my question is can you recall anything
9       that -- any category of things that might get
10      categorized as miscellaneous?
11  A.  I don't recall.
12  Q.  Okay.  Going to code 17A, the description is 6.500
13      motions.  Do you see that?
14  A.  Yes.
15  Q.  Okay.  Is that referring to MCR 6.500?
16  A.  Right.  There was a time when there seemed to be an
17      influx of prisoners complaining about the delay in
18      their 6.500 motions being heard and so we gave it a
19      separate category because we didn't want it in all the
20      delay cases, so we broke that one out.  That was while
21      I was there that we came out with 17A.
22  Q.  Okay.  So it is -- so 17 is sort of complaints about
23      docket delay generally, correct?
24  A.  Yes.
25  Q.  But you specifically broke out a 17A because there was

---

Page 67

1   a large volume of alleged docket delays with respect
2   to postjudgment relief, right?
3   A.  Yes.
4   Q.  Okay.  Now, when you would complete your initial
5       review and assign a code, you would then assign it to
6       a staff attorney, correct?
7   A.  Yes.
8   Q.  How did you decide which staff attorney would be
9       assigned a particular grievance?
10  A.  That's where the past -- you know, the judge's past
11      history with the commission would come in.  I tried to
12      keep one staff attorney with the same judge so that
13      they would have, you know, some standard by which to
14      review matters.
15          I mean, if it was a demeanor thing, for
16      example, which was a typical type of thing, they could
17      say no, no, that judge frequently says that kind of
18      thing and that's just par for the course of that judge
19      and it's not -- not beyond the pale or whatever it may
20      be.  Or look, the judge did the same thing three
21      times, it's time -- instead of it getting dismissed,
22      the commission should take a more serious look at it.
23          So I tried to keep it with the same
24      attorney or if I could see that it was more likely
25      than not that the particular grievance was going to

---

Page 68

1   end up as a formal complaint, then I would try to
2   direct it towards somebody who would be a trial
3   attorney.
4   Q.  So one thing you would do is if there was a prior
5       grievance against the particular judge, you would know
6       that because your administrative staff would look that
7       up, I think you told me, on intake --
8   A.  Right.
9   Q.  -- right, they would check if there had been a prior
10      grievance?
11  A.  Yes.
12  Q.  Would they also give you the name or names of the
13      staff attorneys who had worked on any prior grievance?
14  A.  No, I looked that up.
15  Q.  Okay.  And so if that were true, you would try --
16  A.  Let me take that back.  It was probably listed on
17      the -- with the judges form because the judge would --
18      on the sheet that would have the judge's name that was
19      to be generated by the intake, it would have the list
20      of grievances and it would have the disposition.  So,
21      I mean, it saying it was dismissed, dismissed,
22      dismissed or admonishment or whatever it may have
23      been, and the attorney's code would have been there,
24      their initials.
25  Q.  Okay.  And so to the extent that attorney was still on

---

Pages 65 to 68



PAUL FISCHER
July 28, 2017

## Page 69

1  staff, because this may have changed over time, right?
2  **A.  Right.**
3  Q.  You would assign it to that particular staff attorney?
4  **A.  Yes, except for an occasional adjustment just for**
5  **docket management, to make sure that one person wasn't**
6  **getting too many.  I tried to keep it even.  So, you**
7  **know, it may have been one attorney for 50 cases and**
8  **then it might go to another one for one case just to**
9  **make sure that things balanced that particular month**
10 **or over two months and then it would go back to the**
11 **original attorney again.**
12 Q.  So part of your job as executive director was to make
13 sure that workloads were balanced, correct --
14 **A.  Yes.**
15 Q.  -- that would be fair?
16 **A.  Yes.**
17 Q.  Okay.
18 **A.  That's how I saw it.**
19 Q.  Well, that's what you did?
20 **A.  That's what I did.**
21 Q.  Okay.  And if a grievance came in that was new, there
22 had not been any prior grievance against that judge,
23 what factors would you consider in deciding who to
24 assign it to?
25 **A.  If it were the type of case that I could see it was**

## Page 70

1  **going to be a formal complaint type of case or would**
2  **otherwise be more involved, I would give it to one of**
3  **the more -- to the trial attorneys and if it was just**
4  **anybody, like a newbie judge who just came on, then**
5  **whoever had the least number of cases that month would**
6  **get it.**
7  Q.  So, first of all, when you say trial attorneys, is
8  that any different than the staff attorneys, I'm not
9  sure I understand?  Are you just saying more
10 experienced staff attorneys?
11 **A.  Yeah, so the two attorneys who started while I was**
12 **there, that would be Glenn and Margaret, Maggie, were**
13 **the two attorneys who would try cases.  Cas didn't try**
14 **cases.**
15 Q.  So then Cas would be more likely to get cases that
16 upon your initial review you did not think were likely
17 to go to a formal complaint?
18 **A.  No, because he would do the investigations as well and**
19 **then if it was -- if it were a case of his that were**
20 **going to go to a formal complaint, then one of the**
21 **trial attorneys would come in and they would sort of**
22 **tag team it for a while.**
23 Q.  Was there a reason that Cas was not a trial attorney?
24 **A.  He didn't want to be.**
25 Q.  Okay.

## Page 71

1  MR. NELSON:  Is this probably a good time
2  right now to take a short break?
3  MR. HIRSCH:  Yeah, I think you're right.
4  MR. NELSON:  We've been going for about 90
5  minutes so --
6  MR. HIRSCH:  Sure, okay.  Let's take a
7  break.
8  (Recess taken at 10:32 a.m.)
9  (Back on the record at 10:43 a.m.)
10 BY MR. HIRSCH:
11 Q.  Okay.  Mr. Fischer --
12 MR. NELSON:  Hold on a minute.  I believe
13 Mr. Fischer may have a previous clarification from a
14 previous answer.
15 **A.  Regarding the chart that's on page 10 that shows**
16 **review legal ruling, 91 percent?**
17 BY MR. HIRSCH:
18 Q.  Right.
19 MR. NELSON:  Page 10 of Exhibit 1, correct?
20 THE WITNESS:  Right, yes.
21 BY MR. HIRSCH:
22 Q.  Okay.
23 **A.  So as I recall, when a case is closed it gets closed**
24 **with just one code and the code is then based on the**
25 **form letters that we have for sending out to both the**

## Page 72

1  grievant and to the judge and those are based on
2  how -- for example, it will say something like, you
3  know, the commission determined that this was an
4  appellate matter and without merit or an appellate
5  merit or without merit.
6  If it was an appellate matter it was
7  getting a ten and if it was -- something that was just
8  taking the one code rather than anything else that may
9  have been there.  So it gets based on the closing code
10 rather than the opening code and just one closing
11 code.
12 Q.  So there would always be exactly one closing code,
13 correct?
14 **A.  As I understand that.  I wasn't involved with how that**
15 **would come out, but I know that there were only a**
16 **certain number of form letters that could go and there**
17 **isn't one that would say it was determined that yours**
18 **is based on courtroom demeanor so it was dismissed, it**
19 **would have been without merit.**
20 Q.  When you say you weren't involved with that, does that
21 mean that you were not the person who picked the
22 closing code?
23 **A.  I wasn't the person who picked the letter that would**
24 **go out to the grievant.  There were only, like I say,**
25 **going to be three, four, five letters and the letters**

Pages 69 to 72



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
A U.S. Legal Support Company

US LEGAL SUPPORT
The Power of Commitment™

PAUL FISCHER
July 28, 2017

Page 73

1    would say basically without merit, which covered
2    everything else other than this was determined to be
3    an appellate matter, so that's why the closing one,
4    delete, review legal ruling one, is so high.
5    Q.  Okay.  I think we were talking a little bit before the
6    break about your assignment of grievances to staff
7    attorneys.  Do you recall that?
8    A.  Yes.
9    Q.  And we talked a little bit about Mr. Swastek, Cas,
10   right?
11   A.  Yes.
12   Q.  He wasn't one of the trial attorneys because he didn't
13   want to do that particular work, correct?
14   A.  As I understood it, yes.
15   Q.  Well, I mean, did he ever convey that to you?
16   A.  Probably in the very beginning.  It's not the kind of
17   thing that we talked about, it was just a given that
18   he wasn't going to try any cases.
19   Q.  So given that the other two staff attorneys at a given
20   time, barring any position from being filled, would be
21   what you've been calling trial attorneys, would Cas
22   then be responsible for a greater percentage during
23   the investigation phase to balance the workload?
24   A.  No.
25   Q.  Okay.  You would try to distribute those evenly among

Page 74

1    your staff attorneys?
2    A.  Yes.
3    Q.  Within the criteria we talked about before?
4    A.  Yes.  I would sometimes slow things down when one of
5    them was in trial and then just pick it up more after
6    the trial was over, so that by the end of the year
7    they were more or less on par.
8    Q.  On par in terms of grievances that they had been the
9    staff attorney investigating?
10   A.  Right, so at the end of the year, the number of
11   grievances divided by three, each one would have
12   gotten --
13   Q.  Roughly --
14   A.  -- roughly the same number, right.
15   Q.  Now, would the staff attorney who was assigned to the
16   investigation be the trial attorney so long as it
17   wasn't Cas: in other words, would they follow -- would
18   that particular attorney follow it all the way through
19   if it came to that?
20   A.  Yes.
21   Q.  Okay.  And if Cas was assigned to it and it got to the
22   point of a formal complaint and a hearing, right, a
23   trial -- like hearing, let's call it, then Cas, as you
24   said, would not be on it because he didn't want to do
25   that sort of work, right?

Page 75

1    A.  No, he would -- I don't know that it ever came to be.
2    I know we came close, but he would have been second
3    chair or third chair.  He would have been there, he
4    just would not have been trying the case.
5    Q.  Okay.  So then how would you pick then from the other
6    two staff attorneys who would be then -- I guess you
7    would be -- well, strike that.
8            Would you always be the lead examiner at a
9    hearing on a formal complaint?
10   A.  No, I was until we started -- until the two trial
11   attorneys, so Glenn and Maggie came.  When they came,
12   they took the cases and I would second chair.
13   Q.  Okay.  So if it did get to the point where a case that
14   Cas was the staff attorney on and it was going to go
15   to a hearing, you would pick then whether Glenn or
16   Maggie, if it was in that time frame, would be the
17   first chair?
18   A.  Yes.
19   Q.  Okay.  Now, when you would give -- well, strike that.
20            When you assigned the staff attorney, what
21   material would you give to them when you said you're
22   going to handle this matter?
23   A.  When the grievance comes in it's opened, put into a
24   file, those couple of pages that I described with the
25   judge's history and the grievance history are in the

Page 76

1    file, and then my note, whether it was that pad or a
2    printed version of it off of my computer with my
3    recommendation, all go in the file.  That's what the
4    staff attorney would get.
5    Q.  I'm sorry, now, what was your recommendation?
6    A.  So there would be a page that would have -- it would
7    have the grievant's name, it would have the coding --
8    the code that was --
9    Q.  Right.
10   A.  01, whatever it would be, would be on there.  And it
11   would be -- you know, have the attorney's name, please
12   review this or whatever I said to do.  I think this is
13   a summary dismissal, please review.  I think we should
14   do whatever, what do you think.  It would be like
15   that.  That one sheet would go in there as well.
16   Q.  So when you said your recommendation, that would be
17   what you, I think, described earlier as your sort of
18   initial take on the case --
19   A.  Yes.
20   Q.  -- correct?
21            Okay.  Now, the staff attorney can then
22   request certain additional information, correct?
23   A.  From whom?
24   Q.  Well, when I say certain, under the IOPs they can
25   request additional information from the grievant: is



PAUL FISCHER
July 28, 2017

Page 77

1  that correct?
2  **A.  Yes, yes.**
3  Q.  Okay.  And they can review the court file, is that
4  correct, in applicable cases I guess?
5  **A.  Yes.  They have to ask me to see the court file and**
6  **I'd have to approve that, but they could call the**
7  **grievant or the grievant's attorney without any**
8  **authorization -- further authorization from the**
9  **commission, that was a standing authorization.**
10  Q.  Now, when the IOPs refer to the court file, is
11  that the public court file or is it using the term to
12  mean other files that might be in a courthouse?
13  **A.  I only understood it to mean the court file that would**
14  **be at the clerk's office or the things that are**
15  **available.  So many courts now have docket sheets and**
16  **even you can see documents online and that type of**
17  **thing.**
18  Q.  Okay.  But that would be the public file, right?
19  **A.  Yes.**
20  Q.  Anybody could look at the public docket, right?
21  **A.  That's correct.**
22  Q.  Okay.  It wouldn't mean going in to look at any
23  internal records, you know, of the court that the
24  public couldn't come see, right, at that point in the
25  investigation?

Page 78

1  **A.  Right, not without further authority from the**
2  **commission, right.**
3  Q.  Okay.  Beyond that, the JTC staff can't pursue any
4  further investigation without authorization from the
5  commission, correct?
6  **A.  Correct.**
7  Q.  Okay.  The staff member who is assigned the grievance
8  then makes some assessment: is that right?
9  **A.  Yes.**
10  Q.  And do they convey that to you first?
11  **A.  Almost always.  If they agree that it's a summary**
12  **dismissal we may not discuss it again, I may just see**
13  **the summary dismissal memo.  If they disagree with me,**
14  **then for sure they come and we talk about it.**
15  Q.  So one thing that a staff member might do is agree
16  with your initial take that it should be summarily
17  dismissed, correct?
18  **A.  Yes.**
19  Q.  And they would then indicate that to you by giving you
20  the file back.  How would that happen?
21  **A.  I would meet with the attorneys on a weekly basis.**
22  **I'd go to each office and discuss with each attorney**
23  **the docket that that attorney had and we'd go through**
24  **that attorney's cases and -- here, I recommend summary**
25  **dismissal and they'll say yes, yes, I agree, I'll be**

Page 79

1  **writing a memo, it will come out next month or this**
2  **month or whatever.**
3  Q.  Now, are -- you said that if an attorney -- if a staff
4  attorney agreed -- disagrees with your initial take,
5  then you definitely have a discussion, correct?
6  **A.  Yes.**
7  Q.  Okay.  Did that occur frequently?
8  **A.  It would occur, I mean, I can't put a number on it,**
9  **but it would definitely occur.**
10  Q.  And what would happen in that situation?
11  **A.  I would usually defer to them.  They, well, in all**
12  **likelihood, reviewed the file more carefully than I**
13  **have, I give it a more cursory review, and they would**
14  **go into more detail.  Perhaps they've spoken to the**
15  **grievant then and realized that no, there wasn't**
16  **anything there.**
17  Q.  Or conversely, they may determine there was something
18  there when you had thought maybe initially it was
19  summary?
20  **A.  Yes --**
21  Q.  Okay.
22  **A.  -- exactly.**
23  Q.  And they would also do a memo in that situation as
24  well?
25  **A.  So it was always a memo, but it wasn't so much a memo**

Page 80

1  to me, it would be a memo or a report to the
2  commission.  Every file, if it was going to be
3  summarily dismissed by the commission, had to -- what
4  we called the summary dismissal letter.  So they would
5  prepare a one-page memo explaining why no further
6  investigation would really get us anywhere and the
7  matter should be dismissed and then those would all be
8  included into one letter that would then go to the
9  commissioners ahead of the meeting.
10  If it was the other way around and they
11  thought we should be doing something or that's what I
12  had recommended, then the staff attorney would draft a
13  grievance report to the commission saying here's what
14  it's about, here's a copy of the grievance and here's
15  what we recommend doing.
16  Q.  So is it fair to say then that there were --
17  essentially at this stage of the proceedings there was
18  either going to be a recommendation for summary
19  dismissal or a request for further investigation from
20  the commission?
21  **A.  Yes.**
22  Q.  Those were the two options, right?
23  **A.  Yes.**
24  Q.  Okay.  And the staff attorney would make a
25  recommendation maybe based on your initial intake,



PAUL FISCHER
July 28, 2017

## Page 81

1  maybe they differed from that, right, but you would
2  ultimately present that to the commission, I mean, you
3  would make the final call on what we're going to
4  request the commission to do: is that correct?
5  A. Yes.
6  Q. Okay. Would you have input into the reports that were
7  prepared by the staff attorney before they were
8  provided to the commission?
9  A. Yes.
10 Q. And what sort of input would you provide?
11 A. I would read each one and if I wanted to change or add
12 or delete things I would.
13 Q. You could also change the conclusion, correct?
14 A. Yes.
15 Q. Do you recall if you ever did that?
16 A. Usually at that point we had already discussed it so
17 we were on the same page, as you like to say.
18 Q. Okay. Now, as to each one of those then the
19 commission would hold a vote: is that correct?
20 A. Yes, they -- they used to go out with what we called a
21 mail, M-A-I-L, ballot and they would mail the ballots
22 back. With the advent of e-mail and all, they would
23 just put the file number in the RE section and then
24 say yes or no or some type of comment what they would
25 want to do and then when -- the voting period was two

## Page 82

1  weeks. It would pass -- if it had enough votes to
2  pass it was adopted, if it didn't it would go -- it
3  would -- you know, try to get some of the other ones
4  to vote or if it had a hold then it would get put on
5  the agenda for the commissioners to discuss in person
6  at the next meeting.
7  Q. And the vote required a simple majority, correct?
8  A. Yes.
9  Q. Okay. And if any commissioner wanted a hold,
10 regardless of the other votes, that would be a hold,
11 correct?
12 A. Right, it goes on the agenda.
13 Q. Anyone?
14 A. Anyone.
15 Q. Okay. Now, if the commission then determined that a
16 particular grievance warrants investigation, the
17 commission would direct the staff to investigate: is
18 that correct?
19 A. So they would have received that report with the
20 recommendations that we do A, B or C -- or and C and
21 the commission in the comments could say -- a
22 commissioner could say I approve A and B, but not C.
23    And if everybody else approved everything,
24 then we would just treat it as A and B has been
25 approved and we would do that, but not C. We would

## Page 83

1  treat that not as -- so much as a hold, just as not
2  everybody agreed to it, so hold like, we would
3  continue with the investigation. Or the commission
4  could right there approve everything and they wouldn't
5  necessarily give other instructions what to do, just
6  whatever we had recommended is what would be done.
7  Q. So when you were talking about the A, B and C, those
8  are descriptions of the kind of investigation that
9  would be pursued, is that what you meant?
10 A. Right. So they would say, you know, we want to get --
11 let's say it wasn't one of the big counties. We
12 wanted to go see the court file in Shiawassee County,
13 you know, that would -- we would ask the commission
14 for that. We wouldn't go up there because there
15 aren't a lot of people, we would stick out.
16    In Oakland County, Wayne County, whatever
17 it may be, you can walk in, you get a file, nobody
18 cares who you are, it's not an issue. But we wouldn't
19 want to tip anybody off or cause any problems with the
20 investigated judge, if the judge was being looked at,
21 so we would do things anonymously.
22    So anything -- we want to get the file, we
23 want to talk to somebody other than the grievant or
24 the grievant's attorney. Perhaps we want to speak to
25 the other attorney and get the other attorney's take

## Page 84

1  on things, any of those types of things would require
2  commission approval.
3  Q. Now, in terms of the investigation that was then
4  performed, who would actually perform it, was it the
5  staff attorneys?
6  A. Yes.
7  Q. Did the JTC have any separate investigators it would
8  ever hire?
9  A. They did once, they -- due to financial cutbacks they
10 didn't when I -- from the time I was their staff -- as
11 executive director they did not.
12 Q. Okay.
13 A. On occasion we would hire a private investigator.
14 Q. And you would get the approval of the commission to do
15 that, correct?
16 A. Yes.
17 Q. Could you use the resources of the Michigan State
18 Police?
19 A. Could we? I suppose so, but it would require
20 commission approval, but I don't know that we ever
21 did. I don't recall ever using them -- for
22 investigation, you mean?
23 Q. Correct.
24 A. Right, yeah, I don't recall ever using them.
25 Q. Okay. Your answer -- well, strike that.



PAUL FISCHER
July 28, 2017

---

Page 85

1      Would your answer be the same as to any
2  other law enforcement agency?
3  **A.  We had contact on occasion from the FBI, but they may**
4     **have had an investigation on a particular judge going**
5     **on and they would want to know if -- you know, I**
6     **couldn't tell them what we had going on, but there**
7     **would sometimes be contact.  It's not like they showed**
8     **us theirs and we would show them our reports, nothing**
9     **like that.**
10  Q.  They were not investigating for you, there may have
11     been some concurrent investigation going on and they
12     might have made an inquiry, is that what you're
13     saying?
14  **A.  Yes.**
15  Q.  Okay.
16  **A.  And they would also make inquiries when a judge is**
17     **under consideration for appointments to the federal**
18     **bench, there would be contacts from them, but, again,**
19     **they weren't doing anything on our behalf, the**
20     **commission's behalf.**
21  Q.  So some of the examples of investigation you gave is
22     that the staff attorneys might contact witnesses or
23     potential witnesses, correct?
24  **A.  Only with commission approval.**
25  Q.  With commission approval?

---

Page 86

1  **A.  Yes.**
2  Q.  These are some examples --
3  **A.  Yes.**
4  Q.  -- of things -- types of investigation that the
5     commission might approve you to pursue, correct?
6  **A.  Yes.**
7  Q.  I mean, that's what we will be talking about, okay?
8  **A.  Okay.**
9  Q.  Witnesses didn't have to speak to you, right, no
10     compulsion to speak, right?
11  **A.  That's correct.  I mentioned the point -- with one**
12     **asterisk again.  If a witness or somebody called the**
13     **commission and said they wanted to talk, we would**
14     **certainly talk to them.  We didn't have to say sorry,**
15     **can't talk to you.**
16  Q.  Right, the commission could certainly talk to anyone
17     it wanted to, but a witness was not required to answer
18     a call for any discussion, right?
19  **A.  I'm saying something differently.  We did not have to**
20     **get commission approval if a witness -- if somebody**
21     **called us up, called up the commission and wanted to**
22     **just talk about what had happened, you know, on their**
23     **own voluntary thing, the staff was allowed to talk to**
24     **that person.**
25  Q.  Okay.  Another example of investigations that might be

---

Page 87

1     approved in a given case would be to observe courtroom
2     proceedings; is that correct?
3  **A.  Yes.**
4  Q.  And if a judge was being observed would the judge be
5     notified before that occurred?
6  **A.  No.**
7  Q.  And for the same reasons you sort of described earlier
8     about going in to look at records in busy counties
9     versus not busy counties, you didn't want anybody to
10     know the investigation was going on, correct?
11  **A.  Well, that's more like the Heisenberg uncertainty**
12     **principle.  When the judge knows they're being**
13     **observed, they behave differently so you don't want**
14     **the judge to know.  But, yes, we would -- if we were**
15     **to try to send somebody to a smaller county it would**
16     **be more difficult to get somebody, and I don't know**
17     **that we ever did.  We certainly did send people into**
18     **courts in the Tri-County area and we would get --**
19     **that's like the private investigator would do**
20     **something like that, they could go in and play the**
21     **part.**
22  Q.  Okay.  The commission did not have subpoena power,
23     correct?
24  **A.  No, that's not correct.**
25  Q.  Okay.  It does have subpoena power?

---

Page 88

1  **A.  Yes.**
2  Q.  Okay.  Did it ever exercise that power during the time
3     you were executive director?
4  **A.  All the time.**
5  Q.  Do you know where the subpoena power is authorized,
6     could you direct me to that?
7  **A.  It's in the Court Rules, MCR 9.200.**
8  Q.  That chapter?
9  **A.  Yeah.**
10  Q.  Notwithstanding subpoena or anything else under the
11     Court Rules, judge and court personnel are required to
12     comply with reasonable requests made by the commission
13     in its investigation, correct?
14  **A.  That's what the Court Rules says, yes.**
15  Q.  That's also in the Court Rules.  Now, we talked about
16     the situation where a grievance would get to the point
17     where there's a recommendation for summary dismissal
18     essentially?
19  **A.  Yes.**
20  Q.  Okay.  And the commission would have to approve
21     summary dismissal?
22  **A.  Yes.**
23  Q.  Okay.  We talked earlier in this investigative phase
24     that the judge could be asked to comment about the
25     allegations in the grievance, correct?

---



PAUL FISCHER
July 28, 2017

Page 89

1    A.  Yes.
2    Q.  What would determine whether or not the judge was
3        asked to comment?
4    A.  Sometimes you need to get the judge's story to get the
5        full picture, rather than you can tell already that
6        this isn't going to go anywhere so you don't need the
7        judge's comment or the summary dismissal.  If it's
8        something that looks like it is more serious and may
9        progress, you start by getting the judge's side of the
10       story.
11   Q.  Okay.  And would that be a step that the commission
12       would have to approve also, to say hey, the
13       investigators can contact the judge?
14   A.  Yes, again, with an asterisk.  If the judge happened
15       to call up and say I hear there's a grievance out
16       against me, let me tell you what happened, we could
17       listen to the judge's story.
18   Q.  The judge would not hear there's a grievance against
19       him or her from the commission at that point in the
20       process, correct?
21   A.  That's correct.
22   Q.  Okay.  So if the judge heard that, it would have to be
23       from the grievant or somebody the grievant told,
24       right?
25   A.  Correct.

Page 90

1    Q.  Okay.  And if the commission did approve contact with
2        the judge, you and your staff would take that response
3        into account when making your recommendation to the
4        commission, correct?
5    A.  Yes.
6    Q.  Are there any other types of internal memoranda
7        prepared at that juncture of the review process other
8        than the report from the staff that we just discussed?
9    A.  Sometimes there would be a memorandum from the staff
10       to me, sometimes -- that would be about it, that's all
11       I can think of.  A memorandum to the file, I would get
12       a copy, that kind of thing.
13   Q.  Now, what would be the next step then after the
14       investigative steps had been completed?
15   A.  It depends how many investigative steps there were and
16       there may be -- after you've gotten the first approval
17       for whatever the proposed investigation was from the
18       commission, you've done that, you may want to get
19       other matters investigated, you'll want to talk to
20       other people to explore it further, that would require
21       another report to the commission with, you know,
22       further recommendation.
23           Once all of the investigative steps were
24       done, at that point it's either cut it loose, dismiss
25       the matter, or decide that based on what you have

Page 91

1        already that it would be a dismissal with one of the
2        three varieties of dismissal; an explanation, a
3        caution or an admonishment.  Or if it was thought that
4        it was going to go further than that, at that point it
5        would be a recommendation for a 28-day letter, which
6        is what the Court Rules require to be provided --
7        notice of the charges to be provided to the judge and
8        then the judge has 28 days to answer, which is where
9        the name comes from.
10   Q.  So at the point the investigation is concluded,
11       whatever investigative steps were taken, one thing you
12       said was there might also be a decision that it should
13       be dismissed?
14   A.  Yes.
15   Q.  Now, would that, again, have to go to the commission,
16       there would be a recommendation for dismissal and that
17       would have to be approved by the commission?
18   A.  Yes.
19   Q.  Okay.  So any of those next steps would have to be
20       approved by the commission, correct?
21   A.  Yes.
22   Q.  Okay.  Any of the types of letters that could be sent
23       out would have to be approved, correct?
24   A.  Yes.
25   Q.  And the issuance of a 28-day letter as a prelude to

Page 92

1        the formal complaint would have to be approved by the
2        commission, correct?
3    A.  Yes.
4    Q.  Would the staff attorney then make a recommendation as
5        to what they think the next step should be?
6    A.  It was something that would have been done in
7        conjunction.  Again, I meet with them once a week so
8        I'm aware of where there are with each case and we
9        would have been discussing what had been occurring,
10       how the investigation was going.  So it would have
11       been an ongoing process of deciding what we were going
12       to do next.
13   Q.  So ultimately you, after discussion with the staff
14       attorney -- I mean, you would have the final decision
15       as to the recommendation to the JTC?
16   A.  Yes.  Usually it would be the staff attorney would say
17       I think this is a dismissal and I'm sure I could have
18       overruled it or disagreed, but I think for the most
19       part I went with what the staff attorney thought.
20   Q.  And for the reason we discussed earlier, right, you
21       would have been having ongoing discussions during
22       these weekly meetings and you were generally on the
23       same page, correct?
24   A.  Yes, yes, yes.
25   Q.  If we could, sir, looking at Exhibit 1 -- let me make

Pages 89 to 92



PAUL FISCHER
July 28, 2017

### Page 93

1    sure I get you to the right page.  Page 3, Arabic
2    numeral page 3.  Towards the bottom of the page
3    there's a squared-off box under subsection C titled --
4    it says action the committee can take.  Do you see
5    that?
6  **A.  Yes.**
7  Q.  Okay.  Would those be a list of the actions the
8    commission could take, that's accurate, that's what we
9    were discussing, right?
10 **A.  Yes.  I think there could be others, but, yes, those**
11 **would be the general ones.**
12 Q.  Okay.  And the first one, which I think we already
13   talked about, is dismissal, correct?
14 **A.  Yes.**
15 Q.  And that would just be a recommendation to the
16   commission that the grievance was ultimately without
17   merit; is that correct?
18 **A.  Yes.**
19 Q.  And --
20 **A.  Or I shouldn't say without merit.  It could be because**
21 **it's an appellate matter, it shouldn't be ours;**
22 **because it was against a federal judge, there's no**
23 **jurisdiction.  So it could have been for any of those**
24 **reasons, but dismissal is the only recommendation.**
25 Q.  And upon the closing of the case the judge would

### Page 94

1    receive a copy of the grievance; is that correct?
2  **A.  Almost always.**
3  Q.  The commission could decide not to give that to the
4    judge; is that correct?
5  **A.  Yes, very rarely, but, yes.**
6  Q.  Okay.  Would there be some criteria that -- or reason
7    that it would not be given to the judge?
8  **A.  I don't think there's anything in writing criteria,**
9  **but, as an example, if it was a court employee who had**
10 **been complaining about a judge or how they were being**
11 **treated and then dismissing it would -- and giving a**
12 **copy to the judge might only make matters worse for**
13 **the employee.  Under those circumstances, perhaps not.**
14 Q.  Because it would reveal the name of the grievant and
15   that might make it difficult if they were still
16   employed, correct?
17 **A.  Yes.**
18 Q.  As one example?
19 **A.  Yes.**
20 Q.  The next one is dismissal with explanation, correct?
21 **A.  Yes.**
22 Q.  And under what circumstances would you have
23   recommended a dismissal with explanation?
24 **A.  I can't think of any particular specific example I**
25 **could give you so I could make -- put it in more**

### Page 95

1  **concrete terms, but the type of thing where it's not**
2  **the best thing to do and maybe you should not do that**
3  **again.**
4  Q.  And these are sort of at increasing levels of
5    severity, correct, the way we're looking at it, I
6    mean, dismissal means either it's outside the
7    jurisdiction or nothing was wrong, correct?
8  **A.  Yes.**
9  Q.  And then the next, again, increasing level of severity
10   would be dismissal with explanation, right?
11 **A.  Yes, but severity is maybe not the right term because**
12 **they're still dismissals.  So it's a dismissal no**
13 **matter what, it counts as a dismissal.  It doesn't**
14 **count as discipline, is what I'm saying.**
15 Q.  Okay.  Correct, pursuant to the IOPs, right?
16 **A.  Pursuant to the IOPs and pursuant to the Supreme**
17 **Court, yes.**
18 Q.  Okay.  So would a fair description of dismissal with
19   explanation be that when the commission determines
20   there was no judicial misconduct but that certain
21   actions of the judge should preferably not be
22   repeated?
23 **A.  Yes.**
24 Q.  Okay.
25          MARKED FOR IDENTIFICATION:

### Page 96

1          DEPOSITION EXHIBIT 3
2          11:13 a.m.
3  BY MR. HIRSCH:
4  Q.  Sir, I'm going to show you what we've marked as
5    Exhibit 3 and I just want to show you a few of these
6    to make sure we're on the same page so we understand
7    the nature of these form letters.  So you have
8    Exhibit 3 in front of you right now?
9  **A.  Yes.**
10 Q.  And this as to -- a letter as to request for
11   investigation number 07-17138, correct?
12 **A.  Yes.**
13 Q.  Okay.  And is this an example of sort of the form
14   letter we discussed earlier, the categories of form
15   letters?
16 **A.  No.**
17 Q.  Okay.  This is not?
18 **A.  No.**
19 Q.  Okay.  Is there something different about this
20   particular one?
21 **A.  Yes.**
22 Q.  What's the difference with this particular one?
23 **A.  This is a letter of dismissal with explanation.  Each**
24 **one of those was specifically crafted for the case.**
25 Q.  Okay.  So earlier you were talking about only




PAUL FISCHER
July 28, 2017

Page 97

1    dismissals that happened in the preinvestigative
2    phase; is that correct?
3    **A.   No, just a straight dismissal that --**
4    Q.   Okay.  You were talking about only the first bullet
5        point on the chart we looked at in Exhibit 1, page 3,
6        right?
7    **A.   Yes, what we called straight dismissal.**
8    Q.   Okay.  So these are crafted individually for each
9        case, correct?
10   **A.   Yes.**
11   Q.   Okay.  But this is an example of that second bullet
12       point, dismissal with explanation, correct?
13   **A.   I didn't read it, I just looked at the end because**
14       **that's where we would put the part in there so if you**
15       **give me a second to read --**
16   Q.   Okay.  Again, as with all of them, you can certainly
17       take your time.
18   **A.   Okay.  I've read it.**
19   Q.   Okay.  So this is an example of a dismissal with
20       explanation?
21   **A.   Yes, exactly.**
22                 MARKED FOR IDENTIFICATION:
23                 DEPOSITION EXHIBIT 4
24                 11:15 a.m.
25   BY MR. HIRSCH:

Page 98

1    Q.   Sir, I apologize for doing these out of order, but I
2        want to make sure that we're clear.  So we just handed
3        you what we've marked as Exhibit Number 4 to your
4        deposition and it's request for investigation numbers
5        04-15223 and 04-15241.  Do you have that in front of
6        you, sir?
7    **A.   Yes.**
8    Q.   Would this then be an example of what you termed a
9        straight dismissal?
10   **A.   No, this would be called -- what we would call a**
11       **special dismissal, because it had a specially crafted**
12       **letter.  It counts as a dismissal.  It's not a**
13       **dismissal with explanation, but there's little twists**
14       **and turns to it.  You can see the judge retired and**
15       **that's the reason it was dismissed.**
16   Q.   Okay.  If a judge retires does the JTC still have
17       jurisdiction?
18   **A.   Yes.**
19   Q.   Okay.  If a judge resigns does the JTC still have
20       jurisdiction?
21   **A.   Yes.**
22   Q.   Okay.
23   **A.   As long as the act of misconduct occurred during the**
24       **judge's tenure as a judge.**
25   Q.   Right.  Provided that the underlying act occurred

Page 99

1    during a time that person was a judge, correct?
2    **A.   Yes.**
3    Q.   Okay.  So there is another minor category that's not
4        listed in our box here that you called a special
5        dismissal, right?
6    **A.   Yes.**
7    Q.   And one example then, you said, would be retirement of
8        a judge during --
9    **A.   Yes.**
10   Q.   -- during the process, correct?
11   **A.   Yes.**
12   Q.   After the act, but while the investigation is going
13       on, right?
14   **A.   Yes.**
15   Q.   Would resignation be another thing that might fall
16       into the special dismissal category?
17   **A.   Yes.**
18   Q.   Anything else you can think of?
19   **A.   I know we did a number of cases that there was**
20       **something else involved, I mean, I can't remember the**
21       **specifics, but I can tell you, for example, where a**
22       **judge -- I can't, no, I don't.**
23   Q.   Okay.  But the special dismissal is also not
24       discipline, correct, it falls into that category
25       that's defined as not discipline, right?

Page 100

1    **A.   Right.**
2    Q.   Okay.  Okay.  The next bullet point on page 3 of
3        Exhibit 1 in that chart is called dismissal with
4        caution.  Do you see that, sir?
5    **A.   Yes.**
6    Q.   Was that also called a cautionary letter?
7    **A.   Yes.**
8    Q.   Those terms are interchangeable, right?
9    **A.   Yes.**
10   Q.   What would be the circumstances where the JTC would
11       choose to pursue a dismissal with caution?
12   **A.   I see what's written in the annual report, Exhibit 1,**
13       **and that's more or less what it would be.  The**
14       **commission determines that improper or questionable**
15       **conduct did occur, but was relatively minor.**
16   Q.   And you would agree that's accurate, correct?
17   **A.   Yes.**
18                 MARKED FOR IDENTIFICATION:
19                 DEPOSITION EXHIBIT 5
20                 11:18 a.m.
21   BY MR. HIRSCH:
22   Q.   Mr. Fischer, our court reporter just handed you what
23       we've marked as Exhibit Number 5, a letter regarding
24       request for investigation number 03-14486.  Do you
25       have that in front of you, sir?




PAUL FISCHER
July 28, 2017

---

Page 101

1   A.  Yes.
2   Q.  And would this be an example of a dismissal with
3       caution?
4   A.  Yes.
5   Q.  Okay.
6           MARKED FOR IDENTIFICATION:
7           DEPOSITION EXHIBIT 6
8           11:19 a.m.
9   BY MR. HIRSCH:
10  Q.  The next bullet point is labeled dismissal with
11      admonition, correct?
12  A.  Yes.
13  Q.  And our court reporter has just handed you what we've
14      marked as Exhibit Number 6 to your deposition and it
15      appears to be a letter regarding request for
16      investigation number 02-14082 and 03-14430.  Do you
17      have that in the front of you, sir?
18  A.  Yes.
19  Q.  And would this be an example of a dismissal with
20      admonition?
21  A.  Yes.
22  Q.  Okay.  And a dismissal with admonition is given when
23      somewhat more serious conduct is found; is that
24      correct?
25  A.  Yes.

---

Page 102

1   Q.  And the purpose of private admonitions from the JTC
2       are designed, in part, to bring problems to a judge's
3       attention at an early stage in hope that the conduct
4       will not be repeated or escalate, correct?
5   A.  Yes.
6   Q.  Now, a judge does have the right to challenge an
7       admonition in the Michigan Supreme Court, correct?
8   A.  Right, that was a change of the Court Rules eight,
9       nine years ago.
10  Q.  Okay.  There was no right to challenge the caution or
11      explanation, correct?
12  A.  Right, correct.
13  Q.  Okay.  If a judge does choose to challenge a dismissal
14      with admonition, that becomes public, correct, the
15      Supreme Court's resolution of that is public, correct?
16  A.  Yes.
17  Q.  Okay.  Other than that these categories of dismissal
18      remain private, correct?
19  A.  Yes.
20  Q.  Okay.
21  A.  These categories of?
22  Q.  The ones we discussed, right?
23  A.  I just don't -- did you say the word discipline, these
24      categories are dismissal?
25  Q.  I said dismissal, I thought.  I meant to say

---

Page 103

1       dismissal, if I --
2   A.  Yes.
3   Q.  Now, the next bullet point in the chart on page 3 of
4       Exhibit 1 says recommend private, slash, public
5       censure, comma, suspension or removal to Supreme
6       Court.  Do you see that?
7   A.  Yes.
8   Q.  Do each of those require that a formal complaint be
9       filed?
10  A.  No.  I would say removal, probably, I don't think
11      anybody would agree to removal, but a judge could
12      consent to any of the others, or in theory to removal.
13  Q.  Okay.  So these are I guess -- would it be fair to say
14      that these are three different things in one bullet
15      point -- or maybe four actually?
16  A.  Right, those are four different things.
17  Q.  So one is private censure, correct?
18  A.  Yes, by the Court.
19  Q.  Okay.  Now, how would it get to the Supreme Court for
20      private censure, how would it be private in that case?
21  A.  So the commission would prepare a report, you know,
22      assuming that the judge had agreed to it because it
23      wouldn't be a public hearing.  So the judge would
24      agree to a private censure by the court, the
25      commission would prepare a report to the court saying

---

Page 104

1       we recommend -- make a decision, recommend private
2       censure to judge so-and-so and then the court could
3       accept it and privately admonish the judge, you know,
4       issue an order of admonishment.  So instead of it
5       being a letter of admonishment from the commission,
6       it's an order of admonishment from the court, or the
7       court could refuse.
8   Q.  So still focusing on private censure, the judge would
9       have to agree to that, correct?
10  A.  Yes.
11  Q.  Okay.  And if an order is -- if the judge agrees to
12      it, does the commission then have to agree to it?
13  A.  Yes.
14  Q.  And then the commission would make that recommendation
15      to the Supreme Court, correct?
16  A.  Yes.
17  Q.  And the Supreme Court would agree or not agree,
18      correct?
19  A.  Yes.
20  Q.  Okay.  If the Supreme Court agreed, you said they
21      would issue an order, correct?
22  A.  Yes.
23  Q.  Would that be a public order without disclosing the
24      name?
25  A.  I don't know.

---




PAUL FISCHER
July 28, 2017

## Page 105

1  Q.  Okay.  If the Supreme Court did not agree to the
2      recommendation for private censure what would happen
3      then?
4  **A.  The court would say so in an order sending it back to**
5      **the commission.**
6  Q.  Would the court identify the judge at that point that
7      it sent it back to the commission or would it be an
8      order maybe just, you know, referencing the file
9      number or something?
10 **A.  I don't recall.**
11 Q.  Okay.
12 **A.  I know it happened, I just don't recall how they**
13     **handled it.**
14 Q.  Okay.  With respect to public censure, would that also
15     have to be by agreement?
16 **A.  It would not necessarily have to be.  It could be or**
17     **it could be following a hearing on a formal complaint.**
18 Q.  Okay.  By the way, I'm sorry, going back to private
19     censure, is that considered discipline?
20 **A.  Yes.**
21 Q.  Okay.  It --
22 **A.  If it comes from the Supreme Court it's discipline.**
23 Q.  But how would anybody else then ever know about it?
24 **A.  They wouldn't.**
25 Q.  Okay.  And with respect to public censure, that

## Page 106

1      likewise would be considered discipline, correct?
2  **A.  Yes.**
3  Q.  Okay.  Now, you said that that could be via an
4      agreement with the judge, correct?
5  **A.  Yes.**
6  Q.  Or the commission could decide to do that on its own?
7  **A.  Following a hearing, yes.**
8  Q.  That would have to follow a hearing?
9  **A.  Yes.**
10 Q.  If the judge agreed to it there wouldn't have to be a
11     hearing, correct?
12 **A.  Yeah, correct.**
13 Q.  Okay.  And if the Supreme Court agreed with the
14     recommendation for public censure, the Supreme Court
15     would issue an order of public censure, right?
16 **A.  Yes.**
17 Q.  And that, of course, would have an identification, a
18     name, right?
19 **A.  Yes.**
20 Q.  Okay.  The next one under that same bullet point is
21     suspension, correct?
22 **A.  Yes.**
23 Q.  Okay.  Is that something the judge could agree to?
24 **A.  The judge could agree to it, yes.**
25 Q.  And if the judge agreed there would not have to be a

## Page 107

1      hearing, correct?
2  **A.  Correct.**
3  Q.  Okay.  There would still be a recommendation and the
4      commission would have to agree with that, right?
5  **A.  Yes, what it is is it's the judge and the examiner, or**
6      **the quasi examiner because there wasn't a formal**
7      **complaint issued, came to a settlement agreement.**
8      **That would be submitted to the commission.**
9          **The commission then would treat that as**
10     **akin to the master's report and decide whether to**
11     **accept it or not accept it and then issue a decision**
12     **as if there had been a hearing.  Based on this**
13     **settlement agreement, here's the commission's findings**
14     **and recommendations to the Supreme Court and that**
15     **would get sent to the Supreme Court.**
16 Q.  If for some reason the commission did not accept that
17     though, would they then send it back to you
18     essentially because there might need to be a hearing
19     though, right?
20 **A.  Right.  So it's not so much as they're sending it**
21     **back, but, yes, the commission did not agree to the**
22     **settlement agreement reached by the executive**
23     **director, acting as the quasi examiner and the**
24     **respondent judge, it would come back to where it was**
25     **and then a report would be provided to the commission**

## Page 108

1      **with a recommendation of whatever, dismissal or formal**
2      **complaint.**
3  Q.  So you wouldn't lose the opportunity -- the judge,
4      let's say, wouldn't lose the opportunity for a hearing
5      if the agreement was not approved, correct?
6  **A.  Correct.**
7  Q.  Okay.  And then the final one here is removal,
8      correct?
9  **A.  Yes.**
10 Q.  And that would fundamentally be the same process,
11     correct?
12 **A.  Yes.**
13 Q.  Now, with respect to the items that we determined were
14     not discipline, right, dismiss, dismissal with
15     explanation, dismissal with caution and dismissal with
16     admonition, is the grievant informed of the outcome?
17 **A.  The grievant gets a form letter of all cases.  I don't**
18     **recall specifically what it says with explanation and**
19     **caution, I think it's just the same type of wording as**
20     **with the dismissals, the matter has been closed or**
21     **something like that.**
22         **But with admonition, the admonishment**
23     **letter, it says something like -- the letter to the**
24     **grievant says something slightly different, you know,**
25     **that the behavior -- all judicial offices are not**



PAUL FISCHER
July 28, 2017

## Page 109

1    perfect or corrective action has been taken, something
2    along those lines, but there's a form letter that goes
3    with it.
4    Q.  With respect to private censure, does the grievant
5        then get some kind of letter?
6    A.  So it never happened during my tenure, but there was
7        some type of letter.
8    Q.  Okay.  Public censure -- well, the other is public
9        censure, suspension or removal are public, correct?
10   A.  Right.
11   Q.  I mean, do you send those to the grievant when they're
12       done?
13   A.  Yes, with a letter, here encloses the decision of the
14       Supreme Court.
15   Q.  Okay.  Now, you mentioned that private censure was
16       never done during your time as executive director,
17       correct?
18   A.  The Supreme Court never entered an order of private
19       censure while I was there to -- they may have done one
20       in the very beginning to the best of my recollection.
21       I know that we tried another one and it didn't go
22       through.
23           The court expressed either at a meeting
24       with us or somewhere that they didn't like private
25       censure, that if it was serious enough for a censure

## Page 110

1    it should be a public matter and the commission didn't
2    offer anymore from that time on, which was relatively
3    early in my tenure there.
4    Q.  Now, we talked earlier about a change in the executive
5        director's role, right, upon the filing of formal
6        proceedings?
7    A.  Yes.
8    Q.  And at that point the executive director effectively
9        takes on the role of examiner, correct?
10   A.  Yes.
11   Q.  And the examiner then directs the investigation,
12       correct?
13   A.  There's not much investigation left, it's managing the
14       trial, although there will certainly be some ancillary
15       investigation going on.
16   Q.  Could the executive director issue a subpoena at that
17       point?
18   A.  So in that particular case, once the formal complaint
19       is issued there is no executive director with respect
20       to that case.  The executive director is still at the
21       commission, but not with regard to that particular
22       case.  Yes, the examiner can issue subpoenas.
23   Q.  Okay.  Does the judge who is the subject of the formal
24       complaint get to issue subpoenas?
25   A.  I believe so.

## Page 111

1    Q.  Focusing first on the 28-day letter, who prepares the
2        28-day letter?
3    A.  It's issued under the executive director's name.  It's
4        prepared by a staff attorney, the same way everything
5        else is prepared at an initial level by the staff
6        attorney, but the executive director would have the
7        authority to change whatever would be done.  28-day
8        letters are attached -- or proposed 28-day letters are
9        attached to the report that goes to the commission, so
10       the commission ultimately approves or modifies the
11       28-day letter.
12   Q.  And again, we talked about it's called the 28-day
13       letter because you have 28 days to respond, correct?
14   A.  Right.
15   Q.  The judge then has 28 days to respond?
16   A.  Right.
17   Q.  Could be extended, correct?
18   A.  Yes.
19   Q.  Now, has there ever -- well, strike that.
20           When the commission approves the 28-day
21       letter do they then have to separately approve the
22       formal complaint?
23   A.  Yeah, because when the 28-day letter is issued, that's
24       just another phase of the investigation.  There may
25       not necessarily be a formal complaint.

## Page 112

1    Q.  Okay.  Does the executive director take on the role of
2        examiner when the 28-day letter is filed or is that
3        still viewed as part of the investigative phase?
4    A.  Part of the investigative phase.
5    Q.  So after a response is received from the 28-day letter
6        is there another assessment made?
7    A.  Yes.
8    Q.  Okay.  And the same staff attorney performs that
9        assessment who had been assigned to the case --
10   A.  Yes.
11   Q.  -- barring any turnover in staff, I guess, but --
12   A.  Yes, yes.
13   Q.  Okay.  And you said there have been occasions when
14       following a 28-day letter -- a response to a 28-day
15       letter the recommendation was not to go forward with a
16       formal complaint, correct?
17   A.  Yes.
18   Q.  And that would be based on the contents of the
19       response, correct?
20   A.  Yes, or other matters that may have come up since the
21       time of the last report.
22   Q.  So it's possible that other investigation could still
23       be continuing even after the 28-day letter got issued?
24   A.  Yes, or from the time while the 28-day letter is out
25       pending, yes.



PAUL FISCHER
July 28, 2017

## Page 113

1 Q. Now, after the response to the 28-day letter is
2 received by the commission, if the -- well, strike
3 that.
4 Who reviews the response to the 28-day
5 letter, the staff attorney?
6 A. Staff attorney, the executive director and the
7 commission.
8 Q. Okay. And then does the staff attorney or the
9 executive director in conjunction with the staff
10 attorney prepare a recommendation to the commission
11 and either say we want a formal complaint or we do
12 not?
13 A. Yes.
14 Q. Is there another option -- I mean, at that point in
15 the game, I mean, is it either we've determined
16 there's nothing here so we dismiss or we have to file
17 a formal complaint?
18 A. No, it could be dismissal with caution, dismissal with
19 admonishment --
20 Q. So those same things could still happen after the
21 response?
22 A. Yes.
23 Q. Okay. Now, if the executive director maybe through
24 the staff attorney or in conjunction with the staff
25 attorney decides it is appropriate to have a formal

## Page 114

1 complaint, that goes to the commission and they either
2 approve it or don't, correct?
3 A. Yes.
4 Q. Okay. And if the commission approves the issuance of
5 a formal complaint, who prepares that?
6 A. It's generally prepared -- it's always prepared ahead
7 of time and included with the report that goes to the
8 commission recommending the formal complaint.
9 Q. So the commission sort of sees the example -- or what
10 will go out, assuming you are authorized to do that?
11 A. Well, what may go out. The commission can modify,
12 edit, delete, whatever they like to do.
13 Q. And that formal complaint then becomes a formal
14 statement of the charges, correct?
15 A. Yes.
16 Q. And from that point forward, in other words from the
17 issuance of the formal complaint forward, the
18 proceedings of the JTC are public, correct?
19 A. The hearing is public, the -- any arguments or motions
20 are public, but when the matter comes back to the
21 commission from the master, the commission's
22 deliberations are not public.
23 Q. Correct.
24 A. The hearing in front of the commission is public, but
25 the commission and executive session is not.

## Page 115

1 Q. Correct. But the commission's recommendation is
2 public?
3 A. The decision that it issues, yes.
4 Q. Well, that's actually a recommendation to the Supreme
5 Court, correct?
6 A. Yeah, well, it's the decision and recommendation. It
7 will be a written document that is a public document,
8 yes.
9 Q. Okay. But any pleadings that may be filed in the
10 course of the case are public also, correct?
11 A. Yes, as part of the hearing on the formal complaint,
12 yes. So from that point -- from the issuance of the
13 formal complaint forward, things are public. That
14 doesn't make anything that happened before public.
15 Q. Correct. From that point forward, the answer for
16 example, is public?
17 A. Is a public document, yes.
18 Q. Just like filing in a court, right?
19 A. Exactly.
20 Q. You're familiar with the Brown factors, correct?
21 A. Yes.
22 Q. Are the Brown factors taken into account when deciding
23 whether to file the formal complaint?
24 A. They're not taken into account by the staff in making
25 the recommendation. I don't know what the commission

## Page 116

1 considers when they deliberate on whether they should
2 issue the formal complaint, I'm not in the room when
3 they do it.
4 Q. Now, we talked before about some situations where
5 there could be an agreement reached between the
6 commission and the judge that could result in certain
7 kinds of discipline, correct?
8 A. Yes.
9 Q. Does the JTC essentially offer a deal to the judge in
10 some circumstances?
11 A. So it's not that the JTC is offering a deal, it would
12 be more accurate to say that the -- there is no formal
13 complaint, but the executive director takes on the
14 role of the quasi examiner, taking on the
15 prosecutorial role.
16 The commission is out of that negotiation
17 process because it will be the adjudicative body, but
18 the quasi examiner then can make a plea deal, so to
19 speak, with the respondent judge. That deal is then
20 presented to the commission, which can either accept
21 it or reject it.
22 Q. And just so I understand, could that -- and I
23 understand we're using the term plea deal loosely --
24 A. Yes.
25 Q. -- an agreement with the judge for some type of



PAUL FISCHER
July 28, 2017

---

Page 117

1 discipline, can that be made before the 28-day letter
2 also?
3 A. It could be made at any time, yes.
4 Q. Okay. And it could be made after the 28-day letter,
5 but before the formal complaint is issued?
6 A. Yes.
7 Q. And it could also be reached while the formal -- after
8 the formal complaint has been issued, correct?
9 A. Yes.
10 Q. Okay. Would it be the staff attorney who approaches a
11 judge for the suggestion of an agreement or would it
12 be you or could it be either one?
13 A. It would be the executive director -- it would be
14 there for -- whichever way, whether the offer was made
15 from the executive director or whether the respondent
16 judge had made an offer to the executive director, but
17 it would have been the executive director level, not
18 the staff attorney.
19 Q. And you as executive director would make the decision
20 whether to accept that agreement in the sense of
21 proposing it to the commission as a resolution,
22 correct?
23 A. Right. Acting in the role of quasi examiner because
24 you're not the examiner unless there's a formal
25 complaint. So if there's any type of pre-formal

---

Page 118

1 complaint, the procedures the commission had set up
2 was to have the examiner act as the quasi examiner and
3 negotiate any settlement agreements and then present
4 those to the commission.
5 Q. Did the -- during your time as executive director was
6 it common to offer agreements to a judge for lesser
7 discipline?
8 A. I don't know how to define common, but it happened
9 frequently.
10 Q. And in fact according to the IOPs the commission
11 favors settlement agreements, correct?
12 A. Yes, as did the executive director.
13 Q. In terms of the settlement agreements that you were
14 involved in, did you ever offer a judge the option to
15 resign instead of facing discipline?
16 A. Yes.
17 Q. Did you ever offer the judge an option to retire
18 instead of facing discipline?
19 A. That was more of the judge's choice, but leaving
20 office was the issue. How they handled it, whether it
21 was a resignation or whether it was a retirement, if
22 it's a defined benefit plan, you know, that didn't
23 make any difference to our side. So they could phrase
24 it however they wanted.
25 Q. And when you would make an offer like that, you would

---

Page 119

1 consider that to be a benefit to the judge, right?
2 A. I considered it to be a benefit to the entire system.
3 Q. Well, it would also be for the judge to avoid shame
4 and embarrassment, correct?
5 A. And for the system to avoid shame and embarrassment,
6 yes.
7 Q. I'm sorry, you mean the judicial system in general,
8 correct?
9 A. Anytime a judge commits misconduct against a public
10 slapping from the Supreme Court it harms the judiciary
11 as a whole in the eyes of the public. So everybody
12 wins when there's a -- that type of resignation and a
13 quiet resolution.
14 Q. And you would offer other types of quiet resolutions
15 too, correct, in connection with settlements, right,
16 for example, dismissal with explanation?
17 A. No, I wouldn't offer that, that's something the
18 commission would decide to do on its own.
19 Q. Okay. So in terms of settlement offers or offers that
20 you would be involved in, you said that getting the
21 judge off the bench, you didn't care if it was
22 retirement or resignation, that was one?
23 A. Right.
24 Q. Would you suggest a suspension for some term?
25 A. Yes.

---

Page 120

1 Q. Okay. I mean --
2 A. Are you saying try to negotiate a resolution with the
3 judge?
4 Q. Yes, would that be in the category of things that
5 might be negotiable?
6 A. Yes, we would try to negotiate resolutions for public
7 censure, public censure plus a period of suspension,
8 that type of thing, yes.
9 Q. Well, public censure wouldn't save shame or
10 embarrassment to the system, right, because you said
11 any kind of discipline embarrasses the system, right?
12 A. Yes, but it would be the type of thing that we could
13 also negotiate. A suspension doesn't save
14 embarrassment to the system either --
15 Q. Right.
16 A. -- but not everybody has to resign.
17 Not every infraction rises to the level
18 that the judge should no longer be a judge.
19 Q. Right. So some things we would tolerate that they
20 became public essentially, right?
21 A. Judges have shown that they recognize the error of
22 their ways and turned it around, that's a positive
23 thing.
24 Q. That's good for the system, right?
25 A. That's good for the system or can be.

---



PAUL FISCHER
July 28, 2017

Page 121

1  Q.  Now, once formal proceedings are initiated there is
2      discovery in this process, correct?
3  A.  Yes.
4  Q.  And that's provided in the Michigan Court Rules,
5      right?
6  A.  Yes.
7  Q.  So the judge, subject to the proceeding, is entitled
8      to inspect and copy all documentary evidence in the
9      JTC's possession that is to be introduced at the
10     hearing on the formal complaint, correct?
11 A.  I don't have the copy of the Court Rules in front of
12     me, so I don't know.
13 Q.  Okay.  You don't know one way or the other?
14 A.  It's something like that, but I'm not going to agree
15     to something under oath.  The Court Rules set it out.
16 Q.  Okay.  You recall the JTC is also required to give the
17     judge the name and address of any person to be called
18     as a witness?
19 A.  There's -- whatever the Court Rule says.
20 Q.  You would agree that in the cases you were involved in
21     you provided the discovery requirement under the
22     Michigan Court Rules; is that correct?
23 A.  To the best of my ability, yes.
24 Q.  Did the judge have to request the discovery or was
25     that just required to be provided as a matter of

Page 122

1      course?
2  A.  I don't know that -- it's seems to me that at that
3      point where we're at the discovery level, we're
4      talking with an attorney and it just gets discussed,
5      when are we going to do discovery, that type of thing.
6  Q.  And once a formal complaint is filed the judge is
7      entitled to a hearing, correct?
8  A.  Yes.
9  Q.  And in your experience that is always before the
10     master, correct?
11 A.  Yes.
12 Q.  And it is the Michigan Supreme Court who appoints the
13     master; is that correct?
14 A.  Yes.
15 Q.  Does the commission make a request to the Supreme
16     Court to appoint a master?
17 A.  Yes, there's a file a motion or a request form.
18 Q.  And does the commission have any input into the
19     identity of the master?
20 A.  No.
21 Q.  Do you know how the Michigan Supreme Court selects a
22     master?
23 A.  No.
24 Q.  During your tenure do you recall how many cases where
25     masters were appointed?

Page 123

1  A.  10, 12.
2  Q.  Do you recall if any of those masters were
3      African-American?
4  A.  Do I recall, yes.
5  Q.  Okay.  Can you tell me which one or ones?
6  A.  Yes, there was a woman, she was from the Detroit 36th
7      District Court.  I'm trying to remember which case it
8      was.  I think it was the -- Hultgren or --
9      H-U-L-T-G-R-E-N.
10 Q.  Hultgren was the judge subject to the proceedings --
11 A.  Yes.
12 Q.  -- just so we're --
13 A.  Yes, yes.
14 Q.  -- clear?
15 A.  Okay.  I think in that case.
16 Q.  And you believe it was a former -- the master was a
17     former judge of the 36th District Court?
18 A.  Yes.  We had a couple -- I think we had a couple from
19     the 36th District Court, but, you know, I -- I just
20     don't recall race or gender for the master, but I
21     think we had --
22 Q.  But at least that one you believe, I think you said
23     was a woman?
24 A.  Yes, I think so.
25 Q.  An African-American woman?

Page 124

1  A.  I think so.
2  Q.  Okay.  And after the hearing before the master, the
3      master issues a report; is that correct?
4  A.  Yes.
5  Q.  And the parties can raise objections to that report,
6      correct?
7  A.  Yes.
8  Q.  And then the commission conducts oral argument; is
9      that correct?
10 A.  Yes.
11 Q.  Now, does the commission only conduct oral argument if
12     one party objects -- if either party objects, rather?
13 A.  No, the -- well, I'm not aware of anytime one side or
14     the other didn't object, but there has to be an
15     argument regarding the recommended sanction.  So it
16     will always be some oral argument in front of the
17     commission.
18 Q.  And at that point the commission may also dismiss,
19     right?
20 A.  Yes.
21 Q.  Have you ever seen that happen?
22 A.  Yes.
23 Q.  Would you, sort of in the role of prosecutor at that
24     point, could you appeal the commission's decision to
25     dismiss to the Michigan Supreme Court?



PAUL FISCHER
July 28, 2017

---

Page 125

1   A.  No.
2   Q.  The party could certainly -- I mean, they wouldn't
3       appeal a dismissal obviously, but they could appeal
4       any other decisions to the Michigan Supreme Court,
5       correct?
6   A.  Yeah, so it's not so much that they're appealing.
7       Once the commission issues a decision it has to get
8       filed with the court, but the respondent judge could
9       file objections to the commission's report, the
10      examiner can't.  So if the examiner thinks it should
11      have been a higher sanction or whatever, the examiner
12      can't file something objecting, the examiner can only
13      respond to whatever the respondent raises.
14  Q.  It's an objection, actually I used the word appeal
15      before, but of course you're correct that it's an
16      objection that gets filed.
17          So at that point when the commission has
18      made its recommendation, does the examiner then sort
19      of move back to the role of executive director in the
20      sense that the executive director is then representing
21      and advocating the position of the commission before
22      the Michigan Supreme Court?
23  A.  No, it seems that that person is still at the level of
24      the examiner because they're still advocating the
25      position.  The commission doesn't tell the examiner

Page 126

1       how to argue the case or what to do about the case or
2       how to prepare the brief or review the brief that the
3       examiner files, so no.
4   Q.  You were involved in discovery in this case during the
5       time you were executive director specifically,
6       correct?
7           MR. NELSON:  Objection, vague.  Do you mean
8       by this case, the case in front of the JTC or this
9       litigation in district court?
10  BY MR. HIRSCH:
11  Q.  I mean this litigation in front of the federal
12      district court?
13  A.  Yes.
14  Q.  And you recall that there was a discovery request
15      issued for certain JTC files, correct?
16  A.  Yes.
17  Q.  And there were some motions on that, correct, do you
18      recall that?
19  A.  Yeah, I don't remember the details, but it seems to me
20      that you wanted to get all the files from a particular
21      period and you eventually agreed with counsel to limit
22      it to certain codes or something like that.
23  Q.  We reached some agreement --
24  A.  Yes.
25  Q.  -- between counsel in this case, correct?

Page 127

1   A.  Something, yes.
2   Q.  And were you the person who then made a search to
3       produce some files?
4   A.  Yes.
5   Q.  And how did you go about that search?
6           MS. MILLER:  I'm going to place an
7       objection as I think that would -- at that time I was
8       representing the -- and I still do represent the JTC
9       and I think any discussions we may have had about how
10      the search would be conducted would be attorney/client
11      privilege.
12          MR. HIRSCH:  Well, I don't -- well, first
13      of all, I certainly agree that any discussions you had
14      would be attorney/client privilege, although I don't
15      think that's what I was asking so I'll try to rephrase
16      the question.
17  BY MR. HIRSCH:
18  Q.  In terms of physically going through and reviewing the
19      JTC files, did you make some selections as to what
20      would be produced?
21  A.  Yes.
22  Q.  And without going into the substance, did you make
23      those selections based on a conversation you had had
24      with counsel?
25  A.  I'm sure -- I don't recall specifically.

Page 128

1   Q.  Well, do you recall then how it was that you made
2       choices as to what would be produced?
3   A.  I thought there was an order or something listing the
4       code numbers that were wanted and the grievance
5       numbers that went with those codes and then a separate
6       list with names of the judges that were associated
7       with those grievance numbers.
8   Q.  Now, when you -- well, strike that.
9           Were the files you reviewed electronic or
10      hard copy or a combination?
11  A.  So they would have been PDFs on the computer and then
12      they probably would have been printed out so I could
13      see them, so probably both.
14  Q.  Were you the person that picked which files to print
15      out from the computer?
16  A.  I would say yes.  As I recall, it was based on those
17      codes, you know, the nature of grievance code, a 14 or
18      whatever.  I don't remember which numbers you had
19      asked for, but I think it was just sorting those and
20      then printing those out.
21  Q.  And those codes, you said, are kept, at least now, in
22      a computer system, right, each file has a code
23      associated with it electronically?
24  A.  Yes, at least one, yes.
25  Q.  At least one code, okay.  Now, you did not produce the


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
A U.S. Legal Support Company

US LEGAL SUPPORT
The Power of Commitment™

PAUL FISCHER
July 28, 2017

Page 129

1    entire JTC files, correct?
2    A.   I don't recall what was produced.
3              MARKED FOR IDENTIFICATION:
4              DEPOSITION EXHIBIT 7
5              11:56 a.m.
6    BY MR. HIRSCH:
7    Q.   Sir, I've just handed you what we've marked as
8    Deposition Exhibit Number 7.  You'll see at the bottom
9    it has Bates numbers that begin with the prefix FTC
10   and it goes from 1 to 2.  Do you see that?
11   A.   Yes.
12   Q.   All right.  You're familiar with what a Bates number
13   is, I assume?
14   A.   Yes, yes.
15   Q.   I know you've done this.
16   A.   Yes.
17   Q.   Do you recall that this was a portion of one of the
18   files you produced -- you selected for production?
19   A.   Do I recall, no.
20   Q.   Okay.  Would you agree with me that this is not the
21   complete file for request for investigation number
22   02-14170?
23   A.   Yes, I would agree.
24   Q.   Okay.  Do you know how it was that you selected this
25   particular portion of that file to be produced, and

Page 130

1    again, without going into any conversations you may
2    have had with counsel?
3    A.   I don't recall.
4    Q.   And what this portion of the file appears to include
5    is the request for investigation that starts on the
6    Bates number that ends in 04 and then I guess the
7    resolution letter that comes from the commission that
8    runs from Bates numbers starting at 01 to 03, correct?
9    A.   Yes.
10   Q.   So it looks like we got essentially two documents from
11   this particular file, correct?
12   A.   Yes.
13            MARKED FOR IDENTIFICATION:
14            DEPOSITION EXHIBIT 8
15            11:59 a.m.
16   BY MR. HIRSCH:
17   Q.   Sir, you've just been handed what we've marked as
18   Exhibit Number 8 to your deposition and it appears to
19   be portions of the file regarding request -- requests
20   for investigation 02-14082 and 03-14430.  Do you have
21   those in front of you, sir?
22   A.   Yes.
23   Q.   Do you recall reviewing this particular file?
24   A.   Sorry, I don't recall, no.
25   Q.   And the first page of this, the one that ends in Bates

Page 131

1    number 11, the last two digits of the Bates number?
2    A.   Your Exhibit 8 is the same letter that was in your
3    Exhibit 6, right?
4    Q.   I believe it's the same letter, then I have some
5    additional material.
6    A.   Okay, yes.  Now I'm listening, yes.
7    Q.   You see on the first page it references two requests
8    for investigation?
9    A.   Yes.
10   Q.   Okay.  And you see that starting at Bates number 13,
11   using the last two digits of the Bates number, you've
12   included -- or included was an RFI for number
13   03-14430.  Do you see that?
14   A.   Yes.
15   Q.   Do you know why we would not have been provided with
16   the grievance for case number 02-14082?
17   A.   I don't know.
18   Q.   Okay.  When matters are initiated not pursuant to a
19   request for investigation, all right, for example, we
20   talked about the JTC itself might decide to open one?
21   A.   Yes.
22   Q.   Do those still get these numbers?
23   A.   Yes, a case number, yes.
24   Q.   Okay.  So it is possible, for example, that the
25   02-14082 was started internally so there may not have

Page 132

1    been an RFI?
2    A.   I mean, anything is possible, I just don't know.
3    Q.   Okay.  Since you were the one to compile these for
4    production, to the extent there was an RFI you would
5    have intended to produce it, barring some oversight;
6    is that fair?
7    A.   Yes.
8    Q.   Okay.
9            MARKED FOR IDENTIFICATION:
10           DEPOSITION EXHIBIT 9
11           12:02 p.m.
12   BY MR. HIRSCH:
13   Q.   Sir, our court reporter has just handed you what we've
14   marked as Exhibit Number 9.  Do you have that in front
15   of you?
16   A.   Yes.
17   Q.   And you'll see that this appears to be an RFI with the
18   number 02-14345, I believe, it is a little hard to
19   read?
20   A.   Yes.
21   Q.   Do you know why there would not have been some letter
22   issued by the commission with respect to this RFI
23   number that was produced?
24   A.   I don't know.
25   Q.   Is there always some letter that goes out from the



PAUL FISCHER
July 28, 2017

---

### Page 133

1  commission with respect to each RFI number?
2  **A. I hate saying always, but, yes.**
3  Q.  Well, let me -- I understand that always and never are
4  tough ones, but you can't think of a circumstance
5  where there would be an RFI number assigned to some
6  file where there wouldn't be a letter from the
7  commission that ended the file, correct?
8  **A. Right.**
9  Q.  It was your practice as executive director to at least
10  notify the grievant that the grievance was resolved in
11  some way?
12  **A. And the judge, yes.**
13  Q.  And the judge, okay.  Now, are you aware that there
14  were some files produced by the JTC after the time you
15  were no longer executive director?
16  **A. No.**
17  Q.  Okay.  And you would not have had anything to do with
18  that production, correct?
19  **A. I didn't know that anything had happened.  I don't**
20  **know that I hadn't prepared something beforehand, but**
21  **I don't -- I have no knowledge of anything.**
22  Q.  Okay.  We've looked at two categories of documents
23  that would be in a JTC file, the RFI and the letter
24  from the commission.  You would agree with me there,
25  those two categories?

### Page 134

1  **A. The last few exhibits, yes.**
2  Q.  And in general, would you agree with me that those
3  would be included in the JTC file?
4  **A. Yes.**
5  Q.  Not everyone would have an RFI, right, we talked about
6  that, but --
7  **A. But it would have some sort of memo --**
8  Q.  -- examples --
9  **A. An initiating document and a closing document.**
10  Q.  Okay.  Are meeting minutes of the JTC generally kept
11  in the file for a particular RFI?
12  **A. No, but there will be a little blurb, from the meeting**
13  **that governs a particular case, will generally be**
14  **included in the file.  So, for example, if the**
15  **commission said, you know, in whatever case, you know,**
16  **so-and-so made a motion to authorize the staff to talk**
17  **to a witness or obtain whatever document, that little**
18  **blurb would be included in the file just to kind of**
19  **keep a chronologic record of what was happening.**
20  Q.  If a response is requested from the judge subject to
21  the grievance, that would be kept in the file,
22  correct?
23  **A. If the respondent judge submits a response to**
24  **something, is that what you're asking?**
25  Q.  Well, one thing you can do during an investigation,

### Page 135

1  right, is you can request a response from the judge,
2  correct?
3  **A. Yes, with respect to the judge's comments on**
4  **something, yes, that would be put in the file, yes.**
5  Q.  Okay.  If the judge perhaps had counsel,
6  correspondence with that counsel would be kept in the
7  file: is that correct?
8  **A. Yes.**
9  Q.  And you said in certain instances there might be some
10  other memos prepared, correct?
11  **A. Yes.**
12  Q.  And those would be kept in the corresponding file,
13  correct?
14  **A. Yes.**
15  Q.  Are there any other categories of documents you can
16  think of that might be in the file?
17  **A. The grievance reports, the memo -- which are the memos**
18  **from the staff and me to the commission, they would be**
19  **in there.**
20  Q.  The reports we talked about earlier in some detail,
21  correct?
22  **A. Yes.  The ballots that the commissioners would -- when**
23  **they vote on something, they would be in there too.**
24  **Any additional things that a grievant might send in to**
25  **us, that would be in there.  They frequently would**

### Page 136

1  **update things.  Attorney notes.**
2  Q.  Does -- well, strike that.
3      While you were at the JTC did the JTC keep
4  any record as to the race of each judge that was being
5  investigated?
6  **A. No.**
7  Q.  Did the JTC keep any record of the gender of each
8  judge it was investigating?
9  **A. The sex of the judge, no.**
10  Q.  Yes, male or female?
11  **A. No.**
12  Q.  And in fact you may recall during discovery in this
13  case we actually had a discussion in the courtroom and
14  you indicated that the JTC couldn't provide the race
15  or gender of the particular judges because it didn't
16  keep that information, correct?
17  **A. That's correct.**
18  Q.  Are you aware that later in the case, after you left
19  your position with the JTC, the JTC indicated it was
20  able to provide information as to the race and gender
21  of certain judges?
22  **A. No, I'm not aware of that.**
23  Q.  Okay.  So you would not know how they were able to do
24  that, correct?
25  **A. No.  I could say they couldn't do it by looking at the**

PAUL FISCHER
July 28, 2017

### Page 141

1    MR. HIRSCH:  Okay.  I just --
2    MR. NELSON:  It may have been produced and
3    subject to the Rules of -- excuse me, subject to
4    Federal Rule of Civil Procedure 26, I'm informing you
5    that it appears that it may have been -- it certainly
6    was produced without my client's knowledge and
7    permission and to the extent that it's his attorney
8    work product he has not consented to production.
9        So then there's a Clawback Rule there in
10   Rule 26 and we will need to review this to make a
11   determination as to whether we would be seeking to
12   claw it back.
13   MR. HIRSCH:  All right.  So you'll
14   certainly do that, I trust.
15   BY MR. HIRSCH:
16   Q.  Okay.  Sir, I want to move on now to a slightly
17   different area.  I mean, your counsel has a copy of
18   that too so, I mean, you'll certainly get a chance to
19   look at it later, if you wish.
20        I want to talk about some specific judges
21   that the JTC investigated during your tenure, okay?
22   A.  That's what you want to talk about, that's okay.
23   Q.  Okay.  Do you recall Judge James Kandrevas?
24        MS. MILLER:  I'm going to place an
25   objection insofar as there was no formal complaint

### Page 142

1    issued to him.  Our agreement was no names would be
2    used with the exception of those where formal
3    complaints were issued.  So insofar as he was not the
4    subject of a formal complaint, I think that is in
5    contrary to the agreement that we reached.
6        MR. HIRSCH:  Well, I'm going to disagree on
7    a portion, which is that I think our agreement was
8    that the JTC certainly didn't have to produce that
9    information, but not that we could not have obtained
10   that information from any other source.
11       MS. MILLER:  Well, but the -- for
12   Mr. Fischer to answer that question he would have to
13   be releasing information -- producing information that
14   would be in the JTC's possession.  And to even confirm
15   that there was an investigation, if there was no
16   formal complaint, would I think violate the agreement
17   that we had reached.
18       MR. HIRSCH:  Well, let's go question by
19   question and then you'll --
20       MS. MILLER:  Okay.
21       MR. HIRSCH:  -- object.
22       I think some of them you'll raise an
23   objection, some of them I may take issue with that
24   particular objection.
25   BY MR. HIRSCH:

### Page 143

1    Q.  So I think --
2    A.  Before you ask a question, may I consult with my
3    attorney on something?
4    Q.  Yeah.
5        (Recess taken at 12:18 p.m.)
6        (Back on the record at 1:07 p.m.)
7    BY MR. HIRSCH:
8    Q.  Good afternoon, sir.  Before we broke we had some
9    objections, but I am going to ask my question again
10   and obviously your counsel or any counsel here I guess
11   will make whatever objection they deem appropriate,
12   but I don't know that we got the question out
13   completely and got the objection on the record.
14       So I guess my first question was do you
15   recall Judge James Kandrevas?
16   A.  Do I recall that name?
17   Q.  Yeah, does the name ring a bell?
18   A.  I've heard of him.
19   Q.  Okay.  Do you recall whether the JTC investigated
20   Judge Kandrevas?
21       MS. MILLER:  I'll place an objection to
22   that as it exceeds the scope of the agreement of the
23   parties in terms of what information from the JTC
24   would be disclosed.
25       MR. HIRSCH:  So are you -- just to be

### Page 144

1    clear, are you directing him not to answer?
2        MS. MILLER:  I'm directing him not to
3    answer.
4        MR. HIRSCH:  Okay.  And just to be clear --
5    and I'll skip some questions, I mean, without waiving
6    my right to challenge the objection, but I understand
7    it.  Then probably this line you would object to so
8    you will permit me to challenge it and I will just
9    give you the objection and not continue on for -- I
10   may ask some others that I don't think are
11   objectionable, but --
12       MS. MILLER:  That's -- I would not -- if
13   the determination is later made that this line of
14   questioning is appropriate and that he should answer,
15   I would not later say as well, you didn't ask that
16   question and allow me to specifically object before.
17       MR. HIRSCH:  Right.  In other words, I have
18   some questions underneath, but I will not ask those
19   with that understanding.
20       MS. JAMES:  How many lawyers does he have
21   here?
22       MR. HIRSCH:  Well, no, she's objecting on
23   behalf of the JTC, I presume.
24       MS. MILLER:  Correct.
25       MR. NELSON:  And for the record, Ms. James,



PAUL FISCHER
July 28, 2017

Page 145

1 you're not permitted to speak on the record during the
2 deposition.
3        MS. JAMES:  You don't direct me.
4        MR. HIRSCH:  Okay.  Let's -- let's not get
5 into it.
6        All right.  I am going to ask a couple more
7 questions on this that you may or may not choose to
8 object to.
9 BY MR. HIRSCH:
10 Q.   Do you recall that in a civil deposition Judge
11 Kandrevas asserted his Fifth Amendment right over 200
12 times?
13        MS. MILLER:  Insofar as his answer would
14 require him to call upon knowledge he gained through
15 his employment with the JTC, I would object and
16 instruct him not to answer on the previous basis.  If
17 he has personal knowledge of that apart from what he
18 would have learned through the JTC, he -- I think he
19 could answer.  For instance, if there was -- he gained
20 information through a public news story or something
21 like that.
22        MR. NELSON:  Would you mind repeating the
23 question, Jason?
24 BY MR. HIRSCH:
25 Q.   Yeah, so the question -- actually, why don't we have

Page 146

1 the court reporter read it back and I won't change it?
2 Why don't we stick to that exact question then?
3        (The following requested portion of the
4        record was read by the reporter at
5        1:10 p.m.:
6        Q.  Do you recall that in a civil
7        deposition Judge Kandrevas asserted his
8        Fifth Amendment right over 200 times?)
9 A.   I have no personal knowledge of that.
10 BY MR. HIRSCH:
11 Q.   If you gained knowledge that a judge had asserted his
12 Fifth Amendment right 200 times in a civil case, would
13 that have raised concern for you as executive director
14 of the JTC?
15 A.   I can't speculate.
16 Q.   So it would depend on the particular facts and
17 circumstances?
18 A.   I can't speculate what I might do or might have done
19 based on what might have happened or might not have
20 happened.
21 Q.   Do you recall a judge named Byron Konschuh,
22 K-O-N-S-C-H-U-H?
23 A.   I'm aware of that name, yes.
24 Q.   Were you aware that there were felony charges filed
25 against Judge Konschuh in the summer of 2014?

Page 147

1        MS. MILLER:  I'm going to make the same
2 objection as I had made before on the basis of
3 personal knowledge versus knowledge through the JTC
4 and insofar as it requires information gained through
5 his employment with the JTC I would instruct him not
6 to answer.
7 BY MR. HIRSCH:
8 Q.   Subject to that objection are you able to answer that
9 question?
10 A.   I have no personal knowledge, although I may have seen
11 something in the newspaper about it.
12 Q.   By the way, with respect to Judge Kandrevas, do you
13 know whether he is Caucasian?
14 A.   I do not know.
15 Q.   Okay.  And do you know whether Judge Konschuh is
16 Caucasian?
17 A.   I do not know.
18 Q.   Do you recall a judge named David Stow?
19        MR. NELSON:  You can answer.
20        MS. MILLER:  Insofar as you know there's a
21 judge named David Stow.
22 A.   Any knowledge I would have about somebody with that
23 name would only have come from my work at the Tenure
24 Commission so I can neither confirm or deny that I
25 recognize that name.

Page 148

1 BY MR. HIRSCH:
2 Q.   Do you recall a judge named Mary Waterstone?
3        MS. MILLER:  Same objection.
4 A.   I've heard that name.
5 BY MR. HIRSCH:
6 Q.   Did you hear that from some press coverage about
7 Ms. Waterstone?
8 A.   I believe there was something in the -- it was
9 actually a local judge and there was something in the
10 paper.
11 Q.   Does it refresh your recollection if I tell you that
12 she was a former Wayne County Circuit Court judge?
13 A.   I believe that's correct.  I think she died too.
14 Q.   I believe she did pass away.
15        MARKED FOR IDENTIFICATION:
16        DEPOSITION EXHIBIT 11
17        1:13 p.m.
18 BY MR. HIRSCH:
19 Q.   Sir, you've just been handed what we've marked as
20 Exhibit 8 to your deposition -- 11, I'm sorry, I
21 apologize, what we've marked as Exhibit 11 to your
22 deposition and it's actually a couple of newspaper
23 articles.  The first one talks about Judge Waterstone,
24 and that's on pages 1 and 2.  And there's another
25 article that starts on the third page, it looks like



PAUL FISCHER
July 28, 2017

---

Page 149

1    it's titled Troubling Trend When Michigan Judges Need
2    Disciplining.
3            Do you have that sort of package in front
4    of you?
5    A.  Yes.
6    Q.  Okay.  And if you sort of look at the first two pages,
7    it looks to be an AP article on Judge Waterstone.
8    Does that refresh your recollection on the nature of
9    the allegations made against Judge Waterstone?
10   **A.  Yes.  When you say allegations, I'm assuming you're**
11   **referring to the criminal allegations?**
12   Q.  Yes, the allegations that they're talking about in
13   here, which is talking about criminal charges,
14   right --
15   **A.  Yes.**
16   Q.  -- that's the first paragraph?
17   **A.  Yes.**
18   Q.  I'd like to direct your attention now, if you could
19   look at the second page, the last paragraph of the
20   article, the second sentence there.  It says the State
21   Judicial Tenure Commission, which serves as a watchdog
22   of judges, did not file a formal complaint but scolded
23   Waterstone.  Do you see that sentence?
24   **A.  Yes, I do.**
25   Q.  Okay.  Is it accurate that the Judicial Tenure

---

Page 150

1    Commission did not file a formal complaint against
2    Waterstone?
3            MS. MILLER:  I'm going to place an
4    objection along the lines of the previous objection,
5    as there was no formal complaint.  The parties agreed
6    that the JTC would not produce information related to
7    any specific judge based upon names only.
8    BY MR. HIRSCH:
9    Q.  You have no reason to think this article is wrong,
10   correct?
11   **A.  I don't know.  I can tell you there was no formal**
12   **complaint against her.**
13   Q.  Now, the article also then says but scolded
14   Waterstone.  Do you see that?
15   **A.  I see that.**
16   Q.  Do you know what that means?
17   **A.  I do not.**
18   Q.  Okay.  Do you recall giving any comment to the press
19   with respect to Judge Waterstone?
20   **A.  I -- I do not recall, no.**
21   Q.  Do you recall the press making any inquiries to you
22   about Judge Waterstone?
23           MS. MILLER:  I'm going to, again, place an
24   objection because that would presuppose that there was
25   a matter involving Judge Waterstone in front of the

---

Page 151

1    JTC, which based upon the judge's name we had agreed
2    we will not be providing that information regarding
3    specific judges.
4            MR. HIRSCH:  I'm not sure my question
5    actually though presupposes anything, just whether the
6    press made a call to the JTC asking about Waterstone.
7    So are you still going to direct him not to answer?
8            MS. MILLER:  If you're asking whether the
9    press made a call regarding Waterstone, I think that's
10   okay.
11   BY MR. HIRSCH:
12   Q.  Yes, did -- do you recall whether the press ever made
13   any inquiry to you about Judge Waterstone?
14   **A.  I do not specifically recall, no.  If the press would**
15   **call, the media would call, and they frequently did,**
16   **about judges that were not subject to formal**
17   **complaint, the standard answer that I would give is I**
18   **can neither confirm nor deny the existence or**
19   **nonexistence of a file against any particular judge.**
20   Q.  But you certainly can't recall ever saying that a
21   judge was scolded, correct?
22   **A.  I definitely never said that.**
23   Q.  Okay.  And in fact you wouldn't even know what that
24   means, right?
25   **A.  I know what scolded means, but --**

---

Page 152

1    Q.  Well, but that's -- you're right, you know what
2    scolded means, I didn't mean to suggest otherwise, but
3    that is not any of the forms of discipline or even
4    categories of things that do not fall into
5    discipline -- that's not a term that the JTC uses,
6    correct?
7    **A.  Correct.**
8    Q.  You would agree with me that conspiring to suborn
9    perjury is a serious charge, correct?
10   **A.  Yes.**
11   Q.  And would you agree with me that if a charge of that
12   nature had come to your attention anyway, that would
13   be something the JTC would investigate?
14   **A.  Again, I cannot speculate.**
15   Q.  Do you recall a judge named Mark Somers?
16   **A.  I've heard the name.**
17   Q.  Do you recall that there was a substantial civil jury
18   award rendered against Judge Somers?
19   **A.  Something like that, yes.**
20   Q.  Do you know whether Judge Somers is Caucasian?
21   **A.  I believe he is, but I don't know.  I don't know that**
22   **I've ever seen him, although I may have.**
23   Q.  Do you recall that the nature of the civil suit
24   against Judge Somers involved the former employee who
25   claimed to have been improperly terminated?

---




PAUL FISCHER
July 28, 2017

---

Page 153

1    A.  Something, I don't -- I couldn't state details like
2        that, something involving an employment matter.
3    Q.  Do you recall a judge named Marc Barron?
4    A.  Yes, I know who that is.
5    Q.  Do you know a judge named Kimberly Small?
6    A.  Yes, I know who she is.
7    Q.  And you're familiar with the 48th District Court,
8        correct?
9    A.  Yes, used to practice there.
10   Q.  Were you aware of a civil case filed by a former clerk
11       of the 48th District Court who alleged improper
12       termination and defamation?
13   A.  I'm aware that there was a case like that, yes.
14   Q.  Were you aware that there was a jury award of damages
15       of around $3 million in that case?
16   A.  I know that -- I know there was some type of an award,
17       I don't know any details of that.
18   Q.  Do you know whether Judge Barron is Caucasian?
19   A.  Yes, he is.
20   Q.  Do you know whether Judge Small is Caucasian?
21   A.  Yes, she is.  At least I would consider them to be, I
22       couldn't tell you what they consider themselves.
23   Q.  You have filed two lawsuits against the Judicial
24       Tenure Commission, correct?
25   A.  Say that again?

---

Page 154

1    Q.  You as a plaintiff --
2    A.  Yes, I --
3    Q.  -- filed two lawsuits against the Judicial Tenure
4        Commission?
5    A.  Yes.
6    Q.  One is in the Wayne County Circuit Court, correct?
7    A.  Yes, yes.
8    Q.  And one is in the federal court for the Eastern
9        District of Michigan, correct?
10   A.  Yes.
11   Q.  You were terminated from your position as executive
12       director of the JTC, correct?
13   A.  Yes.
14   Q.  That was in September of 2016; is that correct?
15   A.  Yes.
16   Q.  And in your lawsuit you contend you were terminated
17       without a valid reason; is that correct?
18   A.  The complaint speaks for itself.
19                  MARKED FOR IDENTIFICATION:
20                  DEPOSITION EXHIBIT 12
21                  1:21 p.m.
22   BY MR. HIRSCH:
23   Q.  Sir, I've just handed you what we've marked as
24       Exhibit 12.  It's the complaint in a case captioned
25       Paul J. Fischer vs. State of Michigan and the Judicial

---

Page 155

1        Tenure Commission.  Do you have that in front of you?
2    A.  Yes.
3    Q.  Do you recognize this document?
4    A.  Yes.
5    Q.  And this would be the complaint you filed in the Wayne
6        County Circuit Court, correct?
7    A.  Yes.
8    Q.  And specifically in this complaint you allege that you
9        were terminated in violation of the Michigan
10       Whistleblower's Protection Act, correct?
11   A.  Yes.
12   Q.  And in this complaint you allege some concerns that
13       you had about the behavior of certain commissioners,
14       correct?
15   A.  Yes.
16   Q.  Okay.  And this complaint is related to events that
17       occurred in connection with the grievance filed
18       against Judge Gorcyna from Oakland County; is that
19       correct?
20   A.  Yes.
21   Q.  And in paragraph 22 of this complaint you allege on
22       August 26th, 2016 JTC commissioner one advised Fischer
23       that --
24   A.  I'm sorry, what paragraph?
25   Q.  I'm reading from paragraph 22.

---

Page 156

1    A.  Okay.
2    Q.  I'll start again.  On August 26th, 2015 JTC
3        commissioner one advised Fischer that, quote, I have a
4        real reservation about bringing a formal complaint,
5        but don't see any harm to at least sending out a
6        28-day letter to see what her side of this whole story
7        is, therefore I approve.  Correct?
8    A.  That's what it says.
9    Q.  Okay.  In paragraph 24 of your complaint you allege,
10       among other things, commissioner two emphatically
11       advised Fischer on at least two occasions that a
12       public censure was the most severe sanction that Judge
13       Gorcyca should face and that commissioner two had even
14       expressed that opinion to Judge Gorcyca in one of
15       their many discussions of the matter.  Did I read that
16       correctly, sir?
17   A.  Yes.
18   Q.  It would not be proper for a commissioner to discuss
19       with you whether a judge had committed misconduct,
20       correct?
21                  MR. NELSON:  Can you read that question
22       back again, I'm sorry?
23                  (The following requested portion of the
24                  record was read by the reporter at
25                  1:25 p.m.:

---



PAUL FISCHER
July 28, 2017

---

Page 157

1     Q. It would not be proper for a
2         commissioner to discuss with you whether a
3         judge had committed misconduct, correct?)
4     **A. No, that would not be improper.**
5     BY MR. HIRSCH:
6     Q. Well, let's look at what you allege in paragraph 22.
7         Are you alleging that there is something improper with
8         respect to what you quote commissioner one as having
9         advised you in paragraph 22?
10    **A. I'm confused. Are you asking me questions about my**
11        **lawsuit or are you asking questions about Ms. James'**
12        **lawsuit?**
13    Q. Well, right now I'm asking you questions about
14        paragraph 22 in a complaint that you made.
15    **A. I don't understand your question then.**
16    Q. Are you alleging that there is anything improper about
17        what commissioner one -- what you allege commissioner
18        one advised you in paragraph 22 of the complaint?
19    **A. That's what the complaint says.**
20    Q. Are you alleging that there is anything proper (sic)
21        about what you allege -- in what you allege in
22        paragraph 24 that commissioner two advised you?
23    **A. Is there anything improper?**
24    Q. Yes.
25    **A. You said proper.**

---

Page 158

1     Q. Improper.
2     **A. That's what it says.**
3     Q. Okay. Outside of a hearing before the commission,
4         would it be proper for a commissioner to discuss with
5         you the level of discipline a judge should receive?
6     **A. It would depend on a number of factors.**
7     Q. Who is commissioner one in this complaint?
8             MS. MILLER: I'm going to place an
9         objection, it would go into the deliberative process
10        of the members of the JTC. The commissioner has not
11        been identified. I'm going to instruct him not to
12        disclose the name of the commissioner.
13            MR. HIRSCH: Well, I'm puzzled. It seems
14        to me that the deliberative process would go to the
15        substance of some conversation, which it appears to me
16        Mr. Fischer has already identified in a complaint, not
17        the identity of a particular speaker. Are you still
18        going to direct him not to answer?
19            MS. MILLER: I'm still going to instruct
20        him not to answer.
21    BY MR. HIRSCH:
22    Q. Is there a reason you chose not to identify
23        commissioner one in your complaint?
24    **A. You'd have to ask my attorney.**
25            MR. HIRSCH: I presume that you will make

---

Page 159

1         the same objection as to the identity of commissioner
2         two?
3             MS. MILLER: Correct.
4     BY MR. HIRSCH:
5     Q. You mentioned that you were deposed and you thought
6         maybe it was in connection with both of your cases and
7         maybe agreed to do them together, I think you said,
8         relatively recently, correct?
9     **A. Yes.**
10    Q. Is there a protective order in those cases?
11    **A. I believe so.**
12    Q. During your deposition in those cases did you identify
13        commissioner one?
14    **A. I think so.**
15    Q. Did you identify commissioner two?
16    **A. I'm pretty sure I identified all three, yes.**
17    Q. In paragraph 33 of this complaint you allege at the
18        holiday celebration a commissioner made a speech
19        recognizing JTC as the watchdog and protecting the
20        public from judicial misconduct.
21            Focusing just on that sentence, which
22        commissioner made that speech?
23    **A. That was outgoing Commissioner Michael Hathaway.**
24    Q. And then the remainder of paragraph 33 you allege
25        commissioner four was overheard by JTC staff to say,

---

Page 160

1         quote, something they --
2     **A. Sometimes.**
3     Q. I apologize. Sometimes they, bracket, the JTC, close
4         bracket, gets it wrong. Correct, that's the
5         allegation?
6     **A. Yes.**
7             MR. HIRSCH: Okay. I presume the same
8         objection as to the identity of commissioner four or
9         maybe I shouldn't presume anything?
10            MS. MILLER: If the -- I am not familiar
11        with this lawsuit.
12            I will instruct Mr. Fischer not to answer
13        that if that statement was made in connection with a
14        particular deliberation, but if it was a statement in
15        passing at a holiday celebration, like that's how it
16        looks to me, I don't believe that would be subject to
17        privilege of any kind.
18    **A. It was said at the holiday celebration.**
19    BY MR. HIRSCH:
20    Q. Okay. So can you identify then commissioner four for
21        me?
22    **A. That was David Fischer.**
23    Q. Okay. No relation, by the way, correct?
24    **A. No. Same spelling, no relation.**
25    Q. Okay. And you allege here it was overheard by JTC

---



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
A U.S. Legal Support Company

US LEGAL SUPPORT
The Power of Commitment™

PAUL FISCHER
July 28, 2017

## Page 161

1  staff.  Do you see that?
2  **A.  Yes.**
3  Q.  And can you identify for me the staff that overheard
4      that?
5  **A.  Margaret Rynier certainly was one and I believe also**
6  **Celest, C-E-L-E-S-T, Robinson, who was one of the**
7  **administrative assistants.**
8  Q.  And did Ms. Rynier convey that to you, tell you what
9      she heard?
10 **A.  She probably -- I mean, I heard that and I probably**
11 **heard it from her.**
12 Q.  You didn't hear it directly though, this statement by
13     commissioner four?
14 **A.  I did not hear that directly, no.**
15 Q.  Okay.  And you also allege in this complaint that, and
16     I can refer you, if you'd like, to paragraph 46, but
17     I'm paraphrasing, that you had expressed some concerns
18     that the JTC was somehow treating the Gorcyca matter
19     differently than it treated other cases; is that
20     correct?
21 **A.  That's what it says, yes.**
22 Q.  Do you know why that was the case?
23         MS. MILLER:  I'm not sure I understand your
24     question.
25         MR. HIRSCH:  Well, let me ask a different

## Page 162

1      question.
2  BY MR. HIRSCH:
3  Q.  What was the basis for your assertion that the Gorcyca
4      case was being treated differently than the JTC
5      treated other cases?
6          MR. NELSON:  I'm going to object to the
7      extent that you're calling for his mental impressions
8      that formed anticipation of litigation in the Gorcyca
9      matter.
10 BY MR. HIRSCH:
11 Q.  You would agree with me that one goal of the JTC is to
12     treat equivalent cases similarly, correct?
13 **A.  Yes.**
14 Q.  And so was that one reason that you expressed concern
15     in the Gorcyca case, because you thought it was being
16     treated somehow differently than other cases?
17         MR. NELSON:  Same objection.
18 BY MR. HIRSCH:
19 Q.  Judge Gorcyca is Caucasian, correct?
20 **A.  Yes.  At least that's how I see her, I don't know how**
21 **she defines herself.**
22 Q.  I understand, I mean, and I understand that with
23     respect to all of these, that's your view from having
24     perhaps seen these people.  You certainly didn't go
25     into their ancestry, I assume.

## Page 163

1  **A.  Right.**
2  Q.  You allege in your complaint at paragraph 56 that you
3      filed with the commission a detailed analysis of Judge
4      Gorcyca's conduct that rejected the construct favored
5      by many of the commissioners, correct?
6  **A.  Yes.**
7  Q.  Fair to say that in your conduct you were seeking to
8      treat Judge Gorcyca the same as you would treat any
9      other judge, correct?
10 **A.  Yes.**
11 Q.  What was the construct favored by many of the
12     commissioners?
13         MS. MILLER:  I'm going to place an
14     objection and instruct him not to answer, that it
15     would be, I believe, part by deliberative process
16     and/or potentially attorney/client communications.
17 BY MR. HIRSCH:
18 Q.  Did you normally provide the type of detailed analysis
19     that you provided in Judge Gorcyca's case in other
20     cases?
21 **A.  This is referring to the brief that we would have**
22 **submitted as examiner and associate examiner in**
23 **support of the master's decision and with the**
24 **disciplinary analysis with the recommendation for**
25 **discipline.  That's a public document.**

## Page 164

1  Q.  I'm sorry, so your detailed analysis that you submit
2      to the JTC is public?
3  **A.  Yes, it's a brief.  It's a brief in support of the**
4  **master's decision and argument -- or disciplinary**
5  **analysis with recommendation for discipline.**
6  Q.  Okay.  That's -- I understand what that's referring to
7      now.  Would you agree with me that the construct
8      favored by many of the commissioners is that Judge
9      Gorcyca was a good judge who had a bad day?
10         MS. MILLER:  I'll place the same objection
11     as before, I believe that would -- he would have that
12     information, I believe, in attorney/client
13     relationship and/or it would be the deliberative
14     process -- processes of the JTC.
15 BY MR. HIRSCH:
16 Q.  The master on that case was former Judge Dan Ryan,
17     correct?
18 **A.  Yes.**
19 Q.  In Judge Gorcyca's matter, right?
20 **A.  Yes.**
21 Q.  And Judge Ryan's determination was that Judge Gorcyca
22     had engaged in judicial misconduct, correct?
23 **A.  Yes.**
24 Q.  And you agreed with Judge Ryan's conclusion, right?
25 **A.  Yes.**




PAUL FISCHER
July 28, 2017

Page 165

1 Q. Now, you did then submit the report -- well, strike
2    that.
3       What's called in your complaint a detailed
4    analysis, but what you submitted was your position
5    that Dan Ryan's recommendation should be affirmed by
6    the commission, right?
7 A. Yes.
8 Q. That's what was public, right?
9 A. Yes.
10 Q. You actually did not argue that case in front of the
11    commission, correct?
12 A. That's right.
13 Q. Because you were terminated before it ended up being
14    argued, right?
15 A. Yes.
16 Q. And actually it had been scheduled to be argued on
17    September 12th, 2016, correct?
18 A. Yes.
19 Q. But it got moved to October 10th, 2016, correct?
20 A. Yes.
21 Q. And September 12th, 2016 was the date you were
22    actually terminated, correct?
23 A. Yes.
24 Q. Do you have any idea why the oral argument on Judge
25    Gorcyca's hearing was moved?

Page 166

1 A. One of her attorneys was scheduled to be out of town
2    or some such thing after the scheduling order had been
3    entered and so they asked to have it adjourned a
4    month.
5 Q. Did the JTC give you a reason that you were terminated
6    from your position as executive director?
7 A. Yes, they gave me two.
8 Q. What were the two reasons?
9 A. They didn't like the direction some of the -- the
10    twists some of the investigations had taken and they
11    wanted to go in a different direction.
12 Q. You --
13 A. When -- I should say that was conveyed to me by Tom
14    Ryan, I assume he was speaking on behalf of the
15    commission.
16 Q. You were --
17 A. Commissioner Tom Ryan, sorry.
18 Q. Right, not -- I got it. You were offered the
19    opportunity to resign, correct?
20 A. Yes.
21 Q. You declined to do so, correct?
22 A. Correct. I should say I was offered the opportunity
23    to resign later, I mean, they came in and fired me and
24    later in the week they gave me the opportunity to
25    resign.

Page 167

1 Q. Maybe not much of an opportunity, maybe that's an
2    ill-chosen word, huh?
3 A. Everything that happens in life is an opportunity.
4       MARKED FOR IDENTIFICATION:
5       DEPOSITION EXHIBIT 13
6       1:40 p.m.
7 BY MR. HIRSCH:
8 Q. Sir, I've just handed you what we've marked as Exhibit
9    Number 13 to your deposition, which is titled
10    affidavit of Honorable David H. Sawyer and the caption
11    on it is from your Wayne County Circuit Court case.
12    Do you have that in front of you, sir?
13 A. Yes.
14 Q. Have you seen this affidavit before?
15 A. Yes.
16 Q. And in paragraph 11 of this affidavit Mr. Sawyer says
17    that you were terminated based on work performance.
18    Do you see that?
19 A. Yes.
20 Q. And he says including issues identified by the
21    Michigan Supreme Court in four cases that he
22    identifies. Do you see those?
23 A. Yes.
24 Q. The first case he mentions is a case called In Re
25    Servaas, 484 Mich 634 (2009). Do you see that?

Page 168

1 A. Yes.
2 Q. Do you recall that case?
3 A. Yes.
4 Q. And were you criticized by the Michigan Supreme Court
5    in that case?
6 A. In the court's opinion cited here, yes, there was some
7    criticism. I'm not sure if it was just me or me and
8    the commission and this is the case that led to the
9    grievance against me that ended up being dismissed by
10    the Attorney Grievance Commission, affirmed by the
11    Supreme Court, finding I had done nothing grievable.
12 Q. Are you familiar with the Supreme Court's opinion In
13    Re Servaas?
14 A. I haven't read it in a while, but I've certainly seen
15    it.
16 Q. With respect to the portions of that opinion about --
17    of your conduct, was that accurate or inaccurate?
18 A. I can't say without reading it, I haven't seen it in a
19    while.
20       MARKED FOR IDENTIFICATION:
21       DEPOSITION EXHIBIT 14
22       1:44 p.m.
23 BY MR. HIRSCH:
24 Q. Sir, I've handed you what we've marked as Exhibit
25    Number 14, which is the Michigan Supreme Court's



PAUL FISCHER
July 28, 2017

---

Page 169

1    opinion in In Re Servaas.  Do you have that in front
2    of you, sir?
3    **A.  Yes.**
4    Q.   And I would direct your attention to page 6 of this
5    document.  It has two columns.  In the left-hand
6    column there's a section that begins with the letter B
7    and it's titled conduct of the executive director of
8    the JTC.  Do you see that?
9    **A.  Yes.**
10   Q.   And that would be you during this period of time,
11   correct?
12   **A.  Yes, yes.**
13   Q.   Okay.  Is it accurate that you showed up at Judge
14   Servaas' chambers unannounced with a resignation
15   letter in hand?
16   **A.  Yes, at the commission's direction, yes.**
17   Q.   When you say at the commission's direction, was that
18   an approach that you recommended to the commission and
19   they affirmed that you should take that action or was
20   that just something the commission instructed you to
21   do?
22   **A.  That was something --**
23           MS. MILLER:  I'm going to place an
24   objection as to I think that would be -- his
25   recommendations to the commission would be protected

---

Page 170

1    by the attorney/client privilege at that stage of the
2    investigation.
3    BY MR. HIRSCH:
4    Q.   Had you ever done that before to any other judge?
5    **A.  I have approached judges personally with the**
6    **suggestion, slash, recommendation that they retire or**
7    **resign, yes.**
8    Q.   Well, in this particular case the Supreme Court said
9    you actually had a letter prepared.  That's true?
10   **A.  That is true, yes.**
11   Q.   Had you ever done it before where you actually had a
12   letter prepared when you showed up in the judge's
13   chamber?
14   **A.  No.**
15   Q.   And it says in the Supreme Court opinion that the
16   letter was actually on Judge Servaas' court
17   letterhead.  Is that accurate?
18   **A.  Yes.**
19   Q.   Where did you get the letterhead for Judge Servaas'
20   court?
21   **A.  I don't recall, some staff member gave it to me.  I**
22   **don't know.**
23   Q.   It also says that when you showed up there you showed
24   up with an armed Michigan State Police lieutenant.  Is
25   that accurate?

---

Page 171

1    **A.  I don't know that I knew he was armed, but, yes, I was**
2    **with a Michigan State Police lieutenant.**
3    Q.   Okay.  Had you requested the Michigan State Police to
4    accompany you?
5           MR. NELSON:  You a may answer.
6    **A.  The commission did.**
7    BY MR. HIRSCH:
8    Q.   Had you ever gone to any judge's chamber with a
9    Michigan State Police Officer other than this time?
10   **A.  No.**
11   Q.   Was there a reason you needed a Michigan State Police
12   Officer this time?
13           MS. MILLER:  Insofar that that would
14   require him to disclose confidential communications
15   between himself and the JTC, I'll instruct him not to
16   answer.
17           MR. NELSON:  Could you read the question
18   back?
19           (The following requested portion of the
20           record was read by the reporter at
21           1:48 p.m.:
22           Q.  Was there a reason you needed a
23           Michigan State Police Officer this time?)
24   **A.  The judge was known to have a large number of weapons,**
25   **firearms and kept at least one or two at the**

---

Page 172

1    **courthouse.**
2    BY MR. HIRSCH:
3    Q.   So it was a safety issue, correct?
4    **A.  Yes.**
5    Q.   It was not meant as an intimidation tactic, correct?
6    **A.  Correct.**
7    Q.   There were, I presume, other officers at the court,
8    correct?
9    **A.  I don't know.**
10   Q.   Is it accurate that you offered Judge Servaas the
11   opportunity to resolve the matter quickly without any
12   shame, proceedings or accusations of perjury if he
13   were to resign?
14   **A.  That sounds accurate, yes.**
15   Q.   If you were -- well, strike that.
16           I think you testified earlier that you had
17   sometimes personally approached a judge to give them
18   the option to resign, correct?
19   **A.  Yes.**
20   Q.   If you were concerned about safety in Judge Servaas'
21   courtroom, was there a reason you didn't just mail him
22   something?
23           MR. NELSON:  Objection, lack of foundation.
24   BY MR. HIRSCH:
25   Q.   Well, let's put it this way, your concerns about

---



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
A U.S. Legal Support Company

US LEGAL SUPPORT
The Power of Commitment™

PAUL FISCHER
July 28, 2017

## Page 173

1  safety did not outweigh your desire to go there
2  personally, correct?
3          MR. NELSON:  Objection, lack of foundation.
4  I don't believe he testified that he had concerns
5  about safety.
6  BY MR. HIRSCH:
7  Q.  Did you have concerns about safety because Judge
8  Servaas kept a lot of weapons in his chambers?
9  A.  No.  You asked me, did I personally?
10  Q.  You personally, correct.
11  A.  Yes, I personally did not.
12  Q.  And I presume that you will not tell me whether the
13  commission had concerns about safety?
14          MS. MILLER:  Well, I'll instruct him not to
15  answer because I think that would be disclosing the
16  attorney/client communications.
17  BY MR. HIRSCH:
18  Q.  Now, you were actually presenting the 28-day letter
19  notice in this visit, correct?
20  A.  Yes.
21  Q.  So Judge Servaas at this time when you offered him the
22  opportunity to resign had not even had the chance to
23  respond to the 28-day letter, correct?
24  A.  Correct.
25  Q.  And is it accurate that you gave him until -- you gave

## Page 174

1  Judge Servaas until 9:00 a.m. the next morning to sign
2  the resignation letter?
3  A.  Yes.
4  Q.  And what would happen if he didn't sign the
5  resignation letter by 9:00 a.m.?
6  A.  Then the petition for in-term suspension that the
7  commission had authorized would be filed with the
8  court, the Supreme Court.
9  Q.  And you said this event was the basis of an attorney
10  grievance complaint against you, correct?
11  A.  I don't know about this event, but this case.
12  Q.  Do you know who made that grievance against you?
13  A.  There were a number of attorneys, a group of them.
14  Q.  Did you know who they were?
15  A.  I don't recall.
16  Q.  Do you know what their relationship was to this
17  matter?
18  A.  No official relationship, but I assume they were
19  friends of Judge Servaas or -- I don't know.  I don't
20  recall if the attorney in the case, the defense of
21  Judge Servaas, was one of the signatories, I just
22  don't recall.
23  Q.  The second case mentioned in Judge Sawyer's affidavit
24  is In Re Adams.  Do you recall that case?
25  A.  Yes.

## Page 175

1  Q.  You served as examiner on that case, correct?
2  A.  Yes.  Again, I was the examiner, yes.  I second
3  chaired.
4  Q.  Do you recall in that case that the commission had
5  recommended a 180-day suspension?
6  A.  Yes.
7  Q.  Do you recall that you disagreed with that
8  recommendation?
9  A.  Yes.
10  Q.  I presume that you had argued for a more severe
11  penalty when you had oral argument in front of the
12  commission, correct?
13  A.  Yes.
14  Q.  And the commission nonetheless recommended a 180-day
15  suspension, correct?
16  A.  Yes.
17  Q.  And then who -- well, strike that.
18          Did the respondent then object to the
19  Michigan Supreme Court?
20  A.  Again, so the commission's decision is filed with the
21  court and then the respondent has 28 days, I don't
22  remember the exact number or -- X number of days to
23  file objections.  And whether the respondent files or
24  not, the commission -- the court takes the case.
25  Q.  Right.  But you couldn't object?

## Page 176

1  A.  Correct, I can't file anything in an objection.
2  Q.  But you could respond to the objections filed by the
3  respondent, correct?
4  A.  Yes.
5  Q.  Okay.  And when you argued in front of the Michigan
6  Supreme Court you argued in favor of a greater
7  suspension than that recommended by the JTC, correct?
8  A.  Yes.
9  Q.  And the Supreme Court in its opinion expressed some
10  concern about that: is that fair to say?
11  A.  No.
12  Q.  Okay.  Do you recall whether they made any comment
13  about your argument in their decision in In Re Adams?
14  A.  Yes.
15  Q.  What did they say?
16  A.  In a footnote they questioned the authority of the
17  examiner to argue something greater or against what
18  the commission had recommended.
19  Q.  And I presume, given that you made that argument, you
20  believed that the examiner could argue for something
21  different or greater than what the commission
22  recommended, correct?
23  A.  I did and so did the commission.
24  Q.  Well, how do you know the commission did?
25  A.  Because in a couple of times that the commission had




PAUL FISCHER
July 28, 2017

---

Page 177

1  been asked by the Court to prompt -- to propose
2  additional rules, the commission specifically
3  requested that the rule be clarified to allow the
4  examiner to argue against their position.
5  Q.  Was the rule ever clarified subsequent to In Re Adams?
6  A.  It's still under consideration by the Court, although
7  the commission has changed its position since then,
8  since firing me.
9  Q.  The third case mentioned by Judge Sawyer is In Re
10  McCree.  Do you recall that case?
11  A.  Yes.
12  Q.  You served as examiner in that case?
13  A.  Yes.
14  Q.  Do you know what happened in that case that caused
15  Judge Sawyer to mention that as a basis for some
16  deficiency in your work performance?
17           MR. NELSON:  Objection, calls for
18  speculation.
19  BY MR. HIRSCH:
20  Q.  You can answer to the extent you understand.
21  A.  It's -- there's a footnote in that opinion as well
22  because the commission had recommended removal and I
23  was arguing for removal before the Court.  And I
24  referred to some facts in one of the counts that the
25  commission forgot to include and -- in its decision

---

Page 178

1  about comments the judge had -- Judge McCree had made
2  in court about the litigants and others who were
3  there, and I referred to one or two of those facts and
4  then they made the footnote again that this was
5  considered -- that they questioned me arguing outside
6  or some such thing.  I don't remember that one as
7  clearly.
8  Q.  So you're suggesting that these were facts that were
9  before the JTC, but had not ended up in their written
10  recommendation to the Michigan Supreme Court; is that
11  accurate?
12  A.  Yes, they were in the master's report so they're part
13  of the file.  They were part of the record.
14  Q.  The fourth case mentioned by Judge Sawyer is called In
15  Re Simpson.  Do you recall that case?
16  A.  Yes.
17  Q.  Relatively recent, correct?
18  A.  Yes.
19  Q.  And do you recall that in that case the Michigan
20  Supreme Court had remanded it back to the commission
21  to consider certain information that Judge Simpson had
22  obtained, but which was not in the -- well, strike
23  that.
24           Do you know the reason the Michigan Supreme
25  Court remanded the case back to the commission?

---

Page 179

1  A.  Judge Simpson filed a motion or something in the
2  Supreme Court alleging that I had withheld certain
3  information, some e-mails or some such thing, and that
4  the reason for doing so was based on racism.  The
5  court remanded back to the commission to see if any of
6  those would have made a difference in their opinion.
7           The commission remanded it back to the
8  master to see if it would have made a difference.  The
9  master held a hearing and found that we hadn't
10  withheld anything.  It made its way back to the
11  commission.  The commissioner addressed it again.  The
12  Supreme Court just issued the decision on Monday and
13  didn't address it either.
14  Q.  It was true in that case that some documents had not
15  been produced, correct?
16  A.  I can't answer the question the way you've asked it.
17  We produced everything that we had or everything we
18  knew we had.  We didn't know that we had certain
19  e-mails.
20  Q.  So it was, I think, your position that there was an
21  error because there was some attachment to an e-mail
22  that somehow did not get printed.  Was that roughly
23  it?
24  A.  Yes, it was never forwarded by regular -- we never saw
25  it before.  We never saw it until after the allegation

---

Page 180

1  was made by Judge Simpson and the Supreme Court.
2  Q.  In addition to the Wayne County complaint that we
3  looked at, you also filed a complaint in federal
4  court, correct?
5  A.  Yes.
6  Q.  Before filing that federal complaint you filed a
7  complaint with the EEOC, correct?
8  A.  Yes.
9  Q.  Okay.  What was the outcome of the complaint with the
10  EEOC?
11  A.  They gave authority to file the federal complaint.
12  Q.  So they didn't take any action, but they gave you a
13  right-to-sue letter, correct?
14  A.  That's correct.
15  Q.  In your federal complaint you allege that the JTC
16  discriminated against you because of your religion or
17  ethnicity, correct?
18  A.  Yes.
19  Q.  You are an orthodox Jew, correct?
20  A.  I don't use that term, I'm a Jew.
21           MARKED FOR IDENTIFICATION:
22           DEPOSITION EXHIBIT 15
23           2:01 p.m.
24  BY MR. HIRSCH:
25  Q.  Sir, just to be clear, I did not mean any disrespect,

---




PAUL FISCHER
July 28, 2017

Page 181

1    but --
2    A.  I understand, of course.
3    Q.  -- what we've just handed you is Exhibit Number 15,
4        which is the complaint in the case Paul Fischer vs.
5        State of Michigan and the Judicial Tenure Commission
6        filed in the Eastern District of Michigan.
7            Do you have that in the front of you, sir?
8    A.  Yes.
9    Q.  And that is your complaint in federal court, correct?
10   A.  Yes.
11   Q.  If I could refer you to paragraph 13 of your
12       complaint?  13, sir.
13   A.  Paragraph 13?
14   Q.  Paragraph 13, I'm sorry.
15   A.  Sorry.  Yes.
16   Q.  You do allege there that you are an orthodox Jew.
17       Those are the words you use in your complaint,
18       correct?
19   A.  Those are the words my attorney used, yes.
20   Q.  Okay.  And do you consider your termination a result
21       of anti-Semitism?
22   A.  I believe that was a factor, yes.
23   Q.  And again, you don't identify names in your federal
24       complaint either, but in paragraph 95 you refer to
25       commissioner one.  Do you see that?

Page 182

1    A.  Yes.
2    Q.  And you indicate that commissioner one was
3        instrumental in causing your termination, correct?
4    A.  Yes.
5    Q.  And you base that on comments commissioner one made to
6        you that you perceived some -- strike that, let me
7        start again.
8            Commissioner one -- your allegation is that
9        commissioner one somehow felt that you were bias
10       against Judge Gorcyca because of your Jewishness and
11       ethnicity.  Is that your allegation?
12   A.  Yes, commissioner one expressed it on behalf of
13       himself and commissioner, I think it's three, but they
14       were there, as I understood it, at the direction of
15       the entire commission.
16   Q.  So it would be fair to say that you have observed some
17       discrimination, in fact experienced some
18       discrimination, by the commission based on religion,
19       correct?
20   A.  That's what I've alleged, yes.
21   Q.  Well, your allegations are true, right, you wouldn't
22       make them if they weren't true to the best of your
23       knowledge, information and belief, right?
24   A.  That is correct.
25   Q.  Have you ever observed any racial discrimination by

Page 183

1    any commissioner?
2    A.  No.
3    Q.  Have you ever observed any racial discrimination by
4        any of the professional staff at the JTC?
5    A.  No.
6    Q.  I want to shift focus a little bit and now talk about
7        the Judge James matter before the JTC, okay?
8    A.  Okay.
9    Q.  What prompted the JTC to investigate Judge James?
10   A.  I don't recall if there was a grievance filed or if it
11       was something that we had seen in the media.
12   Q.  Okay.  Do you recall an attorney by the name of David
13       Jones?
14   A.  Yes.
15   Q.  Do you know whether he had filed a grievance against
16       Judge James?
17   A.  As you say that, I believe so, but I can't say for
18       sure.
19   Q.  Do you know Deborah Green?
20   A.  Yes.
21   Q.  Ms. Green works for the State Court Administrator's
22       Office, correct?
23   A.  Worked, past tense, for.
24   Q.  In 2011 she worked for the State Court Administrator's
25       Office; is that correct?

Page 184

1    A.  Yes.  That was before the -- yes.
2            MARKED FOR IDENTIFICATION:
3            DEPOSITION EXHIBIT 16
4            2:06 p.m.
5    BY MR. HIRSCH:
6    Q.  So I'm going to hand you what we've marked as
7        Exhibit 16 to your deposition.  It appears to be a
8        letter dated June 4th, 2011 directed to you at the JTC
9        from Deborah Green at the State Court Administrator's
10       Office.  Do you have that in front of you, sir?
11   A.  Yes, I do.
12   Q.  And again, this is dated June 14th, 2011, correct?
13   A.  Yes.
14   Q.  Do you recall -- well, strike that.
15           First of all, did you view this as a
16       request for investigation from the Supreme Court
17       Administrator's Office -- Administrative Office, I'm
18       sorry?
19   A.  It gets called both, don't worry about it.  Yes.
20   Q.  Okay.  Do you recall if you received this request
21       before or after the request from David Jones?
22   A.  I do not.
23   Q.  Do you recall whether you had already begun an
24       investigation prior to receiving this request from
25       Ms. Green?



PAUL FISCHER
July 28, 2017

---

Page 185

1   A.  I do not.

2   Q.  Do you know when Judge James was placed on

3       administrative leave by the Michigan Supreme Court?

4   A.  I think it was in December of 2011.  The hearing then

5       was maybe in January or February of 2012 and she was

6       removed in July of 2012.  December 2011 sounds about

7       right.

8   Q.  Well, I want to get the timeline straight.  To your

9       recollection Judge James was placed on administrative

10      leave before or after you received the request for

11      investigation from Ms. Green dated June 14th, 2011?

12  A.  I don't specifically recall, but I don't think it

13      would have been before.

14          MR. HIRSCH:  One moment, please.

15          MR. NELSON:  Off the record for a moment.

16          (Discussion off the record at 2:08 p.m.)

17          (Back on the record at 2:10 p.m.)

18  BY MR. HIRSCH:

19  Q.  Okay.  Would you disagree if I told you that Judge

20      James was placed on administrative leave on

21      April 14th, 2011?

22  A.  Then you're asking me -- I didn't understand the

23      question you were asking.  I was -- I was thinking of

24      from the time that the commission petitioned for an

25      in-term suspension, which I believe was put into place

---

Page 186

1       in December of 2011.  Administrative leave, I'm not

2       sure what that means then and I don't know who would

3       have done anything like that.

4   Q.  You did not have anything to do with -- well, strike

5       that.

6   A.  As you're saying that, I remember there being

7       something like that, but it had nothing to do with the

8       commission.

9   Q.  Okay.  So let's clarify.  When I say administrative

10      leave, do you know now what I'm talking about?

11  A.  I understand the words, but there's no provision

12      anywhere for administrative leave that so I don't

13      really know what legal basis there is for it.  I know

14      that it happens.

15  Q.  I'm not suggesting that the commission did it, I'm

16      just asking if you recall that that happened in Judge

17      James' case?

18  A.  I do recall now that there was some type of

19      administrative leave, whatever that means, that took

20      place at some time before the commission petitioned

21      for the in-term suspension.  Is it in a letter?

22  Q.  There you go.  And you had -- you had nothing to do

23      with that administrative leave, correct?

24  A.  Correct.  When you say you, you mean talking about me,

25      Paul Fischer, or me as the executive director of the

---

Page 187

1       commission or the commission --

2   Q.  Well, you -- well, first of all, you in your capacity

3       as executive director at the time?

4   A.  No, no involvement.

5   Q.  And insofar as you know the commission had nothing to

6       do with that, correct?

7   A.  Correct.

8   Q.  That was purely something that happened at the

9       Michigan Supreme Court level?

10  A.  Correct.

11  Q.  And you would agree with me that that was -- well,

12      strike that.

13          Do you agree with me that that occurred

14      before the JTC had opened its investigation?

15  A.  I don't know.  You mentioned some other person,

16      whatever the attorney's name was.  I don't remember if

17      he actually was a grievant or not or if the commission

18      had started something because of -- maybe this was

19      public that she was on some type of administrative

20      leave, I just don't recall when the actual file was

21      opened.

22  Q.  Were you aware that when Judge James was placed on

23      administrative leave an acting judge was installed to

24      oversee the 22nd District Court?

25  A.  I'm aware that that occurred, yes.

---

Page 188

1   Q.  Do you recall if that occurred before the in-term

2       suspension that the JTC requested?

3   A.  Yes, I believe so.

4   Q.  You were aware that Judge James was on administrative

5       leave at the time you filed the request, you on behalf

6       of the JTC, filed the request for in-term suspension,

7       correct?

8   A.  I would have been aware then, I didn't necessarily

9       remember today, but as you're saying this it is

10      bringing it back to me.  It does seem right.

11  Q.  Do you recall any other situation where a judge was

12      under investigation by the JTC, had been placed on

13      administrative leave before the JTC had sought any

14      sort of in-term suspension?

15  A.  I believe so, but I -- don't ask me for any --

16  Q.  Do you recall the judge that was selected to serve as

17      the acting judge in the 22nd District Court when Judge

18      James was -- certainly when -- by the time Judge James

19      was suspended?

20  A.  Valdemar Washington.

21  Q.  Okay.  Did you have anything to do with the selection

22      of Judge Washington to act as the acting judge?

23  A.  No.

24  Q.  Do you know who did?

25  A.  I don't know.

---




PAUL FISCHER
July 28, 2017

---

Page 189

1    Q.   Did you know Judge Washington before Ms. James' matter
2         before the JTC?
3    A.   **I knew who he was.  It's possible I had met him in a**
4         **conference or something.**
5    Q.   At the time the JTC filed its petition for in-term
6         suspension, that was contemporaneous with the filing
7         of the formal complaint: is that right?
8    A.   **I don't specifically recall, but I think so.**
9    Q.   Do you recall whether you had dealt with Judge
10        Washington in any way during the investigative phase
11        prior to the filing of the formal complaint?
12   A.   **I don't recall.**
13   Q.   Who was the staff attorney assigned to Judge James'
14        case?
15   A.   **Margaret Rynier.**
16   Q.   From the beginning?
17   A.   **I don't know, I don't remember when she started.**
18   Q.   Well, that's sort of what I'm getting at, right,
19        Ms. Rynier I believe started in 2011, right?  I don't
20        know what month.  Do you recall what month?
21   A.   **I think early in the year, January, February.  This**
22        **was her first trial at the commission, I remember**
23        **that.**
24   Q.   But if Mr. Swastek, for example, had had the file,
25        Ms. Rynier could still very well have ended up being

---

Page 190

1         the trial attorney, correct?
2    A.   **Anything is possible, I just don't remember him having**
3         **it first.**
4    Q.   But in the sense that Mr. Swastek wouldn't have done
5         it so --
6    A.   **He wouldn't have done the trial, correct.**
7    Q.   And did you make any efforts to resolve this matter
8         with Judge James before the 28-day letter?
9    A.   **I don't specifically recall.**
10   Q.   Don't recall one way or the other?
11   A.   **No.**
12   Q.   Do you recall if you made any efforts to resolve this
13        matter with Judge James after issuing the 28-day
14        letter and before filing the formal complaint?
15   A.   **It's generally my practice to do so.  One of her**
16        **attorneys, I think was her lead attorney -- who I**
17        **considered her lead attorney, was Phil Thomas and that**
18        **I have a good relationship with him, working**
19        **relationship, professional relationship, and I'm**
20        **certain that we discussed it.**
21   Q.   Do you recall --
22   A.   **Presuming we would have discussed it, I don't**
23        **specifically recall doing so though.**
24   Q.   Okay.  Mr. Thomas handles a lot of matters in front of
25        the JTC, correct?

---

Page 191

1    A.   **Yes.**
2    Q.   So I take it since you don't recall specifically
3         whether you did it in this matter, you would not
4         recall if there were any particular offers made,
5         correct?
6    A.   **That's correct.**
7    Q.   And you don't recall whether you gave Judge James the
8         option to resign or retire, correct?
9    A.   **I believe that would be the only option I would have**
10        **given Phil.  ==This was not a suspension case, it was a==**
11        **==removal case.==**
12   Q.   ==It was a removal case in the sense that your review of==
13        ==the file led you to the conclusion that you were going==
14        ==to recommend removal, correct?==
15   A.   **==Yes, it was theft of public money and fraud on the==**
16        **==public.  Removal was the only option.==**
17   Q.   So you don't recall one way or another whether there
18        were discussions for settlement or resolution of this
19        particular case, but ultimately we would agree that
20        there was a formal complaint filed -- issued, correct?
21   A.   **Yes.**
22   Q.   So the commission approved that and it got issued,
23        right?
24   A.   **Yes.**
25   Q.   Okay.  And when you were considering the allegations

---

Page 192

1         in the formal complaint, the formal charging document,
2         did you compare the conduct -- the alleged conduct of
3         Judge James to the conduct of other judges against
4         whom the JTC had proceeded?
5    A.   **There was no other judge who had stolen public money**
6         **and committed fraud the way she had, so no.**
7    Q.   So you didn't think that in the history of the JTC
8         there was anything equivalent to do that sort of
9         comparison, correct?
10   A.   **Correct.  I can recall a case, Jenkins was -- I forgot**
11        **what kind of judge, something in Detroit, and he**
12        **had -- can't quite say that he stole, but he was**
13        **getting things from local little stores or whatever.**
14        **He would go in, getting this for free and there were**
15        **some lies about what he had done, and he was removed.**
16        **That -- I can't even say that that was close because**
17        **he didn't do what she had done.**
18   Q.   So to the extent you were considering it, you were
19        considering it in the context of some, in your view,
20        lesser conduct and since the lesser conduct resulted
21        in removal, what you considered more severe conduct
22        would, I think logically then, have to result in
23        removal, right?
24   A.   **Well, I'm saying that sitting here.  I can't say that**
25        **I necessarily thought of it then.  The actions that**

---



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
A U.S. Legal Support Company

US LEGAL SUPPORT
The Power of Commitment™

PAUL FISCHER
July 28, 2017

## Page 193

1 she had committed in and of themselves in my opinion
2 and in the opinion of the Supreme Court later required
3 her removal.
4 Q. But it is important, I think you've told me, that the
5 JTC seeks to treat judges equally, correct?
6 A. Yes.
7 Q. So to the extent you could make any comparison to how
8 some other judge had been treated, it would be
9 important to do that, right, that's how you'd have to
10 ensure that they were treated equally, right?
11 A. I can't speculate on what it was. There was no other
12 judge who committed the theft that she had committed
13 and the fraud that she had committed. There was
14 nothing to compare her to. What she did required
15 removal.
16 Q. Had you met Judge James at all prior to the JTC's
17 investigation of this case?
18 A. I don't think I ever saw her until the first day of
19 the hearing, unless there was a pretrial, but I don't
20 recall.
21 Q. Did you know Judge James was African-American at the
22 time you filed the formal complaint?
23 A. I did, yes.
24 Q. Do you know how you got that knowledge?
25 A. I'd seen her in another matter that the commission had

## Page 194

1 with her. I had seen a picture of her or some such
2 thing.
3 Q. What was the other matter that the commission had with
4 her?
5 A. Well, there were two that I can recall.
6 Q. What were the two you can recall?
7 A. One was the mayor or mayoral candidate had filed a
8 grievance against her because she had taken a position
9 against his political position regarding the city
10 charter or amended city charter or some such thing.
11 And the other time was she had, I believe it was a
12 loaded gun going through the airport at Metro.
13 Q. With respect to the first one you mentioned, the
14 grievance brought by the mayoral candidate. Do you
15 recall the outcome of that?
16 A. There was no formal complaint. I don't know if there
17 was one or the other types of letters that was issued,
18 I just don't recall.
19 Q. And as to the incident with the gun at the airport, do
20 you recall the outcome of that?
21 A. Also no formal complaint and I don't recall if there
22 was anything else done.
23 Q. Now, in your intake then of Judge James' grievance or
24 grievances, those other two would have come up,
25 correct?

## Page 195

1 A. Yes.
2 Q. That was part of the process, right --
3 A. Yes.
4 Q. -- prior grievances?
5 Did you take the fact that there had been
6 prior grievances into account when deciding whether to
7 proceed against Judge James in the matter we're
8 talking about now, the 2011 matter?
9 MR. NELSON: Objection, calls for his
10 mental impressions and thus work product.
11 MR. HIRSCH: So are you directing him not
12 to answer?
13 MR. NELSON: I'm directing him not to
14 answer.
15 BY MR. HIRSCH:
16 Q. What investigation was performed prior to filing the
17 formal complaint against Judge James?
18 A. I don't specifically recall.
19 Q. If I told you the formal complaint was filed on
20 October 26th, 2011, would you have any reason to
21 dispute that date?
22 A. No.
23 Q. Do you know -- do you know whether investigation was
24 being conducted while Judge James was on
25 administrative leave: in other words, was the

## Page 196

1 investigation conducted at the time when she was not
2 at the 22nd District Court?
3 A. I believe so.
4 Q. Do you recall if the JTC was dealing with Judge
5 Washington at that time?
6 A. I don't know that the JTC dealt with the acting judge
7 or acting chief judge at all. I don't specifically
8 recall.
9 Q. Do you know --
10 A. Now, it's possible that Maggie Rynier, as the chief
11 attorney with that matter, may have talked to him, I
12 don't know.
13 Q. Did you ever visit --
14 A. No.
15 Q. -- the 22nd District Court in the course of the
16 investigation of Judge James?
17 A. No.
18 Q. Okay. And do you know whether any of the staff
19 attorneys visited the 22nd District Court in the
20 course of the investigation of Judge James?
21 A. I believe Margaret Rynier did, but I don't know.
22 Q. Do you know if anyone made a search for materials in
23 Judge James' office?
24 A. I don't know.
25 Q. Do you know if the source of any materials that were



PAUL FISCHER
July 28, 2017

Page 197

1    ultimately used in the disciplinary proceedings came
2    from Judge James' office?
3    A.  I don't know.
4    Q.  And you said you were never at the 22nd District
5    Court, correct?
6    A.  Right.
7    Q.  Did you direct anyone to make a search of any area of
8    the 22nd District Court?
9    A.  No.
10   Q.  Do you know whether there was a safe in Judge James'
11   office?
12   A.  I don't know.
13   Q.  To your knowledge Judge Washington fully cooperated
14   with the JTC's investigation, correct?
15   A.  I don't know that he was involved in the
16   investigation.
17            MR. HIRSCH:  We'll take a short break.
18            (Recess taken at 2:30 p.m.)
19            (Back on the record at 2:42 p.m.)
20   BY MR. HIRSCH:
21   Q.  Sir, we talked a little bit earlier when we were
22   discussing the types of discipline and what fell into
23   the category of discipline and not discipline, right,
24   do you recall that?
25   A.  Yes.

Page 198

1    Q.  Certain letters fell into the category of not
2    discipline?
3    A.  Yes.
4    Q.  And one thing you suggested is that it wouldn't make a
5    difference to you whether a judge resigned or retired
6    if the settlement discussions went to essentially
7    removal, right?  You didn't care how it happened,
8    right?
9    A.  Correct.  I don't know that there's a difference in
10   the judge submits the letter of resignation or
11   whether the Office of Retirement treats it as a
12   retirement or not; that's their business, not mine.
13   Q.  So maybe there's no difference anyway?
14   A.  Right.  But a judge who resigns has to submit a letter
15   to, I forget, Secretary of State, the governor, SCAO,
16   whatever it is.  It's a letter of resignation, it's
17   not a letter of retirement.
18   Q.  Okay.  And to the extent that would happen then and
19   the JTC would resolve the case with one of the
20   resolutions that are in the no-discipline category,
21   correct?
22   A.  Generally what would happen is if a judge resigns
23   under fire, so to speak, the commission will dismiss
24   the matter.
25   Q.  Okay.  And if it's dismissed, then that's no

Page 199

1    discipline, right?
2    A.  No discipline, dismissed.
3    Q.  So in that case a judge who retired or resigned could
4    come back and serve as a visiting judge, correct?
5    A.  So sometimes the commission would specifically say if
6    you do, then the commission will reinstate the
7    charges.
8    Q.  If you come back as a visiting judge?
9    A.  That's right.
10   Q.  Because the commission does have jurisdiction over
11   visiting judges as well?
12   A.  Correct.
13   Q.  Okay.  You are familiar with reciprocal discipline by
14   the State Bar of Michigan, correct -- well, are you
15   familiar with reciprocal discipline by the State Bar
16   of Michigan?
17   A.  In terms of another state discipline?
18   Q.  No, in terms of that the State Bar of Michigan, if
19   there is a finding by the JTC of discipline, would
20   consider that reciprocal discipline with respect to a
21   law license in the State Bar of Michigan?
22   A.  No, I don't think that's how it works, no.
23   Q.  Okay.  You don't think that's how it worked?
24   A.  No.  I mean, I know they can show-cause the judge and
25   show why they couldn't have -- they have to have some

Page 200

1    type of a hearing in front of the Attorney Discipline
2    Board.  There's got to be some process involved there.
3    Q.  Okay.  But you're not -- generally you're not too
4    familiar with that process apparently, correct?
5    A.  Right.
6    Q.  Okay.  We talked about Ms. Green at the Supreme Court
7    Administrative Office.  Do you recall that?
8    A.  Yes.
9    Q.  Did you have any discussions about this matter, and by
10   this matter I'm talking about the federal case we're
11   now in with Ms. Green --
12   A.  So Judge -- the Sylvia James case against Green, me --
13   Q.  Correct.
14   A.  -- the commission.
15   Q.  Correct, the federal matter, not the underlying JTC
16   proceedings.
17   A.  Yes.  So the question is then?
18   Q.  Did you have any discussions with Ms. Green, who is
19   also a Defendant in this case, about this case, this
20   federal case?
21   A.  It's possible, I don't recall.
22   Q.  Did you have any conversations with Valdemar
23   Washington about this case?
24   A.  I don't think so.
25   Q.  Do you know Pamela Anderson?

 

PAUL FISCHER
July 28, 2017

---

Page 201

1   A.   I know who she is, I don't know her personally.

2   Q.   Have you ever met her?

3   A.   I can't say I met her.  She was a witness in the case,

4        I know it's possible that Maggie, who had interviewed

5        her and was questioning her, introduced me to her,

6        that's possible.  I don't specifically recall that

7        either.

8   Q.   She was a witness at the JTC hearing --

9   A.   Yes.

10  Q.   -- for Judge James, correct?

11  A.   Yes.

12  Q.   As was Judge Washington, I believe, correct?  If you

13       recall?

14  A.   I don't recall.

15  Q.   Okay.

16  A.   I believe so, but I don't recall.

17  Q.   Okay.  Did you have any discussions with Ms. Anderson

18       about this federal case?

19  A.   No, I've never spoken to her.

20  Q.   Did you ever discuss this federal case with any

21       present or former justice of the Michigan Supreme

22       Court?

23  A.   I don't think so.

24  Q.   Did you ever discuss --

25  A.   And I only pause -- I only hesitate because the

---

Page 202

1        Supreme Court has -- or had a justice as the liaison

2        to the commission that would come maybe once a year or

3        once every couple years just to see how things are and

4        perhaps it was mentioned at one of those, but I don't

5        specifically recall.  I don't normally sit and talk to

6        Supreme Court justices.

7   Q.   Did you discuss this federal case with any other of

8        the staff members of the JTC?

9   A.   Again, it's possible.  I mean, the commission and I

10       were being sued, it's possible it got mentioned, by

11       the way, we're being sued.

12  Q.   So you don't know one way or the other?

13  A.   I don't specifically recall.

14  Q.   And so I presume you couldn't tell me about any

15       conversations then because you don't recall whether

16       they occurred or not?

17  A.   No, and there wouldn't have been very many.

18  Q.   And in that previous answer I was also referring to

19       the staff attorneys?

20  A.   I'm certain that I've discussed it with Maggie, but

21       discussed more in the sense of mention, the case is

22       still going on, the case got dismissed, the case got

23       reinstated, such and such.

24  Q.   What did you do to prepare for this deposition?

25  A.   I looked over the Supreme Court's decision.  I didn't

---

Page 203

1        read it carefully, but I did read through it.  I met

2        with my attorney yesterday.  I think that's it.

3   Q.   I don't want to know the substance of what you said,

4        but how long did you meet with your attorney

5        yesterday?

6   A.   A couple hours, three hours maybe.

7   Q.   And I've named some categories of people and asked you

8        specifically if you discussed the case with them, but

9        other than the people I already asked you about and

10       other than counsel was there anybody else who you

11       discussed this federal case with?

12  A.   With the commissioners at the time that I still worked

13       there.  Same thing, I would report to them at meetings

14       what was going on with any cases that were -- where

15       the commission was a defendant or I was a defendant

16       and so I would advise them, you know, the case was

17       dismissed, this is what happened, but not in any more

18       detail than that.

19            MR. HIRSCH:  I have nothing further right

20       now.  Thank you, sir.

21            MR. ASHER:  No questions, all set.

22            MS. MILLER:  I have none.

23            MR. NELSON:  I guess we're done.

24            (The deposition was concluded at 2:49 p.m.

25       Signature of the witness was not requested by

---

Page 204

1        counsel for the respective parties hereto.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Pages 201 to 204



PAUL FISCHER
July 28, 2017

Page 205

```
 1              CERTIFICATE OF NOTARY
 2    STATE OF MICHIGAN )
 3            ) SS
 4    COUNTY OF OAKLAND )
 5
 6        I, BECKY JOHNSON, certify that this
 7    deposition was taken before me on the date
 8    hereinbefore set forth; that the foregoing questions
 9    and answers were recorded by me stenographically and
10    reduced to computer transcription; that this is a
11    true, full and correct transcript of my stenographic
12    notes so taken; and that I am not related to, nor of
13    counsel to, either party nor interested in the event
14    of this cause.
15
16
17
18
19
20
21
22            BECKY JOHNSON, CSR-5395
23            Notary Public,
24            Oakland County, Michigan
25    My Commission expires:  January 28, 2019
```

Page 205



PAUL FISCHER
July 28, 2017

Page 206

| A | | | |
|---|---|---|---|
| **a.m** 1:18 6:3 33:8 46:10 55:10 71:8,9 96:2 97:24 100:20 101:8 129:5 130:15 174:1,5 | **action** 93:4 109:1 169:19 180:12 **actions** 93:7 95:21 192:25 **actual** 33:20 187:20 | 53:6 183:21,24 184:9,17 **administrators** 52:10 **admitted** 10:18 **admonish** 104:3 **admonishment** 68:22 91:3 | 102:9 **agree** 6:21 37:5 38:16 40:15,16 41:6,8,11 59:21 78:11,15 78:25 100:16 103:11,24 | **allegation** 160:5 179:25 182:8 182:11 **allegations** 88:25 149:9,10 149:11,12 182:21 191:25 |

**ability** 121:23
**able** 7:8 58:1 136:20,23 147:8
**accept** 104:3 107:11,11,16 116:20 117:20
**accessed** 57:12
**accompany** 171:4
**account** 90:3 115:22,24 195:6
**accountable** 39:23 40:8
**accurate** 34:8,12 39:1,2,14,16 61:12 93:8 100:16 116:12 149:25 168:17 169:13 170:17 170:25 172:10 172:14 173:25 178:11
**accusations** 172:12
**acronym** 32:25
**act** 50:25 98:23 98:25 99:12 118:2 155:10 188:22
**acting** 14:19 15:13 51:7 107:23 117:23 187:23 188:17 188:22 196:6,7

**Adams** 174:24 176:13 177:5
**add** 36:5 62:14 81:11
**addition** 180:2
**additional** 76:22 76:25 131:5 135:24 177:2
**address** 121:17 179:13
**addressed** 7:2 179:11
**addressing** 65:21
**adjourned** 166:3
**adjudicative** 15:8,14 16:1 24:4 116:17
**adjunct** 24:9,10 24:16
**adjustment** 69:4
**Administration** 52:9
**administrative** 16:11 53:13 68:6 161:7 184:17 185:3,9 185:20 186:1,9 186:12,19,23 187:19,23 188:4,13 195:25 200:7
**administrator** 50:8 52:19
**Administrator's** 51:21,25 52:2

104:4,5,6 108:22 113:19
**admonition** 101:11,20,22 102:7,14 108:16,22
**admonitions** 102:1
**adopted** 82:2
**ads** 24:11
**advent** 81:22
**advice** 15:15 24:7
**advise** 17:12 203:16
**advised** 155:22 156:3,11 157:9 157:18,22
**advocate** 15:16
**advocating** 125:21,24
**affairs** 19:20
**affidavit** 167:10 167:14,16 174:23
**affirmed** 28:8 165:5 168:10 169:19
**African-Amer...** 123:3,25 137:16 193:21
**afternoon** 143:8
**agency** 85:2
**agenda** 82:5,12
**ago** 11:10 29:24 30:7 55:5

104:9,12,17,17 105:1 106:23 106:24 107:4 107:21 121:14 121:20 127:13 129:20,23 133:24 134:2 139:3 152:8,11 162:11 164:7 187:11,13 191:19
**agreed** 30:16 40:19 79:4 83:2 103:22 104:20 106:10 106:13,25 126:21 150:5 151:1 159:7 164:24
**agreement** 105:15 106:4 107:7,13,22 108:5 116:5,25 117:11,20 126:23 142:1,5 142:7,16 143:22
**agreements** 118:3,6,11,13
**agrees** 41:3 104:11
**ahead** 42:24 80:9 114:6
**airport** 194:12 194:19
**akin** 107:10
**al** 1:10

**alleged** 67:1 153:11 182:20 192:2
**alleging** 48:2 157:7,16,20 179:2
**allow** 17:12 43:19 144:16 177:3
**allowed** 28:6 58:18,20 86:23
**amended** 194:10
**amendment** 33:4 145:11 146:8,12
**American** 10:11 11:1,11,13
**analysis** 53:18 163:3,18,24 164:1,5 165:4
**ancestry** 162:25
**ancient** 9:24,24 9:25 10:3
**ancillary** 110:14
**and/or** 163:16 164:13
**Anderson** 3:18 200:25 201:17
**Anna** 22:23 23:2
**annual** 16:13

 

PAUL FISCHER
July 28, 2017

33:12 35:13
49:17,19
100:12
**anonymous**
47:22 48:2,7
48:10,15
**anonymously**
83:21
**answer** 7:8 8:3
8:23 23:14
26:13,17 34:15
35:1 42:10
43:21 52:6,12
55:5,18 71:14
84:25 85:1
86:17 91:8
115:15 137:19
142:12 144:1,3
144:14 145:13
145:16,19
147:6,8,19
151:7,17
158:18,20
160:12 163:14
171:5,16
173:15 177:20
179:16 195:12
195:14 202:18
**answers** 7:25
205:9
**anti** 64:1
**anti-Semitism**
181:21
**anticipate** 6:14
**anticipated** 36:3
**anticipation**
162:8
**antiquated** 63:1
**anybody** 9:5
14:3 27:11
70:4 77:20
83:19 87:9
103:11 105:23
203:10

**anymore** 54:17
110:2
**anytime** 119:9
124:13
**anyway** 152:12
198:13
**AP** 149:7
**apart** 145:17
**apologize** 98:1
148:21 160:3
**apparently**
200:4
**appeal** 124:24
125:3,3,14
**appealed** 28:5
**appealing** 125:6
**appeals** 13:12
37:17,23
**appear** 42:17
**APPEARAN...**
2:1
**appeared** 41:15
41:24
**Appearing** 2:12
2:21 3:8,18
**appears** 101:15
130:4,18
132:17 140:19
140:20 141:5
158:15 184:7
**appellate** 20:24
54:19 72:4,4,6
73:3 93:21
**applicable** 77:4
**applicants** 23:18
**applied** 63:5,6
**appoint** 122:16
**appointed** 20:19
122:25
**appointments**
85:17
**appoints** 38:8
122:12
**approach**

169:18
**approached**
170:5 172:17
**approaches**
117:10
**appropriate**
113:25 143:11
144:14
**approval** 36:19
36:23 41:1
84:2,14,20
85:24,25 86:20
90:16
**approve** 26:11
35:24 41:5,7
45:6 47:9 77:6
82:22 83:4
86:5 88:20
89:12 90:1
111:21 114:2
156:7
**approved** 35:23
44:3 82:23,25
87:1 91:17,20
91:23 92:1
108:5 191:22
**approves** 111:10
111:20 114:4
**approving** 41:10
**April** 185:21
**Arabic** 35:20
38:11 40:5
93:1
**area** 13:9 87:18
141:17 197:7
**areas** 6:14 13:13
**argue** 126:1
165:10 176:17
176:20 177:4
**argued** 165:14
165:16 175:10
176:5,6
**arguing** 14:8
15:4 177:23

178:5
**argument** 124:8
124:11,15,16
164:4 165:24
175:11 176:13
176:19
**arguments**
114:19
**armed** 170:24
171:1
**arrived** 25:10,18
**arrives** 53:12
**article** 148:25
149:7,20 150:9
150:13
**articles** 148:23
**arts** 10:1
**ASHER** 3:11
203:21
**asked** 11:10
14:22 17:10
88:24 89:3
128:19 138:8
166:3 173:9
177:1 179:16
203:7,9
**asking** 8:18 30:9
54:21 56:16
127:15 134:24
151:6,8 157:10
157:11,13
185:22,23
186:16
**asserted** 145:11
146:7,11
**assertion** 162:3
**assessment** 78:8
112:6,9
**assign** 54:23
58:18,23 67:5
67:5 69:3,24
**assigned** 58:5
60:17 62:6
67:9 74:15,21

75:20 78:7
112:9 133:5
189:13
**assignment** 73:6
**assist** 17:17
**assistants** 57:16
161:7
**associate** 163:22
**associated** 56:11
128:6,23
**association**
10:12 11:1,11
11:14,19,22
16:23,24 37:24
**associations**
10:6,24,25,25
11:2 16:17
**assume** 63:19
65:7 66:5
129:13 162:25
166:14 174:18
**assuming**
103:22 114:10
149:10
**asterisk** 86:12
89:14
**attached** 4:12
111:8,9
**attachment**
179:21
**attend** 17:25
**attention** 44:20
47:13 48:19
102:3 149:18
152:12 169:4
**attorney** 3:2
12:7 13:13,14
13:14 22:22
23:13 25:16
28:2 54:23
58:23 67:6,8
67:12,24 68:3
68:25 69:3,7
69:11 70:23

 

74:9,15,16,18
75:14,20 76:4
76:21 77:7
78:22,23 79:3
79:4 80:12,24
81:7 83:24,25
92:4,14,16,19
111:4,6 112:8
113:5,6,8,10
113:24,25
117:10,18
122:4 136:1
140:15,20
141:7 143:3
158:24 168:10
174:9,20
181:19 183:12
189:13 190:1
190:16,17
196:11 200:1
203:2,4
**attorney's** 68:23
76:11 78:24
83:25 187:16
**attorney/client**
6:16 127:10,14
163:16 164:12
170:1 173:16
**attorneys** 7:17
21:25 22:11,17
23:21 24:1
26:4 27:4
30:16 35:18
36:12 54:24
68:13 70:3,7,8
70:10,11,13,21
73:7,12,19,21
74:1 75:6,11
78:21 84:5
85:22 166:1
174:13 190:16
196:19 202:19
**August** 155:22
156:2

**authority** 33:22
34:2,9,13,16
42:18,21 65:17
78:1 111:7
176:16 180:11
**authorization**
77:8,8,9 78:4
**authorize** 20:10
134:16
**authorized** 88:5
114:10 174:7
**available** 77:15
**Avenue** 2:6
**avoid** 119:3,5
**award** 152:18
153:14,16
**aware** 6:13
27:24 41:23
42:7,16,20,25
58:17 92:8
124:13 133:13
136:18,22
146:23,24
153:10,13,14
187:22,25
188:4,8

——— **B** ———

**B** 32:21 34:22
35:21 82:20,22
82:24 83:7
169:6
**bachelor's** 10:1
**back** 12:18
35:12 40:4
46:7 47:24
68:16 69:10
71:9 78:20
81:22 105:4,7
105:18 107:17
107:21,24
114:20 125:19
141:12 143:6
146:1 156:22
171:18 178:20

178:25 179:5,7
179:10 185:17
188:10 197:19
199:4,8
**background**
25:21
**bad** 164:9
**balance** 73:23
**balanced** 69:9
69:13
**ballot** 81:21
**ballots** 81:21
135:22
**bar** 10:7,8,11,14
10:25 11:1,2
11:11,13,19
27:6,8,18,20
38:2,7 199:14
199:15,18,21
**barring** 51:15
73:20 112:11
132:5
**Barron** 153:3,18
**Bars** 10:16
**base** 182:5
**based** 42:9
45:21 59:13
71:24 72:1,9
72:18 80:25
90:25 107:12
112:18 127:23
128:16 146:19
150:7 151:1
167:17 179:4
182:18
**basher@mike...**
3:17
**basically** 32:16
32:16 73:1
**basis** 7:1 24:18
29:15 78:21
145:16 147:2
162:3 174:9
177:15 186:13

**Bates** 129:9,12
130:6,8,25
131:1,10,11
138:24
**Becky** 1:20
205:6,22
**bedtime** 19:4
**began** 49:6
56:21
**beginning** 6:18
73:16 109:20
189:16
**begins** 169:6
**begun** 184:23
**behalf** 2:12,21
3:8,18 85:19
85:20 144:23
166:14 182:12
188:5
**behave** 87:13
**behavior** 36:17
42:16 108:25
155:13
**belief** 182:23
**believe** 31:16
71:12 110:25
123:16,22
131:4 132:18
148:8,13,14
152:21 159:11
160:16 161:5
163:15 164:11
164:12 173:4
181:22 183:17
185:25 188:3
188:15 189:19
191:9 194:11
196:3,21
201:12,16
**believed** 176:20
**bell** 143:17
**bench** 85:18
119:21
**benefit** 118:22

119:1,2
**best** 25:4 51:5
95:2 109:20
121:23 182:22
**better** 7:2
**beyond** 67:19
78:3
**bias** 182:9
**big** 64:7,7 65:4
65:10 83:11
**biggest** 65:13
**biggies** 59:25
**Birmingham**
2:8 12:9
**birth** 9:13
**bit** 19:22 35:12
55:4 57:24
64:3 73:5,9
137:13,13
183:6 197:21
**blurb** 134:12,18
**Board** 13:15
200:2
**body** 16:1
116:17
**boilerplate** 36:1
**boogeyman** 19:3
19:17
**Borman** 1:8
**bottom** 93:2
129:8
**box** 93:3 99:4
**bracket** 160:3,4
**break** 9:3,4 71:2
71:7 73:6
197:17
**BRETT** 3:11
**brief** 126:2,2
163:21 164:3,3
**bring** 48:19
102:2
**bringing** 11:9
156:4 188:10
**broad** 13:4




PAUL FISCHER
July 28, 2017

**broke** 66:20,25
   143:8
**brought** 44:20
   194:14
**Brown** 115:20
   115:22
**bullet** 97:4,11
   100:2 101:10
   103:3,14
   106:20
**bureaucrats**
   61:18
**Bushnell** 12:3
   12:19
**business** 198:12
**busy** 87:8,9
**Byron** 146:21

---
**C**
---

**C** 32:21 35:3,21
   38:11 82:20,20
   82:22,25 83:7
   93:3
**C-A-S** 22:24
**C-E-L-E-S-T**
   161:6
**call** 15:11 17:6,7
   24:9 32:22
   57:17 74:23
   77:6 81:3
   86:18 89:15
   98:10 145:14
   151:6,9,15,15
**called** 6:6 52:22
   80:4 81:20
   86:12,21,21
   97:7 98:10
   99:4 100:3,6
   111:12 121:17
   165:3 167:24
   178:14 184:19
**calling** 52:21
   73:21 162:7
**calls** 19:10
   177:17 195:9

**candidate** 194:7
   194:14
**candidates** 25:4
**capacity** 40:19
   42:15 51:7
   187:2
**caption** 167:10
**captioned**
   154:24
**care** 119:21
   198:7
**carefully** 79:12
   203:1
**cares** 83:18
**Cas** 22:24 70:13
   70:15,23 73:9
   73:21 74:17,21
   74:23 75:14
**case** 1:7 15:4
   24:19,19 29:10
   30:3,14,15
   32:20 36:11
   42:20 43:1
   45:13 46:17
   47:25 48:2
   57:15 59:12
   60:9 63:10
   64:4 65:20
   69:8,25 70:1
   70:19 71:23
   75:4,13 76:18
   87:1 92:8
   93:25 96:24
   97:9 103:20
   110:18,20,22
   112:9 115:10
   123:7,15 126:1
   126:1,4,8,8,25
   131:16,23
   134:13,15
   136:13,18
   140:23 146:12
   153:10,13,15
   154:24 161:22

162:4,15
   163:19 164:16
   165:10 167:11
   167:24,24
   168:2,5,8
   170:8 174:11
   174:20,23,24
   175:1,4,24
   177:9,10,12,14
   178:14,15,19
   178:25 179:14
   181:4 186:17
   189:14 191:10
   191:11,12,19
   192:10 193:17
   198:19 199:3
   200:10,12,19
   200:19,20,23
   201:3,18,20
   202:7,21,22,22
   203:8,11,16
**case-by-case**
   24:17
**cases** 23:21 31:7
   31:10,11,18,19
   31:20,24 32:17
   36:12 42:5
   45:13,14,17,22
   46:1,16,17,19
   46:24,25 48:22
   49:10,14 53:10
   56:24 66:20
   69:7 70:5,13
   70:14,15 73:18
   75:12 77:4
   78:24 99:19
   108:17 121:20
   122:24 159:6
   159:10,12
   161:19 162:5
   162:12,16
   163:20 167:21
   203:14
**catchall** 66:5

**categories** 57:25
   58:11 62:6
   96:14 102:17
   102:21,24
   133:22,25
   135:15 139:13
   152:4 203:7
**categorized**
   61:10 66:10
**category** 50:4,15
   62:1,5 63:24
   66:9,19 99:3
   99:16,24 120:4
   137:23 138:6
   197:23 198:1
   198:20
**Caucasian**
   147:13,16
   152:20 153:18
   153:20 162:19
**caught** 41:18
**cause** 83:19
   205:14
**caused** 177:14
**causing** 182:3
**caution** 91:3
   100:4,11 101:3
   102:10 108:15
   108:19 113:18
**cautionary**
   100:6
**celebration**
   159:18 160:15
   160:18
**Celest** 161:6
**censure** 103:5
   103:17,20,24
   104:2,8 105:2
   105:14,19,25
   106:14,15
   109:4,8,9,15
   109:19,25,25
   120:7,7,9
   156:12

**Center** 1:16
**certain** 42:5
   54:14 72:16
   76:22,24 95:20
   116:6 126:15
   126:22 135:9
   136:21 155:13
   178:21 179:2
   179:18 190:20
   198:1 202:20
**certainly** 9:4
   20:7 21:19
   34:5 41:3
   86:14,16 87:17
   97:16 110:14
   125:2 127:13
   138:25 139:6
   139:15 141:5
   141:14,18
   142:8 151:20
   161:5 162:24
   168:14 188:18
**CERTIFICA...**
   205:1
**certify** 205:6
**cetera** 24:11
   32:21
**chair** 75:3,3,12
   75:17
**chaired** 175:3
**challenge** 102:6
   102:10,13
   144:6,8
**chamber** 170:13
   171:8
**chambers**
   169:14 173:8
**chance** 141:18
   173:22
**change** 15:10
   22:6 57:25
   58:14,24 59:2
   81:11,13 102:8
   110:4 111:7




146:1
**changed** 15:9
  21:19 51:11
  69:1 177:7
**changes** 36:3
**chapter** 88:8
**charge** 14:6
  152:9,11
**charges** 91:7
  114:14 146:24
  149:13 199:7
**charging** 192:1
**chart** 50:7 60:20
  60:23 61:7,22
  62:2 64:13
  65:6 71:15
  97:5 100:3
  103:3
**charter** 194:10
  194:10
**check** 68:9
**chief** 45:3,5,10
  46:13,21 53:8
  196:7,10
**choice** 118:19
**choices** 128:2
**choose** 43:16
  62:5 100:11
  102:13 145:7
**chose** 41:16,25
  42:5 139:13
  158:22
**chronologic**
  134:19
**circuit** 10:22
  20:21 37:21
  38:5 137:21,25
  138:1 148:12
  154:6 155:6
  167:11
**circumstance**
  133:4
**circumstances**
  94:13,22

100:10 116:10
  146:17
**cited** 49:19
  168:6
**city** 194:9,10
**civil** 7:20 30:11
  141:4 145:10
  146:6,12
  152:17,23
  153:10
**claimed** 152:25
**clarification**
  71:13
**clarified** 177:3,5
**clarify** 8:10
  186:9
**clarity** 52:20
**claw** 141:12
**Clawback** 141:9
**clear** 26:16 59:7
  63:19 64:21
  98:2 123:14
  137:7 140:13
  144:1,4 180:25
**clearly** 178:7
**clerk** 153:10
**clerk's** 77:14
**clerked** 12:24
**client** 47:3
**client's** 140:21
  141:6
**close** 75:2 160:3
  192:16
**closed** 71:23,23
  108:20
**closing** 72:9,10
  72:12,22 73:3
  93:25 134:9
**code** 17:18
  38:20 41:15,24
  42:17 49:14,15
  54:14 55:25
  56:10 57:9
  58:5,7,11,23

59:10,17 60:16
  61:16,24 62:5
  62:15 63:15,18
  63:23 64:18,25
  65:3,10 66:4
  66:12 67:5
  68:23 71:24,24
  72:8,9,10,11
  72:12,22 76:8
  128:4,17,22,25
**coded** 49:10
  56:3 59:22
  60:7 61:25
**codes** 55:4,14,17
  57:5 58:14,19
  59:8,13 62:23
  63:5 64:4,6
  126:22 128:5
  128:17,21
**coding** 76:7
**college** 9:16
**column** 169:6
**columns** 169:5
**combination**
  128:10
**combine** 30:16
**combined** 14:21
**come** 6:19 18:17
  18:19,24 41:14
  47:13 48:10,12
  48:25 52:14
  53:15 54:8
  63:16 67:11
  70:21 72:15
  77:24 78:14
  79:1 107:24
  112:20 147:23
  152:12 194:24
  199:4,8 202:2
**comes** 75:23
  91:9 105:22
  114:20 130:7
**comma** 103:5
**commence**

43:14
**Commencing**
  1:18
**comment** 81:24
  88:24 89:3,7
  150:18 176:12
**comments** 82:21
  135:3 178:1
  182:5
**commercial**
  13:11
**commission**
  12:7,12,12
  13:14,16,18,21
  14:1,1,9,22
  15:5,6,13,23
  17:12,13,17
  19:19 20:1,4
  22:8,25 23:2,4
  23:15,17,20,23
  23:23 24:3,6,6
  24:10,23 28:3
  28:13 29:7
  30:12 31:16,21
  32:6,7,15,23
  33:12,22 34:3
  34:10,14,17,23
  34:23 35:13,23
  36:4,18 37:11
  38:7,8,13,19
  40:23 41:1,3
  41:10,16 42:5
  42:7,19 43:2,6
  44:1,6,9,18
  45:6 47:8,25
  48:13,24,25
  50:18,21,23,25
  51:8,15 56:25
  61:9 67:11,22
  72:3 77:9 78:2
  78:5 80:2,3,13
  80:20 81:2,4,8
  81:19 82:15,17
  82:21 83:3,13

84:2,14,20
  85:24,25 86:5
  86:13,16,20,21
  87:22 88:12,20
  89:11,19 90:1
  90:4,18,21
  91:15,17,20
  92:2 93:8,16
  94:3 95:19
  100:14 103:21
  103:25 104:5
  104:12,14
  105:5,7 106:6
  107:4,8,9,16
  107:21,25
  110:1,21 111:9
  111:10,20
  113:2,7,10
  114:1,4,8,9,11
  114:21,24,25
  115:25 116:6
  116:16,20
  117:21 118:1,4
  118:10 119:18
  122:15,18
  124:8,11,17,18
  125:7,17,21,25
  130:7 132:22
  133:1,7,24
  134:15 135:18
  137:4 147:24
  149:21 150:1
  153:24 154:4
  155:1 158:3
  163:3 165:6,11
  166:15 168:8
  168:10 169:18
  169:20,25
  171:6 173:13
  174:7 175:4,12
  175:14,24
  176:18,21,23
  176:24,25
  177:2,7,22,25




PAUL FISCHER
July 28, 2017

178:20,25
179:5,7,11
181:5 182:15
182:18 185:24
186:8,15,20
187:1,1,5,17
189:22 191:22
193:25 194:3
198:23 199:5,6
199:10 200:14
202:2,9 203:15
205:25
**commission's**
14:4 36:19,23
40:24 47:12,13
85:20 107:13
114:21 115:1
124:24 125:9
139:2 169:16
169:17 175:20
**commissioner**
82:9,22 155:22
156:3,10,13,18
157:2,8,17,17
157:22 158:4,7
158:10,12,23
159:1,13,15,18
159:22,23,25
160:8,20
161:13 166:17
179:11 181:25
182:2,5,8,9,12
182:13 183:1
**commissioners**
47:20 50:22
51:3,16 80:9
82:5 135:22
155:13 163:5
163:12 164:8
203:12
**commit** 39:24
40:9
**commits** 119:9
**committed**

156:19 157:3
192:6 193:1,12
193:12,13
**committee** 93:4
**common** 32:25
118:6,8
**communicate**
44:9
**communicated**
44:12
**communicatio...**
163:16 171:14
173:16
**compare** 192:2
193:14
**comparison**
192:9 193:7
**compile** 132:3
138:8
**complaining**
47:23 66:17
94:10
**complaint** 14:5
14:10 15:19,20
15:24 20:11
29:11,15 30:11
38:24 39:3,8
47:5 51:6,13
60:5 68:1 70:1
70:17,20 74:22
75:9 92:1
103:8 105:17
107:7 108:2
110:18,24
111:22,25
112:16 113:11
113:17 114:1,5
114:8,13,17
115:11,13,23
116:2,13 117:5
117:8,25 118:1
121:10 122:6
141:25 142:4
142:16 149:22

150:1,5,12
151:17 154:18
154:24 155:5,8
155:12,16,21
156:4,9 157:14
157:18,19
158:7,16,23
159:17 161:15
163:2 165:3
174:10 180:2,3
180:6,7,9,11
180:15 181:4,9
181:12,17,24
189:7,11
190:14 191:20
192:1 193:22
194:16,21
195:17,19
**complaints** 14:2
45:18,23 46:1
46:20 60:6
66:22 142:3
**complete** 67:4
129:21
**completed** 8:23
90:14
**completely**
143:13
**complex** 12:2
13:11
**comply** 88:12
**complying**
17:18
**composition**
21:17 23:4
**comprised**
37:11
**compulsion**
86:10
**computer** 56:2,4
56:21 57:5,16
57:22 76:2
128:11,15,22
205:10

**computerize**
56:23
**computerized**
57:10
**Computerizing**
57:1
**concern** 146:13
162:14 176:10
**concerned** 140:9
172:20
**concerns** 155:12
161:17 172:25
173:4,7,13
**concluded** 91:10
203:24
**conclusion**
81:13 164:24
191:13
**concrete** 95:1
**concurrent**
85:11
**conduct** 17:19
26:7 38:18,20
39:21 41:15,16
41:24,25 42:18
51:3 100:15
101:23 102:3
124:11 163:4,7
168:17 169:7
192:2,2,3,20
192:20,21
**conducted** 37:22
37:25 127:10
195:24 196:1
**conducting** 14:3
**conducts** 124:8
**conference**
189:4
**conferences**
16:13
**confidential**
1:15 6:24
171:14
**confirm** 142:14

147:24 151:18
**confused** 157:10
**conjunction**
92:7 113:9,24
**connection**
56:13 119:15
155:17 159:6
160:13
**consecutively**
138:19
**consent** 103:12
**consented** 141:8
**consider** 69:23
119:1 153:21
153:22 178:21
181:20 199:20
**consideration**
36:19 85:17
177:6
**considered**
105:19 106:1
119:2 178:5
190:17 192:21
**considering**
37:20 191:25
192:18,19
**considers** 116:1
**conspiring**
152:8
**constitution**
33:2,4 34:19
40:2,2
**constitutional**
34:16
**construct** 163:4
163:11 164:7
**consult** 143:2
**contact** 85:3,7
85:22 89:13
90:1
**contacts** 56:25
85:18
**contemporane...**
189:6




PAUL FISCHER
July 28, 2017

**contend** 154:16
**contents** 4:1
  112:18
**context** 192:19
**continue** 32:21
  44:4 58:2 83:3
  144:9
**continues** 39:1
**continuing**
  16:14 112:23
**contractor**
  24:19
**contrary** 142:5
**conversation**
  18:12 127:23
  158:15
**conversations**
  130:1 200:22
  202:15
**conversely**
  79:17
**convey** 17:17
  73:15 78:10
  161:8
**conveyed**
  166:13
**cooperated**
  197:13
**copy** 80:14
  90:12 94:1,12
  121:8,11
  128:10 141:17
**copying** 140:4,5
**corner** 138:18
**correct** 9:20
  10:3,14 13:7
  14:15 15:2,19
  15:22 17:3,22
  18:1,12,25
  19:4,7,9,25
  20:5,8,13,16
  20:19,22,25
  21:9,12,15
  22:12 23:6,15

24:25 25:11,13
25:16,17,17
26:18,24 27:5
27:7,10,13
28:21 30:21,22
31:8,21 32:2,3
33:3,17 34:20
35:6 37:9
38:14 39:8,15
39:18,21,25
40:13,20,25
41:2,4,8 42:4
43:8,11,12,14
43:18,25 44:1
44:4,5,7 45:2
46:25 48:8,9
48:13,17,20,23
49:2,3,9,21
51:1,8,22,25
52:23,24 53:3
53:7,18 54:5
55:18,22,25
57:6 58:5,8,12
59:10,13 60:5
60:9 61:11
62:2 63:3,21
64:4,10,23
65:4,8,21,22
65:23 66:1,6
66:23 67:6
69:13 71:19
72:13 73:13
76:20,22 77:1
77:4,21 78:5,6
78:17 79:5
81:4,13,19
82:7,11,18
84:15,23 85:23
86:5,11 87:2
87:10,23,24
88:13,25 89:20
89:21,25 90:4
91:20,23 92:2
92:23 93:13,17

94:1,4,16,20
95:5,7,15
96:11 97:2,9
97:12 99:1,10
99:24 100:16
101:11,24
102:4,7,11,12
102:14,15,18
103:17 104:9
104:15,18,21
106:1,4,11,12
106:21 107:1,2
108:5,6,8,11
109:9,17 110:9
110:12 111:13
111:17 112:16
112:19 114:2
114:14,18,23
115:1,5,10,15
115:20 116:7
117:8,22
118:11 119:4,8
119:15 121:2
121:10,22
122:7,10,13
124:3,6,9
125:5,15 126:6
126:15,17,25
129:1 130:8,11
133:7,18
134:22 135:2,7
135:10,13,21
136:16,17,24
137:20 138:9
140:11,23
144:24 148:13
150:10 151:21
152:6,7,9
153:8,24 154:6
154:9,12,14,17
155:6,10,14,19
156:7,20 157:3
159:3,8 160:4
160:23 161:20

162:12,19
163:5,9 164:17
164:22 165:11
165:17,19,22
166:19,21,22
169:11 172:3,5
172:6,8,18
173:2,10,19,23
173:24 174:10
175:1,12,15
176:1,3,7,22
178:17 179:15
180:4,7,13,14
180:17,19
181:9,18 182:3
182:19,24
183:22,25
184:12 186:23
186:24 187:6,7
187:10 188:7
190:1,6,25
191:5,6,8,14
191:20 192:9
192:10 193:5
194:25 197:5
197:14 198:9
198:21 199:4
199:12,14
200:4,13,15
201:10,12
205:11
**corrective** 109:1
**correctly** 49:25
  64:16 156:16
**correspondence**
  135:6
**corresponding**
  135:12
**Council** 11:23
**counsel** 6:11
  14:12,18,20,24
  15:2,3,12,17
  15:25 24:6,9
  24:16 126:21

126:25 127:24
130:2 135:5,6
138:17 141:17
143:10,10
203:10 204:1
205:13
**counsels** 24:11
**count** 95:14
**counties** 83:11
  87:8,9
**counts** 95:13
  98:12 177:24
**county** 11:19
  12:5 83:12,16
  83:16 87:15
  148:12 154:6
  155:6,18
  167:11 180:2
  205:4,24
**couple** 23:25
  31:15 75:24
  123:18,18
  145:6 148:22
  176:25 202:3
  203:6
**course** 17:2
  18:23 21:8
  23:7 36:9
  58:15 67:18
  106:17 115:10
  122:1 125:15
  181:2 196:15
  196:20
**court** 1:1 8:4,19
  10:23 14:10
  15:5,6 16:10
  16:12 20:2,3
  20:21,21,24
  28:6,7,7,16,23
  29:10 30:5,14
  30:20,24 33:10
  34:17,19 37:17
  37:21,22,24
  45:1,3,5,10




PAUL FISCHER
July 28, 2017

46:12,21 50:8
50:10,12,15,19
51:18,21,25
52:2,9,18 53:6
53:6 55:12
63:10,13 65:24
77:3,5,10,11
77:13,23 83:12
88:7,11,11,14
88:15 91:6
94:9 95:17
100:22 101:13
102:7,8 103:6
103:18,19,24
103:25 104:2,6
104:7,15,17,20
105:1,4,6,22
106:13,14
107:14,15
109:14,18,23
115:5,18
119:10 121:4
121:11,15,19
121:22 122:12
122:16,21
123:7,17,19
124:25 125:4,8
125:22 126:9
126:12 132:13
137:10,11,21
137:21,22,25
138:1 146:1
148:12 153:7
153:11 154:6,8
155:6 167:11
167:21 168:4
168:11 170:8
170:15,16,20
172:7 174:8,8
175:19,21,24
176:6,9 177:1
177:6,23 178:2
178:10,20,25
179:2,5,12

180:1,4 181:9
183:21,24
184:9,16 185:3
187:9,24
188:17 193:2
196:2,15,19
197:5,8 200:6
201:22 202:1,6
court's 102:15
168:6,12,25
202:25
courthouse
77:12 172:1
courtroom
59:10,17 61:10
62:1,22 72:18
87:1 136:13
172:21
courts 10:19
77:15 87:18
cover 14:25
33:11
coverage 148:6
covered 45:19
73:1
Cox 3:12
crafted 96:24
97:8 98:11
criminal 30:3,19
149:11,13
criteria 74:3
94:6,8
criticism 168:7
criticized 168:4
CSR-5395 1:20
205:22
currently 11:6
31:7
cursory 79:13
cut 90:24
cutbacks 84:9

— D —

D 1:8
damages 153:14

Dan 164:16
165:5
data 57:21
database 53:20
56:2 57:11,21
57:22 58:2
date 9:13 165:21
195:21 205:7
dated 184:8,12
185:11
David 147:18,21
160:22 167:10
183:12 184:21
day 53:16 164:9
193:18
days 56:16,20
56:21 91:8
111:13,15
175:21,22
deal 116:9,11,18
116:19,23
dealing 196:4
dealt 189:9
196:6
Deb 3:9
Deborah 183:19
184:9
December 12:10
185:4,6 186:1
decide 24:14
32:18 65:18
67:8 90:25
94:3 106:6
107:10 119:18
131:20
decides 113:25
deciding 69:23
92:11 115:22
195:6
decision 14:9
54:22 63:12
91:12 92:14
104:1 107:11
109:13 115:3,6

117:19 124:24
125:7 163:23
164:4 175:20
176:13 177:25
179:12 202:25
decisions 125:4
declined 166:21
deem 143:11
defamation
153:12
defendant 2:21
3:18 31:20
200:19 203:15
203:15
Defendants 1:11
3:8
defense 6:11
12:22 13:13,14
174:20
defer 79:11
deficiency
177:16
define 118:8
defined 99:25
118:22
defines 162:21
definitely 60:12
79:5,9 151:22
definition 63:3
degree 9:19,22
10:1
delay 66:17,20
66:23
delays 67:1
delete 73:4
81:12 114:12
deliberate 116:1
deliberately
18:14
deliberation
160:14
deliberations
114:22
deliberative

6:16 158:9,14
163:15 164:13
delineated 37:1
demeanor 59:10
59:17 61:1,10
62:1,2,22
67:15 72:18
deny 147:24
151:18
Department 3:2
depend 146:16
158:6
depending 37:8
depends 90:15
deposed 29:21
29:24 30:1
159:5
deposition 1:15
4:14,15,16,17
4:18,19,20,21
4:22,23,24,25
5:1,2,3,4 7:19
30:4,6,13,19
30:21 33:7
55:9 96:1
97:23 98:4
100:19 101:7
101:14 129:4,8
130:14,18
132:10 138:12
138:16 145:2
145:10 146:7
148:16,20,22
154:20 159:12
167:5,9 168:21
180:22 184:3,7
202:24 203:24
205:7
deputy 22:14
described 14:25
75:24 76:17
87:7
describing 34:9
34:13




PAUL FISCHER
July 28, 2017

Page 214

description
39:12,14 62:16
64:19 65:1
66:4,12 95:18
descriptions
83:8
designate 6:23
designed 102:2
desire 173:1
despite 140:19
detail 79:14
135:20 203:18
detailed 163:3
163:18 164:1
165:3
details 126:19
153:1,17
determination
141:11 144:13
164:21
determine 49:6
79:17 89:2
determined 72:3
72:17 73:2
82:15 108:13
113:15
determines
95:19 100:14
Detroit 123:6
192:11
died 148:13
differed 81:1
difference 62:21
96:22 118:23
179:6,8 198:5
198:9,13
different 12:25
14:17 17:1
27:17 38:4
42:9,14 52:9
52:10 70:8
96:19 103:14
103:16 108:24
141:17 161:25

166:11 176:21
differently
86:19 87:13
161:19 162:4
162:16
differs 34:18
difficult 8:5,19
56:23 57:24
87:16 94:15
digits 131:1,11
direct 68:2
82:17 88:6
145:3 149:18
151:7 158:18
169:4 197:7
directed 184:8
directing 144:1
144:2 195:11
195:13
direction 7:12
14:4 32:19
166:9,11
169:16,17
182:14
directly 51:17
161:12,14
director 12:13
13:17,19,20,22
14:20 15:1,11
16:2 17:3 21:2
21:8,18 22:14
22:15,18 24:5
25:12,13,19
26:1,5 27:4
28:21 29:1
32:5,10,19
33:15 35:14
36:22 39:4
40:20 41:13,20
41:22 42:15
43:16,20,22
44:10,13,18
48:8 52:17
58:4 69:12

84:11 88:3
107:23 109:16
110:8,16,19,20
111:6 112:1
113:6,9,23
116:13 117:13
117:15,16,17
117:19 118:5
118:12 125:19
125:20 126:5
133:9,15
146:13 154:12
166:6 169:7
186:25 187:3
director's 111:3
directors's
110:5
directs 110:11
disability 64:22
disagree 78:13
142:6 185:19
disagreed 92:18
175:7
disagreeing
140:25
disagrees 79:4
disciplinary
11:23 39:24
40:9 163:24
164:4 197:1
discipline 13:15
27:11,13 63:12
95:14 99:24,25
102:23 105:19
105:22 106:1
108:14 116:7
117:1 118:7,15
118:18 120:11
152:3,5 158:5
163:25 164:5
197:22,23,23
198:2 199:1,2
199:13,15,17
199:19,20

200:1
disciplined
25:25 27:5,18
Disciplining
149:2
disclose 158:12
171:14
disclosed 143:24
disclosing
104:23 173:15
discovery 54:15
121:2,21,24
122:3,5 126:4
126:14 136:12
discretion 43:17
43:24
discriminated
180:16
discrimination
182:17,18,25
183:3
discuss 78:12,22
82:5 156:18
157:2 158:4
201:20,24
202:7
discussed 81:16
90:8 92:20
96:14 102:22
122:4 190:20
190:22 202:20
202:21 203:8
203:11
discusses 39:7
discussing 60:8
92:9 93:9
197:22
discussion 59:12
59:15 79:5
86:18 92:13
136:13 185:16
discussions
92:21 127:9,13
156:15 191:18

198:6 200:9,18
201:17
dismiss 32:20
90:24 108:14
113:16 124:18
124:25 198:23
dismissal 28:2,8
31:25 55:1
76:13 78:12,13
78:25 80:4,19
88:17,21 89:7
91:1,2,16
92:17 93:13,24
94:20,23 95:6
95:10,12,13,18
96:23 97:3,7
97:12,19 98:9
98:11,12,13
99:5,16,23
100:3,11 101:2
101:10,19,22
102:13,17,24
102:25 103:1
108:1,14,15,15
113:18,18
119:16 125:3
dismissals 95:12
97:1 108:20
dismissed 27:25
28:7,11 29:5
32:13 67:21
68:21,21,22
72:18 78:17
80:3,7 91:13
98:15 168:9
198:25 199:2
202:22 203:17
dismissing
94:11
disposition
68:20
dispute 195:21
disputing
140:22




PAUL FISCHER
July 28, 2017

Page 215

disrespect
    180:25
dissatisfied
    21:14
distinction
    18:10
distribute 73:25
district 1:1,2
    10:22 20:21
    37:24 38:5
    123:7,17,19
    126:9,12
    137:21,22
    153:7,11 154:9
    181:6 187:24
    188:17 196:2
    196:15,19
    197:4,8
divided 74:11
division 1:3
    19:20,21
divorce 12:23
    30:25 31:2,11
divorced 31:2
docket 66:23
    67:1 69:5
    77:15,20 78:23
Doctoroff 12:3
document 55:13
    115:7,7,17
    134:9,9,17
    138:20 140:10
    140:14,18
    155:3 163:25
    169:5 192:1
documentary
    121:8
documents
    77:16 130:10
    133:22 135:15
    138:23 139:12
    139:13,24,25
    179:14
doing 17:13,17

17:20 18:11
    24:11 51:15,16
    53:17 80:11,15
    85:19 98:1
    179:4 190:23
domestic 13:12
draft 80:12
drafter 40:25
drawing 18:9
Drive 3:13
drunk 62:25
    63:9,13
dual 15:6
due 84:9
duly 6:7
duties 13:19
    14:17,25 51:11
    63:21

——————
        E
——————
E 36:3
e-mail 44:16
    81:22 179:21
e-mails 179:3,19
earlier 12:24
    51:10 64:3,6
    76:17 87:7
    88:23 92:20
    96:14,25 110:4
    135:20 140:14
    172:16 197:21
early 11:17
    102:3 110:3
    189:21
easier 6:22 57:1
easily 57:12
Eastern 1:2
    10:22 154:8
    181:6
edit 114:12
education 9:15
    16:14
educational
    17:16
EEOC 180:7,10

effectively 110:8
efforts 190:7,12
eight 64:18
    102:8
either 64:22
    80:18 90:24
    95:6 109:23
    113:11,15
    114:1 116:20
    117:12 120:14
    124:12 138:6
    179:13 181:24
    201:7 205:13
elect 37:21 38:7
elected 38:2,6
election 20:15
    20:22 37:22,25
electronic 128:9
electronically
    56:3 128:23
embarrasses
    120:11
embarrassment
    119:4,5 120:10
    120:14
emphatically
    156:10
employed 94:16
employee 94:9
    94:13 152:24
employees 24:17
employment
    11:4,24 12:15
    145:15 147:5
    153:2
encloses 109:13
encounter 18:7
    52:8
encounters
    52:14,15
ended 56:20
    133:7 165:13
    168:9 178:9
    189:25

ends 130:6,25
enforce 39:20
enforcement
    85:2
engage 36:17
    41:24
engaged 41:14
    164:22
engaging 63:19
ensure 193:10
entered 56:2
    109:18 166:3
entire 8:12,17
    21:25 22:5
    39:7 119:2
    129:1 140:4
    182:15
entirely 61:12
entitled 121:7
    122:7
equally 193:5,10
equivalent
    162:12 192:8
error 120:21
    179:21
escalate 102:4
Esq 2:22
essentially 80:17
    88:18 107:18
    116:9 120:20
    130:10 198:6
established 33:2
et 1:10 24:11
    32:21
ethical 18:21
    39:21
ethnicity 180:17
    182:11
evenly 73:25
event 58:4 174:9
    174:11 205:13
events 17:22,25
    18:4 155:16
eventually

126:21
everybody
    82:23 83:2
    119:11 120:16
evidence 121:8
exact 28:19
    146:2 175:22
exactly 57:2
    72:12 79:22
    97:21 115:19
EXAMINATI...
    4:6 9:8
examined 6:9
examiner 15:11
    15:13,18,25
    24:5 75:8
    107:5,6,23
    110:9,11,22
    112:2 116:14
    116:18 117:23
    117:24 118:2,2
    125:10,10,11
    125:12,18,24
    125:25 126:3
    163:22,22
    175:1,2 176:17
    176:20 177:4
    177:12
example 26:7
    35:19 36:2,2
    36:16 37:4
    49:18,21,23
    54:16 61:1
    67:16 72:2
    86:25 94:9,18
    94:24 96:13
    97:11,19 98:8
    99:7,21 101:2
    101:19 114:9
    115:16 119:16
    131:19,24
    134:14 140:13
    189:24
examples 17:9




PAUL FISCHER
July 28, 2017

38:13,16 48:5
85:21 86:2
134:8
**exceeds** 143:22
**Excel** 57:18
**exception** 142:2
**excuse** 36:10
141:3
**executive** 12:13
13:17,19,20,22
14:20 15:1,10
16:2 17:3 21:2
21:7,18 22:14
22:15,18 24:5
25:12,13,19
26:1,5 27:3
28:21 29:1
32:4,9,19
33:15 35:14
36:22 39:3
40:20 41:13,20
41:22 42:15
43:16,20,22
44:10,13,17
48:8 52:16
57:15 58:4
69:12 84:11
88:3 107:22
109:16 110:4,8
110:16,19,20
111:3,6 112:1
113:6,9,23
114:25 116:13
117:13,15,16
117:17,19
118:5,12
125:19,20
126:5 133:9,15
146:13 154:11
166:6 169:7
186:25 187:3
**exercise** 88:2
**exercises** 20:3
**exhibit** 4:11,14

4:15,16,17,18
4:19,20,21,22
4:23,24,25 5:1
5:2,3,4 33:7,11
36:6 40:5
49:19 55:9,13
58:12 59:8
60:19 62:17
64:12 65:6
71:19 92:25
96:1,5,8 97:5
97:23 98:3
100:3,12,19,23
101:7,14 103:4
129:4,8 130:14
130:18 131:2,3
132:10,14
138:12,16
148:16,20,21
154:20,24
167:5,8 168:21
168:24 180:22
181:3 184:3,7
**exhibits** 4:9,12
134:1
**existence** 151:18
**experience**
122:9
**experienced**
29:20 70:10
182:17
**expert** 30:3,19
**expires** 205:25
**explain** 35:17
**explaining** 80:5
**explanation**
91:2 94:20,23
95:10,19 96:23
97:12,20 98:13
102:11 108:15
108:18 119:16
**explore** 90:20
**expressed**
109:23 156:14

161:17 162:14
176:9 182:12
**extended** 111:17
**extent** 7:11
34:18 61:24
63:5 68:25
132:4 141:7
162:7 177:20
192:18 193:7
198:18
**eyes** 119:11

---

**F**
**F-I-S-C-H-E-R**
9:12
**face** 42:17
156:13
**facing** 118:15,18
**fact** 20:24 39:17
65:16 118:10
136:12 139:11
140:20 151:23
182:17 195:5
**factor** 181:22
**factors** 69:23
115:20,22
158:6
**facts** 146:16
177:24 178:3,8
**fair** 7:13 17:2,16
26:3 31:14
32:1 36:21
51:1 53:9 60:1
69:15 80:16
95:18 103:13
132:6 137:6
139:12,21
163:7 176:10
182:16
**fall** 50:4,13,14
50:16 63:24
99:15 137:22
152:4
**falls** 99:24
**familiar** 115:20

129:12 153:7
160:10 168:12
199:13,15
200:4
**family** 13:12
**far** 65:13
**far-fetched**
44:22
**favor** 176:6
**favorable** 63:25
**favored** 23:18
163:4,11 164:8
**favors** 118:11
**FBI** 85:3
**fear** 19:9,13
**February** 185:5
189:21
**federal** 7:20
10:18 30:14
85:17 93:22
126:11 141:4
154:8 180:3,6
180:11,15
181:9,23
200:10,15,20
201:18,20
202:7 203:11
**feel** 34:8
**fell** 197:22 198:1
**felony** 146:24
**felt** 182:9
**female** 136:10
138:4
**Fifth** 3:4 145:11
146:8,12
**file** 14:3 15:21
42:11 43:3,17
43:23 47:18
49:1 51:21
53:2 57:14
61:17 75:24
76:1,3 77:3,5
77:10,11,13,18
78:20 79:12

80:2 81:23
83:12,17,22
90:11 105:8
113:16 115:23
122:17 125:9
125:12 128:22
129:21,25
130:4,11,19,23
133:6,7,23
134:3,11,14,18
134:21 135:4,7
135:12,16
139:2,16,25
140:4 149:22
150:1 151:19
175:23 176:1
178:13 180:11
187:20 189:24
191:13
**filed** 27:24 28:12
29:12 30:11
32:7 53:21,24
103:9 112:2
115:9 122:6
125:8,16
146:24 153:10
153:23 154:3
155:5,17 163:3
174:7 175:20
176:2 179:1
180:3,6 181:6
183:10,15
188:5,6 189:5
191:20 193:22
194:7 195:19
**files** 49:5 51:18
59:13,22 77:12
126:3,15,20
127:3,19 128:9
128:14 129:1
129:18 133:14
139:14 175:23
**filing** 15:18
20:10 51:13




PAUL FISCHER
July 28, 2017

110:5 115:18
180:6 189:6,11
190:14 195:16
**filled** 73:20
**filling** 22:12
**final** 81:3 92:14
108:7
**financial** 84:9
**find** 24:10 56:23
**finding** 168:11
199:19
**findings** 107:13
**fine** 18:20
**finish** 8:12,17,24
**fire** 198:23
**firearms** 171:25
**fired** 166:23
**firing** 177:8
**firm** 3:12 12:2,9
12:18,20,21
13:4
**first** 6:7 12:18
13:2 29:25
31:1 45:21
53:11,13 55:4
65:7 70:7
75:17 78:10
90:16 93:12
97:4 111:1
127:12 130:25
131:7 140:11
143:14 148:23
149:6,16
167:24 184:15
187:2 189:22
190:3 193:18
194:13
**Fischer** 1:15
2:21 4:4 6:5
7:8,19,21 9:12
71:11,13
100:22 142:12
154:25 155:22
156:3,11

158:16 160:12
160:22 181:4
186:25
**FISHER** 2:4
**five** 37:15 72:25
**flip** 38:21
**Floor** 3:4
**focus** 12:19 13:9
60:2 183:6
**focusing** 13:17
104:8 111:1
159:21
**folks** 23:15
**follow** 74:17,18
106:8
**following** 46:8
60:20 105:17
106:7 112:14
146:3 156:23
171:19
**follows** 6:9
**footnote** 176:16
177:21 178:4
**foregoing** 205:8
**forget** 198:15
**forgot** 177:25
192:10
**forgotten** 46:4
**form** 49:4 68:17
71:25 72:16
96:7,13,14
108:17 109:2
122:17
**formal** 9:15 14:5
14:9 15:19,20
20:10 29:11,15
45:18,23 46:1
46:19 47:5
51:6,13 60:4,6
68:1 70:1,17
70:20 74:22
75:9 92:1
103:8 105:17
107:6 108:1

110:5,18,23
111:22,25
112:16 113:11
113:17,25
114:5,8,13,13
114:17 115:11
115:13,23
116:2,12 117:5
117:7,8,24
121:1,10 122:6
141:25 142:2,4
142:16 149:22
150:1,5,11
151:16 156:4
189:7,11
190:14 191:20
192:1,1 193:22
194:16,21
195:17,19
**formally** 11:7
**format** 37:4
**formed** 29:15
162:8
**former** 11:22
25:23 123:16
123:17 148:12
152:24 153:10
164:16 201:21
**forms** 152:3
**forth** 34:16
205:8
**forward** 9:16
11:25 45:7
112:15 114:16
114:17 115:13
115:15
**forwarded**
179:24
**found** 101:23
179:9
**foundation**
172:23 173:3
**four** 24:13 36:11
37:15 72:25

103:15,16
159:25 160:8
160:20 161:13
167:21
**fourth** 178:14
**frame** 75:16
**frames** 21:20
**fraud** 191:15
192:6 193:13
**free** 34:8 192:14
**frequent** 48:1
**frequently**
13:21 17:7
18:16 19:19
52:7 67:17
79:7 118:9
135:25 151:15
**Friday** 1:19 6:2
**friend** 18:19
137:10,11
**friends** 64:2
174:19
**front** 13:15 14:8
14:10 15:4,5,5
33:13 55:14
62:19 96:8
98:5 100:25
101:17 114:24
121:11 124:16
126:8,11
130:21 132:14
149:3 150:25
155:1 165:10
167:12 169:1
175:11 176:5
181:7 184:10
190:24 200:1
**FTC** 129:9
**full** 9:11 89:5
205:11
**fuller** 139:16
**fully** 197:13
**function** 14:21
15:7

**functioning**
14:23 53:17
**fundamentally**
108:10
**further** 14:8
32:13 42:1
77:8 78:1,4
80:5,19 90:20
90:22 91:4
203:19

---

### G

**G** 49:20
**G-L-E-N-N** 23:1
**Gage** 12:3
**gained** 145:14
145:19 146:11
147:4
**game** 7:13
113:15
**gender** 123:20
136:7,15,20
**general** 3:2
12:21 13:2,4
14:12,17,20,23
15:1,3 17:10
26:12 93:11
119:7 134:2
137:18
**generally** 17:8
20:3 22:10
44:14 52:21
60:4 66:23
92:22 114:6
134:10,13
190:15 198:22
200:3
**generate** 56:24
**generated** 68:19
**getting** 61:17
67:21 69:6
72:7 89:9
119:20 189:18
192:13,14
**ghost** 19:4




PAUL FISCHER
July 28, 2017

**give** 21:19 22:20 24:25 28:9 32:19 36:14,16 37:3 45:24 46:2 54:13 68:12 70:2 75:19,21 79:13 83:5 94:3,25 97:15 121:16 144:9 151:17 166:5 172:17
**given** 30:23 37:8 61:13 73:17,19 73:19 87:1 94:7 101:22 139:20 176:19 191:10
**gives** 38:12
**giving** 15:15 17:8 24:12 28:4 78:19 94:11 150:18
**glad** 63:16
**Glenn** 22:25 70:12 75:11,15
**go** 7:14,22 42:24 46:6 47:24 54:9 57:14,15 62:7 69:8,10 70:17,20 72:16 72:24 75:14 76:3,15 78:22 78:23 79:14 80:8 81:20 82:2 83:12,14 87:20 89:6 91:4,15 109:21 112:15 114:10 114:11 127:5 142:18 158:9 158:14 162:24 166:11 173:1 186:22 192:14
**goal** 162:11

**goes** 14:5 35:18 82:12 109:2 111:9 114:1,7 129:10 132:25
**going** 6:15 7:23 7:25 12:18 17:11 24:15 30:6 36:4,10 36:16 40:4 42:12 44:19 45:7,16 59:17 64:25 65:19 66:12 67:25 70:1,20 71:4 72:25 73:18 75:14,22 77:22 80:2,18 81:3 85:4,6,11 87:8 87:10 89:6 91:4 92:10,11 96:4 99:12 105:18 110:15 121:14 122:5 127:6,18,22 130:1 138:15 140:17 141:24 142:6 143:9 145:6 147:1 150:3,23 151:7 158:8,11,18,19 162:6 163:13 169:23 184:6 191:13 194:12 202:22 203:14
**good** 7:16 29:24 63:16 71:1 120:24,25 143:8 164:9 190:18
**Gorcyca** 155:18 156:13,14 161:18 162:3,8 162:15,19 163:8 164:9,21

182:10
**Gorcyca's** 163:4 163:19 164:19 165:25
**gotten** 17:14,15 74:12 90:16
**govern** 34:19
**governor** 38:8 198:15
**governs** 134:13
**graduated** 9:17 9:17 11:25
**Grand** 2:18
**granted** 43:7
**greater** 73:22 176:6,17,21
**Green** 3:9 183:19,21 184:9,25 185:11 200:6 200:11,12,18
**greeting** 18:11
**grievable** 168:11
**grievance** 13:14 28:2,12 29:8 29:13,16 52:22 54:1,10,11,12 54:13 55:14 56:6,11 57:9 58:7,11 59:1 61:16,24 62:4 62:6 67:9,25 68:5,10,13 69:21,22 75:23 75:25 78:7 80:13,14 82:16 88:16,25 89:15 89:18 93:16 94:1 128:4,7 128:17 131:16 133:10 134:21 135:17 140:11 155:17 168:9

168:10 174:10 174:12 183:10 183:15 194:8 194:14,23
**grievances** 14:2 27:24 29:3 32:7 53:21 54:4,15 60:6 60:24 61:8 63:24 64:8 68:20 73:6 74:8,11 194:24 195:4,6
**grievant** 28:5 29:6 49:11,11 49:15 53:23,24 56:12 72:1,24 76:25 77:7 79:15 83:23 89:23,23 94:14 108:16,17,24 109:4,11 133:10 135:24 187:17
**grievant's** 76:7 77:7 83:24
**group** 32:20 174:13
**guess** 6:25 11:9 14:8 34:22 56:18 58:15,17 63:16 66:8 75:6 77:4 103:13 112:11 130:6 143:10 143:14 203:23
**gun** 194:12,19
**guys** 6:22

**H**

**H** 167:10
**H-U-L-T-G-R...** 123:9
**halfway** 38:12 40:7

**HAMPTON** 1:10
**hand** 138:15 169:15 184:6
**handed** 33:10 55:12 98:2 100:22 101:13 129:7 130:17 132:13 148:19 154:23 167:8 168:24 181:3
**handle** 75:22
**handled** 105:13 118:20
**handles** 190:24
**happen** 62:12 78:20 79:10 105:2 113:20 124:21 174:4 198:18,22
**happened** 44:23 45:9 46:11 86:22 89:14,16 97:1 105:12 109:6 115:14 118:8 133:19 146:19,20 177:14 186:16 187:8 198:7 203:17
**happening** 134:19
**happens** 167:3 186:14
**happy** 18:21 54:22
**hard** 14:19 61:5 64:14 128:10 132:18
**harm** 156:5
**harms** 119:10
**hate** 133:2
**Hathaway** 159:23




PAUL FISCHER
July 28, 2017

**head** 8:5
**heading** 34:1
  38:23 39:6
**hear** 18:5 48:17
  89:15,18 148:6
  161:12,14
**heard** 52:22
  66:18 89:22
  143:18 148:4
  152:16 161:9
  161:10,11
**hearing** 74:22
  74:23 75:9,15
  103:23 105:17
  106:7,8,11
  107:1,12,18
  108:4 114:19
  114:24 115:11
  121:10 122:7
  124:2 158:3
  165:25 179:9
  185:4 193:19
  200:1 201:8
**Heisenberg**
  87:11
**held** 12:15 39:23
  40:8 179:9
**hello** 18:7,10
**help** 24:7
**helped** 24:10
**hereinbefore**
  205:8
**hereto** 204:1
**hesitate** 201:25
**hey** 89:12
**high** 39:20 73:4
**higher** 65:24
  125:11
**HILLIARD**
  1:10
**hire** 23:8 24:15
  26:25 84:8,13
**hired** 22:8,9,25
  23:2,15,19,20

23:20 24:1,8
24:16 25:6,8
**hiring** 21:3
**hirings** 21:11
  24:20
**Hirsch** 2:3 4:7
  6:21 7:5,10,14
  7:16 8:3,8,12
  8:15,22 9:2,9
  19:12 21:23
  33:9 41:19
  45:20 46:18
  55:11 71:3,6
  71:10,17,21
  96:3 97:25
  100:21 101:9
  126:10 127:12
  127:17 129:6
  130:16 132:12
  138:14 140:22
  141:1,13,15
  142:6,18,21,25
  143:7,25 144:4
  144:17,22
  145:4,9,24
  146:10 147:7
  148:1,5,18
  150:8 151:4,11
  154:22 157:5
  158:13,21,25
  159:4 160:7,19
  161:25 162:2
  162:10,18
  163:17 164:15
  167:7 168:23
  170:3 171:7
  172:2,24 173:6
  173:17 177:19
  180:24 184:5
  185:14,18
  195:11,15
  197:17,20
  203:19
**history** 9:24,24

9:25 10:3 11:4
11:24 67:11
75:25,25 192:7
**hold** 71:12 81:19
  82:4,9,10 83:1
  83:2
**holiday** 159:18
  160:15,18
**Hon** 1:8
**Honorable**
  167:10
**hope** 102:3
**hours** 203:6,6
**huh** 167:2
**Hultgren** 123:8
  123:10
**humor** 8:16
**Hyman** 12:10
  13:6,10
**hypothetically**
  61:25

---
**I**
---

**IAB** 19:20
**icebreaker**
  19:18,22
**ICLE** 16:14
**idea** 36:15 37:3
  137:15 138:2,5
  138:7 165:24
**identification**
  33:6 55:8
  95:25 97:22
  100:18 101:6
  106:17 129:3
  130:13 132:9
  138:11 148:15
  154:19 167:4
  168:20 180:21
  184:2
**identified**
  158:11,16
  159:16 167:20
**identifies** 167:22
**identify** 22:17

49:7 105:6
158:22 159:12
159:15 160:20
161:3 181:23
**identifying**
  46:25
**identity** 122:19
  158:17 159:1
  160:8
**ill-chosen** 167:2
**implicate** 6:15
**important** 61:17
  193:4,9
**impressions**
  162:7 195:10
**improper**
  100:14 153:11
  157:4,7,16,23
  158:1
**improperly**
  152:25
**in-term** 174:6
  185:25 186:21
  188:1,6,14
  189:5
**inaccurate**
  168:17
**incident** 194:19
**include** 50:10
  130:4 137:6,7
  177:25
**included** 59:18
  80:8 114:7
  131:12,12
  134:3,14,18
**includes** 139:12
**including** 48:15
  167:20
**incorporate**
  57:23
**increasing** 95:4
  95:9
**independent**
  24:19 39:23

40:9
**independently**
  50:18
**indicate** 78:19
  182:2
**indicated**
  136:14,19
**individually**
  97:8
**influx** 66:17
**information**
  52:3,12 53:25
  76:22,25
  136:16,20
  142:9,10,13,13
  143:23 145:20
  147:4 150:6
  151:2 164:12
  178:21 179:3
  182:23
**informed**
  108:16
**informing** 141:4
**infraction**
  120:17
**initial** 55:20
  67:4 70:16
  76:18 78:16
  79:4 80:25
  111:5 140:15
**initially** 79:18
**initials** 68:24
**initiated** 46:20
  49:24 121:1
  131:18
**initiating** 134:9
**initiative** 44:7
  47:12
**input** 81:6,10
  122:18
**inquiries** 85:16
  150:21
**inquiry** 85:12
  151:13

 

insofar 141:25
142:3 145:13
147:4,20
171:13 187:5
inspect 121:8
installed 187:23
instance 145:19
instances 44:24
135:9
Institute 16:10
16:14
instruct 145:16
147:5 158:11
158:19 160:12
163:14 171:15
173:14
instructed
169:20
instructions
83:5
instrumental
182:3
intake 68:7,19
80:25 194:23
intemperance
62:16,22,24,25
63:3,9,13
intended 132:5
interchangeable
53:1 100:8
interested 11:7
205:13
internal 19:20
43:19 55:21
77:23 90:6
internally 49:7
131:25
interrupt 8:23
interview 24:14
interviewed
201:4
interviews 24:12
intimidation
172:5

introduced
121:9 201:5
introduction
19:2
investigate
38:14,19 41:16
42:1,8,12,19
43:8 51:18
82:17 152:13
183:9
investigated
27:20 55:2
83:20 90:19
136:5 141:21
143:19
investigating
74:9 85:10
136:8
investigation
28:3 32:13,21
42:6 43:3,13
44:4,6,19 45:2
45:7,11 46:14
47:9,19 48:23
49:4,8 50:20
50:24 51:1,4,8
51:19,22 52:16
52:22 53:2,11
58:15 73:23
74:16 77:25
78:4 80:6,19
82:16 83:3,8
84:3,22 85:4
85:11,21 86:4
87:10 88:13
90:17 91:10
92:10 96:11
98:4 99:12
100:24 101:16
110:11,13,15
111:24 112:22
129:21 130:5
130:20 131:8
131:19 134:25

142:15 170:2
184:16,24
185:11 187:14
188:12 193:17
195:16,23
196:1,16,20
197:14,16
investigations
14:4 27:15
53:15 70:18
86:25 166:10
investigative
15:7 43:17,23
88:23 90:14,15
90:23 91:11
112:3,4 189:10
investigator
84:13 87:19
investigators
84:7 89:13
involved 24:21
31:20 39:17
70:2 72:14,20
99:20 118:14
119:20 121:20
126:4 152:24
197:15 200:2
involvement
35:8,11 187:4
involving
150:25 153:2
IOPs 76:24
77:10 95:15,16
118:10
Island 16:22
issuance 15:20
15:22,23 91:25
114:4,17
115:12
issue 83:18
104:4,21
106:15 107:11
110:16,22,24
116:2 118:20

142:23 172:3
issued 35:13,24
107:7 110:19
111:3,23
112:23 117:5,8
126:15 132:22
142:1,3 179:12
191:20,22
194:17
issues 6:19
15:23 115:3
124:3 125:7
167:20
issuing 190:13
items 108:13

J

J 7:19 154:25
J.D 9:19
James 1:5
141:23 143:15
144:20,25
145:3 183:7,9
183:16 185:2,9
185:20 187:22
188:4,18,18
190:8,13 191:7
192:3 193:16
193:21 195:7
195:17,24
196:16,20
200:12 201:10
James' 157:11
186:17 189:1
189:13 194:23
196:23 197:2
197:10
January 12:11
13:18 21:8
22:21 185:5
189:21 205:25
Jason 2:3 7:16
145:23
JEANMARIE
3:1

Jeffrey 9:12
Jenkins 192:10
jerry-rigged
61:15
Jew 180:19,20
181:16
Jewishness
182:10
jfisher@morg...
2:11
jhirsch@mor...
2:10
job 65:24 69:12
Johnson 1:20
205:6,22
joke 19:16
joking 19:6
Jones 183:13
184:21
JOSHUA 2:4
JTC 3:8 14:13
15:18 19:9,13
19:24 20:7,10
20:18 22:18
32:22 33:2
41:25 43:14
49:7,14,24
52:3 53:12
65:15,22 78:3
84:7 92:15
98:16,19
100:10 102:1
114:18 116:9
116:11 121:16
126:8,15 127:8
127:19 129:1
131:20 133:14
133:23 134:3
134:10 136:3,3
136:7,14,19,19
138:8 139:7,14
139:25 140:23
141:21 142:8
143:19,23




PAUL FISCHER
July 28, 2017

144:23 145:15
145:18 146:14
147:3,5 150:6
151:1,6 152:5
152:13 154:12
155:22 156:2
158:10 159:19
159:25 160:3
160:25 161:18
162:4,11 164:2
164:14 166:5
169:8 171:15
176:7 178:9
180:15 183:4,7
183:9 184:8
187:14 188:2,6
188:12,13
189:2,5 190:25
192:4,7 193:5
196:4,6 198:19
199:19 200:15
201:8 202:8
**JTC's** 21:3
39:20 121:9
142:14 193:16
197:14
**Judd** 2:15
**judge** 1:9 20:7
20:13 29:8,12
29:14,18,19
37:17 38:2
41:14,23 47:23
52:3 53:20,22
56:12,24,25
63:19,25 67:12
67:17,18,20
68:5,17 69:22
70:4 72:1
83:20,20 85:4
85:16 87:4,4
87:12,14 88:11
88:24 89:2,13
89:14,18,22
90:2 91:7,8

93:22,25 94:4
94:7,10,12
95:21 98:14,16
98:19,24 99:1
99:8,22 102:6
102:13 103:11
103:22,23
104:2,3,8,11
105:6 106:4,10
106:23,24,25
107:5,24 108:3
110:23 111:15
116:6,9,19,25
117:11,16
118:6,14,17
119:1,3,9,21
120:3,18,18
121:7,17,24
122:6 123:10
123:17 125:8
133:12,13
134:20,23
135:1,5 136:4
136:8,9 141:23
143:15,20
145:10 146:7
146:11,21,25
147:12,15,18
147:21 148:2,9
148:12,23
149:7,9 150:7
150:19,22,25
151:13,19,21
152:15,18,20
152:24 153:3,5
153:18,20
155:18 156:12
156:14,19
157:3 158:5
162:19 163:3,8
163:9,19 164:8
164:9,16,19,21
164:21,24
165:24 169:13

170:4,16,19
171:24 172:10
172:17,20
173:7,21 174:1
174:19,21,23
177:9,15 178:1
178:1,14,21
179:1 180:1
182:10 183:7,9
183:16 185:2,9
185:19 186:16
187:22,23
188:4,11,16,17
188:17,18,22
188:22 189:1,9
189:13 190:8
190:13 191:7
192:3,5,11
193:8,12,16,21
194:23 195:7
195:17,24
196:4,6,7,16
196:20,23
197:2,10,13
198:5,10,14,22
199:3,4,8,24
200:12 201:10
201:12
**judge's** 57:14
67:10 68:18
75:25 89:4,7,9
89:17 98:24
102:2 118:19
135:3 151:1
170:12 171:8
**judges** 16:23,24
17:14,18,21,25
18:3,17,24
19:9,13,25
20:2,4,15,21
20:24 35:17
36:14,15 37:15
37:15,21,23,24
38:1,4,9 39:21

39:23 40:13
50:17 52:11,13
52:13 53:23
68:17 120:21
128:6 136:15
136:21 137:2
137:15,19,21
137:25 138:1
141:20 149:1
149:22 151:3
151:16 170:5
192:3 193:5
199:11
**judges'** 16:16
**judgment** 31:23
58:10
**judicial** 11:22
12:6,12 13:13
13:15,18 15:7
16:5,9 17:18
30:11 32:23
33:12 34:2,9
34:13 35:4
37:16 38:13
41:15,25 42:17
42:25 63:11,21
95:20 108:25
119:7 137:4
149:21,25
153:23 154:3
154:25 159:20
164:22 181:5
**judiciary** 119:10
**July** 1:19 6:2
185:6
**juncture** 90:7
**June** 184:8,12
185:11
**jurisdiction**
20:18 33:22
93:23 95:7
98:17,20 137:5
137:19,23
199:10

**jury** 152:17
153:14
**justice** 38:6 45:4
45:5,10 46:13
46:21 53:8
201:21 202:1
**justices** 50:15
202:6

---
**K**
---
**K-O-N-S-C-H...**
146:22
**Kandrevas**
141:23 143:15
143:20 145:11
146:7 147:12
**keep** 61:15,19
67:12,23 69:6
134:19 136:3,7
136:16 138:22
**kept** 57:10,19
128:21 134:10
134:21 135:6
135:12 137:1
171:25 173:8
**kids** 19:4
**Kimberly** 153:5
**kind** 12:19 13:4
38:4 54:25
57:21 61:15
62:25 63:20
64:22 67:17
73:16 83:8
90:12 109:5
120:11 134:18
160:17 192:11
**kinds** 17:13 36:8
116:7
**knew** 171:1
179:18 189:3
**know** 6:22,25
7:21 8:4,16,24
9:3 16:21,21
16:23 17:13,23
18:5,18,20,24





PAUL FISCHER
July 28, 2017

19:13,15,18
21:16 23:22
24:13,18 25:6
25:8,18,21,23
25:24 26:12
27:8 29:20
30:1 32:22
36:8,13 37:24
40:1,3 41:5,9
41:12 44:15
45:23 47:12
49:12 50:17
51:17 52:12
54:17 55:2
56:10 57:13,17
58:20,24,25
59:1,4 61:12
61:19 62:8
63:11 64:5
66:5 67:10,13
68:5 69:7 72:3
72:15 75:1,2
76:11 77:23
82:3 83:10,13
84:20 85:5,5
86:22 87:10,14
87:16 88:5
90:21 99:19
103:21 104:3
104:25 105:8
105:12,23
108:24 109:21
115:25 118:8
118:22 121:12
121:13 122:2
122:21 123:19
128:17 129:15
129:24 131:15
131:17 132:2
132:21,24
133:19,20
134:15,15
136:23 137:2
138:3 143:12

147:13,14,15
147:17,20
150:11,16
151:23,25
152:1,20,21,21
153:4,5,6,16
153:16,17,18
153:20 161:22
162:20 170:22
171:1 172:9
174:11,12,14
174:16,19
176:24 177:14
178:24 179:18
183:15,19
185:2 186:2,10
186:13,13
187:5,15
188:24,25
189:1,17,20
193:21,24
194:16 195:23
195:23 196:6,9
196:12,18,21
196:22,24,25
197:3,10,12,15
198:9 199:24
200:25 201:1,1
201:4 202:12
203:3,16
**knowledge** 51:5
133:21 139:5
141:6 145:14
145:17 146:9
146:11 147:3,3
147:10,22
182:23 193:24
197:13
**known** 171:24
**knows** 87:12
**Konschuh**
146:21,25
147:15

_____
**L**

**L** 1:20
**L.L.P** 2:15
**labeled** 50:2,7
60:23 62:2
101:10 140:11
**lack** 172:23
173:3
**language** 36:1
52:20
**Lansing** 3:5
**large** 67:1
171:24
**laugh** 19:8,23
**Laurel** 3:13
**law** 3:12 9:18,20
10:18 11:25
12:1 13:9,12
13:12 63:18,20
85:2 199:21
**lawsuit** 154:16
157:11,12
160:11
**lawsuits** 153:23
154:3
**lawyer** 14:23
**lawyers** 38:3,8,9
64:1 144:20
**laypeople** 38:9
**lead** 52:15 75:8
190:16,17
**learned** 145:18
**leave** 185:3,10
185:20 186:1
186:10,12,19
186:23 187:20
187:23 188:5
188:13 195:25
**leaving** 118:19
**led** 168:8 191:13
**left** 110:13
136:18
**left-hand** 169:5
**legal** 16:14 23:5
24:2 33:22

65:7,21 71:16
73:4 186:13
**lesser** 118:6
192:20,20
**let's** 10:8 32:21
33:25 45:25
55:3,7 57:12
61:25 63:9
71:6 74:23
83:11 108:4
142:18 145:4,4
157:6 172:25
186:9
**letter** 48:2 72:23
80:4,8 91:5,25
96:10,14,23
98:12 100:6,23
101:15 104:5
108:17,23,23
109:2,5,7,13
111:1,2,11,13
111:21,23
112:2,5,14,15
112:23,24
113:1,5 117:1
117:4 130:7
131:2,4 132:21
132:25 133:6
133:23 156:6
169:6,15 170:9
170:12,16
173:18,23
174:2,5 180:13
184:8 186:21
190:8,14
198:10,14,16
198:17
**letterhead**
170:17,19
**letters** 47:22
48:7,10,12,15
71:25 72:16,25
72:25 91:22
96:7,15 111:8

111:8 194:17
198:1
**level** 95:9 111:5
117:17 120:17
122:3 125:23
158:5 187:9
**levels** 95:4
**liability** 12:22
32:1
**liaison** 202:1
**license** 199:21
**lies** 192:15
**lieutenant**
170:24 171:2
**life** 167:3
**light** 19:22
**likelihood** 79:12
**likewise** 106:1
**limit** 45:22,25
46:19 126:21
**limited** 137:18
137:23
**limiting** 45:25
**line** 144:7,13
**lines** 109:2
150:4
**linked** 57:8
**Lippitt** 12:10
13:7,10
**list** 45:19 55:17
56:24 68:19
93:7 128:6
**listed** 68:16 99:4
**listen** 89:17
**listening** 131:6
**listing** 128:3
**litigant** 49:12,13
49:13
**litigants** 178:2
**litigation** 13:11
30:8 59:1
126:9,11 162:8
**little** 12:25
19:22 35:12




PAUL FISCHER
July 28, 2017

40:6 55:4 56:1
57:24 61:5
64:3 73:5,9
98:13 132:18
134:12,17
137:13,13
183:6 192:13
197:21
**Livonia** 3:15
**loaded** 194:12
**local** 11:2 148:9
192:13
**logically** 192:22
**long** 17:3 29:25
74:16 98:23
203:4
**longer** 15:24
23:5 24:5
120:18 133:15
139:7
**look** 33:19 34:7
39:5 49:19
53:19 60:19
64:12 65:6
67:20,22 68:6
77:20,22 87:8
140:7 141:19
149:6,19 157:6
**looked** 60:20
68:14 83:20
97:5,13 133:22
180:3 202:25
**looking** 37:2
38:10 50:6
59:8 62:15,17
92:25 95:5
136:25 138:22
139:11
**looks** 64:13,17
65:11 89:8
130:10 139:1
139:15 148:25
149:7 160:16
**loose** 90:24

**loosely** 116:23
**lose** 108:3,4
**lot** 12:21,25,25
17:2 59:21
83:15 173:8
190:24
**lower** 138:18
**Lyon** 2:16

———

**M**
**M-A-I-L** 81:21
**M-A-R-G-A-...**
23:3
**Mackinac** 16:22
**Maggie** 70:12
75:11,16
196:10 201:4
202:20
**Magistrate** 1:9
**magistrates**
16:25 20:19
137:8
**mail** 53:14 81:21
81:21 172:21
**majority** 82:7
**making** 13:23
46:21 58:2
90:3 115:24
150:21
**male** 136:10
**malpractice**
12:23
**management**
69:5
**manager** 13:23
26:6,10
**managing**
110:13
**Marc** 153:3
**March** 12:4,8
**Margaret** 23:2
70:12 161:5
189:15 196:21
**Marie** 22:23
**Mark** 152:15

**marked** 33:6,11
55:8,13 95:25
96:4 97:22
98:3 100:18,23
101:6,14 129:3
129:7 130:13
130:17 132:9
132:14 138:11
138:15 148:15
148:19,21
154:19,23
167:4,8 168:20
168:24 180:21
184:2,6
**Mary** 148:2
**master** 114:21
122:10,13,16
122:19,22
123:16,20
124:2,3 164:16
179:8,9
**master's** 107:10
163:23 164:4
178:12
**masters** 122:25
123:2
**material** 75:21
131:5
**materials**
196:22,25
**Matt** 6:21
**matter** 7:17 14:5
14:6 15:15
18:21 28:5
30:7,13,19
42:8,13 54:21
60:17 61:16
72:4,6 73:3
75:22 80:7
90:25 93:21
95:13 108:20
110:1 114:20
121:25 150:25
153:2 156:15

161:18 162:9
164:19 172:11
174:17 183:7
189:1 190:7,13
191:3 193:25
194:3 195:7,8
196:11 198:24
200:9,10,15
**matters** 17:11
42:3 47:11,13
67:14 90:19
94:12 112:20
131:18 190:24
**MATTHEW**
2:14
**mayor** 194:7
**mayoral** 194:7
194:14
**McCree** 177:10
178:1
**MCR** 66:15 88:7
**mean** 7:10 9:24
10:7 11:3 16:8
16:21 17:23
18:5,6,9,16
27:14 28:11
30:2 32:10
39:8 40:1
47:24,24 50:21
58:22 59:2
63:9,10 67:15
68:21 72:21
73:15 77:12,13
77:22 79:8
81:2 84:22
86:7 92:14
95:6 99:20
109:11 113:14
113:15 119:7
120:1 125:2
126:7,11 132:2
137:21 139:25
140:22 141:17
141:18 144:5

152:2 161:10
162:22 166:23
180:25 186:24
199:24 202:9
**meaning** 63:13
**means** 63:19
95:6 150:16
151:24,25
152:2 186:2,19
**meant** 11:6 23:7
62:24 83:9
102:25 172:5
**media** 48:7,10
48:17 151:15
183:11
**medical** 12:23
**meet** 17:21 18:3
18:5 78:21
92:7 203:4
**meeting** 18:6
80:9 82:6
109:23 134:10
134:12
**meetings** 16:5
16:12 18:23
19:3 44:14
52:10 92:22
203:13
**meets** 32:15
**member** 10:5,11
10:14,16 11:7
11:10,13,16,22
78:7,15 170:21
**members** 27:9
37:12,14 38:2
38:7 52:8
158:10 202:8
**memo** 78:13
79:1,23,25,25
80:1,5 134:7
135:17
**memoranda**
90:6
**memorandum**




90:9,11
**memos** 135:10
135:17
**mental** 64:19,22
162:7 195:10
**mention** 24:1
177:15 202:21
**mentioned** 24:3
30:18 31:8
86:11 109:15
159:5 174:23
177:9 178:14
187:15 194:13
202:4,10
**mentioning** 47:8
**mentions** 167:24
**merit** 72:4,5,5
72:19 73:1
93:17,20
**met** 189:3
193:16 201:2,3
203:1
**Metro** 194:12
**Mich** 167:25
**Michael** 159:23
**Michigan** 1:2,17
2:8,18 3:2,5,15
6:1 9:17,23
10:14,22 14:10
16:9,22 17:18
18:24 19:14,25
20:4,15,24
27:18,21 28:5
33:2,12 45:1
84:17 102:7
121:4,22
122:12,21
124:25 125:4
125:22 137:3
149:1 154:9,25
155:9 167:21
168:4,25
170:24 171:2,3
171:9,11,23

175:19 176:5
178:10,19,24
181:5,6 185:3
187:9 199:14
199:16,18,21
201:21 205:2
205:24
**mid-question**
9:3
**Mike** 3:12
**MILLER** 3:1
45:16 127:6
141:24 142:11
142:20 143:21
144:2,12,24
145:13 147:1
147:20 148:3
150:3,23 151:8
158:8,19 159:3
160:10 161:23
163:13 164:10
169:23 171:13
173:14 203:22
**millerj51@mi...**
3:7
**million** 153:15
**mind** 23:12
138:22 145:22
**mine** 198:12
**mingling** 18:4
**minor** 99:3
100:15
**minute** 71:12
**minutes** 71:5
134:10
**miscellaneous**
66:4,10
**misconduct** 35:4
38:13 39:24
40:10 43:1
48:3 95:20
98:23 119:9
156:19 157:3
159:20 164:22

**mislead** 27:16
**missed** 31:1
**MJA** 16:22
37:22,23
**MJI** 16:9
**mnelson@wnj...**
2:20
**modification**
36:20
**modifies** 111:10
**modify** 57:25
58:23 114:11
**moment** 6:23
7:3 11:10
19:22 185:14
185:15
**Monday** 179:12
**money** 191:15
192:5
**month** 32:15,17
69:9 70:5 79:1
79:2 166:4
189:20,20
**monthly** 44:14
**months** 12:1,4
69:10
**Moore** 60:14,17
**Morganroth** 2:5
2:5
**morning** 7:16
174:1
**motion** 122:17
134:16 179:1
**motions** 8:6
66:13,18
114:19 126:17
**move** 125:19
141:16
**moved** 165:19
165:25

———————
**N**

**N-O-E-S-K-E**
22:23
**name** 7:16 9:11

29:7 47:8
53:19 56:12,12
68:12,18 76:7
76:11 91:9
94:14 104:24
106:18 111:3
121:17 143:16
143:17 146:23
147:23,25
148:4 151:1
152:16 158:12
183:12 187:16
**named** 31:20
47:5 146:21
147:18,21
148:2 152:15
153:3,5 203:7
**names** 22:20
23:22 24:13,23
68:12 128:6
142:1 150:7
181:23
**narrower**
139:25
**nature** 29:3 30:7
30:8 54:12,13
58:25 59:1
96:7 128:17
149:8 152:12
152:23
**necessarily**
62:13 83:5
105:16 111:25
140:9 188:8
192:25
**need** 7:1 9:2
34:6,7 51:24
55:2 89:4,6
107:18 141:10
149:1
**needed** 61:18
171:11,22
**needs** 9:5 55:2
**negotiable** 120:5

**negotiate** 118:3
120:2,6,13
**negotiation**
116:16
**neither** 38:9
147:24 151:18
**NELSON** 2:14
6:10 7:4,6,13
19:10 21:21
41:17 45:15
71:1,4,12,19
126:7 140:17
140:24 141:2
144:25 145:22
147:19 156:21
162:6,17 171:5
171:17 172:23
173:3 177:17
185:15 195:9
195:13 203:23
**never** 27:12
28:13 42:12
43:20 44:23
109:6,16,18
133:3 138:8,10
151:22 179:24
179:24,25
197:4 201:19
**new** 36:5 69:21
**newbie** 70:4
**news** 47:20
145:20
**newspaper**
147:11 148:22
**nine** 37:11 102:9
**no-discipline**
198:20
**Noeske** 22:23
23:8,10,11
**non-litigant**
49:12
**non-searchable**
57:21
**nonexistence**




PAUL FISCHER
July 28, 2017

Page 225

nonpublic 36:13
Norcross 2:15
normally 163:18
202:5
North 2:6 3:13
Notary 205:1,23
notating 57:5
note 6:12 54:1
76:1
notepad 56:8,10
56:16,20
notes 62:12
136:1 205:12
notice 7:19 91:7
173:19
notified 87:5
notify 133:10
notion 48:25
Notwithstandi...
88:10
November 12:6
number 33:11
33:20 37:18
43:13 47:16
55:13 59:4
60:2 62:15,17
64:7,8,25 70:5
72:16 74:10,14
79:8 81:23
96:11 98:3
99:19 100:23
100:24 101:14
101:16 105:9
129:8,12,21
130:6,18 131:1
131:1,10,11,12
131:16,23
132:14,18,23
133:1,5 138:16
158:6 167:9
168:25 171:24
174:13 175:22
175:22 181:3
numbered

138:24
numbers 54:14
54:17 98:4
128:4,5,7,18
129:9 130:8
131:22 138:17
138:18,23
numeral 33:20
33:21 35:20,21
36:11 38:11,23
39:7,9,13 40:6
93:2
NW 2:16

**O**

Oakland 11:19
12:5 83:16
155:18 205:4
205:24
oath 7:25 51:24
53:5 121:15
object 124:14
142:21 144:7
144:16 145:8
145:15 162:6
175:18,25
objecting
125:12 140:24
144:22
objection 7:12
19:10 21:21
45:17,21
125:14,16
126:7 127:7
140:18 141:25
142:23,24
143:11,13,21
144:6,9 147:2
147:8 148:3
150:4,4,24
158:9 159:1
160:8 162:17
163:14 164:10
169:24 172:23
173:3 176:1

177:17 195:9
objectionable
144:11
objections 124:5
125:9 143:9
175:23 176:2
objective 39:20
objects 124:12
124:12
observe 87:1
observed 87:4
87:13 182:16
182:25 183:3
obtain 134:17
obtained 142:9
178:22
obviously 125:3
143:10
occasion 84:13
85:3
occasional 69:4
occasionally
52:7
occasions 43:7
112:13 156:11
occur 28:20
46:24 79:7,8,9
100:15
occurred 45:13
46:17 87:5
98:23,25
155:17 187:13
187:25 188:1
202:16
occurring 92:9
occurs 15:18
October 165:19
195:20
offer 110:2
116:9 117:14
117:16 118:6
118:14,17,25
119:14,17
offered 166:18

166:22 172:10
173:21
offering 116:11
offers 119:19,19
191:4
office 12:5 16:11
20:8 51:21,25
52:2 53:6
77:14 78:22
118:20 183:22
183:25 184:10
184:17,17
196:23 197:2
197:11 198:11
200:7
Officer 171:9,12
171:23
officers 137:4
172:7
offices 108:25
official 174:18
okay 7:15,23 8:1
8:6,10,20,25
9:6,10 10:5,14
11:4,16,18,21
11:24 17:21
18:3 19:2 20:7
20:18,21 21:7
21:17,24 22:2
22:5,14,17
23:14 24:20
25:6 26:7,22
27:3 29:3,23
30:18 31:3,5
31:10 32:4
33:5,15 34:1
34:22 35:3,8
37:11 39:11
40:12,15 41:13
41:20 43:4,16
44:12 45:5,13
45:21 46:3,16
46:24 47:2,11
48:22 49:5,18

49:23 50:6,12
50:18 51:3,6
51:15,24 52:5
53:2,9,25 54:7
54:9 55:17,24
56:3,6,9 57:4,8
58:4,22 59:21
59:24 60:1,22
61:4,7 62:9,15
63:5,14,16,18
63:23 64:6,12
64:18,25 65:15
66:2,12,15,22
67:4 68:15,25
69:17,21 70:25
71:6,11,22
73:5,25 74:21
75:5,13,19
76:21 77:3,10
77:18,22 78:3
78:7 79:7,21
80:24 81:6,18
82:9,15 84:12
84:25 85:15
86:7,8,25
87:22,25 88:2
88:20,23 89:11
89:22 90:1
91:19,22 93:7
93:12 94:6
95:15,18,24
96:13,17,19,25
97:4,8,11,16
97:18,19 98:16
98:19,22 99:3
99:23 100:2,2
101:5,22
102:10,13,17
102:20 103:13
103:19 104:11
104:20 105:1
105:11,14,18
105:21,25
106:3,13,20,23




107:3 108:7
109:8,15
110:23 112:1,8
112:13 113:8
113:23 114:4
115:9 117:4,10
119:19 120:1
121:13,16
123:5,15 124:2
128:25 129:20
129:24 131:6
131:10,18,24
132:3,8 133:13
133:17,22
134:10 135:5
136:23 137:6
137:12 138:3
139:11,21
140:3,7,8
141:1,16,21,22
141:23 142:20
143:19 144:4
145:4 147:15
149:6,25
150:18 151:10
151:23 155:16
156:1,9 158:3
160:7,20,23,25
161:15 164:6
169:13 171:3
176:5,12 180:9
181:20 183:7,8
183:12 184:20
185:19 186:9
188:21 190:24
191:25 196:18
198:18,25
199:13,23
200:3,6 201:15
201:17
**Old** 2:6
**older** 56:24 58:1
**once** 32:15,17
84:9 90:23

92:7 110:18
121:1 122:6
125:7 202:2,3
**one-on-one**
18:13,14
**one-page** 80:5
**ones** 10:21 16:7
16:19 36:13,13
37:2 43:10
46:20 48:24
82:3 93:11
102:22 123:5
133:4 139:18
139:19
**ongoing** 92:11
92:21
**online** 77:16
**open** 43:2,16,23
44:6,19 47:18
47:25 48:2
49:1 61:17
131:20
**opened** 75:23
187:14,21
**opening** 42:11
53:14 72:10
**operating** 43:19
55:21
**opinion** 24:8
156:14 168:6
168:12,16
169:1 170:15
176:9 177:21
179:6 193:1,2
**opportunity**
108:3,4 166:19
166:22,24
167:1,3 172:11
173:22
**option** 113:14
118:14,17
172:18 191:8,9
191:16
**options** 24:25

25:3 80:22
**oral** 124:8,11,16
165:24 175:11
**order** 6:25 31:25
32:1 98:1
104:4,6,11,21
104:23 105:4,8
106:15 109:18
128:3 159:10
166:2
**organization**
17:9
**organization's**
37:16
**organizations**
17:1 37:16
**orient** 33:23
**original** 69:11
138:20,23
**orthodox** 180:19
181:16
**Ottawa** 3:3
**outcome** 108:16
180:9 194:15
194:20
**outgoing** 159:23
**outside** 63:20
65:12,16 95:6
158:3 178:5
**outweigh** 173:1
**overheard**
159:25 160:25
161:3
**overruled** 92:18
**oversee** 187:24
**oversight** 132:5
**overview** 38:23
39:2
**owners** 13:22,24

———————
**P**
———————
**P-A-G-E** 23:1
**P-R-O-W-S-E**
22:22
**P.L.L.C** 2:5

3:12
**p.m** 132:11
138:13 143:5,6
146:5 148:17
154:21 156:25
167:6 168:22
171:21 180:23
184:4 185:16
185:17 197:18
197:19 203:24
**package** 149:3
**pad** 56:1 76:1
**page** 4:3,11 7:23
22:25 24:22
25:6 26:17
33:11,19,23
35:3,19,20,25
36:2,2,7,10,10
38:10,21,21,22
40:5 49:20
50:7 55:7
60:19,20 64:13
65:6 71:15,19
76:6 81:17
92:23 93:1,1,2
93:2 96:6 97:5
100:2 103:3
130:25 131:7
138:18,21
140:7 148:25
149:19 169:4
**pages** 33:20
39:13 75:24
148:24 149:6
**pale** 67:19
**Pamela** 3:18
200:25
**paper** 47:21
148:10
**par** 67:18 74:7,8
**paragraph**
33:25 34:1
35:3 38:11,12
40:5 149:16,19

155:21,24,25
156:9 157:6,9
157:14,18,22
159:17,24
161:16 163:2
167:16 181:11
181:13,14,24
**paraphrasing**
161:17
**Park** 3:13
**part** 19:2 24:2
32:17 47:18
61:14 69:12
87:21 92:19
97:14 102:2
112:3,4 115:11
138:23 163:15
178:12,13
195:2
**partiality** 63:23
64:14
**particular** 13:2
13:9 17:21
35:6 42:3
43:10 45:22
47:23 49:23,24
53:22,23 56:11
57:9 58:7,10
61:9 62:4 67:9
67:25 68:5
69:3,9 73:13
74:18 82:16
85:4 94:24
96:20,22
110:18,21
126:20 129:25
130:11,23
134:11,13
136:15 138:21
140:10 142:24
146:16 151:19
158:17 160:14
170:8 191:4,19
**parties** 64:1




124:5 143:23
150:5 204:1
**party** 31:8,12
124:12,12
125:2 205:13
**pass** 82:1,2
148:14
**passing** 160:15
**Paul** 1:8,15 2:21
4:4 6:5 7:19
9:12 154:25
181:4 186:25
**pause** 201:25
**PDFs** 128:11
**penalty** 175:11
**pending** 31:7
112:25
**people** 17:12
24:14 83:15
87:17 90:20
162:24 203:7,9
**perceived** 182:6
**percent** 49:24
50:3 61:4,7,8,9
61:20 62:11
64:15 65:11
71:16
**percentage**
65:10 73:22
137:15 138:4
**perfect** 109:1
**perform** 55:21
84:4
**performance**
26:7 167:17
177:16
**performed** 84:4
195:16
**performing** 51:8
**performs** 112:8
**period** 11:16,17
11:19,20 14:15
28:9 57:4 60:8
60:10 81:25

120:7 126:21
169:10
**perjury** 152:9
172:12
**permission**
141:7
**permit** 144:8
**permitted** 145:1
**person** 53:13
58:18 69:5
72:21,23 82:5
86:24 99:1
121:17 125:23
127:2 128:14
187:15
**personal** 145:17
146:9 147:3,10
**personally**
40:16 51:3,16
170:5 172:17
173:2,9,10,11
201:1
**personnel** 88:11
**petition** 174:6
189:5
**petitioned**
185:24 186:20
**phase** 73:23
88:23 97:2
111:24 112:3,4
189:10
**Phil** 190:17
191:10
**phrase** 118:23
**physical** 64:19
64:22
**physically**
127:18
**pick** 74:5 75:5
75:15
**picked** 23:23
72:21,23
128:14
**picture** 89:5

194:1
**pie** 50:7 60:20
60:23
**pile** 53:16
**place** 21:5 45:16
127:6 140:17
141:24 143:21
150:3,23 158:8
163:13 164:10
169:23 185:25
186:20
**placed** 185:2,9
185:20 187:22
188:12
**places** 28:14
**plaintiff** 1:6
2:12 7:17
12:22 154:1
**plan** 118:22
**play** 87:20
**plea** 116:18,23
**pleadings** 115:9
**please** 8:9,12,24
22:20 34:11
55:1 76:11,13
140:7 185:14
**plus** 120:7
**point** 6:17 15:24
22:6,25 35:22
51:6,11,13
74:22 75:13
77:24 81:16
86:11 88:16
89:19 90:24
91:4,10 97:5
97:12 100:2
101:10 103:3
103:15 105:6
106:20 110:8
110:17 113:14
114:16 115:12
115:15 122:3
124:18,24
125:17

**police** 19:21
84:18 170:24
171:2,3,9,11
171:23
**policy** 58:22
**political** 194:9
**portion** 46:8
65:4 129:17,25
130:4 142:7
146:3 156:23
171:19
**portions** 130:19
139:2 168:16
**position** 22:12
73:20 125:21
125:25 136:19
154:11 165:4
166:6 177:4,7
179:20 194:8,9
**positions** 20:19
**positive** 120:22
**possession** 121:9
142:14
**possible** 44:21
112:22 131:24
132:2 189:3
190:2 196:10
200:21 201:4,6
202:9,10
**postjudgment**
67:2
**potential** 85:23
**potentially**
163:16
**power** 19:24
20:1,3 21:13
87:22,25 88:2
88:5
**PowerPoint**
17:8
**practice** 10:18
12:19,21 13:4
13:6 63:20
133:9 153:9

190:15
**practicing** 63:18
**pre-formal**
117:25
**precomputer**
57:9
**preferably** 9:3
95:21
**prefix** 129:9
**preinvestigative**
97:1
**prejudice** 63:23
64:13
**preliminary**
24:12 47:19
**prelude** 91:25
**preparation**
39:17
**prepare** 36:12
36:25 80:5
103:21,25
113:10 126:2
202:24
**prepared** 35:22
81:7 90:7
111:4,5 114:6
114:6 133:20
135:10 140:14
170:9,12
**prepares** 111:1
114:5
**preparing** 35:8
**present** 24:22
25:3 81:2
118:3 201:21
**presentation**
17:8
**presentations**
16:9 17:7
18:16
**presented** 23:22
32:18 36:18
116:20
**presenting**




PAUL FISCHER
July 28, 2017

47:17 173:18
**press** 148:6
150:18,21
151:6,9,12,14
**presume** 9:19
26:16 27:3
139:7 144:23
158:25 160:7,9
172:7 173:12
175:10 176:19
202:14
**Presuming**
190:22
**presuppose**
150:24
**presupposes**
151:5
**pretrial** 193:19
**pretty** 26:12
140:4 159:16
**previous** 56:25
71:13,14
145:16 150:4
202:18
**previously**
44:20
**principle** 87:12
**print** 53:25
128:14
**printed** 54:3
76:2 128:12
179:22
**printing** 128:20
**prior** 68:4,9,13
69:22 184:24
189:11 193:16
195:4,6,16
**prisoner** 49:13
49:13
**prisoners** 66:17
**private** 12:2,18
13:6 63:20
84:13 87:19
102:1,18 103:4

103:17,20,20
103:24 104:1,8
105:2,18 109:4
109:15,18,24
**privately** 104:3
**privilege** 6:15
127:11,14
160:17 170:1
**privileges** 7:9
**Pro/con** 30:25
**probably** 6:22
6:23 7:5 11:17
12:4 37:5
49:10 68:16
71:1 73:16
103:10 128:12
128:13 144:7
161:10,10
**probate** 12:24
16:24 38:1,4
**problem** 61:14
62:10
**problems** 83:19
102:2
**Procedure** 7:20
141:4
**procedures**
43:19 55:22
118:1
**proceed** 195:7
**proceeded** 192:4
**proceeding**
121:7
**proceedings**
80:17 87:2
110:6 114:18
121:1 123:10
172:12 197:1
200:16
**process** 6:17
38:24 39:3,8
54:7 89:20
90:7 92:11
99:10 108:10

116:17 121:2
158:9,14
163:15 164:14
195:2 200:2,4
**processes**
164:14
**Procon** 31:2
**produce** 127:3
128:25 132:5
139:14 142:8
150:6
**produced** 64:4
127:20 128:2
129:2,18,25
132:23 133:14
139:5,6,17,17
139:19 140:19
140:23,25
141:2,6 179:15
179:17
**producing** 59:13
139:18 142:13
**product** 6:16
12:22 140:20
140:21 141:8
195:10
**production**
59:18 129:18
132:4 133:18
139:8,24 141:8
**professional**
10:5 21:3,14
21:17 23:6
27:10,13 183:4
190:19
**professionally**
27:5 40:19
**progress** 89:9
**prompt** 177:1
**prompted** 183:9
**proper** 156:18
157:1,20,25
158:4
**propose** 177:1

**proposed** 90:17
111:8
**proposing**
117:21
**prosecuted**
29:11
**prosecutor**
25:23 124:23
**Prosecutor's**
12:5
**prosecutorial**
15:12 116:15
**protected**
169:25
**protecting**
159:19
**Protection**
155:10
**protective** 6:25
159:10
**provide** 24:5
52:3 81:10
136:14,20
163:18
**provided** 45:19
54:14 81:8
91:6,7 98:25
107:25 121:4
121:21,25
131:15 163:19
**providing** 52:12
140:6 151:2
**provision** 34:16
186:11
**Prowse** 22:22
23:8
**public** 14:1,2
20:10 35:17
36:13,14 77:11
77:18,20,24
102:14,15
103:4,23
104:23 105:14
105:25 106:14

106:15 109:8,8
109:9 110:1
114:18,19,20
114:22,24
115:2,7,10,13
115:14,16,17
119:9,11 120:6
120:7,9,20
145:20 156:12
159:20 163:25
164:2 165:8
187:19 191:15
191:16 192:5
205:23
**purely** 61:24
187:8
**purpose** 17:5
102:1
**pursuant** 6:24
7:19 95:15,16
95:16 131:18
**pursue** 29:8
42:6 78:3 86:5
100:11
**pursued** 83:9
**put** 6:11 36:7,18
54:4,17 58:10
62:1 75:23
79:8 81:23
82:4 94:25
97:14 135:4
138:19 172:25
185:25
**puts** 53:14
**puzzled** 158:13

**Q**
**quasi** 107:6,23
116:14,18
117:23 118:2
**question** 8:9,13
8:18 10:10
14:22 18:19,21
21:22 25:22
26:2 27:17

 

PAUL FISCHER
July 28, 2017

34:7,11,12,15
34:22 39:12
41:18 42:9,14
43:21 45:22,24
46:7 52:6
56:19 66:8
127:16 137:18
142:12,18,19
143:2,9,12,14
144:16 145:23
145:25 146:2
147:9 151:4
156:21 157:15
161:24 162:1
171:17 179:16
185:23 200:17
**questionable**
100:14
**questioned**
176:16 178:5
**questioning**
6:15 144:14
201:5
**questions** 6:18
7:7,7,11,24
10:9 18:17
21:24 144:5,18
145:7 157:10
157:11,13
203:21 205:8
**quickly** 172:11
**quiet** 119:13,14
**quite** 192:12
**quote** 156:3
157:8 160:1
**quoting** 40:1

——————
**R**
**R** 1:9 2:3
**R-Y-N-I-E-R**
23:3
**race** 123:20
136:4,14,20
**racial** 182:25
183:3

**racism** 179:4
**raise** 124:5
142:22
**raised** 146:13
**raises** 125:13
**Rapids** 2:18
**rare** 59:3,6
**rarely** 59:2 94:5
**reached** 107:22
116:5 117:7
126:23 142:5
142:17
**read** 34:6,11
46:7,9 48:12
54:11 61:5
64:14 81:11
97:13,15,18
132:19 146:1,4
156:15,21,24
168:14 171:17
171:20 203:1,1
**reading** 49:25
64:15 155:25
168:18
**reads** 40:8
**real** 156:4
**realized** 79:15
**really** 56:22
65:12 80:6
140:2 186:13
**reason** 64:2
70:23 92:20
94:6 98:15
107:16 150:9
154:17 158:22
162:14 166:5
171:11,22
172:21 178:24
179:4 195:20
**reasonable**
88:12
**reasons** 87:7
93:24 166:8
**recall** 16:7,19

25:5 28:18,19
28:22 29:3,5
29:14 31:6
42:2,3,5 43:1
44:21,24 45:9
45:13 46:3,11
46:16,20 47:7
47:10 48:4
50:5 51:20
56:15 57:8
59:12,19,20
60:13,16,18
66:8,11 71:23
73:7 81:15
84:21,24
105:10,12
108:18 121:16
122:24 123:2,4
123:20 126:14
126:18 127:25
128:1,16 129:2
129:17,19
130:3,23,24
136:12 139:20
139:23 140:1,2
141:23 143:15
143:16,19
145:10 146:6
146:21 147:18
148:2 150:18
150:20,21
151:12,14,20
152:15,17,23
153:3 168:2
170:21 174:15
174:20,22,24
175:4,7 176:12
177:10 178:15
178:19 183:10
183:12 184:14
184:20,23
185:12 186:16
186:18 187:20
188:1,11,16

189:8,9,12,20
190:9,10,12,21
190:23 191:2,4
191:7,17
192:10 193:20
194:5,6,15,18
194:20,21
195:18 196:4,8
197:24 200:7
200:21 201:6
201:13,14,16
202:5,13,15
**receive** 32:8,9
94:1 158:5
**received** 9:19,22
61:8 82:19
112:5 113:2
184:20 185:10
**receives** 32:7
**receiving** 14:2
50:19 51:18
184:24
**Recess** 71:8
143:5 197:18
**reciprocal**
199:13,15,20
**recognize**
120:21 139:8
139:10 147:25
155:3
**recognizing**
159:19
**recollection**
109:20 148:11
149:8 185:9
**recommend**
20:7 25:2 43:2
78:24 80:15
103:4 104:1,1
191:14
**recommendat...**
23:17 32:12
47:17 54:25
76:3,5,16

80:18,25 88:17
90:3,22 91:5
91:16 92:4,15
93:15,24
104:14 105:2
106:14 107:3
108:1 112:15
113:10 115:1,4
115:6,25
125:18 163:24
164:5 165:5
170:6 175:8
178:10
**recommendat...**
82:20 107:14
169:25
**recommended**
80:12 83:6
94:23 124:15
169:18 175:5
175:14 176:7
176:18,22
177:22
**recommending**
114:8
**record** 6:12 7:18
8:16,20,25
9:10 26:16
46:9 71:9
134:19 136:4,7
137:7 140:18
143:6,13
144:25 145:1
146:4 156:24
171:20 178:13
185:15,16,17
197:19
**recorded** 58:1
205:9
**records** 50:19
57:10 77:23
87:8 137:1,1
**reduced** 205:10
**refer** 13:21




18:17 40:4
77:10 161:16
181:11,24
**referees** 16:25
137:9,10,11
**reference**
138:21
**references** 131:7
**referencing**
105:8
**referred** 177:24
178:3
**referring** 40:12
55:18 61:7
64:21 66:15
149:11 163:21
164:6 202:18
**refresh** 148:11
149:8
**refuse** 104:7
**regard** 110:21
**regarding** 71:15
100:23 101:15
124:15 130:19
151:2,9 194:9
**regardless** 82:10
**regional** 52:9,19
**regular** 179:24
**reinstate** 199:6
**reinstated**
202:23
**Reizen** 12:3
**reject** 116:21
**rejected** 163:4
**related** 150:6
155:16 205:12
**relation** 160:23
160:24
**relationship**
164:13 174:16
174:18 190:18
190:19,19
**relatively**
100:15 110:2

159:8 178:17
**releasing** 142:13
**relief** 67:2
**religion** 180:16
182:18
**remain** 102:18
**remainder**
159:24
**remanded**
178:20,25
179:5,7
**remember** 28:4
28:10,14 30:1
30:4 43:10
47:1 50:16
54:16,20 56:20
59:15 99:20
123:7 126:19
128:18 139:18
140:5 175:22
178:6 186:6
187:16 188:9
189:17,22
190:2
**removal** 103:5
103:10,11,12
108:7 109:9
177:22,23
191:11,12,14
191:16 192:21
192:23 193:3
193:15 198:7
**removed** 20:8
29:9 185:6
192:15
**rendered** 31:23
152:18
**repeat** 41:17
**repeated** 95:22
102:4
**repeating**
145:22
**rephrase** 41:21
127:15

**reply** 28:1
**report** 32:9
33:12 35:6,9
35:15,24 36:22
38:10 49:17,19
53:20 80:1,13
82:19 90:8,21
100:12 103:21
103:25 107:10
107:25 111:9
112:21 114:7
124:3,5 125:9
140:11 165:1
178:12 203:13
**reported** 49:16
**reporter** 8:4,19
33:10 46:9
55:12 100:22
101:13 132:13
146:1,4 156:24
171:20
**reports** 35:13
48:17,19 81:6
85:8 135:17,20
**represent** 127:8
138:17
**representing**
125:20 127:8
**request** 42:18,21
43:8 44:3 45:1
45:6,11 46:13
46:22 48:23
49:3,8 50:12
50:19 51:19,22
52:18,21 53:2
53:10,15 54:15
76:22,25 80:19
81:4 96:10
98:4 100:24
101:15 121:24
122:15,17
126:14 129:21
130:5,19
131:19 135:1

184:16,20,21
184:24 185:10
188:5,6
**requested** 46:8
134:20 146:3
156:23 171:3
171:19 177:3
188:2 203:25
**requests** 49:6
88:12 130:19
131:7
**require** 84:1,19
90:20 91:6
103:8 145:14
171:14
**required** 82:7
86:17 88:11
121:16,25
193:2,14
**requirement**
121:21
**requires** 147:4
**reservation**
156:4
**resign** 118:15
120:16 166:19
166:23,25
170:7 172:13
172:18 173:22
191:8
**resignation**
99:15 118:21
119:12,22
169:14 174:2,5
198:10,16
**resigned** 198:5
199:3
**resigns** 98:19
198:14,22
**resolution** 58:16
102:15 117:21
119:13 120:2
130:7 191:18
**resolutions**

119:14 120:6
198:20
**resolve** 6:19
172:11 190:7
190:12 198:19
**resolved** 133:10
**resorts** 16:24
**resources** 84:17
**respect** 47:7,11
67:1 105:14,25
108:13 109:4
110:19 132:22
133:1 135:3
139:3 147:12
150:19 157:8
162:23 168:16
194:13 199:20
**respective** 204:1
**respond** 111:13
111:15 125:13
173:23 176:2
**respondent**
107:24 116:19
117:15 125:8
125:13 134:23
175:18,21,23
176:3
**response** 90:2
112:5,14,19
113:1,4,21
134:20,23
135:1
**responsible** 21:3
21:11 73:22
139:8
**restroom** 9:5
**result** 45:17
60:4 116:6
181:20 192:22
**resulted** 28:2
45:23 46:1,19
47:4 192:20
**retire** 118:17
170:6 191:8




PAUL FISCHER
July 28, 2017

**retired** 22:7,25
23:2 98:14
198:5 199:3
**retirement** 99:7
118:21 119:22
198:11,12,17
**retires** 98:16
**revamped** 35:15
**reveal** 94:14
**review** 32:8,17
50:18 54:11,19
54:20 55:1,20
55:21 57:13
65:1,7,8,16,19
65:19 67:5,14
70:16 71:16
73:4 76:12,13
77:3 79:13
90:7 126:2
139:1 140:15
141:10 191:12
**reviewed** 54:5
54:21 79:12
128:9
**reviewing** 49:5
127:18 130:23
**reviews** 26:8
53:11 65:18
113:4
**RFI** 131:12
132:1,4,17,22
133:1,5,23
134:5,11 139:3
**right** 15:20
18:13 21:12
31:13 34:25
38:3 39:7,9
40:22 41:1,11
42:7 43:6 47:4
47:5 48:9 50:3
50:24 51:4
53:9 54:20
55:5 62:7,11
63:7 65:10,13

65:16,17,18,25
66:16 67:2
68:8,9 69:1,2
71:2,3,18,20
73:10 74:10,14
74:22,25 76:9
77:18,20,24
78:1,2,8 80:22
81:1 82:12
83:4,10 84:24
86:9,10,16,18
89:24 92:20
93:1,9 95:10
95:11,15 96:8
97:6 98:25
99:5,13,25
100:1,8 102:6
102:8,10,12,22
103:16 106:15
106:18 107:4
107:19,20
108:14 109:10
110:5 111:14
111:16 115:18
117:23 119:1
119:15,23
120:10,11,15
120:19,20,24
121:5 124:19
128:22 129:12
131:3,19 133:8
134:5 135:1
138:5,7 141:13
144:6,17 145:6
145:11 146:8
146:12 149:14
151:24 152:1
157:13 163:1
164:19,24
165:6,8,12,14
166:18 175:25
182:21,23
185:7 188:10
189:7,18,19

191:23 192:23
193:9,10 195:2
197:6,23 198:7
198:8,14 199:1
199:9 200:5
203:19
**right-hand**
138:18
**right-to-sue**
180:13
**ring** 143:17
**rises** 120:17
**Robinson** 161:6
**role** 15:9,12,14
15:17,18 16:2
21:2 24:4
25:25 32:4,5
110:5,9 112:1
116:14,15
117:23 124:23
125:19
**roles** 15:1,9 24:4
**Roman** 33:19,21
35:20 36:11
38:23 39:6,9
39:12
**room** 116:2
**roughly** 60:11
74:13,14
179:22
**rule** 28:7 121:19
141:4,9,10
177:3,5
**rules** 7:20,22
34:17,19 88:7
88:11,14,15
91:6 102:8
121:4,11,15,22
141:3 177:2
**ruling** 57:13
65:7,8,22
71:16 73:4
**rulings** 65:1
**run** 20:15,22

37:19,25 53:20
**runs** 13:23
24:11 130:8
**Ryan** 164:16
166:14,17
**Ryan's** 164:21
164:24 165:5
**Rynier** 23:3
24:22 25:8
26:20 161:5,8
189:15,19,25
196:10,21

———————
**S**
**S-E-R-V-A-A-S**
29:19
**S-W-A-S-T-E...**
22:24
**safe** 197:10
**safety** 172:3,20
173:1,5,7,13
**sanction** 124:15
125:11 156:12
**save** 120:9,13
**saw** 69:18
179:24,25
193:18
**Sawyer** 167:10
167:16 177:9
177:15 178:14
**Sawyer's** 174:23
**saying** 18:10
28:23 42:8
47:24 64:15
68:21 70:9
80:13 85:13
86:19 95:14
103:25 120:2
133:2 151:20
186:6 188:9
192:24
**says** 33:11 50:3
55:14 61:1,4,4
62:16 64:18
67:17 88:14

93:4 103:4
108:18,23,24
121:19 149:20
150:13 156:8
157:19 158:2
161:21 167:16
167:20 170:15
170:23
**SCAO** 16:10
37:19 38:1
198:15
**scheduled**
165:16 166:1
**scheduling**
166:2
**school** 9:18,20
11:25 12:1
**scolded** 149:22
150:13 151:21
151:25 152:2
**scope** 143:22
**search** 23:22
58:1 127:2,5
127:10 196:22
197:7
**searchable** 58:3
**second** 45:15
55:5 75:2,12
97:11,15
149:19,20
174:23 175:2
**Secretary**
198:15
**section** 34:22
36:3,6 39:5
40:6 49:20,21
50:2,6,7 81:23
169:6
**section-by-sec...**
7:1
**sections** 36:25
**see** 33:25 34:3
38:11,22,24
40:10 46:5




PAUL FISCHER
July 28, 2017

47:20 50:3
53:20,23 54:12
54:20 60:24
61:2 62:16
64:19 65:1
66:13 67:24
69:25 77:5,16
77:24 78:12
83:12 93:4
98:14 100:4,12
103:6 128:13
129:8,10 131:7
131:10,13
132:17 140:10
149:23 150:14
150:15 156:5,6
161:1 162:20
167:18,22,25
169:8 179:5,8
181:25 202:3
**seeking** 141:11
163:7
**seeks** 193:5
**seen** 124:21
147:10 152:22
162:24 167:14
168:14,18
183:11 193:25
194:1
**sees** 114:9
**select** 37:18
**selected** 37:14
37:15 129:18
129:24 188:16
**selecting** 139:14
139:24,24
**selection** 188:21
**selections**
127:19,23
**selects** 122:21
**seminars** 16:3
16:15
**send** 87:15,17
107:17 109:11

135:24
**sending** 71:25
105:4 107:20
156:5
**senior** 22:22
**sense** 58:3 65:18
117:20 125:20
190:4 191:12
202:21
**sent** 91:22 105:7
107:15
**sentence** 40:7,10
40:12 149:20
149:23 159:21
**separate** 66:19
84:7 128:5
**separately** 24:2
111:21
**September**
12:13,15
154:14 165:17
165:21
**series** 7:24
**serious** 67:22
89:8 101:23
109:25 152:9
**Servaas** 29:19
167:25 168:13
169:1 172:10
173:8,21 174:1
174:19,21
**Servaas'** 169:14
170:16,19
172:20
**serve** 188:16
199:4
**served** 22:15
25:15 26:18
28:25 39:3
175:1 177:12
**serves** 149:21
**session** 114:25
**set** 10:8 118:1
121:15 139:25

203:21 205:8
**sets** 34:16
**settlement** 107:7
107:13,22
118:3,11,13
119:19 191:18
198:6
**settlements**
119:15
**severe** 156:12
175:10 192:21
**severity** 95:5,9
95:11
**sex** 136:9
**shakes** 8:5
**shame** 119:3,5
120:9 172:12
**sheet** 57:14
68:18 76:15
**sheets** 77:15
**Shiawassee**
83:12
**shift** 15:17 183:6
**shifts** 24:3
**short** 11:17,20
71:2 197:17
**shortly** 35:14
56:22 57:2
**show** 7:18 34:5
36:7 49:15
85:8 96:4,5
199:25
**show-cause**
199:24
**showed** 85:7
169:13 170:12
170:23,23
**shown** 120:21
**shows** 71:15
**sic** 157:20
**side** 89:9 118:23
124:13 156:6
**sign** 174:1,4
**signatories**

174:21
**Signature**
203:25
**significant**
19:24
**similar** 10:24
11:19 37:5
**similarly** 162:12
**simple** 82:7
**simpler** 56:19
**Simpson** 175:8
178:21 179:1
180:1
**single** 32:8
35:23 65:20
**sir** 7:16 9:10,13
9:15 11:4
29:20 33:10,13
33:19 34:3
52:20 55:12,15
92:25 96:4
98:1,6 100:4
100:25 101:17
129:7 130:17
130:21 132:13
138:15 141:16
143:8 148:19
154:23 156:16
167:8,12
168:24 169:2
180:25 181:7
181:12 184:10
197:21 203:20
**sit** 18:5 202:5
**sit-down** 18:13
**sit-downs** 18:15
**sitting** 18:6,11
31:13 192:24
**situation** 41:14
41:23 46:3
79:10,23 88:16
188:11
**situations** 116:4
**six** 12:1,3 54:18

54:18 59:25
63:23 64:6
65:3
**skip** 144:5
**Skipping** 64:18
**slapping** 119:10
**slash** 103:4
170:6
**slightly** 41:21,21
42:9,14 64:14
108:24 141:16
**slow** 74:4
**small** 37:20
153:5,20
**smaller** 87:15
**so-and-so** 104:2
134:16
**somebody** 18:7
18:7,10 22:7
24:7 68:2
83:23 86:12,20
87:15,16 89:23
147:22
**Somers** 152:15
152:18,20,24
**somewhat**
101:23
**sorry** 14:16
23:11 31:1,3
40:5 41:17
50:6 62:17
76:5 86:14
105:18 119:7
130:24 148:20
155:24 156:22
164:1 166:17
181:14,15
184:18
**sort** 18:11,14
22:11 24:18
32:4 49:6
53:17 63:24
66:22 70:21
74:25 76:17




81:10 87:7
95:4 96:13
114:9 124:23
125:18 134:7
149:3,6 188:14
189:18 192:8
**sorting** 128:19
**sorts** 18:23
**sought** 188:13
**sounds** 18:9
172:14 185:6
**source** 142:10
196:25
**SOUTHERN**
1:3
**Southfield** 1:17
6:1
**speak** 16:3,11
16:12,16,22
17:10 26:6
83:24 86:9,10
116:19 145:1
198:23
**speaker** 158:17
**speaking** 166:14
**speaks** 154:18
**special** 98:11
99:4,16,23
**specially** 98:11
**specific** 10:9
13:1 16:19
17:9 21:24
37:8 45:17
50:15 52:13
54:17 94:24
141:20 150:7
151:3
**specifically** 42:2
44:21,24 63:12
66:25 96:24
108:18 126:5
127:25 140:21
144:16 151:14
155:8 177:2

185:12 189:8
190:9,23 191:2
195:18 196:7
199:5 201:6
202:5,13 203:8
**specifics** 99:21
**speculate**
146:15,18
152:14 193:11
**speculation**
19:11 177:18
**speech** 159:18
159:22
**speeches** 17:2,5
17:6
**spelling** 160:24
**spoke** 16:13
55:20
**spoken** 16:20
79:14 201:19
**spokesperson**
13:25
**spreadsheet**
57:18
**squared-off**
93:3
**SS** 205:3
**stack** 54:4,10
**staff** 12:7 21:4,5
21:14,18,25
22:11,17,22
23:5,6,13 24:3
25:15 26:4
27:4 32:9
36:11,25 50:22
50:25 51:17
53:14 54:24
58:23 67:6,8
67:12 68:6,13
69:1,3 70:8,10
73:6,19 74:1,9
74:15 75:6,14
75:20 76:4,21
78:3,7,15 79:3

80:12,24 81:7
82:17 84:5,10
85:22 86:23
90:2,8,9 92:4
92:13,16,19
111:4,5 112:8
112:11 113:5,6
113:8,9,24,24
115:24 117:10
117:18 134:16
135:18 140:15
159:25 161:1,3
170:21 183:4
189:13 196:18
202:8,19
**staffed** 21:8
**stage** 51:1 80:17
102:3 170:1
**standard** 67:13
151:17
**standards** 39:20
**standing** 77:9
**start** 33:25
45:25 89:9
156:2 182:7
**started** 6:10
12:4,6,11
35:22 70:11
75:10 131:25
187:18 189:17
189:19
**starting** 11:5
13:18 22:21
36:6 130:8
131:10
**starts** 33:21
130:5 148:25
**state** 3:2 9:18,20
10:7,16,25
16:10 18:24
19:25 20:4
27:6,8,18,20
30:14 33:11
38:2,7 50:7

51:21,25 52:2
52:9,18 53:5
84:17 137:2
149:20 153:1
154:25 170:24
171:2,3,9,11
171:23 181:5
183:21,24
184:9 198:15
199:14,15,17
199:18,21
205:2
**statement** 19:6
28:4 40:15,22
40:24 41:4
114:14 160:13
160:14 161:12
**STATES** 1:1
**statistics** 36:7
138:8
**status** 49:11,15
**stemming** 31:15
**stenographic**
205:11
**stenographica...**
205:9
**step** 35:12 54:7
89:11 90:13
92:5
**steps** 90:14,15
90:23 91:11,19
**Steven** 1:9
**stick** 83:15
146:2
**stole** 192:12
**stolen** 192:5
**store** 13:22,23
**stores** 192:13
**stories** 19:4
**story** 47:20 89:4
89:10,17
145:20 156:6
**Stow** 147:18,21
**straight** 25:3

97:3,7 98:9
185:8
**Street** 2:16 3:3
**strike** 17:24
28:18 31:18
56:18 60:15
75:7,19 84:25
111:19 113:2
128:8 136:2
139:21 165:1
172:15 175:17
178:22 182:6
184:14 186:4
187:12
**subject** 27:12,14
27:15 29:14
61:16 110:23
121:7 123:10
134:20 141:3,3
142:4 147:8
151:16 160:16
**submit** 164:1
165:1 198:14
**submits** 134:23
198:10
**submitted** 36:23
40:25 53:11
107:8 163:22
165:4
**suborn** 152:8
**subpoena** 87:22
87:25 88:5,10
110:16
**subpoenas**
110:22,24
**subsection** 93:3
**subsequent**
177:5
**subset** 49:13
**substance** 65:21
127:22 158:15
203:3
**substantial**
152:17




PAUL FISCHER
July 28, 2017

substantively
140:10
sued 31:15,19
202:10,11
suggest 47:16
119:24 152:2
suggested 48:24
198:4
suggesting
178:8 186:15
suggestion 48:7
117:11 170:6
suggestions 48:9
suit 152:23
Suite 1:16 2:7
2:17 3:14
summaries
36:11,12
summarily 28:1
28:10 32:13
78:16 80:3
summary 55:1
76:13 78:11,13
78:24 79:19
80:4,18 88:17
88:21 89:7
summer 146:25
superior 26:3
supervisor
26:18 27:1
support 163:23
164:3
supporters
29:12
suppose 24:2
52:4 84:19
supreme 10:23
14:10 16:12
20:2,3 28:6,7
28:16,23 29:10
38:6 45:1,5,10
46:12,21 50:10
50:12,15 53:6
63:10 95:16

102:7,15 103:5
103:18,19
104:15,17,20
105:1,22
106:13,14
107:14,15
109:14,18
115:4 119:10
122:12,15,21
124:25 125:4
125:22 167:21
168:4,11,12,25
170:8,15 174:8
175:19 176:6,9
178:10,20,24
179:2,12 180:1
184:16 185:3
187:9 193:2
200:6 201:21
202:1,6,25
sure 6:13 7:4,22
8:18 13:23
17:23 18:8
26:15 30:20
31:4 37:20
40:1 41:10,18
42:2,14 45:3
53:9 55:7 59:7
63:18 69:5,9
69:13 70:9
71:6 78:14
92:17 93:1
96:6 98:2
127:25 137:8
140:4 151:4
159:16 161:23
168:7 183:18
186:2
suspended
188:19
suspension
103:5 106:21
109:9 119:24
120:7,13 174:6

175:5,15 176:7
185:25 186:21
188:2,6,14
189:6 191:10
Swastek 22:24
25:10,18,25
26:10 73:9
189:24 190:4
sworn 6:7 7:25
28:4
Sylvia 1:5
200:12
synonymous
52:25
system 39:24
40:9 56:4,23
57:6,22,23
58:1 61:15
119:2,5,7
120:10,11,14
120:24,25
128:22

---

### T

T 2:14
TABLE 4:1
tactic 172:5
tag 70:22
take 8:5 9:4
27:12 34:6
53:19 67:22
68:16 71:2,6
76:18 78:16
79:4 83:25
90:2 93:4,8
97:17 112:1
138:3,25
142:23 169:19
180:12 191:2
195:5 197:17
taken 1:16 7:19
71:8 91:11
109:1 115:22
115:24 143:5
166:10 194:8

197:18 205:7
205:12
takes 110:9
116:13 175:24
talk 18:22 50:24
52:11 55:3,3
78:14 83:23
86:13,14,15,16
86:22,23 90:19
134:16 141:20
141:22 183:6
202:5
talked 32:4
51:10 55:4
63:11,12 64:3
73:9,17 74:3
88:15,23 93:13
110:4 111:12
116:4 131:20
134:5 135:20
140:14 196:11
197:21 200:6
talking 8:20
32:11,23 35:19
49:21 73:5
83:7 86:7
96:25 97:4
122:4 149:12
149:13 186:10
186:24 195:8
200:10
talks 63:23
148:23
task 24:18
team 70:22
tell 9:15 11:4,24
19:3 26:14
32:5 41:5 59:3
85:6 89:5,16
99:21 123:5
125:25 139:16
139:19 148:11
150:11 153:22
161:8 173:12

202:14
ten 54:19,19,22
57:13 59:25
64:7,25 65:4
65:10 72:7
tense 183:23
tenure 12:7,11
12:12 13:15,18
17:3 19:19
21:25 28:13,21
30:12 31:16,21
32:23 33:12
34:2,9,13
44:17 45:9
46:12 52:5,16
98:24 109:6
110:3 122:24
137:4 141:21
147:23 149:21
149:25 153:24
154:3 155:1
181:5
term 36:21
77:11 95:11
116:23 119:24
152:5 180:20
termed 98:8
terminate 21:13
terminated
152:25 154:11
154:16 155:9
165:13,22
166:5 167:17
termination
153:12 181:20
182:3
terms 6:24 34:8
34:12 52:25
74:8 84:3 95:1
100:8 118:13
119:19 127:18
143:23 199:17
199:18
testified 6:9 30:3




PAUL FISCHER
July 28, 2017

Page 235

| | | | | |
|---|---|---|---|---|
| 172:16 173:4 | 15:3 16:24 | **Thomas** 190:17 | 171:9,12,23 | **treat** 82:24 83:1 |
| **testify** 6:7 | 20:1 24:23 | 190:24 | 173:21 185:24 | 107:9 162:12 |
| **testimony** 30:20 | 30:16,18 34:15 | **thought** 19:18 | 186:20 187:3 | 163:8,8 193:5 |
| 30:23 31:4 | 37:19 38:18 | 23:18 35:16 | 188:5,18 189:5 | **treated** 94:11 |
| **text** 35:21 | 39:6 43:6 46:3 | 59:5 79:18 | 193:22 194:11 | 161:19 162:4,5 |
| **thank** 7:15 | 50:14 52:6,20 | 80:11 91:3 | 196:1,5 203:12 | 162:16 193:8 |
| 203:20 | 53:8 54:18,25 | 92:19 102:25 | **timeline** 185:8 | 193:10 |
| **thanks** 11:9 | 55:1,24 61:4 | 128:3 159:5 | **times** 16:13 22:3 | **treating** 161:18 |
| **theft** 191:15 | 62:12,24 63:10 | 162:15 192:25 | 23:25 26:13 | **treats** 198:11 |
| 193:12 | 63:12,15 64:6 | **three** 22:4,11 | 27:23 28:12 | **Trend** 149:1 |
| **theirs** 85:8 | 64:15 65:3 | 23:1,22 24:13 | 29:23 30:23 | **Tri-County** |
| **theory** 103:12 | 68:7 70:16 | 24:23 25:4 | 31:15 32:16 | 87:18 |
| **thing** 6:24 18:18 | 71:3 73:5 | 27:24 28:20 | 44:24 58:24 | **trial** 14:6 68:2 |
| 24:11 53:22 | 76:12,13,14,17 | 63:18 67:20 | 59:3 67:21 | 70:3,7,21,23 |
| 59:4 61:1 | 90:11 92:5,17 | 72:25 74:11 | 145:12 146:8 | 73:12,21 74:5 |
| 67:15,16,18,20 | 92:18 93:10,12 | 91:2 103:14 | 146:12 176:25 | 74:6,16,23 |
| 68:4 73:17 | 94:8,24 99:18 | 159:16 182:13 | **tip** 83:19 | 75:10 110:14 |
| 77:17 78:15 | 103:10 108:19 | 203:6 | **title** 14:12 39:8 | 189:22 190:1,6 |
| 86:23 90:12 | 123:8,15,18,21 | **time** 8:8,22 9:2,4 | 39:10 | **tried** 56:22 |
| 91:11 95:1,2 | 123:22,24 | 11:16,25 13:17 | **titled** 34:2,23 | 57:22 67:11,23 |
| 99:15 120:8,12 | 124:1 127:7,9 | 14:15,19 21:7 | 35:3 38:23 | 69:6 109:21 |
| 120:23 122:5 | 127:15 128:19 | 21:18,19,20 | 93:3 149:1 | **trouble** 17:15,15 |
| 134:25 166:2 | 133:4 135:16 | 22:5,10,15 | 167:9 169:7 | **Troubling** 149:1 |
| 178:6 179:3 | 137:10,22 | 25:10,15,18 | **today** 37:18 | **true** 19:24 60:12 |
| 194:2,10 198:4 | 138:3 142:4,7 | 26:4,9 27:1,3 | 188:9 | 68:15 170:9,10 |
| 203:13 | 142:16,22 | 28:9,19,25 | **told** 23:7 44:18 | 179:14 182:21 |
| **things** 12:25 | 143:1 144:10 | 29:25,25 30:2 | 68:7 89:23 | 182:22 205:11 |
| 17:13,14 35:17 | 145:18 148:13 | 34:6,6,7 39:3 | 185:19 193:4 | **trust** 141:14 |
| 36:5,15 37:8 | 150:9 151:9 | 41:13,20,22 | 195:19 | **truth** 6:7,8,8 |
| 41:11 42:6 | 159:7,14 | 43:22 44:4,17 | **tolerate** 120:19 | **try** 8:10 18:21 |
| 44:15 49:16 | 169:24 172:16 | 48:1 50:16 | **Tom** 22:22,25 | 36:14 68:1,15 |
| 57:19 59:2 | 173:15 179:20 | 52:8,8 57:4 | 166:13,17 | 70:13,13 73:18 |
| 61:16,19 66:9 | 182:13 185:4 | 60:8,10 66:16 | **top** 33:21 55:13 | 73:25 82:3 |
| 69:9 74:4 | 185:12 189:8 | 67:21 69:1 | **topic** 52:13 | 87:15 120:2,6 |
| 77:14 81:12 | 189:21 190:16 | 71:1 73:20 | **topics** 17:9 | 127:15 |
| 83:21 84:1,1 | 192:7,22 193:4 | 75:16 84:10 | **total** 61:8 | **trying** 19:21 |
| 86:4 103:14,16 | 193:18 199:22 | 88:2,4 97:17 | **tough** 133:4 | 43:5 75:4 |
| 113:20 115:13 | 199:23 200:24 | 99:1 109:16 | **town** 1:16 166:1 | 123:7 |
| 120:4,19 | 201:23 203:2 | 110:2 112:21 | **track** 57:19 | **turn** 13:2 |
| 135:24 136:1 | **thinking** 185:23 | 112:24 114:7 | 61:15,19 | **turned** 120:22 |
| 152:4 156:10 | **thinks** 125:10 | 117:3 118:5 | **transcript** 4:12 | **turnover** 112:11 |
| 192:13 202:3 | **third** 22:8,9 | 126:5 127:7 | 205:11 | **turns** 98:14 |
| **think** 6:22 7:5 | 29:9 75:3 | 133:14 139:1 | **transcription** | **twists** 98:13 |
| 11:10 14:21 | 148:25 177:9 | 139:23 169:10 | 205:10 | 166:10 |

 

**two** 21:25 22:1,2
22:8 23:1,20
24:20,22 25:3
26:23,24 27:25
28:10,15,22,25
29:5 31:7,10
38:7,9 39:7,9
39:13 44:24
62:15 69:10
70:11,13 73:19
75:6,10 80:22
81:25 130:10
131:1,7,11
133:22,25
149:6 153:23
154:3 156:10
156:11,13
157:22 159:2
159:15 166:7,8
169:5 171:25
178:3 194:5,6
194:24
**two-thirds**
38:22
**type** 18:18 24:19
35:21 36:16
48:3 53:22
57:16 60:23
67:16 69:25
70:1 77:16
81:24 95:1
108:19 109:7
116:25 117:25
119:12 120:8
120:12 122:5
153:16 163:18
186:18 187:19
200:1
**types** 17:14
36:15 38:18
49:16 84:1
86:4 90:6
91:22 119:14
194:17 197:22

**typical** 67:16

_____
**U**
**U.S** 10:22
**ultimately** 23:23
24:21 81:2
92:13 93:16
111:10 191:19
197:1
**unannounced**
169:14
**uncertainty**
87:11
**undergrad** 9:22
**undergraduate**
9:16
**underlying**
49:14 98:25
200:15
**underneath**
144:18
**understand** 7:24
8:9,18 10:10
10:11 21:22
25:22 26:2
42:15 56:9
62:3 70:9
72:14 96:6
116:22,23
133:3 144:6
157:15 161:23
162:22,22
164:6 177:20
181:2 185:22
186:11
**understanding**
144:19
**understood**
17:20 73:14
77:13 182:14
**unhappy** 29:6
**unit** 15:7,8,8
**UNITED** 1:1
**University** 9:17
9:23

**update** 17:11
136:1
**use** 7:3 57:5
58:10 84:17
140:18 180:20
181:17
**user-friendly**
35:16
**uses** 152:5
**usually** 19:8,23
79:11 81:16
92:16

_____
**V**
**vague** 21:21
126:7
**Val** 3:8
**Valdemar**
188:20 200:22
**valid** 154:17
**varieties** 91:2
**various** 16:16
22:2 36:12
**verbally** 8:4
**version** 76:2
139:16
**versus** 87:9
147:3
**view** 162:23
184:15 192:19
**viewed** 112:3
**violate** 41:15
42:17 142:16
**violated** 41:24
**violates** 38:20
**violation** 155:9
**visit** 173:19
196:13
**visited** 196:19
**visiting** 199:4,8
199:11
**volume** 67:1
**voluntary** 86:23
**vote** 37:18,19,19
38:3 81:19

82:4,7 135:23
**votes** 82:1,10
**voting** 81:25
**vs** 1:7 154:25
181:4

_____
**W**
**waiving** 144:5
**walk** 83:17
**want** 18:19,20
24:6 27:16
32:20 33:23
57:17 59:7
60:1 66:19
70:24 73:13
74:24 81:25
83:10,19,22,23
83:24 85:5
87:9,13 90:18
90:19 96:5
98:2 113:11
138:16 141:16
141:20,22
183:6 185:8
203:3
**wanted** 6:11,11
6:17 17:10
44:18 81:11
82:9 83:12
86:13,17,21
118:24 126:20
128:4 166:11
**Warfield** 60:14
60:17
**Warner** 2:15
**warranted**
32:14
**warrants** 82:16
**Washington** 3:9
188:20,22
189:1,10 196:5
197:13 200:23
201:12
**wasn't** 9:24
19:16 69:5

72:14,23 73:12
73:18 74:17
79:15,25 83:11
107:6 140:4
**watchdog**
149:21 159:19
**Waterstone**
148:2,7,23
149:7,9,23
150:2,14,19,22
150:25 151:6,9
151:13
**way** 26:15,15
34:18 38:22
39:2 42:23
47:3 49:5 52:7
74:18 80:10
95:5 105:18
111:4 117:14
121:13 133:11
147:12 160:23
172:25 179:10
179:16 189:10
190:10 191:17
192:6 202:11
202:12
**Wayne** 9:18,19
83:16 148:12
154:6 155:5
167:11 180:2
**ways** 43:13
47:16 120:22
**we'll** 6:23 7:14
7:22 8:24 9:4
45:25 197:17
**we're** 7:23 18:6
26:16 31:13
32:22 41:10
42:11,12 55:7
81:3 95:5 96:6
98:2 116:23
122:3,3 123:12
137:7 195:7
200:10 202:11





PAUL FISCHER
July 28, 2017

203:23
**we've** 33:10
  55:12 60:8
  71:4 96:4 98:3
  100:23 101:13
  113:15 129:7
  130:17 132:13
  133:22 138:15
  148:19,21
  154:23 167:8
  168:24 181:3
  184:6
**weapons** 171:24
  173:8
**week** 53:16 92:7
  166:24
**weekly** 78:21
  92:22
**weeks** 29:24
  30:7 82:1
**went** 12:9 16:25
  28:23 62:9
  92:19 128:5
  198:6
**weren't** 21:11
  30:20 54:22
  57:11 72:20
  85:19 182:22
**West** 3:3
**Whalen** 1:9
**whatsoever**
  27:11
**whichever**
  117:14
**Whistleblower's**
  155:10
**wins** 119:12
**wish** 141:19
**withheld** 179:2
  179:10
**witness** 4:3 6:6
  8:2,7,11,14,21
  9:1,7 30:3
  71:20 86:12,17

86:20 121:18
  134:17 201:3,8
  203:25
**witnesses** 85:22
  85:23 86:9
**woman** 123:6,23
  123:25
**Woodward** 2:6
**word** 31:1 63:3
  102:23 125:14
  167:2
**wording** 108:19
**words** 7:2 27:5
  74:17 114:16
  144:17 181:17
  181:19 186:11
  195:25
**work** 6:16 12:22
  13:6 31:16,20
  36:8 49:10
  73:13 74:25
  140:20,21
  141:8 147:23
  167:17 177:16
  195:10
**worked** 12:2,18
  22:18 28:14
  68:13 183:23
  183:24 199:23
  203:12
**working** 190:18
**workload** 73:23
**workloads**
  69:13
**works** 8:16
  183:21 199:22
**worry** 184:19
**worse** 94:12
**worth** 57:21
**wouldn't** 17:6
  51:3 77:22
  83:4,14,18
  103:23 105:24
  106:10 108:3,4

119:17 120:9
  125:2 133:6
  151:23 182:21
  190:4,6 198:4
  202:17
**write** 24:7 56:1
  56:6 57:12
**writing** 79:1
  94:8
**written** 40:22,23
  52:18 56:9
  100:12 115:7
  178:9
**wrong** 59:4 95:7
  150:9 160:4
**wrote** 55:24
  59:4

---

**X**

**X** 26:14 47:18
  55:3 175:22

---

**Y**

**Y** 47:18 55:3
**yeah** 6:21 15:3
  17:20 42:24
  61:12,23 62:8
  65:14 70:11
  71:3 84:24
  88:9 106:12
  111:23 115:6
  125:6 126:19
  143:4,17
  145:25
**year** 13:2 23:1
  32:16 35:15,23
  36:1,9,23 37:4
  37:5,5,9 49:25
  61:9 74:6,10
  189:21 202:2
**years** 11:17 24:8
  26:13 57:20
  102:9 202:3
**yesterday** 203:2
  203:5

---

**Z**

**Z** 47:18 55:3

---

**0**

**01** 60:7 76:10
  130:8
**02-14082** 101:16
  130:20 131:16
  131:25
**02-14170** 129:22
**02-14345** 132:18
**03** 130:8
**03-14430** 101:16
  130:20 131:13
**03-14486** 100:24
**04** 130:6
**04-15223** 98:5
**04-15241** 98:5
**07-17138** 96:11
**08-17418** 139:3

---

**1**

**1** 4:14 33:7,11
  33:19,20 40:5
  40:5 49:19
  60:19 61:4,7,8
  61:9,20 64:12
  64:15 65:6
  71:19 92:25
  97:5 100:3,12
  103:4 129:10
  148:24
**1,000** 137:13
**1:07** 143:6
**1:10** 146:5
**1:13** 148:17
**1:21** 154:21
**1:25** 156:25
**1:40** 167:6
**1:44** 168:22
**1:48** 171:21
**10** 4:23 24:8
  57:20 60:19
  64:13 65:7
  71:15,19 123:1

138:12,16
**10:12** 55:10
**10:32** 71:8
**10:43** 71:9
**100** 4:18 62:10
**101** 4:19
**10th** 165:19
**11** 4:24 32:16
  131:1 148:16
  148:20,21
  167:16
**11-15-57** 9:14
**11:13** 96:2
**11:15** 97:24
**11:18** 100:20
**11:19** 101:8
**11:56** 129:5
**11:59** 130:15
**111** 2:16
**12** 4:25 24:8
  123:1 154:20
  154:24
**12:02** 132:11
**12:11** 138:13
**12:18** 143:5
**120E** 3:14
**129** 4:20
**12th** 12:14
  165:17,21
**13** 5:1 131:10
  167:5,9 181:11
  181:12,13,14
**130** 4:21
**132** 4:22
**138** 4:23
**14** 5:2 36:10
  66:4 128:17
  168:21,25
**148** 4:24
**14th** 184:12
  185:11,21
**15** 5:3 57:20
  180:22 181:3
**154** 4:25




PAUL FISCHER
July 28, 2017

Page 238

**16** 5:4 26:13
  184:3,7
**167** 5:1
**168** 5:2
**17** 66:22
**17430** 3:13
**17A** 66:12,21,25
**18** 140:7
**180** 5:3
**180-day** 175:5
  175:14
**184** 5:4
**1968** 33:4
**1979** 9:17
**1983** 9:18
**1984** 12:4
**1990** 12:6
**1992** 12:8
**1A** 40:6
**1st** 12:11

**2**

**2** 4:15 36:2,3
  38:22 39:13
  55:9,13 58:12
  59:8 62:17
  129:10 148:24
**2:01** 180:23
**2:06** 184:4
**2:08** 185:16
**2:10** 185:17
**2:12-cv-10273**
  1:7
**2:30** 197:18
**2:42** 197:19
**2:49** 203:24
**200** 2:7 145:11
  146:8,12
**2000** 1:16 12:10
**2001** 12:11
  13:19 21:8
  22:21 25:12
  60:11
**2008** 28:16,23
**2009** 28:24

  167:25
**2011** 60:11
  183:24 184:8
  184:12 185:4,6
  185:11,21
  186:1 189:19
  195:8,20
**2012** 185:5,6
**2014** 33:13,15
  35:6 38:10
  61:9 65:11
  146:25
**2015** 156:2
**2016** 12:14,16
  154:14 155:22
  165:17,19,21
**2017** 1:19 6:2
**2019** 205:25
**22** 155:21,25
  157:6,9,14,18
**22nd** 187:24
  188:17 196:2
  196:15,19
  197:4,8
**24** 156:9 157:22
**248** 2:9
**25,000** 137:24
**26** 141:4,10
**26th** 155:22
  156:2 195:20
**2700** 1:16
**28** 1:19 6:2
  37:17 91:8
  111:13,15
  175:21 205:25
**28-day** 91:5,25
  111:1,2,7,8,11
  111:12,20,23
  112:2,5,14,14
  112:23,24
  113:1,4 117:1
  117:4 156:6
  173:18,23
  190:8,13

**3**

**3** 4:16 36:6 93:1
  93:2 96:1,5,8
  97:5 100:2
  103:3 153:15
**30** 32:20
**33** 4:14 159:17
  159:24
**344** 2:6
**36th** 123:6,17,19
**373-6434** 3:6

**4**

**4** 4:17 36:10
  97:23 98:3
**46** 161:16
**47** 50:3
**48009** 2:8
**48152** 3:15
**484** 167:25
**48909** 3:5
**48th** 153:7,11
**49503** 2:18
**4th** 184:8

**5**

**5** 4:18 100:19,23
**50** 69:7
**517** 3:6
**525** 3:3
**55** 4:15
**56** 163:2
**591-4002** 3:16

**6**

**6** 4:19 36:7
  39:13 101:7,14
  131:3 169:4
**6.500** 66:12,15
  66:18
**616** 2:19
**634** 167:25
**6th** 10:22

**7**

**7** 4:20 129:4,8
**734** 3:16
**752-2539** 2:19
**78** 49:23

**8**

**8** 4:21 130:14,18
  131:2 139:20
  148:20
**80s** 11:17 31:4
**864-4000** 2:9

**9**

**9** 4:7,22 28:16
  49:20 50:7
  132:10,14
  139:20
**9.200** 88:7
**9:00** 174:1,5
**9:03** 1:18 6:3
**9:37** 33:8
**9:59** 46:10
**90** 23:13 71:4
**900** 2:17
**91** 65:11 71:16
**92** 23:13
**95** 181:24
**96** 4:16
**97** 4:17


