# EXHIBIT 3

# JAMES v. HAMPTON, ET AL.

# HON. VALDEMAR L. WASHINGTON

## January 17, 2018

*Prepared for you by*



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

HON. VALDEMAR L. WASHINGTON
January 17, 2018

---

**Page 1**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SYLVIA JAMES,
　　　　　　　Plaintiff,
　　vs.　　　　Case No. 2:12-cv-10273
　　　　　　　Hon. Paul D. Borman
　　　　　　　Magistrate Judge R. Steven Whalen
HILLIARD HAMPTON, et al.,
　　　　　　　Defendants.
_____

The Deposition of HON. VALDEMAR L. WASHINGTON
Taken at 718 Beach Street,
Flint, Michigan,
Commencing at 9:54 a.m.,
Wednesday, January 17, 2018,
Before Kathryn L. Janes, CSR-3442, RMR, RPR.

---

**Page 2**

1　APPEARANCES:
2
3　JOSHUA A. FISHER
4　Morganroth & Morganroth, P.L.L.C.
5　344 North Old Woodward Avenue
6　Suite 200
7　Birmingham, Michigan 48009
8　248.864.4000
9　jfisher@morganrothlaw.com
10　　　Appearing on behalf of the Plaintiff.
11
12　DOUGLAS G. POWE
13　Michigan Attorney General
14　525 Ottawa Street
15　5th Floor
16　Lansing, Michigan 48933
17　517.335.7193
18　powed1@michigan.gov
19　　　Appearing on behalf of the Defendants, JTC, Washington
20　　　and Green.
21
22
23
24
25

---

**Page 3**

1　ADAM T. RATLIFF
2　Warner Norcross & Judd LLP
3　2000 Town Center
4　Suite 2700
5　Southfield, Michigan 48075
6　248.784.5154
7　aratliff@wnj.com
8　　　Appearing on behalf of the Defendant Fischer.
9
10　MELISSA D. WOJNAR-RAYCRAFT
11　The Mike Cox Law Firm
12　17430 Laurel Park Drive, North
13　Suite 120 East
14　Livonia, Michigan 48152
15　734.591.4002
16　mraycraft@mikecoxlaw.com
17　　　Appearing on behalf of the Defendant Anderson.
18
19
20
21
22
23
24
25

---

**Page 4**

TABLE OF CONTENTS

WITNESS　　　　　　　　　　　PAGE
HON. VALDEMAR L. WASHINGTON

EXAMINATION
BY MR. FISHER:　　　　　　　　5
EXAMINATION
BY MS. WOJNAR-RAYCRAFT:　　　42
RE-EXAMINATION
BY MR. FISHER:　　　　　　　　55
RE-EXAMINATION
BY MS. WOJNAR-RAYCRAFT:　　　57
RE-EXAMINATION
BY MR. FISHER:　　　　　　　　58

　　　　　EXHIBITS

EXHIBIT　　　　　　　　　　　PAGE
(Exhibits attached to transcript.)

DEPOSITION EXHIBIT 1　　　　　11
DEPOSITION EXHIBIT 2　　　　　17



HON. VALDEMAR L. WASHINGTON
January 17, 2018

## Page 5

1  Flint, Michigan
2  Wednesday, January 17, 2018
3  9:54 a.m.
4
5          HON. VALDEMAR L. WASHINGTON,
6  was thereupon called as a witness herein, and after
7  having first been duly sworn to testify to the truth,
8  the whole truth and nothing but the truth, was
9  examined and testified as follows:
10          EXAMINATION
11 BY MR. FISHER:
12 Q.  Judge Washington, my name's Josh Fisher.  I'm one of
13 the attorneys for the plaintiff in this matter.
14          Let the record show this is the deposition
15 of Judge Valdemar Washington taken pursuant to notice
16 under the Federal Rules of Civil Procedure.
17          Judge, I'll be asking you a series of
18 questions and your answers are given under oath; do
19 you understand that?
20 A.  Yes.
21 Q.  You have to answer verbally so your answer can be
22 recorded by the court reporter; do you understand?
23 A.  Yes.
24 Q.  You must answer -- if you don't understand a question,
25 just say so and I'll try to clarify.  And you have to

## Page 6

1  let me finish my entire question before you answer
2  just to ensure that the court reporter can take
3  everything down.  She can't record two people talking
4  at once.
5  A.  Would you like me to acknowledge that I understand
6  that?
7  Q.  I have a feeling that you understood.
8  A.  I do.
9  Q.  If I interrupt you or you haven't completed your
10 answer, just let me know and I'll permit you to
11 finish.  And of course, if you need a break at any
12 time, just let me know and as long as I can finish a
13 question, I imagine we can be out of here pretty
14 quickly.
15 A.  Fair enough.
16 Q.  What is your full name?
17 A.  Valdemar Luther Washington.
18 Q.  And your date of birth?
19 A.  June 21, 1952.
20 Q.  And if we could go through just your formal education
21 after high school, starting with the earliest school.
22 A.  I went to Michigan State University from 1970 to '74.
23 I graduated with a bachelor's of arts in
24 communication.  I went to the University of Michigan
25 Law School.  I graduated in December of 1976.

## Page 7

1  Q.  And are you a member of the State Bar of Michigan?
2  A.  I am.
3  Q.  Are you a member of any other state bars?
4  A.  No.
5  Q.  Any federal bars?
6  A.  Yes.  Eastern District of Michigan and Western
7  Michigan.
8  Q.  Have you ever been the subject of any professional
9  discipline?
10 A.  No.
11 Q.  Are you a member of any professional associations?
12 A.  I don't think so.
13 Q.  The American Bar Association?
14 A.  Nope.
15 Q.  Will you describe your employment history beginning
16 from undergraduate college forward or I suppose if you
17 weren't employed in law school, maybe from law school.
18 A.  I can give you the whole thing.  I was an RA for
19 Wonders Hall at Michigan State for which I received
20 tuition and room and board -- excuse me, I received
21 room and board.  When I graduated, I went to Ann
22 Arbor.  I worked as a lifeguard at an outdoor pool and
23 night watchman until school started.  When school
24 started I had a job in the law library and I also
25 worked indoors as a lifeguard at an indoor pool.  That

## Page 8

1  was through the two-and-a-half years of law school.
2          I left the University of Michigan and began
3  working in March of 1977 for the Baker Law Firm in Bay
4  City.  I stayed there through the end of 1977 when I
5  moved to Flint.  I became employed immediately upon
6  moving to Flint by the Accounting Aid Society of
7  Greater Flint.  I also started a small private
8  practice at the same time.  I stayed with the
9  Accounting Aid Society until June of 1978, and then I
10 left the Accounting Aid Society and began practicing
11 full time.
12          I continued as a private practitioner until
13 April the 14th of 1986, at which time I was appointed
14 to the Genesee County Circuit bench by Governor Jim
15 Blanchard.  I spent ten years as a circuit court judge
16 from 1986 until it was July 1st of 1996.
17          I then resumed private practice for two
18 years when I was engaged as the special master for
19 Detroit Edison Company.  They had several employee
20 class action lawsuits that were coming together in the
21 consent judgment and they needed someone to kind of
22 run things and implement human resources programs for
23 the next five years.  The assignment lasted an
24 additional year because there was work that should
25 have been done by the company that wasn't completed in



HON. VALDEMAR L. WASHINGTON
January 17, 2018

### Page 9

1  the initial five-year term. They didn't want an
2  extension of the consent judgment, so they asked me if
3  I would be willing to do an additional year on a
4  contractual basis which I agreed to.
5        At the end of that time, I continued a
6  private practice and I moved back to Flint roughly,
7  oh, I think it was July of 2006 where I continued
8  again the private practice. In I think it was
9  December of 2007, I became employed by the State of
10 Michigan, Department of Treasury as deputy state
11 treasurer for local government services, that position
12 lasted until the end of 2010, December 31st.
13       I then was asked by the State Court
14 Administrator's Office to become a visiting judge for
15 the 22nd District Court in Inkster and I began that
16 position or those duties on April the 14th of 2011,
17 and those duties lasted to the end of 2011. I then
18 began private practice again in April of 2012, which I
19 am continuing today.
20       I also along the way did some alternative
21 dispute resolution assignments under the company that
22 I formed in 1996 by the name of Settlemate,
23 S-E-T-T-L-E-M-A-T-E.
24 Q.  I don't think I've ever heard anybody be so detailed
25 and remember everything so well, that's impressive.

### Page 10

1        Do you know how you were selected to be the
2  interim chief judge of the 22nd District Court?
3  A.  I don't know for certain, but I know that one of the
4  requirements if you're going to be appointed as a
5  visiting judge is that you can't have a private
6  practice. I didn't at that time. And I was also
7  African-American and I think that may have had
8  something to do with my selection as well.
9  Q.  And who informed you that you were going to be taking
10 that position?
11 A.  I believe I initially got a call from Deborah Green
12 and she and I had some contact when I was on the
13 circuit court bench so I knew her by name, but I
14 didn't recall her specifically. I then got a
15 follow-up call from Chief Justice Robert Young who
16 specifically asked me if I would consider taking the
17 assignment and I agreed to.
18 Q.  Do you recall an April 15, 2011 letter from Chad
19 Schmucker confirming your appointment?
20 A.  Yes. I mean, I remember it, I don't remember the
21 details of it, but yes, I did get a letter confirming
22 my appointment.
23 Q.  Do you know who Mr. Schmucker is?
24 A.  He was at that time state court administrator.
25 Q.  Had you had previously spoken to Mr. Schmucker before

### Page 11

1  you had received that letter?
2  A.  I don't know if I had or not. But I know that what
3  was in the letter to me reflected what I was -- what I
4  understood to be my charge as the interim chief judge.
5  Q.  I'm going to introduce this as Exhibit 1.
6            MARKED FOR IDENTIFICATION:
7            DEPOSITION EXHIBIT 1
8            10:02 a.m.
9  BY MR. FISHER:
10 Q.  Sir, I'm handing you what's marked as Exhibit 1 which
11 is the April 15, 2011 letter from Mr. Schmucker to
12 yourself. Do you see that this letter, Judge, lists
13 it looks like seven matters that appear to have come
14 to the Supreme Court Administrator Offices' attention
15 regarding the 22nd District Court?
16 A.  Yes.
17 Q.  We'll just hold off on this stuff for just a moment.
18 But when you arrived at the 22nd District Court, did
19 you speak with Ms. Pamela Anderson?
20 A.  I did.
21 Q.  And what was the nature and substance of the
22 discussion?
23 A.  What am I supposed to do now that I'm here.
24 Q.  And did she -- what did she tell you?
25 A.  Well, she mentioned that there were a number of

### Page 12

1  visiting judges that were coming through and helping
2  with the docket so that I was not expected to handle
3  any in-courtroom matters and that was fine with me. I
4  had never been a district court judge. I didn't
5  practice regularly in district court and felt a little
6  bit like a fish out of water in terms of the
7  procedures or the manner of going through things in
8  district court. I was able to handle the
9  administrative matters, the items that were set forth
10 in Exhibit 1.
11 Q.  And you mentioned it was visiting judges that were
12 actually handling the court matters?
13 A.  Correct.
14 Q.  And is it true that in July of 2011, you ended up
15 taking over handling court proceedings?
16 A.  The July 4th weekend. We couldn't get anybody to come
17 and we had business to attend to and so I put the robe
18 back on.
19 Q.  Was there any visiting judges that were -- okay.
20 A.  Nobody was willing to work the July 4th -- I forget
21 what day the 4th fell on, but I knew that we had
22 business that had to be conducted during that holiday
23 period.
24 Q.  And I'm referencing this April 15th letter from
25 Mr. Schmucker. He asked you to attempt to locate



HON. VALDEMAR L. WASHINGTON
January 17, 2018

## Page 13

1    certain documents; is that correct?
2    A.  Yes, item number 4, any records or recollections to
3        justify the additional expenditures of $50 per diem
4        for seven days when the conference was four days.
5    Q.  That was for the drug court?
6    A.  Yes, National Drug Court Conference in Boston in 2010.
7    Q.  Do you see -- were you finished?
8    A.  I'm just looking through the rest of the items.
9    Q.  Sure, oh, take your time, please.
10   A.  That's the only reference that I see in Exhibit 1 to
11       reviewing documents.
12   Q.  Do you see item 2, that Mr. Schmucker had been asking
13       you to attempt to locate certain 1099s for employees?
14   A.  Yes.
15   Q.  Do you recall doing that?
16   A.  I did.
17   Q.  Did you end up finding them?
18   A.  No.  There weren't any.
19   Q.  And as far as the items that Mr. Schmucker asked you
20       to look into, do you know why you were asked to
21       investigate these items?
22   A.  No.
23   Q.  Wasn't the JTC conducting an investigation into Sylvia
24       James at the time?
25   A.  They may well have been, but I didn't know that when I

## Page 14

1        talked to Judge Schmucker and/or got this letter.
2    Q.  Did anyone at the JTC ask you to investigate anything?
3    A.  No.
4    Q.  As far as the 1099s go, did you ask anybody to assist
5        you looking for those?
6    A.  I think I asked Ms. Anderson, were there any 1099s
7        that were issued to the court employees who were
8        working in the Community Service Program.
9    Q.  And I think you testified that you did not find any?
10   A.  That is correct.
11   Q.  And back to I think it was item 4 for the expenditures
12       for the -- regarding the drug court conference, did
13       you try to look for those records?
14   A.  I think I --
15   Q.  For the expenditures?
16   A.  I think I asked, in fact, I know I asked Ms. Anderson
17       for any travel related records that she had relating
18       to Judge James and/or the -- I think it was just
19       travel related documents, yeah.
20   Q.  And it sounds like you had likely asked Ms. Anderson
21       to assist you with that, did you ask anybody else --
22   A.  No.
23   Q.  -- to assist you with that?
24           And you didn't end up finding any records
25       regarding that drug conference, regarding

## Page 15

1        expenditures?
2    A.  I didn't find any records that would explain a request
3        for $50 a day per diem for seven days when the
4        conference was for four days.  So the answer to the
5        question is no, there were no records to support this
6        limited assignment.
7    Q.  Did you find anything else regarding the drug
8        conference and the trip?
9    A.  This one specifically in 2010?
10   Q.  Uh-huh.
11   A.  Not that I recall.
12   Q.  Were there other years that you had looked into or
13       found items for?
14   A.  Yes.
15   Q.  And did you provide those to SCAO?
16   A.  Yes.
17   Q.  If I say SCAO, you understand State Court
18       Administrators?
19   A.  I understand, yes.
20   Q.  Where did you find those items?
21   A.  In the stack of travel documents that I got from
22       Ms. Anderson.
23   Q.  Do you know where Ms. Anderson got those from?
24   A.  I think those were records that she kept as the court
25       administrator.

## Page 16

1    Q.  And Judge James had an office at the 22nd District
2        Court; is that correct?
3    A.  Yes.
4    Q.  Was the office locked when you arrived?
5    A.  It was.
6    Q.  Do you know who had the keys to the office?
7    A.  I do.
8    Q.  Who was that?
9    A.  Ms. Anderson.
10   Q.  Did she end up giving them to you?
11   A.  She gave me a key, yes, so that I could open the door.
12   Q.  Did she keep a key for herself?
13   A.  I don't know.
14   Q.  And you used that space as your office; is that right?
15   A.  Yes, I did.
16   Q.  There was a safe in the office; is that correct?
17   A.  I now know there was a safe.  I didn't know there was
18       a safe when I started using the office.
19   Q.  Okay.  And since you just testified that you weren't
20       aware -- well, strike that.
21           At some point while you were working there,
22       did you become aware that there was a safe?
23   A.  I did.
24   Q.  Are you aware that the safe was locked at the time
25       that you got there at the court?



HON. VALDEMAR L. WASHINGTON
January 17, 2018

---

Page 17

1  A.  I was.  You have to understand -- you're calling it a
2  safe, the outward appearance was that it was a filing
3  cabinet.  When I tested the door when I got there, it
4  was locked.
5  Q.  Uh-huh.  Did it -- if I refer to it as a safe, you'll
6  understand what I mean?
7  A.  Yep.
8  Q.  And let's just --
9        MR. FISHER:  I might as well get this out
10  here and introduce, it might be the last exhibit.  Can
11  you mark this as Exhibit 2.  There's two pages.
12        MARKED FOR IDENTIFICATION:
13        DEPOSITION EXHIBIT 2
14        10:11 a.m.
15  BY MR. FISHER:
16  Q.  I'm going to hand you what is marked as Exhibit 2, it
17  looks like the second page I guess is just a sticker
18  from likely the JTC hearing, it says Respondent's
19  Exhibit 2.  I'm more concerned with the first page.
20  Does that look familiar?
21  A.  No.
22  Q.  It does not?
23  A.  No.
24  Q.  Does this look like -- it does not look anything like
25  what you saw in Sylvia James' office?

---

Page 18

1  A.  What's in Exhibit 2 shows a handle and a combination
2  lock on the front door.  I never saw anything that
3  looked like that.
4  Q.  Okay.
5  A.  There was -- there was an outward covering, for lack
6  of a better word, that looked like a normal file
7  cabinet that had a handle on it that had a keyhole for
8  the lock.  What I -- what I'm familiar with was the
9  exterior.  I don't ever remember seeing what's in
10  Exhibit 2.
11  Q.  Okay.  Do you know if anybody at the 22nd District
12  Court had a key to this cabinet that you're referring
13  to?
14  A.  I don't.
15  Q.  You mentioned that you had spoken with Deb Green, do
16  you know what her job was at the time?
17  A.  No.
18  Q.  You had testified that you had discussions with Deb
19  Green prior to the time you took the position as
20  acting chief judge of the 22nd District Court.
21  A.  Yes.
22  Q.  Did you have any discussions with Ms. Green after you
23  became chief judge?
24  A.  Oh, yeah, I'm sure I did.
25  Q.  Do you recall meeting with her on July 14, 2011?

---

Page 19

1  A.  Yes.
2  Q.  Do you know who was present at the meeting?
3  A.  Well, it wasn't a meeting meeting, it was the -- that
4  was the date that was agreed upon for Judge James to
5  come back to the court to have items, personal items
6  removed at her direction.  So Judge James was there,
7  Mr. Thomas was there, his assistant, Vie, and I can
8  never pronounce her last name so I'm not going to try.
9  Attorney McPhail was there, Deb Green was there, I was
10  there, and there were two men who were movers, but I
11  didn't ever get introduced to them to know their
12  names.  So when you asked me if there was a meeting,
13  yes, we met, but there wasn't a discussion meeting
14  between Ms. Green --
15  Q.  It wasn't sitting down at a table?
16  A.  That's correct.
17  Q.  And when were the other instances that you
18  communicated with Ms. Green after you had taken the
19  position as chief judge?
20  A.  I think on a regular basis I was reporting to her
21  because she was the -- that region, I don't remember
22  if it was Region 1, but she was a Region 1
23  administrator for the State Court Administrative
24  Office, and I was required to report on a regular
25  basis what was going on in the 22nd District Court and

---

Page 20

1  I don't remember now if it was weekly or monthly or
2  biweekly, but I know that there were regular reports
3  that I sent to Ms. Green and I think I copied Judge
4  Schmucker as well.
5  Q.  So those weren't just orally, you were preparing
6  something that was on paper --
7  A.  Yes.
8  Q.  -- and being sent to her?
9  A.  Yes.
10  Q.  What were the substance of what you would be putting
11  in the reports, if you can recall?
12  A.  Well, the progress on the items set forth in
13  Exhibit 1, the administrative and/or procedural
14  aspects of running the court when we were without
15  visiting judges, the issues as relates to former
16  Magistrate Bowdish, the issue related to the Community
17  Service van, the issues related to the Community
18  Service Program, the issues related to travel expenses
19  for which Judge James had been reimbursed by the City
20  of Inkster in advance of her trip.  From my view, she
21  had used frequent flyer miles to buy the ticket,
22  paying only the tax of I think $7.50, and then not
23  reimbursing the City of Inkster after the trip was
24  concluded for the amount that had been advanced to her
25  for the plane ticket.

---



Pages 17 to 20

HON. VALDEMAR L. WASHINGTON
January 17, 2018

## Page 21

1　　　There was the issue of the internal
2　calendar, which I never heard of before, and I
3　commented to Deb Green and Judge Schmucker about my
4　thoughts about what it meant, but I didn't have anyone
5　to substantiate that, it was just my view.
6　　　And then the progress we were making, I
7　think one of the things that we -- yeah, the audit
8　recommendations, number 1, there was 33 audit
9　recommendations from 2006 that had not been acted
10　upon.  And I kept them apprised as to our progress in
11　getting through those audit recommendations and by
12　November the 4th or 5th of 2011, we had gotten through
13　all 33 of them.  So those are the kinds of things that
14　I would report to Deb Green and Judge Schmucker about
15　on a regular basis.
16　Q.　And I know you indicated that there were written, but
17　　　did you ever communicate about these types of issues
18　　　by phone with them?
19　A.　With Deb Green, not with Judge Schmucker, but yes.
20　Q.　What about in person?
21　A.　I don't remember any in-person meetings other than the
22　　　one on the 14th.  There may have been, I just don't
23　　　recall at this time.
24　Q.　And was anybody else involved on discussions over the
25　　　telephone that you may have had with Ms. Green?

## Page 22

1　A.　Not that I can recall, no.
2　Q.　And the reports that you were sending, you stated were
3　　　to Ms. Green and were copied to Mr. Schmucker, was
4　　　anybody else privy to those, that you're aware of?
5　A.　I don't think so, because of my assignment as the
6　　　interim chief judge.  It was my view that the only
7　　　people that had any right to the information existed
8　　　in the State Court Administrator's Office.
9　Q.　Were you aware that Ms. Green and Mr. Schmucker agreed
10　　　that Sylvia James' safe wouldn't be disturbed without
11　　　her being there, and again, when I state safe, I'm
12　　　referring to what we were talking about earlier?
13　A.　No, I didn't know anything about that.  I didn't know
14　　　there was a safe until July the 14th when Mr. Thomas
15　　　pointed out to me that the outer doors had been
16　　　jimmied and that the safe was inside of the outer
17　　　doors.
18　Q.　And you just mentioned the safe was inside the outer
19　　　doors, so was something, you're saying there was
20　　　something that resembled a safe once that was opened?
21　A.　Yeah.  This picture here, the only part that I
22　　　remember seeing was the dial.  I don't remember seeing
23　　　the handle, but the dial that's in Exhibit 2, I saw
24　　　that when Mr. Thomas showed it to me the day,
25　　　July 14th of 2011.

## Page 23

1　Q.　Oh, so what you can see in Exhibit 2, that was
2　　　revealed?
3　A.　On July 14th.
4　Q.　Once you're saying a file cabinet or something was
5　　　opened?
6　A.　Yes.
7　Q.　I see.  Did you take any steps to ensure that Judge
8　　　James' safe wouldn't be disturbed while you were
9　　　there?
10　A.　I didn't know there was a safe there.  I kept asking
11　　　the judge when I spoke to her in April as well as when
12　　　I spoke to Attorney McPhail, tell me what you want?
13　　　What items here can we get to you, please tell me.
14　　　And I never once heard, well, I have a personal safe
15　　　there.
16　Q.　Right.  And relatedly, you had a telephone
17　　　conversation with Sylvia James on April 21, 2011; is
18　　　that correct?
19　A.　I think that sounds right, yeah.
20　Q.　And she was asking to come to the court to pick up her
21　　　check and her belongings: is that right?
22　A.　That's correct.  And actually it was a little more
23　　　involved than that, she told me that she had the
24　　　permission of the chief justice of Michigan Supreme
25　　　Court to come to the building and pick up her check

## Page 24

1　　　and her belongings and I told her that I had not heard
2　　　that, and when I checked with the State Court
3　　　Administrative Offices, they said that that was not
4　　　true.
5　Q.　And you'd told her that you'd get her check, but
6　　　that she wasn't to come into the court; is that right?
7　A.　I told her I would get her check and any other items
8　　　that she could identify that she wanted, yes, I did
9　　　tell her that.
10　Q.　And also that she wasn't to come to the court?
11　A.　I absolutely told her that, yeah.
12　Q.　Right.  And did you have her paycheck delivered to
13　　　her?
14　A.　As far as I know, it was delivered to her.  I gave it
15　　　to her niece, Nicole James, and she then I think
16　　　delivered it to her house.
17　Q.　And so when you first came to the 22nd District Court,
18　　　you obviously entered Sylvia James' office?
19　A.　I did.
20　Q.　Was anybody else with you?
21　A.　I don't think they were, no.
22　Q.　You don't recall that Pamela Anderson was with you
23　　　when you were going inside of Judge James' office?
24　A.　She may have been, yeah.  I know I got the key from
25　　　her.  I don't recall now whether or not she gave me



Pages 21 to 24

HON. VALDEMAR L. WASHINGTON
January 17, 2018

Page 25

1    the key and pointed me to the office or gave me the
2    key and accompanied me to the office.  I think it was
3    probably the latter, that she accompanied me because I
4    would not have necessarily known where it was.
5    Q.  Do you recall going into her office on April 14, 2011?
6    A.  I do.
7    Q.  And what did you do on that date?
8    A.  Tried to find a place to sit and do some work.
9    Q.  Because that was going to be used as your office,
10   right?
11   A.  It was.  And it was pretty packed full of stuff.
12   Q.  And you'd mentioned earlier, you didn't notice the
13   safe?
14   A.  The safe was in the bathroom and I couldn't find the
15   bathroom.  I had to ask the court officer, is there a
16   bathroom in here?  And he showed me where the bathroom
17   was.
18   Q.  And you recall that Sylvia James had mentioned that
19   she had thought somebody tampered with her safe; is
20   that right?
21   A.  I heard that accusation from her lawyer.  I don't know
22   that I heard it directly from Judge James.
23   Q.  Did you ever end up hearing that from Deb Green?
24   A.  You mean before the 14th of July of 2011?
25   Q.  Yes.

Page 26

1    A.  That was the only day that any discussion about a safe
2    came to my attention.
3    Q.  Because certainly you wouldn't have heard anything
4    before that date?
5    A.  That is correct.
6    Q.  How about after, did Deb Green say anything to you
7    about Judge James' concern that somebody had tampered
8    with her safe?
9    A.  No.  Not that I recall.  The only follow-up -- the
10   only follow-up that I recall related to the safe was
11   when I spoke to Lieutenant Smith of the Inkster Police
12   Department in the alley behind the courthouse as I was
13   leaving for the day and he said a complaint had been
14   filed about the damage or tampering with Judge James'
15   safe.  And I told him what I knew and that was the
16   last I heard of anything other than in this lawsuit.
17   Q.  Was there any -- and I'm referring to the meeting
18   with -- I guess we'll call it a meeting, on July 14,
19   2011, with Mr. Thomas and Ms. McPhail, you had
20   mentioned that the purpose was Judge James was coming
21   to pick up some of her belongings.
22   A.  Yes.
23   Q.  Was there any other purpose to the meeting, to your
24   knowledge?
25   A.  I don't know if there was an additional purpose.

Page 27

1    There may have been the desire to get certain
2    documents to help Judge James in terms of her defense
3    of the Complaint that had been filed against her.  I
4    know that the next day, the 15th, I got I think it was
5    a 25 point Request for Production of Documents from
6    Mr. Thomas, and so I assumed that that came out of
7    that meeting on the 14th, but I couldn't swear to
8    that.
9    Q.  Did you direct Nicole James to clean up the chambers
10   area?
11   A.  I asked her if she would be willing to.  She was both
12   the judge's niece and her secretary when I arrived on
13   the 14th of April.  I couldn't find a place to sit and
14   work, and I said I need someplace to do my work here.
15   And I asked her -- and if I remember correctly, the
16   credenza that was immediately behind the desk was
17   literally piled high with legal pads and one thing or
18   another, and I asked Nicole if she wouldn't mind, the
19   items that were clearly her aunt's personal items,
20   boxing them up and getting them so -- getting them
21   together so we could get them to her.  And she did
22   come to me I think it was later that afternoon or
23   maybe the next day and said I've run out of boxes, and
24   we then used garbage bags for her to put the items in
25   and we put those garbage bags in the furnace room area

Page 28

1    and the boxes I know were placed in a station wagon at
2    Nicole's direction and presumably delivered to Judge
3    James.
4    Q.  You left it to Nicole James' discretion as to what
5    would be packed up for Judge James?
6    A.  Yes, I did.
7    Q.  Did you ever ask Nicole James to break into the safe?
8    A.  No.  I didn't know there was a safe there.
9    Q.  Right.  I think I know the answer, but you didn't ask
10   anybody else to break into the safe?
11   A.  No.
12   Q.  You didn't ever express to anyone that you had an idea
13   as to how to get into the safe?
14   A.  I didn't know the safe was there.
15   Q.  Did you remove any documents from Judge James'
16   chambers?
17   A.  You mean other than files?
18   Q.  I guess anything.
19   A.  I know that I -- I know that there were legal pads and
20   when you say removed them, I would have moved them.  I
21   didn't take anything out of the building, no.
22   Q.  So it would be fair to say that you didn't destroy any
23   documents?
24   A.  That is correct.
25   Q.  Did you ever direct anybody to shred any documents?



HON. VALDEMAR L. WASHINGTON
January 17, 2018

## Page 29

1  A. No.

2  Q. Are you aware that documents were shredded, though?

3  A. No.

4  Q. Were you present for Ms. Anderson's testimony at the

5  JTC hearings?

6  A. No. Well, I shouldn't say I wasn't present. I may

7  have been there in the building, but there was a

8  sequestration order, so I wasn't in the courtroom when

9  she was giving her testimony.

10 Q. Did you ever receive the transcript of that hearing

11 testimony?

12 A. Not from Ms. Anderson's testimony, from my testimony,

13 yes, but not hers.

14 Q. Were you present for any of the testimony during any

15 of those JTC hearings?

16 A. None other than my own.

17 Q. So the sequester applied to everything? So it was

18 only -- you only were there when it was your own day,

19 there was two days?

20 A. Actually I was there for the day I was told to be

21 there, but whoever was ahead of me was going long and

22 so I didn't testify the first day. I came back the

23 next day and then I think you're right, I think I

24 testified for a day and a half or two days.

25 Q. Have you reviewed any other transcripts other than

## Page 30

1  your own --

2  A. No.

3  Q. -- from the JTC hearings?

4  A. I have not.

5  Q. When I say the JTC hearings, you understand I'm

6  talking about with Judge James?

7  A. The master hearing, yes. No, I've only reviewed my

8  own transcript because it's been several years.

9  Q. Did you ever direct Ms. Anderson to remove any

10 documents from Judge James' safe?

11 A. No. I didn't know there was a safe there.

12 Q. Back to Nicole James packing up items for Judge James,

13 do you know what happened to any documents that Nicole

14 James didn't pack up for Sylvia James?

15 A. You mean what was left after she finished her work?

16 Anything that was left, in my view, should have been

17 related to court business or was related to court

18 business, and so I don't exactly know what you're

19 asking me, but I didn't see any documents that I can

20 recall at this point. What I remember seeing were a

21 lot of legal pads.

22 Q. The legal pads --

23 A. That had script, that had, you know, writing on them

24 but didn't pertain to, you know, case files as far as

25 I could tell.

## Page 31

1  Q. So there -- were there legal pads with writing on it

2  that Nicole James didn't pack up that remained at the

3  court?

4  A. There may have been, I can't recall at this point. I

5  don't know when I would have seen those legal pads, I

6  know for sure when I walked in, I saw legal pads and

7  things stacked high, and that's when I knew I couldn't

8  work in a space like that and I needed it cleared out.

9  Q. That was before you had Nicole James come and pack

10 things up?

11 A. That's correct, yes.

12 Q. Were there legal pads remaining after Nicole James had

13 packed up the boxes for Sylvia James?

14        MR. POWE: I object, it's been asked and

15 answered.

16        Go ahead.

17 BY MR. FISHER:

18 Q. I don't think I asked about whether legal pads were

19 remaining.

20 A. I don't recall when I saw the legal pads other than

21 right there on April the 14th of 2011.

22 Q. Okay. So that was before Nicole James had picked

23 everything up?

24 A. That's correct.

25 Q. Okay. Because my question was just -- because you had

## Page 32

1  mentioned that -- you had mentioned that the legal

2  pads were stacked up?

3  A. Yes.

4  Q. And it made me realize that that would have been

5  before it was cleaned up?

6  A. Yes.

7  Q. So I was just wondering, things that were remaining

8  after?

9  A. I think I had clean space after.

10 Q. Okay.

11 A. I know that I had an area to work in on the credenza

12 and on the desk after Nicole James did the work that

13 she agreed to do.

14 Q. Okay. And to the July 14, 2011 date when Sylvia James

15 came to pick up her materials, you said Ms. McPhail

16 was with her?

17 A. She was.

18 Q. And do you know Ms. McPhail?

19 A. I do.

20 Q. And you knew that she was Sylvia James' counsel in

21 connection with the JTC proceedings: is that right?

22 A. Well, what I knew at that point I believe was that

23 she, meaning Attorney McPhail, had done some work for,

24 as far as I could tell, both the 22nd District Court

25 as well as Judge James, so it didn't surprise me that



HON. VALDEMAR L. WASHINGTON
January 17, 2018

---

**Page 33**

1  she was there.  I also knew that Judge James was being
2  represented by Mr. Thomas, so both of them were there.
3  It didn't surprise me.
4  Q.  Do you recall on June 2, 2011, that Ms. McPhail had
5  requested that she come and pick up Judge James'
6  records so she could -- to use those records to defend
7  herself in the JTC action?
8  A.  I know that we had some discussions in June, yes.
9  Q.  Do you recall it being an e-mail discussion?
10  A.  Yes.
11  Q.  Do you know why Sylvia James wasn't permitted to pick
12  up the material until July 14th?
13      MR. POWE:  Object to the form of the
14  question.
15      Go ahead, if you can.
16  A.  I have a pretty good idea.
17  BY MR. FISHER:
18  Q.  And why is that?
19  A.  Because when I got to the court, it was clear to me
20  that Judge James in her method of managing the court
21  ruled with an iron fist.  There were clerks who had
22  been there as employees for as long as Judge James had
23  been on the bench, 22 years, who had never been to her
24  chambers.  They were -- they made it clear to me that
25  they were forbidden to go to her chambers and so they

---

**Page 34**

1  were afraid to come back to the hallway to come to her
2  chambers.  I said to them, I tried to make it clear to
3  them, that my style is open-door, you know, you've got
4  something to talk to me about, we've got work here to
5  do, come back and ask me.  And I could not for the
6  life of me get people to walk down the hallway, they
7  would stand at the end of hallway and say, "Judge,
8  I've got a question for you, can you help me with
9  this?"  To this day or to the last day that I was
10  there, Bennett, the court officer, would not come to
11  my chambers, he would stand in the hallway and say,
12  "Judge, we're ready for you."
13      So that was the -- that was the overall
14  impression that I drew both in terms of my just
15  looking at how things were being run as well as after
16  my employee interviews.  And I spoke with every
17  employee on Thursday and Friday after my arrival.  And
18  I got their personal assessment of things, they were
19  afraid of Judge James.  And one of the things that I
20  knew we had to improve upon if we were ever to get
21  through the audit findings was morale.  And so my
22  assessment was, and it was shared I think by SCAO, was
23  that if Judge James was permitted to come back to the
24  courthouse, they would be fearful of reprisals,
25  retaliation and I would lose any progress that had

---

**Page 35**

1  been made towards gaining trust.
2  Q.  Okay.  And when Judge James did come and pick up the
3  material on July 14th, and by the way, when I say July
4  14, you understand I mean 2011?
5  A.  I do.
6  Q.  There's another July 14th date here.
7      That she took the bags and boxes that
8  Nicole James had packed up for her?
9  A.  She took some of them.  I noticed after we were
10  finished on that day, July the 14th of 2011, that the
11  items that were in the bags that Nicole James had
12  placed in the furnace room were still there, and I
13  remember talking to Mr. Thomas saying, "Hey, wait a
14  minute, what's going on?  You wanted these items,
15  they're here for you, you didn't take them.  Please
16  make arrangements to come get them."  And I think he
17  did after that, but I can't swear to that today.
18  Q.  Do you know if she took any other things from the
19  chambers?
20  A.  I don't.  I wasn't in the room when she was directing
21  the movers to take this and take that.  I know she
22  took her two fur coats that I placed in the closet for
23  her and that I know there was some other personal
24  items, but I don't know exactly what was what.  The
25  room was too small to have everybody in there.

---

**Page 36**

1  Q.  And the safe that we've been discussing, she took
2  that?
3  A.  As far as I know, that was taken that day.  I don't
4  have a clear memory of it, but I know that the movers
5  had at least one dolly and I have seen them take
6  it out, so yeah.
7  Q.  And just to clarify, you testified earlier that the
8  first time you noticed that there was a safe was after
9  the door had been opened?
10  A.  Correct, the outer door.
11  Q.  What date was that --
12  A.  I don't know.
13  Q.  -- if you recall?
14  **A.  That was the problem, when I spoke with Lieutenant**
15  **Smith, he says when did you first notice it was askew?**
16  **And I said I don't remember.  I didn't make any**
17  **connection other than it was now ajar or jimmied open,**
18  **and it hadn't been before.**
19  Q.  When was the first time that you noticed the outer,
20  the fact that there was what you said was a file
21  cabinet?
22  A.  That I noticed it, that there was file cabinet?
23  Q.  Right.
24  A.  First day I found the bathroom.  It was very apparent
25  that this was a cabinet, as I said, a file cabinet

---



HON. VALDEMAR L. WASHINGTON
January 17, 2018

## Page 37

1  with a board on top of it, that had a coffee maker
2  and, you know, personal items.
3  Q.  Was the file cabinet not locked at the time that you
4  noticed it?
5  A.  No, it was locked.  Because that's why I said I tested
6  the handle, wanting to know what this file cabinet was
7  doing in the judge's bathroom and it was locked.
8  Q.  What kind of lock was on that door?
9  A.  I don't know the brand name, but it was a key lock
10  that goes into the handle and presumably you have to
11  put the key in and unlock it and then you can turn the
12  handle and the doors would open.
13  Q.  And you didn't see a padlock?
14  A.  No.
15  Q.  Did you see a padlock when it was eventually -- when
16  that door was eventually opened?  Is that correct?
17  A.  No, I never saw a padlock.
18  Q.  In the exhibit that's marked as Exhibit 2 --
19  A.  Yeah.
20  Q.  -- that's the view of it after the door had been
21  jimmied open?
22  A.  What I noticed when I saw that the door was askew was
23  that there was a space and there was another door.  I
24  looked inside and I could see a portion of the dial.
25  I didn't open the doors, I didn't go any further, not

## Page 38

1  my business.  Did I see this whole view in Exhibit 2?
2  No.  All I saw was, as I said, the steel door and a
3  portion of the dial.  And that's when I realized that
4  there was more to this file cabinet than I thought
5  initially.
6  Q.  And just so I can understand, what had happened was
7  you said askew, so it was only jimmied open partially?
8  A.  Oh, yeah.
9  Q.  Okay.  So the door wasn't completely open?
10  A.  No.
11  Q.  Okay.  By the time it was removed on July 14, 2011,
12  had the door been fully opened by that time or was it
13  the same?
14  A.  Not by me, no.  It was the same -- that's what called
15  Mr. Thomas' attention to it, I believe, because he saw
16  that the outer door was askew and he said when did
17  that happen?  I said I don't know.
18  Q.  And you don't know whether the safe had been opened
19  prior to June 2, 2011, do you?
20  A.  June 2nd?
21  Q.  Uh-huh.
22  A.  You mean July 14th?
23  Q.  I'm sorry.
24  A.  June 2nd is the date Attorney McPhail and I had
25  conversation.

## Page 39

1  Q.  Right, I apologize.
2  A.  July 14th was the first time I was aware that that
3  file cabinet contained a safe and as far as I knew,
4  certainly not by my doing, it had not been opened.
5  Q.  And the outer door, you'd say that it looked like it
6  had been jimmied?
7  A.  Yes.
8  Q.  And you don't know who did that?
9  A.  I do not.
10  Q.  But since you knew it was like that by July 14, 2011,
11  it had to have happened before then?
12  A.  Agreed.
13  Q.  Prior to July 14, 2011, Judge James and her counsel
14  didn't have any access to the chambers; isn't that
15  correct?
16  A.  Yes, that is correct.
17  Q.  And you'd been acting as the chief judge from the
18  beginning date was April 14, 2011?
19  A.  That's correct.
20  Q.  Through July 14, 2011 and thereafter?
21  A.  Through the end of the year.
22  Q.  All the way to the end of year was your last day?
23  A.  December 31st or whatever the last business day was
24  before the end of the year.
25  Q.  Was that bathroom locked as well?

## Page 40

1  A.  You mean when I got there?
2  Q.  Yeah.
3  A.  When I discovered it?
4  Q.  Uh-huh.
5  A.  No.
6  Q.  During the period you served as chief judge, was the
7  bathroom your private bathroom?
8  A.  Yes.
9  Q.  Was anybody else allowed to use it?
10  A.  No.
11  Q.  While Judge James was placed on administrative leave
12  and you were serving as chief judge, did you provide
13  any material to the JTC?
14  A.  Other than what I've -- directly to them, no.
15  Anything I would have provided to anyone would have
16  been to the State Court Administrative Office.
17  Q.  And you're presuming maybe that they were giving it to
18  the JTC?
19  A.  I made no presumptions, all I know, I was required to
20  report and I reported.
21  Q.  And you testified at the JTC hearings you had
22  mentioned earlier?
23  A.  I did.
24  Q.  And was your testimony true and correct in all
25  respects?



HON. VALDEMAR L. WASHINGTON
January 17, 2018

---

Page 41

1   A. As best I can recall. With the one exception of why
2   we had to wait until July the 14th, I was mistaken
3   when I said that it was because Deb Green could only
4   be there and therefore we had to start at 5:00 and
5   then be there for only one hour when, in fact, I had
6   committed to a writing that it was because I had an
7   hour-and-a-half commute back to Flint.
8   Q. And what did you do to prepare for this deposition
9   today?
10   A. Reviewed my transcript of my JTC testimony and I spoke
11   with counsel.
12   Q. When you say transcript, you're referring to both the
13   days of testimony: is that correct, the entire?
14   A. Well, the direct examination and cross-examination,
15   that's what I'm referring to.
16   Q. Have you reviewed any transcripts of other depositions
17   in this particular case?
18   A. No.
19   Q. Have you had any other conversations about this matter
20   other than with counsel that we haven't discussed?
21   A. No. Unless you count my wife.
22   Q. That might be privileged too.
23   A. It is privileged.
24       MR. FISHER: I don't have any further
25   questions on direct, at least.

---

Page 42

1       MR. RATLIFF: I don't have any questions.
2       MS. WOJNAR-RAYCRAFT: I do, but I'd like to
3   take a restroom break.
4       MR. FISHER: Sure.
5       MR. RATLIFF: And cross off some that
6   you've already covered.
7       MR. FISHER: Sure, go ahead, take your
8   time.
9       (Recess taken at 10:42 a.m.)
10       (Back on the record at 10:49 a.m.)
11       EXAMINATION
12   BY MS. WOJNAR-RAYCRAFT:
13   Q. Again, I'm Melissa Raycraft, we represent the City of
14   Inkster and Defendant Pam Anderson in this matter, so
15   I've got some follow-up questions based on that. When
16   you, I believe you testified when you first got to
17   court, you met with Pam Anderson?
18   A. Yes.
19   Q. And you had conversations with Ms. Anderson about
20   court business?
21   A. I did.
22   Q. And other than what you've already testified to today,
23   is there any other topics you discussed with her?
24   A. You mean on that first day?
25   Q. Yes.

---

Page 43

1   A. No.
2   Q. Okay. And what was your working relationship like
3   with Ms. Anderson?
4   A. It was excellent.
5   Q. Okay. And did you ever request that Ms. Anderson
6   provide you with documents?
7   A. Travel documents, yes.
8   Q. The travel documents, okay. Any other documents?
9   A. Not that I can recall.
10   Q. Okay. And when you were just starting as the interim
11   court -- as the interim judge, was Ms. Anderson
12   helpful to you?
13   A. Very much so, yes.
14   Q. Okay. And did Ms. Anderson follow your directions?
15   A. She did.
16   Q. Okay. And what was Judge James' chambers like when
17   you first got there?
18   A. A hoarder's delight is I believe how I described it at
19   the JTC hearing.
20   Q. And when you say that, I know what image pops in my
21   head, but can you describe it a little bit?
22   A. There were dolls, there were clearly personal items
23   that were everywhere in that 12 by 12 room that I had
24   never seen a chambers that looked like that. And I've
25   been in a lot of judges' chambers over my career.

---

Page 44

1   Q. Because it had a lot of personal belongings?
2   A. Yes.
3   Q. As opposed to court business?
4   A. That is correct.
5   Q. Okay. And I believe you testified that you didn't
6   know that there was a restroom that was attached to
7   the chambers?
8   A. I thought that there should be because again, all the
9   chambers that I've been in, each judge has their own
10   individual restroom. I actually had to ask Court
11   Officer Brown, is there a restroom in here? And he
12   showed me where it was and then I knew there was a
13   restroom and I used it.
14   Q. Why couldn't you tell that there was a restroom?
15   A. There were wall hangings, there was I think a
16   calendar, there were items that obscured the handle
17   which would have clued me that there was a door and
18   that's probably where the restroom was. I just drew a
19   blank, I couldn't find it.
20   Q. So you couldn't even see that there was a door?
21   A. That's correct.
22   Q. Okay. And this would be the restroom where the file
23   cabinet/safe was?
24   A. That's correct.
25   Q. Okay. Was there any point that you asked Ms. Anderson

---



HON. VALDEMAR L. WASHINGTON
January 17, 2018

---

## Page 45

1    to shred old court documents --
2  A.  No.
3  Q.  -- from the office?
4  A.  No.
5  Q.  Okay.  And you testified earlier that Nicole James,
6      who's also Judge James' niece, boxed up and bagged up
7      some documents for Judge James?
8  A.  Items.
9  Q.  Items?
10 A.  I don't know what she bagged up because I didn't stand
11     there and watch her, I just said that I need space to
12     operate and it's clear that Judge James has some items
13     in here, would you be willing to box them and then
14     when she ran out of boxes, you know, bag them.
15 Q.  And you didn't supervise the boxing and the bagging?
16 A.  I did not.
17 Q.  Was anybody there when she was boxing and bagging?
18 A.  I don't know.
19 Q.  Do you know if Ms. Anderson was there when Nicole
20     James was boxing and bagging?
21 A.  I'm pretty sure she was not there.
22 Q.  Was not there.
23 A.  And I say that because at that time, I was not in the
24     courtroom, I was just doing administrative
25     responsibilities.  So I believe while Nicole James was

## Page 46

1      doing the collecting and the boxing for me, I was in
2      Ms. Anderson's office talking with her about
3      administrative matters.  I can't, you know, I can't
4      pull up --
5  Q.  Okay.
6  A.  -- you know, chapter and verse, but I'm pretty sure
7      that was it because there was no other place for me to
8      be.
9  Q.  Okay.  So while Nicole was collecting and boxing, you
10     and Ms. Anderson were in Ms. Anderson's office?
11 A.  I believe that's correct, yes.
12 Q.  Okay.  Do you know if Ms. Anderson ever prevented
13     Judge James from getting her belongings or documents
14     from her chambers?
15 A.  You mean other than through me?
16 Q.  Correct.
17 A.  Independent of me?
18 Q.  Yes.
19 A.  No.
20 Q.  Do you know if Judge James was prevented from getting
21     any documents that she wanted from the chambers?
22 A.  On July the 14th or before that date?
23 Q.  On July 14th.
24 A.  She was not prevented from -- anything she wanted was
25     open for her to take.

## Page 47

1  Q.  Okay.  Then I believe you testified that in April you
2      had a phone call with Judge James?
3  A.  Correct.
4  Q.  Correct?
5  A.  I assumed it was Judge James, although I'd never
6      spoken with her and I don't think she identified
7      herself, but she kept saying I want to come to the
8      courthouse and get my stuff, I've got permission from
9      the chief justice to come get my stuff.  And I made an
10     assumptive presumption that that was Judge James.
11 Q.  Okay.  On that phone call with who was probably Judge
12     James, did Judge James tell you about the safe in the
13     bathroom?
14 A.  No.
15 Q.  Okay.  And you testified that you had -- I think it
16     was e-mails with Attorney Sharon McPhail on June 2nd,
17     correct?
18 A.  I know there was an exchange, I'm taking everyone's
19     word for it that it was June 2nd, yeah.
20 Q.  Me too.  In that conversation in June-ish with
21     Attorney McPhail, did Attorney McPhail tell you there
22     was a safe in the bathroom?
23 A.  No.
24 Q.  And the conversation that you had with
25     Lieutenant Smith, was that on July 14th?

## Page 48

1  A.  No.  It was sometime after July the 14th because he
2      informed me that a complaint, a police complaint had
3      been lodged by Judge James through her attorney,
4      Mr. Thomas, regarding the safe.
5  Q.  So it was after the July 14th?
6  A.  Yes.
7  Q.  Okay.  And then you said -- you testified that on
8      July 15th, you received a document request from
9      Attorney Thomas?
10 A.  Yes.
11 Q.  Do you recall if any of those document requests were
12     related to documents from the safe?
13 A.  I wouldn't know that.
14 Q.  Okay.
15 A.  I don't know the basis for what he was asking for, all
16     I know, that we had this list of 25 items and we did
17     our best to comply with getting him what he was asking
18     for.  So I guess flipping it around, nothing that we
19     would have provided would have been in the safe
20     because the safe was gone after July the 14th.
21 Q.  Okay.  And let me back up.  The day that Nicole James
22     was boxing up items, did Nicole bring up the safe on
23     that day?
24 A.  No.
25 Q.  Okay.  So did -- and I think I know the answer to



HON. VALDEMAR L. WASHINGTON
January 17, 2018

---

Page 49

1    these questions, but I'm going to ask them anyways for
2    a clearer record.  Did Sharon McPhail ever tell you
3    about the safe?
4    **A.  No.**
5    Q.  Okay.  Did Nicole James ever tell you there was a
6    safe --
7    **A.  No.**
8    Q.  -- in the bathroom?
9    **A.  No.**
10   Q.  Did Pamela Anderson ever tell you about a safe in the
11   bathroom?
12   **A.  No.**
13   Q.  And did anyone else ever tell you there was a safe in
14   the bathroom?
15   **A.  No.**
16   Q.  Until July 14th?
17   **A.  No.**
18   Q.  And did you have keys to the safe?
19   **A.  No.**
20   Q.  Okay.  Do you know if there's any other way to open
21   the safe, other than a key?
22   **A.  You can blow it up, you could pick the lock, you could**
23   **jimmy it, I mean, anything in Hollywood and the**
24   **writers tell me about is a way to get open a safe.**
25   Q.  Okay.

---

Page 50

1    **A.  Do I personally know how to do it?  No, I don't**
2    **personally know how to do it.**
3    Q.  Okay.  Do you know if -- do you know of anybody that
4    had a key to the safe?
5    **A.  No.**
6    Q.  Okay.  Do you know if Pamela Anderson had a key to the
7    safe?
8    **A.  I do not.**
9    Q.  Do you know if Pamela Anderson had any other
10   way other than blowing it up, a way to open the safe?
11   **A.  Well, are you talking about the external doors or the**
12   **internal door that's in Exhibit 2?**
13   Q.  Let's do both.
14   **A.  Clearly someone jimmied the external doors.**
15   Q.  Right.
16   **A.  That's what called it to Mr. Thomas' attention and my**
17   **attention frankly.**
18   Q.  Okay.
19   **A.  In terms of what was inside, I don't know.  As I said,**
20   **I didn't see it in full view, I didn't look at it in**
21   **full view, as far as I recall.  All I remember seeing**
22   **was a portion of the metal door and a little bit of**
23   **the combination dial.**
24   Q.  Okay.  Do you think it was Ms. Anderson who opened the
25   safe?

---

Page 51

1    **A.  I don't know who opened the safe.**
2    Q.  Okay.  Do you think Ms. Anderson would have any reason
3    to open the safe?
4    **A.  Nope.**
5    Q.  Okay.  So who do you think opened the safe?
6    **A.  I think it was Gregory Hill.**
7    Q.  And who's Gregory Hill?
8    **A.  Gregory Hill was an employee in the clerk's office,**
9    **and as I understand his pedigree or his background, he**
10   **had been, I'll call him a very high up placed official**
11   **in the City of Inkster Police Department.  He was**
12   **called to testify in a case, a civil case that was**
13   **brought against the City of Inkster and apparently**
14   **gave inconsistent testimony.  I won't call it perjury**
15   **because there's certain standards for perjury, but his**
16   **inconsistent testimony was called to the jury's**
17   **attention and a substantial verdict was rendered**
18   **against the City of Inkster.**
19   **He was then fired from the police**
20   **department because of his inconsistent testimony, and**
21   **it's my understanding that Judge James reached out to**
22   **Mr. Hill and offered him employment in the clerk's**
23   **office.  And when I arrived on April the 14, 2011, he**
24   **was employed in the clerk's office as a clerk.  I**
25   **didn't know anything about him.  I had never met him.**

---

Page 52

1    I talked to all employees, talked to him privately
2    about, you know, what we had to do and how we were
3    going to do it.  It wasn't until sometime later that I
4    found out what I just have recited to you.
5    So it wasn't my firsthand knowledge about
6    his background, but, you know, people talk in
7    environments and, you know, I got through an indirect
8    means and I don't recall who told me, his, what I'm
9    going to call history/pedigree.  And so the thing that
10   confounded me, and now that I look back on it, I have
11   a different view than I had clearly initially, was
12   that Gregory Hill would have never been in the
13   courtroom with me.  He was not a courtroom clerk.  So
14   whoever did what they did to the outer doors of the
15   safe did it while I was in the courtroom.  So it
16   wouldn't have been the clerk who was in the courtroom
17   with me and I don't remember which one, but I know it
18   wasn't Gregory Hill.  I knew it wasn't my court
19   officers, Bennett or Brown.  And by process of
20   elimination, just in terms of my reading people, if
21   anyone would have had the means, the opportunity, to
22   go into the chambers and into the safe, it would have
23   been a male probably and Greg was the only other male
24   there.
25   Now, the other thing that struck me about

---



HON. VALDEMAR L. WASHINGTON
January 17, 2018

## Page 53

1  the whole scene, if you will, is that in a burglary or
2  somebody who's looking for something, things are
3  askew, things are thrown around, they're disheveled,
4  nothing like that occurred in my chambers, and in
5  fact, as I said, I didn't even realize that there had
6  been what I'll call a breaking into the safe file
7  cabinet until it was -- until I saw the door was askew
8  and then, you know, again, I didn't connect the dots.
9  But then when it was described as a breaking in by
10 Attorney Thomas, there was nothing, if you're looking
11 for something in a safe, you're pulling things out,
12 you don't care where it's thrown, nothing like that
13 was there.  So to me it was somebody who knew what
14 they were looking for, knew how to get into the safe
15 and got into the safe.
16 Q.  Do you think that Mr. Hill would have known what the
17 contents were in the safe?
18 A.  I think whoever broke into the safe knew what they
19 were looking for, yes.
20 Q.  And whoever broke into the safe, what do you think
21 they did with the contents of that?
22 A.  Well, I wouldn't know.  They either took it or didn't
23 take it, but all I know is that because of what I'm
24 going to call the surgical nature of the break-in, it
25 was someone who knew what they were looking for.

## Page 54

1  Q.  Okay.  On the July 14th date --
2  A.  Yes.
3  Q.  -- when Judge James was getting her items, the rest of
4  her items and Mr. Thomas pointed out to you that the
5  safe had been opened, was Ms. Anderson there when
6  Mr. Thomas pointed that out?
7  A.  I don't believe that she was because of the limited
8  amount of space and the time of day.  Remember, this
9  was all after 5:00, and I remember Mr. Thomas and I
10 being in the bathroom.  I think he came out into the
11 hallway to get me to show this to me at that time, and
12 I said, okay.
13 Q.  It was just the two of you?
14 A.  As far as I can recall, yes.
15 Q.  Okay.
16 A.  There wouldn't have been space in the bathroom for
17 anybody else, that I can tell you.
18 Q.  Do you think that there is any time that Ms. Anderson
19 could have took any documents out of the safe?
20 A.  I have no way of knowing that.  I mean, clearly when
21 I'm in the courtroom doing the court's business, I
22 can't tell what's going on in the chambers.  You know,
23 now that, now that we're talking about it, I think the
24 window of when that was done had to be between
25 July 4th and July the 14th.  Why do I say that?

## Page 55

1  Because until that July 4th holiday I was only doing
2  administrative matters, so that to me is the window of
3  opportunity that whoever broke in made use of.
4  Q.  Okay.  And from what you recall, Mr. Hill would have
5  been there during that point in time?
6  A.  You mean employed there?
7  Q.  Yes.
8  A.  Yes.
9  Q.  Okay.
10        MS. WOJNAR-RAYCRAFT:  I think that's all I
11 have.
12        MR. FISHER:  I just have -- go ahead, I'm
13 sorry.
14        MR. POWE:  I have no questions, but go
15 ahead.
16        RE-EXAMINATION
17 BY MR. FISHER:
18 Q.  I just have a very brief follow-up.  Judge Washington,
19 regarding the Gregory Hill, you'd indicated that you
20 thought that he may have broken into the safe by
21 process of elimination because you knew the other
22 folks were in the courtroom with you: is that correct?
23 A.  No.  There was one other clerk in the courtroom.
24 Before that time, I had individual interviews with
25 every single member of the clerk's staff.  And just

## Page 56

1  from that process of talking to people, looking at
2  them, I formed, you know, a conclusion.  Then when I
3  got the back story about Mr. Hill's background, that
4  further added to my thought process about who may have
5  broken into the safe.
6  Q.  What was it about his back story that made you think
7  that he may have broken into the safe?
8  A.  He lied under oath, he was impeached, he caused a huge
9  verdict to be imposed against his employer, the City
10 of Inkster.  That's not something that -- I mean it
11 wasn't a mistake, you know, people say oh, yeah, I
12 forgot about that.  From what I understand, he said X
13 and it was Y.  And when that impeachment took place,
14 the jury kind of reared back and thought oh, okay,
15 then there was substantial verdict that was rendered.
16 Q.  Do you think he had motive to break into the safe,
17 though?
18 A.  Do I think he had a motive?
19 Q.  Yes.
20 A.  Yeah, I do think he had a motive.
21 Q.  What do you think that was?
22 A.  I think this whole thing was orchestrated by Judge
23 James, her and Mr. Hill orchestrated this break-in,
24 this so called break-in so that if, in fact, she was
25 bounced by the Tenure Commission, removed from the



HON. VALDEMAR L. WASHINGTON
January 17, 2018

---

**Page 57**

1 bench, she would have a fallback position, i.e., my
2 personal property was violated, this terrible thing
3 happened to me and my rights were violated, that's
4 what I think happened. I really do.
5 Q. You indicated earlier that you weren't certain that
6 whether Pam Anderson was or was not -- did or did not
7 have access to the safe while you were in the
8 courtroom: is that correct?
9 **A. Yes, that's true.**
10 Q. So you can't say for sure that it wasn't Ms. Anderson?
11 **A. Absolutely right.**
12 MR. FISHER: I have nothing further.
13 RE-EXAMINATION
14 BY MS. WOJNAR-RAYCRAFT:
15 Q. I just have a follow-up on that. You testified that
16 you think it was a male that probably opened the safe?
17 **A. Right.**
18 Q. Why do you think that?
19 **A. Well, you had to have a certain amount of strength in**
20 order to -- you'd have -- first of all, you'd have to
21 know what kind of tool to use to get underneath or get
22 into an opening that would allow you to pry. Most
23 males, you know, being a little sexist here, I'm not
24 trying to be, but most males are familiar with tools,
25 many women are not. So that is one factor that goes

---

**Page 58**

1 in. There was clearly some sort of tool used that
2 pried the outer door open. And the other thing is
3 strength, you know, I mean, I like Pam, but she was
4 nobody's Ms. America in terms of body building, and I
5 would not have ascribed that kind of strength to her
6 in terms of what would have been necessary to pry open
7 those doors.
8 MS. WOJNAR-RAYCRAFT: Okay, thank you.
9 RE-EXAMINATION
10 BY MR. FISHER:
11 Q. I just have one more real quick one. You don't --
12 you're not saying that it would be impossible if
13 Ms. Anderson was interested in getting into the safe
14 that she could have had a person help her that may
15 have had the strength if she did not have the
16 strength?
17 **A. Well, here's the point. You're asking me a lot of**
18 nots, so let me see if I can clarify it to answer your
19 question. Whenever this was done, it would have been
20 done during business hours and it would have been done
21 while I was in the courtroom. Therefore the only
22 person who could have gone in there, persons who could
23 have gone into the judges' chambers would have been
24 court employees. So by process of elimination, if
25 you're going to ascribe this misconduct to

---

**Page 59**

1 **Ms. Anderson, the only other person would have been**
2 **Gregory Hill.**
3 MR. FISHER: I don't have any further
4 questions.
5 MS. WOJNAR-RAYCRAFT: I'm good.
6 MR. POWE: We're all done.
7 MR. FISHER: Just E-Tran.
8 MS. WOJNAR-RAYCRAFT: E-Tran.
9 MR. FISHER: You can take exhibits.
10 MR. RATLIFF: We don't need one.
11 MR. POWE: E-Tran, thank you.
12 (The deposition was concluded at 11:12 a.m.
13 Signature of the witness was not requested by
14 counsel for the respective parties hereto.)
15
16
17
18
19
20
21
22
23
24
25

---

**Page 60**

1 CERTIFICATE OF NOTARY
2 STATE OF MICHIGAN )
3 ) SS
4 COUNTY OF WAYNE )
5
6 I, KATHRYN L. JANES, certify that this
7 deposition was taken before me on the date
8 hereinbefore set forth; that the foregoing questions
9 and answers were recorded by me stenographically and
10 reduced to computer transcription; that this is a
11 true, full and correct transcript of my stenographic
12 notes so taken; and that I am not related to, nor of
13 counsel to, either party nor interested in the event
14 of this cause.
15
16
17
18
19
20
21
22 KATHRYN L. JANES, CSR-3442
23 Notary Public,
24 Wayne County, Michigan.
25 My Commission expires: October 22, 2022



HON. VALDEMAR L. WASHINGTON
January 17, 2018

Page 61

**A**

**a.m** 1:18 5:3
11:8 17:14
42:9,10 59:12
**able** 12:8
**absolutely** 24:11
57:11
**access** 39:14
57:7
**accompanied**
25:2,3
**Accounting** 8:6
8:9,10
**accusation**
25:21
**acknowledge**
6:5
**acted** 21:9
**acting** 18:20
39:17
**action** 8:20 33:7
**ADAM** 3:1
**added** 56:4
**additional** 8:24
9:3 13:3 26:25
**administrative**
12:9 19:23
20:13 24:3
40:11,16 45:24
46:3 55:2
**administrator**
10:24 11:14
15:25 19:23
**Administrator's**
9:14 22:8
**Administrators**
15:18
**advance** 20:20
**advanced** 20:24
**afraid** 34:1,19

**African-Amer...**
10:7
**afternoon** 27:22
**agreed** 9:4 10:17
19:4 22:9
32:13 39:12
**ahead** 29:21
31:16 33:15
42:7 55:12,15
**Aid** 8:6,9,10
**ajar** 36:17
**al** 1:10
**alley** 26:12
**allow** 57:22
**allowed** 40:9
**alternative** 9:20
**America** 58:4
**American** 7:13
**amount** 20:24
54:8 57:19
**and/or** 14:1,18
20:13
**Anderson** 3:17
11:19 14:6,16
14:20 15:22,23
16:9 24:22
30:9 42:14,17
42:19 43:3,5
43:11,14 44:25
45:19 46:10,12
49:10 50:6,9
50:24 51:2
54:5,18 57:6
57:10 58:13
59:1
**Anderson's** 29:4
29:12 46:2,10
**Ann** 7:21
**answer** 5:21,21
5:24 6:1,10

15:4 28:9
48:25 58:18
**answered** 31:15
**answers** 5:18
60:9
**anybody** 9:24
12:16 14:4,21
18:11 21:24
22:4 24:20
28:10,25 40:9
45:17 50:3
54:17
**anyways** 49:1
**apologize** 39:1
**apparent** 36:24
**apparently**
51:13
**appear** 11:13
**appearance**
17:2
**APPEARAN...**
2:1
**Appearing** 2:10
2:19 3:8,17
**applied** 29:17
**appointed** 8:13
10:4
**appointment**
10:19,22
**apprised** 21:10
**April** 8:13 9:16
9:18 10:18
11:11 12:24
23:11,17 25:5
27:13 31:21
39:18 47:1
51:23
**aratliff@wnj....**
3:7
**Arbor** 7:22

**area** 27:10,25
32:11
**arrangements**
35:16
**arrival** 34:17
**arrived** 11:18
16:4 27:12
51:23
**arts** 6:23
**ascribe** 58:25
**ascribed** 58:5
**asked** 9:2,13
10:16 12:25
13:19,20 14:6
14:16,16,20
19:12 27:11,15
27:18 31:14,18
44:25
**askew** 36:15
37:22 38:7,16
53:3,7
**asking** 5:17
13:12 23:10,20
30:19 48:15,17
58:17
**aspects** 20:14
**assessment**
34:18,22
**assignment** 8:23
10:17 15:6
22:5
**assignments**
9:21
**assist** 14:4,21,23
**assistant** 19:7
**Association** 7:13
**associations**
7:11
**assumed** 27:6
47:5

**assumptive**
47:10
**attached** 4:20
44:6
**attempt** 12:25
13:13
**attend** 12:17
**attention** 11:14
26:2 38:15
50:16,17 51:17
**attorney** 2:13
19:9 23:12
32:23 38:24
47:16,21,21
48:3,9 53:10
**attorneys** 5:13
**audit** 21:7,8,11
34:21
**aunt's** 27:19
**Avenue** 2:5
**aware** 16:20,22
16:24 22:4,9
29:2 39:2

**B**

**bachelor's** 6:23
**back** 9:6 12:18
14:11 19:5
29:22 30:12
34:1,5,23 41:7
42:10 48:21
52:10 56:3,6
56:14
**background**
51:9 52:6 56:3
**bag** 45:14
**bagged** 45:6,10
**bagging** 45:15
45:17,20
**bags** 27:24,25



HON. VALDEMAR L. WASHINGTON
January 17, 2018

Page 62

35:7,11
**Baker** 8:3
**Bar** 7:1,13
**bars** 7:3,5
**based** 42:15
**basis** 9:4 19:20
19:25 21:15
48:15
**bathroom** 25:14
25:15,16,16
36:24 37:7
39:25 40:7,7
47:13,22 49:8
49:11,14 54:10
54:16
**Bay** 8:3
**Beach** 1:16
**began** 8:2,10
9:15,18
**beginning** 7:15
39:18
**behalf** 2:10,19
3:8,17
**believe** 10:11
32:22 38:15
42:16 43:18
44:5 45:25
46:11 47:1
54:7
**belongings**
23:21 24:1
26:21 44:1
46:13
**bench** 8:14
10:13 33:23
57:1
**Bennett** 34:10
52:19
**best** 41:1 48:17
**better** 18:6

**Birmingham**
2:7
**birth** 6:18
**bit** 12:6 43:21
50:22
**biweekly** 20:2
**Blanchard** 8:15
**blank** 44:19
**blow** 49:22
**blowing** 50:10
**board** 7:20,21
37:1
**body** 58:4
**Borman** 1:8
**Boston** 13:6
**bounced** 56:25
**Bowdish** 20:16
**box** 45:13
**boxed** 45:6
**boxes** 27:23 28:1
31:13 35:7
45:14
**boxing** 27:20
45:15,17,20
46:1,9 48:22
**brand** 37:9
**break** 6:11 28:7
28:10 42:3
56:16
**break-in** 53:24
56:23,24
**breaking** 53:6,9
**brief** 55:18
**bring** 48:22
**broke** 53:18,20
55:3
**broken** 55:20
56:5,7
**brought** 51:13
**Brown** 44:11

52:19
**building** 23:25
28:21 29:7
58:4
**burglary** 53:1
**business** 12:17
12:22 30:17,18
38:1 39:23
42:20 44:3
54:21 58:20
**buy** 20:21

_____

**C**
**cabinet** 17:3
18:7,12 23:4
36:21,22,25,25
37:3,6 38:4
39:3 53:7
**cabinet/safe**
44:23
**calendar** 21:2
44:16
**call** 10:11,15
26:18 47:2,11
51:10,14 52:9
53:6,24
**called** 5:6 38:14
50:16 51:12,16
56:24
**calling** 17:1
**care** 53:12
**career** 43:25
**case** 1:7 30:24
41:17 51:12,12
**cause** 60:14
**caused** 56:8
**Center** 3:3
**certain** 10:3
13:1,13 27:1
51:15 57:5,19

**certainly** 26:3
39:4
**CERTIFICA...**
60:1
**certify** 60:6
**Chad** 10:18
**chambers** 27:9
28:16 33:24,25
34:2,11 35:19
39:14 43:16,24
43:25 44:7,9
46:14,21 52:22
53:4 54:22
58:23
**chapter** 46:6
**charge** 11:4
**check** 23:21,25
24:5,7
**checked** 24:2
**chief** 10:2,15
11:4 18:20,23
19:19 22:6
23:24 39:17
40:6,12 47:9
**circuit** 8:14,15
10:13
**City** 8:4 20:19
20:23 42:13
51:11,13,18
56:9
**civil** 5:16 51:12
**clarify** 5:25 36:7
58:18
**class** 8:20
**clean** 27:9 32:9
**cleaned** 32:5
**clear** 33:19,24
34:2 36:4
45:12
**cleared** 31:8

**clearer** 49:2
**clearly** 27:19
43:22 50:14
52:11 54:20
58:1
**clerk** 51:24
52:13,16 55:23
**clerk's** 51:8,22
51:24 55:25
**clerks** 33:21
**closet** 35:22
**clued** 44:17
**coats** 35:22
**coffee** 37:1
**collecting** 46:1,9
**college** 7:16
**combination**
18:1 50:23
**come** 11:13
12:16 19:5
23:20,25 24:6
24:10 27:22
31:9 33:5 34:1
34:1,5,10,23
35:2,16 47:7,9
**coming** 8:20
12:1 26:20
**Commencing**
1:18
**commented**
21:3
**Commission**
56:25 60:25
**committed** 41:6
**communicate**
21:17
**communicated**
19:18
**communication**
6:24



HON. VALDEMAR L. WASHINGTON
January 17, 2018

Page 63

**Community** 14:8 20:16,17
**commute** 41:7
**company** 8:19 8:25 9:21
**complaint** 26:13 27:3 48:2,2
**completed** 6:9 8:25
**completely** 38:9
**comply** 48:17
**computer** 60:10
**concern** 26:7
**concerned** 17:19
**concluded** 20:24 59:12
**conclusion** 56:2
**conducted** 12:22
**conducting** 13:23
**conference** 13:4 13:6 14:12,25 15:4,8
**confirming** 10:19,21
**confounded** 52:10
**connect** 53:8
**connection** 32:21 36:17
**consent** 8:21 9:2
**consider** 10:16
**contact** 10:12
**contained** 39:3
**contents** 4:1 53:17,21
**continued** 8:12 9:5,7
**continuing** 9:19
**contractual** 9:4

**conversation** 23:17 38:25 47:20,24
**conversations** 41:19 42:19
**copied** 20:3 22:3
**correct** 12:13 13:1 14:10 16:2,16 19:16 23:18,22 26:5 28:24 31:11,24 36:10 37:16 39:15,16,19 40:24 41:13 44:4,21,24 46:11,16 47:3 47:4,17 55:22 57:8 60:11
**correctly** 27:15
**counsel** 32:20 39:13 41:11,20 59:14 60:13
**count** 41:21
**County** 8:14 60:4,24
**course** 6:11
**court** 1:1 5:22 6:2 8:15 9:13 9:15 10:2,13 10:24 11:14,15 11:18 12:4,5,8 12:12,15 13:5 13:6 14:7,12 15:17,24 16:2 16:25 18:12,20 19:5,23,25 20:14 22:8 23:20,25 24:2 24:6,10,17 25:15 30:17,17

31:3 32:24 33:19,20 34:10 40:16 42:17,20 43:11 44:3,10 45:1 52:18 58:24
**court's** 54:21
**courthouse** 26:12 34:24 47:8
**courtroom** 29:8 45:24 52:13,13 52:15,16 54:21 55:22,23 57:8 58:21
**covered** 42:6
**covering** 18:5
**Cox** 3:11
**credenza** 27:16 32:11
**cross** 42:5
**cross-examina...** 41:14
**CSR-3442** 1:20 60:22

**D**

**D** 1:8 3:10
**damage** 26:14
**date** 6:18 19:4 25:7 26:4 32:14 35:6 36:11 38:24 39:18 46:22 54:1 60:7
**day** 12:21 15:3 22:24 26:1,13 27:4,23 29:18 29:20,22,23,24 34:9,9 35:10

36:3,24 39:22 39:23 42:24 48:21,23 54:8
**days** 13:4,4 15:3 15:4 29:19,24 41:13
**Deb** 18:15,18 19:9 21:3,14 21:19 25:23 26:6 41:3
**Deborah** 10:11
**December** 6:25 9:9,12 39:23
**defend** 33:6
**Defendant** 3:8 3:17 42:14
**Defendants** 1:11 2:19
**defense** 27:2
**delight** 43:18
**delivered** 24:12 24:14,16 28:2
**department** 9:10 26:12 51:11,20
**deposition** 1:15 4:22,23 5:14 11:7 17:13 41:8 59:12 60:7
**depositions** 41:16
**deputy** 9:10
**describe** 7:15 43:21
**described** 43:18 53:9
**desire** 27:1
**desk** 27:16 32:12

**destroy** 28:22
**detailed** 9:24
**details** 10:21
**Detroit** 8:19
**dial** 22:22,23 37:24 38:3 50:23
**diem** 13:3 15:3
**different** 52:11
**direct** 27:9 28:25 30:9 41:14,25
**directing** 35:20
**direction** 19:6 28:2
**directions** 43:14
**directly** 25:22 40:14
**discipline** 7:9
**discovered** 40:3
**discretion** 28:4
**discussed** 41:20 42:23
**discussing** 36:1
**discussion** 11:22 19:13 26:1 33:9
**discussions** 18:18,22 21:24 33:8
**disheveled** 53:3
**dispute** 9:21
**district** 1:1,2 7:6 9:15 10:2 11:15,18 12:4 12:5,8 16:1 18:11,20 19:25 24:17 32:24
**disturbed** 22:10 23:8



US LEGAL SUPPORT
The Power of Commitment™

HON. VALDEMAR L. WASHINGTON
January 17, 2018

Page 64

**DIVISION** 1:3
**docket** 12:2
**document** 48:8
  48:11
**documents** 13:1
  13:11 14:19
  15:21 27:2,5
  28:15,23,25
  29:2 30:10,13
  30:19 43:6,7,8
  43:8 45:1,7
  46:13,21 48:12
  54:19
**doing** 13:15 37:7
  39:4 45:24
  46:1 54:21
  55:1
**dolls** 43:22
**dolly** 36:5
**door** 16:11 17:3
  18:2 36:9,10
  37:8,16,20,22
  37:23 38:2,9
  38:12,16 39:5
  44:17,20 50:12
  50:22 53:7
  58:2
**doors** 22:15,17
  22:19 37:12,25
  50:11,14 52:14
  58:7
**dots** 53:8
**DOUGLAS**
  2:12
**drew** 34:14
  44:18
**Drive** 3:12
**drug** 13:5,6
  14:12,25 15:7
**duly** 5:7

**duties** 9:16,17

**E**

**e-mail** 33:9
**e-mails** 47:16
**E-Tran** 59:7,8
  59:11
**earlier** 22:12
  25:12 36:7
  40:22 45:5
  57:5
**earliest** 6:21
**East** 3:13
**Eastern** 1:2 7:6
**Edison** 8:19
**education** 6:20
**either** 53:22
  60:13
**elimination**
  52:20 55:21
  58:24
**employed** 7:17
  8:5 9:9 51:24
  55:6
**employee** 8:19
  34:16,17 51:8
**employees** 13:13
  14:7 33:22
  52:1 58:24
**employer** 56:9
**employment**
  7:15 51:22
**ended** 12:14
**engaged** 8:18
**ensure** 6:2 23:7
**entered** 24:18
**entire** 6:1 41:13
**environments**
  52:7
**et** 1:10

**event** 60:13
**eventually** 37:15
  37:16
**everybody**
  35:25
**everyone's**
  47:18
**exactly** 30:18
  35:24
**examination** 4:6
  4:8 5:10 41:14
  42:11
**examined** 5:9
**excellent** 43:4
**exception** 41:1
**exchange** 47:18
**excuse** 7:20
**exhibit** 4:19,22
  4:23 11:5,7,10
  12:10 13:10
  17:10,11,13,16
  17:19 18:1,10
  20:13 22:23
  23:1 37:18,18
  38:1 50:12
**exhibits** 4:17,20
  59:9
**existed** 22:7
**expected** 12:2
**expenditures**
  13:3 14:11,15
  15:1
**expenses** 20:18
**expires** 60:25
**explain** 15:2
**express** 28:12
**extension** 9:2
**exterior** 18:9
**external** 50:11
  50:14

**F**

**fact** 14:16 36:20
  41:5 53:5
  56:24
**factor** 57:25
**fair** 6:15 28:22
**fallback** 57:1
**familiar** 17:20
  18:8 57:24
**far** 13:19 14:4
  24:14 30:24
  32:24 36:3
  39:3 50:21
  54:14
**fearful** 34:24
**federal** 5:16 7:5
**feeling** 6:7
**fell** 12:21
**felt** 12:5
**file** 18:6 23:4
  36:20,22,25
  37:3,6 38:4
  39:3 44:22
  53:6
**filed** 26:14 27:3
**files** 28:17 30:24
**filing** 17:2
**find** 14:9 15:2,7
  15:20 25:8,14
  27:13 44:19
**finding** 13:17
  14:24
**findings** 34:21
**fine** 12:3
**finish** 6:1,11,12
**finished** 13:7
  30:15 35:10
**fired** 51:19
**Firm** 3:11 8:3
**first** 5:7 17:19

  24:17 29:22
  36:8,15,19,24
  39:2 42:16,24
  43:17 57:20
**firsthand** 52:5
**Fischer** 3:8
**fish** 12:6
**Fisher** 2:3 4:7
  4:11,15 5:11
  5:12 11:9 17:9
  17:15 31:17
  33:17 41:24
  42:4,7 55:12
  55:17 57:12
  58:10 59:3,7,9
**fist** 33:21
**five** 8:23
**five-year** 9:1
**Flint** 1:17 5:1
  8:5,6,7 9:6
  41:7
**flipping** 48:18
**Floor** 2:15
**flyer** 20:21
**folks** 55:22
**follow** 43:14
**follow-up** 10:15
  26:9,10 42:15
  55:18 57:15
**follows** 5:9
**forbidden** 33:25
**foregoing** 60:8
**forget** 12:20
**forgot** 56:12
**form** 33:13
**formal** 6:20
**formed** 9:22
  56:2
**former** 20:15
**forth** 12:9 20:12



HON. VALDEMAR L. WASHINGTON
January 17, 2018

Page 65

60:8
**forward** 7:16
**found** 15:13
  36:24 52:4
**four** 13:4 15:4
**frankly** 50:17
**frequent** 20:21
**Friday** 34:17
**front** 18:2
**full** 6:16 8:11
  25:11 50:20,21
  60:11
**fully** 38:12
**fur** 35:22
**furnace** 27:25
  35:12
**further** 37:25
  41:24 56:4
  57:12 59:3

### G

**G** 2:12
**gaining** 35:1
**garbage** 27:24
  27:25
**General** 2:13
**Genesee** 8:14
**getting** 21:11
  27:20,20 46:13
  46:20 48:17
  54:3 58:13
**give** 7:18
**given** 5:18
**giving** 16:10
  29:9 40:17
**go** 6:20 14:4
  31:16 33:15,25
  37:25 42:7
  52:22 55:12,14
**goes** 37:10 57:25

**going** 10:4,9
  11:5 12:7
  17:16 19:8,25
  24:23 25:5,9
  29:21 35:14
  49:1 52:3,9
  53:24 54:22
  58:25
**good** 33:16 59:5
**gotten** 21:12
**government**
  9:11
**Governor** 8:14
**graduated** 6:23
  6:25 7:21
**Greater** 8:7
**Green** 2:20
  10:11 18:15,19
  18:22 19:9,14
  19:18 20:3
  21:3,14,19,25
  22:3,9 25:23
  26:6 41:3
**Greg** 52:23
**Gregory** 51:6,7
  51:8 52:12,18
  55:19 59:2
**guess** 17:17
  26:18 28:18
  48:18

### H

**half** 29:24
**Hall** 7:19
**hallway** 34:1,6,7
  34:11 54:11
**HAMPTON**
  1:10
**hand** 17:16
**handing** 11:10

**handle** 12:2,8
  18:1,7 22:23
  37:6,10,12
  44:16
**handling** 12:12
  12:15
**hangings** 44:15
**happen** 38:17
**happened** 30:13
  38:6 39:11
  57:3,4
**head** 43:21
**heard** 9:24 21:2
  23:14 24:1
  25:21,22 26:3
  26:16
**hearing** 17:18
  25:23 29:10
  30:7 43:19
**hearings** 29:5,15
  30:3,5 40:21
**help** 27:2 34:8
  58:14
**helpful** 43:12
**helping** 12:1
**hereinbefore**
  60:8
**hereto** 59:14
**Hey** 35:13
**high** 6:21 27:17
  31:7 51:10
**Hill** 51:6,7,8,22
  52:12,18 53:16
  55:4,19 56:23
  59:2
**Hill's** 56:3
**HILLIARD**
  1:10
**history** 7:15
**history/pedigr...**

52:9
**hoarder's** 43:18
**hold** 11:17
**holiday** 12:22
  55:1
**Hollywood**
  49:23
**Hon** 1:8,15 4:4
  5:5
**hour** 41:5
**hour-and-a-half**
  41:7
**hours** 58:20
**house** 24:16
**huge** 56:8
**human** 8:22

### I

**i.e** 57:1
**idea** 28:12 33:16
**IDENTIFICA...**
  11:6 17:12
**identified** 47:6
**identify** 24:8
**image** 43:20
**imagine** 6:13
**immediately** 8:5
  27:16
**impeached** 56:8
**impeachment**
  56:13
**implement** 8:22
**imposed** 56:9
**impossible**
  58:12
**impression**
  34:14
**impressive** 9:25
**improve** 34:20
**in-courtroom**

12:3
**in-person** 21:21
**inconsistent**
  51:14,16,20
**Independent**
  46:17
**indicated** 21:16
  55:19 57:5
**indirect** 52:7
**individual** 44:10
  55:24
**indoor** 7:25
**indoors** 7:25
**information**
  22:7
**informed** 10:9
  48:2
**initial** 9:1
**initially** 10:11
  38:5 52:11
**Inkster** 9:15
  20:20,23 26:11
  42:14 51:11,13
  51:18 56:10
**inside** 22:16,18
  24:23 37:24
  50:19
**instances** 19:17
**interested** 58:13
  60:13
**interim** 10:2
  11:4 22:6
  43:10,11
**internal** 21:1
  50:12
**interrupt** 6:9
**interviews** 34:16
  55:24
**introduce** 11:5
  17:10



US LEGAL SUPPORT
The Power of Commitment™

HON. VALDEMAR L. WASHINGTON
January 17, 2018

Page 66

**introduced**
  19:11
**investigate**
  13:21 14:2
**investigation**
  13:23
**involved** 21:24
  23:23
**iron** 33:21
**issue** 20:16 21:1
**issued** 14:7
**issues** 20:15,17
  20:18 21:17
**item** 13:2,12
  14:11
**items** 12:9 13:8
  13:19,21 15:13
  15:20 19:5,5
  20:12 23:13
  24:7 27:19,19
  27:24 30:12
  35:11,14,24
  37:2 43:22
  44:16 45:8,9
  45:12 48:16,22
  54:3,4

**—— J ——**
**James** 1:5 13:24
  14:18 16:1
  19:4,6 20:19
  23:17 24:15
  25:18,22 26:20
  27:2,9 28:3,5,7
  30:6,12,12,14
  30:14 31:2,9
  31:12,13,22
  32:12,14,25
  33:1,11,20,22
  34:19,23 35:2

35:8,11 39:13
  40:11 45:5,7
  45:12,20,25
  46:13,20 47:2
  47:5,10,12,12
  48:3,21 49:5
  51:21 54:3
  56:23
**James'** 17:25
  22:10 23:8
  24:18,23 26:7
  26:14 28:4,15
  30:10 32:20
  33:5 43:16
  45:6
**Janes** 1:20 60:6
  60:22
**January** 1:19
  5:2
**jfisher@morg...**
  2:9
**Jim** 8:14
**jimmied** 22:16
  36:17 37:21
  38:7 39:6
  50:14
**jimmy** 49:23
**job** 7:24 18:16
**Josh** 5:12
**JOSHUA** 2:3
**JTC** 2:19 13:23
  14:2 17:18
  29:5,15 30:3,5
  32:21 33:7
  40:13,18,21
  41:10 43:19
**Judd** 3:2
**judge** 1:9 5:12
  5:15,17 8:15
  9:14 10:2,5

11:4,12 12:4
  14:1,18 16:1
  18:20,23 19:4
  19:6,19 20:3
  20:19 21:3,14
  21:19 22:6
  23:7,11 24:23
  25:22 26:7,14
  26:20 27:2
  28:2,5,15 30:6
  30:10,12 32:25
  33:1,5,20,22
  34:7,12,19,23
  35:2 39:13,17
  40:6,11,12
  43:11,16 44:9
  45:6,7,12
  46:13,20 47:2
  47:5,10,11,12
  48:3 51:21
  54:3 55:18
  56:22
**judge's** 27:12
  37:7
**judges** 12:1,11
  12:19 20:15
**judges'** 43:25
  58:23
**judgment** 8:21
  9:2
**July** 8:16 9:7
  12:14,16,20
  18:25 22:14,25
  23:3 25:24
  26:18 32:14
  33:12 35:3,3,6
  35:10 38:11,22
  39:2,10,13,20
  41:2 46:22,23
  47:25 48:1,5,8

48:20 49:16
  54:1,25,25
  55:1
**June** 6:19 8:9
  33:4,8 38:19
  38:20,24 47:16
  47:19
**June-ish** 47:20
**jury** 56:14
**jury's** 51:16
**justice** 10:15
  23:24 47:9
**justify** 13:3

**—— K ——**
**Kathryn** 1:20
  60:6,22
**keep** 16:12
**kept** 15:24 21:10
  23:10 47:7
**key** 16:11,12
  18:12 24:24
  25:1,2 37:9,11
  49:21 50:4,6
**keyhole** 18:7
**keys** 16:6 49:18
**kind** 8:21 37:8
  56:14 57:21
  58:5
**kinds** 21:13
**knew** 10:13
  12:21 26:15
  31:7 32:20,22
  33:1 34:20
  39:3,10 44:12
  52:18 53:13,14
  53:18,25 55:21
**know** 6:10,12
  10:1,3,3,23
  11:2,2 13:20

13:25 14:16
  15:23 16:6,13
  16:17,17 18:11
  18:16 19:2,11
  20:2 21:16
  22:13,13 23:10
  24:14,24 25:21
  26:25 27:4
  28:1,8,9,14,19
  28:19 30:11,13
  30:18,23,24
  31:5,6 32:11
  32:18 33:8,11
  34:3 35:18,21
  35:23,24 36:3
  36:4,12 37:2,6
  37:9 38:17,18
  39:8 40:19
  42:3 44:6
  45:10,14,18,19
  46:3,6,12,20
  47:18 48:13,15
  48:16,25 49:20
  50:1,2,3,3,6,9
  50:19 51:1,25
  52:2,6,7,17
  53:8,22,23
  54:22 56:2,11
  57:21,23 58:3
**knowing** 54:20
**knowledge**
  26:24 52:5
**known** 25:4
  53:16

**—— L ——**
**L** 1:15,20 4:4
  5:5 60:6,22
**lack** 18:5
**Lansing** 2:16



HON. VALDEMAR L. WASHINGTON
January 17, 2018

Page 67

| | | | | |
|---|---|---|---|---|
| **lasted** 8:23 9:12 9:17 | **locate** 12:25 13:13 | 17:12,16 37:18 | 11:25 12:11 18:15 22:18 | 37:9 |
| **Laurel** 3:12 | **lock** 18:2,8 37:8 37:9 49:22 | **master** 8:18 30:7 | 25:12,18 26:20 32:1,1 40:22 | **name's** 5:12 **names** 19:12 |
| **law** 3:11 6:25 7:17,17,24 8:1 8:3 | **locked** 16:4,24 17:4 37:3,5,7 39:25 | **material** 33:12 35:3 40:13 **materials** 32:15 | **met** 19:13 42:17 51:25 | **National** 13:6 **nature** 11:21 53:24 |
| **lawsuit** 26:16 | **lodged** 48:3 | **matter** 5:13 41:19 42:14 | **metal** 50:22 **method** 33:20 | **necessarily** 25:4 **necessary** 58:6 |
| **lawsuits** 8:20 | **long** 6:12 29:21 33:22 | **matters** 11:13 12:3,9,12 46:3 | **Michigan** 1:2,17 2:7,13,16 3:5 | **need** 6:11 27:14 45:11 59:10 |
| **lawyer** 25:21 | **look** 13:20 14:13 17:20,24,24 | 55:2 | 3:14 5:1 6:22 6:24 7:1,6,7,19 | **needed** 8:21 31:8 |
| **leave** 40:11 **leaving** 26:13 | 50:20 52:10 | **McPhail** 19:9 23:12 26:19 | 8:2 9:10 23:24 60:2,24 | **never** 12:4 18:2 19:8 21:2 |
| **left** 8:2,10 28:4 30:15,16 | **looked** 15:12 18:3,6 37:24 | 32:15,18,23 33:4 38:24 | **Mike** 3:11 | 23:14 33:23 37:17 43:24 |
| **legal** 27:17 28:19 30:21,22 | 39:5 43:24 **looking** 13:8 | 47:16,21,21 49:2 | **miles** 20:21 **mind** 27:18 | 47:5 51:25 52:12 |
| 31:1,5,6,12,18 31:20 32:1 | 14:5 34:15 53:2,10,14,19 | **mean** 10:20 17:6 25:24 28:17 | **minute** 35:14 **misconduct** | **Nicole** 24:15 27:9,18 28:4,7 |
| **let's** 17:8 50:13 | 53:25 56:1 | 30:15 35:4 38:22 40:1 | 58:25 | 30:12,13 31:2 31:9,12,22 |
| **letter** 10:18,21 11:1,3,11,12 | **looks** 11:13 17:17 | 42:24 46:15 49:23 54:20 | **mistake** 56:11 **mistaken** 41:2 | 32:12 35:8,11 45:5,19,25 |
| 12:24 14:1 | **lose** 34:25 | 55:6 56:10 58:3 | **moment** 11:17 **monthly** 20:1 | 46:9 48:21,22 49:5 |
| **library** 7:24 | **lot** 30:21 43:25 44:1 58:17 | **meaning** 32:23 | **morale** 34:21 **Morganroth** 2:4 | **Nicole's** 28:2 |
| **lied** 56:8 | **Luther** 6:17 | **means** 52:8,21 **meant** 21:4 | 2:4 | **niece** 24:15 27:12 45:6 |
| **Lieutenant** 26:11 36:14 47:25 | ——————— | **meeting** 18:25 19:2,3,3,12,13 | **motive** 56:16,18 56:20 | **night** 7:23 **nobody's** 58:4 |
| **life** 34:6 | **M** | 26:17,18,23 27:7 | **moved** 8:5 9:6 28:20 | **Nope** 7:14 51:4 **Norcross** 3:2 |
| **lifeguard** 7:22 7:25 | **Magistrate** 1:9 20:16 | **meetings** 21:21 **Melissa** 3:10 | **movers** 19:10 35:21 36:4 | **normal** 18:6 **North** 2:5 3:12 |
| **limited** 15:6 54:7 | **maker** 37:1 **making** 21:6 | 42:13 **member** 7:1,3 | **moving** 8:6 **mraycraft@m...** | **Notary** 60:1,23 **notes** 60:12 |
| **list** 48:16 | **male** 52:23,23 57:16 | 7:11 55:25 | 3:16 | **notice** 5:15 25:12 36:15 |
| **lists** 11:12 | **males** 57:23,24 **managing** 33:20 | **memory** 36:4 **men** 19:10 | ——————— | **noticed** 35:9 |
| **literally** 27:17 **little** 12:5 23:22 | **manner** 12:7 **March** 8:3 | **mentioned** | **N** | |
| 43:21 50:22 57:23 | **mark** 17:11 **marked** 11:6,10 | | **name** 6:16 9:22 10:13 19:8 | |
| **Livonia** 3:14 | | | | |
| **LLP** 3:2 | | | | |
| **local** 9:11 | | | | |



HON. VALDEMAR L. WASHINGTON
January 17, 2018

Page 68

36:8,19,22
37:4,22
**nots** 58:18
**November**
21:12
**number** 11:25
13:2 21:8

---

**O**

**oath** 5:18 56:8
**object** 31:14
33:13
**obscured** 44:16
**obviously** 24:18
**occurred** 53:4
**October** 60:25
**offered** 51:22
**office** 9:14 16:1
16:4,6,14,16
16:18 17:25
19:24 22:8
24:18,23 25:1
25:2,5,9 40:16
45:3 46:2,10
51:8,23,24
**officer** 25:15
34:10 44:11
**officers** 52:19
**Offices** 24:3
**Offices'** 11:14
**official** 51:10
**oh** 9:7 13:9
18:24 23:1
38:8 56:11,14
**okay** 12:19
16:19 18:4,11
31:22,25 32:10
32:14 35:2
38:9,11 43:2,5
43:8,10,14,16

44:5,22,25
45:5 46:5,9,12
47:1,11,15,24
48:5,7,14,21
48:25 49:5,20
49:25 50:3,6,9
50:18,24 51:2
51:5 54:1,12
54:15 55:4,9
56:14 58:8
**old** 2:5 45:1
**once** 6:4 22:20
23:4,14
**open** 16:11
36:17 37:12,21
37:25 38:7,9
46:25 49:20,24
50:10 51:3
58:2,6
**open-door** 34:3
**opened** 22:20
23:5 36:9
37:16 38:12,18
39:4 50:24
51:1,5 54:5
57:16
**opening** 57:22
**operate** 45:12
**opportunity**
52:21 55:3
**opposed** 44:3
**orally** 20:5
**orchestrated**
56:22,23
**order** 29:8 57:20
**Ottawa** 2:14
**outdoor** 7:22
**outer** 22:15,16
22:18 36:10,19
38:16 39:5

52:14 58:2
**outward** 17:2
18:5
**overall** 34:13

---

**P**

**P.L.L.C** 2:4
**pack** 30:14 31:2
31:9
**packed** 25:11
28:5 31:13
35:8
**packing** 30:12
**padlock** 37:13
37:15,17
**pads** 27:17
28:19 30:21,22
31:1,5,6,12,18
31:20 32:2
**page** 4:3,19
17:17,19
**pages** 17:11
**Pam** 42:14,17
57:6 58:3
**Pamela** 11:19
24:22 49:10
50:6,9
**paper** 20:6
**Park** 3:12
**part** 22:21
**partially** 38:7
**particular** 41:17
**parties** 59:14
**party** 60:13
**Paul** 1:8
**paycheck** 24:12
**paying** 20:22
**pedigree** 51:9
**people** 6:3 22:7
34:6 52:6,20

56:1,11
**period** 12:23
40:6
**perjury** 51:14
51:15
**permission**
23:24 47:8
**permit** 6:10
**permitted** 33:11
34:23
**person** 21:20
58:14,22 59:1
**personal** 19:5
23:14 27:19
34:18 35:23
37:2 43:22
44:1 57:2
**personally** 50:1
50:2
**persons** 58:22
**pertain** 30:24
**phone** 21:18
47:2,11
**pick** 23:20,25
26:21 32:15
33:5,11 35:2
49:22
**picked** 31:22
**picture** 22:21
**piled** 27:17
**place** 25:8 27:13
46:7 56:13
**placed** 28:1
35:12,22 40:11
51:10
**plaintiff** 1:6
2:10 5:13
**plane** 20:25
**please** 13:9
23:13 35:15

**point** 16:21 27:5
30:20 31:4
32:22 44:25
55:5 58:17
**pointed** 22:15
25:1 54:4,6
**police** 26:11
48:2 51:11,19
**pool** 7:22,25
**pops** 43:20
**portion** 37:24
38:3 50:22
**position** 9:11,16
10:10 18:19
19:19 57:1
**POWE** 2:12
31:14 33:13
55:14 59:6,11
**powed1@mic...**
2:18
**practice** 8:8,17
9:6,8,18 10:6
12:5
**practicing** 8:10
**practitioner**
8:12
**prepare** 41:8
**preparing** 20:5
**present** 19:2
29:4,6,14
**presumably**
28:2 37:10
**presuming**
40:17
**presumption**
47:10
**presumptions**
40:19
**pretty** 6:13
25:11 33:16



US LEGAL SUPPORT
The Power of Commitment™

45:21 46:6
**prevented** 46:12
  46:20,24
**previously**
  10:25
**pried** 58:2
**prior** 18:19
  38:19 39:13
**private** 8:7,12
  8:17 9:6,8,18
  10:5 40:7
**privately** 52:1
**privileged** 41:22
  41:23
**privy** 22:4
**probably** 25:3
  44:18 47:11
  52:23 57:16
**problem** 36:14
**procedural**
  20:13
**Procedure** 5:16
**procedures** 12:7
**proceedings**
  12:15 32:21
**process** 52:19
  55:21 56:1,4
  58:24
**Production** 27:5
**professional** 7:8
  7:11
**Program** 14:8
  20:18
**programs** 8:22
**progress** 20:12
  21:6,10 34:25
**pronounce** 19:8
**property** 57:2
**provide** 15:15
  40:12 43:6

**provided** 40:15
  48:19
**pry** 57:22 58:6
**Public** 60:23
**pull** 46:4
**pulling** 53:11
**purpose** 26:20
  26:23,25
**pursuant** 5:15
**put** 12:17 27:24
  27:25 37:11
**putting** 20:10

---

**Q**

**question** 5:24
  6:1,13 15:5
  31:25 33:14
  34:8 58:19
**questions** 5:18
  41:25 42:1,15
  49:1 55:14
  59:4 60:8
**quick** 58:11
**quickly** 6:14

---

**R**

**R** 1:9
**RA** 7:18
**ran** 45:14
**RATLIFF** 3:1
  42:1,5 59:10
**Raycraft** 42:13
**RE-EXAMIN...**
  4:10,12,14
  55:16 57:13
  58:9
**reached** 51:21
**reading** 52:20
**ready** 34:12
**real** 58:11
**realize** 32:4 53:5

**realized** 38:3
**really** 57:4
**reared** 56:14
**reason** 51:2
**recall** 10:14,18
  13:15 15:11
  18:25 20:11
  21:23 22:1
  24:22,25 25:5
  25:18 26:9,10
  30:20 31:4,20
  33:4,9 36:13
  41:1 43:9
  48:11 50:21
  52:8 54:14
  55:4
**receive** 29:10
**received** 7:19,20
  11:1 48:8
**Recess** 42:9
**recited** 52:4
**recollections**
  13:2
**recommendat...**
  21:8,9,11
**record** 5:14 6:3
  42:10 49:2
**recorded** 5:22
  60:9
**records** 13:2
  14:13,17,24
  15:2,5,24 33:6
  33:6
**reduced** 60:10
**refer** 17:5
**reference** 13:10
**referencing**
  12:24
**referring** 18:12
  22:12 26:17

41:12,15
**reflected** 11:3
**regarding** 11:15
  14:12,25,25
  15:7 48:4
  55:19
**region** 19:21,22
  19:22
**regular** 19:20,24
  20:2 21:15
**regularly** 12:5
**reimbursed**
  20:19
**reimbursing**
  20:23
**related** 14:17,19
  20:16,17,18
  26:10 30:17,17
  48:12 60:12
**relatedly** 23:16
**relates** 20:15
**relating** 14:17
**relationship**
  43:2
**remained** 31:2
**remaining** 31:12
  31:19 32:7
**remember** 9:25
  10:20,20 18:9
  19:21 20:1
  21:21 22:22,22
  27:15 30:20
  35:13 36:16
  50:21 52:17
  54:8,9
**remove** 28:15
  30:9
**removed** 19:6
  28:20 38:11
  56:25

**rendered** 51:17
  56:15
**report** 19:24
  21:14 40:20
**reported** 40:20
**reporter** 5:22
  6:2
**reporting** 19:20
**reports** 20:2,11
  22:2
**represent** 42:13
**represented**
  33:2
**reprisals** 34:24
**request** 15:2
  27:5 43:5 48:8
**requested** 33:5
  59:13
**requests** 48:11
**required** 19:24
  40:19
**requirements**
  10:4
**resembled** 22:20
**resolution** 9:21
**resources** 8:22
**respective** 59:14
**respects** 40:25
**Respondent's**
  17:18
**responsibilities**
  45:25
**rest** 13:8 54:3
**restroom** 42:3
  44:6,10,11,13
  44:14,18,22
**resumed** 8:17
**retaliation**
  34:25
**revealed** 23:2



HON. VALDEMAR L. WASHINGTON
January 17, 2018

Page 70

reviewed 29:25 30:7 41:10,16
reviewing 13:11
right 16:14 22:7 23:16,19,21 24:6,12 25:10 25:20 28:9 29:23 31:21 32:21 36:23 39:1 50:15 57:11,17
rights 57:3
RMR 1:20
robe 12:17
Robert 10:15
room 7:20,21 27:25 35:12,20 35:25 43:23
roughly 9:6
RPR 1:20
ruled 33:21
Rules 5:16
run 8:22 27:23 34:15
running 20:14

**S**

S-E-T-T-L-E-... 9:23
safe 16:16,17,18 16:22,24 17:2 17:5 22:10,11 22:14,16,18,20 23:8,10,14 25:13,14,19 26:1,8,10,15 28:7,8,10,13 28:14 30:10,11 36:1,8 38:18 39:3 47:12,22

48:4,12,19,20 48:22 49:3,6 49:10,13,18,21 49:24 50:4,7 50:10,25 51:1 51:3,5 52:15 52:22 53:6,11 53:14,15,17,18 53:20 54:5,19 55:20 56:5,7 56:16 57:7,16 58:13
saw 17:25 18:2 22:23 31:6,20 37:17,22 38:2 38:15 53:7
saying 22:19 23:4 35:13 47:7 58:12
says 17:18 36:15
SCAO 15:15,17 34:22
scene 53:1
Schmucker 10:19,23,25 11:11 12:25 13:12,19 14:1 20:4 21:3,14 21:19 22:3,9
school 6:21,21 6:25 7:17,17 7:23,23 8:1
script 30:23
second 17:17
secretary 27:12
see 11:12 13:7 13:10,12 23:1 23:7 30:19 37:13,15,24 38:1 44:20

50:20 58:18
seeing 18:9 22:22,22 30:20 50:21
seen 31:5 36:5 43:24
selected 10:1
selection 10:8
sending 22:2
sent 20:3,8
sequester 29:17
sequestration 29:8
series 5:17
served 40:6
Service 14:8 20:17,18
services 9:11
serving 40:12
set 12:9 20:12 60:8
Settlemate 9:22
seven 11:13 13:4 15:3
sexist 57:23
shared 34:22
Sharon 47:16 49:2
show 5:14 54:11
showed 22:24 25:16 44:12
shows 18:1
shred 28:25 45:1
shredded 29:2
Signature 59:13
single 55:25
Sir 11:10
sit 25:8 27:13
sitting 19:15
small 8:7 35:25

Smith 26:11 36:15 47:25
Society 8:6,9,10
somebody 25:19 26:7 53:2,13
someplace 27:14
sorry 38:23 55:13
sort 58:1
sounds 14:20 23:19
SOUTHERN 1:3
Southfield 3:5
space 16:14 31:8 32:9 37:23 45:11 54:8,16
speak 11:19
special 8:18
specifically 10:14,16 15:9
spent 8:15
spoke 23:11,12 26:11 34:16 36:14 41:10
spoken 10:25 18:15 47:6
SS 60:3
stack 15:21
stacked 31:7 32:2
staff 55:25
stand 34:7,11 45:10
standards 51:15
start 41:4
started 7:23,24 8:7 16:18
starting 6:21 43:10

state 6:22 7:1,3 7:19 9:9,10,13 10:24 15:17 19:23 22:8,11 24:2 40:16 60:2
stated 22:2
STATES 1:1
station 28:1
stayed 8:4,8
steel 38:2
stenographic 60:11
stenographica... 60:9
steps 23:7
Steven 1:9
sticker 17:17
story 56:3,6
Street 1:16 2:14
strength 57:19 58:3,5,15,16
strike 16:20
struck 52:25
stuff 11:17 25:11 47:8,9
style 34:3
subject 7:8
substance 11:21 20:10
substantial 51:17 56:15
substantiate 21:5
Suite 2:6 3:4,13
supervise 45:15
support 15:5
suppose 7:16
supposed 11:23
Supreme 11:14



US LEGAL
SUPPORT
The Power of Commitment™

HON. VALDEMAR L. WASHINGTON
January 17, 2018

Page 71

| | | | | |
|---|---|---|---|---|
| 23:24 | **tampering** | 34:15,18,19 | 21:23 36:8,19 | **turn** 37:11 |
| **sure** 13:9 18:24 | 26:14 | 35:18 53:2,3 | 37:3 38:11,12 | **two** 6:3 8:17 |
| 31:6 42:4,7 | **tax** 20:22 | 53:11 | 39:2 42:8 | 17:11 19:10 |
| 45:21 46:6 | **telephone** 21:25 | **think** 7:12 9:7,8 | 45:23 54:8,11 | 29:19,24 35:22 |
| 57:10 | 23:16 | 9:24 10:7 14:6 | 54:18 55:5,24 | 54:13 |
| **surgical** 53:24 | **tell** 11:24 23:12 | 14:9,11,14,16 | **today** 9:19 35:17 | **two-and-a-half** |
| **surprise** 32:25 | 23:13 24:9 | 14:18 15:24 | 41:9 42:22 | 8:1 |
| 33:3 | 30:25 32:24 | 19:20 20:3,22 | **told** 23:23 24:1 | **types** 21:17 |
| **swear** 27:7 | 44:14 47:12,21 | 21:7 22:5 | 24:5,7,11 | |
| 35:17 | 49:2,5,10,13 | 23:19 24:15,21 | 26:15 29:20 | ___U___ |
| **sworn** 5:7 | 49:24 54:17,22 | 25:2 27:4,22 | 52:8 | **Uh-huh** 15:10 |
| **Sylvia** 1:5 13:23 | **ten** 8:15 | 28:9 29:23,23 | **tool** 57:21 58:1 | 17:5 38:21 |
| 17:25 22:10 | **Tenure** 56:25 | 31:18 32:9 | **tools** 57:24 | 40:4 |
| 23:17 24:18 | **term** 9:1 | 34:22 35:16 | **top** 37:1 | **undergraduate** |
| 25:18 30:14 | **terms** 12:6 27:2 | 44:15 47:6,15 | **topics** 42:23 | 7:16 |
| 31:13 32:14,20 | 34:14 50:19 | 48:25 50:24 | **Town** 3:3 | **underneath** |
| 33:11 | 52:20 58:4,6 | 51:2,5,6 53:16 | **transcript** 4:20 | 57:21 |
| | **terrible** 57:2 | 53:18,20 54:10 | 29:10 30:8 | **understand** 5:19 |
| ___T___ | **tested** 17:3 37:5 | 54:18,23 55:10 | 41:10,12 60:11 | 5:22,24 6:5 |
| **T** 3:1 | **testified** 5:9 14:9 | 56:6,16,18,20 | **transcription** | 15:17,19 17:1 |
| **table** 4:1 19:15 | 16:19 18:18 | 56:21,22 57:4 | 60:10 | 17:6 30:5 35:4 |
| **take** 6:2 13:9 | 29:24 36:7 | 57:16,18 | **transcripts** | 38:6 51:9 |
| 23:7 28:21 | 40:21 42:16,22 | **Thomas** 19:7 | 29:25 41:16 | 56:12 |
| 35:15,21,21 | 44:5 45:5 47:1 | 22:14,24 26:19 | **travel** 14:17,19 | **understanding** |
| 36:5 42:3,7 | 47:15 48:7 | 27:6 33:2 | 15:21 20:18 | 51:21 |
| 46:25 53:23 | 57:15 | 35:13 48:4,9 | 43:7,8 | **understood** 6:7 |
| 59:9 | **testify** 5:7 29:22 | 53:10 54:4,6,9 | **treasurer** 9:11 | 11:4 |
| **taken** 1:16 5:15 | 51:12 | **Thomas'** 38:15 | **Treasury** 9:10 | **UNITED** 1:1 |
| 19:18 36:3 | **testimony** 29:4,9 | 50:16 | **tried** 25:8 34:2 | **University** 6:22 |
| 42:9 60:7,12 | 29:11,12,12,14 | **thought** 25:19 | **trip** 15:8 20:20 | 6:24 8:2 |
| **talk** 34:4 52:6 | 40:24 41:10,13 | 38:4 44:8 | 20:23 | **unlock** 37:11 |
| **talked** 14:1 52:1 | 51:14,16,20 | 55:20 56:4,14 | **true** 12:14 24:4 | **use** 33:6 40:9 |
| 52:1 | **thank** 58:8 | **thoughts** 21:4 | 40:24 57:9 | 55:3 57:21 |
| **talking** 6:3 | 59:11 | **thrown** 53:3,12 | 60:11 | |
| 22:12 30:6 | **thing** 7:18 27:17 | **Thursday** 34:17 | **trust** 35:1 | ___V___ |
| 35:13 46:2 | 52:9,25 56:22 | **ticket** 20:21,25 | **truth** 5:7,8,8 | **Valdemar** 1:15 |
| 50:11 54:23 | 57:2 58:2 | **time** 6:12 8:8,11 | **try** 5:25 14:13 | 4:4 5:5,15 6:17 |
| 56:1 | **things** 8:22 12:7 | 8:13 9:5 10:6 | 19:8 | **van** 20:17 |
| **tampered** 25:19 | 21:7,13 31:7 | 10:24 13:9,24 | **trying** 57:24 | **verbally** 5:21 |
| 26:7 | 31:10 32:7 | 16:24 18:16,19 | **tuition** 7:20 | **verdict** 51:17 |
| | | | | 56:9,15 |



US LEGAL SUPPORT
The Power of Commitment™

HON. VALDEMAR L. WASHINGTON
January 17, 2018

Page 72

verse 46:6
Vie 19:7
view 20:20 21:5
  22:6 30:16
  37:20 38:1
  50:20,21 52:11
violated 57:2,3
visiting 9:14
  10:5 12:1,11
  12:19 20:15
vs 1:7

**W**

wagon 28:1
wait 35:13 41:2
walk 34:6
walked 31:6
wall 44:15
want 9:1 23:12
  47:7
wanted 24:8
  35:14 46:21,24
wanting 37:6
Warner 3:2
Washington
  1:15 2:19 4:4
  5:5,12,15 6:17
  55:18
wasn't 8:25
  13:23 19:3,13
  19:15 24:6,10
  29:6,8 33:11
  35:20 38:9
  52:3,5,18,18
  56:11 57:10
watch 45:11
watchman 7:23
water 12:6
way 9:20 35:3
  39:22 49:20,24

50:10,10 54:20
Wayne 60:4,24
we'll 11:17
  26:18
we're 34:12
  54:23 59:6
we've 34:4 36:1
Wednesday
  1:19 5:2
weekend 12:16
weekly 20:1
went 6:22,24
  7:21
weren't 7:17
  13:18 16:19
  20:5 57:5
Western 7:6
Whalen 1:9
wife 41:21
willing 9:3 12:20
  27:11 45:13
window 54:24
  55:2
witness 4:3 5:6
  59:13
WOJNAR-R...
  3:10 4:9,13
  42:2,12 55:10
  57:14 58:8
  59:5,8
women 57:25
wondering 32:7
Wonders 7:19
Woodward 2:5
word 18:6 47:19
work 8:24 12:20
  25:8 27:14,14
  30:15 31:8
  32:11,12,23
  34:4

worked 7:22,25
working 8:3
  14:8 16:21
  43:2
wouldn't 22:10
  23:8 26:3
  27:18 48:13
  52:16 53:22
  54:16
writers 49:24
writing 30:23
  31:1 41:6
written 21:16

**X**

X 56:12

**Y**

Y 56:13
yeah 14:19
  18:24 21:7
  22:21 23:19
  24:11,24 36:6
  37:19 38:8
  40:2 47:19
  56:11,20
year 8:24 9:3
  39:21,22,24
years 8:1,15,18
  8:23 15:12
  30:8 33:23
Yep 17:7
Young 10:15

**Z**

**0**

**1**

1 4:22 11:5,7,10
  12:10 13:10

19:22,22 20:13
  21:8
10:02 11:8
10:11 17:14
10:42 42:9
10:49 42:10
1099s 13:13 14:4
  14:6
11 4:22
11:12 59:12
12 43:23,23
120 3:13
14 18:25 25:5
  26:18 32:14
  35:4 38:11
  39:10,13,18,20
  51:23
14th 8:13 9:16
  21:22 22:14,25
  23:3 25:24
  27:7,13 31:21
  33:12 35:3,6
  35:10 38:22
  39:2 41:2
  46:22,23 47:25
  48:1,5,20
  49:16 54:1,25
15 10:18 11:11
15th 12:24 27:4
  48:8
17 1:19 4:23 5:2
17430 3:12
1952 6:19
1970 6:22
1976 6:25
1977 8:3,4
1978 8:9
1986 8:13,16
1996 8:16 9:22
1st 8:16

**2**

2 4:23 13:12
  17:11,13,16,19
  18:1,10 22:23
  23:1 33:4
  37:18 38:1,19
  50:12
2:12-cv-10273
  1:7
200 2:6
2000 3:3
2006 9:7 21:9
2007 9:9
2010 9:12 13:6
  15:9
2011 9:16,17
  10:18 11:11
  12:14 18:25
  21:12 22:25
  23:17 25:5,24
  26:19 31:21
  32:14 33:4
  35:4,10 38:11
  38:19 39:10,13
  39:18,20 51:23
2012 9:18
2018 1:19 5:2
2022 60:25
21 6:19 23:17
22 33:23 60:25
22nd 9:15 10:2
  11:15,18 16:1
  18:11,20 19:25
  24:17 32:24
248.784.5154
  3:6
248.864.4000
  2:8
25 27:5 48:16
2700 3:4



HON. VALDEMAR L. WASHINGTON
January 17, 2018

Page 73

| | |
|---|---|
| **2nd** 38:20,24 47:16,19 | **9** |
| | **9:54** 1:18 5:3 |
| **3** | |
| **31st** 9:12 39:23 | |
| **33** 21:8,13 | |
| **344** 2:5 | |
| **4** | |
| **4** 13:2 14:11 | |
| **42** 4:9 | |
| **48009** 2:7 | |
| **48075** 3:5 | |
| **48152** 3:14 | |
| **48933** 2:16 | |
| **4th** 12:16,20,21 21:12 54:25 55:1 | |
| **5** | |
| **5** 4:7 | |
| **5:00** 41:4 54:9 | |
| **50** 13:3 15:3 | |
| **517.335.7193** 2:17 | |
| **525** 2:14 | |
| **55** 4:11 | |
| **57** 4:13 | |
| **58** 4:15 | |
| **5th** 2:15 21:12 | |
| **6** | |
| **7** | |
| **7.50** 20:22 | |
| **718** 1:16 | |
| **734.591.4002** 3:15 | |
| **74** 6:22 | |
| **8** | |


US LEGAL SUPPORT
The Power of Commitment™