# EXHIBIT 7

JAMES v. HAMPTON, ET AL.

MARGARET RYNIER

December 21, 2017

*Prepared for you by*



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

MARGARET RYNIER
December 21, 2017

---

**Page 1**

1    IN THE DISTRICT COURT OF THE UNITED STATES
2    FOR THE EASTERN DISTRICT OF MICHIGAN
3    SOUTHERN DIVISION
4
5    SYLVIA JAMES,
6            Plaintiff,
7    vs.            Case No. 2:12-CV-10273
8            Hon. Paul Borman
9    HILLIARD HAMPTON, et al,
10           Defendants.
11                    /
12
13
14    The Deposition of MARGARET RYNIER,
15    Taken at 3030 West Grand Boulevard,
16    Detroit, Michigan,
17    Commencing at 9:56 a.m.
18    Thursday, December 21, 2017,
19    Before Nora Morrissy, CSR-2642.
20
21
22
23
24
25

---

**Page 2**

1    APPEARANCES:
2
3    JOSHUA FISHER
4    Morganroth & Morganroth, PLLC
5    344 North Old Woodward
6    Suite 200
7    Birmingham, Michigan 48009
8    248.864.4000
9    jfisher@morganrothlaw.com
10           Appearing on behalf of the Plaintiff.
11
12    JEANMARIE MILLER
13    Assistant Attorney General
14    State of Michigan
15    Department of Attorney General
16    525 West Ottawa Street, Floor 5
17    Lansing, Michigan 48933
18    517.373.6434
19    millerJ51@michigan.gov
20           Appearing on behalf of the Defendant.
21
22
23
24
25

---

**Page 3**

1    ALLYSON TERPSMA
2    Warner, Norcross & Judd, LLP
3    111 Lyon Street, NW
4    Grand Rapids, Michigan 49503
5    616.752.2539
6    aterpsma@wnj.com
7           Appearing on behalf of the Defendant Fischer.
8
9    MELISSA WOJNAR-RAYCRAFT
10    The Mike Cox Law Firm, PLLC
11    17430 Laurel Park Drive North, Suite 120
12    Livonia, Michigan 48152
13    734.591.4002
14    mraycraft@mikecoxlaw.com
15           Appearing on behalf of the Defendant Anderson.
16
17    ALSO PRESENT:
18    Paul Fischer
19
20
21
22
23
24
25

---

**Page 4**

1                    TABLE OF CONTENTS
2
3    Witness                    Page
4    MARGARET RYNIER
5
6    EXAMINATION
7    BY MR. FISHER:                    6
8    EXAMINATION
9    BY MS. WOJNAR-RAYCRAFT:                    50
10
11                    EXHIBITS
12
13    Exhibit                    Page
14    (Exhibits attached to transcript.)
15
16    DEPOSITION EXHIBIT 1                    14
17    DEPOSITION EXHIBIT 2                    39
18
19
20
21
22
23
24
25



MARGARET RYNIER
December 21, 2017

Page 5

1    Detroit, Michigan
2    Thursday, December 21, 2017
3    9:56 a.m.
4
5                MARGARET RYNIER,
6    was thereupon called as a witness herein, and after
7    having first been duly sworn to testify to the truth,
8    the whole truth and nothing but the truth, was
9    examined and testified as follows:
10            MR. FISHER:  My name is Joshua Fisher.  I'm
11   one of the attorneys for plaintiff in this matter.
12            Let the record show this is the deposition
13   of Margaret Rynier taken pursuant to notice under the
14   Federal Rules of Civil Procedure.
15            Miss Rynier, I'll be asking you a series of
16   questions and your answers are given under oath.
17            Do you understand that?
18            THE WITNESS:  Yes.
19            MR. FISHER:  You must answer verbally so
20   that your answer can be recorded by the court
21   reporter.
22            Do you understand?
23            THE WITNESS:  Yes.
24            MR. FISHER:  If you don't understand a
25   question, just say so and I'll try and clarify it, and

Page 6

1    you have to let me finish my question before you
2    answer just so the court reporter can get everything
3    on the record, and the same thing applies to me if I
4    cut you off or anything, try to be good.
5            THE WITNESS:  Okay.
6            MR. FISHER:  So, we can get everything
7    down.  If I interrupt you or you haven't completed
8    your answer, just let me know and I'll let permit you
9    to finish.
10            Even though I think this should be pretty
11   quick, if you do need a break for any reason, just let
12   me know.  I might have to finish a line of questioning
13   but I think any time you do, just let me know we'll
14   take a break.
15            THE WITNESS:  Okay.
16            EXAMINATION
17   BY MR. FISHER:
18   Q.   What's your full name?
19   A.   Margaret Rynier.
20   Q.   No middle name?
21   A.   Initials NS.
22   Q.   What's your date of birth?
23            MR. FISCHER:  Women don't like answering
24   that.
25            MS. MILLER:  It's background.  It's okay.

Page 7

1    A.   March 14th, 1956.
2    BY MR. FISHER:
3    Q.   And then can you describe your formal education, just
4        going from college forward.
5    A.   Graduated from college in 1978 or '9.  Started law
6        school in 1979.  Graduated in 1982, and then I had a
7        judicial clerkship and started with the Wayne County
8        Prosecutor's Office in 1985.
9    Q.   What college did you go to?
10   A.   University of Detroit.
11   Q.   And your major?
12   A.   Broadcast management.
13   Q.   And you got a degree in that?
14   A.   Correct.
15   Q.   And then for law school where did you go?
16   A.   University of Detroit.
17   Q.   Okay.  Did you get any other graduate degrees?
18   A.   No.
19   Q.   Are you a member of any professional associations?
20   A.   American Bar Association, Michigan Bar Association I
21        believe still.  I think that's it.
22   Q.   As far as the ABA goes, are you on any ABA committees?
23   A.   No.
24   Q.   Are you familiar with the ABA Standing Committee on
25        Professional Discipline?

Page 8

1    A.   Am I familiar with it?  Yeah, I know it exists.
2    Q.   How about the ABA Standing Committee on Judicial
3        Independence?
4    A.   I know it exists.
5    Q.   But you don't have any affiliation with it?
6    A.   No.
7    Q.   Can you please describe your complete employment
8        history going from the time you graduated college, not
9        before college, from college on.
10   A.   I actually can't, not complete.  I know that -- I can
11        tell you since law school because it's much easier.  I
12        mean during law school I clerked.  I can't tell you
13        the firm names anymore.
14   Q.   If you don't remember --
15   A.   I don't, I'm sorry.
16   Q.   I mean that's an answer.
17   A.   I know that since law school I had a judicial
18        clerkship and then Wayne County Prosecutor's Office.
19   Q.   Okay.  And how long were you at the Wayne County
20        Prosecutor's Office?
21   A.   1985 until January of 2011.
22   Q.   And after the Wayne County Prosecutor's Office?
23   A.   Judicial Tenure Commission.
24   Q.   Where you are still working?
25   A.   Correct.



MARGARET RYNIER
December 21, 2017

## Page 9

1   Q.  What was your position at the Judicial Tenure
2       Commission when you started there?
3   A.  Staff attorney.
4   Q.  And you're still staff attorney?
5   A.  All of us are, yes.
6   Q.  And who hired you at the JTC?
7   A.  I understand the Commission.
8   Q.  But it wasn't an individual that interviewed you and
9       hired you?
10  A.  Oh, Mr. Fischer hired me.
11  Q.  If I call it the JTC, you know I mean the Judicial
12      Tenure Commission?
13  A.  Okay, of course.
14  Q.  So, I presume Mr. Fischer was the executive director
15      at the time you were hired?
16  A.  Yes.
17  Q.  And are you a senior staff attorney?  Are there
18      different --
19  A.  There's no designations.
20  Q.  Staff attorney, staff attorney?
21  A.  Correct.
22  Q.  Can you describe your duties as a staff attorney?
23  A.  Investigating requests for investigation or reviewing
24      investigations, request for investigations,
25      interviewing witnesses, preparation of reports for the

## Page 10

1       Commission, request for comments to respondents who
2       are the judges, formal complaints if the Commission
3       authorizes them and then trying cases or formal
4       hearings if that's what the Commission authorizes.
5   Q.  Do you ever prepare cases for hearings?
6   A.  Yes.
7   Q.  And would you ever actually present evidence at a
8       hearing before a master?
9   A.  Yes.
10  Q.  Do staff attorneys serve as associate examiners during
11      formal proceedings ever?
12  A.  Yes.
13  Q.  And I presume that you do that as well?
14  A.  Yes.
15  Q.  How many times have you served as an associate
16      examiner?
17  A.  I believe in the area of seven, eight.
18  Q.  Does the JTC divide as far as staff attorneys go the
19      -- which staff attorneys are going to serve as the
20      associate examiners, pretty evenly or do they have a
21      way of choosing who is going to be an associate
22      examiner for any given case?
23  A.  Since I've hired in I've done most of the formal
24      hearings but that's because I do trials.
25  Q.  Okay.  Can you describe your roles and

## Page 11

1       responsibilities in your capacity as an associate
2       examiner during the formal proceedings?
3   A.  Preparing witnesses for the formal hearing,
4       presentation of evidence.  After that if a master
5       requires or requests, preparation of a proposed
6       finding of fact, writing of briefs, responding to
7       motions before the formal hearing if any are filed by
8       either side, and then briefs to the Supreme Court --
9       briefs to the Commission and briefs to the Supreme
10      Court.
11  Q.  What are the differences in the briefs that go to the
12      Commission and the briefs that go to the Supreme
13      Court?
14  A.  Well, the brief to the Commission is taking the
15      master's findings of fact and conclusions of law
16      then arguing those, and then once the Commission makes
17      a decision, then we adopt that position and we present
18      that to the Supreme Court.
19  Q.  Is there ever a different -- the master also makes
20      findings, is that correct?
21  A.  The master makes finding of fact and conclusions of
22      law, yes.
23  Q.  Is there ever a difference in what the master might
24      determine and what the Commission might ultimately end
25      up recommending?

## Page 12

1   A.  The master does not make any recommendations to the
2       Supreme Court in terms of the sanctions.  The master
3       only makes finding of facts and conclusions of law.
4   Q.  Okay.
5   A.  The Commission can then adopt or reject those and then
6       they make a recommendation to the Supreme Court, and
7       we argue that position and then the court is free to
8       adopt or reject.
9   Q.  Are you familiar with who Judge Sylvia James is?
10  A.  Yes.
11  Q.  Do you recall when the JTC was investigating
12      Judge James?
13  A.  Yes, I recall there was an investigation.
14  Q.  But nothing beyond that?
15  A.  But I mean I don't have a one hundred percent recall
16      of every detail of that investigation.
17  Q.  That would have been close to around when you began at
18      the JTC?
19  A.  Yes.
20  Q.  Do you recall when the JTC was pursuing a formal
21      complaint against Judge James as well?
22  A.  Yes.
23  Q.  How did the JTC's investigation of Judge James begin?
24  A.  I'm sorry.  I don't understand the question.  What do
25      you mean begin?



MARGARET RYNIER
December 21, 2017

## Page 13

1  Q.  What was the first instance you heard about the
2      investigation of Judge James?
3  A.  It was either on the news before the request for
4      investigation was filed or the request for
5      investigation was filed and then the news story broke.
6      I cannot tell you which one came first.  And there
7      were several requests for investigation filed.
8  Q.  Do you know how many requests for investigation?
9  A.  No, I don't, I'm sorry.
10 Q.  If I use the term grievance, will you understand that
11     to mean the same thing as a request for investigation?
12 A.  Sure.
13 Q.  I might use request for investigation as well:  You
14     indicated there were several grievances.  Do you know
15     who initiated the investigation of Judge James?
16 A.  Well, the investigation has to be approved by the
17     Commission but who filed the first grievance?
18 Q.  Uh-huh.
19 A.  I don't know.  I know there was a gentleman who was
20     prohibited or barred from entering the courthouse
21     because he wore a pair of jeans.  Whether he was the
22     first, I don't know.
23     I know there was a grievance filed by a
24     city attorney, I can't tell the name anymore, and I'm
25     not sure if there was another one or not.

## Page 14

1  Q.  You're aware that the JTC could open up an
2      investigation on its own volition without a grievance?
3  A.  Correct.
4  Q.  Did that happen in Judge James' case?
5  A.  I don't remember.
6  Q.  Do you know if a request for investigation was filed
7      by Deborah Green?
8  A.  It might have been.
9          MARKED FOR IDENTIFICATION:
10         DEPOSITION EXHIBIT 1
11         10:11 a.m.
12 BY MR. FISHER:
13 Q.  I'm handing you what's been marked as Exhibit 1 which
14     is a June 14th, 2011 letter to Mr. Paul Fischer from
15     Deborah Green who at the time was a regional
16     administrator of the Michigan Supreme Court State
17     Court Administrative Office.
18         I don't think you have to read the whole
19     thing.  I just -- I guess take your time and take a
20     look at -- and let me know if this refreshes your
21     recollection as to whether Deborah Green had filed a
22     request for investigation.
23 A.  Whether she was an actual grievant, no, it doesn't.  I
24     know that I spoke to her during the investigation.
25     She may have very well filed one, and I remember there

## Page 15

1      was an audit conducted by Miss McLemore, I remember I
2      spoke to her.  Does it refresh my memory, no, but I
3      have a faint memory that there might have been one
4      filed by SCAO.
5  Q.  Is that because this isn't an actual grievance form?
6  A.  Correct.
7  Q.  If somebody wanted to make a grievance, would they
8      have to file that grievance form or would something
9      like this suffice to open an investigation?
10 A.  I believe there has to be a form filled out.
11 Q.  Okay.  Do you know if a request for investigation was
12     filed by David Jones?
13 A.  That rings a bell.
14 Q.  And would you recall when Mr. Jones' grievance was
15     received by the --
16 A.  No.
17 Q.  And I would imagine you wouldn't recall whether the --
18     Mr. Jones' grievance was before or after Judge James
19     was placed on administrative leave?
20 A.  No, I have no memory.
21 Q.  Do you recall the nature of Mr. Jones' grievance?
22 A.  No.
23 Q.  Do you know if the JTC had any investigations
24     regarding Judge James prior to the investigation that
25     ultimately led to formal complaint 88?

## Page 16

1  A.  No, I don't remember.  I'm not sure I ever knew.
2  Q.  Do you know if -- I think you testified that you don't
3      recall if Deborah Green even filed a grievance, that
4      is correct?
5  A.  I seem to have a faint memory there was one filed by
6      SCAO and that would have been Deborah Green, but can I
7      tell you if I have an existing memory, no.
8  Q.  Do you recall if that grievance would have been filed
9      with the JTC before -- presented before the JTC before or
10     after Judge James was placed on administrative leave?
11 A.  No memory whatsoever.  Please keep in mind the filing
12     is a separate time frame than presentation to the
13     Commission.  So, it has to be filed, then presented to
14     the Commission.
15 Q.  Is there usually a long time period between those two
16     events?
17 A.  It varies.
18 Q.  Are you aware that Judge James was placed on
19     administrative leave?
20 A.  Yes.
21 Q.  Is it true that a request for investigation from the
22     State Court Administrator doesn't need to be under
23     oath?
24 A.  I have no idea.
25 Q.  Do you know if the JTC was considering independently



MARGARET RYNIER
December 21, 2017

## Page 17

1  opening an investigation regarding Judge James before
2  it received any grievances?
3  **A.  You mean the Commission itself?**
4  Q.  Correct.
5  **A.  I would not know.  I'm not privy to the deliberations.**
6  Q.  So, is it true that staff attorneys don't decide
7  whether the JTC is going to independently open an
8  investigation without having received any grievances
9  from other folks?
10  **A.  That is correct.**
11  Q.  It would be the Commission that does that?
12  **A.  Correct.**
13  Q.  Okay.  So, the only time a staff attorney would ever
14  know that the JTC might open or is going to open an
15  independent investigation without receiving a
16  grievance would be after the commissioners might
17  notify a staff attorney?  I can shorten it if you'd
18  like.
19       I just want to know if a staff attorney
20  would ever begin or start the process of the JTC
21  independently opening an investigation or is it always
22  something that comes right down from the Commission?
23  **A.  The Commission has to give authority for an**
24  **investigation whether it's filed by someone or whether**
25  **they decide to open it on their own.**

## Page 18

1  Q.  Okay.  So, a staff attorney can't go to the Commission
2  and say I think we should open up an investigation
3  against so and so, is that right?
4  **A.  We never go to the Commission ourselves.  I mean we're**
5  **not there when they are deliberating.**
6  Q.  Okay.
7  **A.  Do we present reports, yes, and then they will decide**
8  **whether to open it or not.**
9  Q.  Okay.
10  **A.  Do you follow me?**
11  Q.  Yeah, I do.  So, for example, I'm not saying something
12  like this could have ever happened but if a staff
13  attorney was aware of an egregious media article that
14  the staff attorney found out about, it might present
15  that to the Commission by way of a brief or a memo or
16  something like that?
17  **A.  Correct.**
18  Q.  Do you know when Judge James was placed on
19  administrative leave by the Supreme Court?
20  **A.  No.**
21  Q.  When I say Supreme Court, I mean the Michigan Supreme
22  Court.
23  **A.  No, I don't.**
24  Q.  Do you know if the Michigan Supreme Court was notified
25  when the JTC opened its investigation --

## Page 19

1  **A.  I have no idea.**
2  Q.  -- on Judge James?  Do you know that when Judge James
3  was placed on administrative leave that Judge Valdemar
4  Washington was appointed to act as interim chief judge
5  of the 22nd District Court?
6  **A.  Do I know that now, yes.**
7  Q.  Do you know that -- so, you know that now in hindsight
8  but you didn't know it was happening at the time?
9  **A.  Oh, no, I did.  I can't tell you when that happened.**
10  Q.  So, you don't know when it happened but now that it
11  happened after she was placed on administrative leave?
12  **A.  I believe so, but I don't know how close it came to**
13  **it, whether it was simultaneously or a day or two**
14  **after, I can't tell you.**
15  Q.  Sure.  Fair enough.  Do you know if Judge Washington
16  controlled access to Judge James' safe while he served
17  as the interim --
18  **A.  I have no knowledge of that.**
19  Q.  Was Judge Washington -- strike that.
20       Judge Washington cooperated with the JTC's
21  investigation of Judge James, is that correct?
22  **A.  Yes.**
23  Q.  Do you know to what extent Judge Washington was
24  involved in the investigation of Judge James?
25  **A.  I'm not clear as to what you mean by that.**

## Page 20

1  Q.  Do you know what Judge Washington was asked to do as
2  far as accessing information related to the
3  investigation of Judge James?
4  **A.  I'm sorry.  You'd have to be more specific.**
5  **Information -- most of our information came from**
6  **Miss Anderson.  Did I speak with Judge Washington,**
7  **yes, did he cooperate in answering the questions, yes.**
8  **I can't tell you anything beyond that.**
9  Q.  Do you know whether Judge Washington was asked to look
10  for certain documents in the courthouse?
11  **A.  Not that I know of, not by me.**
12  Q.  You just said that Judge Washington answered
13  questions.  What were the nature of the types of
14  questions that Judge Washington was answering?
15  **A.  I can't tell you that.**
16  Q.  Who was the staff attorney assigned to investigate
17  Judge James once the actual investigation was opened?
18  **A.  I was.**
19  Q.  Okay.  Anybody else?
20  **A.  No.**
21  Q.  And it's usually just one staff attorney?
22  **A.  One staff attorney and the executive director.**
23  Q.  Can you describe the nature of the investigation in
24  terms of what was being done primarily?
25  **A.  Interviewing witnesses, meeting with the court**



MARGARET RYNIER
December 21, 2017

### Page 21

1  administrator, gathering evidence, evaluating
2  evidence, writing reports, presenting them to the
3  Commission, asking for authority to do further
4  investigation and then following that authority.
5  Q.  What type of evidence was being gathered?
6  A.  The information gathered related to the allegations.
7  I remember there were financial allegations or
8  financial impropriety allegations, so, that was
9  gathered and the investigation included talking to
10  witnesses about policies and procedures in terms of
11  allowing people to enter the courthouse, I mean there
12  is so much more that I'm sure I'm missing some at this
13  point.  Please keep in mind that it has been five
14  years.
15  Q.  Oh, I understand.  It's not a memory game.  Speaking
16  of which do you recall which witnesses you were
17  interviewing?
18  A.  I know I had several meetings with Pam Anderson.  I
19  know I met with Judge Washington, I know I met with
20  Judge James' niece.  I no longer remember her name.  I
21  think perhaps a few other clerks but I can't tell you
22  who.
23  Q.  What were the nature of the conversations with
24  Miss Anderson?
25  A.  And again trying to recall five years ago it related

### Page 22

1  to expenses, expenditures, how -- there was some kind
2  of a community service program whether she knew how
3  that was run.
4        MS. WOJNAR-RAYCRAFT:  When you say she, do
5  you mean Pam Anderson?
6        THE WITNESS:  No, I mean Judge James, how
7  she ran that program.
8  A.  I recall there were questions overriding the computer
9  system for entering fines and costs imposed on
10  defendants.  I'm sorry.  That's the best of my recall
11  at this point.  I'm sure there are additionals.
12  BY MR. FISHER:
13  Q.  What about discussions with Judge Washington?
14  A.  I don't remember most of those.
15  Q.  How about conversations with Judge James' niece?  I
16  believe her name is Nicole James.
17  A.  Nicole James, you're right.  There was I believe an
18  issue related to promotions and pay increases for her.
19  I remember meeting with Miss Nicole James in Pam'
20  Anderson's office.  Miss Anderson left.  I had a
21  chance to talk to Nicole alone.
22        I recall telling her that I was -- I
23  understood her predicament and being related to the
24  judge.  That's the best of my recall.
25  Q.  And how about the same question but with respect to

### Page 23

1  the clerks, and if you have to parse them out with
2  different people, that's fine.
3  A.  I can't tell you, I'm sorry.
4  Q.  Were any discussions with Judge Washington regarding
5  finding any documents in the courthouse?
6  A.  I don't believe so.
7  Q.  How about with respect to Miss Anderson?
8  A.  There were a lot of documents that I requested.  I
9  remember her maintaining some calendars and I asked
10  for copies of those, perhaps some docket sheets.  You
11  know, we already had the checks that were at issue,
12  but those I did not obtain from Miss Anderson, I got
13  those from Miss McLemore.
14  Q.  Is it true that the JTC will sometimes attempt to
15  settle a case instead of filing a formal complaint?
16  A.  Had there been settlements since I started, I believe
17  so.
18  Q.  Just to be clear when I say settlement, I mean that
19  JTC will make a deal in lieu of filing a formal
20  complaint, it might be a resignation, it might be
21  something else of that nature.  I just wanted to
22  clarify what I mean by settlement.
23  A.  I believe so, but I'm not certain.  Does it come
24  before formal complaint or after, I can't tell you.
25  Q.  Well, it would come before formal complaint because if

### Page 24

1  there was a settlement reached, there would be no
2  formal complaint.
3  A.  I know one of my cases which was Judge Powers since it
4  was filed, a formal complaint was filed, his
5  resignation came after.
6  Q.  Okay.
7  A.  But I believe there have been some negotiations in
8  some cases.  I can't tell you any details.
9  Q.  You don't have to tell me the details, I was just
10  wondering if that occurs.
11  A.  I think so.
12  Q.  And do you know if any attempts were made to settle
13  with Judge James before a formal complaint was filed
14  against her?
15  A.  I have no idea.
16  Q.  Since -- strike that.
17        Is it true that staff attorneys like
18  yourself would make recommendations to the executive
19  director regarding discipline?  When I say discipline
20  I mean in connection with a judge that you're
21  investigating.
22  A.  When you say recommendations, do we discuss stuff,
23  yes, we all do but in terms of recommendations, those
24  are made to the Commission and they're the ones who
25  ultimately recommend to the Supreme Court.



MARGARET RYNIER
December 21, 2017

---

Page 25

1        I don't know if that answers your question.
2        Do we discuss, do we say oh, this should be whatever,
3        sanctioned, I mean just as lawyers, yeah, we do but is
4        it a formal recommendation, no.
5    Q.  And correct me if I'm wrong, but isn't it true that
6        the executive director makes the recommendation to the
7        Commission regarding discipline?  By way of example
8        the executive director might say 60-day suspension for
9        this judge.
10   A.  Okay.  Keep in mind that I am not in the room when the
11       executive director meets with the commissioners.
12       That's behind closed doors.  We will make a
13       recommendation in a report and clearly that's with the
14       approval of the executive director.
15              What goes on behind those closed doors, I
16       can't tell you.
17   Q.  Behind closed doors would be with the executive
18       director and the Commission?
19   A.  Correct.
20   Q.  Before that happens, though -- does the actual
21       discipline, what should be the discipline -- I'm just
22       saying just by way of example, 30 days, 60 days, six
23       months, is that the kind of thing that would be
24       discussed between the staff attorney and the executive
25       director?

---

Page 26

1    A.  Sometimes.
2    Q.  And would the staff attorney in any instances say that
3        I think this should be 60 days suspension for this
4        judge?
5    A.  That may happen.
6    Q.  Not in a brief but would be just in discussion or
7        either way?
8    A.  Well, ultimately the report that goes to the
9        Commission will have a recommendation or the brief
10       that will go to the Commission, not report.
11   Q.  And the brief would be from the executive director but
12       perhaps drafted by staff attorneys?
13   A.  It's drafted by staff attorneys, it's reviewed by the
14       executive director and signed by both, and the
15       recommendation comes after the formal hearing.
16   Q.  Did you provide a recommendation to the executive
17       director regarding Judge James?
18   A.  At what point?  After the hearing?  Sure.
19   Q.  It would have been after the hearing but not before
20       the hearing?
21   A.  And once again did we talk about it in the office as
22       attorneys, sure.  If you're asking for any kind of a
23       formal document or recommendation, I don't think one
24       exists prior to the formal hearing.
25   Q.  And as far as discussing things as attorneys, what was

---

Page 27

1        -- what were the nature of those discussions?
2              MS. MILLER:  I'm going to object.  I
3        believe that would be work product and attorney-client
4        privilege.
5    BY MR. FISHER:
6    Q.  Okay.  And as far as Judge James goes, Mr. Fischer
7        didn't believe that a lesser form of discipline such
8        as a letter would have been appropriate for
9        Judge James?
10   A.  You have to ask him what he believed.
11   Q.  To your knowledge though you don't know either way?
12              MS. MILLER:  I'm going to object again.  I
13       believe that would go to work product and
14       attorney-client privilege.  It's a discussion among
15       staff.
16   BY MR. FISHER:
17   Q.  Do you know if approval to file a formal complaint
18       with regard to Judge James was requested?
19   A.  Yeah, it has to be approved by the Commission.  You
20       mean from the Commission?
21   Q.  Yeah.
22   A.  Yeah, the Commission has to approve a formal
23       complaint.  In fact one proposed formal complaint is
24       presented to them and they can make whatever changes
25       they want.

---

Page 28

1    Q.  And who made that request, would that have been
2        Mr. Fischer who was executive director at the time?
3    A.  With my signature on that as well.  Maybe not.  I
4        don't know if the formal complaint is even signed, the
5        proposed formal complaint.  The report would have
6        been.
7    Q.  Now, since -- we know that Judge James did have a
8        formal complaint filed against her, it was formal
9        complaint number 88.
10   A.  Sure.
11   Q.  And you testified it would have been your
12       recommendation -- or the recommendation signed by the
13       executive director and yourself.
14              So, is it fair to say it was your
15       recommendation that a formal complaint should be filed
16       against Judge James?
17   A.  Yes.
18   Q.  And that was granted by the Commission?
19   A.  It was approved by the Commission, yes.
20   Q.  In determining whether to file a formal complaint
21       against Judge James, did you consider her alleged
22       conduct compared to the conduct of other judges who
23       the JTC had filed formal complaints against
24       previously?
25              MS. MILLER:  I'm going to place an

---



MARGARET RYNIER
December 21, 2017

---

Page 29

1    objection because I believe that goes to work product,
2    her mental impressions and it's potentially
3    attorney-client privileged.
4    BY MR. FISHER:
5    Q.  In considering whether to file a formal complaint in
6        general, does the JTC compare the conduct of prior
7        judges who had formal complaints against them just as
8        a matter of practice and conduct?
9    A.  I believe so.
10   Q.  Are you familiar with the Brown factors?
11   A.  Yes.
12   Q.  Is that something that is also considered?
13   A.  Sure.
14   Q.  Would that be one of the main things that's
15       considered?
16   A.  You know, there are so many facts considered.  I know
17       that her case involved financial improprieties which
18       are -- which were severe and that was a major
19       consideration.
20           There were so many other factors.  I can't
21       tell you what was considered.  In general things are
22       considered all around.
23   Q.  And a similar question as before, did you compare
24       Judge James' alleged conduct with the conduct of other
25       judges against whom the JTC decided not to file a

---

Page 30

1        formal complaint?
2    A.  I don't recall.
3    Q.  Are you familiar with a Judge Mary Waterstone?
4    A.  Personally, yes, I was.  She was a judge at 36th
5        District Court when I was with the Prosecutor's
6        Office.  So, I know who she was.
7    Q.  And how did you come to learn who she was?
8    A.  I appeared in front of her.
9    Q.  Oh, okay.  You appeared in front of her in her court?
10   A.  Yes.
11   Q.  For --
12   A.  I believe preliminary exams.
13   Q.  Oh, while you were --
14   A.  Prosecutor, yes.
15   Q.  Did you ever become aware while you were at the JTC
16       that there was some potential or alleged misconduct
17       that Judge Waterstone had committed?
18           MS. MILLER:  I'm going to place an
19       objection insofar as you're asking her for information
20       about something that may have happened or something
21       that was less than a formal proceeding.  You can ask
22       her about formal proceedings but anything less than
23       that I believe is confidential and contrary to the
24       order that we had entered into prior with discovery.
25   BY MR. FISHER:

---

Page 31

1    Q.  Do you -- you testified that the JTC might open an
2        investigation based on media articles?
3    A.  Yes.
4    Q.  And would there have been media articles that you
5        recall regarding Judge Waterstone that came to the
6        attention of the JTC or staff attorneys?
7    A.  I don't know because I think when that hit the press,
8        I was still with the Prosecutor's Office.
9    Q.  Okay.
10   A.  So, I don't know what came to the attention of JTC at
11       that time.
12   Q.  And I guess while we are on the subject of -- and I
13       guess the way I'm looking at this is the JTC learning
14       about -- and I'll say alleged or potential because if
15       it's in the media, we don't know what it is.
16           Do you recall hearing media articles
17       regarding Judge Mark Somers?
18   A.  No.
19   Q.  How about --
20   A.  I can't tell you one way or the other.
21   Q.  How about Judge James Kandrevas?
22   A.  News articles, I don't remember, no.
23   Q.  Was there anything that came into the JTC's office --
24           MS. MILLER:  She can't -- we are going to
25       place an objection because insofar as something didn't

---

Page 32

1        rise to the level of formal complaint, she's not at
2        liberty to discuss.
3           MR. FISHER:  And what's the basis of that
4        objection?
5           MS. MILLER:  The agreement we have with
6        regard to the discovery that only -- that no judicial
7        names in terms of investigations, judges' names will
8        not be disclosed unless it rose to the level of a
9        formal complaint.  It's in the order that the judge
10       entered.
11          MR. FISHER:  Well, I would just suggest
12       that --
13   BY MR. FISHER:
14   Q.  When I say JTC, I'm including the staff attorneys.
15          Would you understand that when I say JTC,
16       it includes the staff attorneys and the Commission, is
17       that fair?
18   A.  I don't know what the Commission was aware of.  If you
19       want to ask me what I am aware of, that's different,
20       but I don't know what they would have been aware of.
21   Q.  I'm just prefacing my question that when I say what
22       the JTC was aware of something, that would include the
23       staff attorneys, is that fair, or should I say
24       separately the staff attorneys?
25   A.  I'm assuming any questions when you say JTC is limited

---



MARGARET RYNIER
December 21, 2017

---

**Page 33**

1  to me. I don't know what anybody else was aware of.
2  So, if there were some discussions behind closed doors
3  with the Commission, I can't vouch for that, I can't
4  testify to about.
5  Q.  When I say the JTC, though, do you understand that I'm
6  not only speaking about commissioners, I might also be
7  asking whether it --
8  A.  I'm going to take it as you are limiting it to me.
9       MR. FISHER:  Now, for the objection I'm
10  just wondering whether you are objecting that whether
11  the JTC received information about allegations and
12  media articles about judges, if you're saying that's
13  an objection regarding the order that the court
14  entered.
15       MS. MILLER:  Well, insofar as your question
16  is seeking to ask did the -- was the JTC and their
17  attorneys, did they take any action based upon news
18  articles, I believe that is covered in terms of
19  conducting investigations, I believe that would be
20  conducted under the court order.
21       Now, if you're asking her was she
22  personally aware of a news article, I think that's a
23  different question and she --
24       MR. FISHER:  That's what I asked.
25       MS. MILLER:  Well, you said, you were

---

**Page 34**

1  prefacing it in terms of the JTC.
2       MR. FISHER:  I was only asking about the
3  JTC because I wanted to make clear when I say the JTC,
4  I'm not talking about the commissioners, I'm talking
5  about the commissioners and staff attorneys and
6  everybody else.
7       MS. MILLER:  I think she testified she can
8  only testify as to what she was aware of.
9       MR. FISHER:  Right, right.
10       MS. MILLER:  So, in terms of these
11  questions, if we can address them to were you
12  personally aware of them, that's --
13       MR. FISHER:  That's all I want to know.
14  BY MR. FISHER:
15  Q.  I don't want to know if the JTC took action about it
16  because that's what Miss Miller objected to. The same
17  question.
18  A.  I'm sorry. Repeat that question.
19  Q.  I will.
20  A.  Thank you.
21  Q.  So, I'm just wondering whether you were ever aware of
22  any allegations or media articles regarding
23  Judge James Kandrevas?
24  A.  I don't recall.
25  Q.  Same question but as to Judge Steven Servaas.

---

**Page 35**

1  A.  At what point in time?
2  Q.  Any point in time.
3  A.  After I started with the Commission I heard about some
4  articles. I know nothing about the content of those
5  articles.
6  Q.  I'll include two judges because I believe it was
7  regarding the same set of circumstances but Judges
8  Kimberly Small and Marc Barron of the 48th District
9  Court.
10  A.  No.
11  Q.  How about Judge David Stowe?
12  A.  No.
13  Q.  Judge Byron Konschuh spelled K O N S C H U H?
14  A.  Newspaper articles?
15  Q.  Any media article.
16  A.  I believe there is some media articles about Judge
17  Konschuh that I read.
18  Q.  You already testified that the JTC takes the Brown
19  factors into account when deciding whether to seek a
20  formal complaint and you testified that that's among
21  other things of course.
22  A.  Again I'm speaking for myself. In preparing brief to
23  the Commission we cover those factors, yes.
24  Q.  Do you know if you took those factors into
25  consideration when determining whether Judge James

---

**Page 36**

1  should have a formal complaint filed against her?
2  A.  I'm sure I did. I don't specifically recall. I know
3  I covered them in the brief to the Commission, yes.
4  Q.  Are there any circumstances where a staff attorney
5  might not consider the Brown factors?
6  A.  Not that I know of.
7  Q.  Had you met Judge James prior to the JTC's
8  investigation of her?
9  A.  Yes.
10  Q.  Under what circumstances?
11  A.  I appeared in front of her.
12  Q.  While you were a prosecutor?
13  A.  Yes.
14  Q.  And do you remember when that was because I know you
15  were there for awhile.
16  A.  I know it was after 2001 and prior to 2008.
17  Q.  And had you ever met Judge James outside of that
18  context?
19  A.  I don't think so.
20  Q.  And I presume since you had met her that you are aware
21  she's African-American?
22  A.  Certainly.
23  Q.  After the JTC opened an investigation regarding
24  Judge James, did the JTC review any documents that it
25  had received?

---



MARGARET RYNIER
December 21, 2017

---

Page 37

1   A.   Once again are you talking about me or the Commission?
2   Q.   You.
3   A.   Yeah.
4   Q.   Were the documents reviewed -- were the documents
5        received by subpoena or just by the JTC requesting?
6   A.   Both.
7   Q.   And do you recall what documents were reviewed?
8   A.   I know there were checks that were received, I know
9        Miss McLemore's report was reviewed.  I know there was
10       some flight records reviewed.  Those three come to
11       mind.  I'm sure there were more but I don't recall.
12  Q.   Do you recall what the significance of the checks
13       were?
14            MS. MILLER:  I'm going to place an
15       objection because I believe that goes to her mental
16       impressions and work product.
17  Q.   I'm presuming you're going to object but I'll just
18       have you to ask the question.
19            Do you recall what the significance of what
20       -- am I pronouncing it correctly, McLemore?
21  A.   Charlene McLemore's.
22  Q.   Report was?
23            MS. MILLER:  Same objection.
24  BY MR. FISHER:
25  Q.   And how about the flight records?

---

Page 38

1            MS. MILLER:  Same objection.
2   BY MR. FISHER:
3   Q.   I presume with respect to requesting documents and
4        asking for interviews whether it was documents at the
5        22nd District Court or folks that worked at the 22nd
6        District Court that you or the JTC did not need to
7        issue subpoenas to those folks, is that correct?
8   A.   So, you've got a couple parts to it.  Are you talking
9        about interviews?  I didn't have to subpoena anybody
10       that I recall to interview the staff.
11            I don't recall having to issue a subpoena
12       for any records from the court, I don't believe so,
13       no.
14  Q.   And the reason I ask is you did say that subpoenas
15       were issued and I would just like to know who those
16       subpoenas were issued to.
17  A.   I can't remember.  I know there was a subpoena issued
18       for I think flight records.
19  Q.   Okay.  So, to the airline?
20  A.   Correct.
21            (Recess taken at 10:48 a.m. )
22            (Back on the record at 10:50 a.m.)
23  BY MR. FISHER:
24  Q.   Do you know when the formal complaint against
25       Judge James was filed?

---

Page 39

1   A.   I want to say at the end of 2011 but I know that the
2        formal hearing was in the first part of 2012, at least
3        that's my recall.  I can't give you the exact date.
4            MARKED FOR IDENTIFICATION:
5            DEPOSITION EXHIBIT 2
6            10:51 a.m.
7   BY MR. FISHER:
8   Q.   Do you see -- you have in front of you what's been
9        marked as Exhibit 2 which is the petition for interim
10       suspension, and I think there's a timestamp that says
11       October 29, 2012.
12            Do you see on the first page paragraph one
13       below the preamble it states that the Commission filed
14       formal complaint number 88 on a Wednesday, October 26,
15       2011?
16  A.   Yes.
17  Q.   Does that refresh your recollection on the exact date?
18  A.   My memory of the end of 2011, that's consistent, yeah.
19  Q.   I just wanted the date to be on here so we can
20       pinpoint it.
21            Do you know what investigation took place
22       between the time Judge James was placed on
23       administrative leave and October 26, 2011 which is
24       when the formal complaint was filed?
25  A.   What part of the investigation?  No, I can't tell you

---

Page 40

1        exactly what was done between those two dates and
2        again I don't know when she was placed on
3        administrative leave, so, unless you give me that
4        date, I can't answer.
5            (Discussion held off the record at
6            10:53 a.m.)
7            (Back on the record at 10:54 a.m.)
8   BY MR. FISHER:
9   Q.   Can you look at the first page of Exhibit 2 there's a
10       preamble that states towards the end, do you see it
11       states that Judge James was placed on administrative
12       leave as ordered by the Michigan Supreme Court on
13       April 14, 2011?
14  A.   Yes, I see it.
15  Q.   You have no reason --
16  A.   I have no reason to doubt that.
17  Q.   So, my question is before that date, were there any
18       investigations being conducted?
19  A.   I have no idea.
20            MS. MILLER:  When you say that date, at
21       that time you're referring to the April 14th?
22            MR. FISHER:  Correct.
23  BY MR. FISHER:
24  Q.   And I know you stated earlier that you had interviewed
25       some folks at the 22nd District Court, but did anybody

---



MARGARET RYNIER
December 21, 2017

## Page 41

1  else conduct any investigations or interviews with
2  folks?
3  **A.  From our office?**
4  Q.  Correct.
5  **A.  I don't believe so.**
6  Q.  How about other people outside of the JTC?
7  **A.  I wouldn't know.**
8  Q.  So, you guys don't hire private investigators?
9  **A.  No.**
10  Q.  And certainly with respect to Judge James'
11  investigation, there weren't other people besides
12  staff attorneys at the JTC going to the court and
13  questioning people or looking for things?
14  **A.  No.  Not that I know of, no.**
15  Q.  While you were -- strike that.
16       How many times did you go to the 22nd
17  District Court and not in your capacity as a
18  prosecutor, I mean with respect --
19  **A.  Obviously.  I'm guessing now but I would say two or
20  three.**
21  Q.  And when you went during those instances, did you ever
22  search for materials at the court that you were
23  interested in?
24  **A.  No.**
25  Q.  Did you ever ask for any materials that you were

## Page 42

1  interested in?
2  **A.  Sure.**
3  Q.  And what types of materials?
4  **A.  Like I said depending on the interview conversation, I
5  asked for calendars from Miss Anderson.  The rest I
6  can't tell you.**
7  Q.  And I know this might sound kind of silly to you
8  because you're familiar with the process but I'm just
9  trying to get a picture of how this works.
10       So, is it pretty informal when you visit a
11  courthouse to investigate or do you schedule the
12  meetings and say we're going to be in this room from
13  this time to this time or is it relatively informal?
14  **A.  It's up to each individual court.  We always provide
15  notice as a courtesy.  We want to disrupt their
16  proceedings as little as possible.  We ask when it
17  would be convenient.**
18       **Usually the court administrator gets back
19  with us as to what is convenient, who is going to be
20  in, if there are any times off that are scheduled, and
21  then we arrive and if they provide a room, that's
22  wonderful, otherwise like with Miss Anderson she gave
23  us her office, she left and I spoke, for example, to
24  Miss Nicole James.**
25  Q.  You testified that you had requested documents and

## Page 43

1  materials, but when you did that, was it the kind of
2  thing that they said hold on, let me go get that for
3  you or did they say --
4  **A.  It varied.**
5  Q.  It varied?  Both?
6  **A.  Both.**
7  Q.  And when it was the instance where they weren't able
8  to just grab it for you on the spot, did they give it
9  to you the next time you showed up or mailed in to
10  you?
11  **A.  Again it varied.**
12  Q.  Varied.
13  **A.  Please keep in mind we always try to accommodate the
14  court.  That's the policy under Mr. Fischer.  We don't
15  disrupt them.**
16  Q.  Right.  Did you search Judge James' former office?
17  **A.  No.**
18  Q.  Did you direct anybody to do that?
19  **A.  No.**
20  Q.  And do you know whether anybody directed anybody to
21  search Judge James' office?
22  **A.  No.**
23  Q.  Do you know whether Judge James' office was searched?
24  **A.  No, I don't know.**
25  Q.  Do you know whether there was a safe in Judge James'

## Page 44

1  office?
2  **A.  I don't believe it was in her office.**
3  Q.  Do you know whether there's a safe in the bathroom
4  that was associated with Judge James' office?
5  **A.  See, I don't know where that bathroom was.  I remember
6  walking past -- walking someplace with Miss Anderson
7  and her pointing to what she represented to be a safe.**
8  Q.  Do you know why she was pointing the safe out to you?
9  **A.  Because it was opened.**
10  Q.  This was at a time where the safe had already been
11  opened?
12  **A.  Correct.**
13  Q.  Did it look like it was broken into?
14  **A.  I never got that close.**
15  Q.  It was just opened?
16  **A.  Correct.  And when I looked, I'm not saying it was all
17  open.  That was the representation made to me and I
18  believe that I noticed that the door was not
19  completely shut.**
20  Q.  Were you interested in what was in the safe?
21  **A.  No.**
22  Q.  And you didn't ask whether some of the documents that
23  the JTC or yourself was interested in whether they
24  could be in the safe?
25  **A.  No.**



MARGARET RYNIER
December 21, 2017

## Page 45

1  Q.  And you're not aware whether items were removed from
2      her safe?
3  A.  I'm not aware of anything.
4  Q.  Do you know whether any documents obtained from
5      Judge James' office were used in connection with the
6      case against Judge James in front of the JTC?
7  A.  I'm sorry, say that again.
8  Q.  Do you know whether any documents that were obtained
9      from Judge James' office were used in connection with
10     the investigation or formal proceeding?
11 A.  I can't tell you at this point.
12 Q.  Do you know whether any documents that were obtained
13     from Judge James' safe were used in connection with
14     the investigation?
15 A.  Not to my knowledge, no.
16 Q.  How about any documents that were obtained just from
17     the 22nd District Court, were those used in connection
18     with the investigation or formal proceedings regarding
19     Judge James?
20 A.  I'm sure there were because I asked for docket sheets
21     and calendars and stuff like that, so, yes.
22 Q.  Did the JTC have any communications with anybody from
23     the Michigan Supreme Court Administrator's Office
24     regarding Judge James?
25 A.  Okay.  Again did I have any communications with SCAO,

## Page 46

1      yes.
2  Q.  Who would that be with?
3  A.  Deb Green, Charlene McLemore.
4  Q.  What were the nature of the conversations with Deb
5      Green?
6  A.  I actually don't recall those.  I recall more with
7      Miss McLemore than Miss Green.
8  Q.  What about with Miss McLemore?
9  A.  She had to explain her reports to me.  They were
10     accounting reports and I needed to make sure to
11     understand those.
12 Q.  And I ask the last few questions with respect to you,
13     but do you know whether commissioners would have had
14     any contact with SCAO?
15 A.  I would not know that.
16 Q.  You wouldn't know one way or the other?
17 A.  No.
18 Q.  Do you know whether commissioners ever contact people
19     in connection with investigations?
20 A.  Contact whom?
21 Q.  Anybody, I mean just -- you interview folks and make
22     phone calls or interview or talk to people.  Do you
23     know if commissioners ever do that in --
24 A.  I have no idea.
25 Q.  Did the JTC have any communications -- strike that.

## Page 47

1      Did the JTC have any communications with
2      David Jones regarding Judge James?
3  A.  Are you talking about the commissioners or me?
4  Q.  I'll parse it out in two ways.  When I say the JTC, I
5      want to know about the commissioners so I'm asking --
6  A.  I know nothing like that.
7  Q.  How about the JTC staff which would include you?
8  A.  I believe I had contact with Mr. Jones but I'm not
9      certain.
10 Q.  Do you know what it would have been about?
11 A.  Unless I would see the request for investigation, I
12     can't tell you at this point.
13 Q.  So, you think that if you did speak to him, it would
14     be in connection with the request for investigation
15     that he made against Judge James?
16 A.  Yes.
17 Q.  Did you or any other JTC staff member ever have any
18     communications with Hilliard Hampton regarding
19     Judge James?
20 A.  No.  No from me, and I don't know about anybody else,
21     but I doubt it.
22 Q.  I'll ask the same question with respect to
23     commissioners.
24 A.  Same answer.  I have no idea.
25 Q.  Did the JTC have any communication with anybody from

## Page 48

1      the City of Inkster regarding Judge James?
2  A.  And again are you asking me or the Commission?
3  Q.  Well, first with respect to you and then --
4  A.  Anybody from the city?
5  Q.  And that would include the City Council.
6  A.  Not that I recall from me, and I have no knowledge as
7      to the Commission.
8  Q.  Did the JTC have any communications -- I'll first ask
9      did you or any staff attorneys have any communications
10     with Judge Washington regarding Judge James?
11 A.  Yes, I met with him.
12 Q.  I'm sorry?
13 A.  I met with him.
14 Q.  And what was the nature of those communications?
15 A.  I don't recall but it related to the investigation.  I
16     don't remember the particulars now.
17 Q.  Are you aware that Judge Washington as chief judge had
18     been asked to perform some degree of investigation
19     regarding Judge James when he was serving --
20 A.  I don't recall that.
21 Q.  Do you know if any JTC commissioners had any
22     communications with Judge Washington?
23 A.  Not that I know of.
24 Q.  We just covered a decent amount of folks but are there
25     any other categories of people or organizations that



MARGARET RYNIER
December 21, 2017

---

**Page 49**

1    you or any other staff attorneys had communications

2    with regard Judge James?

3    **A.  I don't think so.**

4    Q.  And the same question as to commissioners.

5    **A.  I don't know.**

6    Q.  What did you do to prepare for this deposition today?

7    **A.  I called Jeanmarie.**

8    Q.  I don't want to hear about what you said to her.

9    **A.  Regarding the date and the time.  If you're asking did**

10   **I review any documents, no, I did not.**

11   Q.  Was this the first time you've been deposed?

12   **A.  No.**

13   Q.  And what other times have you been deposed?

14   **A.  I was deposed in the case of Mr. Fischer's, and I**

15   **don't remember whether I was deposed -- I testified**

16   **before but that was in court, not in a deposition.**

17   Q.  And aside from counsel, have you spoken to anybody

18   else about this case?

19   **A.  I spoke to Mr. Swastek after his deposition basically**

20   **asking why it took three-and-a-half hours or close to**

21   **it.  Nothing about details.  He had nothing to do with**

22   **the case itself, so --**

23   Q.  So, you were just talking to Mr. Swastek about how the

24   deposition went?

25   **A.  How it went.**

---

**Page 50**

1    Q.  Whether we were jerks?

2    **A.  Why it took three hours plus.  That's it.**

3    Q.  Well, I don't think yours will take three hours

4    because I have nothing else and I appreciate your

5    time.

6    **A.  Thank you.**

7        MR. FISHER:  Anybody else?

8        MS. MILLER:  I don't have any questions.

9        MS. TERPSMA:  I don't have any questions.

10       MS. WOJNAR-RAYCRAFT:  I have some follow-up

11   questions, but if I could take a little break to make

12   sure I don't repeat and organize them as efficiently

13   as possible.

14       (Recess taken at 11:08 a.m.)

15       (Back on the record at 11:14 a.m.)

16           EXAMINATION

17   BY MS. WOJNAR-RAYCRAFT:

18   Q.  Again I'm Melissa Raycraft from Mike Cox Law Firm.  I

19   represent Pam Anderson.

20       I tried to go through and cross off

21   questions I had related to Pam that Mr. Fisher already

22   covered.  We've got about 15 minutes maybe.

23       I think you said you had meetings at the

24   courthouse with Pam Anderson.

25   **A.  Yes.**

---

**Page 51**

1    Q.  Do you recall how many meetings you had with her?

2    **A.  I'm guessing two or three.**

3    Q.  Two or three?  Okay.

4    **A.  And I recall that I met with her I think during the**

5    **hearing.**

6    Q.  During the hearing.

7    **A.  But that's during the proceedings.**

8    Q.  For hearing preparation?

9    **A.  Yes, this hearing lasted six weeks.**

10   Q.  I've tried to wade through some of the transcript.

11   So, the two to three times that you went to the

12   courthouse for your investigation was Miss Anderson at

13   all of those meetings?

14   **A.  I believe so.**

15   Q.  Okay.  And I believe you testified that when you

16   called to set up the meetings, you would have been

17   setting them up through Pam Anderson as the court

18   administrator?

19   **A.  Yes.**

20   Q.  Okay.  Do you recall what dates you went to the

21   courthouse?  I'm sorry.  I'm going to ask and you can

22   say no.

23   **A.  No, I don't, I'm sorry.**

24   Q.  I can't recall last week but I'm going to ask the

25   question anyway.

---

**Page 52**

1       And I think one of the things that you said

2    you talked with Miss Anderson about was the community

3    service fund, the check requests for that, you went

4    over checks with Miss Anderson?

5    **A.  Yes, but keep in mind that I believe the checks came**

6    **from Miss McLemore.**

7    Q.  Okay.

8    **A.  I think she had all the checks already.**

9    Q.  Right.

10   **A.  Because she did her audit.**

11   Q.  Okay.

12   **A.  Did I discuss it with Pam, yeah, I think so.**

13   Q.  So, you testified you already had the checks from

14   Miss McLemore so you didn't get those from

15   Miss Anderson, but did you at one of your meetings go

16   over the checks with her in the check records maybe?

17   **A.  Each of the checks, no, I don't think so.**

18   Q.  Okay.  And did you go through the check request forms

19   with Miss Anderson if you recall?

20   **A.  I seem to have some recall of that but I can't be**

21   **certain.**

22   Q.  Okay.  Did you tell Miss Anderson that there was

23   anything improper about the checks or the check

24   requests?

25   **A.  You know, I don't express an opinion during an**



MARGARET RYNIER
December 21, 2017

## Page 53

1    investigation.
2    Q.   Okay.
3    A.   For the most part I just get information and get it
4         ready to present at a formal hearing because even
5         during the investigation there's always a focus on a
6         possibility of a formal hearing.  So, you always have
7         to focus on that.
8              So, I don't know.
9    Q.   Okay.  Did Miss Anderson tell you that she thought
10        there was anything improper about the checks?
11   A.   I don't recall.
12   Q.   And I think one of the other topics that you met with
13        Miss Anderson about were the calendars.
14   A.   I know in one of the conversations an issue came up
15        about calendars and the information that she
16        maintained in those calendars.
17   Q.   She being?
18   A.   Miss Anderson.
19   Q.   Okay.
20   A.   So, I asked for a copy of those calendars.
21   Q.   From Miss Anderson?
22   A.   Yes.
23   Q.   And did Miss Anderson give you --
24   A.   Yes.
25   Q.   Do you recall what years of the calendars that you

## Page 54

1    asked for?
2    A.   No, I'm sorry, I don't.
3    Q.   Okay.  Were they paper calendars or electronic
4         calendars?
5    A.   Oh, paper.
6    Q.   And was the purpose of reviewing the calendars
7         regarding Judge James' time off?
8    A.   I believe so but I'm not one hundred percent certain.
9    Q.   Would there have been another purpose to review the
10        calendars?
11   A.   Not that I recall.  Keep in mind I have not reviewed
12        anything in this case.
13   Q.   For this deposition?
14   A.   Correct.
15   Q.   Okay.  But for the hearing you probably did?
16   A.   Yes.
17   Q.   Okay.  Did you request that Miss Anderson put together
18        a summary regarding Judge James' attendance at court?
19   A.   I don't recall.
20   Q.   Okay.
21   A.   I may have but I'm not certain.
22   Q.   Okay.  And I think I already know the answer to this
23        question but I'm going to ask it anyways.  Did you
24        tell Miss Anderson that you thought there was a
25        problem with Judge James' time off?

## Page 55

1    A.   I don't recall whether I did or did not say that.  I
2         know that issue came up in the investigation.
3    Q.   Okay.  Did Miss Anderson tell you that she thought
4         there was a problem with the days off?
5    A.   I don't recall.
6    Q.   And did you discuss with Miss Anderson anything
7         regarding Judge James' reimbursement for travel
8         expenses?
9    A.   I don't know.
10   Q.   Okay.  Did Miss Anderson -- did you ask Miss Anderson
11        for any documents relating to travel expenses?
12   A.   I think I may have, but I can't tell you what exactly
13        I would ask for.
14   Q.   Okay.
15   A.   I simply have no memory.  It's been five years.  I
16        know there was an issue with regards to travel, yes,
17        but I can't tell you one way or the other.
18   Q.   Okay.  Did Miss Anderson tell you she thought there
19        was anything improper about the travel expenses?
20   A.   I don't recall.
21   Q.   Okay.  One of the other topics that you testified
22        earlier to today about, and I'm not quite sure, some
23        overriding in the computer, and I'm not sure what that
24        is.
25   A.   Yes, as I recall if someone was paying fines or fees,

## Page 56

1    court costs, there was a -- I want to say JIS computer
2    system or program, and I may be wrong on the letters
3    here but where it would automatically apportion the
4    payments into certain accounts.
5         There was some way to override it, and I
6    believe that there was some testimony and some
7    evidence that Judge James had requested that the
8    clerks override the program and funnel that money into
9    a separate account that was at the heart of the
10   investigation, part of the investigation.
11   Q.   Okay.  Did Miss Anderson provide you any information
12        on that part of your investigation about the
13        overriding the fines?
14   A.   I believe so but if you ask me exactly what she
15        provided, I could not tell you.
16   Q.   Then one of the other things you said you asked Miss
17        Anderson for docket sheets?
18   A.   I may have.
19   Q.   Okay.  And what was the purpose of asking?
20   A.   And again in terms of documents I can't tell you
21        whether I specifically did ask, but a lot of times I
22        will ask for docket sheets if there are specific cases
23        we are looking into.  I can't tell you what I asked
24        for specifically.
25   Q.   Do you recall if Miss Anderson provided you with the



MARGARET RYNIER
December 21, 2017

Page 57

1    docket sheets you asked for?
2    **A.   Whatever we requested she provided I believe to the**
3    **best of I believe her ability.**
4    **Q.   Was Miss Anderson cooperative during the**
5    **investigation?**
6    **A.   Yes.**
7    Q.   All right.  I have some questions about the infamous
8    safe again.
9        So, was the first time that you heard about
10   this safe was when you were walking through the
11   courthouse with Miss Anderson?
12   **A.   Yes.**
13   Q.   And it was one of the two to three times you were
14   there for your investigation?
15   **A.   Yes.**
16   Q.   And I believe you said that Miss Anderson pointed out
17   to you what was represented to be a safe, something
18   like that?
19   **A.   Yes, just walking past what I believe now to be the**
20   **bathroom that it was in.**
21   Q.   Okay.
22   **A.   I never entered, neither did she.**
23   Q.   Okay.  But Miss Anderson pointed it out to you?
24   **A.   Correct.**
25   Q.   And did it look like a safe?

Page 58

1    **A.   I mean it was kind of like a box.**
2    Q.   Okay.
3    **A.   I know there was almost like a doily on top of it and**
4    **I think there was -- as you were facing there was a**
5    **sink and it was to the right of the sink.  Is it a**
6    **traditional sink, no, I would say not.**
7    Q.   Somebody --
8    **A.   But I didn't look that close --**
9    Q.   Did you stop?
10   **A.   No.**
11   Q.   Okay.  So, you just kept on walking and Miss Anderson
12   said there's the safe, something like that?
13   **A.   No, there was some mention of -- this is not a quote.**
14   Q.   Right.
15   **A.   Miss Anderson making a comment that somebody did**
16   **something to the safe or somebody opened the safe or**
17   **the safe was opened, but it was clear that she had no**
18   **knowledge as to who and we just kept on walking.**
19   Q.   So, didn't even stop, just kept on walking?
20   **A.   No.**
21   Q.   Okay.  Do you recall after she made those comments
22   did you follow up with any questions about the safe
23   with her?
24   **A.   No, not that I recall.**
25   Q.   Okay.  I believe you testified that you noticed that

Page 59

1    it wasn't completely shut.
2    **A.   Correct.**
3    Q.   Okay.  And after that meeting at the courthouse, did
4    you ever follow up on any -- with Miss Anderson about
5    the safe at all after that?
6    **A.   I don't believe so, no.**
7    Q.   Okay.
8    **A.   Until the hearing when that issue came up.**
9    Q.   Okay.  And I'm not sure if I can this so I'm sure
10   you'll object.
11       When you were preparing for the hearing,
12   did you investigate any more about the safe?
13   **A.   No.**
14   Q.   Okay.
15   **A.   I mean the issue came during the hearing itself.**
16   Q.   During the hearing in the hearing.
17   **A.   Correct.**
18   Q.   But I was asking for like when you were preparing for
19   it.
20   **A.   No.**
21   Q.   Do you know if anybody had a key to the safe?
22   **A.   You are assuming there was a key.  I don't know how it**
23   **was opened.  I couldn't see whether it was a**
24   **combination or key.  I don't know.  Never got that**
25   **close.**

Page 60

1    Q.   All right.  To your knowledge do you know if Miss
2    Anderson had any way to open the safe?
3    **A.   Not that I know of.**
4    Q.   Do you know who opened the safe?
5    **A.   No.**
6    Q.   Do you know if any of the documents that you requested
7    from Miss Anderson for your investigation would have
8    been in the safe?
9    **A.   Not that I know of.**
10   Q.   Do you know what ended up -- do you know what ended up
11   happening with the safe?
12   **A.   No.**
13   Q.   Okay.
14       MS. WOJNAR-RAYCRAFT:  I think that's all I
15   have.  Yep.  That's it.  I'm done.
16       MR. FISHER:  I'm done.
17       MS. MILLER:  Do you have anything?
18       MS. TERPSMA:  No.
19       (The deposition was concluded at 11:29 a.m.
20       Signature of the witness was not requested by
21       counsel for the respective parties hereto.)
22
23
24
25



MARGARET RYNIER
December 21, 2017

Page 61

1          CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN )
3              ) SS
4    COUNTY OF WAYNE)
5
6          I, Nora Morrissy, certify that this
7    deposition was taken before me on the date
8    hereinbefore set forth: that the foregoing questions
9    and answers were recorded by me stenographically and
10   reduced to computer transcription: that this is a
11   true, full and correct transcript of my stenographic
12   notes so taken; and that I am not related to, nor of
13   counsel to, either party nor interested in the event
14   of this cause.
15
16
17
18
19
20
21
22          Nora Morrissy, CSR-2642
23          Notary Public,
24          Wayne, County, Michigan.
25   My Commission expires: 9-13-19



MARGARET RYNIER
December 21, 2017

Page 62

---

**A**

**a.m** 1:17 5:3
14:11 38:21,22
39:6 40:6,7
50:14,15 60:19
**ABA** 7:22,22,24
8:2
**ability** 57:3
**able** 43:7
**access** 19:16
**accessing** 20:2
**accommodate** 43:13
**account** 35:19
56:9
**accounting** 46:10
**accounts** 56:4
**act** 19:4
**action** 33:17
34:15
**actual** 14:23
15:5 20:17
25:20
**additionals** 22:11
**address** 34:11
**administrative** 14:17 15:19
16:10,19 18:19
19:3,11 39:23
40:3,11
**administrator** 14:16 16:22
21:1 42:18
51:18
**Administrator's** 45:23
**adopt** 11:17
12:5,8

**affiliation** 8:5
**African-Amer...** 36:21
**ago** 21:25
**agreement** 32:5
**airline** 38:19
**al** 1:9
**allegations** 21:6
21:7,8 33:11
34:22
**alleged** 28:21
29:24 30:16
31:14
**allowing** 21:11
**ALLYSON** 3:1
**American** 7:20
**amount** 48:24
**Anderson** 3:15
20:6 21:18,24
22:5,20 23:7
23:12 42:5,22
44:6 50:19,24
51:12,17 52:2
52:4,15,19,22
53:9,13,18,21
53:23 54:17,24
55:3,6,10,10
55:18 56:11,17
56:25 57:4,11
57:16,23 58:11
58:15 59:4
60:2,7
**Anderson's** 22:20
**answer** 5:19,20
6:2,8 8:16 40:4
47:24 54:22
**answered** 20:12
**answering** 6:23
20:7,14

**answers** 5:16
25:1 61:9
**anybody** 20:19
33:1 38:9
40:25 43:18,20
43:20 45:22
46:21 47:20,25
48:4 49:17
50:7 59:21
**anymore** 8:13
13:24
**anyway** 51:25
**anyways** 54:23
**APPEARAN...** 2:1
**appeared** 30:8,9
36:11
**Appearing** 2:10
2:20 3:7,15
**applies** 6:3
**appointed** 19:4
**apportion** 56:3
**appreciate** 50:4
**appropriate** 27:8
**approval** 25:14
27:17
**approve** 27:22
**approved** 13:16
27:19 28:19
**April** 40:13,21
**area** 10:17
**argue** 12:7
**arguing** 11:16
**arrive** 42:21
**article** 18:13
33:22 35:15
**articles** 31:2,4
31:16,22 33:12
33:18 34:22

35:4,5,14,16
**aside** 49:17
**asked** 20:1,9
23:9 33:24
42:5 45:20
48:18 53:20
54:1 56:16,23
57:1
**asking** 5:15 21:3
26:22 30:19
33:7,21 34:2
38:4 47:5 48:2
49:9,20 56:19
59:18
**assigned** 20:16
**Assistant** 2:13
**associate** 10:10
10:15,20,21
11:1
**associated** 44:4
**Association** 7:20
7:20
**associations** 7:19
**assuming** 32:25
59:22
**aterpsma@w...** 3:6
**attached** 4:14
**attempt** 23:14
**attempts** 24:12
**attendance** 54:18
**attention** 31:6
31:10
**attorney** 2:13,15
9:3,4,17,20,20
9:22 13:24
17:13,17,19
18:1,13,14

20:16,21,22
25:24 26:2
36:4
**attorney-client** 27:3,14 29:3
**attorneys** 5:11
10:10,18,19
17:6 24:17
26:12,13,22,25
31:6 32:14,16
32:23,24 33:17
34:5 41:12
48:9 49:1
**audit** 15:1 52:10
**authority** 17:23
21:3,4
**authorizes** 10:3
10:4
**automatically** 56:3
**aware** 14:1
16:18 18:13
30:15 32:18,19
32:20,22 33:1
33:22 34:8,12
34:21 36:20
45:1,3 48:17
**awhile** 36:15

---

**B**

**back** 38:22 40:7
42:18 50:15
**background** 6:25
**Bar** 7:20,20
**barred** 13:20
**Barron** 35:8
**based** 31:2
33:17
**basically** 49:19



MARGARET RYNIER
December 21, 2017

Page 63

basis 32:3
bathroom 44:3
  44:5 57:20
began 12:17
behalf 2:10,20
  3:7,15
believe 7:21
  10:17 15:10
  19:12 22:16,17
  23:6,16,23
  24:7 27:3,7,13
  29:1,9 30:12
  30:23 33:18,19
  35:6,16 37:15
  38:12 41:5
  44:2,18 47:8
  51:14,15 52:5
  54:8 56:6,14
  57:2,3,16,19
  58:25 59:6
believed 27:10
bell 15:13
best 22:10,24
  57:3
beyond 12:14
  20:8
Birmingham
  2:7
birth 6:22
Borman 1:8
Boulevard 1:15
box 58:1
break 6:11,14
  50:11
brief 11:14
  18:15 26:6,9
  26:11 35:22
  36:3
briefs 11:6,8,9,9
  11:11,12

Broadcast 7:12
broke 13:5
broken 44:13
Brown 29:10
  35:18 36:5
Byron 35:13

### C

C 35:13
calendars 23:9
  42:5 45:21
  53:13,15,16,20
  53:25 54:3,4,6
  54:10
call 9:11
called 5:6 49:7
  51:16
calls 46:22
capacity 11:1
  41:17
case 1:7 10:22
  14:4 23:15
  29:17 45:6
  49:14,18,22
  54:12
cases 10:3,5
  24:3,8 56:22
categories 48:25
cause 61:14
certain 20:10
  23:23 47:9
  52:21 54:8,21
  56:4
certainly 36:22
  41:10
CERTIFICA...
  61:1
certify 61:6
chance 22:21
changes 27:24

Charlene 37:21
  46:3
check 52:3,16
  52:18,23
checks 23:11
  37:8,12 52:4,5
  52:8,13,16,17
  52:23 53:10
chief 19:4 48:17
choosing 10:21
circumstances
  35:7 36:4,10
city 13:24 48:1,4
  48:5
Civil 5:14
clarify 5:25
  23:22
clear 19:25
  23:18 34:3
  58:17
clearly 25:13
clerked 8:12
clerks 21:21
  23:1 56:8
clerkship 7:7
  8:18
close 12:17
  19:12 44:14
  49:20 58:8
  59:25
closed 25:12,15
  25:17 33:2
college 7:4,5,9
  8:8,9,9
combination
  59:24
come 23:23,25
  30:7 37:10
comes 17:22
  26:15

Commencing
  1:17
comment 58:15
comments 10:1
  58:21
Commission
  8:23 9:2,7,12
  10:1,2,4 11:9
  11:12,14,16,24
  12:5 13:17
  16:13,14 17:3
  17:11,22,23
  18:1,4,15 21:3
  24:24 25:7,18
  26:9,10 27:19
  27:20,22 28:18
  28:19 32:16,18
  33:3 35:3,23
  36:3 37:1
  39:13 48:2,7
  61:25
commissioners
  17:16 25:11
  33:6 34:4,5
  46:13,18,23
  47:3,5,23
  48:21 49:4
committed
  30:17
Committee 7:24
  8:2
committees 7:22
communication
  47:25
communicatio...
  45:22,25 46:25
  47:1,18 48:8,9
  48:14,22 49:1
community 22:2
  52:2

compare 29:6
  29:23
compared 28:22
complaint 12:21
  15:25 23:15,20
  23:24,25 24:2
  24:4,13 27:17
  27:23,23 28:4
  28:5,8,9,15,20
  29:5 30:1 32:1
  32:9 35:20
  36:1 38:24
  39:14,24
complaints 10:2
  28:23 29:7
complete 8:7,10
completed 6:7
completely
  44:19 59:1
computer 22:8
  55:23 56:1
  61:10
concluded 60:19
conclusions
  11:15,21 12:3
conduct 28:22
  28:22 29:6,8
  29:24,24 41:1
conducted 15:1
  33:20 40:18
conducting
  33:19
confidential
  30:23
connection
  24:20 45:5,9
  45:13,17 46:19
  47:14
consider 28:21
  36:5



MARGARET RYNIER
December 21, 2017

Page 64

consideration 29:19 35:25
considered 29:12,15,16,21 29:22
considering 16:25 29:5
consistent 39:18
contact 46:14,18 46:20 47:8
content 35:4
CONTENTS 4:1
context 36:18
contrary 30:23
controlled 19:16
convenient 42:17,19
conversation 42:4
conversations 21:23 22:15 46:4 53:14
cooperate 20:7
cooperated 19:20
cooperative 57:4
copies 23:10
copy 53:20
correct 7:14 8:25 9:21 11:20 14:3 15:6 16:4 17:4 17:10,12 18:17 19:21 25:5,19 38:7,20 40:22 41:4 44:12,16 54:14 57:24 59:2,17 61:11

correctly 37:20
costs 22:9 56:1
Council 48:5
counsel 49:17 60:21 61:13
County 7:7 8:18 8:19,22 61:4 61:24
couple 38:8
course 9:13 35:21
court 1:1 5:20 6:2 11:8,10,13 11:18 12:2,6,7 14:16,17 16:22 18:19,21,22,24 19:5 20:25 24:25 30:5,9 33:13,20 35:9 38:5,6,12 40:12,25 41:12 41:17,22 42:14 42:18 43:14 45:17,23 49:16 51:17 54:18 56:1
courtesy 42:15
courthouse 13:20 20:10 21:11 23:5 42:11 50:24 51:12,21 57:11 59:3
cover 35:23
covered 33:18 36:3 48:24 50:22
Cox 3:10 50:18
cross 50:20
CSR-2642 1:19

61:22
cut 6:4

**D**

date 6:22 39:3 39:17,19 40:4 40:17,20 49:9 61:7
dates 40:1 51:20
David 15:12 35:11 47:2
day 19:13
days 25:22,22 26:3 55:4
deal 23:19
Deb 46:3,4
Deborah 14:7 14:15,21 16:3 16:6
December 1:18 5:2
decent 48:24
decide 17:6,25 18:7
decided 29:25
deciding 35:19
decision 11:17
Defendant 2:20 3:7,15
defendants 1:10 22:10
degree 7:13 48:18
degrees 7:17
deliberating 18:5
deliberations 17:5
Department 2:15

depending 42:4
deposed 49:11 49:13,14,15
deposition 1:14 4:16,17 5:12 14:10 39:5 49:6,16,19,24 54:13 60:19 61:7
describe 7:3 8:7 9:22 10:25 20:23
designations 9:19
detail 12:16
details 24:8,9 49:21
determine 11:24
determining 28:20 35:25
Detroit 1:16 5:1 7:10,16
difference 11:23
differences 11:11
different 9:18 11:19 23:2 32:19 33:23
direct 43:18
directed 43:20
director 9:14 20:22 24:19 25:6,8,11,14 25:18,25 26:11 26:14,17 28:2 28:13
discipline 7:25 24:19,19 25:7 25:21,21 27:7
disclosed 32:8

discovery 30:24 32:6
discuss 24:22 25:2 32:2 52:12 55:6
discussed 25:24
discussing 26:25
discussion 26:6 27:14 40:5
discussions 22:13 23:4 27:1 33:2
disrupt 42:15 43:15
District 1:1,2 19:5 30:5 35:8 38:5,6 40:25 41:17 45:17
divide 10:18
DIVISION 1:3
docket 23:10 45:20 56:17,22 57:1
document 26:23
documents 20:10 23:5,8 36:24 37:4,4,7 38:3,4 42:25 44:22 45:4,8 45:12,16 49:10 55:11 56:20 60:6
doily 58:3
door 44:18
doors 25:12,15 25:17 33:2
doubt 40:16 47:21
drafted 26:12,13
Drive 3:11



US LEGAL SUPPORT
The Power of Commitment™

MARGARET RYNIER
December 21, 2017

Page 65

**duly** 5:7
**duties** 9:22

**E**

**earlier** 40:24
  55:22
**easier** 8:11
**EASTERN** 1:2
**education** 7:3
**efficiently** 50:12
**egregious** 18:13
**eight** 10:17
**either** 11:8 13:3
  26:7 27:11
  61:11
**electronic** 54:3
**employment** 8:7
**ended** 60:10,10
**enter** 21:11
**entered** 30:24
  32:10 33:14
  57:22
**entering** 13:20
  22:9
**et** 1:9
**evaluating** 21:1
**evenly** 10:20
**event** 61:13
**events** 16:16
**everybody** 34:6
**evidence** 10:7
  11:4 21:1,2,5
  56:7
**exact** 39:3,17
**exactly** 40:1
  55:12 56:14
**EXAMINATI...**
  4:6,8 6:16
  50:16
**examined** 5:9

**examiner** 10:16
  10:22 11:2
**examiners** 10:10
  10:20
**example** 18:11
  25:7,22 42:23
**exams** 30:12
**executive** 9:14
  20:22 24:18
  25:6,8,11,14
  25:17,24 26:11
  26:14,16 28:2
  28:13
**Exhibit** 4:13,16
  4:17 14:10,13
  39:5,9 40:9
**Exhibits** 4:11,14
**existing** 16:7
**exists** 8:1,4
  26:24
**expenditures**
  22:1
**expenses** 22:1
  55:8,11,19
**expires** 61:25
**explain** 46:9
**express** 52:25
**extent** 19:23

**F**

**facing** 58:4
**fact** 11:6,15,21
  27:23
**factors** 29:10,20
  35:19,23,24
  36:5
**facts** 12:3 29:16
**faint** 15:3 16:5
**fair** 19:15 28:14
  32:17,23

**familiar** 7:24
  8:1 12:9 29:10
  30:3 42:8
**far** 7:22 10:18
  20:2 26:25
  27:6
**Federal** 5:14
**fees** 55:25
**file** 15:8 27:17
  28:20 29:5,25
**filed** 11:7 13:4,5
  13:7,17,23
  14:6,21,25
  15:4,12 16:3,5
  16:8,13 17:24
  24:4,4,13 28:8
  28:15,23 36:1
  38:25 39:13,24
**filing** 16:11
  23:15,19
**filled** 15:10
**financial** 21:7,8
  29:17
**finding** 11:6,21
  12:3 23:5
**findings** 11:15
  11:20
**fine** 23:2
**fines** 22:9 55:25
  56:13
**finish** 6:1,9,12
**firm** 3:10 8:13
  50:18
**first** 5:7 13:1,6
  13:17,22 39:2
  39:12 40:9
  48:3,8 49:11
  57:9
**Fischer** 3:7,18
  6:23 9:10,14

  14:14 27:6
  28:2 43:14
**Fischer's** 49:14
**Fisher** 2:3 4:7
  5:10,10,19,24
  6:6,17 7:2
  14:12 22:12
  27:5,16 29:4
  30:25 32:3,11
  32:13 33:9,24
  34:2,9,13,14
  37:24 38:2,23
  39:7 40:8,22
  40:23 50:7,21
  60:16
**five** 21:13,25
  55:15
**flight** 37:10,25
  38:18
**Floor** 2:16
**focus** 53:5,7
**folks** 17:9 38:5,7
  40:25 41:2
  46:21 48:24
**follow** 18:10
  58:22 59:4
**follow-up** 50:10
**following** 21:4
**follows** 5:9
**foregoing** 61:8
**form** 15:5,8,10
  27:7
**formal** 7:3 10:2
  10:3,11,23
  11:2,3,7 12:20
  15:25 23:15,19
  23:24,25 24:2
  24:4,13 25:4
  26:15,23,24
  27:17,22,23

  28:4,5,8,8,15
  28:20,23 29:5
  29:7 30:1,21
  30:22 32:1,9
  35:20 36:1
  38:24 39:2,14
  39:24 45:10,18
  53:4,6
**former** 43:16
**forms** 52:18
**forth** 61:8
**forward** 7:4
**found** 18:14
**frame** 16:12
**free** 12:7
**front** 30:8,9
  36:11 39:8
  45:6
**full** 6:18 61:11
**fund** 52:3
**funnel** 56:8
**further** 21:3

**G**

**game** 21:15
**gathered** 21:5,6
  21:9
**gathering** 21:1
**general** 2:13,15
  29:6,21
**gentleman**
  13:19
**give** 17:23 39:3
  40:3 43:8
  53:23
**given** 5:16 10:22
**go** 7:9,15 10:18
  11:11,12 18:1
  18:4 26:10
  27:13 41:16



MARGARET RYNIER
December 21, 2017

Page 66

43:2 50:20
52:15,18
**goes** 7:22 25:15
26:8 27:6 29:1
37:15
**going** 7:4 8:8
10:19,21 17:7
17:14 27:2,12
28:25 30:18
31:24 33:8
37:14,17 41:12
42:12,19 51:21
51:24 54:23
**good** 6:4
**grab** 43:8
**graduate** 7:17
**graduated** 7:5,6
8:8
**Grand** 1:15 3:4
**granted** 28:18
**Green** 14:7,15
14:21 16:3,6
46:3,5,7
**grievance** 13:10
13:17,23 14:2
15:5,7,8,14,18
15:21 16:3,8
17:16
**grievances**
13:14 17:2,8
**grievant** 14:23
**guess** 14:19
31:12,13
**guessing** 41:19
51:2
**guys** 41:8

**H**
**H** 35:13,13
**Hampton** 1:9

47:18
**handing** 14:13
**happen** 14:4
26:5
**happened** 18:12
19:9,10,11
30:20
**happening** 19:8
60:11
**happens** 25:20
**hear** 49:8
**heard** 13:1 35:3
57:9
**hearing** 10:8
11:3,7 26:15
26:18,19,20,24
31:16 39:2
51:5,6,8,9 53:4
53:6 54:15
59:8,11,15,16
59:16
**hearings** 10:4,5
10:24
**heart** 56:9
**held** 40:5
**hereinbefore**
61:8
**hereto** 60:21
**Hilliard** 1:9
47:18
**hindsight** 19:7
**hire** 41:8
**hired** 9:6,9,10
9:15 10:23
**history** 8:8
**hit** 31:7
**hold** 43:2
**Hon** 1:8
**hours** 49:20
50:2,3

**hundred** 12:15
54:8

**I**
**idea** 16:24 19:1
24:15 40:19
46:24 47:24
**IDENTIFICA...**
14:9 39:4
**imagine** 15:17
**imposed** 22:9
**impressions**
29:2 37:16
**improper** 52:23
53:10 55:19
**improprieties**
29:17
**impropriety**
21:8
**include** 32:22
35:6 47:7 48:5
**included** 21:9
**includes** 32:16
**including** 32:14
**increases** 22:18
**Independence**
8:3
**independent**
17:15
**independently**
16:25 17:7,21
**indicated** 13:14
**individual** 9:8
42:14
**infamous** 57:7
**informal** 42:10
42:13
**information**
20:2,5,5 21:6
30:19 33:11

53:3,15 56:11
**Initials** 6:21
**initiated** 13:15
**Inkster** 48:1
**insofar** 30:19
31:25 33:15
**instance** 13:1
43:7
**instances** 26:2
41:21
**interested** 41:23
42:1 44:20,23
61:13
**interim** 19:4,17
39:9
**interrupt** 6:7
**interview** 38:10
42:4 46:21,22
**interviewed** 9:8
40:24
**interviewing**
9:25 20:25
21:17
**interviews** 38:4
38:9 41:1
**investigate**
20:16 42:11
59:12
**investigating**
9:23 12:11
24:21
**investigation**
9:23 12:13,16
12:23 13:2,4,5
13:7,8,11,13
13:15,16 14:2
14:6,22,24
15:9,11,24
16:21 17:1,8
17:15,21,24

18:2,25 19:21
19:24 20:3,17
20:23 21:4,9
31:2 36:8,23
39:21,25 41:11
45:10,14,18
47:11,14 48:15
48:18 51:12
53:1,5 55:2
56:10,10,12
57:5,14 60:7
**investigations**
9:24,24 15:23
32:7 33:19
40:18 41:1
46:19
**investigators**
41:8
**involved** 19:24
29:17
**issue** 22:18
23:11 38:7,11
53:14 55:2,16
59:8,15
**issued** 38:15,16
38:17
**items** 45:1

**J**
**James** 1:5 12:9
12:12,21,23
13:2,15 15:18
15:24 16:10,18
17:1 18:18
19:2,2,21,24
20:3,17 22:6
22:16,17,19
24:13 26:17
27:6,9,18 28:7
28:16,21 31:21



34:23 35:25
36:7,17,24
38:25 39:22
40:11 42:24
45:6,19,24
47:2,15,19
48:1,10,19
49:2 56:7
**James'** 14:4
  19:16 21:20
  22:15 29:24
  41:10 43:16,21
  43:23,25 44:4
  45:5,9,13 54:7
  54:18,25 55:7
**January** 8:21
**Jeanmarie** 2:12
  49:7
**jeans** 13:21
**jerks** 50:1
**jfisher@morg...**
  2:9
**JIS** 56:1
**Jones** 15:12 47:2
  47:8
**Jones'** 15:14,18
  15:21
**Joshua** 2:3 5:10
**JTC** 9:6,11
  10:18 12:11,18
  12:20 14:1
  15:23 16:9,9
  16:25 17:7,14
  17:20 18:25
  23:14,19 28:23
  29:6,25 30:15
  31:1,6,10,13
  32:14,15,22,25
  33:5,11,16
  34:1,3,3,15

35:18 36:23,24
37:5 38:6 41:6
41:12 44:23
45:6,22 46:25
47:1,4,7,17,25
48:8,21
**JTC's** 12:23
  19:20 31:23
  36:7
**Judd** 3:2
**judge** 12:9,12,21
  12:23 13:2,15
  14:4 15:18,24
  16:10,18 17:1
  18:18 19:2,2,3
  19:4,15,16,19
  19:20,21,23,24
  20:1,3,6,9,12
  20:14,17 21:19
  21:20 22:6,13
  22:15,24 23:4
  24:3,13,20
  25:9 26:4,17
  27:6,9,18 28:7
  28:16,21 29:24
  30:3,4,17 31:5
  31:17,21 32:9
  34:23,25 35:11
  35:13,16,25
  36:7,17,24
  38:25 39:22
  40:11 41:10
  43:16,21,23,25
  44:4 45:5,6,9
  45:13,19,24
  47:2,15,19
  48:1,10,10,17
  48:17,19,22
  49:2 54:7,18
  54:25 55:7

56:7
**judges** 10:2
  28:22 29:7,25
  33:12 35:6,7
**judges'** 32:7
**judicial** 7:7 8:2
  8:17,23 9:1,11
  32:6
**June** 14:14

_____

### K

**K** 35:13
**Kandrevas**
  31:21 34:23
**keep** 16:11
  21:13 25:10
  43:13 52:5
  54:11
**kept** 58:11,18,19
**key** 59:21,22,24
**Kimberly** 35:8
**kind** 22:1 25:23
  26:22 42:7
  43:1 58:1
**knew** 16:1 22:2
**know** 6:8,12,13
  8:1,4,10,17
  9:11 13:8,14
  13:19,19,22,23
  14:6,20,24
  15:11,23 16:2
  16:25 17:5,14
  17:19 18:18,24
  19:2,6,7,7,8,10
  19:12,15,23
  20:1,9,11
  21:18,19,19
  23:11 24:3,12
  25:1 27:11,17
  28:4,7 29:16

29:16 30:6
31:7,10,15
32:18,20 33:1
34:13,15 35:4
35:24 36:2,6
36:14,16 37:8
37:8,9 38:15
38:17,24 39:1
39:21 40:2,24
41:7,14 42:7
43:20,23,24,25
44:3,5,8 45:4,8
45:12 46:13,15
46:16,18,23
47:5,6,10,20
48:21,23 49:5
52:25 53:8,14
54:22 55:2,9
55:16 58:3
59:21,22,24
60:1,3,4,6,9,10
60:10
**knowledge**
  19:18 27:11
  45:15 48:6
  58:18 60:1
**Konschuh** 35:13
  35:17

_____

### L

**Lansing** 2:17
**lasted** 51:9
**Laurel** 3:11
**law** 3:10 7:5,15
  8:11,12,17
  11:15,22 12:3
  50:18
**lawyers** 25:3
**learn** 30:7
**learning** 31:13

**leave** 15:19
  16:10,19 18:19
  19:3,11 39:23
  40:3,12
**led** 15:25
**left** 22:20 42:23
**lesser** 27:7
**letter** 14:14 27:8
**letters** 56:2
**level** 32:1,8
**liberty** 32:2
**lieu** 23:19
**limited** 32:25
**limiting** 33:8
**line** 6:12
**little** 42:16
  50:11
**Livonia** 3:12
**LLP** 3:2
**long** 8:19 16:15
**longer** 21:20
**look** 14:20 20:9
  40:9 44:13
  57:25 58:8
**looked** 44:16
**looking** 31:13
  41:13 56:23
**lot** 23:8 56:21
**Lyon** 3:3

_____

### M

**mailed** 43:9
**main** 29:14
**maintained**
  53:16
**maintaining**
  23:9
**major** 7:11
  29:18
**making** 58:15



MARGARET RYNIER
December 21, 2017

Page 68

management 7:12
Marc 35:8
March 7:1
Margaret 1:14 4:4 5:5,13 6:19
Mark 31:17
marked 14:9,13 39:4,9
Mary 30:3
master 10:8 11:4,19,21,23 12:1,2
master's 11:15
materials 41:22 41:25 42:3 43:1
matter 5:11 29:8
McLemore 15:1 23:13 37:20 46:3,7,8 52:6 52:14
McLemore's 37:9,21
mean 8:12,16 9:11 12:15,25 13:11 17:3 18:4,21 19:25 21:11 22:5,6 23:18,22 24:20 25:3 27:20 41:18 46:21 58:1 59:15
media 18:13 31:2,4,15,16 33:12 34:22 35:15,16
meeting 20:25 22:19 59:3
meetings 21:18

42:12 50:23 51:1,13,16 52:15
meets 25:11
Melissa 3:9 50:18
member 7:19 47:17
memo 18:15
memory 15:2,3 15:20 16:5,7 16:11 21:15 39:18 55:15
mental 29:2 37:15
mention 58:13
met 21:19,19 36:7,17,20 48:11,13 51:4 53:12
Michigan 1:2,16 2:7,14,17 3:4 3:12 5:1 7:20 14:16 18:21,24 40:12 45:23 61:2,24
middle 6:20
Mike 3:10 50:18
Miller 2:12 6:25 27:2,12 28:25 30:18 31:24 32:5 33:15,25 34:7,10,16 37:14,23 38:1 40:20 50:8 60:17
millerJ51@mi... 2:19
mind 16:11 21:13 25:10

37:11 43:13 52:5 54:11
minutes 50:22
misconduct 30:16
missing 21:12
money 56:8
months 25:23
Morganroth 2:4 2:4
Morrissy 1:19 61:6,22
motions 11:7
mraycraft@m... 3:14

_____

**N**

N 35:13
name 5:10 6:18 6:20 13:24 21:20 22:16
names 8:13 32:7 32:7
nature 15:21 20:13,23 21:23 23:21 27:1 46:4 48:14
need 6:11 16:22 38:6
needed 46:10
negotiations 24:7
neither 57:22
never 18:4 44:14 57:22 59:24
news 13:3,5 31:22 33:17,22
Newspaper 35:14
Nicole 22:16,17

22:19,21 42:24
niece 21:20 22:15
Nora 1:19 61:6 61:22
Norcross 3:2
North 2:5 3:11
Notary 61:1,23
notes 61:12
notice 5:13 42:15
noticed 44:18 58:25
notified 18:24
notify 17:17
NS 6:21
number 28:9 39:14
NW 3:3

_____

**O**

O 35:13
oath 5:16 16:23
object 27:2,12 37:17 59:10
objected 34:16
objecting 33:10
objection 29:1 30:19 31:25 32:4 33:9,13 37:15,23 38:1
obtain 23:12
obtained 45:4,8 45:12,16
Obviously 41:19
occurs 24:10
October 39:11 39:14,23
office 7:8 8:18 8:20,22 14:17

22:20 26:21 30:6 31:8,23 41:3 42:23 43:16,21,23 44:1,2,4 45:5,9 45:23
oh 9:10 19:9 21:15 25:2 30:9,13 54:5
okay 6:5,15,25 7:17 8:19 9:13 10:25 12:4 15:11 17:13 18:1,6,9 20:19 24:6 25:10 27:6 30:9 31:9 38:19 45:25 51:3,15,20 52:7,11,18,22 53:2,9,19 54:3 54:15,17,20,22 55:3,10,14,18 55:21 56:11,19 57:21,23 58:2 58:11,21,25 59:3,7,9,14 60:13
Old 2:5
once 11:16 20:17 26:21 37:1
ones 24:24
open 14:1 15:9 17:7,14,14,25 18:2,8 31:1 44:17 60:2
opened 18:25 20:17 36:23 44:9,11,15 58:16,17 59:23



MARGARET RYNIER
December 21, 2017

Page 69

60:4
**opening** 17:1,21
**opinion** 52:25
**order** 30:24 32:9
33:13,20
**ordered** 40:12
**organizations**
48:25
**organize** 50:12
**Ottawa** 2:16
**outside** 36:17
41:6
**override** 56:5,8
**overriding** 22:8
55:23 56:13

**P**

**page** 4:3,13
39:12 40:9
**pair** 13:21
**Pam** 21:18 22:5
50:19,21,24
51:17 52:12
**Pam'** 22:19
**paper** 54:3,5
**paragraph**
39:12
**Park** 3:11
**parse** 23:1 47:4
**part** 39:2,25
53:3 56:10,12
**particulars**
48:16
**parties** 60:21
**parts** 38:8
**party** 61:13
**Paul** 1:8 3:18
14:14
**pay** 22:18
**paying** 55:25

**payments** 56:4
**people** 21:11
23:2 41:6,11
41:13 46:18,22
48:25
**percent** 12:15
54:8
**perform** 48:18
**period** 16:15
**permit** 6:8
**personally** 30:4
33:22 34:12
**petition** 39:9
**phone** 46:22
**picture** 42:9
**pinpoint** 39:20
**place** 28:25
30:18 31:25
37:14 39:21
**placed** 15:19
16:10,18 18:18
19:3,11 39:22
40:2,11
**plaintiff** 1:6
2:10 5:11
**please** 8:7 16:11
21:13 43:13
**PLLC** 2:4 3:10
**plus** 50:2
**point** 21:13
22:11 26:18
35:1,2 45:11
47:12
**pointed** 57:16
57:23
**pointing** 44:7,8
**policies** 21:10
**policy** 43:14
**position** 9:1
11:17 12:7

**possibility** 53:6
**possible** 42:16
50:13
**potential** 30:16
31:14
**potentially** 29:2
**Powers** 24:3
**practice** 29:8
**preamble** 39:13
40:10
**predicament**
22:23
**prefacing** 32:21
34:1
**preliminary**
30:12
**preparation**
9:25 11:5 51:8
**prepare** 10:5
49:6
**preparing** 11:3
35:22 59:11,18
**present** 3:17
10:7 11:17
18:7,14 53:4
**presentation**
11:4 16:12
**presented** 16:9
16:13 27:24
**presenting** 21:2
**press** 31:7
**presume** 9:14
10:13 36:20
38:3
**presuming**
37:17
**pretty** 6:10
10:20 42:10
**previously**
28:24

**primarily** 20:24
**prior** 15:24
26:24 29:6
30:24 36:7,16
**private** 41:8
**privilege** 27:4
27:14
**privileged** 29:3
**privy** 17:5
**probably** 54:15
**problem** 54:25
55:4
**Procedure** 5:14
**procedures**
21:10
**proceeding**
30:21 45:10
**proceedings**
10:11 11:2
30:22 42:16
45:18 51:7
**process** 17:20
42:8
**product** 27:3,13
29:1 37:16
**professional**
7:19,25
**program** 22:2,7
56:2,8
**prohibited**
13:20
**promotions**
22:18
**pronouncing**
37:20
**proposed** 11:5
27:23 28:5
**prosecutor**
30:14 36:12
41:18

**Prosecutor's** 7:8
8:18,20,22
30:5 31:8
**provide** 26:16
42:14,21 56:11
**provided** 56:15
56:25 57:2
**Public** 61:23
**purpose** 54:6,9
56:19
**pursuant** 5:13
**pursuing** 12:20
**put** 54:17

**Q**

**question** 5:25
6:1 12:24
22:25 25:1
29:23 32:21
33:15,23 34:17
34:18,25 37:18
40:17 47:22
49:4 51:25
54:23
**questioning**
6:12 41:13
**questions** 5:16
20:7,13,14
22:8 32:25
34:11 46:12
50:8,9,11,21
57:7 58:22
61:8
**quick** 6:11
**quite** 55:22
**quote** 58:13

**R**

**ran** 22:7
**Rapids** 3:4
**Raycraft** 50:18



US LEGAL SUPPORT
The Power of Commitment™

MARGARET RYNIER
December 21, 2017

Page 70

| | | | | |
|---|---|---|---|---|
| **reached** 24:1 | 11:25 | 22:14,19 23:9 | 41:10,18 46:12 | 59:21 60:2,4,8 |
| **read** 14:18 | **record** 5:12 6:3 | 31:22 36:14 | 47:22 48:3 | 60:11 |
| 35:17 | 38:22 40:5,7 | 38:17 44:5 | **respective** 60:21 | **sanctioned** 25:3 |
| **ready** 53:4 | 50:15 | 48:16 49:15 | **respondents** | **sanctions** 12:2 |
| **reason** 6:11 | **recorded** 5:20 | **removed** 45:1 | 10:1 | **saying** 18:11 |
| 38:14 40:15,16 | 61:9 | **repeat** 34:18 | **responding** 11:6 | 25:22 33:12 |
| **recall** 12:11,13 | **records** 37:10 | 50:12 | **responsibilities** | 44:16 |
| 12:15,20 15:14 | 37:25 38:12,18 | **report** 25:13 | 11:1 | **says** 39:10 |
| 15:17,21 16:3 | 52:16 | 26:8,10 28:5 | **rest** 42:5 | **SCAO** 15:4 16:6 |
| 16:8 21:16,25 | **reduced** 61:10 | 37:9,22 | **review** 36:24 | 45:25 46:14 |
| 22:8,10,22,24 | **referring** 40:21 | **reporter** 5:21 | 49:10 54:9 | **schedule** 42:11 |
| 30:2 31:5,16 | **refresh** 15:2 | 6:2 | **reviewed** 26:13 | **scheduled** 42:20 |
| 34:24 36:2 | 39:17 | **reports** 9:25 | 37:4,7,9,10 | **school** 7:6,15 |
| 37:7,11,12,19 | **refreshes** 14:20 | 18:7 21:2 46:9 | 54:11 | 8:11,12,17 |
| 38:10,11 39:3 | **regard** 27:18 | 46:10 | **reviewing** 9:23 | **search** 41:22 |
| 46:6,6 48:6,15 | 32:6 49:2 | **represent** 50:19 | 54:6 | 43:16,21 |
| 48:20 51:1,4 | **regarding** 15:24 | **representation** | **right** 17:22 18:3 | **searched** 43:23 |
| 51:20,24 52:19 | 17:1 23:4 | 44:17 | 22:17 34:9,9 | **see** 39:8,12 |
| 52:20 53:11,25 | 24:19 25:7 | **represented** | 43:16 52:9 | 40:10,14 44:5 |
| 54:11,19 55:1 | 26:17 31:5,17 | 44:7 57:17 | 57:7 58:5,14 | 47:11 59:23 |
| 55:5,20,25 | 33:13 34:22 | **request** 9:24 | 60:1 | **seek** 35:19 |
| 56:25 58:21,24 | 35:7 36:23 | 10:1 13:3,4,11 | **rings** 15:13 | **seeking** 33:16 |
| **received** 15:15 | 45:18,24 47:2 | 13:13 14:6,22 | **rise** 32:1 | **senior** 9:17 |
| 17:2,8 33:11 | 47:18 48:1,10 | 15:11 16:21 | **roles** 10:25 | **separate** 16:12 |
| 36:25 37:5,8 | 48:19 49:9 | 28:1 47:11,14 | **room** 25:10 | 56:9 |
| **receiving** 17:15 | 54:7,18 55:7 | 52:18 54:17 | 42:12,21 | **separately** 32:24 |
| **Recess** 38:21 | **regards** 55:16 | **requested** 23:8 | **rose** 32:8 | **series** 5:15 |
| 50:14 | **regional** 14:15 | 27:18 42:25 | **Rules** 5:14 | **Servaas** 34:25 |
| **recollection** | **reimbursement** | 56:7 57:2 60:6 | **run** 22:3 | **serve** 10:10,19 |
| 14:21 39:17 | 55:7 | 60:20 | **Rynier** 1:14 4:4 | **served** 10:15 |
| **recommend** | **reject** 12:5,8 | **requesting** 37:5 | 5:5,13,15 6:19 | 19:16 |
| 24:25 | **related** 20:2 | 38:3 | | **service** 22:2 |
| **recommendat...** | 21:6,25 22:18 | **requests** 9:23 | **S** | 52:3 |
| 12:6 25:4,6,13 | 22:23 48:15 | 11:5 13:7,8 | | **serving** 48:19 |
| 26:9,15,16,23 | 50:21 61:12 | 52:3,24 | **S** 35:13 | **set** 35:7 51:16 |
| 28:12,12,15 | **relating** 55:11 | **requires** 11:5 | **safe** 19:16 43:25 | 61:8 |
| **recommendat...** | **relatively** 42:13 | **resignation** | 44:3,7,8,10,20 | **setting** 51:17 |
| 12:1 24:18,22 | **remember** 8:14 | 23:20 24:5 | 44:24 45:2,13 | **settle** 23:15 |
| 24:23 | 14:5,25 15:1 | **respect** 22:25 | 57:8,10,17,25 | 24:12 |
| **recommending** | 16:1 21:7,20 | 23:7 38:3 | 58:12,16,16,17 | **settlement** 23:18 |
| | | | 58:22 59:5,12 | |


US LEGAL SUPPORT
The Power of Commitment™

MARGARET RYNIER
December 21, 2017

Page 71

23:22 24:1
**settlements**
   23:16
**seven** 10:17
**severe** 29:18
**sheets** 23:10
   45:20 56:17,22
   57:1
**shorten** 17:17
**show** 5:12
**showed** 43:9
**shut** 44:19 59:1
**side** 11:8
**signature** 28:3
   60:20
**signed** 26:14
   28:4,12
**significance**
   37:12,19
**silly** 42:7
**similar** 29:23
**simply** 55:15
**simultaneously**
   19:13
**sink** 58:5,5,6
**six** 25:22 51:9
**Small** 35:8
**somebody** 15:7
   58:7,15,16
**someplace** 44:6
**Somers** 31:17
**sorry** 8:15 12:24
   13:9 20:4
   22:10 23:3
   34:18 45:7
   48:12 51:21,23
   54:2
**sound** 42:7
**SOUTHERN**
   1:3

**speak** 20:6
   47:13
**speaking** 21:15
   33:6 35:22
**specific** 20:4
   56:22
**specifically** 36:2
   56:21,24
**spelled** 35:13
**spoke** 14:24
   15:2 42:23
   49:19
**spoken** 49:17
**spot** 43:8
**SS** 61:3
**staff** 9:3,4,17,20
   9:20,22 10:10
   10:18,19 17:6
   17:13,17,19
   18:1,12,14
   20:16,21,22
   24:17 25:24
   26:2,12,13
   27:15 31:6
   32:14,16,23,24
   33:16 34:5
   36:4 38:10
   41:12 47:7,17
   48:9 49:1
**Standing** 7:24
   8:2
**start** 17:20
**started** 7:5,7 9:2
   23:16 35:3
**State** 2:14 14:16
   16:22 61:2
**stated** 40:24
**states** 1:1 39:13
   40:10,11
**stenographic**

61:11
**stenographica...**
   61:9
**Steven** 34:25
**stop** 58:9,19
**story** 13:5
**Stowe** 35:11
**Street** 2:16 3:3
**strike** 19:19
   24:16 41:15
   46:25
**stuff** 24:22
   45:21
**subject** 31:12
**subpoena** 37:5
   38:9,11,17
**subpoenas** 38:7
   38:14,16
**suffice** 15:9
**suggest** 32:11
**Suite** 2:6 3:11
**summary** 54:18
**Supreme** 11:8,9
   11:12,18 12:2
   12:6 14:16
   18:19,21,21,24
   24:25 40:12
   45:23
**sure** 13:12,25
   16:1 19:15
   21:12 22:11
   26:18,22 28:10
   29:13 36:2
   37:11 42:2
   45:20 46:10
   50:12 55:22,23
   59:9,9
**suspension** 25:8
   26:3 39:10
**Swastek** 49:19

49:23
**sworn** 5:7
**Sylvia** 1:5 12:9
**system** 22:9 56:2

_____ T _____

**TABLE** 4:1
**take** 6:14 14:19
   14:19 33:8,17
   50:3,11
**taken** 1:15 5:13
   38:21 50:14
   61:7,12
**takes** 35:18
**talk** 22:21 26:21
   46:22
**talked** 52:2
**talking** 21:9
   34:4,4 37:1
   38:8 47:3
   49:23
**tell** 8:11,12 13:6
   13:24 16:7
   19:9,14 20:8
   20:15 21:21
   23:3,24 24:8,9
   25:16 29:21
   31:20 39:25
   42:6 45:11
   47:12 52:22
   53:9 54:24
   55:3,12,17,18
   56:15,20,23
**telling** 22:22
**Tenure** 8:23 9:1
   9:12
**term** 13:10
**terms** 12:2
   20:24 21:10
   24:23 32:7

33:18 34:1,10
   56:20
**TERPSMA** 3:1
   50:9 60:18
**testified** 5:9 16:2
   28:11 31:1
   34:7 35:18,20
   42:25 49:15
   51:15 52:13
   55:21 58:25
**testify** 5:7 33:4
   34:8
**testimony** 56:6
**Thank** 34:20
   50:6
**thing** 6:3 13:11
   14:19 25:23
   43:2
**things** 26:25
   29:14,21 35:21
   41:13 52:1
   56:16
**think** 6:10,13
   7:21 14:18
   16:2 18:2
   21:21 24:11
   26:3,23 31:7
   33:22 34:7
   36:19 38:18
   39:10 47:13
   49:3 50:3,23
   51:4 52:1,8,12
   52:17 53:12
   54:22 55:12
   58:4 60:14
**thought** 53:9
   54:24 55:3,18
**three** 37:10
   41:20 50:2,3
   51:2,3,11



MARGARET RYNIER
December 21, 2017

Page 72

57:13
**three-and-a-h...**
49:20
**Thursday** 1:18
5:2
**time** 6:13 8:8
9:15 14:15,19
16:12,15 17:13
19:8 28:2
31:11 35:1,2
39:22 40:21
42:13,13 43:9
44:10 49:9,11
50:5 54:7,25
57:9
**times** 10:15
41:16 42:20
49:13 51:11
56:21 57:13
**timestamp**
39:10
**today** 49:6 55:22
**top** 58:3
**topics** 53:12
55:21
**traditional** 58:6
**transcript** 4:14
51:10 61:11
**transcription**
61:10
**travel** 55:7,11
55:16,19
**trials** 10:24
**tried** 50:20
51:10
**true** 16:21 17:6
23:14 24:17
25:5 61:11
**truth** 5:7,8,8
**try** 5:25 6:4

43:13
**trying** 10:3
21:25 42:9
**two** 16:15 19:13
35:6 40:1
41:19 47:4
51:2,3,11
57:13
**type** 21:5
**types** 20:13 42:3

---

**U**

**U** 35:13
**Uh-huh** 13:18
**ultimately** 11:24
15:25 24:25
26:8
**understand** 5:17
5:22,24 9:7
12:24 13:10
21:15 32:15
33:5 46:11
**understood**
22:23
**UNITED** 1:1
**University** 7:10
7:16
**use** 13:10,13
**usually** 16:15
20:21 42:18

---

**V**

**Valdemar** 19:3
**varied** 43:4,5,11
43:12
**varies** 16:17
**verbally** 5:19
**visit** 42:10
**volition** 14:2
**vouch** 33:3
**vs** 1:7

---

**W**

**wade** 51:10
**walking** 44:6,6
57:10,19 58:11
58:18,19
**want** 17:19
27:25 32:19
34:13,15 39:1
42:15 47:5
49:8 56:1
**wanted** 15:7
23:21 34:3
39:19
**Warner** 3:2
**Washington**
19:4,15,19,20
19:23 20:1,6,9
20:12,14 21:19
22:13 23:4
48:10,17,22
**wasn't** 9:8 59:1
**Waterstone**
30:3,17 31:5
**way** 10:21 18:15
25:7,22 26:7
27:11 31:13,20
46:16 55:17
56:5 60:2
**Wayne** 7:7 8:18
8:19,22 61:4
61:24
**ways** 47:4
**we'll** 6:13
**we're** 18:4 42:12
**We've** 50:22
**Wednesday**
39:14
**week** 51:24
**weeks** 51:9
**went** 41:21

49:24,25 51:11
51:20 52:3
**weren't** 41:11
43:7
**West** 1:15 2:16
**whatsoever**
16:11
**witness** 4:3 5:6
5:18,23 6:5,15
22:6 60:20
**witnesses** 9:25
11:3 20:25
21:10,16
**WOJNAR-R...**
3:9 4:9 22:4
50:10,17 60:14
**Women** 6:23
**wonderful** 42:22
**wondering**
24:10 33:10
34:21
**Woodward** 2:5
**wore** 13:21
**work** 27:3,13
29:1 37:16
**worked** 38:5
**working** 8:24
**works** 42:9
**wouldn't** 15:17
41:7 46:16
**writing** 11:6
21:2
**wrong** 25:5 56:2

---

**X**

---

**Y**

**yeah** 8:1 18:11
25:3 27:19,21
27:22 37:3
39:18 52:12

**years** 21:14,25
53:25 55:15
**Yep** 60:15

---

**Z**

---

**0**

---

**1**

**1** 4:16 14:10,13
**10:11** 14:11
**10:48** 38:21
**10:50** 38:22
**10:51** 39:6
**10:53** 40:6
**10:54** 40:7
**11:08** 50:14
**11:14** 50:15
**11:29** 60:19
**111** 3:3
**120** 3:11
**14** 4:16 40:13
**14th** 7:1 14:14
40:21
**15** 50:22
**17430** 3:11
**1956** 7:1
**1978** 7:5
**1979** 7:6
**1982** 7:6
**1985** 7:8 8:21

---

**2**

**2** 4:17 39:5,9
40:9
**2:12-CV-10273**
1:7
**200** 2:6
**2001** 36:16
**2008** 36:16
**2011** 8:21 14:14



MARGARET RYNIER
December 21, 2017

Page  73

| | |
|---|---|
| 39:1,15,18,23 40:13 | **7** |
| **2012** 39:2,11 | **734.591.4002** 3:13 |
| **2017** 1:18 5:2 | |
| **21** 1:18 5:2 | **8** |
| **22nd** 19:5 38:5,5 40:25 41:16 45:17 | **88** 15:25 28:9 39:14 |
| **248.864.4000** 2:8 | **9** |
| **26** 39:14,23 | **9** 7:5 |
| **29** 39:11 | **9-13-19** 61:25 |
| | **9:56** 1:17 5:3 |
| **3** | |
| **30** 25:22 | |
| **3030** 1:15 | |
| **344** 2:5 | |
| **36th** 30:4 | |
| **39** 4:17 | |
| | |
| **4** | |
| **48009** 2:7 | |
| **48152** 3:12 | |
| **48933** 2:17 | |
| **48th** 35:8 | |
| **49503** 3:4 | |
| | |
| **5** | |
| **5** 2:16 | |
| **50** 4:9 | |
| **517.373.6434** 2:18 | |
| **525** 2:16 | |
| | |
| **6** | |
| **6** 4:7 | |
| **60** 25:22 26:3 | |
| **60-day** 25:8 | |
| **616.752.2539** 3:5 | |

