UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SYLVIA JAMES,

               Plaintiff,                            Case No. 12-10273

                                                  Paul D. Borman
                                                    United States District Judge

v.

                                                    R. Steven Whalen

PAMELA ANDERSON, an                       United States Magistrate Judge
individual,  DEBORAH GREEN, an
individual, PAUL FISCHER, an individual
and Executive Director of the Judicial Tenure
Commission, the JUDICIAL TENURE
COMMISSION, and VALDEMAR
WASHINGTON, an individual,

               Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANT PAMELA ANDERSON'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 132)

This case, reassigned to this Court in February, 2015, from the Honorable

Lawrence P. Zatkoff by Administrative Order, is before the Court on remand from the

Sixth Circuit to consider the claims of Judge Sylvia James, a female African-

American former state court judge, that Defendants violated her Fourth and

Fourteenth Amendment rights when they conducted a search of her office and

personal safe and instituted proceedings that resulted in her removal from office by

1

the Michigan Supreme Court based upon alleged misconduct in her role as a judge of the 22nd District Court of the State of Michigan.[1]

On September 2, 2015, this Court issued an Opinion and Order granting Defendants Jones, Hampton, and the City of Inkster's motions to dismiss and denying Defendant Anderson's motion to dismiss.[2] *James v. Hampton*, No. 12-10273, 2015 WL 5159332 (E.D. Mich. Sept. 2, 2015). Now before the Court is Defendant Pamela

---

[1] Following the Sixth Circuit's remand, there are only two specifically defined remaining claims, both asserted under 42 U.S.C. § 1983, alleging: (1) a Fourth Amendment violation stemming from an alleged search of Plaintiff's personal safe and (2) a Fourteenth Amendment equal protection violation based upon the alleged conduct of certain Defendants in declining to recommend the discipline of several white and/or male Michigan state court judges who also engaged in judicial misconduct. *James v. Hampton*, 592 F. App'x 449, 451 (6th Cir. 2015). Only the Fourth Amendment claim is at issue in this motion filed by Defendant Anderson. Anderson is not implicated in the equal protection claim, which is the subject of motions filed by the other remaining Defendants and will be addressed in a separate Opinion and Order.

[2] Although the Sixth Circuit concluded that Plaintiff did plead a plausible Fourth Amendment claim, the remand was not entirely clear as to which Defendants specifically were implicated by which of the Plaintiff's allegations. In fact, in response to Jones, Hampton, and the City of Inkster's motion to dismiss following remand, Plaintiff conceded that she did not intend to assert a Fourth Amendment claim against these Defendants and was no longer pursuing claims against Jones, Hampton, or the City of Inkster following the Sixth Circuit's ruling and remand. *James*, 2015 WL 5159332, at *5. Defendant Anderson's motion to dismiss following remand was based on her claim that Plaintiff failed to specifically allege Anderson's personal involvement in the allegedly unconstitutional search. This Court disagreed and denied Anderson's motion to dismiss. Anderson now files her motion for summary judgment on Plaintiff's sole remaining claim against her for an alleged unconstitutional search of Plaintiff's safe.

Anderson's motion for summary judgment.[3] (ECF No. 132.)   Plaintiff filed a Response (ECF No. 140) and Defendant filed a Reply (ECF No. 144).  The Court held a hearing on August 27, 2018,  For the reasons that follow, the Court GRANTS Anderson's motion for summary judgment.

I.     **BACKGROUND**

   A.     **Procedural Background**

As this Court summarized in its September 2, 2015 Opinion and Order, this is the second remand of this action from the Sixth Circuit; the first followed Plaintiff's appeal of Judge Zatkoff's April 2, 2012 decision to abstain and dismiss this action under *Younger v. Harris*, 401 U.S. 37 (1971), pending the outcome of the state court administrative proceedings that were then in progress against Judge James.  In the first remand, the Sixth Circuit held that while *Younger* abstention was appropriate, Judge Zatkoff should have stayed the case pending the outcome of the state court administrative proceedings rather than dismiss, in order to avoid Plaintiff's encountering any statute of limitations issues following the state court administrative

_____

[3] The remaining Defendants – Deborah Green, Paul Fischer, Valdemar Washington, and the Judicial Tenure Commission – did not move to dismiss following remand but, as discussed *supra* in footnote 1, have also filed motions for summary judgment that will be addressed in a separate Opinion and Order. Those Defendants face both Fourth Amendment and equal protection claims, as remanded by the Sixth Circuit.  Defendant Anderson faces only a Fourth Amendment claim.

process.  *James v. Hampton*, 513 F. App'x 471 (6th Cir. 2013).  Upon final resolution of the state administrative proceedings against Judge James, which found sufficient evidence of misconduct to remove her from office, Judge Zatkoff entertained and granted the Inkster and State Defendants' motions to dismiss James's Fourth Amendment unlawful search and Fourteenth Amendment equal protection claims for failure to state a claim and declined to exercise supplemental jurisdiction over James's state law claims.  *James v. Hampton*, No. 12-10273, 2013 WL 6839136 (E.D. Mich. Dec. 27, 2013).  Plaintiff again appealed Judge Zatkoff's dismissal of her claims and the Sixth Circuit again reversed, remanding for further proceedings that are now before this Court.  *James v. Hampton*, 592 F. App'x 449 (6th Cir. 2015).

In its September 2, 2015 Opinion and Order, this Court discussed at length the Sixth Circuit's January 7, 2015 decision reversing Judge Zatkoff's dismissal of Plaintiff's claims and remanding the matter to this Court, which was reassigned this case pursuant to administrative order.  As relevant here, and as stated in this Court's previous Opinion and Order, the Sixth Circuit concluded that Plaintiff did plausibly plead a Fourth Amendment claim based upon allegations of the warrantless search of the safe that James kept in her office at the 22nd District Court. 592 F. App'x at 459 ("[W]e find that James has stated a claim that the search of her locked personal safe was unreasonable [and] reverse the district court's dismissal of James's Fourth

4

Amendment claim."). The Sixth Circuit also found that Plaintiff plausibly alleged an equal protection claim against certain Defendants, but not against Defendant Anderson. 592 F. App'x at 461 ("[W]e reverse the dismissal of James's equal protection claim as to the State Defendants and remand for further proceedings. Because James has not alleged an equal protection claim against the Inkster Defendants [including Anderson], on remand the district court need only consider this claim against the State Defendants.").

Examining James's Fourth Amendment claim under the special needs exception for workplace searches enunciated by the Supreme Court in *O'Connor v. Ortega*, 480 U.S. 709 (1987), the Sixth Circuit concluded that James had a reasonable expectation of privacy in both her office and her locked safe. In so holding, the Sixth Circuit noted (1) that there were no office regulations or policies regarding routine or random searches or employer access that would have diminished James's reasonable expectation of privacy, (2) James kept personal belongings in the safe, (3) James secured the safe with two locks and there was no evidence that any one else had access to the safe, (4) James purchased the safe with her own funds, and (5) James maintained the safe for her exclusive use. 592 F. App'x at 456. Having found that James had a reasonable expectation of privacy in her office and safe, the Sixth Circuit then analyzed the reasonableness of the search of the office and the safe separately,

considering the two-prong "special needs" workplace exception established in *O'Connor* which asks: (1) was the search reasonable at its inception, *i.e.* were there reasonable grounds to suspect that the search would turn up evidence that the employee is guilty of workplace misconduct, and (2) was the search reasonable in scope, *i.e.* were the measures adopted reasonably related to the objectives of the search and not excessively intrusive given the nature of the misconduct. *O'Connor*, 480 U.S. at 726.

As a preliminary matter, the Sixth Circuit analyzed whether James's office and her personal safe were part of "the workplace context," such that analysis under *O'Connor* was even appropriate. 592 F. App'x at 456. Judge Cole's "majority" opinion concluded that James's office was part of the "workplace context," but that James's personal safe, which the court determined was "analogous to a piece of closed personal luggage or a briefcase because it was not within the employer's control," was not properly considered part of the workplace context and concluded that "the warrantless search of the safe falls outside the bounds of the special needs exception to the warrant requirement altogether." *Id*. at 457. The Sixth Circuit concluded that because the safe fell outside the workplace context, it was subject to the general warrant and probable cause requirement under the Fourth Amendment, and held that Plaintiff's Complaint adequately alleged a Fourth Amendment claim for the

6

warrantless search of her safe: "The complaint states that the safe was searched absent a warrant, probable cause, or exception. These allegations sufficiently state an illegal search claim under the Fourth Amendment." *Id*.[4]

The Sixth Circuit then analyzed the search of both the office and the safe (assuming *arguendo* as to the safe that it did fall within the workplace context) under the *O'Connor* workplace exception for reasonableness at inception and in scope. *Id*. at 457. The Sixth Circuit concluded that the search of James's office space was reasonable at its inception because there were "'reasonable grounds' for suspecting that a search of James's office would yield evidence that James was 'guilty of work-related misconduct.'" 592 F. App'x at 458 (quoting *O'Connor*, 480 U.S. at 726). The Sixth Circuit also concluded that a thorough search of James's office proper, an area

---

[4] Judge Batchelder dissented, finding untenable the majority's assumption that a safe is more analogous to a portable, lightweight briefcase or piece of luggage than the more permanent office fixtures of a desk or filing cabinet. "By contrast [to a briefcase or piece of luggage], few employees, if any, lug a safe to and from work each day." 592 F. App'x at 468. Batchelder would apply the *O'Connor* special needs exception for the workplace to both the office and the safe and would conclude that the search of both the office and the safe was reasonable, both at inception and in scope, and would affirm Judge Zatkoff. Judge Keith, concurring in part and dissenting in part, concluded that both "the alleged search of the office and safe were unconstitutional" and "unreasonable at [] inception" because, in his view, the allegations of the Complaint (given the presumption of truth to which they were entitled) suggested an illegitimate purpose behind the search and did not suggest a reasonable inference that Plaintiff was guilty of workplace misconduct. 592 F. App'x 466-67 (Keith, J.) (concurring in part and dissenting in part) (alteration added).

that "might contain financial and employment records," was reasonable in scope given the nature of the allegations of misappropriation of public funds and employment irregularities against James and given her acknowledgment in her Complaint that she had taken control of the court finances in 2010. *Id*. at 459.

The Sixth Circuit reached a different conclusion as to the reasonableness of the search of James's safe, which it analyzed under the special needs exception *assuming*, for the sake of argument, that it did fall within the workplace exception, which the court previously held it did not. As to the safe, the majority reasoned that, because James alleged in her Complaint that she purchased the safe for personal use and kept it under lock and key, and had instructed Deborah Green, the SCAO Regional Administrator at the time, that the safe was private and contained personal information and received an assurance from Green that her privacy rights in the safe would not be violated, the Complaint stated "a plausible claim that it was excessively intrusive to search her personal safe, because evidence of work-related misconduct was unlikely to be found there." *Id*. at 459 (citing *O'Connor*, 480 U.S. at 726).

As discussed *supra*, this Court previously denied Anderson's motion to dismiss following remand, finding that Plaintiff's Complaint plausibly alleged Anderson's personal involvement in the alleged search of her personal safe. The Court is no longer bound to accept the allegations of Plaintiff's Complaint as true, and must

determine at this summary judgment stage whether, viewing the facts now adduced through discovery in the light most favorable to the Plaintiff, there are genuine issues of material fact for trial.

**B.     Factual Background**

**1.     The JTC proceedings and Judge James's removal from office.**

Plaintiff Sylvia James was a judge for the 22nd District Court for 23 years before she was placed on administrative leave on April 13, 2011, by a unanimous vote of the Michigan Supreme Court in response to a grievance filed by the State Court Administrators Office ("SCAO") alleging that Plaintiff had engaged in numerous financial and administrative improprieties during her tenure on the bench.  (ECF No. 132-2, September 26, 2017 Deposition of Sylvia James 16:9-22, 234:12-15; August 11, 2017 Deposition of Deborah Lynn Evans Green 18:22-21:15.) Deborah Green, the SCAO Regional Administrator at the time, was authorized by the Supreme Court to appoint an outside judge to operate the 22nd District Court in Plaintiff's absence and she appointed Valdemar Washington. (Green Dep. 21:2-15, 24:18-25:5.) The Judicial Tenure Commission ("JTC"), and specifically JTC staff attorney Margaret Rynier who was assigned Judge James's case, conducted an investigation into the grievance filed against Judge James and ultimately recommended that a formal complaint be filed against her.  (Def.'s Mot. Ex. 6, December 21, 2017 Deposition of Margaret Rynier

20:16-20,27:17-28:19.)

The JTC did file a formal complaint against Judge James on October 26, 2011, "asserting that [Plaintiff] had engaged in (1) financial improprieties, (2) administrative improprieties, (3) employment improprieties, and (4) misrepresentations to the JTC." *In re James*, 492 Mich. 553, 559 (2012). On December 15, 2011, the Michigan Supreme Court appointed retired District Judge Ann Mattson to act as a special master to conduct a hearing as to the charges made against Judge James in the JTC's formal complaint. *Id*. That hearing lasted approximately six weeks and the special master filed her findings of fact and conclusions of law on April 23, 2012, finding that the JTC "had proven portions of all four counts by a preponderance of the evidence." *Id*. The JTC issued its decision on discipline on June 11, 2012, adopting "all but one of the special master's findings," and recommending that Judge James be removed from office and pay $81,181.88 in fees and costs. *Id*.

The Michigan Supreme Court, after reviewing the record and hearing oral argument, "agree[d] with the findings of the JTC and adopt[ed] its recommendation regarding sanctions." *Id*. at 560. The most significant impropriety that the court found to have occurred was Judge James's diversion of "thousands of dollars," that were required by law to be allocated to restitution for crime victims, to charities and organizations of Judge James's own choosing, many of which "were for

advertisements that promoted the judge, prominently displaying her picture and only tangentially mentioning" the Community Service Program ("CSP") from which the funds were obtained.

Justice Steven Markman filed a separate lengthy opinion, concurring in part and dissenting in part, expressing his opinion that the sanction of removal (which only lasted until the expiration of Judge James's then-existing term of office) was insufficient punishment for the nature and degree of her transgressions:

> The evidence clearly establishes that Judge James' misconduct was prejudicial to the actual administration of justice, as her private use of hundreds of thousands of dollars of public funds prevented those funds from being used for their proper purposes, including provisions of assistance for the victims of crime within Inkster. As the majority has detailed, Judge James treated public funds, including funds statutorily required to go to victims of crime, as her own "publicly-funded, private charitable foundation" of which she was the sole administrator. In so doing, Judge James routinely ignored or circumvented legal requirements that conflicted with her own personal desires.
>
> *          *          *
>
> But the most disturbing factor, and the one that arguably presents the greatest danger to the integrity of the judiciary, is that Judge James' misconduct was part of an enduring pattern or practice that she has shown no intention of changing. Her behavior and statements before, during, and after the investigation and hearing demonstrate that Judge James refuses to be bound by any law or requirement that conflicts with her own desires. This sustained pattern of misconduct and disregard for the law precludes, in my judgment, sympathetic consideration of Judge James' behavior. "We simply cannot overlook a disclosed pattern [of misconduct]. Once such pattern is discovered, the opportunity of continuity thereof must be concluded with firmness and resolution." *In*

*re Graham*, 366 Mich. 268, 276, 114 N.W.2d 333 (1962). In this case, removal alone, which may accomplish nothing more than removing her from the bench for a period of fewer than five months, will not divest from Judge James all opportunity to continue her pattern of misconduct and her cavalier approach to her responsibilities as a district judge.

The inadequacy of removal is further demonstrated by Judge James' practice of being unrestrained by her oath to tell the truth. During the course of this investigation and hearing, Judge James lied numerous times. . . . The provision of false testimony or evidence in a JTC proceeding has generally led to removal from office. *In re Servaas*, 484 Mich. 634, 716 n. 11, 774 N.W.2d 46 (2009) (YOUNG, J., dissenting).

492 Mich. 580-81.

### 2.    Facts surrounding the alleged search of Plaintiff's safe.

Defendant Anderson served under the Plaintiff as the court administrator at the 22nd District Court.  (October 12, 2017 Deposition of Pamela Anderson 11:16-17, 57:2-3; Pl.'s Dep. 241:12-18.)  Anderson's role at the 22nd District Court entailed maintaining custody of court records and filings.  (Anderson Dep. 24:6-9.)  Plaintiff described Anderson's job as "the keeper of the records," and the "liaison" between the 22nd District Court and the regional administrator's office.  (Pl.'s Dep. 132:13-16, 248:14-15.)  Plaintiff's only claim against Defendant Anderson involves the alleged Fourth Amendment violation related to the search of Plaintiff's safe as to which, the Sixth Circuit has determined, Plaintiff plausibly alleged in her Complaint a reasonable expectation of privacy that required a warrant for any search by the government of her safe.  The facts relevant to Plaintiff's Fourth Amendment claim, viewed in the light

12

most favorable to the Plaintiff, are as follows.  Plaintiff maintained a personal safe in her office, which was kept in her personal lavatory under lock and key.  Plaintiff had the only key to the safe which she kept on her key chain.  (James Dep. 47:7-51:15.) Plaintiff's safe was locked when she left the court the day she was placed on administrative leave. (James Dep. 125:16-21.) Plaintiff never gave consent to anyone to open her safe and in fact was assured by Green that the investigation would not "invade the judge's personal safe without her being there."  (James Dep. 62:3-63:1, 227:22-228:9; ECF No. 140-9, Pl.'s Resp. Ex. 8, Excerpt from Proceedings held before Master Hon. Ann E. Mattson, January 24, 2012, Testimony of Deborah Green 293:4-16.)  While Plaintiff did not specifically tell anyone at the 22nd District Court that she had an expectation of privacy in her safe, it was well understood around the 22nd District Court, and specifically by Anderson, that no one ventured into Judge James's personal office when she was not there.  (James Dep. 59:20-60:5, 243:2-18, 247:1-248:7.)

On April 13, 2011, the day that James was placed on administrative leave, she received a phone call from Michigan Supreme Court Justice Robert Young and had "about three hours" to pack up her things and leave the court.  (James Dep. 234:12-235:22.)  Within days, and not more than a week after being placed on administrative leave, Plaintiff called Judge Valdemar Washington, who was asked by the SCAO to

become a visiting judge at the 22nd District Court and was appointed to act as interim chief judge in Plaintiff's absence beginning on April 14, 2011. Plaintiff tried to return to the court to pick up a paycheck or collect some things but Washington refused to allow her to return. (James Dep. 246:8-25; Def.'s Mot. Ex. 4, January 17, 2018 Deposition of Valdemar L. Washington 9:13-17, 23:16-24:11.) When Plaintiff did finally arrange to go back to the court on July 14, 2011 to collect her things, having arranged to do so through Justice Young, it was discovered that her safe had been opened by someone in her absence. (James Dep. 120:18-121:2; Washington Dep. 22:9-25.)

Plaintiff admits that she does not know who "actually broke into" her safe but she does know that Washington had "dominion and control over [her] office." (James Dep. 121:3-6, 123:24-124:4.) Plaintiff alleges that Defendant Anderson is one of the individuals who had access to Plaintiff's office in Plaintiff's absence and she thought Anderson had "an ax to grind" with Plaintiff, but Plaintiff has no "evidence" that Anderson broke into her safe and does not know who broke into her safe. (James Dep. 255:25-256:21.) Anderson testified that she knew that Plaintiff had a safe in her bathroom because you could see the safe when you were standing in the Plaintiff's office and the bathroom door was open. (Anderson Dep. 38:22-39:5.) Plaintiff testified that she never told Anderson what was in the safe or that the safe contained

14

personal information but she thought it was "implicit." (James Dep. 247:1-25, 248:25-249:3.) Anderson testified that she did not have a key to the Plaintiff's safe, she did not know whether it required a key or was a combination lock and she didn't have a combination if one was required, and she did not know if the safe was owned by Plaintiff or the 22nd District Court. (Anderson Dep. 39:6-25, 54:8-18, 55:1-7, 66:17-67:7.) Anderson testified that during the time that Plaintiff was the Chief Judge she never told Anderson that no one was to go in her safe. Plaintiff also testified that prior to being placed on administrative leave, she never indicated to anyone at the court, including Anderson, that she had an expectation of privacy in her safe. Plaintiff suggested that because court employees knew that she kept her office locked, and they were not permitted in her office when she was not there, they would know not to go in the safe. (Pl.'s Dep. 247:1-248:2.) After Plaintiff was placed on administrative leave, no one ever told Anderson that no one was supposed to access Plaintiff's safe and Anderson never saw anyone open the safe. (Anderson Dep. 43:10-19.) Anderson testified that Judge Washington never made comments to her about wanting to open the safe. (Anderson Dep. 64:21-65:5.)

Anderson was aware and observed that Judge Washington and Plaintiff's niece, Nicole James who served as Plaintiff's judicial secretary and had a key to Plaintiff's office, were cleaning up Plaintiff's office and Anderson assumed that documents were

being removed because the stacks of papers were getting smaller but she did not personally go through Plaintiff's office to look for documents. (Anderson Dep. 37:2-16, 43:24-45:18, 47:7-48:11.) At some point in this "clean up" process, Nicole James did bring some "boxes of stuff" to Anderson, including old court files, old registers of action, old pleas by mail, "from like the 1990s." (Anderson Dep. 48:22-49:9.) Anderson was unsure exactly where the boxes came from and she did not review their contents thoroughly before giving them to Brianna Purdy with instructions to shred the old registers of action and pleas by mail and to "take care" of any court files that were in the boxes. Ms. Purdy never reported back to Anderson after taking possession of the boxes and Anderson assumes that Purdy followed her instructions but Anderson cannot be certain of what was actually shredded. (Anderson Dep. 49:10-51:12.) Nicole James packed up James's personal belongings in boxes and garbage bags and presumably delivered them to Plaintiff. (Washington Dep. 27:18-28:6.)

Anderson testified that at some point after Plaintiff was placed on administrative leave and before Plaintiff returned to the court on July 14, 2011 to collect her things, Anderson was called into the Plaintiff's office by Judge Washington, whom she considered to be her supervisor, and alerted by him to the fact that the Plaintiff's safe was "open" and there were documents inside. Anderson testified that "[t]he safe was ajar just enough where you could fit your hand in."

(Anderson Dep. 41:8-42:12, 65:22-66:8.) Anderson testified that Judge Washington was with her when she reached her hand into the safe, pulled out a document and said "oh, these are tax returns," and "put the document back in the safe." (Anderson Dep. 42:12-17.) Anderson does not recall what if anything Judge Washington said or did at the time. She recalls that she just returned to her office but testified that Judge Washington was near enough that he would have heard her remark that the documents were tax returns. (Anderson Dep. 42:18-43:7.) Anderson never saw anyone actually open the safe. (Anderson Dep. 43:17-19.)

Nicole James testified during the JTC proceedings before District Judge Mattson that at some point Judge Washington also asked Nicole to clean out Plaintiff's safe but Nicole told Judge Washington that she did not feel comfortable doing that. (ECF No. 140-15, Excerpt from JTC Proceedings, Testimony of Nicole Green 2620:19-2621:1.) Nicole testified that when she declined to clean out the safe Washington responded: "Well, don't worry about it. I have another plan for that." (*Id*. at 2621:1-6.)[5]

---

[5] Washington, on the other hand, testified that he never asked Nicole James to clean out Plaintiff's safe and he never asked anyone else to break into or remove documents from Plaintiff's safe – he testified that he didn't even know there was a safe there until Plaintiff returned to the court on July 14, 2011, and it was noted by Plaintiff's attorney that the safe was ajar and appeared to have been forcibly opened. (Washington Dep. 28:7-14.) This testimony is inconsistent with both Nicole James's testimony that Washington specifically asked her to clean out the safe prior to James returning to the

On April 15, 2011, the day after Washington began his duties as acting interim chief judge, Washington received a letter from Chad Schmucker, who was then the State Court Administrator, explaining that Plaintiff had been placed on administrative leave and asking Washington to investigate a number of matters related to the charges against Plaintiff.  (Washington Dep. 10:18-11:4; ECF No. 140-4, Pl.'s Resp. Ex. 3, April 15, 2011 Letter from Chad C. Schmucker to Valdemar Washington.)  The letter asked Washington to investigate several specific items including documentation to support certain travel expenditures, and Plaintiff's practice of issuing I.R.S. 1099's to court employees for their work on the CSP program. Washington asked Anderson to gather any travel related records she had and to be on the lookout for documents relating to the CSP program, which she did, and Washington provided any documents Anderson gathered to the SCAO.  Washington also asked Anderson to see if there were 1099's issued to court employees but none were located.  (Washington Dep. 12:24-15:25; Anderson Dep. 34:21-35:21.)  Anderson testified that Washington asked her to "be on the lookout" for certain categories of documents and Anderson was able

---

court on July 14, 2011, and with Anderson's testimony that at some point prior to July 14, 2011, Washington called her into his office and alerted her to the open safe, and with Ms. Rynier's testimony that Anderson pointed out the opened safe to Ms. Rynier one day when Ms. Rynier was at the 22nd District Court meeting with Ms. Anderson. Washington's motion for summary judgment is addressed in a separate Opinion and Order.

to locate some responsive documents and she believes she showed them to Judge Washington and ultimately gave them to Ms. Rynier.  (Anderson Dep. 34:9-35:17.) Washington prepared regular written reports for Green to inform her of the progress he was making on the items in the Schmucker letter. (Washington Dep. 19:17-21:15.)

Defendant Green also came to the courthouse and explained to Anderson that Plaintiff was under investigation and asked Anderson to cooperate and assist with locating documents and providing information related to certain areas that were being investigated.  Anderson knew that Green worked for the SCAO but believed that Green was acting on behalf of the JTC. (Anderson Dep. 19:6-20:7.) Anderson agreed to honor Green's request for assistance because Green "was working for" the SCAO. (Anderson Dep. 22:6-9.) Anderson met with and reviewed many of the documents she located with Margaret Rynier, the JTC staff attorney conducting the investigation into Plaintiff's conduct.    (Anderson Dep. 20:12-15, 21:1-22, 23:8-28:24.)   Anderson complied with the various requests of the JTC, SCAO, and Washington to collect and provide records and documents but never provided any documents from Plaintiff's safe.  (Anderson Dep. 42:14-23, 47:22-24; Washington Dep. 30:9-11; Rynier Dep. 44:20-25, 45:12-15.)

## II.    LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (Borman, J.) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801

F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III.   ANALYSIS

Defendant Anderson makes four main arguments for dismissal of Plaintiff's Fourth Amendment claim against her: (1) Plaintiff has failed to establish that Anderson acted with "an investigatory purpose" when she encountered Plaintiff's "unlocked and open" safe and reached in to remove a document and therefore the Fourth Amendment does not apply to her conduct: (2) Plaintiff had no reasonable expectation of privacy in her safe because discovery has revealed that in fact the safe was "open and unlocked"; (3) Plaintiff has failed to identify what documents were

taken from her safe and has not specified how documents taken from her safe would have been exculpatory evidence that she could have offered in her defense against the JTC charges of impropriety and thus has failed to establish proximate cause; and (4) even were the Court to find that Defendant Anderson violated Plaintiff's Fourth Amendment rights, Anderson is entitled to qualified immunity because at the time of the search there was no clearly established law prohibiting the search of a safe in the workplace context.  The Court will address these arguments in turn.

### A.    The "Investigatory Purpose" of Anderson's Alleged Search

Anderson argues that because she lacked an "investigatory purpose to the aid the JTC in its investigation" when she reached into and examined a document(s) from Plaintiff's safe, her conduct does not implicate the Fourth Amendment.  It is not at all clear that the Sixth Circuit would require Plaintiff to establish an investigatory purpose to aid the JTC, but even assuming it did, there is at a minimum a genuine issue of material fact whether Anderson was acting with an investigatory purpose at the time she is alleged to have removed exculpatory materials from Plaintiff's safe.

Defendant relies on several cases discussing the principle "that the Fourth Amendment proscribes only governmental action and does not apply to a search or seizure, even an unreasonable one, conducted by a private individual not acting as an agent of the government or with the participation or knowledge of any governmental

official." *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985) (citing *United States v. Jacobsen*, 466 U.S. 109 (1984)). *See also United States v. Shepherd*, 646 F. App'x 385, 388 (6th Cir. 2016) ("In the context of a search, the defendant must demonstrate two facts: (1) Law enforcement "instigated, encouraged or participated in the search" and (2) the individual 'engaged in the search with the intent of assisting the police in their investigative efforts.'") (quoting *United States v. Hardin*, 539 F.3d 404, 419 (6th Cir. 2008) (quoting *Lambert*, 771 F.2d at 89); *United States v. Howard*, 752 F.2d 220, (6th Cir.), *vacated on other grounds*, 770 F.2d 57 (6th Cir. 1985) ("[W]here, as here, the intent of the private party conducting the search is entirely independent of the government's intent to collect evidence for use in a criminal prosecution, we hold that the private party is not an agent of the government.").

In *Lambert*, for example, the Sixth Circuit determined that inculpatory evidence that was provided to the FBI by a housekeeper, who was acting as an FBI informant but was a private party, was not seized in violation of the Fourth Amendment.  The court  explained that two facts must be present for a private party to be deemed to be acting as an agent of the government: "First, the police must have instigated, encouraged or participated in the search.  Second, the individual must have engaged in the search with the intent of assisting the police in their investigative efforts."  771 F.2d at 89.  The court reasoned that "there is no seizure within the meaning of the

Fourth Amendment when an object discovered in a private search is voluntarily relinquished to the government." *Id.* (internal quotation marks and citation omitted). Although the housekeeper was a government informant and intended to assist the government in its investigation when she provided the inculpatory evidence, the Sixth Circuit concluded that "the record fail[ed] to show that the FBI instigated, encouraged or participated in her searches," because "the record shows that she was told on several occasions that she should not take items from the house," and therefore her "search must be deemed to be a private search and, therefore, not within the purview of the Fourth Amendment." 771 F.2d at 89.

In *Shepherd*, law enforcement officers transported Shepherd to an emergency room, suspecting he had a bag of drugs in his rectum. 646 F. App'x at 386. Shepherd was drifting in and out of consciousness and officers were concerned that his life was at risk. *Id.* The attending physician in the emergency room performed an x-ray and a CT scan, both of which alerted to a "foreign body" in Shepherd's rectum, but otherwise determined that Shepherd's life was not immediately at risk. *Id.* at 387. Based in part on the results of the attending physician's studies, the officers obtained a warrant to permit sedation of Shepherd and removal of the bag. *Id.* Shepherd moved to suppress the the pre-warrant x-ray and CT scan evidence, arguing that the private physician was acting as an agent of the government and that his "search," i.e.

taking x-rays and a CT scan,  was attributable to the government and violated the Fourth Amendment.  *Id.* at 388.  The district court denied the motion, and the Sixth Circuit affirmed.  The Sixth Circuit concluded that the emergency room physician "acted in pursuit of Shepherd's medical well-being rather than to help the police retrieve the drugs." *Id.* at 389.  In reaching this conclusion, the Sixth Circuit reasoned that the "pertinent question" in the context of a "medical emergency involving an individual whose liberty the state has limited . . . is whether the contact arises in an effort to aid law enforcement in their duty to provide medical care, rather than to advance a search."  *Id.* at 390.  In Shepherd's case, the "search" occurred in the context of the duty to provide medical aid.  *Id.*

Finally, in *Howard*, the Sixth Circuit found that an insurance investigator, conducting an inspection for purposes of determining the insured's coverage under a policy of insurance, was not "an agent" of the government where his intent in collecting evidence was separate and apart from the government's criminal investigation: "[W]here, as here, the intent of the private party conducting the search is entirely independent of the government's intent to collect evidence for use in a criminal prosecution, we hold that the private party is not an agent of the government," and the district court "did not err in admitting his testimony."  752 F.2d at 228.

The gist of these cases is clear – and each of them involved the actions of *private* parties – a housekeeper, Federal Express employees (*Jacobsen*), an insurance investigator, a private medical doctor – not otherwise employed by a governmental entity. It is undisputed that Anderson is employed by a governmental entity, as her plea for qualified immunity demonstrates. Defendant suggests, however, that in addition to purely private parties, a "non-law enforcement governmental actor" must also be found to have acted with an "investigatory purpose," in this case a purpose to "aid the JTC," in order for the strictures of the Fourth Amendment to apply to his or her conduct. (Def.'s Mot. 12, PgID 3217-20.) Defendant relies on the Ninth Circuit's reasoning in *United States v. Attson*, 900 F.2d 1427, 1433 (9th Cir. 1990), that "for the conduct of a governmental party to be subject to the fourth amendment, the governmental party engaging in that conduct must have acted with the intent to assist the government in its investigatory or administrative purposes and not for an independent purpose." 900 F.2d at 1433 (citing *Howard*, 752 F.2d at 227).

Despite Anderson's suggestion otherwise, and as discussed *supra*, *Howard* addressed the actions of a purely private party – an insurance investigator – and did *not* address the actions of a "non-law enforcement governmental actor." Anderson has cited no authority to indicate that the Sixth Circuit has embraced or would adopt the *Attson* investigative purpose requirement for "non-law enforcement governmental

employees." Indeed, several courts have questioned whether *Attson* remains good law on this point and those courts that have indicated an inclination to adopt such a distinction appear to have done so in the specific context, presented in *Attson*, of the conduct of a government-employed medical doctor. *See, e.g.*, *Dubbs v. Head Start Inc.*, 336 F.3d 1194, 1205 (10th Cir. 2003) (noting defendants reliance on *Attson* but concluding that the "contention that the Fourth Amendment does not apply in the 'noncriminal' and 'noninvestigatory' context is without foundation"); *Keyes v. Washington County*, No. 15-cv-1987, 2017 WL 3446256, at * 4 (D. Ore. Aug. 10, 2017) (rejecting defendants reliance on *Attson* for the proposition that "the Fourth Amendment does not apply" because defendant lacked an investigative or administrative purpose, concluding that *Soldal v. Cook County*, 506 U.S. 56, 69 (1992), "implicitly overruled *Attson* because *Attson's* holding turned on the governmental actor's subjective motivation for conducting a search"); *Jane Doe I v. Valencia College Bd. of Trustees*, 838 F.3d 1207, 1212–13 (11th Cir. 2016) (rejecting *Attson* as "not good law" in light of *Soldal,* and rejecting the district court's conclusion that "no search occurred because the transvaginal ultrasounds had no 'investigative' or 'administrative' purpose," observing "that the word 'search' in the Fourth Amendment does not contain a purpose requirement"); *Madden v. Hamilton County Dep't of Educ.*, No. 13-cv-377, 2015 WL 11004862, at *4-6 (E.D. Tenn. Aug.

5, 2015) (questioning whether the Sixth Circuit would adopt the *Attson* test and noting that the Tenth Circuit in *Dubbs* "vigorously disagreed with this rationale"). *But see Small v. Fetter*, No. 14-cv-006, 2015 WL 1393585, at *4 (E.D. Ky. March 25, 2015) (noting that "[t]he Sixth Circuit has not articulated a test for determining whether the conduct of a non-law enforcement government employee, like Dr. Fetter, is subject to the Fourth Amendment" citing *Hearring v. Sliwowski*, 712 F.3d 275, 281 (6th Cir. 2013), and "applying *Attson's* rationale in the context of a government-employed physician"). The Sixth Circuit has cited *Attson* twice, once to distinguish it factually and warn that "focusing too much on the language of [*Attson* and *Howard*] and not on the actual holdings would turn them into an engine for circumventing the Fourth Amendment," *see United States v. Booker*, 728 F.3d 535, 545 (6th Cir. 2013), and once to note *Attson's* holding but finding that the *Attson* was insufficient out-of-circuit precedent on which to find a clearly established right, *see Hearring v. Sliwowski*, 712 F.3d 275, 281-82 (6th Cir. 2013).

Apart from the legal uncertainty that an investigatory purpose requirement as applied in *Attson* would be adopted in the Sixth Circuit, Anderson ignores the actual language of *Attson* which holds that the Fourth Amendment would apply to governmental conduct animated either by an investigative *or administrative* purpose: "[T]he type of conduct regulated by the fourth amendment must be somehow designed

to elicit a benefit for the government in an investigatory or, more broadly, an administrative capacity." 900 F.2d at 1429. Here, Anderson denies an investigatory purpose to aid the JTC when she examined documents from Plaintiff's safe but concedes that in reaching into Plaintiff's safe and examining the contents, she was acting in her role as administrator of the 22nd District Court – as keeper of the court records – and believed that the documents in the safe "were probably court documents," which presumably she was intending to examine and control if appropriate in her role as state court administrator. (ECF No. 132-10, March 14, 2018 Affidavit of Pamela Anderson ¶¶ 5-6.) Anderson argues that she was "in her workplace, as a court administrator who is charged with maintaining the court's files [for the benefit of the government], and she encounter[ed] an unlocked and open safe, that could contain court files," thus justifying her examination of the contents of the safe. (Def.'s Mot. 18-19, PgID 3223-24.) Even if she lacked an investigative purpose to aid the JTC at that moment in time, she cannot deny an administrative purpose related to her role as court administrator in control of court records and files, in service of the government.

Even assuming that Plaintiff would be required to establish that Anderson possessed an investigatory purpose to aid the JTC, and assuming that her admitted administrative purpose would fail to satisfy such a test, there is at a minimum a

29

question of fact on this summary judgment record whether a reasonable juror could find that Anderson possessed an investigatory purpose to aid the JTC. According to Washington and Anderson, Anderson was directly tasked with gathering documents and information, by both Washington and Green, to assist in the investigation into Plaintiff's alleged workplace misconduct. And Anderson did provide documents that she gathered directly to Maggie Ryniers, the JTC staff attorney handling the investigation, and "went over" those documents with Ryniers. Indeed, Anderson testified that she felt compelled to cooperate with Green because "she was the SCAO."

With regard to the search of the safe itself, according to Anderson it was Washington, Anderson's supervisor and the individual who was directly charged with assisting in the JTC investigation as evidenced by the Schmucker letter and the testimony of several witnesses, who called her into the office and alerted her to the open safe, specifically alerting her that "there were documents inside." And documents are what Washington and Anderson were instructed to collect by the SCAO.

Given that Anderson was actively assisting in the investigation, and in fact pleaded as much in her state court suit against Plaintiff, *see* Anderson Dep. 59:5-61:9, a reasonable juror could certainly conclude that she acted with an investigatory purpose when, at the direction of Washington, she reached into Plaintiff's safe and

examined the document(s) she pulled out.  To completely ignore the context of the ongoing investigation at the time that Washington called Anderson into his office and alerted her to the documents visible in Plaintiff's opened safe would disregard the Court's obligation to view the facts and all reasonable inferences from those facts in the light most favorable to the Plaintiff.  At a minimum, Plaintiff has created a genuine issue of material fact that Anderson acted with an investigatory purpose to assist Judge Washington and the JTC investigation, both generally and specifically when Anderson reached into the safe and examined a document from the safe.  Assuming that Plaintiff is required to establish investigatory purpose, Defendant is not entitled to summary judgment based on this issue.

### B.  Plaintiff Fails to Submit Evidence Creating a Genuine Issue of Material Fact on her Claim That Anderson Violated Plaintiff's Reasonable Expectation of Privacy in the Safe

"[Plaintiff's] Fourth Amendment rights are implicated only if the conduct of the [Defendant] in this case infringed 'an expectation of privacy that society is prepared to consider reasonable.'" *O'Connor*, 480 U.S. at 715 (quoting *Jacobsen*, 466 U.S. at 109).  "[P]ublic employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances."  480 U.S. at 725-26. Anderson argues

that even assuming that Plaintiff had an expectation of privacy in her locked safe a pled, Plaintiff cannot establish that society would likewise be willing to recognize as reasonable an expectation of privacy "in an *unlocked* and *opened* safe that she kept in her office lavatory in the workplace context." (Def.'s Mot. 15, PgID 3220.) Anderson relies on the Supreme Court's rationale in *Jacobsen* regarding searches conducted by *private* actors, and also cites *Taylor v. Michigan Dept. of Natural Resources*, 502 F.3d 452 (6th Cir. 2007), for the proposition that any intrusion into Plaintiff's opened and unlocked safe to remove and immediately replace a document was so minimal an intrusion as to be free of Fourth Amendment strictures.[6] But, as discussed *supra*, Anderson is not a purely private actor like the Federal Express employees in *Jacobsen* and Plaintiff's argument analogizing to *Taylor* relies on disputed issues of fact. However, for reasons independent of those proffered by Anderson, the Court concludes that Plaintiff did not have an expectation of privacy in her safe vis-a-vis Defendant Anderson that society would be willing to recognize and Plaintiff has failed to create a genuine issue of material fact that Defendant Anderson violated her Fourth

---

[6] Indeed the Court has difficulty following Anderson's argument here based on *Jacobsen*. She appears on the one hand to liken herself to the purely private Federal Express employees, but on the other relies on the rationale that when the government happens upon evidence that has been exposed by a private party's search, it does not violate the Fourth Amendment by observing that evidence. In any event, Anderson is not a private party and she did more than just "observe" the open safe as she found it – she admits to having reached in and removed and examined some of its contents.

Amendment rights.

In analyzing the allegations of Plaintiff's Complaint in this case, the Sixth Circuit recognized that the Supreme Court in *O'Connor* defined the boundaries of the workplace context to include an office but also held that certain items that are personal in nature, while found inside the workplace, such as "a piece of closed personal luggage, a handbag or a briefcase," that happen to "pass through" the employer's workplace, are not necessarily considered "part of the workplace context." 592 F. App'x at 456 (citing *O'Connor*, 480 U.S. at 716). The Sixth Circuit held that Plaintiff had alleged facts that plausibly suggested that her locked personal safe was "analogous to a piece of closed personal luggage or a briefcase because it was not within the employer's control, and thus not a part of the 'workplace context.'" 592 F. App'x at 457. Accordingly, the Sixth Circuit concluded that the *O'Connor* special needs workplace exception did not apply, a warrant was required and was not obtained, and therefore Plaintiff plausibly alleged a Fourth Amendment violation. *Id*. In reaching this conclusion, the Sixth Circuit assumed the truth of the following allegations:

> James purchased the safe herself, kept it locked, and used it to store personal items. James alleges that she did not authorize employer use or access; she used it exclusively. Specifically, James alleges that she and her attorney met with Defendant Green and informed her that the safe contained personal documents. In response, James was advised that no one would violate her privacy rights. Importantly, because she was not

on notice that her safe could be subject to search and there is no evidence that others had access to her safe or that it was "generally within the employer's control," James's safe is further distinguished from the confines of the workplace delineated in *O'Connor*, 480 U.S. at 715, 107 S.Ct. 1492 ("The workplace includes those areas and items that are related to work and are generally within the employer's control."). Thus, although the safe was "within the employer's business address," it is analogous to a piece of closed personal luggage or a briefcase because it was not within the employer's control, and thus is not part of the "workplace context." *Id.* at 716, 107 S.Ct. 1492. *O'Connor* counsels that the warrantless search of the safe falls outside the bounds of the special needs exception to the warrant requirement altogether.

592 F. App'x at 457.

In reaching this conclusion, the Sixth Circuit distinguished the Seventh Circuit's decision in *Gossmeyer v. McDonald*, 128 F.3d 481 (7th Cir. 1997), which upheld the search of an employee's locked filing cabinet and storage unit. In *Gossmeyer*, the plaintiff, a child protective investigator, kept a filing cabinet and desk in her office, containing both work and personal items, that she kept locked "with her own private key." *Id.* at 484-85. Law enforcement officers investigating allegations that plaintiff possessed child pornography entered plaintiff's workplace and in the course of their search of her office "pried open the desk and file cabinet with their tools," and searched the contents. Upon returning to work Gossmeyer noted that personal items had been removed from her desk, items that were later returned to her desk without her knowledge or consent. *Id.* at 485-86. Gossmeyer was never informed of the results of the investigation and was never charged or indicted for any

crime based on the search. *Id*. at 486. Gossmeyer filed a complaint alleging, in part, a violation of her Fourth Amendment rights based on the search of her locked desk and file cabinet.

The district court found the search reasonable and the Seventh Circuit affirmed. The Seventh Circuit found the search of Gossmeyer's locked desk and file cabinet was a workplace search under *O'Connor* and was reasonable under the Fourth Amendment, reasoning as follows:

> We first examine whether Gossmeyer had a reasonable expectation of privacy. Gossmeyer contends that she had an expectation of privacy in her office, filing cabinet, two-door storage unit, and desk because she bought the unit and filing cabinet herself and had exclusive control over them with lock and key. She also notes that she maintained her desk with a lock and key. However, Gossmeyer herself points out that in the two cabinets she stored evidentiary photographs, files, documents, work-related sundries, and some personal items. Most of the contents were work-related items, and Gossmeyer was the subject of a work-related investigation. In *Ortega*, the Court found that the "workplace" includes "those areas and items that are related to work and are generally within the employer's control." *Ortega,* 480 U.S. at 715, 107 S.Ct. at 1496–97. Gossmeyer is correct that the "workplace" does not necessarily include closed personal containers, such as locked luggage or purses, that just happen to be in the workplace. *See id.* at 716, 107 S.Ct. at 1497. But we fail to find an expectation of privacy in the cabinets simply because Gossmeyer bought them herself. The cabinets were not personal containers which just happened to be in the workplace; they were containers purchased by Gossmeyer primarily for the storage of work-related materials. Gossmeyer herself stated that she bought them because of a lack of storage space. Also, Carla Hay had at least a key to the two-door storage unit, which she opened for Heath and Jesse. Gossmeyer's desk, which she did not purchase, also likely had work-related materials in it. Gossmeyer had no constitutionally-protected

35

privacy interest in her desk, two-door storage unit, or filing cabinet. These items were part of the "workplace," not part of Gossmeyer's personal domain.

128 F.3d at 491.  But the majority in this case distinguished *Gossmeyer*, "specifically" because here Plaintiff had expressed the private nature of her safe to Defendant Green and had been assured that her privacy expectations in her safe would be protected:

> The search of James's safe presents very different circumstances than these cases because she claims to have used the safe primarily for personal use. James purchased the safe herself, kept it locked, and used it to store personal items. James alleges that she did not authorize employer use or access; she used it exclusively. Specifically, James alleges that she and her attorney met with Defendant Green and informed her that the safe contained personal documents. In response, James was advised that no one would violate her privacy rights.

592 F. App'x at 457.  The plaintiff in *Gossmeyer* also had purchased the filing cabinet herself, kept it locked, and had it "pried open" in her absence.  Thus, the fact distinguishing Plaintiff's allegations from *Gossmeyer* was that Plaintiff alleged that she had communicated to Green the private nature of the materials kept in her safe and was assured that "no one would violate her privacy rights."  592 F. App'x at 457.

There is absolutely no evidence that the information conveyed by Plaintiff to Green was ever communicated to Anderson.  We must analyze Anderson's conduct in light of the circumstances known to her at the time she encountered an open, unlocked safe in Plaintiff's office in the midst of an office-wide investigation into, and collection of documentary evidence related to, Plaintiff's alleged workplace

36

misconduct.  There is no evidence that Anderson had any awareness of any of the factors that the Sixth Circuit found determinative of a Fourth Amendment right to privacy here.  There is no genuine issue of fact that Anderson did not know whether Plaintiff or the court had purchased the safe, she was not aware that Plaintiff kept it under lock and key, she was not aware that Plaintiff kept personal, as opposed to work-related materials in the safe, and she was not aware that Plaintiff had secured a commitment from Green that her safe would not be searched for evidence of workplace misconduct.  In fact, Plaintiff concedes that she did not tell Anderson or anyone else at the 22nd District Court that her safe was private, locked, or contained personal materials.  Plaintiff testified that prior to being placed on administrative leave, she never indicated to anyone at the court, including Anderson, that she had an expectation of privacy in her safe.  Plaintiff suggested that because court employees knew that she kept her office locked, and they were not permitted in her office when she was not there, they would know not to go in the safe.  (Pl.'s Dep. 247:1-248:2.) But as we know, the Sixth Circuit has concluded that the search of Plaintiff's office was reasonable under the Fourth Amendment so any expectation of privacy that Plaintiff claims in her safe that was solely derivative of her expectation of privacy in her office is not protected under the Fourth Amendment.  On the facts known to Anderson at the time of the search, which were quite different from the facts that the

Sixth Circuit concluded plausibly alleged a Fourth Amendment violation, a state court administrator in Anderson's position would reasonably have believed that reaching into Plaintiff's safe, whether it was "ajar" or had been "jimmied open," was constitutionally permissible under the circumstances.

With respect to Anderson, the facts regarding the private nature of Plaintiff's safe assumed by the Sixth Circuit to be true were not borne out in the discovery process. "The reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred." *Jacobsen*, 466 U.S. at 115. The question the Court must answer is whether society would recognize an expectation of privacy in an open, unlocked safe kept in the office of a state court judge, and encountered during the course of an official investigation into the alleged misconduct of that judge, by a court administrator who was both generally responsible for maintaining court records and files and specifically was tasked with assisting in collecting documents related to the alleged acts of misconduct. Even viewing the facts at the time that the alleged search occurred in the light most favorable to the Plaintiff, Plaintiff has not created a genuine issue of material fact on her claim that Anderson violated Plaintiff's Fourth Amendment rights when she was called by Judge Washington (her supervisor at the time) and alerted to Plaintiff's open, unlocked safe and removed and examined a document (or documents) from that

safe.  The evidence suggests that the staff at the 22nd District Court may generally have understood that the Plaintiff's office, which Plaintiff kept locked at all times when she was not in it, was considered by Plaintiff to be her private space.  But the Sixth Circuit concluded that a search of Plaintiff's office was reasonable under the Fourth Amendment and there is insufficient evidence on which a reasonable juror could conclude that Anderson understood that Plaintiff's safe, which was within Plaintiff's office space, contained Plaintiff's private, personal information or was kept locked or was in anyway more "private" and entitled to greater constitutional protection than Plaintiff's office or desk.

Anderson had been directed by the SCAO and by Judge Washington to collect certain documentation related to the alleged misconduct and it is undisputed that Anderson did collect documents, some of which she turned over to Ms. Rynier from the JTC and some of which she authorized Brianna Purdy to shred, under guidelines that she received from the SCAO.  As discussed *supra*, the Sixth Circuit concluded that the search and collection of documents from Plaintiff's office space was reasonable at its inception because there were "'reasonable grounds' for suspecting that a search of James's office would yield evidence that James was 'guilty of work-related misconduct.'" 592 F. App'x at 458 (quoting *O'Connor*, 480 U.S. at 726).  The Sixth Circuit also concluded that a thorough search of Plaintiff's office proper, an area

that "might contain financial and employment records," was reasonable in scope given the nature of the allegations of misappropriation of public funds and employment irregularities against James and given her acknowledgment in her Complaint that she had taken control of the court finances in 2010. *Id.* at 459.      While there is evidence in the record suggesting that Plaintiff told Green that she considered her safe to be private, and received assurances from Green that her safe would not be disturbed or opened, there is no evidence in the record to suggest that Anderson learned this fact from Green or that Anderson had any knowledge that the safe in Plaintiff's office was different from (i.e. kept under lock and key and more private than) any other space in the Plaintiff's office which was being searched for relevant information.[7]  Nor is there *any* evidence, other than Plaintiff's unsupported assertion that Anderson "had control" over Plaintiff's office space after Plaintiff was placed on administrative leave, on which a reasonable juror could conclude that Anderson had anything whatsoever to do with the unlocking/opening of Plaintiff's safe.  In fact, Plaintiff admits that she has

---

[7] There is evidence in the record sufficient to create a genuine issue of material fact that Green *did* communicate to *Washington* the information conveyed to Green by Plaintiff regarding the private nature of her safe and its contents.  *See* ECF No. 140-9, JTC Hr'g Tr. 297, PgID 4639-40.  Green testified in the JTC proceedings that Plaintiff's attorney, Sharon McPhail, did inform Green of the private nature of Plaintiff's safe and Green recalled that she did convey that information to Judge Washington.  This evidence is discussed in a separate Opinion and Order addressing Judge Washington's motion for summary judgment.

no evidence that it was Anderson who broke into/opened her safe and removed or destroyed exculpatory documents. (James Dep. 265:20-22.) The only evidence in the record suggests that it was *not* Anderson who opened the safe. First, Anderson's testimony that Judge Washington alerted her to the fact that the safe was "ajar" and that there were "documents inside" is not disputed by the Plaintiff. Indeed, Plaintiff relies on this evidence to support her Fourth Amendment claim. Second, Anderson specifically testified that while she was aware during Plaintiff's tenure at the 22nd District Court that Plaintiff had a safe in her office, she did not know whether the safe belonged to Plaintiff or the Court, she did not know what Plaintiff kept in the safe, she did not know whether it was kept locked or not, and if it was locked she had no way of knowing how to get into the safe. (Anderson Dep. 38:22-39:25.) Anderson testified that she did not notice at the time she reached into the safe that it had been "broken into or pried open." (Def.'s Mot. Ex. 9, Anderson Aff. ¶ 4.) But even assuming that the safe did appear to have been "jimmied open," *Gossmeyer* instructs that this does not change the analysis with respect to Anderson's conduct based on the facts known to her at the time of the alleged search.

"To make out a *genuine* issue of material fact, plaintiff must present significant probative evidence tending to support her version of the facts, *evidence* on which a reasonable jury could return a verdict for her." *Chappell v. City of Cleveland*, 585

41

F.3d 901, 913 (6th Cir. 2009) (emphasis in original). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir.1986)).

 Plaintiff has failed to produce evidence on which a trier of fact could conclude that Anderson had any involvement in opening the safe, had any knowledge that the safe was the personal private property of the Plaintiff, or that it contained Plaintiff's personal information and/or that it was kept locked. Nor is there evidence to dispute the fact that at the time of the alleged search, Anderson encountered an open, unlocked safe with the door ajar (or "jimmied open"), and that the opened safe appeared on a visual inspection to contain documents. Likewise, it is undisputed that Anderson was the court administrator charged with maintaining court files and had been tasked by the SCAO and Judge Washington with assisting with the collection of documentary evidence of Plaintiff's alleged misconduct when she was alerted by her supervisor, Judge Washington, to the open and unlocked safe visibly containing documents. No reasonable juror could conclude, under these circumstances, that Anderson violated a reasonable expectation of privacy in the safe when she reached into the safe and removed and examined document(s). As discussed *infra*, even if the Court were to conclude that genuine issues of material fact did exist as to the reasonableness of Anderson's conduct in reaching into the safe and removing documents, Anderson

would be entitled to qualified immunity based upon the novelty of this factual scenario.

C.   **Plaintiff Has Failed to Submit Evidence Creating a Genuine Issue of Material Fact that Anderson's Conduct in Allegedly Removing Documents From Plaintiff's Safe Proximately Caused Plaintiff's Injury**

Defendant Anderson argues that Plaintiff cannot state a Fourth Amendment claim because she has not adduced sufficient evidence to create a genuine issue of material fact regarding what documents were taken from her safe and whether any of the documents that she claims were taken from the safe were used against her or would have proved to be exculpatory in the JTC proceeding. Anderson argues that if Plaintiff cannot demonstrate that Anderson retained and shredded or provided to the JTC any documents from Plaintiff's safe, she cannot establish that Anderson's conduct proximately caused her injuries, which "is an essential element of a § 1983 claim." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 659 (6th Cir. 1994). *See also Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 442 F.3d 410, 443 (6th Cir. 2006), *rev'd and remanded on other grounds* 127 S. Ct. 2489 (2007) ("[P]roximate causation is an essential element of a § 1983 claim for damages. That is, a violation of a federally secured right is remediable in damages only upon proof that the violation proximately caused injury.") (internal quotation marks omitted).

Defendant Anderson argues that Plaintiff has been unable to identify in discovery what documents were in her office safe in 2011 or how those documents would have been exculpatory. Plaintiff testified in her deposition that the safe would have contained: "Tax returns, statements from my accountant, American Express statements. If memory serves me correctly maybe some personal bank statements. There may have been some documents regarding my daughter. . . . Some documents from the Judicial Tenure Commission obviously not involving this case . . . . an inventory of some furnishings or something from my old law firm . . . . Some letters. Checkbook, I'm thinking a checkbook from old law firm . . . a money order . . . some case information from private practice . . . . Probably some W-2's, possibly some property information . . . because I had a time share, that probably would have been in there. So that's all I can think of right now." (James Dep. 52:8-53:11.) Plaintiff expressly testified that there were no court files or "financial information for the court" in her safe. (James Dep. 53:21-54:2.)

Anderson submits that Plaintiff never described how any of the documents she maintains were in her safe were used against her or could have been exculpatory in her JTC proceedings. Plaintiff responds that "[t]hese personal financial documents would have assisted Plaintiff's defense in the JTC proceedings inasmuch as the JTC alleged, among other things, that Plaintiff used certain court funds for personal travel." (ECF

No. 140, Pl.'s Resp. 12, PgID 4499.)  Plaintiff argues that because it is undisputed (and it is) that Washington and Nicole James did collect documents from Plaintiff's *office* (in which the Sixth Circuit determined Plaintiff *did not* have a reasonable expectation of privacy) and because it is undisputed (and it is) that some documents (old registers of action and pleas) were shredded, this creates a genuine issue of material fact "as to whether some of the documents which were shredded came from Plaintiff's safe."  (Pl.'s Resp. 13, PgID 4500.)  But Plaintiff testified that she does not know if Anderson took documents from her safe and does not know if Anderson shredded any documents taken from her safe:

> Q: But you don't have any evidence to contradict where [Anderson] says that she didn't remove or destroy any documents from the safe?
>
>        \*          \*          \*
>
> A: I know that she destroyed documents, and I know that exculpatory documents were missing and never returned.
>
> Q: Did those documents come from the safe?
>
> A: Which documents?
>
> Q: The exculpatory documents that were missing.
>
> A: I know that there are documents from the safe that were taken and never returned.  Whether she ate them, shredded them, or what she did with them I don't know.
>
> Q: Well, you're now assuming that she's the one who did something with them, and you don't know that, right?

A: I don't know who did it.

(James Dep. 265:3-22.)  Plaintiff admitted in her deposition that she has no evidence that Anderson broke into the safe, directed anyone to break into the safe, or ever possessed documents from the safe but testified that "it wouldn't surprise her." (James Dep. 257:11-258:9.)  Plaintiff argues that "[r]egardless of whether Plaintiff can now specifically identify documents which were removed, Anderson testified under oath that she did in fact remove items from Plaintiff's personal safe, and Plaintiff has identified the categories of documents store[d] in her safe."  (Pl.'s Resp. 12 n. 4, PgID 4499.)  Thus, Plaintiff admits that she cannot identify, other than by category, any specific documents that are missing and has produced no evidence or argument as to how those unidentified documents would have been exculpatory.

In its January 7, 2015 Opinion and Order remanding this matter, the Sixth Circuit discussed Plaintiff's allegations that some of the documents that were taken from her personal safe would have been exculpatory in her JTC proceedings, and noted the possibility that "personal financial documents could be considered exculpatory to charges of improper expenditures of court funds if the documents showed that [Plaintiff] had used personal funds for certain purchases."  592 F. App'x at 459.  While such allegations did suffice at the pleading stage, Plaintiff was required to come forward with evidence in response to Anderson's motion for summary

judgment on which a reasonable juror could conclude that Anderson removed and destroyed documents from Plaintiff's safe that would have been exculpatory in Plaintiff's JTC proceedings without engaging in speculation and conjecture. But Plaintiff provides no such evidence, makes no such argument, and provides no evidence on which a reasonable juror could reach any conclusion regarding the exculpatory nature of any documents. Although the Sixth Circuit allowed this claim to move forward as alleged, Plaintiff has failed to come forward with evidence on which a juror could reasonably conclude, without speculation and conjecture, (1) that Anderson removed and failed to return any particular documents that were in Plaintiff's safe, or (2) that any documents taken from her safe were destroyed or that they would have been exculpatory. Ms. Rynier, the JTC staff attorney who conducted the investigation into Plaintiff's alleged misconduct, testified that she had no interest in what was in Plaintiff's safe (Rynier Dep. 44:20-25) and Ms. Anderson testified that she placed the only document she took from Plaintiff's safe back into the safe and did not give the JTC any documents from Plaintiff's safe. In response to this evidence that no documents from Plaintiff's safe were given to the JTC or removed and destroyed, Plaintiff was required to come forward with more than unsupported statements that of course that must have happened. She has not done so. The most she can say is that the document Anderson removed was "a tax document" and that

47

Schmucker told Washington to be on the lookout for 1099's. And as to the other categories of documents, such as personal credit card statements that *may* have demonstrated that Plaintiff used personal and not court funds for certain expenses, Plaintiff has completely failed to specifically identify any such documents or to explain what exculpatory charges may have been revealed by those unidentified documents. And Plaintiff admits that she never tried to obtain these allegedly critically important exculpatory documents through any other means, such as asking her accountants, banks, or credit card company for copies of these generally obtainable documents. (James Dep. 252:1-24, 254:1-6.)   A jury would be required to impermissibly speculate in order to tie this scant evidence together to arrive at the conclusion that Anderson removed documents from Plaintiff's personal safe and that those documents would have been exculpatory in Plaintiff's JTC proceedings.

"To make out a genuine issue of material fact, plaintiff must present significant probative evidence tending to support her version of the facts, evidence on which a reasonable jury could return a verdict for her." *Chappell*, 585 F.3d at 913.  Plaintiff has failed to present sufficient evidence to permit a reasonable juror to conclude that any alleged search by Anderson of Plaintiff's personal safe, even if it occurred, proximately caused Plaintiff's injuries.

However, this is not necessarily the end of the matter.  Although Plaintiff has not claimed them, nominal damages are generally available to vindicate the violation of constitutional rights that result in no actual damages.  *See Memphis Commun. School District v. Stachura*, 477 U.S. 299, 308, 308 n. 11 (1986) (holding that "the abstract value of constitutional rights may not form the basis for § 1983 damages," but observing that "nominal damages . . . are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury") (citing *Carey v. Piphus*, 435 U.S. 247, 266 (1978)); *Hill v. Ypsilanti Housing Commission*, No. 09-13562, 2010 WL 3168440, at *3 (E.D. Mich. Aug. 10, 2010) (holding that plaintiff may be entitled to nominal damages for a constitutional violation "regardless of proximate causation as to actual injury").  *See also Stoedter v. Gates*, 704 F. App'x 748, 757-58 (10th Cir. 2017) (agreeing with the district court that "nominal damages are mandatory upon a finding of a constitutional violation," and declining to distinguish among categories of constitutional rights).

Here, however, because the Court concludes that there was not a constitutional violation, and even if there was, Anderson is entitled to qualified immunity, *see infra* discussion at Section IIID, even nominal damages are not available to this Plaintiff from this Defendant based upon an alleged unconstitutional search of Plaintiff's safe. *See Eaddy-Bey v. Gosslin*, 860 F.2d 1078, at *1 n. 1 (6th Cir. 1988) (table case)

(noting that prison hearing officer who was granted qualified immunity "should have been immune from paying even nominal damages" but allowing the nominal damage award to stand because the hearing officer did not appeal); *Bamdad v. Drug Enforcement Admin.*, 617 F. App'x 7, at *9 (D.C. Cir. Sept. 22, 2015) (Mem.) (observing that "'[s]everal other circuits have also implicitly recognized the legal nature of nominal damages by finding them to be barred by qualified immunity.' . . . [a]nd for good reason [because] [q]ualified immunity is an immunity from *suit*, not just remedial absolution.") (alterations added) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 978 (8th Cir. 1999) (finding that both Eleventh Amendment and qualified immunity bar recovery of nominal damages in a § 1983 case); *Reese v. Gray*, No. 06-cv-126, 2011 WL 302873, at *13 (N.D. Miss. Jan. 27, 2011) (holding that finding of qualified immunity precludes an award of nominal damages) (collecting cases).

Even assuming Plaintiff could establish that Anderson violated her Fourth Amendment rights, she could not establish proximate cause. Because Plaintiff cannot establish proximate cause, she would be entitled to at most nominal damages for any claimed violation of her Fourth Amendment rights by Anderson. But because Anderson would be entitled to qualified immunity if a constitutional violation were found, any claim for nominal damages would be legally barred.

**D.    Even Were the Court to Find a Genuine Issue of Material Fact Regarding the Constitutionality of Anderson's "Search" of the Safe, Anderson Would be Entitled to Qualified Immunity Because Any Right to Privacy in Plaintiff's Unlocked and Open Safe Located in Plaintiff's Office Was Not Clearly Established on the Facts Known to Anderson at the Time of the Alleged Search**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "In § 1983 constitutional torts like this one, qualified immunity prevents government officials from being held liable if (1) the officers did not violate any constitutional guarantees or (2) the guarantee, even if violated, was not 'clearly established' at the time of the alleged misconduct." *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 992 (6th Cir. 2017), *rehearing en banc denied* (July 5, 2017), *certiorari denied* 138 S. Ct. 738 (Jan. 16, 2018) (citing *Pearson*, 555 U.S. at 232. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

""When . . . a defendant raises qualified immunity as a defense . . . [t]he plaintiff has the burden of showing that a right is clearly established . . . [and] the defendant carries the burden of showing that the challenged act was objectively

reasonable in light of the law existing at the time. In satisfying this burden, a defendant can rely on a reasonable mistake of fact, for [q]ualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact." *Harris v. Klare*, 902 F.3d 630, 637 (6th Cir. 2018) (internal quotation marks and citations omitted) (ellipses and alterations in original).

"The Supreme Court 'do[es] not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Kent v. Oakland Cty.*, 810 F.3d 384, 395 (6th Cir. 2016) (quoting *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013)). The inquiry requires the plaintiff to point to "controlling authority" or "a robust consensus of cases of persuasive authority" in order to show that the right was clearly established. *Hidden Village, LLC v. City of Lakewood, Ohio*, 734 F.3d 519, 529 (6th Cir. 2013).

The Sixth Circuit has summarized a plaintiff's obligation to identify cases with similar fact patterns in demonstrating the "clearly established" prong:

"[C]learly established law" may not be defined at such "a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). It must be more "particularized" than that. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *see Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 508–09 (6th Cir. 2012). The Supreme Court recently reminded us that a

plaintiff must identify a case with a similar fact pattern that would have given "fair and clear warning to officers" about what the law requires. *White v. Pauly*, —— U.S. ——, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (quotation omitted). The district court, we note, did not have the benefit of *Pauly*. But we do, and accordingly we must follow its lead. Immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 551 (quotation omitted). The "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

*Arrington-Bey*, 858 F.3d at 992-93.

Here, Plaintiff fails both prongs. The Court has already determined that Plaintiff has failed to present a genuine issue of material fact on her claim that Anderson violated her Fourth Amendment rights. "By definition, if [Anderson] did not violate a constitutional right, [s]he did not violate a constitutional right that is clearly established." *Taylor*, 502 F.3d at 458. "[T]here being insufficient evidence of a constitutional violation, defendants, in effect, have no need of qualified immunity and are actually entitled to summary judgment as matter of law." *Chappell*, 585 F.3d at 916.

But even if the Court had found an issue of fact on the first prong, and found that a reasonable juror could conclude that Anderson had violated Plaintiff's Fourth Amendment rights, Plaintiff has failed to establish that "[t]he contours of [the] right" at the time of the alleged unconstitutional search were "'sufficiently clear' that every

'reasonable official would have understood that what he is doing violates that right.'"

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (first alteration in original) (quoting

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[T]to determine whether a

government official would believe that a right is clearly established," the court applies

an "objective reasonableness test [that] focuses on whether an official, given the facts

that the official knew or reasonably should have known about the situation, should

have known that his or her particular conduct would not pass scrutiny when applied

to the law." *Sandul v. Larion*, 119 F.3d 1250, 1254 (6th Cir. 1997) (internal quotation

marks and citations omitted).

Plaintiff has failed to point to "clearly established" law, i.e. Sixth Circuit or

Supreme Court precedent, or a "robust consensus of cases," that would have put

Anderson, the court administrator generally charged with maintaining court records

and specifically tasked with collecting documents relating to Plaintiff's alleged

misconduct from the 22nd District Court files, on notice that she should not reach into

an open, unlocked safe within the Plaintiff's office at the request of her supervisor

(Judge Washington) to examine documents that may have been work-related or

pertinent to the investigation.

The Sixth Circuit's determination that Plaintiff had stated a plausible Fourth

Amendment claim as to the individual or individual(s) who opened her safe was

premised on the allegation that the safe was closed and locked when encountered by the violators, and also assumed that whoever conducted the search would have known of the private nature of the safe and its contents as a result of Plaintiff's disclosure to Green regarding the privacy of her safe. The Sixth Circuit's opinion explicitly noted that Plaintiff alleged that she had informed Green that her safe contained private information and had been assured by Green that her privacy in her safe would not be invaded. 592 F. App'x at 457.

But, as discussed *supra*, there is no evidence to suggest that Anderson was aware either of the private nature of the Plaintiff's safe or of Green's alleged promise to protect Plaintiff's privacy rights in the safe. In fact, as discussed *supra*, Anderson's unrebutted testimony is that she had no such knowledge regarding who owned the safe that Plaintiff kept in her office, what Plaintiff kept in the safe, or whether Plaintiff kept that safe locked. And it is undisputed that no one, including the Plaintiff, ever told Anderson that Plaintiff had an expectation of privacy in her safe.

While the 22nd District Court employees, including Anderson, had perhaps understood that Plaintiff did not allow free and open to access to her office during her tenure at the court, there was a search underway of Plaintiff's office to collect documents and information potentially relevant to alleged workplace misconduct. The Sixth Circuit found that the office aspect of the search was reasonable under the

55

Fourth Amendment: "[It was not] unreasonable, given the context of the JTC investigation against her, to suspect her office to contain evidence of her work-related misconduct. Therefore, we conclude that the search of James's office was reasonable at its inception."  592 F. App'x at 458.  The Sixth Circuit drew a novel distinction between the Plaintiff's office and the safe she kept in that office, which they found to lie outside the workplace context, based on the facts alleged and assumed to exist regarding the private nature of the safe: "The search of James's safe presents very different circumstances than these cases because she claims to have used the safe primarily for personal use. James purchased the safe herself, kept it locked, and used it to store personal items. James alleges that she did not authorize employer use or access; she used it exclusively. *Specifically*, James alleges that she and her attorney met with Defendant Green and informed her that the safe contained personal documents." 592 F. App'x at 457 (emphasis added).  And when examining the scope of the search (having assumed *arguendo* that the safe did fall within the workplace context) the Sixth Circuit reiterated the significance of these allegations:  "However, unlike in *Jackson [v. City of Columbus*, 194 F.3d 737 (6th Cir. 1999)], James alleges that a locked personal item—her safe—was also searched, and thus *Jackson* does not settle the question of whether the search was unreasonable in scope. As discussed above, James has alleged that she purchased the safe, maintained it for her personal

use, and kept it under lock and key." 592 F. App'x at 459.

It is undisputed that Defendant Anderson possessed none of this information when she allegedly removed documents from Plaintiff's safe at Judge Washington's suggestion. Plaintiff has provided the Court with no clearly established law that would have put Anderson, under the facts as relevant to her alleged misconduct, on notice that there was a constitutional distinction between Plaintiff's office and Plaintiff's open, unlocked safe, or between a locked filing cabinet that had been pried open (*Gossmeyer*) and a "jimmied open" safe. For purposes of qualified immunity, we must analyze Anderson's conduct based on the facts known to her at the time of the alleged search and ask whether there was clearly established law that would have put her on notice that Plaintiff had a protectable privacy interest in the contents of her safe.

The Sixth Circuit majority in this case turned to the Seventh Circuit's opinion in *Gossmeyer* as "one of the few courts" having considered the application of *O'Connor* to the facts presented by Plaintiff's allegations. And on the facts known to Anderson at the time of the search, a state court administrator would reasonably have interpreted *Gossmeyer* as teaching that the "search" of Plaintiff's safe, even if it involved an obviously "jimmied open" safe, was permissible under the circumstances of the JTC investigation into the allegations of Plaintiff's workplace

57

misconduct.  Although Anderson testified that at the time she reached into the safe she was not thinking of aiding in the JTC investigation, she was called into Judge Washington's office and alerted by him to the presence of "documents" in the safe. Anderson was the keeper of the records at the 22nd District Court and she was charged with maintaining court files.  In addition, a search for documentary evidence of Plaintiff's alleged misconduct was underway at the time of the alleged search and no clearly established law would have put Anderson on notice under the circumstances known to her that the documents in the safe were personal and beyond the scope of the work-related investigation.

With respect to Defendant Anderson, the facts adduced in discovery have not borne out the facts alleged in the Complaint and relied upon by the Sixth Circuit in finding that Plaintiff had plausibly alleged a Fourth Amendment violation.  Plaintiff has failed to create a genuine issue of material fact that Defendant Anderson violated her Fourth Amendment rights, nor was such a right clearly established.  Anderson is entitled to summary judgment.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant Anderson's motion for summary judgment and DISMISSES Plaintiff's claims against Anderson in this action WITH PREJUDICE.

IT IS SO ORDERED.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  November 26, 2018


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 26, 2018.


s/Deborah Tofil
Case Manager