UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SYLVIA JAMES,

          Plaintiff,

v.

PAMELA ANDERSON, an
individual, DEBORAH GREEN, an
individual, PAUL FISCHER, an individual
and Executive Director of the Judicial Tenure
Commission, the JUDICIAL TENURE
COMMISSION, and VALDEMAR
WASHINGTON, an individual,

          Defendants.

_____/

Case No. 12-10273

Paul D. Borman
United States District Judge

R. Steven Whalen
United States Magistrate Judge

OPINION AND ORDER
(1) GRANTING IN PART AND DENYING IN PART DEFENDANTS
JUDICIAL TENURE COMMISSION OF THE STATE OF MICHIGAN,
DEBORAH GREEN AND VALDEMAR WASHINGTON'S MOTION FOR
SUMMARY JUDGMENT (ECF NO. 134),
(2) GRANTING DEFENDANT PAUL J. FISCHER'S MOTION TO DISMISS
FOR LACK OF SUBJECT MATTER JURISDICTION, FOR JUDGMENT ON
THE PLEADINGS, AND FOR SUMMARY JUDGMENT (ECF NO. 135), and
(3) DENYING AS MOOT THE JUDICIAL TENURE COMMISSION
AND PAUL FISCHER'S MOTION TO PRECLUDE THE EXPERT REPORT
AND TESTIMONY OF PLAINTIFF'S EXPERT
EDWARD D. ROTHMAN (ECF NO. 136)

This case, reassigned to this Court in February, 2015, from the Honorable

Lawrence P. Zatkoff by Administrative Order, is before the Court on remand from the

United States Court of Appeals for the Sixth Circuit to consider the claims of Judge Sylvia James, a female African-American former state court judge, that Defendants violated her Fourth and Fourteenth Amendment rights when they conducted a search of her office and personal safe and instituted proceedings that resulted in her removal from office by the Michigan Supreme Court based upon alleged judicial misconduct in her role as a judge of the 22nd District Court of the State of Michigan.[1]

Defendants, the Judicial Tenure Commission ("JTC"), Paul Fischer, Valdemar Washington and Deborah Green, have filed motions to dismiss and/or for summary judgment that are now before the Court.[2] The motions are fully briefed and the Court held hearings on the motions on September 7, 2018, and September 13, 2018. For the reasons that follow, the motions are GRANTED IN PART and DENIED IN PART.

---

[1] Following the Sixth Circuit's remand, there are only two specifically defined remaining claims, both asserted under 42 U.S.C. § 1983, alleging: (1) a Fourth Amendment violation stemming from an alleged search of Plaintiff's personal safe and (2) a Fourteenth Amendment equal protection violation based upon the alleged conduct of certain Defendants in declining to recommend the discipline of several white and/or male Michigan state court judges who also engaged in judicial misconduct. *James v. Hampton*, 592 F. App'x 449, 451 (6th Cir. 2015).

[2] Defendant Pamela Anderson also filed a motion for summary judgment, which is addressed in a separate Opinion and Order.

# I.    BACKGROUND[3]

## A.    Procedural Background

On September 2, 2015, this Court issued an Opinion and Order granting Defendants Jones, Hampton, and the City of Inkster's motions to dismiss and denying Defendant Anderson's motion to dismiss. *James v. Hampton*, No. 12-10273, 2015 WL 5159332 (E.D. Mich. Sept. 2, 2015). As this Court summarized in that Opinion and Order, this is the second remand of this action from the Sixth Circuit; the first followed Plaintiff's appeal of Judge Zatkoff's April 2, 2012 decision to abstain and dismiss this action under *Younger v. Harris*, 401 U.S. 37 (1971), pending the outcome of the state court administrative proceedings that were then in progress against Judge James. In the first remand, the Sixth Circuit held that while *Younger* abstention was appropriate, Judge Zatkoff should have stayed the case pending the outcome of the state court administrative proceedings rather than dismiss, in order to avoid Plaintiff's encountering any statute of limitations issues following the state court administrative process. *James v. Hampton*, 513 F. App'x 471 (6th Cir. 2013). Upon final resolution of the state administrative proceedings against Judge James, which found sufficient evidence of misconduct to remove her from office, Judge Zatkoff entertained and

---

[3] Some of this same background is set forth in the Court's Opinion and Order granting Defendant Anderson's motion for summary judgment, and is repeated here for context and as relevant to the claims against these Defendants.

3

granted the Inkster and State Defendants' motions to dismiss James's Fourth Amendment unlawful search and Fourteenth Amendment equal protection claims for failure to state a claim and declined to exercise supplemental jurisdiction over James's state law claims. *James v. Hampton*, No. 12-10273, 2013 WL 6839136 (E.D. Mich. Dec. 27, 2013). Plaintiff again appealed Judge Zatkoff's dismissal of her claims and the Sixth Circuit again reversed, remanding for further proceedings that are now before this Court. *James v. Hampton*, 592 F. App'x 449 (6th Cir. 2015).

In its September 2, 2015 Opinion and Order, this Court discussed at length the Sixth Circuit's January 7, 2015 decision reversing Judge Zatkoff's dismissal of Plaintiff's claims and remanding the matter to this Court, which was reassigned this case pursuant to administrative order. As relevant here, and as stated in this Court's previous Opinion and Order, the Sixth Circuit concluded that Plaintiff did plausibly plead a Fourth Amendment claim based upon allegations of the warrantless search of the safe that James kept in her office at the 22nd District Court. 592 F. App'x at 459 ("[W]e find that James has stated a claim that the search of her locked personal safe was unreasonable [and] reverse the district court's dismissal of James's Fourth Amendment claim."). The Sixth Circuit also found that Plaintiff plausibly alleged an equal protection claim against certain Defendants. 592 F. App'x at 461 ("[W]e reverse the dismissal of James's equal protection claim as to the State Defendants and

4

remand for further proceedings. Because James has not alleged an equal protection claim against the Inkster Defendants, on remand the district court need only consider this claim against the State Defendants [Green, Washington, Fischer, the JTC].").

Examining James's Fourth Amendment claim under the special needs exception for workplace searches enunciated by the Supreme Court in *O'Connor v. Ortega*, 480 U.S. 709 (1987), the Sixth Circuit concluded that James had a reasonable expectation of privacy in both her office and her locked safe. In so holding, the Sixth Circuit noted (1) that there were no office regulations or policies regarding routine or random searches or employer access that would have diminished James's reasonable expectation of privacy, (2) James kept personal belongings in the safe, (3) James secured the safe with two locks and there was no evidence that anyone else had access to the safe, (4) James purchased the safe with her own funds, and (5) James maintained the safe for her exclusive use. 592 F. App'x at 456. Having found that James had a reasonable expectation of privacy in her office and safe, the Sixth Circuit then analyzed the reasonableness of the search of the office and the safe separately, considering the two-prong "special needs" workplace exception established in *O'Connor* which asks: (1) was the search reasonable at its inception, *i.e.* were there reasonable grounds to suspect that the search would turn up evidence that the employee is guilty of workplace misconduct, and (2) was the search reasonable in

scope, *i.e.* were the measures adopted reasonably related to the objectives of the search and not excessively intrusive given the nature of the misconduct. *O'Connor*, 480 U.S. at 726.

As a preliminary matter, the Sixth Circuit analyzed whether James's office and her personal safe were part of "the workplace context," such that analysis under *O'Connor* was even appropriate. 592 F. App'x at 456. Judge Cole's "majority" opinion concluded that James's office was part of the "workplace context," but that James's personal safe, which the court determined was "analogous to a piece of closed personal luggage or a briefcase because it was not within the employer's control," was not properly considered part of the workplace context and concluded that "the warrantless search of the safe falls outside the bounds of the special needs exception to the warrant requirement altogether." *Id*. at 457. The Sixth Circuit concluded that because the safe fell outside the workplace context, it was subject to the general warrant and probable cause requirement under the Fourth Amendment, and held that Plaintiff's Complaint adequately alleged a Fourth Amendment claim for the warrantless search of her safe: "The complaint states that the safe was searched absent a warrant, probable cause, or exception. These allegations sufficiently state an illegal

search claim under the Fourth Amendment." *Id.*[4]

The Sixth Circuit then analyzed the search of both the office and the safe (assuming *arguendo* as to the safe that it did fall within the workplace context) under the *O'Connor* workplace exception for reasonableness at inception and in scope. *Id.* at 457. The Sixth Circuit concluded that the search of James's office space was reasonable at its inception because there were "'reasonable grounds' for suspecting that a search of James's office would yield evidence that James was 'guilty of work-related misconduct.'" 592 F. App'x at 458 (quoting *O'Connor*, 480 U.S. at 726). The Sixth Circuit also concluded that a thorough search of James's office proper, an area that "might contain financial and employment records," was reasonable in scope given the nature of the allegations of misappropriation of public funds and employment

_____

[4] Judge Batchelder dissented, finding untenable the majority's assumption that a safe is more analogous to a portable, lightweight briefcase or piece of luggage than the more permanent office fixtures of a desk or filing cabinet. "By contrast [to a briefcase or piece of luggage], few employees, if any, lug a safe to and from work each day." 592 F. App'x at 468. Batchelder would apply the *O'Connor* special needs exception for the workplace to both the office and the safe and would conclude that the search of both the office and the safe was reasonable, both at inception and in scope, and would affirm Judge Zatkoff. Judge Keith, concurring in part and dissenting in part, concluded that both "the alleged search of the office and safe were unconstitutional" and "unreasonable at [] inception" because, in his view, the allegations of the Complaint (given the presumption of truth to which they were entitled) suggested an illegitimate purpose behind the search and did not suggest a reasonable inference that Plaintiff was guilty of workplace misconduct. 592 F. App'x 466-67 (Keith, J.) (concurring in part and dissenting in part) (alteration added).

irregularities against James and given her acknowledgment in her Complaint that she had taken control of the court finances in 2010.  *Id*. at 459.

The Sixth Circuit reached a different conclusion as to the reasonableness of the search of James's safe, which it analyzed under the special needs exception *assuming*, for the sake of argument, that it did fall within the workplace exception, which the court previously held it did not.  As to the safe, the majority reasoned that, because James alleged in her Complaint that she purchased the safe for personal use and kept it under lock and key, and had instructed Deborah Green, the SCAO Regional Administrator at the time, that the safe was private and contained personal information and received an assurance from Green that her privacy rights in the safe would not be violated, the Complaint stated "a plausible claim that it was excessively intrusive to search her personal safe, because evidence of work-related misconduct was unlikely to be found there."  *Id*. at 459 (citing *O'Connor*, 480 U.S. at 726).

## B.    Factual Background

### 1.    The JTC proceedings and Judge James's removal from office.

Plaintiff Sylvia James was a judge of the 22nd District Court for 23 years before she was placed on administrative leave on April 13, 2011, by a unanimous vote of the Michigan Supreme Court in response to grievances filed by both the State Court Administrators Office ("SCAO") and by the City of Inkster attorney, David Jones,

alleging that Plaintiff had engaged in numerous financial and administrative improprieties during her tenure on the bench. (ECF No. 132-2, September 26, 2017 Deposition of Sylvia James 16:9-22, 234:12-15; August 11, 2017 Deposition of Deborah Lynn Evans Green 18:22-21:15.) Deborah Green, the SCAO Regional Administrator at the time, was directed to appoint an outside judge to operate the 22nd District Court in Plaintiff's absence and the Michigan Supreme Court authorized the appointment of Valdemar Washington. (Green Dep. 21:2-15, 24:18-25:5.) The Judicial Tenure Commission ("JTC"), and specifically JTC staff attorney Margaret Rynier who was assigned Judge James's case, conducted an investigation into the grievance filed against Judge James and ultimately recommended that a formal complaint be filed against her. (Def.'s Mot. Ex. 6, December 21, 2017 Deposition of Margaret Rynier 20:16-20,27:17-28:19.)

The JTC is an entity established under the Michigan Constitution empowered to make recommendations to the Michigan Supreme Court for the censure, suspension, or removal from office of any Michigan State judge. Mich. Const. 1963, art. 6, § 30. The Michigan Supreme Court is directed to make rules governing the functioning of the JTC. *Id*. Those rules are set forth in M.C.R. 9.200-9.228 under the heading "Judicial Tenure Commission." Some of those rules are especially relevant here:

**9.202 JUDICIAL TENURE COMMISSION; ORGANIZATION**

\*　　　　　\*　　　　　\*

**(G) Commission Staff**

(1) The commission shall employ an executive director or equivalent person or persons, and such other staff members as the commission concludes are warranted, to perform the duties that the commission directs, subject to the availability of funds under its budget.

(2) The executive director or any other staff person who is involved in the investigation or prosecution of a judge

(a) shall not be present during the deliberations of the commission or participate in any other manner in the decision to file formal charges or to recommend action by the Supreme Court with regard to that judge, and

(b) shall have no substantive ex parte communication with the commission regarding a formal complaint that the commission has authorized.

Mich. Ct. R. 9.202(g)(1-2).

**9.203 JUDICIAL TENURE COMMISSION: POWERS; REVIEW**

(A) Authority of Commission. The commission has all the powers provided for under Const 1963, art 6, § 30, and further powers provided by Supreme Court rule. Proceedings before the commission or a master are governed by these rules. The commission may adopt and publish administrative rules for its internal operation and the administration of its proceedings that do not conflict with this subchapter and shall submit them to the Supreme Court for approval.

(B) Review as an Appellate Court. The commission may not function as an appellate court to review the decision of a court or to exercise superintending or administrative control of a court, but may examine decisions incident to a complaint of judicial misconduct, disability, or other circumstance that the commission may undertake to investigate under Const 1963, art 6, § 30, and MCR 9.207. An erroneous decision by a judge made in good faith and with due diligence is not judicial misconduct.

(C) Control of Commission Action. Proceedings under these rules are subject to the direct and exclusive superintending control of the Supreme Court. No other court has jurisdiction to restrict, control, or review the orders of the master or the commission.

Mich. Ct. R. 9.203(A)-(C).

## 9.207 INVESTIGATION; NOTICE

(A) Request for Investigation. A request for investigation of a judge must be made in writing and verified on oath of the complainant. The commission also is authorized to act on its own initiative or at the request of the Supreme Court, the state court administrator, or the Attorney Grievance Commission.

(B) Investigation. Upon receiving a request for investigation that is not clearly unfounded or frivolous, the commission shall direct that an investigation be conducted to determine whether a complaint should be filed and a hearing held. If there is insufficient cause to warrant filing a complaint, the commission may:

(1) dismiss the matter,
(2) dismiss the matter with a letter of explanation or caution that addresses the respondent's conduct,
(3) dismiss the matter contingent upon the satisfaction of conditions imposed by the commission, which may include a period of monitoring,
(4) admonish the respondent, or
(5) recommend to the Supreme Court private censure, with

a statement of reasons.

Mich. Ct. R. 9.207(A), (B).

Defendant Paul Fischer served as the executive director of the JTC from approximately January 2001 to September 12, 2016. (ECF No. 135-3, Def. Fischer's Mot. Ex. B, July 28, 2017 Deposition of Paul Fischer 12:11-14, 13:17-19.) Mr. Fischer described his job duties as executive director as follows:

> Q: Focusing on your time as executive director of the Judicial Tenure Commission starting in January of 2001, what were your duties as executive director?
>
> A: There are many of them. The executive director – I would frequently refer to this, to the commission, as they were the store owners and the executive director is like the store manager, making sure everything runs while the owners aren't there.
>
> So you're the spokesperson to the commission, for the commission, to the public, receiving grievances, complaints from the public and anybody else who may file one, conducting investigations at the commission's direction and then if the matter goes to a formal complaint, being in charge of the trial of the matter. . . . [and] arguing in front of the commission if there is a decision in a formal complaint, and in front of the Michigan Supreme Court as well.
>
>         *                  *                  *
>
> [T]he commission has a dual function as an investigative unit and as a judicial unit, an adjudicative unit. As those roles changed, my role would change as well, it would become less of the executive director and more of what I would call the examiner, a prosecutorial role, and there would be no counsel from me to the commission when acting as the examiner because they're in their adjudicative role and I could not be giving them advice on a matter that I'm also an advocate on.
>
> Q: And that shift from your role as counsel maybe to the JTC to your

role as examiner occurs upon the filing of a formal complaint; is that correct?

A: Right, the issuance of a formal complaint, then we file it yes.

Q: The issuance, correct?

A: The issuance – the commission itself issues the complaint and then at that point I no longer am their counsel and they become the adjudicative body.

(Fischer Dep. 13:20-14:6, 15:6-16:1.)  In Mr. Fischer's estimation the Michigan Supreme Court, not the JTC, has power over Michigan judges.  (*Id*. at 20:1-2.)

The JTC is comprised of nine members – four judges selected by their judicial organizations (i.e. Court of Appeals' judges, circuit court judges, district court judges, probate judges) and one judge elected by the members of the State Bar of Michigan. No Supreme Court Justice can be elected to the JTC.  The State Bar of Michigan also elects two lawyers to the commission and the governor appoints two laypeople who are neither lawyers nor judges.  (*Id*. at 37:11-38:7.)

The JTC receives and reviews every single grievance (or request for investigation – the terms are interchangeable (Fischer Dep. 52:20-53:1)), that is filed with the JTC.  The JTC receives a report from the staff of the JTC and the executive director with a recommendation as to each one – "whether it should be summarily dismissed or whether further investigation is warranted." (Fischer Dep. 32:7-14.) The JTC meets once a month to review all the cases that are presented and to "decide and

13

give direction to the executive director what they want done in each case; dismiss this group of 30, let's continue investigation on A, B, and C, et cetera." (*Id*. 32:15-21.) The JTC's internal operating procedures allow the executive director to open an investigation in his discretion, but during his tenure Fischer never opened an investigative file without seeking and obtaining the approval of the JTC. (*Id*. 43:16-44:5.) The JTC may open an investigation on its own initiative and the Chief Justice of the Michigan Supreme Court can make a request for an investigation but the JTC has to approve such a request. (*Id*. at 44:6-45:8.) As executive director, if some allegations of misconduct came to his attention, either through anonymous letters sent to the JTC or from the media, Fischer could suggest to the JTC that they open an investigation. (*Id*. at 47:11-48:21.) Also the SCAO can file a request for investigation and those requests, unlike all other requests for investigation, do not have to be under oath. (*Id*. at 51:21-53:8.)

In the investigative phase, the JTC acts through the executive director and the JTC staff. (Fischer Dep. 50:24-51:14.) The first person to review a request for investigation is the administrative staff of the JTC who open up the mail, take a look at the name of the judge and run a report to see if other grievances have been filed against that judge and also to see how many grievances that particular grievant has filed with the JTC. The administrative staff would include that information or make

a note of it and pass the file on to the executive director. (*Id.* at 53:10-54:8.) Fischer would review the grievance and assign a code or codes depending on the nature of the grievance, i.e. demeanor, intemperance (drunkeness), practicing law, prejudice or partiality, physical or mental disability, review of a legal ruling, docket delay. (*Id.* at 58:4-9, 59:10-67:3.)

After Fischer assigned a grievance code or codes he would assign a staff attorney to do the investigation. Margaret Rynier was the staff attorney assigned to James's case. (*Id.* at 189:13-15.) Along with his assignment to the staff attorney, he would make a recommendation based on his initial take, i.e. "I think this is a summary dismissal, please review, or I think this needs to get investigated." (*Id.* at 54:23-55:3, 67:4-7, 75:23-76:19.) Fischer tried to balance the case load evenly among the staff attorneys but would assign a grievance to a particular staff attorney if that attorney had previously worked with the particular judge that was being grieved. (*Id.* at 67:4-69:16.) If he suspected the matter may move to a formal complaint or otherwise appeared more involved, he would try to assign a more experienced staff attorney with trial experience. (*Id.* at 69:21-7.) The staff attorney would review the grievance and could call the grievant or the grievant's attorney, and could look at any public records available on the judge's docket, but beyond that would have to seek authorization from the JTC. (*Id.* at 76:21-78:6.) The staff attorney would then make a

recommendation regarding whether there should be an investigation. Fischer would review the staff attorney's recommendation, and would almost always defer to the staff attorney's recommendation although there may be discussion between Fischer and the staff attorney. That recommendation would then go to the commission which always made the final call as to whether a matter would proceed to an investigation. (*Id*. at 78:7-81:17.) The commissioners would "vote" on the recommendation by email and a simple majority would be enough to proceed – but if any one of the commissioners wanted a hold for the next meeting it would be put on the agenda for the next meeting regardless of the vote. (*Id*. at 81:18-82:14.) If the JTC determines that a particular grievance warrants investigation, and agrees with the recommendation or parts of it, the JTC directs the staff to investigate. The staff is required to seek approval from the JTC for most investigative acts, other than speaking with the grievant and reviewing the public docket. (*Id*. at 82:15-84:2, 85:21-86:1.) The actual investigation is performed by the staff attorneys. (*Id*. at 84:3-6.) The JTC does have subpoena power pursuant to Mich. Ct. R. 9.200. (*Id*. at 87:22-88:7.) In some instances the staff attorney may want to ask the judge being grieved to comment – to get the judge's side of the story – and this requires commission approval unless the judge contacts the staff attorney directly, in which case the staff attorney is authorized to speak with the judge. (*Id*. at 88:23-89:17.)

"Once all of the investigative steps were done, at that point it's either cut it loose, dismiss the matter or decide that based on what you have already that it would be a dismissal with . . . an explanation, a caution or an admonishment." (*Id*. at 90:23-91:3.) "Or if it was thought that it was going to go further than that, at that point it would be a recommendation for a 28-day letter, which is what the Court Rules require to be provided – notice of the charges to be provided to the judge and then the judge has 28 days to answer, which is where the name comes from." (*Id*. at 91:4-91.) The staff attorney drafts the 28-day letter, the executive director reviews it, and the JTC ultimately approves or modifies the letter. This is considered part of the investigative phase. (*Id*. at 111:1-11, 112:1-4.) Any of these next steps have to be approved by the JTC, including the issuance of a formal complaint, which must be separately approved by the JTC after the 28-day letter issues and the judge has responded. (*Id*. at 91:15-92:3, 111:20-112:4.) Once that formal complaint is authorized to be filed by the JTC, the executive director takes on a new role as the examiner. (*Id*. at 110:4-22.) The formal complaint is drafted by the staff attorney with their recommendation and the JTC can modify, edit, delete, or whatever they like before the letter goes out. (*Id*. at 113:4-114:12.) The executive director is not present for the JTC's deliberations regarding the filing of a formal complaint and has no part in that decision. (*Id*. at 115:24-116:3.) From the issuance of the formal complaint forward, everything

becomes public. (*Id*. at 115:11-14.)

It is possible for a judge to be offered something like a plea deal before a formal complaint is issued. This is done by the executive director in the role of a "quasi examiner." The JTC is not part of that negotiation because it will ultimately be the adjudicative body but the "quasi examiner" can offer such a deal that is then presented to the JTC for approval. (*Id*. at 116:4-21.) In his time as executive director, acting in this "quasi examiner" role akin to a prosecutor offering a plea deal, Fischer "frequently" resolved grievances short of a formal hearing through such deals. (*Id*. at 116:22-119:6.)

Once formal proceedings are initiated there is an opportunity for discovery, provided for in Mich. Ct. R. 9.208(C), and the judge is entitled to a hearing, typically before a special master appointed by the Michigan Supreme Court. The JTC has no input into the selection of a special master. (Fischer Dep. 121:1-122:23.) After the hearing, the special master issues a report and the parties have the opportunity to object to the report. Then the JTC conducts a hearing on the special master's report and any objections and issues its recommendations regarding sanctions. The respondent judge can file objections to the JTC's report, but the examiner cannot. The examiner can only respond to whatever the judge raises. Throughout this process, the examiner remains in the role of an examiner and does not revert back to the role of

executive director with respect to that judge.  (124:2-126:3.)

Regarding Plaintiff's case, Fischer can't recall exactly how it got started but recalls that David Jones perhaps filed a grievance and recalls Deb Green of the SCAO but doesn't recall if she also filed a grievance. (*Id*. at 183:6-23.)  He recalled that Plaintiff was placed on administrative leave in December 2011, because the hearing was in January or February of 2012 and she was removed in July 2012.  (*Id*. at 184:6-185:7.) He was unaware that Plaintiff was placed on administrative leave on April 14, 2011, and he had nothing to do with that decision as executive director of the JTC. That was purely something that happened at the Supreme Court level – neither he nor the JTC had anything to do with that decision.  (*Id*. at 185:19-187:10.)  He did know that when Plaintiff was placed on leave, Judge Washington was appointed to serve as interim chief but Fischer had nothing to do with selecting Washington. (*Id*. at 187:22-188:25.)

Fischer believes that he would have discussed with Phil Thomas, Plaintiff's attorney at the time, the possibility of resolving the matter short of a hearing.  (*Id*. at 190:12-191:8.)  However, he would only have offered resignation or retirement because she was charged with theft of public money and fraud and those would be the only options for a deal based on that misconduct.  No other judge in his recollection had done what Plaintiff had done and there was no basis for comparison to other

judges with whom he had made deals short of a hearing. (*Id*. at 191:7-193:15.) Fischer knew that Plaintiff was African American at the time because she had come before the JTC on two other matters – taking a political position regarding amending the city charter and carrying a loaded gun into Metro airport. No formal complaints were filed as to either of those prior matters. (*Id*. at 193:21-194:22.)

Fischer was not aware who if anyone (possibly Margaret Rynier) from the JTC would have been dealing directly with Judge Washington but Fischer was not. Fischer never visited the 22nd District Court in the course of the investigation of the Plaintiff. (*Id*. at 195:23-196:17.) Fischer did not know if a search of Plaintiff's office had been conducted and did not know if any materials obtained from her office were used in the disciplinary proceedings. He did not direct anyone to search her office and did not know if she had a safe in her office. He also did not know if Washington was involved at all in the investigation. (*Id*. at 196:21-197:15.) Fischer testified that it is possible that he discussed Plaintiff's case at some point with Deb Green but he has never spoken to Pamela Anderson. (*Id*. at 200:18-201:23.)

The JTC did file a formal complaint against Judge James on October 26, 2011, "asserting that [Plaintiff] had engaged in (1) financial improprieties, (2) administrative improprieties, (3) employment improprieties, and (4) misrepresentations to the JTC." *In re James*, 492 Mich. 553, 559 (2012). On December 15, 2011, the Michigan

Supreme Court appointed retired District Judge Ann Mattson to act as a special master to conduct a hearing as to the charges made against Judge James in the JTC's formal complaint. *Id*. That hearing lasted approximately six weeks and the special master filed her findings of fact and conclusions of law on April 23, 2012, finding that the JTC "had proven portions of all four counts by a preponderance of the evidence." *Id*. The JTC issued its decision on discipline on June 11, 2012, adopting "all but one of the special master's findings," and recommending that Judge James be removed from office and pay $81,181.88 in fees and costs. *Id*.

The Michigan Supreme Court, after reviewing the record and hearing oral argument, "agree[d] with the findings of the JTC and adopt[ed] its recommendation regarding sanctions." *Id*. at 560. The most significant impropriety that the court found to have occurred was Judge James's diversion of "thousands of dollars," that were required by law to be allocated to restitution for crime victims, to charities and organizations of Judge James's own choosing, many of which "were for advertisements that promoted the judge, prominently displaying her picture and only tangentially mentioning" the Community Service Program ("CSP") from which the funds were obtained.

Justice Steven Markman filed a separate lengthy opinion, concurring in part and dissenting in part, expressing his opinion that the sanction of removal (which only

lasted until the expiration of Judge James's then-existing term of office) was insufficient punishment for the nature and degree of her transgressions:

> The evidence clearly establishes that Judge James' misconduct was prejudicial to the actual administration of justice, as her private use of hundreds of thousands of dollars of public funds prevented those funds from being used for their proper purposes, including provisions of assistance for the victims of crime within Inkster. As the majority has detailed, Judge James treated public funds, including funds statutorily required to go to victims of crime, as her own "publicly-funded, private charitable foundation" of which she was the sole administrator. In so doing, Judge James routinely ignored or circumvented legal requirements that conflicted with her own personal desires.

\*          \*          \*

> But the most disturbing factor, and the one that arguably presents the greatest danger to the integrity of the judiciary, is that Judge James' misconduct was part of an enduring pattern or practice that she has shown no intention of changing. Her behavior and statements before, during, and after the investigation and hearing demonstrate that Judge James refuses to be bound by any law or requirement that conflicts with her own desires. This sustained pattern of misconduct and disregard for the law precludes, in my judgment, sympathetic consideration of Judge James' behavior. "We simply cannot overlook a disclosed pattern [of misconduct]. Once such pattern is discovered, the opportunity of continuity thereof must be concluded with firmness and resolution." *In re Graham*, 366 Mich. 268, 276, 114 N.W.2d 333 (1962). In this case, removal alone, which may accomplish nothing more than removing her from the bench for a period of fewer than five months, will not divest from Judge James all opportunity to continue her pattern of misconduct and her cavalier approach to her responsibilities as a district judge.

> The inadequacy of removal is further demonstrated by Judge James' practice of being unrestrained by her oath to tell the truth. During the course of this investigation and hearing, Judge James lied numerous times. . . . The provision of false testimony or evidence in a JTC

proceeding has generally led to removal from office. *In re Servaas*, 484 Mich. 634, 716 n. 11, 774 N.W.2d 46 (2009) (YOUNG, J., dissenting).

492 Mich. 580-81.

**2.    Facts surrounding the alleged search of Plaintiff's safe.**

The facts relevant to Plaintiff's Fourth Amendment claim, viewed in the light most favorable to the Plaintiff, are set forth in detail in this Court's Opinion and Order granting Defendant Anderson's motion for summary judgment and, as relevant here, are as follows.  Plaintiff maintained a personal safe in her office, which was kept in her personal lavatory under lock and key.  Plaintiff had the only key to the safe which she kept on her key chain.  (James Dep. 47:7-51:15.) Plaintiff's safe was locked when she left the court the day she was placed on administrative leave. (James Dep. 125:16-21.) Plaintiff never gave consent to anyone to open her safe and in fact was assured by Defendant Green that the investigation would not "invade the judge's personal safe without her being there."  (James Dep. 62:3-63:1, 227:22-228:9; ECF No. 140-9, Pl.'s Resp. Ex. 8, Excerpt from Proceedings held before Master Hon. Ann E. Mattson, January 24, 2012, Testimony of Deborah Green 293:4-16.)  While Plaintiff did not specifically tell anyone at the 22nd District Court that she had an expectation of privacy in her safe, it was well understood around the 22nd District Court, and specifically by Anderson, that no one ventured into Judge James's personal office when she was not there.  (James Dep. 59:20-60:5, 243:2-18, 247:1-248:7.)

On April 13, 2011, the day that James was placed on administrative leave, she received a phone call from Michigan Supreme Court Justice Young and had "about three hours" to pack up her things and leave the court. (James Dep. 234:12-235:22.) Within days, and not more than a week after being placed on administrative leave, Plaintiff called Judge Valdemar Washington, who was appointed to act as interim chief judge in Plaintiff's absence beginning on April 14, 2011, and tried to return to the court to pick up a paycheck or collect some things but he refused to allow her to return. (James Dep. 246:8-25; Def.'s Mot. Ex. 4, January 17, 2018 Deposition of Valdemar L. Washington 9:13-17, 23:16-24:11.) When Plaintiff did finally arrange to go back to the court on July 14, 2011 to collect her things, having arranged to do so through Justice Young, it was discovered that her safe had been opened by someone in her absence. (James Dep. 120:18-121:2; Washington Dep. 22:9-25.)

Plaintiff admits that she does not know who "actually broke into" her safe but she does know that Washington had "dominion and control over [her] office." (James Dep. 121:3-6, 123:24-124:4.) Plaintiff alleges that Defendant Anderson is one of the individuals who had access to Plaintiff's office in Plaintiff's absence and she thought Anderson had "an ax to grind" with Plaintiff, but Plaintiff has no "evidence" that Anderson broke into her safe and does not know who broke into her safe. (James Dep. 255:25-256:21.) Defendant Anderson served under the Plaintiff as the court

administrator at the 22nd District Court. (October 12, 2017 Deposition of Pamela Anderson 11:16-17, 57:2-3; Pl.'s Dep. 241:12-18.) Anderson's role at the 22nd District Court entailed maintaining custody of court records and filings. (Anderson Dep. 24:6-9.) Plaintiff described Anderson's job as "the keeper of the records," and the "liaison" between the 22nd District Court and the regional administrator's office. (Pl.'s Dep. 132:13-16, 248:14-15.) Anderson testified that she knew that Plaintiff had a safe in her bathroom because you could see the safe when you were standing in the Plaintiff's office and the bathroom door was open. (Anderson Dep. 38:22-39:5.) Plaintiff testified that she never told Anderson what was in the safe or that the safe contained personal information but she thought it was "implicit." (James Dep. 247:1-25, 248:25-249:3.) Anderson testified that she did not have a key to the Plaintiff's safe, she did not know whether it required a key or was a combination lock and she didn't have a combination if one was required, and she did not know if the safe was owned by Plaintiff or the 22nd District Court. (Anderson Dep. 39:6-25, 54:8-18, 55:1-7, 66:17-67:7.) Anderson testified that during the time that Plaintiff was the Chief Judge she never told Anderson that no one was to go in her safe. Plaintiff also testified that prior to being placed on administrative leave, she never indicated to anyone at the court, including Anderson, that she had an expectation of privacy in her safe. Plaintiff suggested that because court employees knew that she kept her office

locked, and they were not permitted in her office when she was not there, they would know not to go in the safe. (Pl.'s Dep. 247:1-248:2.) After Plaintiff was placed on administrative leave, no one ever told Anderson that no one was supposed to access Plaintiff's safe and Anderson never saw anyone open the safe. (Anderson Dep. 43:10-19.) Anderson testified that Judge Washington never made comments to her about wanting to open the safe. (Anderson Dep. 64:21-65:5.)

Anderson was aware and observed that Judge Washington and Plaintiff's niece, Nicole James who served as Plaintiff's judicial secretary and had a key to Plaintiff's office, were cleaning up Plaintiff's office and Anderson assumed that documents were being removed because the stacks of papers in Plaintiff's office were getting smaller but Anderson did not personally go through Plaintiff's office to look for documents. (Anderson Dep. 37:2-16, 43:24-45:18, 47:7-48:11.) At some point in this "clean up" process, Nicole James did bring some "boxes of stuff" to Anderson, including old court files, old registers of action, old pleas by mail, "from like the 1990s." (Anderson Dep. 48:22-49:9.) Anderson was unsure exactly where the boxes came from and she did not review their contents thoroughly before giving them to Breana Purdy with instructions to shred the old registers of action and pleas by mail and to "take care" of any court files that were in the boxes. Ms. Purdy never reported back to Anderson after taking possession of the boxes and Anderson assumes that Purdy followed her

instructions but Anderson cannot be certain of what was actually shredded. (Anderson Dep. 49:10-51:12.) Nicole James packed up James's personal belongings in boxes and garbage bags and presumably delivered them to Plaintiff. (Washington Dep. 27:18-28:6.)

Anderson testified that at some point after Plaintiff was placed on administrative leave and before Plaintiff returned to the court on July 14, 2011 to collect her things, Anderson was called into the Plaintiff's office by Judge Washington, whom she considered to be her supervisor, and alerted by him to the fact that the Plaintiff's safe was "open" and there were documents inside. Anderson testified that "[t]he safe was ajar just enough where you could fit your hand in." (Anderson Dep. 41:8-42:12, 65:22-66:8.) Anderson testified that Judge Washington was with her when she reached her hand into the safe, pulled out a document and said "oh, these are tax returns," and "put the document back in the safe." (Anderson Dep. 42:12-17.) Anderson does not recall what if anything Judge Washington said or did at the time. She recalls that she just returned to her office but testified that Judge Washington was near enough that he would have heard her remark that the documents were tax returns. (Anderson Dep. 42:18-43-7.) Anderson never saw anyone actually open the safe. (Anderson Dep. 43:17-19.)

Nicole James testified during the JTC proceedings before District Judge Mattson that at some point Judge Washington also asked Nicole to clean out Plaintiff's safe but Nicole told Judge Washington that she did not feel comfortable doing that. (ECF No. 140-15, Excerpt from JTC Proceedings, Testimony of Nicole Green 2620:19-2621:1.) Nicole testified that when she declined to clean out the safe Washington responded: "Well, don't worry about it. I have another plan for that." (*Id*. at 2621:1-6.)

Washington, on the other hand, testified that he never asked Nicole James to clean out Plaintiff's safe and he never asked anyone else to break into or remove documents from Plaintiff's safe – he testified that he didn't even know there was a safe there until Plaintiff returned to the court on July 14, 2011, and it was noted by Plaintiff's attorney that the safe was ajar and appeared to have been forcibly opened. (Washington Dep. 28:7-14.) Washington's testimony regarding when he first became aware that there was a safe in Plaintiff's office is inconsistent with both Nicole James's testimony that Washington specifically asked her to clean out the safe prior to James returning to the court on July 14, 2011, and with Anderson's testimony that at some point prior to July 14, 2011, Washington called her into his office and alerted her to the open safe. Importantly, Washington's denial of any knowledge regarding Plaintiff's safe until July 14, 2011, is also inconsistent with the testimony of Deborah

Green during the JTC proceedings that at the same time that she learned from Plaintiff's then-attorney Sharon McPhail that Plaintiff's safe contained only personal documents and information, she (Green) told Washington that the safe in Plaintiff's office was private and that Plaintiff's privacy in that safe was to be protected. (ECF No. 140-9, Pl.'s Resp. to Anderson's Mot. Summ. J., Ex. 8, PgID 4640).

On April 15, 2011, the day after Washington began his duties as acting interim chief judge, Washington received a letter from Chad Schmucker, who was then the State Court Administrator, explaining that Plaintiff had been placed on administrative leave and asking Washington to look into a number of matters related to the charges against Plaintiff. (Washington Dep. 10:18-11:4; ECF No. 140-4, Pl.'s Resp. Ex. 3, April 15, 2011 Letter from Chad C. Schmucker to Valdemar Washington.) The letter asked Washington to investigate several specific items including documentation to support certain travel expenditures, and Plaintiff's practice of issuing I.R.S. 1099's to court employees for their work on the CSP program. Washington asked Anderson to gather any travel related records she had and to be on the lookout for documents relating to the CSP program, which she did. Washington provided the documents Anderson gathered to the SCAO. Washington also asked Anderson to see if there were 1099's issued to court employees but none were located. (Washington Dep. 12:24-15:25; Anderson Dep. 34:21-35:21.) Anderson testified that Washington asked

her to "be on the lookout" for certain categories of documents and Anderson was able to locate some responsive documents and she believes she showed them to Judge Washington and ultimately gave them to Ms. Rynier. (Anderson Dep. 34:9-35:17.) Washington prepared regular written reports for Green to inform her of the progress he was making on the items in Schmucker's letter. (Washington Dep. 19:17-21:15.)

Defendant Green also came to the courthouse and sought Anderson's cooperation and assistance with locating documents and providing information related to certain areas that were being investigated. Anderson agreed to honor Green's request for assistance because Green "was working for" the SCAO. (Anderson Dep. 22:6-9.) Anderson met with and reviewed many of the documents she located with Margaret Rynier, the JTC staff attorney conducting the investigation into Plaintiff's conduct. (Anderson Dep. 20:12-15, 21:1-22, 23:8-28:24.) Anderson complied with the various requests of the JTC, SCAO, and Washington to collect and provide records and documents but never provided any documents from Plaintiff's safe. (Anderson Dep. 42:14-23, 47:22-24; Washington Dep. 30:9-11; Rynier Dep. 44:20-25, 45:12-15.)

### 3.     Facts related to Plaintiff's equal protection claim

Plaintiff asserted an equal protection claim in her Complaint only against Defendants Fischer and the JTC. Plaintiff also now argues a separate equal protection

claim against Defendant Green. The Court concludes *infra* that Plaintiff is not entitled to proceed on her equal protection claim against any Defendant, and summarizes the facts here as necessary to the Court's resolution of the claims. In its Opinion remanding Plaintiff's Fourth Amendment and equal protection claims, the Sixth Circuit explained the necessary elements of proof for Plaintiff's equal protection Claim:

> In order to prevail on a Fourteenth Amendment equal protection claim under 42 U.S.C. § 1983, a plaintiff must prove the same elements required to establish a disparate treatment claim under Title VII of the Civil Rights Act of 1964. *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. ). A plaintiff may prove disparate treatment either by direct evidence of discriminatory motive or through circumstantial evidence based on a prima facie showing of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In order to establish a prima facie case of racial discrimination under the burden-shifting framework laid out in *McDonnell Douglas*, the plaintiff must show that 1) she was a member of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the job; and 4) she was treated differently from similarly situated employees who were not members of the protected class. *Perry*, 209 F.3d at 601. Upon establishing the prima facie case, the burden shifts to the defendant to show evidence of a legitimate nondiscriminatory reason for the adverse employment action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).

592 F. App'x at 459-60. The Sixth Circuit then concluded that Plaintiff had alleged sufficient facts to state a facially plausible claim a violation of her equal protection rights:

> James alleges facts that are sufficient "to state a claim to relief that is

plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. She identifies herself as a member of a protected class, details the JTC's investigation against her both prior and subsequent to her suspension from her judgeship, and identifies and describes the misconduct of five white state court judges who were not investigated or disciplined by the JTC. Although the district court correctly noted that James's complaint lacks significant detail of the alleged misconduct of the other judges, on its face the complaint provides enough facts to "raise a right to relief above the speculative level." *Id*. at 555, 127 S.Ct. 1955. . . . She does not merely make "conclusory allegations" that the JTC treated white judges differently, but identifies specific individuals and summarizes instances of their misconduct. *Cf. 16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013) (upholding the dismissal of a race discrimination claim in which the plaintiffs alleged their belief that a bank had refinanced the loans of delinquent white borrowers but failed to identify these borrowers). The "factual content" she alleges, in the form of the misconduct of the other judges, is sufficient to draw a reasonable inference of discrimination because she points to specific instances of abuse of judicial power by white judges. For instance, she alleges that one judge had improperly used court funds to pay off a court employee who reported inappropriate personal contact between the judge and a litigant, and that other judges had engaged in various other employment improprieties. James's complaint is thus sufficient to "giv[e] rise to 'reasonably founded hope that the discovery process will reveal relevant evidence' to support" her claims. *Lindsay*, 498 F.3d at 440 n. 6 (quoting *Twombly*, 550 U.S. at 559–60, 127 S.Ct. 1955).

592 F. App'x at 461.

The Sixth Circuit concluded that Plaintiff had *alleged* sufficient facts regarding other instances of judicial misconduct that were not acted upon by the Defendants, but of course Plaintiff was required to back up those allegations with "evidence of evidentiary quality" in order for her equal protection claim to survive summary judgment. Plaintiff has identified four judges whom she believes engaged in similarly

egregious conduct but against whom the JTC and Fischer failed to file a formal complaint. Plaintiff claims that 28th District Court Judge James Kandrevas, a Caucasian male, engaged in equally serious misconduct and the JTC did not file a formal complaint against him. Plaintiff relies on newspaper articles that were circulating at the time of Judge Kandrevas's alleged misconduct that discuss how Judge Kandrevas was alleged to have "created bank accounts and used money, as well as allegations that the court had made fraudulent representations to the state and federal governments in connection with seeking money through drug court grants when the court had ample funds." (ECF No. 143, Pl.'s Resp. 21, PgID 5416, Exs. 9, 10.) According to the articles, Judge Kandrevas "asserted his Fifth Amendment right more than 200 times while refusing to answer questions about court operations and how he handled money." (*Id.*)

Plaintiff asserts that "it was reported that" former Wayne County Circuit Judge Mary Waterstone, a Caucasian female, "had suborned perjury," and "was tried on four charges, including concealing perjured testimony." (Pl.'s Resp. at 21-22, PgID 5416-17, Ex. 11.) According to the reports, the trial judge stated that "Judge Waterstone's actions 'violated the fundamental tenet of the judicial system: to seek truth.'" (*Id.* at 22, PgID 5417.) It was reported that the Michigan Court of Appeals "indicated that Judge Waterstone's actions were disgraceful." (*Id.*) It was also reported in the news

that the JTC did not file a formal complaint against Judge Waterstone and "merely scolded" her.  (*Id*.)

Plaintiff also cites the instance of Grand Traverse County Probate Judge David Stowe, a Caucasian male, who "was reported to have a romantic relationship with a litigant in a divorce case over which he was presiding, and he continued oversight of the custody case related to the divorce even after the two began a physical relationship."  (*Id*. at 22, PgID 5417, Ex. 12.)  It was reported that Stowe eventually married the litigant and later "tampered with an investigation into a domestic dispute" between himself and that litigant.  (*Id*.)  "It was reported that the JTC only gave Judge Stowe 'a wrist slap.'" (*Id*.)

Finally, Plaintiff cites the instance of Lapeer Circuit Court Judge Byron Konschuh, a Caucasian male, who "pled no contest to a misdemeanor of failing to account for county money after having been charged in 2014 with five felony counts of embezzlement following an investigation by the Michigan State Police." (*Id*. at 22-23, PgID 5417-18, Ex. 13.)  Plaintiff asserts that "[p]rosecutors alleged that Judge Konschuh used funds his office received and placed them in his own personal bank account."  (*Id*.)  The JTC did not file a formal complaint against Judge Konschuh.

Plaintiff also now asserts that Defendant Green violated Plaintiff's equal protection rights by declining to file grievances against two of these judges, Judge

Kandrevas and Judge Waterstone, despite having an awareness of the reports of their alleged misconduct. Green testified that she recalled an incident involving Judge Kandrevas that was brought to her attention (regarding the solicitation of food for a softball game) that she resolved at the administrative level without filing a grievance with the JTC. (ECF No. 142-2, Pl.'s Resp. Ex. 1, Excerpts from Jan. 5, 2018 Deposition of Deborah Green 97:16-99:15). Beyond this incident, Green testified that she did not hear any other allegations regarding Judge Kandrevas that concerned her. (Green Dep. 99:13-15.) With respect to Judge Waterstone, Green testified that she did hear allegations of misconduct regarding Judge Waterstone from the JTC, but she had no first hand knowledge of the allegations. Because she knew that the JTC was already apprised of the allegations, there was no need to file a grievance. (Green Dep. 100:2-101:7.) Green testified that "[a]nybody can file a grievance" with the JTC, that grievances don't have to come from her, and that it was not part of her "duties" as the SCAO regional administrator to file grievances with the JTC. (Green Dep. 102:11-19.) Indeed, in Plaintiff's case, the JTC received grievances from both the SCAO and the City of Inkster attorney, David Jones.

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1)

Challenges to subject-matter jurisdiction under Federal Rule of Civil Procedure

12(b)(1) "come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin–Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). Under a facial attack, all of the allegations in the complaint must be taken as true, much as with a Rule 12(b)(6) motion. *Gentek*, 491 F.3d at 330 (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). Under a factual attack, however, the court can actually weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction. Where the defendant brings a factual attack on the subject matter jurisdiction, no presumption of truth applies to the allegations contained in the pleadings, and the court may consider documentary evidence in conducting its review. 491 F.3d at 330. If the district court must weigh conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist, it has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts. *Id*.

### B. Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c)

"Motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) are analyzed under the same de novo standard as motions to dismiss pursuant to Rule 12(b)(6)." *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008) (citing *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 697 (6th Cir. 2005)). "[T]he legal standards for adjudicating

Rule 12(b)(6) and Rule 12(c) motions are the same . . . ." *Lindsay v. Yates*, 498 F.3d 434, 437 n. 5 (6th Cir. 2007). The Sixth Circuit has defined the pleading requirements necessary to withstand a challenge under Rule 12(c):

> We recently explained the pleading requirements that are necessary to survive a Rule 12(c) motion:
>
>> In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.... Factual allegations must be enough to raise a right to relief above the speculative level...." *Id*. at 1964-65 (internal citations omitted). In *Erickson v. Pardus*, 550 U.S. ----, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), decided two weeks after *Twombly*, however, the Supreme Court affirmed that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Id*. at 2200 (quoting *Twombly*, 127 S.Ct. at 1964). The opinion in *Erickson* reiterated that "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Id*. (citing *Twombly*, 127 S.Ct. at 1965). We read the *Twombly* and *Erickson* decisions in conjunction with one another when reviewing a district court's decision to grant a motion to dismiss for failure to state a claim or a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12.

*Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 550 (6th Cir. 2008) (quoting

*Sensations,* 526 F.3d at 295-96).

Federal Rule of Civil Procedure 12(b)(6), and therefore Rule 12(c), allows for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). Sixth Circuit "precedent instructs that, for a complaint to survive such motions, it must contain 'either direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory.'" *Buck v. City of Highland Park, Michigan*, 733 F. App'x 248, 251 (6th Cir. 2018) (quoting *Philadelphia Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 649 (6th Cir. 2013)). "[T]he complaint 'does not need detailed factual allegations' but should identify 'more than labels and conclusions.'" *Casias v. Wal–Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Handy-Clay*, 695 F.3d at 539 (internal citations and quotation marks omitted). In other words, a plaintiff must provide more than "formulaic recitation of the elements of a cause of action" and his or her "[f]actual allegations must be enough

38

to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. The Sixth Circuit has recently reiterated that "[t]o survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims, (2) matters of which a court may take judicial notice (3) documents that are a matter of public record, and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 829 (6th Cir. 2015) ("Documents outside of the pleadings that may typically be incorporated without converting the motion to dismiss into a motion for summary judgment are public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.") (Internal quotation marks and citations omitted); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings. . . . [C]ourts may also consider public records,

matters of which a court may take judicial notice, and letter decisions of governmental agencies."); *Greenberg v. Life Ins. Co. Of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed to form a part of the pleadings).

## C.    Motion for Summary Judgment Pursuant to Rule 56

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (Borman, J.) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce

enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III. ANALYSIS

### A. The JTC and Fischer in His Official Capacity are Entitled to Eleventh Amendment From Suit Under § 1983

Plaintiff asserts claims under 42 U.S.C. § 1983 for alleged violations of her Fourth and Fourteenth Amendment rights. *James*, 592 F. App'x at 451 ("James sued

the JTC and other state and local officials under 42 U.S.C. § 1983," alleging violations of her Fourth and Fourteenth Amendment rights). "The Eleventh Amendment bars § 1983 suits against a state, its agencies, and its officials sued in their official capacities for damages." *Cady v. Arenac County*, 574 F.3d 334, 342 (6th Cir. 2009) (citing *Kentucky v. Graham*, 473 U.S. 159, 169 (1985)).[5] In determining "whether an entity is an 'arm of the State'" for purposes of Eleventh Amendment immunity, the Sixth Circuit has advised courts to consider the following factors:

> (1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government.

*Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 760 (6th Cir. 2010).

As discussed at length *supra*, the JTC is established by the Michigan Constitution and the Michigan Supreme Court is empowered by the Constitution to make rules, which it has done in Mich. Ct. R. 9.200, governing every aspect of the

---

[5] The State Defendants have not waived their right to assert Eleventh Amendment Immunity. *See Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 515 n. 19 (1982) (observing that although the board of regents failed to properly raise an Eleventh Amendment immunity argument on appeal, "[n]othing in this opinion precludes the Board of Regents from raising its Eleventh Amendment claim on remand"); *Kovacevich v. Kent State University*, 224 F.3d 806, 816 (6th Cir. 2000) (observing that Eleventh Amendment immunity "may be raised at any point of the proceedings").

functions of the JTC: "Proceedings under these rules are subject to the direct and exclusive superintending control of the Supreme Court. No other court has jurisdiction to restrict, control, or review the orders of the master or the commission." Mich. Ct. R. 9.203(C).

Numerous courts have concluded that the Michigan Supreme Court, and state disciplinary agencies that function under its authority, are state entities entitled to immunity from suit in federal court under the Eleventh Amendment absent waiver of that immunity or abrogation by Congress, neither of which has occurred here. *Butcher v. Michigan Supreme Court*, No. 07-14940, 2008 WL 2067028, at \*2 (E.D. Mich. May 15, 2008). Like the Michigan Attorney Grievance Commission and the Michigan Attorney Discipline Board analyzed in *Butcher*, both of whom are subject to rules and procedures adopted by the Michigan Supreme Court, and whose decisions are subject to Michigan Supreme Court review, the JTC is a "state judicial agenc[y] and enjoy[s] Eleventh Amendment immunity." *Id*. at \*3. And like the Michigan Board of Bar Examiners and the State Bar of Michigan analyzed by the Sixth Circuit in *Dubuc v. Michigan Bd. of Law Examiners*, 342 F.3d 610, 615 (6th Cir. 2003), the JTC is "merely [an] extension[] of the Michigan Supreme Court." "Because they are arms of the Michigan Supreme Court for all purposes relevant to this lawsuit, the Board and the Bar are state agencies immune from this lawsuit under the Eleventh

Amendment." *Id*.  If licensing and regulation of attorneys is inherently a judicial

function, then all the more so the regulation and discipline of state court judges, as

courts in this District have explicitly held.  *See Sanders v. Michigan Supreme Court*,

No. 16-12959, 2018 WL 1101311, at *7 (E.D. Mich. Feb. 23, 2018) ("[T]he Supreme

Court is an arm of the state of Michigan and is immune from suit under the Eleventh

Amendment. *See Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 762-64 (6th Cir.

2010). Likewise, the JTC is established by the state Constitution, Mich. Const. 1963,

art 6, § 30, and is therefore entitled to Eleventh Amendment immunity as an arm of

the state.") (Internal quotation marks and citations omitted.) (Whalen, MJ), *adopted

at* 2018 WL 1466085 (E.D. Mich. March 26, 2018) (Cohn, J.) (agreeing with the

Magistrate Judge's dismissal of the Michigan Supreme Court, the JTC, and the

Attorney Discipline Board under the Eleventh Amendment).      Fischer is also entitled

to Eleventh Amendment immunity for claims against him in his official capacity for

monetary damages, which are the only claims asserted against him in this action.  "In

general, the Eleventh Amendment immunizes state officials from suit in federal

court," except that the Eleventh Amendment does not bar a suit against a state official

seeking prospective injunctive relief.  *Dubuc*, 342 F.3d at 616 (citing *Pennhurst State

Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) and *Ex parte Young*, 209 U.S.

123 (1908)); *Cady*, 574 F.3d at 342.[6]

Plaintiff's responses to the JTC and Fischer's Eleventh Amendment argument completely lack merit. First, as noted *supra* at note 5, there has been no waiver of Eleventh Amendment immunity. Second, Plaintiff conflates the notion of *sovereign* immunity under the Eleventh Amendment with *quasi-judicial* and *prosecutorial* immunity. These latter two types of immunity, deriving from the common law, may be subject to certain exceptions. Sovereign immunity is absolute and has no

---

[6] Plaintiff acknowledges that cases have held that the JTC enjoys absolute Eleventh Amendment immunity, but argued (for the first time at the hearing on Defendants' motion) that none of these cases engaged in a detailed analysis of the relevant factors as set forth in *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 760 (6th Cir. 2010). This Court finds that consideration of the *Pucci* factors is inherent in these decisions. But importantly, Plaintiff provides *no* argument or evidence on the *Pucci* factors, nor does Plaintiff even mention *Pucci* in her brief in response to Defendants' motion setting forth their Eleventh Amendment immunity argument. Plaintiff adverts to an argument without any effort at legal or factual development and expects the Court to do the work for her. Issues "adverted to . . . in a perfunctory manner, unaccompanied by some effort at developed argumentation," are deemed waived. *Clemente v. Vaslo*, 679 F.3d 482, 497 (6th Cir. 2012). "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *Bishop v. Gosiger, Inc.*, 692 F. Supp. 2d 762, 774 (E.D. Mich. 2010) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). This will not abide. In any event, while the record in this case does not contain "evidence" directed to the *Pucci* factors, it is undisputed that the Michigan Supreme Court has complete superintending control over the actions of the JTC, the state courts and the governor appoint the majority of the members of the JTC, and the functions of the JTC are totally within the purview of the Michigan Supreme Court. Plaintiff certainly has not presented evidence on the *Pucci* factors that would cause this Court to disregard the cases quoted above in which courts have expressly determined that the JTC is entitled to Eleventh Amendment immunity.

exceptions in this suit for money damages. Finally, relying *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978), the Plaintiff confuses immunity of a state entity with immunity of a municipality or other unit of local government. (ECF No. 143, Pl.'s Resp. to Fischer's Mot. 11-12, PgID 5406-07.) Again, while *Monell* instructs that there are instances in which a municipality may be sued, the sovereign immunity of a state and its adjuncts under the Eleventh Amendment has no exceptions, apart from suits for prospective injunctive relief which are not at issue here.

Both the JTC and Fischer, for claims against him in his official capacity, are entitled to dismissal of Plaintiff's claims against them based on Eleventh Amendment immunity.[7]

## B. The JTC and Fischer are Entitled to Absolute Quasi-Judicial and/or Prosecutorial Immunity

Were they not protected by Eleventh Amendment immunity, the JTC and Fischer would be entitled to absolute quasi-judicial immunity. The Sixth Circuit has recognized "that public policy requires absolute immunity for public officials

---

[7] In her deposition, when asked whether she was still seeking injunctive and declaratory relief, Plaintiff conceded that her misconduct case (which she had originally sought to enjoin) had concluded and Mr. Fischer (against whom she had sought injunctive relief) no longer worked for the JTC. (James Dep. 197:25-199:14.) While Plaintiff suggested that she was still seeking "whatever relief" this Court would give her, she does not seek reinstatement and, in any event, there is no prospective injunctive relief requested (or possible) here.

performing quasi-judicial functions in a number of circumstances." *Sparks v. Character and Fitness Committee of Kentucky*, 859 F.2d 428, 430 (6th Cir. 1988). Such "quasi-judicial" immunity, the Sixth Circuit continued, "has been granted to members of an attorney disciplinary committee, to a state bar association conducting disciplinary proceedings, to lawyers serving on a mediation panel, to the court's clerk for acts within the scope of his quasi-judicial duties, to 'friends of the court,' and to prosecutors engaging in prosecutorial activity." *Id*. at 430-31 (internal citations omitted).

In *Sparks*, the Sixth Circuit acknowledged that the Supreme Court's decision in *Forrester v. White*, 484 U.S. 219 (1988), compelled consideration of the nature of the specific "function" being challenged in determining whether the acts complained of are entitled to judicial immunity:

> In *Forrester*, Justice O'Connor explained that the analytical key "in attempting to draw the line" between functions for which judicial immunity attaches and those for which it does not is the determination whether the questioned activities are "truly judicial acts" or "acts that simply happen to have been done by judges." It is the nature of the function involved that determines whether an act is "truly" judicial.

*Sparks*, 859 F.2d at 432.  The Sixth Circuit concluded that "the action of the justices of a state supreme court and their designees in considering the qualifications of an applicant for admission to the bar," was judicial nature and unlike the hiring and firing of court staff personnel that was at issue in *Forrester*.  *Id.* at 432-33.  The Sixth

Circuit reasoned:

> We return, then, to the analytical key provided by Justice O'Connor in Forrester for "drawing the line" between functions for which judicial immunity attaches and those for which it does not: whether the function in question is a "truly judicial act[ ]" or an "act[ ] that simply happen[s] to have been done by judges." Whatever argument might be made about the inherently "judicial" character of the function of determining the membership of the bar, it is manifest that whether analyzed from the perspective of judicial precedent, judicial expertise, history and tradition, or the nature of the act itself, determining the composition of the bar is clearly not a function, like hiring and firing administrative, clerical, and other court personnel that is or ever has been performed by anyone in the private sector or in other branches of government, and "simply happen[s] to have been done by judges."

*Sparks*, 859 F.3d at 434.

Plaintiff urges that this Court's analysis of the JTC and Fischer's claims to quasi-judicial immunity requires the Court to focus on the specific conduct about which Plaintiff complains. Plaintiff states in her brief in response to Fischer's motion that she challenges "specifically Fischer's decision to investigate and pursue Plaintiff, an African American female, while choosing not to investigate or pursue male and non-African American judges who engaged in similar or more egregious conduct in violation of the M[ichigan] C[ode] [of] J[udicial] C[onduct]." (Pl.'s Resp. to Fischer's Mot. 12-13, PgID 5407-08.) Plaintiff points out that Fischer concedes in his motion that "James's accusations against Fischer all concern actions taken in his official capacity investigating the charges against James." (Fischer's Mot. 10, PgID 3741.)

48

Plaintiff argues that because the conduct about which she complains was "investigatory" and not "judicial," Fischer is not entitled to quasi-judicial immunity.

Plaintiff relies on *Buckley v. Fitzsimmons*, 509 U.S. 259, 276 (1993), in which the Supreme Court held that a prosecutor was not entitled to absolute prosecutorial immunity with respect to allegations that he personally fabricated evidence by knowingly pursuing and obtaining unreliable expert testimony in order to obtain a grand jury indictment of the plaintiff. The Court concluded that the prosecutor's "preindictment fabrication of evidence" was not protected by absolute prosecutorial immunity. *Id*. at 272. The Court based its holding on the following alleged facts:

> [Prosecutors] conspired to manufacture false evidence that would link [plaintiff's] boot with the bootprint the murderer left on the front door. To obtain this false evidence, petitioner submits, the prosecutors shopped for experts until they found one who would provide the opinion they sought. At the time of this witness shopping the assistant prosecutors were working hand in hand with the sheriff's detectives under the joint supervision of the sheriff and state's attorney Fitzsimmons.

509 U.S. at 273 (internal citation omitted).

The Supreme Court continued:

> We have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made. . . . There is a difference between the advocate's role in evaluating

evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other."

509 U.S. at 273.

*Buckley* applies in the specific context of prosecutorial immunity, a form of quasi-judicial immunity, *see, e.g. Imbler v. Pachtman*, 424 U.S. 409, ("in deciding whether or not to prosecute, the prosecutor performs a "quasi-judicial" function"). Here, at all times Fischer and the JTC were acting pursuant to the duties imposed on them as an arm of the Michigan Supreme Court to determine the fitness of the Plaintiff to serve in office. At all times, the JTC and Fischer were acting under the superintending control of the Michigan Supreme Court, carrying out a function certainly no less inherently judicial than determining the competence and moral fitness of potential officers who seek to practice before the court. Plaintiff admits that Fischer was at all times "acting in his official capacity."

Fischer concedes, his "role" in the judicial tenure proceedings changes from that of executive director to that of examiner upon the filing of a formal complaint. And Fischer concedes that the JTC staff "investigates" a grievance to determine what type of recommendation will be made to the JTC regarding resolution of that

grievance and that Fischer reviews the staff recommendations, with which he typically agrees. At all times, however, any recommendation by the JTC staff attorneys and/or Fischer is subject to modification by the JTC, which has the ultimate say in each and every case as to whether a formal complaint will be filed and what type of discipline, if any, will be recommended and ultimately ruled upon by the Michigan Supreme Court. These are not functions that might otherwise be carried out by "clerical" or "administrative" employees and they are not akin to the acts of a police officer or field investigator. It is clear that throughout the process of "investigating complaints and initiating prosecutions of complaints concerning judicial misconduct," the JTC and the executive director are engaged in inherently "quasi-judicial" functions. *Lepley v. Dresser*, 681 F. Supp. 418, 423 (W.D. Mich. 1988) (analogizing the JTC to the Attorney Grievance Commission which, as an arm of the Michigan Supreme Court, was entitled to the same immunity from suit as that Court, and expressly finding that the JTC's executive director was engaged in "quasi-judicial functions" when investigating complaints of judicial misconduct and determining whether to initiate formal prosecutions and both were therefore entitled to "absolute immunity"). *Accord Rogers v. Michigan Judicial Tenure Comm'n*, No. 15-14211, 2016 WL 1445345, at *2 (E.D. Mich. March 23, 2016) (Grand, MJ), *adopted at* 2016 WL 1436707 (E.D. Mich. April 11, 2016) (holding that the JTC enjoyed absolute immunity from a suit

alleging failure to properly investigate claims of judicial misconduct, noting that "this Court has held that the JTC and its members 'perform functions that are equivalent to the job performed by judges in court proceedings, and, thus, are entitled to absolute quasi-judicial immunity'") (quoting *Briggs v. Kuhn*, No. 11-14001, 2011 WL 6339574, at *4 (E.D. Mich. Dec. 19, 2011)). *See also Lawrence v. Welch*, 531 F.3d 364, 372-73 (6th Cir. 2008) (concluding that "members of the State Bar of Michigan's Character and Fitness committee – and thus agents of the Board of Law Examiners and the Michigan Supreme Court – are entitled to absolute immunity for their actions in investigating Lawrence's character and fitness to practice law and in making recommendations about the same"); *Wagner v. Genesee County Bd. of Commr's*, 607 F. Supp. 1158, 1162 (E.D. Mich. 1985) (noting that "[w]hether particular office holders have quasi-judicial immunity in their acts depends on an analysis of the activities in which they were engaged and the relationship of those activities to the judicial process," and finding that employees of the Friend of the Court who likely committed malfeaseance in their investigative work were entitled to absolute quasi-judicial immunity).

The JTC and Fischer are entitled to absolute quasi-judicial and/or prosecutorial immunity for their conduct in Plaintiff's case. Every act undertaken by Fischer, the JTC staff, and the JTC, after receiving a grievance, "relates to the decision" whether

or not to recommend the filing of a formal complaint – an inherently judicial act. "Absolute immunity [] applies to the 'decision to investigate or not to investigate and to present the facts discovered in a judicial proceeding . . . .'" *Carmichael v. City of Cleveland*, 571 F. App'x 426, 437 (6th Cir. 2014) (quoting *Grant v. Hollenbach*, 870 F.2d 1135, 1139 (6th Cir. 1989)). The heart of Plaintiff's equal protection claim (the only viable claim against Fischer and the JTC as discussed *infra*) is that these Defendants wrongfully decided to investigate the Plaintiff and improperly decided to bring formal charges against Plaintiff while "choosing not to investigate or pursue" charges against Caucasian and/or male judges who engaged in similar acts of misconduct. Accordingly, Fischer and the JTC are entitled to immunity from Plaintiff's § 1983 claims in this action. Even if Fischer's role "is equated to [that] of a prosecutor rather than an arm of the judiciary, absolute quasi-judicial immunity nonetheless is applicable." *Wagner*, 607 F. Supp. at 1164. *See also Eston v. Van Bolt*, 728 F. Supp. 1336, 1338-39 (E.D. Mich. 1990) (finding that members of the Michigan Attorney Discipline Board, "the adjudicative arm of the Supreme Court" responsible for discharging the Michigan Supreme Court's duty of supervising and disciplining attorneys, and the Michigan Attorney Grievance Commission, "the prosecution arm of the Supreme Court" responsible for discharging the Michigan Supreme Court's duty to supervise and discipline attorneys, were entitled to absolute quasi-judicial

immunity at all times when performing their statutory functions).

The JTC and Fischer in his official capacity (Plaintiff has never suggested and individual capacity claim against Fischer) are entitled to Eleventh Amendment absolute immunity from suit. Were they not entitled to the Eleventh Amendment immunity, they would be entitled to quasi-judicial and/or prosecutorial immunity. Accordingly, the Court GRANTS Defendants JTC and Fischer's motions to dismiss and/or for summary judgment and DISMISSES each of Plaintiff's claims against them in this action WITH PREJUDICE.[8]

## C. Defendants Green and Washington are Not Entitled to Immunity From Plaintiff's Federal Claims Under Mich. Ct. R. 9.227

---

[8] Because the Court concludes that the JTC and Fischer are clearly entitled to immunity from suit, the Court need not address the merits of Plaintiff's equal protection claim against them and need not address these Defendants' alternate arguments for dismissal and/or summary judgment. In addition, as the Court discusses *infra* in Section III(D)(1), Plaintiff has failed to produce *any* evidence on which a reasonable juror could conclude that Defendant Fischer was personally involved in the alleged search of Plaintiff's safe. There is no evidence in the record that Fischer was ever on-site at the 22nd District Court and no evidence linking him with the alleged search of Plaintiff's safe in even the most tangential or circumstantial way. Indeed, Plaintiff's one-half page argument in support her Fourth Amendment claim against Fischer cites no law and simply states that because "the JTC had been dealing with Washington and Anderson" and because "Fischer was directing the JTC investigation," there is a genuine issue of material fact that Fischer violated Plaintiff's Fourth Amendment rights. (ECF No. 143, Pl.'s Resp. 15-16, PgID 5410-11.) The Court rejects this poorly articulated and factually and legally unsupported argument, adverted to in a "perfunctory manner" with no effort at development, *Clemente*, 679 F.3d at 497, and concludes that Plaintiff has presented no evidence on which a reasonable juror could find that Fischer violated Plaintiff's Fourth Amendment rights.

Defendants Green and Washington argue that they are entitled to "broad immunity" from claims under Michigan Court Rule 9.227, which provides in relevant part: "Members of the [JTC] and their employees and agents, masters, and examiners are absolutely immune from civil suit for all conduct in the course of their official duties." In *Dubuc*, the Sixth Circuit held that a similar broad grant of immunity to the State Bar staff and members and staff of the Board of Law examiners provided for in the Michigan Supreme Court Rules Concerning the State Bar of Michigan (RCSBM) could not immunize any defendant from a § 1983 lawsuit in federal court. "While this provision may immunize the individual defendants from state law claims, no state law or rule can immunize anyone from liability for violating the United States Constitution." *Dubuc*, 342 F.3d at 617.

The Court similarly rejects this state-law immunity argument for several reasons. Plaintiff has presented no evidence to establish that either Defendant Green or Judge Washington is a "member, employee, agent, master or examiner" of the JTC. Green is employed the SCAO.[9] Defendant Washington testified that he reported to

───────────────

[9] Green's counsel also suggested at the hearing on Defendants' motion that the SCAO (not a Defendant in this case) was also an entity "part and parcel of the Michigan Supreme Court," suggesting that Green would be protected by the SCAO's immunity as to any official capacity claim. But there is no evidence in this record regarding the composition or creation of the SCAO and the Court makes no findings at all regarding Green's derivative entitlement to any type of "SCAO immunity," sovereign or

55

and communicated solely with the SCAO and expressly denied that he was working at the request of the JTC or even aware of the JTC investigation. (Washington Dep. 13:12-14:3, 19:20-21:15, 21:16-22:8, 40:11-20). But most importantly, *Dubuc* makes clear that broad grants of immunity set forth in the Michigan Court Rules cannot insulate individuals from liability for federal constitutional violations. Defendants Green and Washington are not entitled to immunity from Plaintiff's § 1983 claims in this Court under this provision of the Michigan Court Rules.

**D.    Plaintiff's Fourth Amendment Claim Against Fischer and Washington**

In her Responses, Plaintiff claims that Fischer and Washington violated her Fourth Amendment rights by engaging in the search of her personal locked safe. To succeed on her § 1983 claim against these Defendants for allegedly violating her Fourth Amendment rights by conducting a search of her personal safe, Plaintiff must demonstrate that each was personally involved in the alleged violation of her constitutional rights. "Each defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citing *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir. 2008)). When the determination of personal involvement is dependent on genuinely disputed material facts, those facts

---

otherwise.

must be determined by the trier of fact. Based on those factual determinations, the Court can make the legal determination regarding each Defendant's personal involvement. *Binay*, 610 F.3d at 650-51 (finding genuine issue of material fact regarding officers' personal involvement precluded entry of summary judgment on the basis of qualified immunity); *McKinney v. Lexington-Fayette Urban County Gov't*, 651 F. App'x 449, 457-58 (6th Cir. 2016) (unpublished) (finding district court's decision to defer ruling on qualified immunity, pending further factual development regarding the individual officer's "knowledge at each critical point in time," was sufficiently articulated and individualized).

1.      **Plaintiff fails to create a genuine issue of material fact regarding Fischer's personal involvement in the alleged search of her safe**.

Plaintiff's argument that Fischer was personally involved in this alleged Fourth Amendment violation is as follows: "Anderson and Washington personally conducted an illegal search of Plaintiff's locked safe," and there is "substantial evidence that this search occurred at the direction, or with the approval, of the JTC." (Pl.'s Resp. to JTC, Washington and Green's Mot. 16.) But Plaintiff offers no evidence whatsoever establishing Fischer's personal awareness that Plaintiff even had a safe in her office, let alone that he somehow authorized someone else to search the safe. Fischer expressly denied in his deposition any awareness of the safe and denied ever

instructing anyone to search the safe. Fischer testified that he never even visited the 22nd District Court during the course of the investigation into the charges of the Plaintiff. (Fischer Dep. 195:23-196:17.) None of this evidence is disputed.

Plaintiff argues that because Margaret Rynier, the JTC staff attorney assigned to Plaintiff's case, was working with Anderson and Washington, and because Rynier reported to Fischer, and because Fischer was "directing the investigation of Plaintiff," there is a genuine issue of material fact regarding Fischer's involvement in the search of her personal safe. But Plaintiff has not sued Rynier and does not allege that Rynier was involved in the search of her safe. Yet, she argues, Fischer must have known about or directed the search of her safe because he supervised Rynier. This "evidence," which relies on pure conjecture and speculation, fails to create a genuine issue of material fact regarding Fischer's involvement in the search of Plaintiff's safe. "[T]he non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale*, 519 F.3d at 601.

Plaintiff has failed to adduce sufficient evidence of Fischer's personal involvement in the search of her safe. Fischer testified that he never visited the 22nd District Court during the entirety of Plaintiff's disciplinary proceedings and that he did not know that Plaintiff had a personal safe in her office while the JTC

58

investigation and proceedings were ongoing. This evidence is unrebutted. Plaintiff cannot rely on pure speculation that Fischer "must have known about" or "must have ordered" the search of Plaintiff's safe. Plaintiff was required to come forward with "evidence of evidentiary quality" demonstrating that Fischer was personally involved in the search of her safe. She has failed to do so.[10]

### 2. Plaintiff has adduced sufficient evidence creating a genuine issue of material fact regarding Washington's personal involvement in the alleged search of her safe.

Plaintiff has presented evidence that creates a genuine issue of material fact regarding Washington's knowledge of certain facts that bear on his personal involvement in the alleged search of Plaintiff's safe. Anderson testified that Washington called her into James's office to alert her to the fact that the safe had been "jimmied" sometime before July 14, 2011, when Plaintiff returned to the Court to retrieve her belongings and observed that her safe had been opened. Nicole James testified that, again long before Plaintiff returned to the Court on July 14, 2011 to

---

[10] Plaintiff's responses to the Defendants' motions do not even suggest that she intends to pursue a Fourth Amendment claim against Green, presenting argument only as to Defendants Fischer and Washington on the Fourth Amendment violation. Similarly, at the hearing on the Defendants' motion, Plaintiff's counsel acknowledged that the evidence against Green was evidence of "omission," which is not sufficient to demonstrate personal involvement under § 1983. Thus, to the extent that Plaintiff was claiming a Fourth Amendment violation against Defendant Green, Plaintiff has failed to allege facts sufficient to demonstrate Green's personal involvement in any search and such a claim is dismissed with prejudice as against Defendant Green.

retrieve her belongings, Washington asked Nicole James to open and clean out Plaintiff's safe. Nicole James testified that when she refused Washington's request to go through Plaintiff's personal safe, Washington stated that he had "another a plan for that." Yet Washington denies any knowledge of a "safe" in Plaintiff's office before July 14, 2011, when Plaintiff returned to the court to retrieve her personal items. Washington denies ever asking anyone, including Nicole James, to go into Plaintiff's safe. (Washington Dep. 28:7-14.) Finally, Green testified that she informed Washington, as soon as she learned from the Plaintiff's attorney Ms. McPhail that Plaintiff's safe contained personal materials and that Plaintiff's privacy in her safe was to be protected. (ECF No. 140-9, Pl.' Resp. to Anderson Mot. Summ. J., Ex. 8). Yet Washington testified that no one ever told him that there was a safe in Plaintiff's bathroom until July 14, 2011. (Washington Dep. 48:21-49:19.) Washington testified that until that date, he thought it was only a locked filing cabinet. (Washington Dep. 16:16-17:4, 22:9-23:6.) In fact, Washington testified that July 14, 2011 was the only day that discussion of the safe ever came to his attention. (Washington Dep. 25:18-26:5.) And it is undisputed that Washington had dominion and control over the Plaintiff's office space, and her personal lavatory where her safe was located, during the time that he served as interim chief judge at the 22nd District Court. All of these facts, taken in the light most favorable to the Plaintiff, support an

inference that Washington was personally involved in the opening of Plaintiff's safe and authorized (indeed encouraged) Anderson to reach into the safe to examine the contents. Plaintiff may establish personal involvement based on circumstantial evidence. *Binay*, 601 F.3d at 651 (finding disputed issue of material fact based on circumstantial evidence of officer's personal involvement); *Glover v. City of New York*, No. 15-cv-4899, 2018 WL 4906253, at *32, n. 61 (E.D.N.Y. Oct. 9, 2018) (noting "sufficient circumstantial evidence from which a reasonable jury could find [officer's] personal involvement in the alleged seizure") (collecting cases finding personal involvement based on circumstantial evidence). Accordingly, when viewing the facts in the light most favorable to the Plaintiff, Plaintiff has presented evidence on which a reasonable juror could conclude that Washington (1) knew of the private nature of Plaintiff's safe and its contents from Green, (2) asked Nicole James to open the safe and when she refused told her that he had "other plans" for opening the safe, and (3) alerted Defendant Anderson to documents in the opened and unlocked safe, creating a genuine issue of material fact whether Washington was personally involved in the opening and search of Plaintiff's safe.

### 3. Washington is not entitled to qualified immunity given the factual issues that remain regarding the facts known to him at the time of the alleged search.[11]

"In § 1983 constitutional torts like this one, qualified immunity prevents government officials from being held liable if (1) the officers did not violate any constitutional guarantees or (2) the guarantee, even if violated, was not 'clearly established' at the time of the alleged misconduct." *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 992 (6th Cir. 2017), *rehearing en banc denied* (July 5, 2017), *certiorari denied* 138 S. Ct. 738 (Jan. 16, 2018) (citing *Pearson*, 555 U.S. at 232. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

""When . . . a defendant raises qualified immunity as a defense . . . [t]he plaintiff has the burden of showing that a right is clearly established . . . [and] the

---

[11] Washington makes an extremely perfunctory argument that he is entitled to "sovereign immunity" in his "official capacity," (ECF No. 134, Defs.' Mot. 14-15), but Plaintiff has not sued Washington in his "official capacity," and argues in any event that Washington acted outside the scope of his "official duties" in allegedly violating Plaintiff's Fourth Amendment rights through a search of her private safe in connection with the SCAO and JTC investigation into claims of Plaintiff's alleged judicial misconduct. (ECF No. 142, Pl.'s Resp. 14 n. 11, 15 n. 12.) *See, e.g., Archie v. Lanier,* 95 F.3d 438, 440-41 (6th Cir. 1996) (holding that a state court judge is not entitled to judicial immunity for (1) "'actions not taken in the judge's judicial capacity,'" and (2) "'for actions, though judicial in nature, taken in the complete absence of all jurisdiction'") (quoting *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991)).

defendant carries the burden of showing that the challenged act was objectively reasonable in light of the law existing at the time. In satisfying this burden, a defendant can rely on a reasonable mistake of fact, for [q]ualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact." *Harris v. Klare*, 902 F.3d 630, 637 (6th Cir. 2018) (internal quotation marks and citations omitted) (ellipses and alterations in original).

"[T]to determine whether a government official would believe that a right is clearly established," the court applies an "objective reasonableness test [that] focuses on whether an official, given the facts that the official knew or reasonably should have known about the situation, should have known that his or her particular conduct would not pass scrutiny when applied to the law." *Sandul v. Larion*, 119 F.3d 1250, 1254 (6th Cir. 1997) (internal quotation marks and citations omitted).

The facts adduced through discovery as to Defendant Washington are markedly different in several significant respects from those that discovery revealed as to Defendant Anderson – and these differences impact the Court's qualified immunity analysis. First, the Court has concluded that Plaintiff has adduced sufficient evidence to create a genuine issue of material fact that Washington violated her Fourth Amendment rights by opening her locked safe, which he was informed contained only

Plaintiff's private materials. And, because there is evidence on which a reasonable juror could conclude that Washington, unlike Anderson, was apprised of each of the facts that the Sixth Circuit found would amount to a violation of Plaintiff's Fourth Amendment rights under the circumstances of this case, and critically of the fact that Plaintiff's safe was private and not to be searched during the investigation into her alleged misconduct, Washington is not entitled to qualified immunity.

The Sixth Circuit's determination that Plaintiff had stated a plausible Fourth Amendment claim as to the individual or individual(s) who opened her safe was premised on the allegation that the safe was closed and locked when encountered by the violator, and also assumed that whoever conducted the search would have known of the private nature of the safe and its contents as a result of Plaintiff's disclosure to Green regarding the privacy of her safe. The Sixth Circuit's opinion explicitly noted that Plaintiff alleged that she had informed Green that her safe contained private information and had been assured by Green that her privacy in her safe would not be invaded. 592 F. App'x at 457. As to Defendant Washington, Plaintiff has adduced sufficient evidence to create a genuine issue of material fact that: (1) Washington was told by Green at the outset of the investigation into Plaintiff's alleged misconduct that Plaintiff had a safe in her office and that the safe contained personal information and Plaintiff's privacy in the safe was not to be breached; (2) Washington asked Nicole

James to open the safe and when she refused he told her that was okay because he had "other plans for that;" (3) Washington alerted Anderson to the already-opened safe and directed her attention to the documents that were visible in the safe.

Plaintiff has argued that Washington would not be entitled to qualified immunity on these facts because *O'Connor* clearly established that a reasonable judicial officer would know that a search of a private locked safe, that was known by him not to contain any work-related material and that he was instructed not open, in the context of an administrative search for evidence of workplace misconduct, would violate the Fourth Amendment. (ECF No. 142, Pl.'s Resp. 15-16 n. 13, PgID 5022-23.) The Court agrees.

Washington argues that he is entitled to qualified immunity because the Sixth Circuit's ruling in this case that Plaintiff's locked, personal safe was more like a purse or a piece of luggage than a filing cabinet was "an expansion" of the right to privacy established in *O'Connor*. But not every "novel" circumstance will entitle an official to qualified immunity:

> The Supreme Court has repeatedly cautioned that rights are not to be defined at a "high level of generality" but instead the inquiry must be undertaken in light of the specific context of the case. *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). With that said, an official can be on notice that his conduct violates established law even in novel factual situations. *Hope v. Pelzer*, 536 U.S. 730, 731, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034 ("This is not to say that an official action is

protected by qualified immunity unless the very action in question has previously been held unlawful....”).

*Littlejohn v. Myers*, 684 F. App’x 563, 569 (6th Cir. 2017).

The issue here, however, is not just whether *O’Connor* presaged the unconstitutionality of a search of a locked safe that may contain work-related materials, kept in an office environment, in the context of an investigation of workplace misconduct.  As this Court reasoned in its Opinion and Order granting Anderson’s motion for summary judgment, qualified immunity may well protect the alleged search in such a situation.  But the facts as to Defendant Washington, viewed in the light most favorable to the Plaintiff, present a different scenario.  The Court agrees that a reasonable judicial officer in Washington’s position acting as the interim chief judge of the 22nd District Court, who had been specifically informed of the private nature of the Plaintiff’s workplace safe, and warned not to violate the privacy of that safe, would have known that opening (or breaking into) that safe would have violated Plaintiff’s reasonable expectation of privacy. Under the clearly established precedent of *O’Connor*, the search would be unreasonable at inception because, under these facts, there would be no “‘reasonable grounds’ for suspecting that a search of James’s [safe] would yield evidence that James was ‘guilty of workplace misconduct.’” *James*, 592 F. App’x at 458 (quoting *O’Connor*, 480 U.S. 726).  There need be no case specifically involving a safe, as opposed to a desk or a filing cabinet,

on such facts. It is not the nature of the container, but the searching party's knowledge of its private contents, that clearly establishes the constitutional prohibition in this case. Thus, Washington is not entitled to qualified immunity at this stage of proceedings based on a number of genuinely disputed material facts regarding his involvement in the intrusion into Plaintiff's safe.

4. **Although the Court has previously held that Plaintiff cannot establish that her alleged damages in this case were proximately caused by any search of her safe, thus barring any recovery of actual damages, nominal damages may be available if Plaintiff succeeds on her claim that Washington violated her Fourth Amendment rights.**

As this Court discussed at length in its Opinion and Order granting Defendant Anderson's motion for summary judgment, "proximate causation is an essential element of a § 1983 claim for damage," *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 659 (6th Cir. 1994), and Plaintiff has failed to create a genuine issue of material fact in this case that any alleged search of her safe caused her damages allegedly resulting from her inability to defend herself from the misconduct charges brought against her by the JTC. (ECF No. 166, Opinion and Order Granting Defendant Anderson's Motion for Summary Judgment at 43-50.) However, as the Court noted in that Opinion and Order, this is not the end of the matter because nominal damages are generally available to vindicate the violation of constitutional rights that result in no actual damages. *See Memphis Commun. School District v.*

*Stachura*, 477 U.S. 299, 308, 308 n. 11 (1986) (holding that "the abstract value of constitutional rights may not form the basis for § 1983 damages," but observing that "nominal damages . . . are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury") (citing *Carey v. Piphus*, 435 U.S. 247, 266 (1978)); *Hill v. Ypsilanti Housing Commission*, No. 09-13562, 2010 WL 3168440, at *3 (E.D. Mich. Aug. 10, 2010) (holding that plaintiff may be entitled to nominal damages for a constitutional violation "regardless of proximate causation as to actual injury"). *See also Stoedter v. Gates*, 704 F. App'x 748, 757-58 (10th Cir. 2017) (agreeing with the district court that "nominal damages are mandatory upon a finding of a constitutional violation," and declining to distinguish among categories of constitutional rights).

This Court determined that nominal damages were not available from Defendant Anderson because (1) Plaintiff failed to create a genuine issue of material fact that Anderson violated her Fourth Amendment rights, and (2) even if Plaintiff had established an issue of fact as to a Fourth Amendment violation by Anderson, Anderson was entitled to qualified immunity which operated as a bar to recovery of even nominal damages. (ECF No. 166, Opinion and Order Granting Defendant Anderson's Motion for Summary Judgment at 50-58.) *See Eaddy-Bey v. Gosslin*, 860 F.2d 1078, at *1 n. 1 (6th Cir. 1988) (table case) (noting that prison hearing officer

68

who was granted qualified immunity "should have been immune from paying even nominal damages" but allowing the nominal damage award to stand because the hearing officer did not appeal); *Bamdad v. Drug Enforcement Admin.*, 617 F. App'x 7, at *9 (D.C. Cir. Sept. 22, 2015) (Mem.) (observing that "'[s]everal other circuits have also implicitly recognized the legal nature of nominal damages by finding them to be barred by qualified immunity.' . . . [a]nd for good reason [because] [q]ualified immunity is an immunity from *suit*, not just remedial absolution.") (alterations added) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 978 (8th Cir. 1999) (finding that both Eleventh Amendment and qualified immunity bar recovery of nominal damages in a § 1983 case); *Reese v. Gray*, No. 06-cv-126, 2011 WL 302873, at *13 (N.D. Miss. Jan. 27, 2011) (holding that finding of qualified immunity precludes an award of nominal damages) (collecting cases).

Here, however, because the Court has determined that (1) Plaintiff has adduced sufficient evidence on which a reasonable juror could conclude that Washington violated her Fourth Amendment rights, and (2) Washington is not entitled to either judicial or qualified immunity, Plaintiff would be entitled to recover nominal damages from Washington were she to succeed in convincing a jury that he violated her Fourth Amendment rights. Accordingly, the Court DENIES Washington's motion for summary judgment, and Plaintiff's Fourth Amendment claim continues against

Washington.

**E.    Plaintiff Has Failed to Create a Genuine Issue of Material Fact that Defendant Green Violated Plaintiff's Equal Protection Rights[12]**

"The Equal Protection Clause of the Fourteenth Amendment commands that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." *Center for Bio-Ethical Reform Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quoting U.S. Const. amend. XIV, § 1). "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Id.* (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 299 (6th Cir. 2006)). "As we have held, the 'threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers.'"    *Id.* (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006)). Thus, an "allegation of discriminatory

---

[12] As discussed *supra*, because the Court concludes that Defendants JTC and Fischer are entitled to Eleventh Amendment Immunity and/or absolute quasi-judicial and prosecutorial immunity, and dismisses Plaintiff's claims against the JTC and Fischer in this action with prejudice on that basis, the Court need not address the merits of Plaintiff's equal protection claims against these Defendants.

intent based on race must be 'accompanied by some evidence that the people not disciplined were similarly situated and of a different race.'" *Id.* (quoting *Nali v. Ekman*, 355 F. App'x 909, 913 (6th Cir. 2009)). "[A] plaintiff asserting a Fourteenth Amendment equal protection claim under 42 U.S.C. § 1983 must prove the same elements required to establish a disparate treatment claim under Title VII of the Civil Rights Act of 1964." *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000).

As Plaintiff correctly observes, "[a] plaintiff's proposed comparators need not be exactly similarly situated, and the question of whether persons are similarly situated may in some cases be a question of fact for a jury." *Ryan v. City of Detroit*, 698 F. App'x 272, 280 (6th Cir. 2017) (citing *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462-63 (6th Cir. 2012)). "However, [the Sixth Circuit has] upheld grants of summary judgment where no reasonable juror could find that the plaintiff's comparators were similarly situated in 'relevant' or 'material' respects." *Id.* (citing *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 864-65 (6th Cir. 2012) and *United States v. Green*, 654 F.3d 637, 650-62 (6th Cir. 2011)).

In its Opinion remanding Plaintiff's Fourth Amendment and equal protection claims, the Sixth Circuit explained the necessary elements of proof for Plaintiff's equal protection Claim:

> In order to prevail on a Fourteenth Amendment equal protection claim under 42 U.S.C. § 1983, a plaintiff must prove the same elements

required to establish a disparate treatment claim under Title VII of the Civil Rights Act of 1964. *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. ). A plaintiff may prove disparate treatment either by direct evidence of discriminatory motive or through circumstantial evidence based on a prima facie showing of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In order to establish a prima facie case of racial discrimination under the burden-shifting framework laid out in *McDonnell Douglas*, the plaintiff must show that 1) she was a member of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the job; and 4) she was treated differently from similarly situated employees who were not members of the protected class. *Perry*, 209 F.3d at 601. Upon establishing the prima facie case, the burden shifts to the defendant to show evidence of a legitimate nondiscriminatory reason for the adverse employment action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).

592 F. App'x at 459-60. The Sixth Circuit then concluded that Plaintiff had alleged

sufficient facts regarding the conduct of the JTC to state a facially plausible claim for

a violation of her equal protection rights:

James alleges facts that are sufficient "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. She identifies herself as a member of a protected class, details the JTC's investigation against her both prior and subsequent to her suspension from her judgeship, and identifies and describes the misconduct of five white state court judges who were not investigated or disciplined by the JTC. Although the district court correctly noted that James's complaint lacks significant detail of the alleged misconduct of the other judges, on its face the complaint provides enough facts to "raise a right to relief above the speculative level." *Id.* at 555, 127 S.Ct. 1955. . . . She does not merely make "conclusory allegations" that the JTC treated white judges differently, but identifies specific individuals and summarizes instances of their misconduct. *Cf. 16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013) (upholding the dismissal of a race discrimination claim in which the plaintiffs alleged their belief that

a bank had refinanced the loans of delinquent white borrowers but failed to identify these borrowers). The "factual content" she alleges, in the form of the misconduct of the other judges, is sufficient to draw a reasonable inference of discrimination because she points to specific instances of abuse of judicial power by white judges. For instance, she alleges that one judge had improperly used court funds to pay off a court employee who reported inappropriate personal contact between the judge and a litigant, and that other judges had engaged in various other employment improprieties. James's complaint is thus sufficient to "giv[e] rise to 'reasonably founded hope that the discovery process will reveal relevant evidence' to support" her claims. *Lindsay*, 498 F.3d at 440 n. 6 (quoting *Twombly*, 550 U.S. at 559–60, 127 S.Ct. 1955).

592 F. App'x at 461.

Although the Sixth Circuit did not expressly distinguish among the "State Defendants" in remanding the Plaintiff's equal protection claim, neither did the Sixth Circuit mention, let alone rule on, the plausibility of a separate equal protection claim against Green, who works for the SCAO (not a Defendant) and not the JTC. And there is good reason for this because no such claim is pleaded in Plaintiff's Complaint. To quote the caption of Count IV of Plaintiff's Complaint which sets forth the allegations related to her equal protection claim: "Defendant Judicial Tenure Commission and Paul Fischer have violated the Plaintiff's right to equal protection of the law by prosecuting a complaint to remove her from the bench under circumstances that they routinely to pursue with matters involving respondents who are not African American." (ECF No. 1, p. 14, Count IV.) At the hearing on Defendant Green's motion, the Court inquired of Plaintiff's counsel whether Plaintiff

was asserting an equal protection claim against Green and Plaintiff acknowledged that the Complaint was not "perfectly drafted" but argued that the Complaint put Defendants on notice that Plaintiff was asserting an equal protection claim against Green based on her actions in electing to file or not file grievances with the JTC.

The Court disagrees that the Complaint put Defendants on notice that Plaintiff was asserting a separate equal protection claim against Green, based on an entirely different set of facts than those pleaded in the Complaint. Nothing in the Plaintiff's Complaint suggests a separate equal protection claim against Green for her conduct in allegedly selectively filing grievances against African American and/or female judges. Even if such a claim could be gleaned from the Complaint, or from the course of proceedings, Plaintiff has completely failed to develop such a claim in any meaningful way. As this Court remarked earlier in this Opinion and Order, issues "adverted to . . . in a perfunctory manner, unaccompanied by some effort at developed argumentation," are deemed waived. *Clemente v. Vaslo*, 679 F.3d 482, 497 (6th Cir. 2012). "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *Bishop v. Gosiger, Inc.*, 692 F. Supp. 2d 762, 774 (E.D. Mich. 2010) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)).

Plaintiff alleges that as to two Caucasian judges, Judge Kandrevas and Judge

Waterstone, Green was "aware of reports regarding the misconduct of these judges, and did not file grievances against either of them." (*Id.* at 21, PgID 5028.) Yet Plaintiff devotes less than one full page of briefing to the claim that Green allegedly violated her equal protection rights in failing to file grievances in these two instances. (ECF No. 142, Pl.'s Resp. 20-21, PgID 5027-28.) Highlighting the Plaintiff's lack of diligence in presenting this claim against Green is the fact that Plaintiff's "statistical expert," Edward Rothman, who prepared an expert report examining the statistical disparities in the way African Americans and women "are treated by the Judicial Tenure Commission," (ECF No. 136, Defs.' Mot. to Exclude Rothman Report, Ex. A, Rothman Report 1), makes no mention of Defendant Green or of the "statistical significance" of the number or nature of grievances Green has filed with the JTC. Moreover, Defendant Green testified in her deposition (and her testimony is unrebutted) that filing grievances with the JTC was not even part of her duties as the regional administrator for the SCAO, that anyone can file a grievance with the JTC, that she had not even heard the allegations against Judge Kandrevas that Plaintiff alleges Green failed to act against, and that as to the allegations against Judge Waterstone that Plaintiff alleges Green failed to act against, Green testified that she learned about the allegations against Judge Waterstone from the JTC and so obviously had no need to file a grievance as to those allegations with the JTC and also had no

firsthand knowledge of anything Judge Waterstone was alleged to have done. This is the totality of the evidence that Plaintiff points to in support of her equal protection claim against Defendant Green and it fails to pass the "scintilla of evidence" threshold that would allow the claim to survive summary judgment. Green is entitled to summary judgment on Plaintiff's equal protection claim and that claim is DISMISSED WITH PREJUDICE against Defendant Green.

## IV. CONCLUSION

For the foregoing reasons, the Court:

(1) Grants in Part and Denies in Part the Judicial Tenure Commission, Deborah Green and Valdemar Washington's Motion for Summary Judgment (ECF No. 134) and DISMISSES WITH PREJUDICE each of Plaintiff's claims against the JTC and Green; and

(2) Grants Defendant Paul J. Fischer's Motion to Dismiss for Lack of Subject Matter Jurisdiction, for Judgment on the Pleadings, and for Summary Judgment (ECF No. 135) and DISMISSES WITH PREJUDICE each of Plaintiff's claims against Fischer; and

(3) Denies as MOOT the Judicial Tenure Commission and Paul Fischer's Motion to Preclude the Expert Report and Testimony of Plaintiff's Expert Edward D. Rothman (ECF No. 136).[13]

---

[13] The Rothman Report related solely to Plaintiff's equal protection claim against the JTC and Fischer, which the Court will not address given its ruling that these Defendants are entitled to immunity. Accordingly, the motion to exclude the Rothman Report and Testimony is DENIED AS MOOT.

The case continues only on Plaintiff's Fourth Amendment claim against Defendant Washington.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  November 26, 2018

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 26, 2018.

s/Deborah Tofil
Case Manager